## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

| | |
|---|---|
| **MICHAEL COREY JENKINS,** ) | |
| ) | |
| **EDDIE TERRELL PARKER** ) | |
| ) | |
| **PLAINTIFFS,** ) | |
| ) | |
| **v.** ) | **CASE NO.** |
| ) | 3:23-cv-374-DPJ-FKB |
| ) | |
| **RANKIN COUNTY, MISSISSIPPI** ) | |
| ) | |
| **RANKIN CO. SHERIFF BRYAN BAILEY** ) | |
| **Individually, and in his official capacity** ) | |
| ) | |
| **CITY OF RICHLAND, MISSISSIPPI** ) | |
| ) | |
| **RANKIN CO. DEPUTY HUNTER ELWARD** ) | |
| **Individually,** ) | |
| ) | |
| **RANKIN CO. DEPUTY BRETT MC'ALPIN** ) | |
| **Individually,** ) | |
| ) | |
| **RANKIN CO.  DEPUTY CHRISTIAN DEDMON** ) | |
| **Individually,** ) | |
| ) | |
| **RANKIN CO.  DEPUTY DANIEL OPDYKE** ) | |
| **Individually,** ) | |
| ) | |
| **RANKIN CO.  DEPUTY JEFFREY MIDDLETON** ) | |
| **Individually,** ) | |
| ) | |
| **RICHLAND, MS.  DEPUTY JOSHUA HARTFIELD** ) | |
| **Individually** ) | |
| ) | |
| ) | |
| **DEFENDANTS,** ) | |

## COMPLAINT FOR CIVIL DAMAGES

Comes now, MICHAEL COREY JENKINS and EDDIE TERRELL PARKER, residents of RANKIN COUNTY, Mississippi, by way of counsel, and hereby formally file suit against RANKIN COUNTY, Mississippi SHERIFF BRYAN BAILEY, RANKIN COUNTY DEPUTIES HUNTER ELWARD, CHRISTIAN DEDMON, BRETT MC'ALPINE, DANIEL OPDYKE, and JEFFREY MIDDLETON.  In addition, this suit is also brought against the CITY OF RICHLAND, Mississippi, and RICHLAND OFFICER JOSHUA HARTFIELD for their tortious violations of Mississippi civil statutes and multiple violations of the United States Constitution.  The nearly two-hour ordeal described in this Complaint is one of the worst and most bizarre incidents of police misconduct in United States history.  The egregious conduct described in this Complaint is torturous and hateful.  The acts described herein, committed under the color of law, epitomize what the public perceives as the out-of-control nature of policing in America today.

## JURISDICTION AND VENUE

1.  This Court has concurrent jurisdiction over the federal constitutional claims and the Mississippi civil claims in this matter pursuant to 42 U.S.C. § 1983; 28 U.S.C. § 1331; and 28 U.S.C. § 1367.

## NOTICE OF CLAIM

2.  In correspondence dated February 16, 2023, the Plaintiffs caused to be filed Notice of Claim, and delivered on the date of February 22, 2023, via registered mail to RANKIN COUNTY, Mississippi, c/o RANKIN COUNTY Chancery Clerk Larry Swales, 211 East Government Street, Suite D, Brandon, MS 39042.

3.  Plaintiff's Notice of Claim letter contained the acts and claims set forth herein, pursuant

to  Miss. Code Ann.§11-46-11, 42 U.S.C.§1983, 42 U.S.C.§1981, and any, and all other applicable state or federal statute(s) or constitutional provision(s), or any applicable state or federal common law cause(s) of action.

4.   The Plaintiffs delivered a 2nd Notice of Claim to RANKIN COUNTY on April 19, 2023, Sheriff Bryan Bailey and the Rankin County Attorney via certified mail.  Plaintiffs submit that Defendants have been on formal notice for at least 116 days before filing the original Complaint. Defendants have also received constructive notice of this high-profile public incident since its occurrence on January 24, 2023.

### PARTIES

5.   MICHAEL COREY JENKINS, at all times relevant herein, was a 32-year old African-American resident of RANKIN COUNTY, Mississippi.  MICHAEL JENKINS was of a slight build, weighed approximately 155 pounds, and stood 5 foot 9 inches tall at the time of this occurrence.

6.   EDDIE TERRELL PARKER, at all times relevant herein, was a 38-year-old African-American resident of RANKIN COUNTY, Mississippi.  Eddie Parker stood 5 foot 10 inches and weighed about 170 pounds.

7.   Defendant SHERIFF BRYAN BAILEY, at all times relevant herein, was the Sheriff of the RANKIN COUNTY Sheriff's Department, the chief law enforcement officer in RANKIN COUNTY, with supervisory control over RANKIN COUNTY deputies.  SHERIFF BAILEY is hereby sued in his individual capacity as supervisor of the RANKIN COUNTY SHERIFF'S DEPT. and in his official capacity.

8.   Defendant RANKIN COUNTY, MISSISSIPPI, is a governmental entity organized and existing under and by virtue of the laws of the State of Mississippi.  RANKIN COUNTY, Mississippi, is subject to

suit pursuant to Miss. Code Ann. § 11-46-5 and 11-46-7 is vicariously liable for its employees' acts in the course and scope of their employment.

9.    Defendant BRETT MORRIS MCALPIN ("McAlpin") was employed as the Chief Investigator with the Rankin County Sheriff's Office in Rankin County, Mississippi.

10. Defendant JEFFREY ARWOOD MIDDLETON ("Middleton') was employed as a Lieutenant with the Rankin County Sheriff's Office in Rankin County, Mississippi.

11. Defendant/ CHRISTIAN LEE DEDMON ("Dedmon) was employed as a Narcotics Investigator by the Rankin County Sheriff's Office in Rankin County, Mississippi.

12. Defendant HUNTER THOMAS ELWARD ("Elward") was employed as a patrol Deputy with the Rankin County Sheriff's Office in Rankin County, Mississippi.

13. Defendant Daniel Ready Opdyke ("Opdyke") was employed as a patrol Deputy with the Rankin County Sheriff's Office in Rankin County, Mississippi.

14. Defendant CITY OF RICHLAND, Mississippi, is a governmental entity organized and existing under and by virtue of the laws of the State of Mississippi. It is located in RICHLAND , Mississippi, and is subject to suit pursuant to Miss. Code Ann. § 11-46-5 and 11-46-7

15. Defendant Joshua Allen Hartfield ("Hartfield") was employed by the CITY OF RICHLAND Police Department as a narcotics investigator.

## FACTS RELEVANT TO ALL CLAIMS

16.    In January 2023, the plaintiffs were residing at 135 Conerly Road in Braxton, Rankin County, Mississippi. The property is a four-bedroom ranch-style home ("the property") owned by Kristi Walley, a white woman. Plaintiff Parker was a long-time friend of Ms. Walley and was helping care for her while plaintiff Jenkins was residing at the property temporarily.

17.    On January 24, 2023, defendant MCALPIN received a complaint from one of his

white neighbors in Braxton, Mississippi.  The neighbor supposedly told him, among other things, that several Black males had been at the property and that he, the neighbor, had observed suspicious behavior.  That evening, defendant MCAPLIN directed defendant DEDMON to take care of the problem.

18.  In response, defendant DEDMON reached out to a group of officers who called themselves "The GOON SQUAD" because of their willingness to use excessive force with impunity and otherwise abuse the authority provided by their law enforcement badge and the cover it provided.

19.  The self-labeled GOON SQUAD was led by defendant MIDDLETON and consisted of defendants ELWARD, OPDYKE, DEDMON, MCALPIN, and HARTFIELD, among others.

20.  At approximately 9:28 pm, defendant DEDMON sent a group message to three members of the GOON SQUAD: defendants MIDDLETON, ELWARD, and OPDYKE.  Defendant DEDMON's message read, "Are y'all available for a mission?"

21.  Defendant DEDMON messaged the group that they were going to the property on Conerly Road and warned them: "There is a chance [of] cameras... let's approach east and work easy."  The defendants understood "work easy" to mean knock on the door rather than kick it down.  Defendant ELWARD texted back an eye-roll emoji, and defendant OPDYKE texted a .gif of a baby crying.

22.  Defendant DEDMON messaged the group, "If we don't see cameras go." The defendant officers understood that to mean that they should enter without a warrant if they did not see surveillance cameras at the property.

23.  Defendant DEDMON messaged the group again, reminding them that there were

to be "No bad mugshots." The defendant officers understood "No bad mugshots" to be a green light to use force only on parts of the body not captured by a mugshot.

24.  Defendants MIDDLETON, ELWARD, and OPDYKE gathered at the Cato Volunteer Fire Department ("CVFD") in Braxton, the agreed-upon staging area, and waited for DEDMON to join them.

25.  Defendant DEDMON radioed the group that he had someone with him who would cover the property's back door during their initial entry.  That someone was defendant Hartfield.

26.  Defendants DEDMON and HARTFIELD drove by the staging area in DEDMON's truck.  Defendants MIDDLETON, ELWARD, and OPDYKE each pulled out of the staging area in their service vehicles and followed closely behind DEDMON's truck.

27.  Shortly after that, defendants DEDMON, HARTFIELD, ELWARD, OPDYKE, and MIDDLETON, in four vehicles, arrived at the property and pulled into the driveway. MCALPIN, who had been surveilling the property from down the street, pulled into the driveway behind them.

28.  Noticing a surveillance camera above the front door of the property, defendants DEDMON, ELWARD, and OPDYKE walked around to the carport door, which had no surveillance camera covering it, and defendant HARTFIELD walked around to the back door, which also had no surveillance camera covering it.

29.  Defendants DEDMON and OPDYKE each kicked the carport door; however, it did not open.  Defendant ELWARD then took a turn, kicking the carport door and causing it to burst open.  At about the same time, defendant HARTFIELD kicked the back door, causing it to swing open.

30.  The defendants then entered the house, HARTFIELD through the back door and the other four defendants through the carport door.  The defendant officers did not have a warrant to enter the house, and there were no exigent circumstances that would authorize their entry without a warrant.

31.  When defendants DEDMON, ELWARD, and OPDYKE entered the house through the carport door, they saw they encountered the plaintiffs.  Upon encountering the plaintiffs inside the property, the defendant officers shouted orders to the plaintiffs.  The plaintiffs complied with their commands.

32.  Notwithstanding that the plaintiffs complied with the commands of the defendant officers, defendant DEDMON tased the plaintiff, Jenkins, handcuffed him and placed him under arrest without probable cause to believe that he had committed a crime.  After the plaintiff was in handcuffs, defendant DEDMON continued to tase him multiple times.

33.  Defendant ELWARD tased plaintiff Parker, handcuffed him, and placed him under arrest without probable cause to believe that he had committed a crime.  After plaintiff Parker was in handcuffs, defendant ELWARD continued to tase him multiple times.  While this was occurring, defendant OPDYKE kicked plaintiff Parker in the ribs.

34.  Defendant DEDMON approached plaintiff Parker and demanded to know where the drugs were.  When plaintiff Parker responded by telling him that there were no drugs, defendant DEDMON took out his service weapon, pointed it toward the back of the house and pulled the trigger.  The gun discharged, and the bullet lodged in the wall of the adjoining laundry room.

35.  Defendant DEDmON again demanded to know where the drugs were, and plaintiff Parker again told him that there were no drugs.

36. At this point, the defendant officers grabbed both plaintiffs, who were still handcuffed, and took them to the living room of the property and began to hurl racial slurs at them in a taunting manner.

37. The defendant officers, all of whom are white, referred to the plaintiffs as "nigger," "monkey," and "boy"; and accused them of taking advantage of the white woman who owned the house; and warned them to stay out of Rankin County and go back to Jackson or to "their side" of the Pearl River-areas with higher concentrations of black residents. As the defendant officers were taunting the plaintiffs with racial slurs and threats, defendant DEDMON repeatedly tased the plaintiffs with his taser in drive-stun mode.

38. During the warrantless search of the property, defendant OPDYKE kicked in the padlocked door to the front bedroom. Inside, he found a white-flesh-toned dildo and a B.B. gun. He mounted the dildo onto the end of the B.B. gun and brought the dildo into the living room, where plaintiffs were handcuffed and seated on the couch. Defendant OPDYKE then forced the dildo into the mouth of plaintiff Parker and attempted to force the dildo into the mouth of plaintiff Jenkins. Defendant DEDMON grabbed the dildo from defendant OPDYKE slapped the plaintiffs in the face with it as they constantly taunted them.

39. Defendant DEDMON forced the plaintiffs to their knees with their backs facing him and threatened to rape the plaintiffs with the dildo anally. To further impress the plaintiffs on the seriousness of his threat, defendant DEDMON grabbed the back of plaintiff Jenkins' pants and moved the dildo toward his backside.

40. At this point, plaintiff Jenkins lost control of his bowels and defecated on himself. While still handcuffed, plaintiffs were forced onto their backs on the floor of the living room where defendant ELWARD held them down, and plaintiff DEDMON poured

milk, alcohol, and chocolate syrup on their faces and into their mouths, forcing plaintiffs to involuntarily ingest milk, alcohol, and syrup.  In addition, plaintiff DEDMON poured cooking grease on defendant Parker's head.

41.  Defendant ELWARD then began throwing eggs at the plaintiffs.  Shortly after that, the defendant officers ordered the plaintiffs to strip naked and shower in order to wash away evidence of abuse before they were taken to jail.

42.  While the plaintiffs were forced to shower, defendant HARTFIELD guarded the bathroom door to ensure they did not escape.  When they were finished, they were forced to change into clean underwear and sweats, and then they were brought to the side bedroom.

43.  The plaintiffs' ordeal unfortunately did not end here, as defendant OPDYKE grabbed a wooden kitchen implement and struck plaintiff Parker with it, as defendant MIDDLETON grabbed a metal sword and assaulted plaintiff parker with that as well.

44.  Defendants DEDMON and MCALPIN joined in the assault upon plaintiff Parker by grabbing pieces of wood and proceeding to strike him across his back with them.

45.  While plaintiffs were handcuffed and forced to sit down on the floor of the side bedroom, the defendant officers decided to test their tasers on the plaintiffs to see which one was the most powerful.

46.  At this point, defendants DEDMON, MIDDLETON, HARTFIELD, and ELWARD Tased the plaintiffs repeatedly: defendant ELWARD's taser was discharged eight times, defendant HARTFIELD's taser was discharged five times, and defendant DEDMON's taser was discharged four times.

47.  To further intimidate, harass, and threaten the plaintiffs, defendant DEDMON stepped from the side bedroom into the adjoining carport, pulled out his gun, and fired into the

8

yard.  Defendant ELWARD surreptitiously removed a bullet from the chamber of his gun.  He then forced plaintiff Jenkins onto his knees, stuck the gun into his mouth, and pulled the trigger.   The unloaded gun clicked but did not discharge.

48.   Defendant ELWARD then cocked his weapon a second time and put the gun back into plaintiff Jenkin's mouth and pulled the trigger, the gun discharged this time.  The bullet lacerated Jenkin's tongue, broke his jaw, and exited out of his neck.  Miraculously, he survived this most atrocious act.

49.  As plaintiff Jenkins lay bleeding on the floor, instead of providing him medical attention, the defendant officers huddled up on the rear screened-in porch and devised a false story to cover up their misconduct.

50.   In order to cover up their entry into the property without a warrant, the defendants agreed to tell investigators that when they arrived at the house, they observed a Black male-later identified as plaintiff Jenkins in the driveway; that defendant DEDMON obtained his consent to search his pockets and found two baggies of methamphetamine; and that plaintiff Jenkins fled into the house and DEDMON ran after him.

51.   In order to cover up defendant ELWARD's shooting of plaintiff Jenkins, the defendant officers agreed to tell investigators that defendant ELWARD brought plaintiff Jenkins into the side bedroom to conduct a controlled drug buy over the phone, that ELWARD had removed plaintiff Jenkin's handcuffs; that plaintiff Jenkins had reached for a gun; and that ELWARD shot plaintiff Elward in self-defense.

52.   To minimize the number of witnesses to the shooting, the defendant officers agreed to tell investigators that, at the time of the shooting, defendants MCALPIN and

MIDDLETON had left the property and were driving home; defendants DEDMON and HARTFIELD were at DEDMON's truck; and defendant OPDYKE was escorting plaintiff parker to a patrol car.

53. The defendants then planted and tampered with evidence to corroborate their false cover story and cover up their misconduct. Defendant MIDDLETON offered to plant a "throw-down" gun on plaintiff Jenkins that defendant MIDDLETON kept, in his service vehicle, a Titan Tiger .38 special snub-nosed revolver with serial number 0887098 that was not registered to him in case a gun needed to be planted on a victim.

54. Defendant ELWARD responded that he would use the B.B. gun on which they had mounted the dildo during the assaults in the living room instead. Defendant ELWARD then grabbed the B.B. gun and brought it to the side bedroom where plaintiff Jenkins was still bleeding from the mouth and neck and was still not receiving any medical attention. Defendant ELWARD despicably removed plaintiff Jenkin's handcuffs and planted the B.B. gun next to Plaintiff Jenkin's seriously injured body.

55. Defendant DEDMON picked up spent taser cartridges and removed them. Defendant MCALPIN ordered defendant OPDYKE to take plaintiff Parker from the side bedroom and put him in the back of his patrol car.

56. Defendant MCALPIN opened the back door of defendant OPDYKE's patrol car and pressured plaintiff Parker to go along with the cover story. MCALPIN suggested to plaintiff Parker that if he went along with the cover story, it was guaranteed that he would be released from jail.

57. Aware that his service vehicle had an O.P.S. tracking system, defendant MCALPIN left the scene to corroborate his cover lie that he had not been present when

plaintiff Jenkins was shot.

58.  Defendant HARTFIELD retrieved the soiled clothes that plaintiffs had been wearing when they were abused.  He took the clothes outside and tried to set them afire, but they were too wet.  Defendant HARTFIELD then threw the clothes into the woods behind the property.

59.  Defendant HARTFIELD then removed the hard drive from the property's surveillance system and put it in defendant DEDMON's truck.  Later that night, defendant HARTFIELD threw the hard drive into Steen Creek in Florence, Mississippi.

60.  Defendant OPDYKE searched the hallway of the property for the shell casing from defendant DEDMON's first discharge of his weapon.  Once he found it, he picked it up and put it in his pocket.  Later that night, defendant OPDYKE put the shell casing in a water bottle, secured the top, and threw the bottle into the tall grass on the side of Cato Road in Braxton, Mississippi.

61.  The defendant officers searched for the shell casing from defendant DEDMON's second discharge of his weapon without success.  Defendant DEDMON then retrieved some methamphetamine he had previously obtained from a subject-turned-informant that had not been entered into evidence as they should have been.  He divided the drugs that should have been lodged as evidence in that other matter into two baggies and submitted them to the crime lab, falsely certifying that they belonged to plaintiff Jenkins.

62.  Each of the defendant officers wrote and submitted a report documenting the false cover story that they manufactured to justify their conduct.

63.  On January 25, 2023, defendant ELWARD signed a sworn affidavit in which he claimed that plaintiff Jenkins committed felony aggravated assault on a police officer, in

violation of Mississippi Code 97-3-7(2), "under circumstances manifesting extreme indifference to the value of human life" by "obtaining a firearm the[n] aiming/pointing it in the direction of Deputy Elward." Upon the filing of this affidavit, plaintiff Jenkins was charged with felony aggravated assault on a police officer.   The maximum punishment for that offense is 30 years in prison.

64.   On January 25, 2023, defendant DEDMON signed a sworn affidavit alleging that plaintiff Jenkins committed felony possession of methamphetamine in violation of Mississippi Code 41-29-139(c).  Upon the filing of this affidavit, plaintiff Jenkins was charged with felony possession of methamphetamine.   The maximum punishment for that offense is eight years in prison.

65.   On January 25, 2023, defendant DEDMON signed a sworn affidavit alleging that plaintiff Jenkins committed misdemeanor disorderly conduct, in violation of Mississippi Code 97-35-7, by "refusing to follow verbal commands and stop running after locating a felony amount of methamphetamine on his person." Upon the filing of DEDMON's affidavit, plaintiff Jenkins was charged with misdemeanor disorderly conduct.   The maximum punishment for that offense is one year in prison.

66.   Plaintiff Jenkins was detained on those false charges at the University of Mississippi Medical Center until he posted a bond and was released from law enforcement custody.   The false misdemeanor charge against him remained pending until June 30, 2023, when a Rankin County Justice Court Clerk approved its immediate remand.  The false felony charges against him remained pending until July 5, 2023, when a Rankin County Court Judge ordered the charges remanded to the files of the Rankin County Circuit Court.

67.  Each of the defendant o f f i c e r s  w a s  interviewed separately by agents with the

Mississippi Bureau of Investigation ("M.B.I."), the law enforcement agency in Mississippi with the authority to investigate officer-involved shootings.

68. During those interviews, each of them stuck to the concocted story and provided false accounts of the incident with the plaintiff to investigators. Eventually, the truth about the atrocities committed by the defendant officers came to light.

69. As a result, each of the defendant officers pled guilty to multiple felony charges in federal court for violating the constitutional rights of the plaintiff and several felony charges in Mississippi state court for violations of state law during the torture ordeal of the plaintiffs.

## FACTS RELEVANT TO MUNICIPAL LIABILITY

### A. RANKIN COUNTY

70. Sheriff BRYAN BAILEY directly participates in acts of excessive force. This court has denied him qualified immunity in U.S. District Court; Civil Action No. 3:21-CV-124-HTW-LGI. In that matter, a federal judge has issued a ruling where it was determined that Sheriff Bryan Bailey is not exempt from liability in a wrongful death lawsuit. Judge Henry Wingate stated: "Sheriff BRYAN BAILEY is individually liable because he was present at the scene; he was actively involved in the negotiations; and he played an important role in the use of the alleged excessive force which led to Woods' death." Based on the record before it, this court cannot state that SHERIFF BAILEY'S actions were reasonable under the circumstances." It was also determined in that case that defendant Elward was not entitled to qualified immunity for his alleged use of excessive force.

71. Despite actual notice of SHERIFF BAILEY'S potential liability for his supervisory actions, and despite defendant ELWARD'S denial of qualified immunity by this Court for his

deadly use of force in that case, both remained unsanctioned and did not receive any re-training from RANKIN COUNTY. The fact that no corrective action of any kind was taken by RANKIN COUNTY was consistent with its custom and policy of tolerance and acceptance of constitutional violations.

72. At the time of the attack on JENKINS and PARKER on 1/24/2023, defendant MC'ALPIN remained an active duty deputy for Rankin County despite this Court denying his qualified immunity for committing the same type of violations that the plaintiffs allege in the instant case. MC'ALPIN'S previously similar conduct included, but was not limited to, the use of excessive force. Notwithstanding defendant MCALPIN's documented derelictions and use of excessive force in that case, defendant BAILEY failed to reprimand, monitor, or re-train defendant MCALPIN. Such failure and deliberate indifference for the community's safety was a proximate cause of the injuries suffered by the plaintiffs.

73. On July 26, 2021, Defendant ELWARD was involved in the subduing of an unarmed Damien Cameron. Cameron died after being restrained by defendant Elward and another Rankin County deputy by the name of Luke Stickman.

74. In an affidavit dated April 13, 2023, Monica Lee, Cameron's mother and a witness to the occurrence, indicated that Stickman and defendant ELWARD choked Cameron to death by placing a knee across the back of his neck, long after Cameron was completely immobilized. Cameron's last words to ELWARD and Stickman were that he *could not breathe* (Lee v. RANKIN COUNTY Circuit Court for Rankin County, Cause No. 2022- 073).

75. Despite actual and constructive notice of the above facts, Defendant RANKIN COUNTY failed to create new policies to correct such conduct; failed to create a police review board; failed to undertake any re-training of defendant ELWARD, failed to conduct an

administrative review of the encounter to assure that it was consistent with its use of force policies, and failed to take any meaningful action of any kind to protect the citizens of Rankin County from unconstitutional misconduct by the law enforcement officers it employs.

76.  Defendant MIDDLETON was the admitted leader of the GOON SQUAD that operated openly and notoriously within the Rankin County Sheriff's Office under the watchful eye of defendant Bailey.  The GOON SQUAD was so brazen and accepted that it had a LOGO.

77.  At the time that defendant RANKIN COUNTY hired defendant MIDDLETON, he was a former City of Jackson, Mississippi police officer who had been convicted of vehicular homicide with culpable negligence.

78.  Not only did defendant RANKIN COUNTY hire defendant MIDDLETON despite his reckless and criminal past, which included actions that occurred within the scope of his previous law enforcement employment, but it also placed him in a supervisory role.  It anointed him with the rank of lieutenant.

79. On August 3, 2022 in U.S. District Court for the southern district, Christian Lee Dedmon, Hunter Elward and Daniel Opdyke pled guilty to deprivation of rights under the color of law. Dedmon also pleaded guilty to discharging a firearm in furtherance of a crime of violence, according to court documents.  Court documents say the incident happened "on or about December 4, 2022." According to the brief filing, Dedmon is accused of assaulting a man, identified as A.S. by "punching, kicking, and tasing him." He's also accused of discharging "… a firearm in close proximity to A.S. for the purpose of scaring A.S. and coercing a confession." Prosecutors say the other two deputies at the scene refrained from intervening.  Despite these defendant's actions, all remained unsanctioned and did not receive any re-training from  RANKIN COUNTY.  The fact that no corrective action of any kind was taken

by RANKIN COUNTY was consistent with its custom and policy of tolerance and acceptance of constitutional violations.

80.  RANKIN COUNTY, under its budgetary authority, continued to finance the Sheriff's Office headed by defendant BAILEY without implementing any policy reforms, controls, or audits.  The lack of oversight on the part of  Defendant RANKIN COUNTY created an environment within the Sheriff's Office where the defendant law enforcement personnel operated with impunity, which is a proximate cause of the atrocities committed upon JENKINS and PARKER in this case.

## B. CITY OF RICHLAND

81.  Defendant Hartfield was a City of RICHLAND narcotics officer at all times relevant herein, and he was also a member of the GOON SQUAD that was led by defendant Middleton, who was a Lt. with the Rankin County Sheriff's Office.

82.  While performing his duties as a narcotics officer with the City of RICHLAND police department, defendant Hartfield would occasionally perform "work" with the Rankin County GOON SQUAD.

83.  Defendant Hartfield's actions with the GOON SQUAD were never properly monitored by the City of RICHLAND, nor were they properly documented.  The City of RICHLAND allowed him to roam with Rankin County officers, all in the name of crime fighting, on a routine basis.

84.  The actions of the City of RICHLAND in this regard amounted to an official policy and/or practice of allowing its officers to engage in law enforcement activities under the color of law that it provided, without oversight of any kind.  This conduct was a proximate cause of the injuries suffered by the plaintiffs.

16

## COUNT I

**42 U.S.C. § 1983- FAILURE TO TRAIN, SUPERVISE, AND DISCIPLINE**
(SHERIFF BRYAN BAILEY)

85.  Plaintiffs hereby incorporate paragraphs 1-84 as if fully set forth herein.

86.  Defendant SHERIFF BRYAN BAILEY acted negligently, carelessly, recklessly, and with deliberate indifference to the safety and constitutional rights of the plaintiffs and the citizens of the State of Mississippi by failing to properly train, supervise, control, direct, monitor, and discipline Rankin County Sheriff's Deputies.

87.  Citizen complaints, lawsuits, public news, and public records verify that SHERIFF BAILEY is specifically aware that County deputies have committed and are likely to commit constitutional violations of the type plaintiffs suffered as described in this lawsuit.

88.  As a direct and proximate result of the acts and omissions and deliberate indifference of defendants SHERIFF BAILEY, plaintiffs MICHAEL JENKINS and EDDIE PARKER were wrongfully imprisoned, unlawfully seized, assaulted, sexually assaulted, waterboarded, otherwise tortured, and had their constitutional rights violated by RANKIN COUNTY deputies who also attempted to kill JENKINS by shooting him inside of his mouth.

89.  Defendant SHERIFF BAILEY had actual and/or constructive knowledge of the lawlessness engaged in by the so-called GOON SQUAD, which operated within the Sheriff's Office, openly and notoriously, before the plaintiffs' ordeal occurred.   That group, which consisted of the defendant officers, among others, was allowed to  imprison persons without probable cause, seize citizens without justification, and use excessive force and torture tactics as a way of enforcing "law and order" in Rankin County irrespective of the violations of constitutional rights that such actions entailed

**Ratification**

17

90. Defendant SHERIFF BAILEY failed to immediately discipline and/or reprimand the defendant Rankin County Deputies, who were under his direct supervision and control for their actions in this matter.

91. Instead, defendant SHERIFF BAILEY allowed the defendant officers in this case to remain in their positions without any adverse action being taken against them for months. In fact, no adverse action was taken against the defendant officers before the instant lawsuit was filed, and it became apparent that the defendant officers were going to be charged with criminally related to their interaction with the plaintiffs.

92. Defendant BAILEY's inaction in the face of such startling misconduct by the defendant deputies confirms that he condoned and/or ratified the misconduct admitted herein by the defendant deputies.

93. As a direct consequence of the deliberate indifference of defendant BAILEY in this regard, plaintiff JENKINS has suffered permanent physical injuries, permanent cognitive damage, long-term psychological damage, permanent disfigurement, and impairment. Defendant Parker has suffered severe injuries from his mistreatment, had to seek prompt medical attention, and also suffered long-term psychological damage from the trauma of the ordeal.

WHEREFORE, Plaintiffs MICHAEL JENKINS and EDDIE PARKER demand judgment against Defendant RANKIN COUNTY and BAILEY in the full and fair amount of Four Hundred Million Dollars ($400,000,000), in compensatory damages plus interest and costs.

## COUNT II

### § 1983 – MUNICIPAL LIABILITY FOR UNCONSTITUTIONAL CUSTOM, PRACTICE, OR POLICY (RANKIN COUNTY)

94. Plaintiffs hereby incorporate paragraphs 1-93 as if fully set forth herein.

95.   Based upon the principles set forth in Monell v. New York City Department of
Social Services, 436 U.S. 658 (1978), on and for some time prior to January 24, 2023, and
continuing to the present date, defendant RANKIN CO., acting with reckless and deliberate
indifference to the rights and liberties of the public in general, and of PLAINTIFF's JENKINS
and PARKER, and of persons in their class, situation, and comparable position in particular,
knowingly maintained, enforced and applied an official recognized custom, policy, and practice
of:

The use of excessive force on African-American citizens

The use of excessive force on the citizenry at large

4th Amendment violations, unlawful searches, and seizures

14th Amendment equal protection violations

Using torture tactics in the course of interrogation.

Failing to ensure officers were adequately trained and supervised

Failing to ensure that officers were vetted correctly and hired

96.   Because of the aforementioned policies and practices by RANKIN CO., the Plaintiffs
were subjected to constitutional violations, beatings, torture, humiliation, excessive force, other
torts, attempts to kill JENKINS, and other crimes described herein.

97.   Defendant RANKIN CO. and various other officials, whether named or unnamed, had
either actual or constructive knowledge of the deficient policies, practices, and customs alleged
in the paragraphs above.

98.   Despite having knowledge as stated above, these defendants condoned, tolerated, and
through actions and inactions, thereby ratified such policies.  Said Defendants also acted with
deliberate indifference to the foreseeable effects and consequences of these policies concerning

the constitutional rights of JENKINS, PARKER,  and other individuals similarly situated.

99.  As a result of the acts or omissions by defendant RANKIN COUNTY, plaintiff JENKINS has suffered permanent physical injuries, permanent cognitive damage, long-term psychological damage, permanent disfigurement, and impairment.   Plaintiff Parker has suffered injuries from his mistreatment, sought prompt medical attention, and also suffered long-term psychological damage from the trauma of the ordeal.

WHEREFORE, Plaintiffs MICHAEL JENKINS and EDDIE PARKER demand judgment against DEFENDANT RANKIN CO. in the full and fair amount of Four Hundred Million Dollars ($400,000,000), in compensatory damages plus interest and costs.

## COUNT III

## 42 U.S.C. § 1983 – MUNICIPAL LIABILITY FOR UNCONSTITUTIONAL CUSTOM, PRACTICE, OR POLICY (CITY OF RICHLAND)

100.   Plaintiffs hereby incorporate paragraphs 1-99 as if fully set forth herein.

101.   The City of RICHLAND, Mississippi, which is in Rankin County, operates a police force.  Its officers exercise jurisdiction primarily within the boundaries of the city except on occasion when they conduct joint operations with other law enforcement agencies upon request or with task forces, etc.  Whenever such operations are undertaken, there is a clear chain of command to ensure proper supervision of the different law enforcement personnel.

102.   Despite this common practice, the City of RICHLAND allowed defendant Hartfield to act as a free agent.  It neither monitored his actions nor limited where he could engage in law enforcement activities or with whom.

103.   In addition, even after learning of defendant Hartfield's involvement with the plaintiffs in January 2023, no action nor discipline of defendant Hartfield occurred until after the

co-defendant Rankin County officers were fired until after the plaintiffs' original lawsuit was filed and until after a criminal investigation had been launched and completed which led to guilty pleas by all of the officers involved.

104.  The City of RICHLAND's actions and/or inactions in this regard amounted to a policy and/or practice that exhibited deliberate indifference to the constitutional rights and safety of citizens in Rankin County, Mississippi.

105.  As a result of the acts or omissions by the defendant, City of RICHLAND, JENKINS has suffered permanent physical injuries, permanent cognitive damage, long-term psychological damage, permanent disfigurement, and impairment.  Plaintiff Parker has suffered injuries from his mistreatment, sought prompt medical attention, and also suffered long-term psychological damage from the trauma of the ordeal.

WHEREFORE, Plaintiffs MICHAEL JENKINS and EDDIE PARKER demand judgment against DEFENDANT CITY OF RICHLAND in the full and fair amount of Four Hundred Million Dollars ($400,000,000), in compensatory damages plus interest and costs.

## COUNT IV

## RECKLESS DISREGARD FOR THE RIGHTS AND SAFETY OF OTHERS
(against RANKIN COUNTY)

106.  Plaintiffs hereby incorporate paragraphs 1-105 as if fully set forth herein.

107.  For some time prior to January 24, 2023, RANKIN COUNTY with reckless disregard to the rights and liberties of the public in general, and of PLAINTIFF's JENKINS and PARKER, and of persons in their class, situation, and comparable position in particular, knowingly maintained, enforced and applied an official recognized custom, policy, and practice of:

The use of excessive force on African-American citizens

The use of excessive force on the citizenry at large

4th Amendment violations, unlawful searches, and seizures

14th Amendment equal protection violations

Using torture tactics in the course of interrogation.

Failing to ensure officers were adequately trained and supervised

Failing to ensure that officers were vetted correctly and hired

108.  By reason of the aforementioned policies and practices by RANKIN CO., Plaintiffs were subjected to constitutional violations, beatings, torture, humiliation, excessive force, other torts, attempts to kill JENKINS, and other crimes described herein.

109.  Defendant RANKIN CO., together with various other officials, whether named or unnamed, had either actual or constructive knowledge of the deficient policies, practices, and customs alleged in the paragraphs above.

110.  Despite having knowledge as stated above, these defendants condoned, tolerated, and through actions and inactions, thereby ratified such policies.  Said Defendants also acted with deliberate indifference to the foreseeable effects and consequences of these policies concerning the constitutional rights of JENKINS, PARKER,  and other individuals similarly situated.

111.  Further, these act(s) or omission(s) were perpetrated with such callousness that a reasonable, prudent person can undoubtedly conclude that these act(s) or omission(s) were carried out with a reckless disregard for the rights and safety of the Plaintiffs and others. Therefore, the act(s) or omission(s) constitute a reckless disregard for the rights and safety of the Plaintiffs as defined under Mississippi law.

112.  As a result of the acts or omissions by defendant RANKIN COUNTY, plaintiff JENKINS has suffered permanent physical injuries, permanent cognitive damage, long-term psychological damage, permanent disfigurement, and impairment.   Plaintiff Parker has suffered injuries from his mistreatment, sought prompt medical attention, and also suffered long-term psychological damage from the trauma of the ordeal.

WHEREFORE, Plaintiffs MICHAEL JENKINS and EDDIE PARKER demand judgment against DEFENDANT RANKIN CO. in the full and fair amount of Four Hundred Million Dollars ($400,000,000), in compensatory damages plus interest and costs.

## COUNT V

**DEPRIVATION OF CIVIL RIGHTS, 42 U.S.C. § 1983-EXCESSIVE FORCE**
**ELWARD, MC'ALPIN, DEDMON, OPDYKE, MIDDLETON AND HARTFIELD**
**(Attempting to kill Michael C. Jenkins)**

113.  Plaintiffs hereby incorporate paragraphs 1-112 as if fully set forth herein.

114.  Plaintiffs further allege that the defendants  ELWARD,  MC'ALPIN, DEDMON, OPDYKE, HARTSFIELD, and  MIDDLETON, with deliberate indifference to and in reckless disregard for the safety and well-being of MICHAEL COREY JENKINS and in violation of the 4th Amendment to the Constitution, did on January 24, 2023, commit acts which deprived Plaintiff MICHAEL JENKINS of his constitutional right to be free from excessive force.

115.  Defendant ELWARD, under the color of law, without justification of cause, did place his service weapon inside plaintiff JENKIN'S mouth; at the same time, he was handcuffed and shot him in his mouth, shattering his jaw, lacerating his tongue and causing him a near-fatal injury.

116.  The defendant deputies, ELWARD, MC'ALPIN, DEDMON, OPDYKE,

HARTSFIELD, AND MIDDLETON, all conspired, aided, and/or abetted to kill plaintiff

Jenkins.  Clearly, no lawful force was warranted against plaintiff Jenkins's person under these

circumstances as he  posed no threat to any of the defendant officers

      117.   As a direct and proximate result of the actions of defendants ELWARD,

MC'ALPIN, DEDMON,  OPDYKE, HARTSFIELD, AND MIDDLETON, plaintiff Jenkins was

deprived of his liberty and subjected to the near ultimate use of force when he was almost killed

by DEPUTY ELWARD acting well outside the parameters of law and decency.

      118.   As a result of the excessive use of force described herein by the officers, plaintiff

JENKINS has suffered permanent physical injuries, permanent cognitive damage, long-term

psychological damage, permanent disfigurement, and impairment

      WHEREFORE, plaintiffs JENKINS demands judgment against defendants ELWARD,

MC'ALPIN, OPDYKE, DEDMON, MIDDLETON, and HARTFIELD in the full and fair

amount of Four Hundred Million Dollars ($400,000,000) in compensatory and punitive damages

plus interest and costs.

## COUNT V

**DEPRIVATION OF CIVIL RIGHTS, 42 U.S.C. § 1983**
**ELWARD, ELWARD, MC'ALPIN, DEDMON,  OPDYKE, HARTSFIELD AND**
**MIDDLETON**
**(Unconstitutional Search and Seizure)**

      119.   Plaintiffs hereby incorporate paragraphs 1-118 as if fully set forth herein.

      120.   Plaintiff further alleges that the defendant deputies ELWARD MC'ALPIN,

DEDMON,  OPDYKE, HARTSFIELD AND MIDDLETON, under the color of law, and with

deliberate indifference to and in reckless disregard for the safety and well-being of the plaintiffs

and in violation of the 4th Amendment to the Constitution, did on January 24, 2023, commit

many acts which deprived plaintiffs JENKINS and PARKER of their constitutional right to be free from an unreasonable seizure of their persons.

121.   Defendants ELWARD, MC'ALPIN, DEDMON, OPDYKE, HARTSFIELD, and MIDDLETON, without reasonable suspicion or probable cause, forcibly entered the property in Braxton, Mississippi, where plaintiff PARKER was living, and plaintiff JENKINS was visiting.

122.   The defendant officers did not possess a search warrant, nor did any exigent circumstances exist to enter the property.  Upon their unlawful entry into the property, the defendant officers immediately accosted the plaintiffs by handcuffing and beating them.

123.   Each of the defendant deputies wrongfully entered the premises, wrongfully seized, and falsely imprisoned plaintiffs when clearly no seizure was warranted.

124.   As a direct and proximate result of the actions of the defendant officers, plaintiffs were deprived of their liberty and injured by the defendant deputies, who were acting far outside the parameters of law and decency.  As a result of the violation of the 4th Amendment in this regard, the plaintiff has suffered permanent physical injuries, permanent cognitive damage, long-term psychological damage, permanent disfigurement, and impairment.  Plaintiff Parker suffered injuries from his mistreatment, sought prompt medical attention, and also suffered long-term psychological damage from the trauma of the ordeal.

WHEREFORE, plaintiffs JENKINS and PARKER demand judgment against defendants ELWARD, MC'ALPIN, OPDYKE, DEDMON, MIDDLETON, and HARTFIELD in the full and fair amount of Four Hundred Million Dollars ($400,000,000) in compensatory and punitive damages plus interest and costs.

## COUNT VI

**DEPRIVATION OF CIVIL RIGHTS, 42 U.S.C. § 1983**
**ELWARD MC'ALPIN, DEDMON,  OPDYKE, HARTSFIELD AND MIDDLETON**

25

**(Excessive Force- Taser Use and Beatings)**

125.  Plaintiffs hereby incorporate paragraphs 1-124 as if fully set forth herein.

126.  Plaintiff further alleges that Defendants ELWARD MC'ALPIN, DEDMON, OPDYKE, HARTSFIELD, and MIDDLETON, under the color of law, with deliberate indifference to and in reckless disregard for the safety and well-being of the plaintiffs and in violation of their constitutional rights, did on January 24, 2023, commit many acts which deprived plaintiffs  JENKINS and PARKER of their constitutional rights to be free from excessive force.

127.  Defendants ELWARD MC'ALPIN, DEDMON, UPDYKE, HARTSFIELD, and MIDDLETON deployed their taser devices and used them repeatedly and gratuitously against both JENKINS and PARKER while they were subdued and handcuffed.

128.  Defendants repeatedly beat the plaintiffs by physically punching them, throwing them to the ground, kicking them, and otherwise physically assaulting them.

129.  The defendant deputies did not have justification nor cause for using force by way of tasing and beating plaintiffs JENKINS and PARKER while they were defenseless, incapable of harm, and handcuffed.

130.  At no point did plaintiff JENKINS or PARKER give any justification or cause for the use of force by Defendants.  Clearly, no force at all was warranted against their person under the circumstances.

131.  As a direct and proximate result of the actions of the defendant deputies, plaintiffs were deprived of their constitutional right to be free from the use of force by the defendant deputies, who were acting far outside the parameters of law and decency.

132.  As a result of the unlawful use of force by the defendant deputies, plaintiffs suffered

permanent severe physical injuries, permanent cognitive damage, and long-term psychological damage.

WHEREFORE, plaintiffs JENKINS and PARKER demand judgment against defendants ELWARD, MC'ALPIN, OPDYKE, DEDMON, MIDDLETON, and HARTFIELD in the full and fair amount of Four Hundred Million Dollars ($400,000,000) in compensatory damages plus interest and costs.

## COUNT VII

**Deprivation of Civil Rights, 42 U.S.C. § 1983**
**ELWARD MC'ALPIN, DEDMON, AND UPDYKE, HARTSFIELD, AND MIDDLETON**
**(Unreasonable Seizure, Excessive force -Waterboarding)**

133.  Plaintiffs hereby incorporate paragraphs 1-132 as if fully set forth herein.

134.  Defendants ELWARD, MC'ALPIN, DEDMON OPDYKE, HARTSFIELD and MIDDLETON, under the color of law, with deliberate indifference to, and in reckless disregard for the safety and well-being of the plaintiffs and in violation of their constitutional rights, did on January 24, 2023, commit specific acts which deprived plaintiffs JENKINS and  PARKER of their constitutional rights to be free from the use of excessive force and an unreasonable seizure.

135.  Defendants ELWARD, MC'ALPIN, DEDMON, UPDYKE, HARTSFIELD, and MIDDLETON used a form of waterboarding techniques against both plaintiffs while they were handcuffed, bound, and on their backs.  These acts amounted to a form of torture.

136.  Defendants ELWARD, MC'ALPIN, DEDMON, OPDYKE, HARTSFIELD, and MIDDLETON had no justification or cause for using a  form of waterboarding on plaintiffs JENKINS and PARKER as no justification for such barbaric behavior exists in a civilized society under any circumstances.

137.  As a direct and proximate result of the actions of the defendant deputies, plaintiffs

were deprived of their constitutional right to be free from the use of excessive force and an

unreasonable seizure.

138.  As a result of the barbaric waterboarding used against the plaintiffs by the

defendant deputies, plaintiffs JENKINS and PARKER have suffered permanent physical

injuries, permanent cognitive damage, long-term psychological damage, and impairment.

WHEREFORE, plaintiffs JENKINS and PARKER demand judgment against defendants

ELWARD, MC'ALPIN, OPDYKE, DEDMON, MIDDLETON, and HARTFIELD in the full and

fair amount of Four Hundred Million Dollars ($400,000,000) in compensatory and punitive

damages plus interest and costs.


## COUNT XIII

### Deprivation of Civil Rights, 42 U.S.C. § 1983
### ELWARD MC'ALPIN, DEDMON, AND UPDYKE, HARTSFIELD, AND MIDDLETON
### (Sexual assault,  Unreasonable seizure)

139.  Plaintiffs hereby incorporate paragraphs 1-138  as if fully set forth herein.

140.  Defendants ELWARD, MC'ALPIN, DEDMON OPDYKE, HARTSFIELD, and

MIDDLETON, under the color of law, with deliberate indifference to and in reckless disregard

for the safety and well-being of the Plaintiffs and in violation of their constitutional rights, did on

January 24, 2023, commit specific acts which deprived the plaintiffs of their constitutional rights

to be free from an unreasonable seizure.

141.  Defendants ELWARD, MC'ALPIN, DEDMON, OPDYKE, HARTSFIELD, and

MIDDLETON, attempted to use a sexual device, a dildo, against both plaintiffs JENKINS and

PARKER and did put it in their mouths and threatened to use it in plaintiff Jenkins' anal cavity

while he was handcuffed and bound.

142.   The defendant deputies further forced both plaintiffs to strip naked and take a shower together in order to clean up the mess that was made by the deputies hurling eggs at them; the mess from the liquids poured in their mouths and on their faces, the liquids used in the course of their waterboarding, and the soil from the involuntary bowel movement that plaintiff JENKINS had when threatened with anal rape with a dildo.

143.   In committing both sadistic acts of attempting to assault the plaintiffs with a sexual device (dildo) sexually and then forcing both African-American men to strip naked and shower together, the defendants committed a form of torture against the plaintiffs.

144.   The defendant deputies exceeded all bounds of decency when they subjected the plaintiffs to sexual assaults while they were handcuffed, bound, and surrounded.

145.   No justification exists for such shocking and outrageous acts under any circumstances.

146.   As a direct and proximate result of the actions of the defendant deputies, plaintiffs were deprived of their constitutional rights to be free from excessive force and unreasonable seizure by way of sick and perverted sexual assaults and sex acts against them.

147.   As a result of the acts by the defendant deputies, plaintiffs JENKINS and PARKER have suffered permanent physical injuries, permanent cognitive damage, long-term psychological damage,  and impairment.

WHEREFORE, plaintiffs JENKINS and PARKER demand judgment against defendants ELWARD, MC'ALPIN, OPDYKE, DEDMON, MIDDLETON, and HARTFIELD in the full and fair amount of Four Hundred Million Dollars ($400,000,000) in compensatory damages plus interest and costs.

**COUNT IX**

**DEPRIVATION OF CIVIL RIGHTS, 42 U.S.C. § 1981**
**ELWARD, MC'ALPIN, DEDMON, AND DEPUTIES OPDYKE, HARTSFIELD AND**
**MIDDLETON**
(14th Amendment Equal Protection Violation on the Basis of Race)

148.  Plaintiffs hereby incorporate paragraphs 1-147 as if fully set forth herein.

149.  Defendants ELWARD, MC'ALPIN, DEDMON, OPDYKE, HARTSFIELD, and MIDDLETON, under the color of law, with deliberate indifference to and in reckless disregard for the safety and well-being of the plaintiffs and in violation of their constitutional rights, did on January 24, 2023, commit specific acts which deprived the plaintiffs of their constitutional rights to be free from deprivation of their rights of equal protection guaranteed under the 14th Amendment.

150.  The defendant deputies deprived both JENKINS and PARKER of their 14th Amendment Right to be free from police harassment and misconduct on the basis of race.

151.  The Equal Protection Clause of the U.S. Constitution directs that persons similarly situated should be treated alike.  The elimination of racial discrimination remains at the heart of the Fourteenth Amendment.  The Constitution does not tolerate intentional police harassment of racial minorities.

152.  Defendants ELWARD, MC'ALPIN, DEDMON,  OPDYKE, HARTSFIELD, and MIDDLETON repeatedly used racial epithets, i.e., calling JENKINS and PARKER "niggers' and "monkeys,' told them that they were not welcome in Rankin County because of their race, questioned them about "dating White women," and coupled their use of r offensive words with physical harassment and the numerous acts of violence described in this Complaint. Such words, coupled with the violent acts described herein, deprived plaintiffs of equal protection of the laws guaranteed under the United States Constitution.

`    153. As a direct and proximate result of the actions of the defendant deputies, plaintiffs JENKINS and PARKER were deprived of their constitutional right to equal protection and to be free from racially motivated violence at the hands of law enforcement acting far outside the parameters of law and decency.

   154. As a result of the acts of the defendant deputies, plaintiffs JENKINS and PARKER have suffered permanent physical injuries, permanent cognitive damage, long-term psychological damage, and impairment.

   WHEREFORE, plaintiffs JENKINS and PARKER demand judgment against defendants ELWARD, MC'ALPIN, OPDYKE, DEDMON, MIDDLETON, and HARTFIELD in the full and fair amount of Four Hundred Million Dollars ($400,000,000) in compensatory and punitive damages plus interest and costs.

## COUNT X

### DEPRIVATION OF CIVIL RIGHTS, 42 U.S.C. § 1983
### ELWARD, MC'ALPIN, DEDMON, OPDYKE, HARTSFIELD AND MIDDLETON
(Bystander Liability)

   155. Plaintiffs hereby incorporate paragraphs 1-154 as if fully set forth herein.

   156. The defendant deputies deliberately and consciously deprived the plaintiffs of their constitutional rights.

   157. Each of the defendant deputies (1) had a realistic opportunity to intervene and prevent the harm suffered by the plaintiffs, (2)  knew that the plaintiffs' constitutional rights were being violated, and (3) failed to take reasonable steps to intervene.

   158. At all times relevant herein, when any of the defendant deputies were not actively participating in any specific tort described in this Complaint, the defendants failed to take action to prevent another Rankin County deputy from violating the law.

159.  Consequently,  defendants ELWARD, MC'ALPIN, DEDMON, OPDYKE, HARTSFIELD, and MIDDLETON are equally responsible for all the acts described herein, including the attempt to kill plaintiff JENKINS.

160.  The actions of the defendant deputies were pursuant to a purposeful and ongoing pattern, undertaken with the intent to violate the plaintiffs' constitutional rights.

161.  As a direct and proximate result of the conduct of the defendant deputies, the plaintiffs were deprived of their constitutional right to be free from the use of excessive force, violations of their 4th Amendment rights against an unlawful seizure, and their fundamental human rights.

162.  As a result of the acts of the defendant deputies, plaintiffs JENKINS and PARKER have suffered permanent physical injuries, permanent cognitive damage, long-term psychological damage, and impairment.

WHEREFORE, plaintiffs JENKINS and PARKER demand judgment against defendants ELWARD, MC'ALPIN, OPDYKE, DEDMON, MIDDLETON, and HARTFIELD in the full and fair amount of Four Hundred Million Dollars ($400,000,000) in compensatory and punitive damages plus interest and costs.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury pursuant to Federal Rules of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted on 11/20/ 2023 by:

**/s/MALIK SHABAZZ, Esq./s/**
**ATTORNEY FOR PLAINTIFF**
The Law Office of Malik Shabazz, Esq.
D.C. Bar #

458434 6305
Ivy Lane,
Suite 608
Greenbelt, MD 20770
Email:Attorney.shabazz@yahoo.co
m Tel: (301) 513-5445
Fax: (301) 513-5447


/s/ TRENT L. WALKER
 **BY: TRENT L. WALKER, M.S.B. #10475**
**ATTORNEY FOR PLAINTIFF**

OF COUNSEL:
TRENT    WALKER,    COUNSELOR    AT
LAW, PLLC
5255 KEELE STREET, SUITE A
JACKSON, MISSISSIPPI 39206