Michael Corey Jenkins, et al.

v.

Rankin County, Mississippi, et al.

Sheriff Bryan Bailey

January 8, 2025

*Brown Court Reporting & Litigation Support*

*4780 I-55 North, Suite 100*

*Jackson, MS 39211*

*julie@browncourtreporting.com*

*(601) 203-0071 phone | (601) 709-4611 fax*



EXHIBIT 1

```
 1            IN THE UNITED STATES DISTRICT COURT FOR
                THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                      NORTHERN DIVISION

 3

 4

 5   MICHAEL COREY JENKINS, et al.

 6               Plaintiffs,

 7

 8   v.                Civil Action No.  3:23-cv-374-ASH-DPJ

 9

10   RANKIN COUNTY, MISSISSIPPI, et al.,

11               Defendants.

12

13

14

15           DEPOSITION OF SHERIFF BRYAN BAILEY

16

17

18
        Taken at the instance of the Plaintiff at the
19   offices of Biggs Ingram and Solop PLLC, 578 Highland
     Colony Parkway, Suite 100, Ridgeland, Mississippi on
20               Wednesday, January 8, 2025,
                   beginning at 10:17 a.m.
21

22

23

24           * * * * * * * * * * * * * *
             REPORTED STENOGRAPHICALLY BY:
25        LORI W. BUSICK, CVR-S #7510, CCR #1677
```

```
 1   APPEARANCES:

 2        TRENT L. WALKER, ESQ.
          Walker Law Offices
 3        5255 Keele Street, Suite A
          Jackson, Mississippi 39206
 4        Phone: 601-321-9540
          Fax: 800-398-391
 5        Trent@trentwakeresq.com

 6

 7        MALIK SHABAZZ, ESQ. (VIA ZOOM)
          The Law Office of Malik Shabazz
 8        6305 Ivy Lane, Suite 608
          Greenbelt, MD 20770
 9        (301)513-5445
          attorney.shabazz@yahoo.com.
10
              COUNSEL FOR PLAINTIFF
11

12        JASON E. DARE, ESQ.
          Biggs, Ingram & Solop PLLC
13        Paragon Two
          578 Highland Colony Parkway, Suite 100
14        Ridgeland, MS  39157
          Phone: 601.987.5307
15        Fax: 601.987.5307
          jdare@bislawyers.com
16
              COUNSEL FOR DEFENDANT
17

18

19   ALSO PRESENT: Cole Lothorp, Law Clerk

20

21

22

23

24

25
```

Sheriff Bryan Bailey - January 8, 2025

3

```
 1                        INDEX
 2    Style and Appearances...........................1
 3    Certificate of Deponent.......................262
 4    Certificate of Court Reporter.................263
 5
 6                      EXAMINATIONS
 7    Examination by Mr. Shabazz......................4
 8
 9                       EXHIBITS
10    EXHIBIT 1    Rankin County Supplemental  ........40
11                 Responses to Plaintiff's
12                 First Set of Interrogatories
13    EXHIBIT 2    Organizational Chart ...............45
14    EXHIBIT 3    Deposition Excerpt .................57
15    EXHIBIT 4    Challenge Coin Logo ................98
16    EXHIBIT 5    MBI Report ........................114
17    EXHIBIT 6    MBI Report ........................114
18    EXHIBIT 7    Mack Allegations ..................114
19    EXHIBIT 8    Mugshots ..........................223
20    EXHIBIT 9    Taser Policy ......................260
21
22
23
24
25
```

Brown Court Reporting, Inc. - (601) 832-4920

4

```
 1              Bryan Bailey,
 2   having been first duly sworn, was examined and
 3   testified as follows:
 4
 5   EXAMINATION BY MR. SHABAZZ:
 6       Q.   All right.  Good morning, Mr. Bailey.
 7       A.   Good morning.
 8       Q.   My name is Malik Shabazz and I'm here with
 9   Trent Walker.  We are attorneys who represent
10   Michael Jenkins and Eddie Parker for the incidents
11   and occurrence of January 24, 2023 in Rankin County,
12   Mississippi, in this lawsuit, which is a civil
13   rights lawsuit.
14            And amongst the allegations are that you
15   as the sheriff failed to monitor supervise your
16   department which had a direct connection to what
17   happened to Michael and Eddie on that day.  Okay?
18            So I want to ask you this, are you aware
19   that you're under oath today, the same as if you
20   were in a court of law?
21       A.   I do.
22       Q.   Are you under the effect of any type of
23   medication or anything that would affect your
24   answers to my questions today?
25       A.   I'm not.
```

Sheriff Bryan Bailey - January 9, 2025

5

```
1        Q.   Okay.  I'm sure you've taken depositions
2   before; is that correct?
3        A.   I have.
4        Q.   So if you don't understand the question
5   you'll tell me and I'll try to speak to get my
6   answer out and I'm hoping you'll wait and then
7   you'll answer and I'll be patient with you to hear
8   your answer before I speak so that we have a clear
9   record.  But if you don't understand a question,
10  please tell me.
11           What did you do today to prepare for
12  today's deposition?  Without --
13           MR. DARE:  And Counsel.
14           MR. SHABAZZ:  Yes.
15           MR. DARE:  Sorry for interrupting.
16           The only other introductory portion that I
17  typically give in depositions is just want to make
18  sure that it is agreed by all counsel the deposition
19  is being taken pursuant to the Federal Rules of
20  Civil Procedure, such that all objections, except
21  for the form of the question are reserved until such
22  time as this deposition is used at a other trial or
23  hearing.  Is that acceptable?
24           MR. SHABAZZ:  That's acceptable.
25           MR. DARE:  Thank you, Counsel.
```

Sheriff Bryan Bailey - January 8, 2025

6

```
 1              MR. SHABAZZ:  Yes, sir.
 2         Q.   (By Mr. Shabazz) Mr. Bailey, your attorney
 3    at some point will object, but this is a deposition
 4    so we still will have to answer the question.
 5              So without going into the content of your
 6    conversation with your attorney, what did you do to
 7    prepare for today's deposition?
 8         A.   I haven't done anything today.  Yesterday
 9    I just reviewed the old -- some old policies and
10    procedures.
11         Q.   Okay.  Have you met or spoke with anyone
12    from the -- other than your attorney, have you spoke
13    with anyone from Rankin County about your testimony
14    today?
15         A.   No, I have not.
16         Q.   Have you reviewed or discussed your
17    testimony with anyone other than your attorney?
18         A.   No, not my testimony.  No.
19         Q.   Have you reviewed any materials that have
20    been provided to you in preparation for today's
21    deposition?
22         A.   The only thing I reviewed was some old --
23    the old policies and procedures.
24         Q.   Now, when you say old policy and
25    procedure, what did you mean?
```

```
 1        A.    The policies and procedures that were in
 2   place January of 2023.
 3        Q.    Okay.  Prior to the policies -- why do you
 4   call that old?
 5        A.    Because they've since been changed,
 6   several of them have been changed.
 7        Q.    So you have reviewed the policies that
 8   were in place at the time of what happened to
 9   Michael Jenkins and Eddie Parker?
10        A.    Yes.
11        Q.    When were those policies developed?
12        A.    I'd have to look back at them again to see
13   the dates on them.
14        Q.    But you don't recall the dates on them at
15   this time?
16        A.    No, sir.  I can tell you they were in
17   place in January of 2023, those were the current
18   policies.
19        Q.    And then the policies were changed?  Were
20   the policies changed after that?
21        A.    Some policies were changed after that,
22   yes, sir.
23        Q.    Okay.  And the policies that were in place
24   in January of 2023, how long had they been in place
25   for?
```

Sheriff Bryan Bailey - January 30, 2024

8

```
 1        A.   I don't know.  I would have to review them
 2   again because it was five or six different policies.
 3   I don't know the dates on them.
 4        Q.   What would be your -- what would be
 5   your -- your rough estimate?
 6             MR. DARE:  You're not required to
 7   speculate.
 8             THE WITNESS:  I would have to review them
 9   and get the date off the policy and procedures.
10        Q.   (By Mr. Shabazz) But do you recall, prior
11   to January 2023, the last time that any of those
12   policies were changed?
13        A.   The policies are constantly changed.
14   That's why I'm saying I would have to look at the
15   dates.  Because throughout the years they're
16   constantly being changed and updated.  So I can't
17   give you an exact date that they were updated.
18        Q.   But you say that they're constantly being
19   changed and updated prior -- going up to the
20   incident of January 2023?
21        A.   Yes, sir, policies and procedures are
22   reviewed and updated over time.
23        Q.   Okay.  And you say that was constantly
24   occurring?
25        A.   Over time, yeah.  But it's not like a -- I
```

9

```
 1    mean, I'm sure yearly that something in a policy
 2    would change yearly or every other year, but they
 3    would be reviewed and changed as needed.
 4         Q.   Okay.  Can you tell me, in terms of the
 5    Michael Jenkins and Eddie Parker incident, can you
 6    tell me everyone you have spoken to about this
 7    lawsuit?  Can you tell me the persons that you've
 8    spoken to about -- pardon me -- not the lawsuit.
 9    About the incident that occurred, the shooting of
10    Michael Jenkins.  Can you tell me everyone that you
11    have spoken to about that incident?
12         A.   I don't know if I can tell you every
13    single person I talked to, but I can -- I know I
14    talked to the administrative staff at the sheriff's
15    office and our attorney and -- that would be the
16    main ones that I talked to about it.
17         Q.   The administrative staff at the sheriff's
18    office?
19         A.   Yes, sir.
20         Q.   Okay.  Could you tell me those persons you
21    spoke to about it?
22         A.   Let's see, back then the undersheriff
23    would have been Randy Gray, the attorney would have
24    been Paul Holley, the Captain of Patrol would have
25    been Dewayne Thornton, the Chief Investigator would
```

1    have been Brett McAlpin, the Jail Administrator

2    would have been Barry Vaughn, I think

3    Michael Chandler was over Court Services.

4        Q.   Who was that person?

5        A.   Michael Chandler would be the Captain over

6    Court Services.

7        Q.   Okay.  That's the administrative staff at

8    the jail.

9             Have you spoken to any other agency

10   authorities about that incident?

11            MR. DARE:  Object to form.  You can

12   answer.

13       Q.   (By Mr. Shabazz) For example, Department

14   of Justice, Mississippi Bureau of Investigation?

15       A.   The night that it happened I talked to

16   Investigator Holifield, Colonel Haynes and there's

17   another MBI investigator, I can't remember his name,

18   that responded that night.  I talked to them that

19   night about the initial call.

20            Then afterwards I didn't really talk --

21   you know, I really wasn't informed of anything.  The

22   only time I talked to -- I think I talked to an FBI

23   agent one time when he was up at the office.

24       Q.   Who would that person be?

25       A.   Adam Smith I think is his name.  Roland

1    Adam Smith is the agent.

2        Q.    Roland Adam Smith?

3        A.    Yes, sir.

4        Q.    Okay.  Go ahead.

5        A.    And then pretty much after they, the MBI

6    and FBI took over the -- or did their investigation,

7    I really didn't -- wasn't really updated or anything

8    that I can remember by any of them.  Not until --

9    really not until later on.  Later on one of the

10   deputies involved came and met with Paul Holley and

11   Steve Godfrey and that was just like months later.

12   It was like June of that year and told them the

13   truth.

14           So that's how I actually found out the

15   truth about the case.

16       Q.    Which deputy?  Which deputy was that?

17       A.    Hunter Elward.

18       Q.    And you said later on he came to you or he

19   came to the other persons you named?

20       A.    He met with Steve Godfrey and Paul Holley

21   and told them the truth and they came back and

22   related that to me.

23       Q.    Was Elward -- at that time, was

24   Hunter Elward still employed with the Rankin County

25   Sheriff's Department?

```
1         A.   Yes, he was still employed but he was

2    terminated the same day.

3         Q.   What month was that?

4         A.   It would have been June of '23.

5         Q.   June of 2023?

6         A.   Yes, sir.

7         Q.   Okay.  Let me ask you this.  At that time

8    was Christian Dedmon still employed with the Rankin

9    County Sheriff's Department?

10        A.   Yes, that day he was.  But he was

11   terminated the same day also.

12        Q.   Okay.  I just want to -- was Deputy

13   Opdyke, was he still employed on that day?

14        A.   Yes, but when I found out the truth, he

15   was terminated also.

16        Q.   I understand the terminations.  I just

17   want to know their status of employment at that

18   time.

19             So Deputy Dedmon was still employed in

20   June of 2023; is that correct?

21        A.   Yes, sir, he was terminated in June of

22   2023.

23        Q.   I get you on the termination.  I'm just

24   asking you about the status at that time.  I

25   understand -- I'll get to the termination.
```

Sheriff Bryan Bailey - January 03, 2025

13

```
 1              I just want to know were they still
 2   employed.  When June of 2023 came around, I just
 3   want to know which of these officers that were
 4   involved in the Jenkins-Parker dispute were still
 5   employed.
 6              So Hunter Elward was still employed; is
 7   that correct?
 8        A.    He was employed and terminated in June.
 9        Q.    Okay.  Deputy Opdyke was still employed,
10   correct?
11        A.    Deputy Opdyke was employed and terminated
12   in June.
13        Q.    Okay.  Deputy Dedmon was still employed;
14   is that right?
15        A.    Yeah, employed and terminated in June.
16        Q.    Lieutenant Middleton?
17        A.    That's right.  He was still employed until
18   I found out the truth that day and was terminated in
19   June.
20        Q.    Okay.  All of the officers that were
21   involved in the incident that were subsequently
22   convicted, they were all employed as of May 31,
23   2023; is that correct?
24        A.    Yes, sir.
25        Q.    Okay.  Now in terms of communicating about
```

1    the lawsuit, have you spoken to the Department of

2    Justice about -- about the incident?  Have you

3    spoken to the Department of Justice about what

4    happened in that specific incident?

5         A.   No, we met with the Department of Justice,

6    but this specific incident wasn't discussed.  The

7    best I can recall nothing was said about the

8    incident.

9         Q.   In terms of your performance as the

10   Sheriff and how you have been supervising and

11   running the department, have you spoken with the

12   Department of Justice about that?

13        A.   They -- we met with them, I can't remember

14   the date, a couple of months ago and they were

15   coming in to look and see how we operated things.

16   And, like I say, nothing was really discussed about

17   it.  They were just going to come in and interview

18   people and see how we operate and get copies of

19   policies and procedures and stuff like that.

20        Q.   Okay.  Now when did that occur?

21        A.   I can't remember.  It's been a month or

22   two ago.  I don't remember the exact date.

23        Q.   A couple of months ago?  A couple of

24   months ago, would that be accurate?

25        A.   Yes, sir.

Sheriff Bryan Bailey - January 9, 2025

```
 1              MR. DARE:  He testified a month or two
 2    ago.
 3              THE WITNESS:  Yeah.
 4         Q.   (By Mr. Shabazz) Okay.  Who from the
 5    Department of Justice did you meet with?
 6         A.   I can't remember all their names.  It was
 7    five or six of them.  I can't remember their names.
 8         Q.   Can you remember any names?
 9         A.   No, sir, not off the top of my head.
10         Q.   Okay.  Do you have any records of that
11    meeting?
12         A.   Yes, sir.  Our attorney was there with us
13    and all the admin staff.  We actually had more than
14    one meeting.  There was a couple of meetings that
15    we've had with them.  I think two or three meetings.
16         Q.   So you had two or three meetings?
17         A.   Yes, sir.
18         Q.   Do you recall the name of any person from
19    the Department of Justice that you met with in those
20    several meetings?
21         A.   No, sir.  I would have to go back and
22    look -- and look the name up.  Like I said, I met
23    them two or three times, but I can't remember their
24    names.
25         Q.   If you went to look it up, where would you
```

```
 1    look their names up from?
 2         A.    I'd probably get with my attorney because
 3    I know that he was there and has the contact
 4    information from them.  I'd probably get the
 5    information from him.
 6         Q.    Your attorney would be able to tell us the
 7    persons you met with from the Department of Justice?
 8         A.    Some of them I believe he would be able
 9    to, yes.
10         Q.    Okay.  And you stated that you supplied --
11    that you'd given -- am I correct that you -- that
12    you stated that you'd given the Department of
13    Justice a number of documents?
14         A.    We're using the -- our attorney is the
15    go-between between the sheriff's office and
16    Department of Justice.  So pretty much they've been
17    communicating with him and he's been supplying the
18    information that they requested.
19         Q.    But you -- is it true that you've given
20    your attorney the documents that were supplied to
21    the Department of Justice?
22         A.    No, sir, I didn't give him the documents.
23    No, sir.
24         Q.    Okay.  What was -- what's the source of
25    those documents that you gave the Department of
```

Sheriff Bryan Bailey - January 9, 2025

1   Justice?

2       A.   Well, it wouldn't be such much the

3   documents, it would be computer files, like files.

4       Q.   Which files?  What files were given?

5       A.   We'd have to ask him.  See I know that it

6   was maybe some offense reports, some, maybe some use

7   of --

8       Q.   What was that?  What was that?

9       A.   Offense reports.

10      Q.   Offense reports?

11      A.   Yes, sir.  Offense reports.

12      Q.   Tell me what an offense report is.

13      A.   It's a report that's written when a deputy

14  responds to a call for service.

15      Q.   What other reports -- what other reports

16  were given to the Department of Justice?

17           MR. DARE:  I've got to object to the form,

18  simply because what relevance does that have to this

19  case, what was given to the Department of Justice?

20           MR. SHABAZZ:  Okay.  I mean, I understand

21  your objection, but you're still required to answer.

22           MR. DARE:  And you're required to ask

23  relevant questions.  So...

24           MR. SHABAZZ:  The Department of Justice

25  has opened a pattern and practice investigation into

18

1    Rankin County as it respects to how it's been either

2    protecting or not protecting the constitutional

3    rights of the citizens.  And so the documents that

4    -- and the meetings and the substance of them of

5    what has been discussed with and given to the

6    Department of Justice is directly related to the

7    core claims in this civil rights lawsuit, which has

8    many similarities to the pattern and practice

9    investigation.

10           So what I just want to get to is just

11   trying to figure out what was -- what are the

12   documents that were given to the Department of

13   Justice, so we just want to figure those documents

14   out so we may obtain them.

15           MR. DARE:  You can answer if you know.

16           THE WITNESS:  Yeah.  I don't know

17   everything that was given to them.  I believe it was

18   offense reports and some use-of-force reports, as

19   far as I know.

20      Q.   (By Mr. Shabazz) Okay.  Use-of-force

21   reports.  Do you know what period of time those

22   use-of-force reports covered?

23      A.   No, sir, I don't.

24      Q.   Okay.  Do you know how many use-of-force

25   reports were furnished?

```
 1        A.    I don't.

 2        Q.    But you supplied -- you're the one that

 3   supplied the documents, correct?

 4        A.    No, sir, I haven't supplied anything.

 5   They're on file at the sheriff's office.

 6        Q.    Okay.  But you are -- you have ultimate

 7   control of those documents?

 8        A.    I personally have not retrieved any of the

 9   documents or things given to them.

10        Q.    Who in your office did?

11        A.    Again, the file -- the data would be on

12   the server, so I know that a lot of data was saved

13   to a hard drive and given to DOJ, but I don't know

14   exactly what all it was besides --

15        Q.    Okay.  But how did it get there?  Which

16   person in your office was the one that supplied the

17   documents?

18        A.    The IT department put them on a hard drive

19   and the hard drive was given to our attorney who

20   gave it to DOJ.

21        Q.    Who directed the IT of which documents to

22   provide?

23        A.    I guess Attorney Dare told them what he

24   needed and they put it on a hard drive.

25        Q.    So you're saying Attorney Dare directly
```

1    communicated with your staff to gain these

2    documents?

3              MR. DARE:  And just for the record, I am

4    counsel on the record for the Sheriff's Department

5    for the County in the ongoing Department of Justice

6    investigation.

7              MR. SHABAZZ:  Okay.

8         Q.   (By Mr. Shabazz) So are you saying that

9    Attorney Dare worked directly with your staff to get

10   the documents that were furnished to the Department

11   of Justice?

12        A.   The IT department actually doesn't work

13   for me, so.

14              Yeah, but they were asked to put them on a

15   hard drive to supply to the Department of Justice.

16        Q.   Okay.  But were you aware of what was

17   being provided?

18        A.   Yes, sir, I was aware that information was

19   being supplied to them.  Yes, sir.  I can't tell you

20   exactly what all information or the date ranges on

21   it, but, yeah, I'm aware that they were asking for

22   information and we were cooperating with them and

23   supplying it.

24        Q.   And I understand you can't give me any

25   detail.  But you've told me you've given -- you gave

Shericka Bryan Bailey - January 9, 2025

21

```
 1   offense reports, use-of-force reports.  What other
 2   documents were provided to the Department of
 3   Justice?
 4        A.   I can't recall right now.  I don't know
 5   for certain what all was supplied to them.
 6        Q.   I know you can't know all for certain, but
 7   do you remember more than just these two sets of
 8   documents that you've described to me?
 9        A.   That's all I can remember right now.
10   There may be something else, but I can't remember.
11        Q.   Okay.  Did you provide them with a taser
12   reports, taser logs?
13        A.   I don't know if they've asked for that
14   yet, I don't know if it's been supplied yet.  Like I
15   said, the only thing I know is it was offense
16   reports and use-of-force reports.  I really can't
17   remember what else has been asked for.
18        Q.   Okay.  But you and your attorney can
19   provide us with all of the documents that you
20   provided to the Department of Justice; is that
21   correct?
22             MR. DARE:  You can answer.
23             THE WITNESS:  I don't know if we can
24   provide to you the documents, but I know we can
25   provide possibly what all they asked for.  Again, I
```

1    would have to go back and look and see what all they

2    asked for because I'm not certain.

3        Q.    (By Mr. Shabazz) Okay.  But will you go

4    back so we can have copies of that?

5        A.    Will I what?

6        Q.    Will you go back and be sure about -- and

7    review what was given to the Department of Justice

8    so that we may have copies of those documents?

9            MR. DARE:  Counsel, if you'd like

10   documents from the sheriff's department, all you got

11   to do is ask.  Now, if you're just going to ask for,

12   hey, we want everything from the Department of

13   Justice, I'm probably going to object and say ask

14   for specific documents.

15           So that sounds like a fight later on

16   between you and me and doesn't necessarily concern

17   this witness.  But we can have that conversation.

18           MR. SHABAZZ:  Okay.  Not to get into a

19   sidebar with you, but we have asked for that.  So

20   I'm only just trying to figure out here exactly, you

21   know, what the documents were so that we'll know --

22   have greater clarity on obtaining it.  I'll move on.

23       Q.    (By Mr. Shabazz) Okay.  Now you say you

24   had several meetings with the Department of Justice,

25   correct?

23

```
 1        A.    No, it wasn't several.  I think I met with
 2   them two or three times.
 3        Q.    And in those three meetings, what was the
 4   substance of the discussion of those meetings?
 5        A.    They explained why they were there, what
 6   they were going to be doing, who they would be
 7   talking to in the first meeting.  And I remember the
 8   second meeting was more the administrative staff.
 9   Again, they went back over why they were there, what
10   they were going to be doing and who they wanted to
11   talk to and talked about doing ride-alongs.
12             And then I can't -- so I may have only met
13   with them twice.  So that's for certain the two
14   meetings I know I was in with them.
15        Q.    And what is the current status of the
16   Department of Justice investigation into Rankin
17   County?
18        A.    I have no idea.  We haven't -- I haven't
19   heard -- as far as I know we haven't heard from them
20   in a couple weeks.  But I have no idea what their
21   status is.
22        Q.    Okay.  From your understanding from those
23   meetings, what do you understand that they would be
24   doing?
25        A.    Reviewing data from the sheriff's office,
```

```
 1   doing ride-alongs and interviewing deputies.
 2        Q.   Have they conducted any ride-alongs?
 3        A.   Yes, sir.
 4        Q.   Who did they ride along with?
 5        A.   I can't remember off the top of my head.
 6   I would have to go back and try to find a list.  But
 7   it was -- I know they came a couple of times and
 8   each time they'd ride with two or three deputies.
 9   So it may be approximately -- probably around six
10   deputies they've ridden with.
11        Q.   Okay.  You would be able to tell us their
12   names if we ask your attorney?
13        A.   Yes, sir.
14        Q.   Who -- when they talked to you at first,
15   when they first had the meetings with you, who did
16   they tell you they wanted to talk to?
17        A.   Well, at first they just said that they
18   were there for the -- to look into the patterns of
19   practice, but they -- we weren't being accused of
20   doing anything wrong and that they would be
21   interviewing different ones.  And I know that
22   they've interviewed the deputies and I think maybe a
23   couple of jailers.  And that's the only ones I know
24   they've interviewed so far.
25        Q.   Okay.  Now, we -- I'm still talking about
```

1    communications here, just with other persons about

2    either this incident or the lawsuit -- incident or

3    this lawsuit or related investigations.  What other

4    law enforcement officials in your department have

5    you talked to about the Jenkins and Parker incident

6    or this lawsuit?

7         A.    About the -- I mean, I can't remember

8    everybody I talked to.  But the main ones I talked

9    to were the administrative staff, the attorney, you

10   know.  The only other person I -- that I know

11   specifically I talked to about it was Chris Picou

12   who's over the K-9s.

13        Q.    How do you spell Chris' name?

14        A.    C-H-R-I-S, Picou, P-I-C-O-U.

15        Q.    Uh-huh (affirmative response).

16        A.    And, like I said, I can't remember who

17   else -- who else I talked to about it.

18        Q.    Okay.  Have you talked -- did you talk to

19   Brett McAlpin about what happened on January 24,

20   2023?  Did you ever speak with him after January 24,

21   2023?

22        A.    No, I didn't.  And once or twice he came

23   in my office and he would start talking about it and

24   because the MBI and the FBI were investigating it, I

25   told him, I say, Brett, we don't need to talk about

1  this.  This is being investigated by MBI and FBI,

2  I'm not going to talk to you about it.  And so, he

3  never tried to talk to me again.  And he really

4  wasn't talking about it, he would come in and say,

5  you know, this isn't right, it's a lie or something

6  like that and I would stop him.  I said, you know,

7  Brett, I don't want to talk to you about it.

8       Q.   So he came to your office how many times?

9       A.   Maybe twice.

10      Q.   Just on his own initiation?

11      A.   Yes, sir.

12      Q.   On his own initiative?  Pardon me.

13      A.   Yes, sir.  Let me rephrase.  He's been in

14  my office several more times, but it would be about

15  a case or something with the sheriff's office.  But,

16  you know, once or twice he said -- he tried to bring

17  up something about the January incident and, again,

18  I stopped him and told him I couldn't talk to him

19  about it.

20      Q.   Okay.  So are you saying that you -- that

21  after January 24, 2023 that -- are you saying that

22  you and Brett McAlpin had regular meetings?

23      A.   We had -- not regular meetings, but he --

24  they would -- he would come and tell me what was

25  going on, you know, within the sheriff's department.

Shelbria Bryan Bailey - January 09, 2025

27

```
 1    If there was a case that I needed to know about or
 2    some investigation that they were working on, he
 3    would come tell me about it.
 4         Q.   So up until the time he was terminated,
 5    about how many times did you meet with Brett McAlpin
 6    after the Jenkins and Parker incident?
 7         A.   I'd say maybe once or twice a week or two
 8    or three times a week.
 9         Q.   And he was the chief -- your chief
10    investigative officer, right?
11         A.   Yes, sir.
12         Q.   And he continued to function in that
13    office up until the time of his exit; is that
14    correct?
15         A.   Yes, he did.  And the reason he did is
16    because he lied to me about everything to do with
17    that night.  He told me he wasn't even there.  So he
18    lied the whole time.
19         Q.   Okay.  I'll come back to that.
20              And who ever else -- have you spoken to
21    like a spouse or partner about this lawsuit or a
22    lawsuit or what happened in Jenkins and Parker?
23    Have you spoken to a spouse or partner about this?
24              MR. DARE:  Yeah, we'll go with the spousal
25    immunity on that one.
```

Shebrika Bryan Bailey - January 9, 2025

28

```
 1       Q.   (By Mr. Shabazz) Partner, friend,
 2   relative?
 3       A.   I've talked to, you know -- again, this
 4   has been going on for almost two years now and it's
 5   taken a heavy toll on me.  So I've talked to, you
 6   know, different people about it, but, specifically,
 7   which ones, it's going to be hard for me to tell you
 8   or come up with a list of everybody that I've talked
 9   to about it.
10            THE WITNESS:  Did I do something?  It
11   says, collaborate using zoom.
12            MR. DARE:  No, he's still live.
13            MR. SHABAZZ:  I'm sorry, what was that
14   last thing?
15            MR. DARE:  No, there was something --
16   sorry -- and we can be off the record.
17              (Pause in proceedings.)
18       Q.   (By Mr. Shabazz) Okay.  So you said it's
19   been a couple of years and you've spoken to quite a
20   few people about it; is that right?
21       A.   I wouldn't say quite a few, but I've
22   talked to several people.  Not about details of it,
23   just about how it was a very stressful thing to go
24   through and what a bad situation it was.
25       Q.   Okay.  Well, can you elaborate on that?
```

1    You say it's a stressful thing to go through and

2    it's taken a toll on you, to paraphrase you.  Can

3    you explain that?

4        A.    Yes, sir.  I'm elected by the people of

5    Rankin County to provide a safe community.  And I

6    would hope that most people I have working for me

7    would have the same desire to serve the public and

8    protect the public like I do.  And then I find out

9    that -- and it took months to find out, that five of

10   my guys actually committed crimes and just ruined

11   the reputation of the sheriff's office, ruined two

12   young men's lives.

13           And that's just a lot to take on when I've

14   really tried my whole career to make it a good

15   department.  And I've always gotten a lot of

16   compliments.  A lot of -- you know, I've been

17   reelected to the office, this is my fourth term.

18   And, you know, I was -- really thought that I had a

19   good department going until these individuals did

20   this and they lied to me about it.  And then, again,

21   it took me six months to find out the truth or right

22   at six months.

23           So yeah, it was pretty stressful.

24       Q.    Okay.  Let's -- when were you first

25   elected as sheriff?

```
 1        A.   I took office in January of 2012.

 2        Q.   And you say you've been reelected four

 3   times since then?

 4        A.   This is my fourth term, so, yeah.

 5        Q.   You're on your fourth term?

 6        A.   Uh-huh (affirmative response).

 7        Q.   Prior to being elected sheriff, what

 8   position did you hold in sheriff's department?

 9        A.   I was the undersheriff.

10        Q.   From what years?

11        A.   For eight years.

12        Q.   From, would you say, roughly 2004 to 2012?

13        A.   Yes, sir.

14        Q.   And prior to that what position did you

15   hold?

16        A.   I was an investigator.

17        Q.   In Rankin County?

18        A.   Yes, sir.  I was investigator for the

19   sheriff's office.  I also worked for the Attorney

20   General's Office, Public Integrity Division for a

21   little while.  But they kept me out of town too much

22   so I came up to -- back to the sheriff's office.

23        Q.   When you were the undersheriff, what

24   sheriff did you serve under?

25        A.   Ron- --
```

```
 1        Q.   What was that?

 2        A.   Go ahead.

 3        Q.   Who was the sheriff you served under from

 4   2004 to 2012?

 5        A.   Ronnie Pennington.

 6        Q.   How you spell his name?

 7        A.   P-E-N-N-I-N-G-T-O-N.

 8        Q.   Rodney Pennington?

 9        A.   Ronnie, R-O-N-N-I-E, Ronnie.

10        Q.   Ronnie Pennington.  From 2004 to 2012?

11        A.   Uh-huh (affirmative response).

12        Q.   So back to when you were undersheriff up

13   until now, if you wanted to access your personnel

14   file, could you?

15        A.   My personnel file at the sheriff's office?

16        Q.   Yes.

17        A.   Yes, sir.

18        Q.   And you do have possession of your

19   personnel file?

20        A.   Yes.

21        Q.   Is that going back to 2004?

22        A.   It would be prior to that.  I started at

23   Rankin County, I think it was January of '96 maybe.

24        Q.   '96?

25        A.   Yes, sir.  And I was there --
```

```
 1        Q.   You could --

 2        A.   Go ahead.

 3        Q.   No, go ahead.

 4        A.   I was there until maybe sometime in '97 I

 5   went -- I can't remember the dates, but sometime

 6   during my career I went to the Attorney General's

 7   Office, Public Integrity Division and I came back to

 8   the sheriff's office and have been there ever since.

 9        Q.   If you wanted to access your disciplinary

10   records since you began, could you?

11        A.   Yes, sir.  I don't think I have a -- I

12   don't think there's anything in my file on

13   discipline.

14        Q.   Okay.  Now, once you were elected sheriff,

15   did Rankin County Board of Supervisors or its

16   leadership, did they have any other procedures or

17   way to assess your qualifications to run the

18   department?

19        A.   Board of Supervisors doesn't have anything

20   to do with my qualifications of running the

21   department.  But the State law says -- states my

22   qualifications to be elected or to take office.

23        Q.   I understand what the State law says and I

24   understand you're elected.

25             But I just wanted to know, does Rankin
```

Sheriff Bryan Bailey - January 3, 2023

33

```
 1    County have any -- anything in place that assesses
 2    your qualifications to be the sheriff?
 3            MR. DARE:  And for Rankin County, are you
 4    referring to the Board of Supervisors or are you
 5    referring to the sheriff's department?
 6            MR. SHABAZZ:  I'm speaking to the Board of
 7    Supervisors or any county leadership outside of the
 8    sheriff's department?
 9            THE WITNESS:  No, sir, I'm separate from
10    the Board of Supervisors.  The only thing they do is
11    provide my funding I'm elected separately from them.
12    I have my own office.
13        Q.   (By Mr. Shabazz) I understand the
14    structure.  But I'm asking you, does the Board of
15    Supervisors or Rankin County have anything in place
16    to assess your qualifications or assess your
17    performance while they are funding?
18        A.   The Board -- Rankin County Board of
19    Supervisors has no authority over the sheriff's
20    office besides my funding.  They have to provide my
21    funding.  Financial, that's the only thing they have
22    anything to do with the sheriff's office, is approve
23    my budget every year and approve the training.
24        Q.   You say "only," but funding is pretty big,
25    isn't it?
```

34

```
 1        A.   Well, I mean, it's not big enough.  I
 2   could always use more.
 3        Q.   You can't operate, you can't -- you can't
 4   do anything without funds; is that correct?
 5        A.   That's right.
 6        Q.   So, just for example, how much was your
 7   budget in the last fiscal year?
 8        A.   I would have to go back and see, but maybe
 9   19 or 20 million.
10        Q.   So just in the last fiscal year Rankin
11   County Board of Supervisors allocated you
12   $20 million?
13        A.   Yeah, that may not be the exact number
14   because it changes every year.
15        Q.   Approximately 20 million?
16        A.   Uh-huh (affirmative response).
17        Q.   And are you telling me that in giving you
18   this $20 million that there's no stipulations or
19   review of how you're operating the department when
20   you receive that approximately $20 million?
21        A.   No, sir.  The State law says that they
22   have to supply my money for the budget.  And that I
23   spend that money -- you know, I submit a budget to
24   them.  I spend that money on my budget.  But outside
25   of that, they have no -- nothing to do over the
```

1    sheriff's office.

2         Q.    So they just give you the money regardless

3    to your performance; is that correct?

4              MR. DARE:  This has been asked and

5    answered now, at least, 10 times.

6              MR. SHABAZZ:  How is it 10 times?  I just

7    started this.

8              MR. DARE:  You've asked the exact same

9    question now 10 different ways.  And just because

10   you don't get the answer you like doesn't mean you

11   get to ask it again.  He's answered the question.

12             MR. SHABAZZ:  I get --

13             MR. DARE:  He's answered this question.

14   And I would -- he can answer it again one more time

15   but then you need to move on.  Because I'm going to

16   instruct him not to answer the exact same question

17   over and over and over again.

18             MR. SHABAZZ:  Well, I disagree with your

19   characterization with that.

20             MR. DARE:  Understood.  But you have asked

21   the question a bunch of times.  Ask it in a

22   different way if you want, but, you know, I'm going

23   to continue to object to asked and answered.

24        Q.    (By Mr. Shabazz) Does the Board of

25   Supervisors exercise any authority over you for

Sheriff Bryan Bailey - January 03, 2025

```
 1   giving you that approximately $20 million?

 2       A.   I'm elected separate from the Rankin

 3   County Board of Supervisors.  The people of the

 4   County elect me.  I'm accountable to the people of

 5   Rankin County.

 6            The State law says that the Board of

 7   Supervisors funds my department.  So each year I

 8   submit a budget request, they give me what they --

 9   what they agree to on my budget and I have to spend

10   that money throughout the year.

11            Now if something happens and I need more

12   money, then I have to go back before them.  I've had

13   to change some money between lines for like inmate

14   medical or something like that, I have to ask for

15   more money.  Then I have to go back before the Board

16   and ask them.

17            And the only other thing they have

18   authority over is if me or any of my deputies or

19   jailers go out of town for training, they have to

20   approve the out-of-town travel, the meals, the

21   lodging and stuff like that.  Again, all financial

22   stuff.

23       Q.   Okay.  Now I want to -- from my

24   understanding that you meet monthly with the Board

25   of Supervisors; is that correct?
```

37

```
 1        A.   It's -- most of the time it's two to three
 2   times a month.
 3        Q.   You meet with them two to three times a
 4   month?
 5        A.   Uh-huh (affirmative response).
 6        Q.   And all of those meetings are -- the notes
 7   are -- the minutes are online; am I correct?
 8        A.   Yes, sir, I think there are videos -- I
 9   think they video each meeting and it's -- I think
10   it's available online through their website.
11        Q.   So there's a video of each meeting also.
12             And from my understanding sometimes you
13   all go into what's called executive session; is that
14   correct?
15        A.   Yes.
16        Q.   Okay.  And when do you go into executive
17   session?  What -- when do you go into executive
18   session?
19        A.   I don't go into executive session.  I have
20   no authority to go into executive session.  It's the
21   Board, the five Board of Supervisors votes or makes
22   a motion to go into executive session and they go
23   into executive session.
24        Q.   Are you in those meetings?
25        A.   Yes, sir.  Well, not all of them.
```

 1   Sometimes I have to get a substitute to go in my

 2   place.

 3        Q.   But you are in some of those meetings of

 4   executive session?

 5        A.   Yes.

 6        Q.   Okay.  And what happens in those meetings?

 7        A.   Well, the reason they go into executive

 8   session most of the time is either for land

 9   acquisition, personnel, lawsuits, different things

10   like that where the law allows them to go into

11   executive session.

12        Q.   And are those meetings recorded?

13        A.   I don't think the excessive session part

14   is.  Now, if they agree on something in the

15   executive session and come out of the executive

16   session, if they took any action, they have to put

17   it on the minutes then, on the video.  So after the

18   executive session, if they do anything it would be

19   on that video, if they take any action.

20        Q.   And are there minutes taken in those

21   executive session meetings?

22        A.   I'm not sure.  That would be a question

23   for the chancery clerk.  They keep the minutes of

24   the meetings.

25        Q.   Do you take any notes in those meetings?

```
1          A.    No, sir.

2          Q.    And who's in those meetings, again?

3          A.    Let me clarify to you, the State

4    statute -- the State law says I'm required, the

5    sheriff or his designee must attend the Board

6    meetings.  So that's why I'm there to start with.

7                And then so you'll have the five, if all

8    of them are present, the five supervisors, the

9    county administrator, the county attorney, the -- or

10   the board attorney, not the county attorney, the

11   chancery clerk or his designee.  Most of the time

12   that's it, unless they have to bring in a -- like on

13   the land acquisition, sometimes they'll bring in

14   somebody that's trying to buy land for a

15   right-of-way for the County and that person will

16   discuss that with them in there, you know, things

17   like that.  But most of the time that's who's inside

18   there.  The supervisors, chancery clerk and county

19   administrator, board attorney and then whoever is

20   involved with the executive session.

21               MR. SHABAZZ:  Okay.  I think what I want

22   to do is come with my first exhibit and that's

23   Rankin Supplemental Responses.  Rankin County

24   Supplemental Responses to Plaintiff's

25   Interrogatories.
```

```
 1              MR. DARE:  Are those going to be Exhibit 1
 2     to your deposition?
 3              MR. SHABAZZ:  Yes.  This is going to be
 4     marked as Exhibit No. 1.
 5              MR. DARE:  Okay.
 6              (Exhibit 1 marked for identification.)
 7              MR. DARE:  Counsel, he has in front of him
 8     Rankin County Supplemental Responses to Plaintiff's
 9     First Set of Interrogatories marked as Exhibit 1 to
10     this deposition.
11              MR. SHABAZZ:  Okay.  And I want to go to
12     page 2.  If we could show him page 2.  Are we
13     putting this on the screen or how are we working it?
14              MR. DARE:  He's got it in front of him.
15              MR. SHABAZZ:  Okay.
16         Q.   (By Mr. Shabazz) So I want to direct your
17     attention to page 2 at the bottom, supplemental
18     response.  Well, actually strike that.
19              I want to direct your attention to
20     Interrogatory No. 3.  Do you see that, Mr. Bailey?
21         A.   Yes, sir.
22         Q.   It says, identify all persons responsible
23     for monitoring the action of the Rankin County
24     Sheriff's Department on behalf of the County.
25              Do you see that question?
```

```
 1        A.   Yes, sir.

 2        Q.   Now, when you answered, you answered

 3   that -- do you see supplemental response at the

 4   bottom?

 5        A.   Yes, sir.

 6        Q.   You stated that, Rankin County monitors

 7   the action of the Rankin County employees working at

 8   the Rankin County Sheriff's Department through,

 9   several persons.  It says though Wayne Carter, the

10   Training Director DeMartino, supervisors, not

11   limited to you, but Barry Vaughn, Brian Whittington,

12   Fred Lovette, jail administrator, Darrell Barnett.

13   Those persons you named earlier?

14             MR. DARE:  Daniel Barnett.

15             THE WITNESS:  Daniel Barnett.  Yes, sir.

16        Q.   (By Mr. Shabazz) Okay.  These are the

17   persons that monitor the actions of the Rankin

18   County Sheriff's Department?

19        A.   Yes, sir, they're all in the supervisory

20   positions.  Yes, sir.

21        Q.   Okay.  Now, is there anybody outside of

22   the sheriff's department in Rankin County, such as

23   the Board of Supervisors or its leadership, that

24   monitors the actions of the sheriff's department?

25        A.   No, sir.  We're separate from the Board of
```

 1   Supervisors.  I'm elected separate from all the

 2   supervisors.  All they do is provide me funding.

 3       Q.   I got that.  I get that answer.  I get

 4   that.

 5            So all of your -- all of your actions are

 6   monitored within the sheriff's department's chain of

 7   command; is that right?

 8       A.   Well, that, and I mean, like I said

 9   before, I'm directly accountable to the public,

10   every four years I'm elected.  So if I don't do a

11   good job I'm not going to get reelected.

12            So I'd say number one I'm directly

13   accountable to the people of Rankin County.  And

14   then within the department, these different

15   supervisors monitor the sheriff's office.

16       Q.   But other than that, unless it's election

17   time, when it comes to monitoring your department,

18   is it true that the buck stops with Bryan Bailey?

19       A.   Yes, sir.  I'm the sheriff, yes, sir.

20   It's my department.

21       Q.   Okay.  So you determine, ultimately,

22   whether you're in compliance or not outside of

23   elections?

24       A.   No, the election is a daily thing.  It's

25   not every four years.  The election goes on daily.

43

```
 1    And when you're in a county office like this you
 2    have to do a job, you know, try to do a good job
 3    every day.
 4              But I guess I'm confused on what you're
 5    asking as far as -- I'm the sheriff, but yeah, I
 6    have all these supervisors who are supposed to help
 7    me keep this going the correct way.
 8         Q.   But they're under your chain of command,
 9    correct?
10         A.   Yes, sir.
11         Q.   And there is not -- an election does not
12    occur every day, does it?
13         A.   Yes, sir, in my eyes it does.  Yes, sir.
14         Q.   But, formally, there is no daily election,
15    is there?
16         A.   No, sir.  But again, I campaign every day.
17         Q.   But that's politics.
18         A.   No, sir, it's not politics.  I try to do a
19    good job for the people of the county so they'll
20    continue to, you know, elect us.  And I actually
21    live there, so I want to keep it a safe place to
22    live and work.
23         Q.   The public really -- the public -- would
24    you agree that the public does not know whether the
25    Rankin County Sheriff's Department is abiding by the
```

 1   United States Constitution and State law?  Would you

 2   agree?  The public --

 3        A.   I would think that overall, yes, sir, we

 4   abide by it.  Now when you have an incident like we

 5   had in January of '23 when I, you know, had five

 6   sworn officers lie to me and commit the crimes they

 7   did, yeah, that's going to affect the public.  It

 8   has affected the public, it's affected the

 9   department.

10           So, you know, yeah, I have still been

11   accountable to the citizens of Rankin County during

12   all of this.  Because believe me, I've had, you

13   know, a lot of people --

14        Q.   So at --

15        A.   Go ahead.

16        Q.   At the end of the day, you're monitoring

17   yourself?

18        A.   Myself along with the admin staff monitor

19   the sheriff's office daily.  Yes, sir, we try to

20   monitor it daily.

21        Q.   Now what I want to -- I'm trying to get

22   a -- can you -- my Exhibit No. 2 is going to be an

23   organizational chart.  And I want to go to page 4 of

24   that.

25           MR. DARE:  We need to have it marked.

Shettris Bryant Bailey - January 03, 2025

45

```
 1   Hang on real quick.  We can go off the record.
 2                  (Off the record discussion.)
 3                  (Exhibit 2 marked for identification.)
 4        Q.    (By Mr. Shabazz) Do you have that in front
 5   of you, this org chart administration?
 6        A.    Yes, sir.
 7        Q.    Okay.  When was this chart developed?
 8        A.    I'll have to look at the -- it's dated
 9   November 20th, 2023.
10        Q.    Okay.  Did you have an org chart for your
11   department prior to this date?
12        A.    I don't remember if I had one like this or
13   not.  I don't remember, to be honest with you.
14        Q.    Okay.  So why was this chart developed?
15        A.    It was recommended by somebody that we do
16   it, so I approved it.  I don't -- I really can't
17   remember why it was redone.
18        Q.    Redone?  So do you have a previous
19   organizational chart?
20        A.    That's what I'm saying, I don't remember
21   if there's a previous one in the old one or not.  I
22   would have to check on that and let you know.  I'd
23   have to research it.  I don't remember if there was
24   actually a chart in there or not.
25        Q.    Okay.  So right now this is the only org
```

1    chart that you've operated by; is that right?

2        A.    This is the only one I have in front of me

3    that I remember.  I can't remember if we had another

4    one or not.  It seems like that we did, but I'd

5    hate -- I'm trying to answer truthfully to you.  So

6    I don't remember, I would have to research that and

7    let you know.

8        Q.    Okay.  So who recommended that you put

9    this -- who recommended that this chart be a part of

10   your operations?

11       A.    I can't remember at this time, but I can

12   find out.

13       Q.    You can't remember who helped you to

14   produce this chart?

15       A.    No, sir, I can't remember who actually did

16   the chart.  No, sir.  I would have to check with the

17   admin staff and see.

18       Q.    Okay.  But you helped produce this chart,

19   correct?

20       A.    No, sir, I didn't produce it.  Somebody

21   came up with it and recommended it and I approved

22   it.  Again, I would have to check back and see who

23   came up with it.

24             We've had a lot going on the past two

25   years and made some changes and I would have to look

```
1    back to let you know exactly who made this up.
2         Q.   Okay.  But now as the -- as the lead
3    officer of the sheriff's department and the
4    supervisor, the structure of your department is
5    critical to your job, isn't it?
6         A.   Yes, sir.
7         Q.   So this organizational chart represents
8    the actual structure of the department that you're
9    supervising, correct?
10        A.   Yes, sir.  Right now, yes, sir.
11        Q.   So this is something that you had a key
12   role in developing; is that right?
13        A.   Well, they made recommendations.  Like the
14   whole compliance division is new.  We didn't have
15   that before, so we have it now.
16             So again, I'd -- like I said, I would have
17   to go back and find the old, if we have the old one
18   or if it was worded in the policy to let you know
19   exactly what it said.  I can't remember right now.
20   I don't have a photographic memory of what the old
21   one said or if there was a chart in there.
22        Q.   So you do have an old one?  You've
23   referenced that several times.  You do have an old
24   one, you said that?
25        A.   I just said I don't know.  I mean, I've
```

 1    said that three times.  I do not know if there's an

 2    old one actually in the policy and procedure.  I'm

 3    trying to answer your questions the best of my

 4    ability.  And if I'm telling you I don't know, I

 5    don't know.  I don't know if there's actually one in

 6    the policy or if it's just worded in the policy.

 7    I'll be glad to check on it and let you know.

 8         Q.   I'm not going to get stuck on that.  I'm

 9    not going to get stuck on it.  I just know you said

10    old several times, so I'm taking that to mean that

11    there was one.  But it's okay.

12              Let's go to compliance division.

13         A.   Yes, sir.

14         Q.   You say that's a new department?

15         A.   Yes, sir.

16         Q.   Okay.  How did -- how did you come about

17    putting in place the compliance division?

18         A.   You know after what happened in January of

19    2023 with Mr. Jenkins and Mr. Parker, it was obvious

20    the system that I had wasn't working.  You know, I

21    had faith and trust in people to do the right thing.

22    And we had been doing the use-of-force reports, the

23    reviewing offense reports, everything I thought that

24    needed to be done to -- for a check and balance.

25              But after what happened with Mr. Jenkins

```
 1    and Mr. Parker it was obvious that I have to come up

 2    with something else for the checks and balances.

 3              So it was decided that we'd have a

 4    compliance director.  And that would be

 5    Wayne Carter.  And he started this job in -- he was

 6    an investigator before.  He started being compliance

 7    director in maybe June -- mid 2023.

 8              So what his job is, is to -- he's

 9    independent of any of the departments, any other

10    division.  And his main job is to review

11    use-of-force reports and review -- randomly review

12    body-camera video.

13              And more or less, he comes behind the

14    supervisors where we didn't have that before.  I was

15    trusting my supervisors to review and make me aware

16    of things.  Well, now he comes behind the

17    supervisors.  Like a lieutenant is supposed to check

18    so many videos.  Then the captain of patrol checks

19    so many videos.  And then the compliance director,

20    he checks behind the captain randomly.  And he

21    checks pretty much every incident involving

22    use-of-force, reviews it.

23              And then with him there's also a part-time

24    person, Mr. Eric Redd, who assists him with the

25    video, but he also does the background
```

50

1    investigations on new applicants.

2        Q.   Okay.  So back to what you said earlier,

3    so are you saying that you recognize that after what

4    happened to Jenkins and Parker, that your department

5    was not running -- being run right, is that what you

6    are saying?

7        A.   No, sir, I'm not saying that.  I'm saying

8    I thought I was running a good department.  I mean,

9    when I first got elected, I'm the one that started

10   the use-of-force reports and keeping them on file.

11          And, you know, you would think that

12   somebody in law enforcement would have close to the

13   same values and morals that I did.  And so, you

14   know, when you have a supervisor, a chief

15   investigator that lied to me and covered up and

16   committed crimes and covered up for other people.

17   Then it's obvious to me then that, you know, I had

18   to have something else besides just trust in my

19   fellowman.  And so that's why we came up with this

20   is trusting, but verifying now.

21       Q.   Okay.  So you recognize you had serious

22   systemic problems in your department when you

23   created the compliance division?

24       A.   No, sir, I didn't recognize serious

25   systemic problems.  I've never heard of anything

1    like this happening before.  I've never had

2    complaints like this before of what happened in

3    January of '23.  Never in my whole career have I

4    heard or seen of anything like that.

5              And, again, these five guys that I trusted

6    completely lied to me.  And so based on that one

7    incident I see that we had to come up with something

8    else for checks and balances.

9        Q.   You had to change your system; is that

10   right?

11       A.   Not change the system, we added to it.

12       Q.   I think the previous -- it seems like your

13   previous -- your previous system of operations was

14   trusting -- trusting the people who you later say

15   lied to you.  Seems it was based on a trust system

16   rather than a system that goes beyond trusting the

17   individual?

18       A.   I said -- I understand what you're saying.

19   But it was one person, the chief investigator who I

20   had trust in to do the right thing and he failed --

21   failed at that.  And based on that we sort of added

22   to the checks and balances.

23             So, I mean, over all these years I've

24   never had a complaint of the crimes that they

25   committed against the two individuals.  I've never

1    had anything like that being reported.  It has never

2    been investigated by the FBI, never received

3    anything from them.

4            So, like I said, I don't know how it could

5    have been wide-spread if we didn't get more

6    complaints from outside and inside the department.

7            But I'm telling you that based on what

8    happened with that incident with the body cameras,

9    the use-of-force, the crimes that were committed by

10   those deputies, that this compliance division, in

11   our opinion, needed to be added as a check and

12   balance for our whole system.

13       Q.   Okay.  I'll come back to that.

14           Now you speak to making these changes as a

15   result of what happened to Michael Jenkins and Eddie

16   Parker.

17           You're familiar with the case of

18   Mr. Schmidt; is that right?

19       A.   No, sir.  Mr. Schmidt?

20       Q.   Right.  Alan Schmidt.

21       A.   Do you have a offense report or something

22   on that?

23       Q.   No.  Mr. Schmidt was a part of the guilty

24   pleas of your officers, not only were they guilty of

25   the crimes that they committed against

53

```
 1    Michael Jenkins and Eddie Parker, but also what

 2    happened in December of 2022 to Mr. Schmidt.

 3         A.    Was that the incident on the side of the

 4    interstate?

 5         Q.    Yes.

 6         A.    Okay.  I know what you're talking about

 7    now.  Yes, sir.

 8         Q.    Okay.  Did that incident have anything to

 9    do --

10         A.    Yes, sir, along with this, you know, we

11    turn around and investigated that incident

12    internally and took action on a deputy that was

13    still -- at that time was still employed, took

14    action on him.  But, yes, sir, that would have

15    something to do it with it.

16              Also, again, the compliance director

17    reviewing body-camera video and use-of-force

18    reports.

19         Q.    Okay.  I'll come back to that.

20              So compliance division here consists of

21    the compliance director and internal affairs

22    investigators.

23              Who are -- the current internal affairs

24    investigator is who?

25         A.    Right now it's Tyler -- Christopher
```

54

```
1    Cousins and Tyler -- my mind just went blank.
2    Investigator Tyler.  I'll think of his name in just
3    a second.
4         Q.    Investigator Tyler, T-Y-L-E-R?
5         A.    Yes, sir, that's his first name.
6    Tyler Vernell and Chris Cousins.
7         Q.    And you call these your internal affairs
8    investigators?
9         A.    Yes, sir.
10        Q.    When were they placed in that position?
11        A.    I would have to go back and look when --
12   Tyler, we actually hired him from the Attorney
13   General's Office, Public Integrity Division.  And
14   I'd have to look back and give you a date on him
15   when he started at the sheriff's office.
16        Q.    Was it after what happened to
17   Michael Jenkins and Eddie Parker?
18        A.    I can't remember.  I'd have to go back and
19   look and see.
20        Q.    What about Mr. Cousins?
21        A.    Mr. Cousins, he's been there, he's been
22   with the department for a long time.
23        Q.    Serving in which position?
24        A.    Well, he started out as a detention
25   officer then worked his way up to -- went to the
```

55

```
 1   academy and was a deputy and then went to

 2   investigations.

 3       Q.   In terms of internal affairs

 4   investigations, when did -- when was that office

 5   established?

 6       A.   I mean, there's not really an office.  I

 7   mean, they fall up under them now, when the

 8   compliance director finds something, he -- if he

 9   thinks it needs to be looked at he refers it to him.

10   But we've had internal investigations before.  My

11   whole time as sheriff --

12       Q.   I'm sorry, I cut you off.  Go ahead.

13       A.   I said we've had internal investigation --

14   internal investigations for -- I mean, my whole time

15   as sheriff, there's been, you know, somebody

16   available to do an internal investigation.

17       Q.   So do you -- do you know when Mr. Tyler

18   and Mr. Cousins started, began as your internal

19   investigators?

20       A.   I would have to go back and look to give

21   you a specific date.

22       Q.   Do you know who served in that position

23   prior to them serving as your investigators?

24       A.   Steve Godfrey, a retired FBI agent that we

25   hired --
```

Shetrica Bryan Bailey - January 13, 2025

56

```
 1          Q.    Okay.
 2          A.    -- he did that.  But again, we wouldn't
 3   get that many internal affairs complaints.  So Steve
 4   was over like the SRT team, over some training and
 5   the internal affairs.
 6          Q.    But are you stating to me that Steve
 7   Godfrey was your internal affairs investigator?
 8          A.    Steve Godfrey did several of the --
 9   several -- he did some of the internal affairs
10   investigations.  I can't remember if he did all of
11   them or if somebody else did some of them.  I would
12   have to research it and see.
13                MR. SHABAZZ:  I want to show you what
14   we're going to mark as Exhibit No. 3.  And this is a
15   deposition that you took in the Monica Lee case.
16   The case of Damien Cameron, Monica Lee being his
17   mother.
18                Do you have that, Trent?
19                MR. WALKER:  I'm checking for it now.
20                MR. DARE:  While he's looking for that,
21   would this be a good time to take a quick break?
22                MR. WALKER:  Absolutely would.
23                MR. DARE:  Counsel, do you mind going off
24   the record?
25                MR. SHABAZZ:  No, I don't mind.
```

```
 1                      (Off the record.)

 2              (Exhibit 3 marked for identification.)

 3       Q.    (By Mr. Shabazz) Chief Bailey, we're back

 4   on the record.

 5       A.    Yes, sir.

 6       Q.    Can you hear me?

 7       A.    Yes, sir.

 8       Q.    Now, on page 30, line 17, do you see that

 9   on the exhibit, the deposition transcript?

10       A.    Yes, sir.

11       Q.    On line 17 I asked a question, I said,

12   Okay, now you said you had an internal affairs

13   person assigned.

14              And your answer was, Yes, sir, at that

15   time I had an internal affairs investigator.

16              You see that?

17       A.    Yes, sir.

18       Q.    And I said who was that and you said Steve

19   Godfrey; is that right?

20       A.    Yes, sir.

21       Q.    Okay.  And if you -- and if you turn -- if

22   you look at page 31, which is down the page.  And on

23   17 of 31 I asked -- I said, But he was not called

24   your internal affairs officer, was he?

25              You see that?
```

Shelbra Bryant Bunkley - January 03, 2025

58

 1        A.    Yes, sir, Steve Godfrey -- we're talking

 2   about Steve Godfrey doing internal affairs?  Yes,

 3   sir.

 4        Q.    Yes, talking about Mr. Godfrey.

 5              And then you said, Well, yes -- you said,

 6   Well, yeah, he was.  I'm telling you he is the one

 7   called to do internal affairs investigations at that

 8   time.

 9        A.    Okay.

10        Q.    You see that?

11        A.    Yes, sir.

12        Q.    And so your testimony today is that

13   Steven Godfrey was your internal affairs officer at

14   the time of Damien Cameron's death; is that right?

15        A.    Yeah, I'll have to look back and see when

16   he left.  I can't remember when Steve left the -- he

17   retired.  I don't know the exact date that he

18   retired.  But yeah, Steven was doing internal

19   affairs investigations in previous years.

20        Q.    Was he your internal affairs director at

21   the time of the Michael Jenkins-Eddie Parker

22   incident?

23        A.    Again, I would have to check and see when

24   Steve -- he retired and I can't remember exactly

25   when.  I think it may have been in '23, but I don't

Shebria Bryan Lindsey - January 9, 2025

59

```
 1    remember the exact date.
 2         Q.   But it was after Michael Jenkins and
 3    Eddie Parker?
 4         A.   I think so, yes.  But, again, I would have
 5    to give you an exact date.
 6         Q.   Now, if you came to understand that
 7    Steven Godfrey denies that he was your internal
 8    affairs officer or director, what would your
 9    response be?
10         A.   That's what I -- one of the things,
11    whenever I hired him, that's what we talked about
12    him doing, internal affairs for me.  I know he had
13    investigated some in the past, he definitely
14    investigated some.  He may not have been the only
15    one, there may have been others.  I'd have to go
16    back and research it and see.  But, no, he did
17    internal affairs.
18         Q.   But -- so if he denies that, your response
19    is?
20              MR. DARE:  Asked and answered.
21              THE WITNESS:  Yes, that's part of the
22    reason I hired him was for internal affairs,
23    investigations is why I initially hired him.
24         Q.   (By Mr. Shabazz) Now are you saying that
25    you had an internal affairs department in place at
```

Sherbren Bryan Bradley - January 03, 2025

60

1    the time of the Jenkins and Parker incident?

2        A.   No, sir, we're not big enough to have a

3    whole internal affairs department, you know, for

4    full-time investigators.  That's why the -- even the

5    ones now are part-time investigators.

6            Because if you remember before during this

7    deposition I just told you a minute ago that Steve

8    Godfrey was over the SRT team training and did some

9    internal affairs.  Do you remember that?

10       Q.   I remember that.

11       A.   Okay.

12       Q.   But you have a formal internal affairs

13   investigation team now; is that right?

14       A.   I just told you I don't have a full-time,

15   the two investigators are part-time.  The compliance

16   director and his part-time person are full-time in

17   the compliance department.  If they come across

18   something that needs to be looked at, they turn it

19   over to the internal affairs investigator or if we

20   get a complaint now -- we have an online complaint

21   system now where all the complaints are filled out

22   online.  Even if somebody walks in the office, an

23   investigator or somebody fills out the complaint

24   form.  And now all complaints are seen by all the

25   admin and action is taken on every single complaint.

61

```
 1    It's not just going to one person now.
 2         Q.   So did you have that online complaint
 3    system in place when the incident happened between
 4    Michael Jenkins and Eddie Parker?
 5         A.   No, sir.
 6         Q.   What was your complaint system at that
 7    time?
 8         A.   At that time when a complaint would come
 9    in and if it was -- like if I talked to somebody on
10    the telephone, they called in and complained, I'd
11    write down the information.  And then I'd go to the
12    department head of that employee that was being
13    complained on and ask them to look into it and
14    report back to me if they found anything to it.
15              So if it was patrol, it would go to the
16    captain of patrol.  If it was the jail, it would go
17    to the jail.  And then, of course, I would get
18    letters from the jail complaining about the jail and
19    I'd give them to the jail administer to look into
20    it.
21         Q.   So you relied on just a person just
22    writing information and giving it to your department
23    to make a complaint?
24         A.   Yes, sir.  I wouldn't rely on the -- if a
25    call came into me, I'd collect it.  If it came into
```

Sheriff Bryan Bailey - January 9, 2025

62

1    the front desk and they told me about it then we

2    would refer it to the department head to look into

3    it.

4         Q.   So do you have any written procedures

5    regarding your complaint process at the time of the

6    incident between Jenkins and Parker?

7         A.   I'd have to go back and look and see.  I

8    don't remember if we had anything in the policies or

9    not.  But we do now.

10             We've made it a lot easier for the public

11   to file a complaint online or in person at the

12   sheriff's office.

13             And again, now we're logging and tracking

14   every single complaint, whether it's valid or not,

15   we still have a log of every single complaint that's

16   coming in.

17        Q.   So you're now -- you have official

18   procedures and logging complaints now; is that

19   right?

20        A.   Well, I had official procedures before,

21   but now this makes everybody more accountable.

22   Because there's one area for all these complaints to

23   go to where everybody can see them.  Everybody knows

24   about them now, instead of just that department

25   head.  More than one person knows about the

1 | complaint.

2 | Q.   But previously none of these systems you

3 | have now were in place at the time of what happened

4 | between Jenkins and Parker?

5 | A.   Yeah, I told you I had a system in place

6 | where the complaint would come in and would go to

7 | the department head and they were supposed to

8 | investigate it and take -- either let me know if it

9 | was substantiated or not and take action.

10 |       So, yeah, there was a system in place.

11 | Q.   These systems that you have in now was not

12 | in place; is that right?

13 | A.   Right.

14 | Q.   And if a person was to make a complaint

15 | before, I mean, do you have a -- do you have any, is

16 | it in your policies or any official documents what

17 | the complaint system was at the time of the incident

18 | between Jenkins and Parker?

19 | A.   I'd have to go back and look and see if

20 | there is a policy or not.

21 | Q.   But right now you cannot state a policy;

22 | is that right?

23 | A.   No, I have a policy now, or I have a

24 | system now.  I don't know if there -- I don't know

25 | if there's a policy.

64

```
 1        Q.    I'm talking about then.  Did you have a
 2   policy regarding complaints and how they would be
 3   handled by your department?
 4        A.    I would have to research that and find the
 5   policy and procedure and give it to you.
 6        Q.    But you don't have that right now, right?
 7        A.    Not with me, no.
 8        Q.    And you don't know about it, do you?
 9        A.    I'd have to go back and research it.
10   There's a whole bunch of policies and procedures for
11   the sheriff's office and I can't remember each one
12   specifically.
13             And as I told you, we've made several
14   changes throughout the past two years to our
15   policies and procedures, so I don't want to give you
16   incorrect information.
17        Q.    But you would agree that a citizen making
18   a complaint about a violation of their civil rights
19   or police procedure by an officer, that that's one
20   of your most important jobs; is that right?
21        A.    My most important job is to protect
22   everybody, the public, civil rights violation my --
23   you know, to protect everyone.  And you know, I did
24   that to the best of my ability and I thought -- with
25   a system that I thought was working.
```

1          And, again, now we've added more checks

2     and balances to the complaint system where now more

3     people are seeing it and action is -- some type of

4     action is taken on, I can't say each complaint, but

5     each complaint is evaluated by more than one person.

6          Q.   Because previously your complaint system

7     was not working effectively; is that right?

8          A.   No, sir, I had no complaints.  I can't

9     remember -- like I say, I've never been contacted by

10    the FBI or the Attorney General's Office.  As far as

11    I know it was working fine, until again, these five

12    guys took this situation and lied to me and just

13    broke all the trust that I had.

14         Q.   Did you have a formal complaint form in

15    place at the time of Michael Jenkins and

16    Eddie Parker's incident?

17         A.   No, sir.  If it rose to -- if it was a

18    substantiated complaint, if there had been an

19    offense report written in the offense report system

20    or if it was serious enough it would be referred to

21    the FBI or attorney general's office.

22         Q.   But I'm saying, did you have a -- the

23    direct question is, did you have a complaint form

24    for a member -- a citizen to fill out to make a

25    complaint against a member of your department at

1   that time?

2         A.   Yes, sir.  And that's what I'm telling

3   you, the form would actually be an offense report,

4   would be filled out about the complaint.  If it was

5   substantiated, if it looked like there was something

6   to it that needed to be investigated then an offense

7   form would be filled out.  And then if it was

8   serious allegations, then it would be referred to

9   the FBI or the attorney general's office.

10             And I referred many people to -- that

11   called in and complained on different things.  And,

12   you know, and even then we'd refer them to the FBI

13   and to the attorney general's office.

14         Q.   But do you have a -- did you have -- I get

15   the offense report.  Are you saying your offense

16   report is your complaint form?

17         A.   It would have been if the complaint would

18   have been substantiated, if there had been something

19   to the complaint once the supervisor looked into it.

20         Q.   Okay.  You said substantiated.  But how

21   does the complaint originate?  How would the

22   complaint originate at the time of the incident of

23   Jenkins and Parker?  How would your complaint

24   originate?

25         A.   If the complaint -- if it's a phonecall

Shebri Tr. Bryan Bailey — January 9, 2025

67

 1   then the information would be taken over the phone

 2   and referred to the department supervisor.  Or if it

 3   was in-person, then they would talk to an

 4   investigator or a deputy up there and again it would

 5   be referred to a supervisor.

 6          And then, the very few times that I was

 7   contacted directly with actual evidence of a deputy

 8   and a civil rights violation, I self-reported it to

 9   the FBI.

10       Q.   Okay.  So -- and do you have any of this

11   written down as a formal procedure?

12       A.   Again, I'd have to go back and look and

13   see what our policy at that time said.  I don't have

14   it memorized.  I'd have to research it and let you

15   know what it says.

16       Q.   Okay.  And do you have a -- are those

17   different phonecalls and ad hoc methods of

18   reporting, do you have a record of the complaints

19   that came in through those various methods?

20       A.   So the complaint would come in, it would

21   go to their department supervisor.  If it was

22   substantiated, then, again, an offense report or if

23   the deputy was found to have done something in

24   violation of a policy, then it would have been

25   written up, put in his personnel file.

Sheriff Bryan Bailey - January 9, 2025

68

```
 1            So any record of something like that would
 2    be in the deputy's personnel file where they got
 3    written up for it on a complaint.
 4        Q.   Do you have a record of the complaints
 5    that were filed against deputies in your department
 6    for the year 2022?
 7        A.   Not for that year.  I'd have to look
 8    through each deputy's file and see if there was any
 9    kind of write-up in there on them.
10        Q.   Do you keep a log -- did you keep a log of
11    the complaints that were filed according to your
12    methods in 2022?
13        A.   No, but now I do.  Now we have a
14    centralized system that keeps up with all of the --
15    but then, no, I didn't have any way of logging it.
16        Q.   You made that change because your previous
17    system was not working effectively; is that right?
18        A.   I think for the 10 years or how many years
19    it's been since I've been elected it worked fine,
20    until these guys lied to me and made all this happen
21    where we had to take some kind of action to
22    prevent -- do our best to prevent anything like this
23    from happening again.
24        Q.   Well, Chief, if you don't have a formal or
25    acceptable complaint system in place, that could
```

Sheriff Bryan Bailey - January 9, 2025

69

1    encourage officers to lie to you; is that right?

2        A.    I think over the 10 years prior to that,

3    11 years prior to that, it had worked fine.  Again,

4    they're -- these guys lying and committing the

5    crimes that they did, forced me to come up with a

6    more -- a better way of being accountable on

7    complaints, so that's why I changed it.

8        Q.    Yeah, but if your officers were in the

9    field committing abuses against persons and the

10   persons had no formal way to complain, wouldn't that

11   encourage your officers to go back out in the field

12   and to commit acts knowing that their complaint

13   would never be formally dealt with, tracked or

14   logged?

15       A.    No, sir, I don't agree with you.  I mean,

16   I think that at that time I thought the system was

17   working well.  And plus, there's more than just the

18   sheriff's office.  If they're not satisfied with the

19   results of the actions on a complaint at the

20   sheriff's office, I've always -- hundreds of people

21   I've told, you're welcome to call the attorney

22   general's office or the FBI.

23           And again, to my knowledge, the FBI and

24   the attorney general's office hadn't received a lot

25   of complaints on us that I'm aware of, especially

```
 1    use-of-force complaints.  So I don't know --

 2         Q.    Have you -- I'm sorry.  Go ahead.

 3         A.    No, you go ahead.

 4         Q.    So did you have any formal document that

 5    referred persons who were complaining to the

 6    attorney general or the FBI office with their

 7    complaint?

 8         A.    No, sir.  I would do that on the telephone

 9    or in person if they complained that -- when we're

10    talking about complaints, we're talking about a

11    whole lot more than just any kind of civil rights

12    violation.  We're talking about people complaining

13    about an accident report not being correct, they're

14    saying it's not correct.  And people would complain

15    about officers that weren't even with my department,

16    it would be a totally different agency or anything.

17              And if they didn't like the outcome of the

18    complaint, then I'd always recommend that they could

19    contact the AG's office or the FBI and file a

20    complaint with them and that they would investigate

21    us.

22         Q.    Okay.  So at the time of the

23    Jenkins-Parker incident, a citizen could not

24    complain to your department through online

25    procedures?
```

 1        A.    Not online, they could in-person and on

 2   the phone, though.

 3        Q.    Okay.  But there was no form in-person,

 4   right?

 5        A.    Yes, sir.  I mean, the information will be

 6   taken and it would be given to a supervisor, they

 7   would research it.  And if it rose to a level where

 8   something needed to be done, there would be an

 9   offense report written on it, referred to another

10   agency, like the FBI or the MBI or personnel writeup

11   would be written up and put in their file.

12              So, yes, sir, action was taken.

13        Q.    Direct question is, but there was not a

14   formal citizen's complaint form that a citizen could

15   fill out where you would have a record of it; is

16   that right?

17        A.    I've answered that.  I'm telling you that

18   the form would be --

19        Q.    Did you have a form -- go ahead.  I'm

20   sorry.

21        A.    No, no, you go ahead.

22        Q.    Did you have a formal complaint form?

23        A.    No, I didn't have a form that said

24   complaint.  But every report starts with a blank

25   piece of paper, so that blank piece of paper would

Sheriff Bryan Bailey - January 03, 2025

72

 1    be the complaint form.  The information would be

 2    taken via the telephone or in-person, referred to

 3    the department head and they -- I'd ask them to look

 4    into it and research it and find out if there's a

 5    valid complaint or not.

 6           Now we do have a complaint form that is

 7    available online.

 8      Q.   And you made -- and you made those changes

 9    for specific reasons, right?

10      A.   Yeah, I made those changes specific

11    because five deputies lied to me and committed

12    crimes against two innocent individuals.

13      Q.   And you made that change also because your

14    previous system was not working?

15      A.   Yes, I believe it was working.  I think it

16    was working.

17      Q.   You believe your previous system was

18    working?

19           MR. DARE:  Asked and answered.

20      Q.   (By Mr. Shabazz) Let me ask you this, did

21    you keep a record, according to your method of

22    gathering citizen complaints, did you keep a record

23    of those complaints again in the year 2022?

24           MR. DARE:  Asked and answered.

25      Q.   (By Mr. Shabazz) Did you keep a record of

Shebrika Bryan Bailey - January 9, 2025

73

```
 1   them in 2021?

 2        A.   It would be the same scenario as what I

 3   told you before, that they call -- so if there was a

 4   valid complaint, there would be an offense report or

 5   a personnel writeup in a file up there.  But, no, I

 6   don't have a record of all the complaints that came

 7   in.

 8        Q.   Okay.  Do you -- do you-- you have no

 9   record for 2021, right?

10             MR. DARE:  That's not what he said.

11             MR. SHABAZZ:  Well, I didn't hear him.

12   Again, I just want to get a direct answer.

13        Q.   (By Mr. Shabazz) Do you have a record of

14   the complaints for 2021?

15        A.   If there were any valid complaints that

16   came in that rose to the -- of being written --

17   somebody would have an offense report or a writeup

18   on a deputy or a jailer, employee, wherever the

19   complaint was, dispatch or wherever, it would be in

20   their personnel file.

21             So I would have to look through all the

22   files to see if there was anything in 2021.

23        Q.   Okay.  So you would have copies of the

24   complaints for these years that we're speaking of?

25        A.   No, I just said -- I told you it would be
```

Brown Court Reporting, Inc. - (601) 832-4920

Sheriff Bryan Bailey - January 03, 2025

74

```
 1    the offense report or a writeup on an employee due
 2    to the complaint.
 3         Q.   Is this the same scenario for all the
 4    years that you've been the sheriff?
 5         A.   Yes, sir, until this year.
 6         Q.   And do you have a record or a tracking of
 7    the outcomes of your investigation into these
 8    complaints?
 9         A.   I do now when we started this online
10    thing.  Like I say, all complaints are in a
11    centralized location now and all the action taken.
12    So, yes, I do now.
13         Q.   But this was not in place when the
14    incident between Jenkins and Parker happened?
15         A.   No.
16         Q.   Not in place when the incident between
17    Mr. Schmidt happened?
18         A.   No, sir.
19         Q.   And then -- and so can you tell us,
20    according to your methods of gathering complaints,
21    do you have a record of the outcomes or final
22    decisions being made in regards to those complaints?
23              MR. DARE:  Asked and answered.
24         Q.   (By Mr. Shabazz) For all the years you've
25    been sheriff?
```

Shebrick Bryan Btelcey - January 03, 2025

75

1        A.   Again, I would have to go back through the

2   personnel files and see the writeups or check the

3   offense reports to check to give you a number on it.

4        Q.   But you do have it?  You say you did reach

5   outcomes and formal conclusions on complaints that

6   were being filed?

7        A.   On some of them, yes, I do.  There would

8   be something in their personnel file or an offense

9   report written on it.

10        Q.   Okay.  And you would be able to produce

11   that to us?

12        A.   I'd have to research all the files to see

13   what was in them on the complaints.  But yes, sir,

14   if they were written up for a complaint, it would be

15   in their personnel file.

16        Q.   And was the citizen who complained

17   notified of the results of the investigation?

18        A.   Yes, sir, as far as I know, by the

19   supervisor they were.  Or if it's something that I

20   looked into myself, I would call them back and tell

21   them what I'd found.

22        Q.   So you're saying you would just do this

23   orally?

24        A.   Yes, sir.

25        Q.   But did you have any -- did you have

Sherl-l-l-l Bryan Bradley -- January 03/17/25

```
 1    anything written or email or correspondence with the
 2    person who complained, where they received a
 3    response from the results of their complaint?
 4        A.   If it rose to something serious enough
 5    where the employee had to be written up, then yeah,
 6    there would be a writeup in the file or there would
 7    be an offense report on it.  And the few that I've
 8    dealt with, I know I've called people back.
 9            And again, you're talking about such a
10    wide scale of complaints here.  It could be a
11    complaint on a deputy speeding, so no, I didn't log
12    that down.  But I would call the person back, hey, I
13    talked to the deputy, they were going to this call
14    or hey, I talked to the deputy and got on to him
15    about speeding in a patrol car.
16            So there's so many different levels of
17    complaints that, yeah, a lot of them were just
18    handled on the phone, the minor ones.
19        Q.   But you don't have like a logging process
20    where you were able to log your complaints and the
21    outcomes?
22        A.   Yeah, I've already answered that.  I do
23    now.  I didn't before.  I do now.
24        Q.   Okay.  All right.  I get it.
25            All right.  Just a couple of quick
```

Shelbra Bryant Bentley - January 9, 2025

77

1    questions on your administration and who was in the

2    position before, just to get an idea, you know, over

3    the few years of who was in the position.

4            The current training director is

5    Mr. Martinez, correct?

6        A.    DeMartino, AJ DeMartino.

7        Q.    DeMartino, okay.

8            And how long has he been the training

9    director?

10       A.    You would have to let me go back and look.

11   I want to say he was made training director maybe in

12   2023.  It could have been before that but I would

13   have to look back and see his personnel

14   recommendation when he was changed.

15       Q.    Who was in the position before him?

16       A.    Before it would have been Steve Godfrey

17   did some training, Paul Holley was over some

18   training and then Richard Lawrence, our attorney,

19   before that, he was over some training.

20       Q.    Over some training.  So Martini (sic) was

21   put in after the Jenkins-Parker incident as the

22   training director?

23       A.    Yeah, sometime in '23.  I would have to

24   look at the date and make sure, but it was possibly

25   after.  But he's like a full -- that's the first

Sherriff Bryan Bailey - January 03, 2023

78

1    time we did a full-time person in that position.

2         Q.   Was this in response to what happened to

3    Michael Jenkins and Eddie Parker?

4         A.   It was in response to the changes that we

5    thought needed to be made at the sheriff's office on

6    training because we've grown and all that.  I don't

7    know if it's directly due to that incident or not

8    but --

9         Q.   Why did you make those changes --

10        A.   I'm sorry?

11        Q.   Why did you make the change from your --

12   why did you make the change to Martini (sic) as the

13   training director?

14        A.   Well, based on his training, experience

15   and his desire to do the job.  He was already

16   helping training on firearms and different things

17   like that.

18        Q.   But was it a response to what happened to

19   Jenkins and Parker?

20             MR. DARE:  Asked and answered.

21             THE WITNESS:  Yes, sir, I'd -- yeah, I

22   can't remember if it's exactly -- I'm sure part of

23   it was.  But the biggest reason is the department

24   has grown and the legislature recently increased the

25   training hours for deputies to be mandatory hours,

Shelriff Bryan Bailey - January 9, 2025

79

1    so you know, we had to do something with training

2    anyway.

3        Q.    Undersheriff Barry Vaughn, when did he

4    come on?

5        A.    When did he come on the sheriff's office

6    or when did he become undersheriff?

7        Q.    When did he come on as undersheriff?

8        A.    I don't even know that I've actually done

9    the paperwork.  He's had the position -- he's been

10   working the position, training the position for a

11   couple of months now.  I'm not sure I've officially

12   done the personnel recommendation to change his

13   title, because the former undersheriff, Dwayne

14   Thornton just retired last month.

15       Q.    Who served -- who served before

16   Mr. Thornton?

17       A.    Before it was Paul Holley.

18       Q.    Paul Holley.  And before Holley?

19       A.    It would have bee Randy Gray.

20       Q.    Randy Gray.

21             Do you know what year Mr. Gray came on?

22       A.    As undersheriff, I'd have to look back in

23   his personnel file and see.

24       Q.    Currently your Chief Deputy is Brian

25   Whittington; is that right?

```
 1        A.   Yes, sir.

 2        Q.   And how long has he been chief deputy?

 3        A.   Sir, I would have to go back and check and

 4   see.  My years sort of -- my time runs together --

 5        Q.   Approximately?

 6        A.   A year or two maybe -- well --

 7        Q.   After Jenkins -- he came on after the

 8   Jenkins-Parker incident?

 9        A.   I can't answer that.  I would have to look

10   at his personnel file to give you a date.

11        Q.   Who served before Whittington in that

12   position of chief deputy?

13        A.   Dwayne Thornton.

14        Q.   And before him?

15        A.   Let me think a minute.  It was -- I may be

16   skipping somebody, Mr. Shabazz, I think it may have

17   been Ken McBroom possibly, before --

18        Q.   Ken who?

19        A.   Ken McBroom possibly.  But I would have to

20   look back and see the personnel recommendations.

21   Because like I said, my years and my people sort of

22   run together on it.  So --

23        Q.   I got it.

24        A.   -- I'm trying to think.  If I think of it

25   while we're talking I'll let you know names.  But it
```

Shebrina Bryan Bailey - January 9, 2025

81

```
 1    may have been Ken McBroom prior to that.
 2         Q.   And prior to him?
 3         A.   I know I'm missing somebody, I just can't
 4    think of who it is.  So it's Dewayne --
 5              MR. DARE:  You don't have to think out
 6    loud.
 7         Q.   (By Mr. Shabazz) Okay, I'll come back to
 8    that.
 9              Let me ask you this, chief investigator --
10    your chief investigator right now is Fred Lovett; is
11    that right?
12         A.   Yes, sir.
13         Q.   And when did he come on?
14         A.   He came into that whenever Chief
15    Investigator McAlpin was arrested and terminated.
16         Q.   Okay.  And prior to that it was
17    Mr. McAlpin?
18         A.   Yes, sir.
19         Q.   And before Mr. McAlpin, who was it?
20         A.   I think it was Tim Lawless.
21         Q.   Tim Lawless?
22         A.   Yes, sir.
23         Q.   Do you know what years he served as chief
24    investigator?
25         A.   No, sir.  He's been gone a couple of
```

1    years, but maybe -- it may be three or four years, I

2    don't know.  I would have to go back and look at the

3    files to see the personnel recommendations to give

4    you exact dates on changes.

5        Q.    And Mr. McAlpin, what was his years in the

6    position of chief investigator?

7        A.    Again, it would have been whenever

8    Tim Lawless retired Brett was put over that.  And

9    then he would have served up until his termination

10   in June of '23.

11       Q.    Okay.  All right.  I'm going to turn your

12   attention to the subject of the Rankin County night

13   shift, the night shift operations at the time of the

14   incident between Michael Jenkins and Eddie Parker.

15           Who was your lead officer on the night

16   shift at the time of the incident?

17       A.    When you say night shift, there's four

18   patrol shifts.  So -- and again, at that time they

19   were working -- I don't know if they were still

20   working 11:00 to 11:00 then or if they had already

21   changed from 7:00 to 7:00.

22           The shift that was working that night

23   would have been Jeffrey Middleton, Lieutenant

24   Jeffrey Middleton's shift.

25       Q.    And can you detail for -- can you tell me

1   how you monitored and supervised the night shift?

2        A.   Well, again, I had put faith and trust

3   into all my supervisors so they would, you know,

4   pretty much acted on my behalf when I wasn't

5   present, but I would listen to -- I would monitor my

6   radio a lot.  And really, at night, I mean I had

7   that time -- I mean I got 240 employees, so there's

8   no way I can keep up with and watch every single one

9   of them, so I trusted my supervisors to do their job

10  and supervise.

11          So again, that's how I kept -- that's how

12  I monitored them, through the supervisors and I'd

13  monitor the radio occasionally, monitor the calls.

14          And then pretty much within the sheriff's

15  office when they'd notify me, they'd call me about

16  certain things, it would be like an accident with

17  injuries and above, I want them to call me and let

18  me know about it.  So pretty much if somebody was

19  bleeding, I want them to call me and tell me what

20  was going on with it.  So dispatch would do that.

21          And that's how I kept up with the shifts

22  too and what was going on, by the phonecalls.

23       Q.   So Lieutenant Middleton had a direct

24  contact with you on your telephone; is that right?

25       A.   If something -- yeah, if it's something

 1   bad, like I say if it was an accident with injuries

 2   and above and he was on scene, either the

 3   lieutenant, sergeant or dispatch, one of those three

 4   would usually call me.

 5        Q.   Okay.  And was this on a department issued

 6   cellphone?

 7        A.   Of his?

 8        Q.   Of yours.

 9        A.   Mine is a personal cellphone.

10        Q.   So Lieutenant Middleton would call you on

11   your cellphone?

12        A.   Uh-huh (affirmative response).

13        Q.   How many officers was on the night shift?

14        A.   Seven, eight, maybe.  I would have to look

15   back and see at that time if we were fully staffed

16   or not.

17        Q.   Seven to eight officers would be on

18   overnight?

19        A.   Uh-huh (affirmative response).  Yes, sir.

20   And if --

21        Q.   And you -- I'm sorry.  Go ahead.

22        A.   Depending on who was off, if somebody was

23   sick, if we were short, it just depends.  I could go

24   back to that night and let you know.

25             And plus, like I told you, I can't

Sheriff Bryan Bailey - January 9, 2025

1    remember when we changed the shift change, because

2    sometimes they would overlap.  And I can't remember

3    at that time if they were working, still working

4    11:00, 11:00 or if they'd changed to 7:00 to 7:00.

5    So I think they were still on 11:00 to 11:00, maybe.

6           But anyway, it would be seven to eight on

7    a shift.

8        Q.   Seven to eight on the night shift?

9        A.   Yes, sir.

10       Q.   And you said your basic system was to

11   trust officers like Jeffery Middleton to do the

12   right thing?

13       A.   Yes, sir.

14       Q.   That was your basic system of supervision?

15       A.   Yes, sir, I trust everybody until they

16   give me a reason not to.  I have, you know, faith

17   that people were going to do the right thing.

18       Q.   And you trusted Jeffrey Middleton?

19       A.   Yes, sir, I trusted him.  I trusted all

20   five of them.

21       Q.   Now, would any of the other five reach you

22   on your personal cellphone?

23       A.   Would they call me on my personal

24   cellphone?

25       Q.   Yes.

Sheriff Bryan Bailey - January 03, 2025

86

1      A.   Yes, sir.  If it was something that rose

2  to a level they thought I needed to be notified,

3  they'd call me and tell me what was going on.

4      Q.   That includes Hunter Elward, would call or

5  text you on your cellphone?

6      A.   Like I said before, the dispatch, the

7  lieutenant, the sergeant or the deputy on the scene

8  of a serious incident would usually call me and tell

9  me what was going on.

10      Q.   What was your cellphone number at the time

11  of the incident between Jenkins and Parker?

12      A.   (601)906-9923.

13      Q.   9923?

14      A.   Yes, sir.

15      Q.   (601)906-9923?

16      A.   Yes, sir.

17      Q.   Would you have a record of the text

18  messages that were sent to you by all of those

19  officers who were convicted in this case?

20      A.   I would have to go back and search the

21  phone records to see what was theirs.  I mean, I'm

22  sure not all of them text me, and I mean, some of

23  them I didn't talk to very often, but I would have

24  to research the phone to see.

25      Q.   But you did speak with Hunter, you did

Sheriff Bryan Bailey - January 03, 2025

87

1    exchange contact with -- messages with

2    Hunter Elward; is that right?

3         A.   On this incident or in general?

4         Q.   In general?

5         A.   I'm sure he's texted me in the past, yes,

6    sir.

7         Q.   Is that true for Brett McAlpin?

8         A.   Yes, I'm sure he had text me something in

9    the past.  None of them text me anything on the

10   night of the incident in January of '23.

11        Q.   I'm just asking about your communications

12   in general with them and members of this night

13   shift?

14        A.   Yeah.

15        Q.   How long did you have that cellphone

16   number?

17        A.   I would have to look back, but for a long

18   time.  Probably 20 years maybe, 15 years.

19        Q.   Twenty to 15 years.  All right.

20             And so you would have text messages from

21   all of those officers on that night shift, as you

22   stated?

23        A.   I don't know, I would have to look back

24   and see if there was anything there.  But I don't

25   save -- I get so many text messages, so many

Sheriff Bryan Bailey - January 03, 2025

88

```
 1   phonecalls, all my text messages delete
 2   automatically after a year.
 3       Q.    Well, did you save your text messages that
 4   you had from those officers at the time that the
 5   Jenkins and Parker incident took place?
 6       A.    I would have to look back at the last time
 7   I saved -- did a backup on the phone and see.
 8       Q.    Did you do a backup?
 9       A.    Yes, sir, I would have to look at the date
10   on it, but there should be a backup with all the
11   data on it.
12       Q.    Okay.  Now, did you -- in terms of
13   trusting Mr. Middleton, I mean did you -- when you
14   came back in the office the next day -- strike that.
15            I mean, did you have a procedure where you
16   regularly met with Mr. Middleton to evaluate the --
17   what was going on, on the night shift?
18       A.    No, sir.  That would be the captain of
19   patrol would keep up with all the lieutenants.
20            The only time an email -- we said text,
21   but the biggest way of communication at the
22   sheriff's office for getting information out and in
23   was email.  So the -- we get a lot of emails on a
24   daily basis on it.
25            But I wouldn't meet with Middleton
```

1  regularly, the captain of patrol would meet with his

2  lieutenants and sergeants about what was going on

3  patrol.

4         When I say they would contact me, they

5  would only contact me if something major had

6  happened on their shift.

7     Q.   Who was the captain of patrol at the time

8  of the Jenkins-Parker incident?

9     A.   I think Dwayne Thornton was.

10    Q.   Thornton.  And did you meet with Mr. --

11 did you have any procedures where you met with

12 Mr. Thornton to understand was your night shift in

13 compliance with department policy?

14    A.   No, sir.  He would just contact me if

15 there were any issues with the patrol.  And if he

16 had to take any action against anybody, he would

17 come talk to me about it first.

18         But, no, we didn't meet on a regular

19 basis, unless there was an issue.

20         No, I take that back.  We did meet with

21 every -- and I don't go to all of them now, but

22 every morning we have a morning meeting at the

23 sheriff's office where the sheriff, the

24 undersheriff, the chief investigator, all the

25 investigators, the captain of patrol, we meet every

1    morning, Monday through Friday, and talk about

2    everything that had happened the previous day.  So

3    that was a big way that we communicated like that.

4    We call it the investigator meetings.

5            But also the lieutenant that was working

6    or the sergeant would come to that same meeting and

7    everybody would exchange and share information.

8        Q.   Okay.  So I mean, did you have that

9    meeting on January 24th, the morning after

10   Michael Jenkins was shot, did you have that meeting?

11       A.   They had a meeting but I don't think I

12   attended it.  Now I met with some of the admin that

13   morning about the incident.

14       Q.   Who was in that meeting?

15       A.   I told you before at the beginning of the

16   deposition, it was me and -- see, I can't

17   remember -- Paul Holley was gone to the FBI academy

18   and I don't remember if he was back.  I don't think

19   he was back yet or not from the FBI academy.  So it

20   would have been Dwayne Thornton, I think Randy Gray,

21   maybe Ken McBroom, Barry Vaughn.  I can't remember

22   who else was in there when we met and talked about

23   it.  Because I know we were talking about getting

24   information together that MBI had requested.

25       Q.   Okay.  What was -- let's go back to

Sheriff Bryan Bailey - January 03, 2025

91

```
 1    Jeffrey Middleton.  How was Jeffery Middleton -- how
 2    did he gain the authority as the lead officer over
 3    the night shift?
 4         A.   Well, I mean, there's an interview board
 5    that does interviews for corporal, sergeants and
 6    lieutenants.  And I specifically keep myself out of
 7    the process so nobody thinks that I'm playing
 8    favorites.  But there'll be a promotion board made
 9    up of the captain of patrol, captain of court
10    services, the chief investigator and then they'd
11    pick -- let's say if they were interviewing for a
12    sergeant, they would get one or two lieutenants to
13    sit in on it.  And they'd interview all the
14    applicants and then decide within that group who got
15    promoted up.
16         Q.   Okay.  But so do you know about
17    Jeffrey Middleton, how he gained such authority?
18         A.   I just told you, we had a promotion board
19    that he would have gone before and they would have
20    interviewed several candidates and that promotion
21    board would have picked the top candidate in their
22    opinion.  And I always approve their pick.
23         Q.   So Jeffrey Middleton was specifically
24    approved by you once the board --
25         A.   Man, I just told you, this board would
```

92

```
1   interview five or six, however many people put in
2   for the lieutenant's job.  The board would come to
3   me and say, hey, we recommend this guy, I'd say
4   that's fine, if that's who y'all picked that's fine
5   with me.
6        Q.   Okay.  So you approved Jeffery Middleton
7   to --
8        A.   I approved -- yes, I approved the board's
9   recommendation for the -- for the -- whatever spot
10  that that person was applying for, be it lieutenant,
11  sergeant, corporal, investigator, anything like
12  that.
13       Q.   And that specifically includes
14  Jeffrey Middleton?
15       A.   Yes, sir.
16       Q.   When was Jeffrey Middleton hired by Rankin
17  County Sheriff's Department?
18       A.   I would have to go back and look, pull up
19  his personnel file.  He was hired before I was
20  sheriff.
21       Q.   You became sheriff in 2004?
22       A.   No, I became sheriff in 2012.
23       Q.   Sorry.  2012.  I'm sorry.
24            But you were in the department when
25  Jeffery Middleton came on?
```

1      A.   Yes, sir.  I can't remember if I was

2   undersheriff or I was investigator.  Again, I'd have

3   to refer to his personnel file.

4      Q.   Okay.  When you became sheriff, did you

5   review Jeffrey Middleton's personnel file?

6      A.   When I became sheriff?

7      Q.   Yes.

8      A.   No, sir, I don't think I reviewed

9   anybody's file.  I mean, I didn't -- I didn't

10  like -- there wasn't a change -- whenever I got

11  elected sheriff, I just took on the same crew that

12  was already there.  So the same employees stayed, I

13  didn't get rid of everybody.

14     Q.   I understand that.

15          Now when Jeffrey Middleton, when you

16  approved Jeffrey Middleton to be in charge of the

17  night shift, did you review his personnel file?

18     A.   No, sir, I took the recommendation of the

19  board, the promotion board.

20     Q.   And did -- was there any specific training

21  required to supervise the night shift?

22     A.   No, sir.  Now several of them, I don't

23  know, I could check his personnel file and see, but

24  several of them, if they're going to be in a

25  supervisory position, we'd make them go to command

Sheriff Bryan Bailey - January 03, 2025

1    college that the FBI puts on.  They would go through

2    this command college, which lasts about a week, on

3    leadership.

4        Q.    Did Jeffrey Middleton attend that?

5        A.    I just told you I would have to check his

6    file to see, but I'm pretty sure he went because

7    pretty much we make every lieutenant and sergeant

8    go.  But I don't want to tell you that and then not

9    be true.  So, again, I would have to check his

10   personnel file to see if he completed that training

11   or not.

12       Q.    Now, were you aware of Jeffrey Middleton's

13   criminal background when you approved him to be in

14   charge of the night shift?

15       A.    I was aware of something that happened

16   in -- I don't know if he was working for the Jackson

17   or something like that, but there was an accident

18   and somebody was injured or killed and I think he

19   got charged with it, initially, but then it was

20   no -- it was nolle pros or something done away with.

21   I remember something like that going on with him,

22   but I don't know the details of it.  I wasn't

23   sheriff then.

24       Q.    You said it was not prosecuted?

25       A.    I don't know if it was prosecuted or not.

1  I just remember I was undersheriff and somebody said

2  something about him being in an accident in Jackson.

3  But, again, I didn't hire him.  I had nothing to do

4  with hiring him at the sheriff's office.  I was

5  undersheriff then, I didn't -- I didn't hire the

6  deputies, the sheriff did.

7       Q.   But when you approved his promotion, did

8  you review his criminal background?

9       A.   No, sir, I took the recommendation of the

10 promotion board, like I told you.

11      Q.   You are -- you are aware that he has a

12 felony conviction?  Are you aware of that?

13      A.   No, sir, I'm not aware he has a felony

14 conviction.  I don't see how he can have a felony

15 conviction and the state would have give him his

16 certification.

17           MR. DARE:  And just to clarify, are you

18 talking about the felony conviction as a result of

19 the January '23 incident?

20           MR. SHABAZZ:  I'm talking about his

21 previous -- his previous --

22           MR. WALKER:  His vehicular manslaughter

23 conviction that was non-adjudicated or otherwise --

24           MR. DARE:  Which isn't a conviction.

25           MR. WALKER:  Since it was non-adjudicated,

1   but we're off topic.

2          MR. DARE:  So are you representing to this

3   witness that Jeffrey Middleton had a felony

4   conviction, prior to being brought on to the

5   sheriff's department?

6          MR. SHABAZZ:  I'm limiting my question to

7   whether or not he reviewed Jeffery Middleton's

8   criminal background before allowing him to supervise

9   the night shift.

10          MR. DARE:  No, no, your question was, were

11   you aware that he had a felony conviction?

12          THE WITNESS:  Yeah, you said conviction.

13          MR. SHABAZZ:  Okay, well, strike that.

14   I'm asking the question I'm asking right now.

15          MR. DARE:  Okay.  What's the question?

16      Q.   (By Mr. Shabazz) Were you aware of

17   Jeffrey Middleton's criminal background prior to

18   approving him to supervise the Rankin County Sheriff

19   Department's night shift?

20      A.   I was aware of an incident that happened

21   in Hinds County, but I was under the -- it was my

22   understanding that it had been non-adjudicated

23   somehow or another.  But he was a certified officer

24   with the State of Mississippi, so I don't know how

25   he could have been -- have a felony conviction and

Sheriff Bryan Bailey - January 03, 2025

97

```
 1   they wouldn't have given him a certification.  They
 2   wouldn't have sent certification if he was a
 3   convicted felon.  So I'm sure we had his state
 4   certification.
 5        Q.   And you met with Mr. Middleton -- I know
 6   you said you had a procedure, but how often did you
 7   meet directly with Mr. Middleton?
 8        A.   Not very often at all.
 9        Q.   Okay.
10        A.   I don't know that I ever met with him.
11   Again, the captain of patrol would meet with the
12   lieutenants and sergeants.  And the only time I
13   really communicated with Middleton or any lieutenant
14   or sergeant was if something serious happened on
15   their shift, they would contact me directly.
16        Q.   Okay.  Are you familiar with some WhatsApp
17   text messages that were exchanged between the
18   officers on your night shift?
19        A.   Just through an article in the newspaper
20   is the first time I'd seen or heard about it.
21        Q.   Okay.  But have you seen those text
22   messages?
23        A.   I read them in the paper.  Being as it was
24   several months ago I can't remember what all they
25   said.
```

Sherri Bryan Bentley - January 03, 2023

```
 1        Q.   But I mean outside of the newspaper, do
 2   you have a copy of those text messages?
 3        A.   No, sir.
 4        Q.   Okay.  And then were you aware that your
 5   officers had a text message system that they
 6   communicated with?
 7        A.   No, sir.
 8             MR. SHABAZZ:  Can I put the logo exhibit,
 9   which I think we want to mark as number four?
10             MR. DARE:  What logo exhibit?
11             MR. SHABAZZ:  Goon Squad logo.
12             MR. WALKER:  It's probably on that same
13   email that he sent you.
14             MR. SHABAZZ:  I think you have it, Trent,
15   and it should be with the court reporter.
16             MR. WALKER:  Again, I can't access it from
17   here.
18             MR. DARE:  Let's go off the record.
19                  (Off the record.)
20             (Exhibit 4 marked for identification.)
21        Q.   (By Mr. Shabazz) Sheriff, we're back on
22   the record.
23             Do you recognize what's marked as
24   Exhibit 4?
25        A.   Yes, sir.
```

Sheriff Bryan Bailey - January 8, 2025

99

```
 1        Q.   What is that?
 2        A.   It's a challenge coin with Rankin County
 3   Mississippi on one side and Lieutenant Middleton's
 4   Goon Squad on the other side.
 5        Q.   Okay.  When was the first time you saw
 6   this coin?
 7        A.   I think it was June of '23 whenever the
 8   five former deputies pled guilty to that bill
 9   information is the first time I've heard of this.
10        Q.   Okay.  And do you have -- at the time of
11   the Jenkins-Parker incident, did you have any
12   policies or procedures in place that dealt with
13   using Rankin County Sheriff's Department insignia on
14   logos?
15        A.   Yes, sir.  I can't remember which policy
16   it is, but there should be one restricting the use
17   of the sheriff's office logo without my approval.
18        Q.   And how did you enforce that policy?
19        A.   If somebody used the sheriff's office logo
20   in an inappropriate way, an employee, then I would
21   tell them they couldn't use it like that or tell
22   them to take it off their social media or whatever
23   it was.
24        Q.   Okay.  Facts of this case stated this
25   coin -- this logo and coin was being used in your
```

1  department?

2  　　A.　Yes, sir, it was being used without my

3  knowledge.  I never would have approved anything

4  like this.

5  　　Q.　Okay.  Now, if you come -- if you were to

6  come to understand that the testimony in this case

7  has revealed that this logo and the operation of the

8  Goon Squad that is represented by the logo was known

9  to your officials and your department much earlier

10 than June of 2023, if you came to know that, what

11 would your response be?

12 　　　　MR. DARE:  Object to the form.

13 　　　　THE WITNESS:  I mean, I'm upset about it.

14 It should have never been used, never authorized.

15 And if somebody else knew about it they should have

16 said something.  Somebody should have informed me

17 about it.

18 　　Q.　(By Mr. Shabazz) And did you ever hear

19 anybody mention the existence of a Goon Squad?

20 　　A.　 Never heard it before they pled guilty to

21 that in June, sometime in June, whatever the court

22 date was in June is the first time I've ever heard

23 of the Goon Squad.

24 　　Q.　And would you be surprised that it's been

25 testified that many persons in your department

1    were -- had saw the coin and was aware of the

2    existence of the Goon Squad?

3         A.   I wasn't aware of it and I never would

4    have approved it.  And if I had known about it, I

5    would have made them turn them all in.  And, again,

6    I had no clue about it.

7         Q.   Okay.  Have you changed your policy on

8    logos and insignia since then?

9         A.   I would have to see if we changed it, but

10   I didn't change it because of that.  There was

11   already one in place, I know, and I would have to

12   get you a copy of it.  But there's always been

13   something in place about using the sheriff's office

14   logo.  Because I've had people post stuff on their

15   personal social media accounts that was -- I felt

16   was inappropriate or brought bad light on the

17   sheriff's office, so they would have to get approval

18   from me to use it.

19        Q.   Okay.  Are you familiar with a Lloyd Goon

20   Jones?

21        A.   Yes, sir.  Well, not Goon, I know

22   Lloyd Jones.

23        Q.   Lloyd Jones?

24        A.   Yes, sir.

25        Q.   Lloyd Jones.  Can you tell me about your

1  familiarity with Lloyd Jones?

2      A.   Yes, sir.  When I first got in law

3  enforcement he -- Sheriff Lloyd Jones hired me in

4  19- -- I graduated from Jackson State in '90 and I

5  went to work for Mendenhall Police Department.  And

6  then Sheriff Jones offered me a job at the Simpson

7  County Sheriff's Office in '90 or '91 and I began to

8  work for him there.

9      Q.   Okay.  And how would you characterize your

10  relationship with him thereafter?

11      A.   I mean, he was my boss.  He was the

12  sheriff.  He was a good sheriff.  It was a

13  sheriff-deputy relationship.  I don't know what else

14  you would call it.  It was -- I worked for him.

15      Q.   You admired Lloyd Jones?

16      A.   Oh, yes, sir.  Yes, sir.

17      Q.   Okay.  Indulgence.

18          Turning your attention to internal

19  investigations.  I'm pretty much clear on who you

20  say were your internal investigations officers.

21          Let me ask you this, do your internal

22  affairs -- at the time of the Jenkins and Parker,

23  you said that Mr. Godfrey was your internal affairs

24  director; is that right?

25      A.   Not so much director, he would be the

1    internal affairs investigator.  He'd be the one that

2    I'd turn to.  But there are other people, and I

3    can't tell you who, I know other people have done

4    internal affairs.  But, yes, I would rely on Godfrey

5    for internal affairs investigations and advice.

6         Q.   So did Mr. Godfrey initiate investigations

7    or did he only investigate matters brought to his

8    attention?

9         A.   I would say he only investigated the stuff

10   that I brought to his attention that I asked him to

11   look into.

12        Q.   So only you could bring matters to

13   Mr. Godfrey's attention?

14        A.   No, sir.  Anybody in administration or

15   anybody that filed a complaint with him.  If a

16   citizen did a complaint with him or if a deputy made

17   a complaint with him, he can investigate anybody.

18   It didn't have to just come from me.

19        Q.   How often did he do that?

20        A.   I mean, to the best of my recollection,

21   just guessing, like once a year maybe, twice a year

22   maybe, it wasn't very often.

23        Q.   So as internal affairs investigator he may

24   have investigated maybe once or twice a year --

25        A.   Yes, and I'm just guessing on that.  I

1    don't know for a fact.  Again, I would have to go

2    back and do some research to give you an exact

3    number.

4         Q.   But do you have records of his

5    investigations?

6         A.   Yes, sir.  If he did an investigation

7    there would be an offense report on file.

8         Q.   So you do have records of the

9    investigations that Mr. Godfrey conducted?

10        A.   If he conducted an investigation and did a

11   report, then there should be a file, yes, sir.

12        Q.   And that would include emails also, right?

13        A.   If it was pertinent to the case I guess an

14   email would be attached to it.

15        Q.   Okay.  And you would be able to provide

16   your attorney to give us the results of all of his

17   investigations?

18        A.   Yes, sir, if I'm able to locate everything

19   that he did, yes, sir.  If it's in the PTS reporting

20   system, then I should be able to find it.

21        Q.   But just your general knowledge, he may

22   have investigated once or twice a year?

23        A.   Yes, sir, and I'm just guessing.  I can't

24   give you a specific number.  Like I said, I've been

25   sheriff now for what, 12 years, so there has been a

1    lot of cases, a lot of things happen, so I can't

2    give you specific numbers.

3         Q.   Well, let's talk about the year right

4    before Jenkins and Parker, year 2022.  In the year

5    2022, just approximately, I'm not holding you to a

6    specific number, because you say that you can bring

7    matters to him, you say a complaint could be brought

8    to him.  Those are various sources, correct?

9         A.   Yes, sir.

10        Q.   Approximately, in 2022, how many

11   investigations did your internal investigator

12   conduct in the year 2022?

13        A.   I have no idea.  But I'm guessing around

14   one or two a year.  Like I told you, for every year

15   I would say maybe one or two a year.  Because it's

16   not that often that it would happen.  So again, it

17   would be something I would have to research to give

18   you a more specific number on.

19        Q.   Now looking back when you -- when you

20   earlier described that, you know, complaints could

21   come in on any number of sources, how do you see

22   that number once or twice a year where your internal

23   affairs --

24        A.   You're talking about internal affairs.

25   There's a big difference between complaints and

1   internal affairs investigations.  A complaint could

2   be a deputy speeding.  So there's a big difference

3   between the two.

4       Q.   I'm talking about allegations of

5   misconduct.

6       A.   Then that would be like an internal

7   affairs.  If it rose to something serious enough

8   where an internal affairs investigation would be

9   done, then I'd say maybe once or twice a year.  I'd

10  have to research it to give you those numbers.

11      Q.   Okay.  And he didn't investigate anything

12  on his own; is that right?  It had to come to him?

13      A.   I know I referred some things to him.  I

14  don't know if anybody else did.  I don't know if he

15  took any walk-ins, I don't know.  I'd have to

16  research it to see what was all saved in his name or

17  the reports that he did.

18      Q.   Do you have a record of the investigations

19  that you referred to him?

20      A.   No, sir, but it would be in the PTS.  So,

21  yes, there would be a record if it in the PTS

22  system.  Because if I referred something to him and

23  it rose to a serious level, then he would have done

24  an offense report on it or a case file on it.

25      Q.   What's PTS system?

```
 1        A.    Our reporting system, our offense report
 2   system.
 3        Q.    Your offense report system?
 4        A.    Yes, sir.
 5        Q.    Your attorney would be able to give us all
 6   of these offense reports?
 7        A.    Yes, sir.
 8        Q.    And the criteria for initiating an
 9   investigation, what's your -- what was your criteria
10   for referring an investigation to Mr. Godfrey?
11        A.    Well, if it was a serious enough complaint
12   or if something came back on a complaint from one of
13   the supervisors.  You know, let's say I got a
14   complaint in, it went to the supervisor, came back,
15   hey, yeah, there may be something to this.  Then we
16   get -- I would get Godfrey to look at it.  And,
17   again, it wasn't very often that that would happen.
18   But that would rise to a little bit higher level
19   where he would look a little deeper into it.
20        Q.    And nobody -- and no one else was
21   functioning as internal investigations, other than
22   he?
23        A.    I told you that before, that somebody else
24   could have done some of them.  I don't remember.
25   No, I don't think he did all of them but I can't
```

Brown Court Reporting, Inc. - (601) 832-4920

 1    tell you who else -- who would have done one.  But I

 2    don't think that he did all of them.  I think there

 3    may have been some other investigators that may have

 4    looked into stuff.  Again, it would be something I

 5    would have to research.  I'd have to search

 6    personnel files, see what was in there and research

 7    the system and ask -- and talk to some of the guys

 8    that have been there a while.

 9         Q.   But you would have records of this?

10         A.   Yes, sir, I should have records of all --

11    anything that a report was written on, there would

12    be a record of it.

13         Q.   And his outcomes of his investigations,

14    you would have records of his outcomes of his

15    investigations, right?

16         A.   Yes, sir, that should be a part of the

17    file, whether it was a paper file or on PTS, it

18    should be part of his file, the outcomes.

19         Q.   Okay.  And once that outcome would be

20    reached, what would you do thereafter?

21         A.   Usually I took whatever action that the

22    internal affairs investigators recommend or we'd

23    discuss the situation and I'd talk with our attorney

24    and come up with some kind of -- some kind of action

25    on the issue.

```
 1        Q.   Do you have a record of your actions that
 2   you took on these investigations?
 3        A.   Yeah, Mr. Shabazz, I'd have to go back
 4   through the personnel file and look through each one
 5   and, you know, like find an offense report.  If an
 6   officer or detention officer or dispatcher was
 7   terminated or fired or written up, it would be in
 8   the personnel file.  So I'd have to go through the
 9   personnel files to see what happened, to see what
10   the outcome was.
11        Q.   You don't have a separate recordkeeping
12   system for your internal investigations as a whole
13   for your department?
14        A.   Then we didn't, now we do, it's part of
15   the complaint system.
16        Q.   You made certain changes?
17        A.   Yes, sir.
18        Q.   And you made those changes, why?
19        A.   To make the department more accountable.
20   We always want to improve and better ourselves.  And
21   this incident showed that we need to improve our
22   recordkeeping on complaints and internal affairs
23   investigations and have somebody checkup -- check
24   behind the supervisors, myself.  That's why we did
25   the compliance director, somebody to have more
```

1    checks and balances in place.

2        Q.    Because you would agree that if it's not

3    recordkeeping or department -- that if there's no

4    recordkeeping or internal investigations are not

5    taken serious by your deputies, that that would

6    increase the likelihood of them violating policy?

7        A.    No, sir, I don't agree with you.  Like I

8    said, I think that my system at that time was

9    working, until these five deputies committed this

10   crime and lied and just messed everything up for the

11   whole department, you know.

12            I think that a man's word should mean

13   something still these days.  And these guys, again,

14   these guys, all five of them lied.  And, I mean,

15   they hid this from me from the getgo before the FBI

16   or MBI ever showed up.  They lied to me from the

17   very beginning on this.  So they were covering this

18   up from me.

19            And like I say, if I had any way to

20   prevent it before then, I sure would have.  But now

21   I hope I have taken the steps to prevent anything

22   like this from ever happening again.

23       Q.    And you do that by instituting a better

24   system of accountability; is that right?

25       A.    I've instituted a better system of

1    accountability on the complaints and I hope it does

2    make a difference and improves the department.

3         Q.   And investigation, your whole

4    investigation system, you made serious changes

5    there, haven't you?

6         A.   Made serious changes in investigations?

7         Q.   In your internal investigation department

8    and procedures, you made some serious changes,

9    haven't you?

10        A.   I think the compliance director is the

11   biggest change.  But the internal affairs

12   investigators, I mean, I think they're doing the

13   same thing.  But now I have a more centralized

14   system in keeping up with complaints and more than

15   one or two people know about the complaints.  So,

16   yeah, I think I have a better system now.

17        Q.   Your previous system allowed officers to

18   lie to you and get away with it?

19        A.   Well, they didn't get away with it.  They

20   lied to me for sure and lied to me that night, but

21   they didn't get away with it.

22             I think that the checks and balances are

23   in place by getting an outside agency like MBI to

24   come in and then the FBI coming in, that they found

25   the truth.  And I think that that part of it worked

Sheriff Bryan Bailey - January 8, 2025

112

1  like it was supposed to.

2      Q.    Now, was it working when Mr. Schmidt was

3  violated in December of 2022, was your system

4  working then?

5      A.    As far as I knew, yeah, it was working.  I

6  don't know -- I don't know if Mr. Schmidt ever

7  complained, filed a complaint with the sheriff's

8  office or not.  That's something else I would have

9  to research and see if he filed one or not.

10         But then again, you know, once that

11  complaint was filed with the FBI and the MBI --

12  again, they've investigated and people are, former

13  officers are paying the price for committing those

14  crimes.  So, yeah, it worked.

15      Q.    Your system was working at the time that

16  Adam Schmidt was violated?

17         MR. DARE:  Asked and answered.

18         Counsel, you can't keep asking, literally,

19  the exact same question over and over and over

20  again.  That was asked and answered.  You don't have

21  to answer that again.

22      Q.    (By Mr. Shabazz) Okay.  Adam Schmidt --

23  okay.  We'll come back to that.

24         MR. SHABAZZ:  Can we go to the -- I've got

25  an exhibit here and it's a Mississippi Bureau of

1    Investigation.  This is your -- I gave this to you,

2    I don't know what Bates number.  Let me see.

3    Anyway, you'll recognize this, Jason.  This is a

4    Mississippi Bureau of Investigation -- just two

5    reports, Mr. Walker.

6               MR. WALKER:  Yeah.

7               MR. SHABAZZ:  Drafted by Willard

8    Holifield.

9               MR. WALKER:  Yeah.

10              MR. SHABAZZ:  Willard Holifield.  I've got

11   two of them dated 12/5/2023.  They're separate and I

12   think this would be five and six.  Five, let's start

13   with five.  Let me see, I'm trying to distinguish

14   one from another to you.  Okay.

15              Trent, at the bottom one says case number

16   B23 and it ends with 200.

17              MR. WALKER:  Yeah, I got both of them.

18   166 and 200.

19              MR. SHABAZZ:  Let's start with 200 and

20   mark that as number 5.

21                   (Off record discussion.)

22              MR. DARE:  Let's stay off the record so

23   the witness will have an opportunity to review over

24   those.

25                   (Off record discussion.)

```
 1              (Exhibit 5 marked for identification.)

 2              (Exhibit 6 marked for identification.)

 3              (Exhibit 7 marked for identification.)

 4        Q.   (By Mr. Shabazz) Sheriff, we're back on

 5   the record.

 6              I want to turn you to what we have marked

 7   as Exhibit 5.  Just want to refresh you about a

 8   meeting that you had with the MBI or conversation

 9   you had with the MBI on January 25, 2023.

10              Do you recall talking to the MBI on this

11   date?

12        A.   Yeah.  Is this the night of the incident

13   at Conerly Road?

14        Q.   It's the next day, actually.

15              MR. DARE:  No, it's still the same night.

16              MR. WALKER:  Same night.  It's after

17   midnight.

18              THE WITNESS:  Yeah, this is the same.

19   Yeah, because this is saying on January 25th at

20   12:09 a.m.

21        Q.   (By Mr. Shabazz) Okay.  And were you at

22   the scene that night?

23        A.   Yes, sir, I responded to it.

24        Q.   Who contacted you to come to the scene?

25        A.   I think Brett did.  I think Brett McAlpin
```

1  called me and then dispatch may have called me also.

2  But I know I got dressed, I was at home in the bed

3  and I got dressed and I contacted MBI while I was on

4  the way to the scene.

5      Q.   And who from -- do you know who from

6  dispatch contacted you?

7      A.   No, sir, I don't.  I don't.  I would have

8  to go -- if they even contacted -- I know -- I'm

9  pretty sure Brett called me, but I can't remember if

10  dispatch called also.  Because a lot of times more

11  than one person will call me on an incident.  But I

12  think it was Brett that called me that night.

13      Q.   And what was Brett McAlpin's communication

14  to you?

15      A.   That there had been an officer-involved

16  shooting.  That Hunter had shot an individual and

17  that that individual was supposed to have had a gun.

18  And I told him I was on the way, to secure the scene

19  and that I would be calling MBI to respond to it.

20      Q.   Okay.  And you do remember speaking to

21  Mr. Holifield; is that right?

22      A.   Yes, sir.  The MBI agent, Holifield?

23      Q.   Yes.

24      A.   Yes, sir.  Yes, sir.

25      Q.   Okay.  Holifield states that he spoke with

1    you and you told him what deputies were involved.

2    Did that occur?

3          A.   Yes, sir, I'm sure it did.

4          Q.   Okay.  And you gave him Hunter Elward's

5    cellphone; is that right?

6          A.   I don't remember giving him a cellphone

7    number.  I think -- I'm trying to remember if Hunter

8    was still on the scene or not.  He may have already

9    gone to the sheriff's office.  I don't know if I

10   gave him a cellphone number or not.

11         Q.   Okay.  But in this report it's says that

12   he, meaning you, stated that Hunter Elward had an

13   altercation with Michael Jenkins inside of the home.

14   During this altercation Jenkins produced a handgun

15   and Elward fired one shot at Jenkins.

16         A.   Yes, sir.

17         Q.   Did you tell that to Holifield?

18         A.   Yes, sir, that's what was told to me by

19   the -- by hunter.

20         Q.   So what you stated to Holifield was -- you

21   did state that -- to Holifield that Michael Jenkins

22   had produced a handgun?

23         A.   Yes, sir, that's what was told to me.

24   That's what Hunter told me, that Michael Jenkins had

25   pulled a gun on him, he drew his weapon and fired at

117

```
 1   him.
 2        Q.   Okay.  And you believed Hunter Elward?
 3        A.   Oh, yes, sir, at that time I believed him.
 4   Yes, sir.
 5        Q.   And you stated earlier that all of your
 6   systems were working until you found out that they
 7   were -- had lied to you about that night?
 8        A.   I felt like they were working until -- I
 9   couldn't comprehend anything like this ever
10   happening.  Even this night -- again, he told me
11   that and I believed him until -- like I said, I
12   didn't find out the truth until June of that year.
13   What, five or six months later is when I found out
14   the truth.
15        Q.   So was Hunter Elward placed on any kind of
16   administrative leave or suspension that night?
17        A.   Yes, sir, he was placed on administrative
18   leave for being involved with an officer-involved
19   shooting.
20        Q.   Okay.  But now in terms of them lying to
21   you, you really don't know how long they had been
22   lying to you; is that right?
23        A.   I know they lied about this incident.
24   It's been proven that they were lying.  I don't know
25   that they lied to me before or not, but this one
```

1    they definitely did.

2         Q.   So you do not know whether this was the

3    first time that they had been lying to you?

4         A.   This is the first time I know that they

5    lied to me.

6         Q.   You cannot state -- pardon me.

7              You cannot state that this was the first

8    time that these convicted officers had lied to you?

9         A.   This is the first time I know for a fact

10   that they lied to me.

11        Q.   But you really don't -- you really can't

12   say for sure?

13             MR. DARE:  Whether he knows when they lied

14   to him?  I'm -- I'm going to object.  It's

15   argumentative and asked and answered.  But you can

16   certainly ask it again if you need to.

17        Q.   (By Mr. Shabazz) Okay.  Well, I mean, you

18   don't know whether or not this is the first time

19   they've lied to you?

20        A.   This is the first time that -- like Hunter

21   Elward, he lied to me.  Again, I didn't know it

22   until several months later that all of them were

23   lying.

24        Q.   Okay.  And so when you spoke to the MBI,

25   you were supporting Hunter Elward's position on the

1    shooting?

2         A.    I wasn't supporting his position.  I

3    related to the MBI agent what the deputy had told

4    me, which, at the time, I believed as being true.

5         Q.    Okay.  Let's go to Exhibit No. 6.  Exhibit

6    No. 6 is the same agent.

7         A.    Yes, sir, I'm looking at it.

8         Q.    Okay.  States that you told Holifield that

9    when he arrived -- Holifield states that when he

10   arrived he met with you and you stated that no

11   deputy had their body cameras on during the

12   shooting; is that true?

13        A.    Well, yes, sir.  I noticed that one deputy

14   didn't have his body camera on.  I said, Where's

15   your body camera?  And I'm trying to remember -- I

16   think it was Opdyke.  And I said, Where's your body

17   camera at?  He said, We were told not to wear it.  I

18   said, Who told you not to wear it?  And he never

19   would answer me, he never would give me a straight

20   answer.  And then I found out that none of them had

21   recorded it.

22             Because at the time I still believed that

23   Brett had not been there and that Middleton was not

24   there.  So I thought it was just these deputies

25   there.  And none of them could tell me why their --

```
 1   well, Hunter had a body camera on, but it was

 2   covered where it wasn't -- couldn't be -- I don't

 3   know if it was recording or not at that time, but

 4   the lens was covered anyway.

 5          But Opdyke obviously had an empty camera

 6   mount.  So I asked him and he kept telling me --

 7   that's when the first red flag in this whole case

 8   sort of popped up, is when they didn't have their

 9   body cameras on.

10          And so I wanted to make sure that the MBI

11   guy knew that they didn't have their body cameras

12   on.  Because, you know, a lot of times, nowadays

13   that's the first thing everybody wants to see or

14   preserve, is the body-camera footage.

15          So, yes, sir, I did tell him that they

16   didn't have their body cameras.

17      Q.   So you made a determination that night

18   that no officer had their body-worn cameras on

19   during the incident?

20      A.   Correct.

21      Q.   And was that in violation of department

22   policy?

23      A.   At the time I thought it was, that night I

24   thought it was.  Because I actually talked to

25   somebody in the admin, because I was so mad they
```

1    didn't have their body cameras on, I said, you know,

2    I'm going to write them all up for it and punish

3    them for not having their body cameras on.

4            Well, then that's when the next day, I

5    can't remember who it was that pointed out to me, in

6    our old policy, there's an exception for wearing --

7    not having to wear their body cameras when dealing

8    with the CI or undercover officers.  And that's what

9    they said they were doing, was helping with an

10   undercover drug deal.

11           But, also, the next morning is when I

12   found out about the taser discharges.  My second red

13   flag on it.  I said, you know what, I'm not going

14   to -- I'm not going to do anything, I'm not going to

15   do anything to interfere with the MBI investigation

16   or the FBI investigation.  Because that's how we

17   actually sort of found out about the taser

18   discharges, was from a request by the MBI for the

19   taser data.

20       Q.   So once you made a determination that no

21   body-worn cameras were being worn and also that

22   there were serious issues with the tasers, did you

23   take any action against the other officers besides

24   Hunter Elward?

25       A.   Like I said, Hunter was put on

122

1    administrative leave.  And then it was

2    Christian Dedmon's taser that had a large amount of

3    discharges on it, so I put him on restricted duty

4    until we could get to the bottom of it.

5              And again, also, there was a lot going on

6    at this time with MBI wanting to collect a bunch of

7    data, so I didn't want to interfere with their

8    investigation by starting an internal investigation

9    on these guys.

10        Q.   So all of them continued to work for the

11   department?

12        A.   Yes, sir.

13        Q.   Was this matter -- the matter pertaining

14   to the body-worn cameras, was it referred to any

15   internal affairs person in your department?

16        A.   Well, that's why I said I didn't take any

17   action, because at that time our SOP had an

18   exemption for undercover narcotics operations, which

19   how these guys knew that this was in there, I don't

20   know.  But one of them brought up or somebody

21   brought up that that was in there and they never

22   would tell me who told them not to wear their

23   cameras.  So again, it was red flags.

24              And the MBI investigation and later the

25   FBI getting involved, I didn't do anything

1  internally because I didn't want to interfere with

2  the federal or state investigation.

3       Q.   Okay.  But since you say there was an

4  exception in your policy, did you -- did you

5  initiate any kind of prompt investigation to

6  determine whether or not what they did on

7  January 24th met that exception for turning off

8  those cameras?

9       A.   I told you that there's an exception in

10  there that was brought to attention the next day,

11  the next morning after the shooting.  At that time,

12  like I say, with two red flags and it's just not

13  looking good from their side of the story, I didn't

14  want to take any action internally to jeopardize the

15  state or federal investigation.  So, no, I didn't do

16  anything.  I let MBI and the FBI work their end of

17  it because it started to sound more serious.

18       Q.   So your position was to do nothing, in

19  terms of investigation and keep them on duty while

20  the MBI looked into the shooting?

21       A.   No, sir, I didn't do anything.  I fully

22  cooperated with both the federal and state agencies

23  and supplied them immediately with any information

24  they requested.

25            And, again, I wanted the truth just as

Sheriff Bryan Bailey - January 8, 2025

124

1  much as everybody else did.  It just took, what,

2  four or five months for the truth to get to me.

3       Q.   So you didn't investigate -- you didn't

4  investigate the turning off of the body-worn

5  cameras?

6            MR. DARE:  Asked and answered.

7            THE WITNESS:  I've already answered you on

8  that.

9       Q.   (By Mr. Shabazz) Did you refer the

10  body-worn camera matter to anyone in the department

11  to investigate?

12       A.   You know, I told you that I didn't want to

13  interfere with the serious investigation going on to

14  the sheriff's office by MBI and later FBI, so I

15  didn't take any internal action.  Because I didn't

16  want to question them or make -- or do anything to

17  screw up the state's investigation or to jeopardize

18  their investigation.

19            So, no, at that time I didn't take any

20  actions on the cameras, because the red flags had

21  come up about them not wearing the camera, then the

22  taser downloads.  And it just didn't look good and I

23  didn't want to mess up anything or anybody say I

24  interfered with a federal or state investigation

25  into my officers.  So I let it go at that time.

1        Q.   Okay.  So how does the suspension
2   interfere with the investigation?
3        A.   Because I would have to interview them and
4   talk to them and confront them about the camera
5   issue.
6        Q.   How did that interfere with the
7   investigation?
8        A.   Because I didn't want to talk to them or
9   anything to do about that incident that night.
10       Q.   Now, Hunter Elward was placed on
11   administrative leave, correct?
12       A.   Yes, as per our policy per any
13   officer-involved shooting.  He told me that he was
14   in an officer-involved shooting, so everybody before
15   him has been put on administrative leave until
16   they're cleared.
17       Q.   And that means he continues to get paid
18   while he's on administrative leave?
19       A.   Yes, sir.
20       Q.   And while he's on that leave is -- that
21   didn't interfere with the investigation against
22   Hunter Elward, did it?
23       A.   What didn't interfere?
24       Q.   Him being on leave, that did not interfere
25   with the MBI and the authorities investigating

```
 1   Mr. Elward, did it?
 2        A.   No, sir, I don't think it interfered with
 3   it.  No, sir.
 4        Q.   So if you had to do it all over again,
 5   would you -- would you continue, after this incident
 6   knowing what you knew at the time, that the
 7   body-worn cameras were off, it's questionable
 8   whether it was within the policy that you had,
 9   misuse of the tasers, would you still have left
10   these officers on duty and active members of the
11   department?
12        A.   Well, I hope I never ever in my whole life
13   have to deal with a case as serious as this one.
14   But, again, there were some serious allegations by
15   you on these deputies, which ended up being true,
16   which I was lied to, I was left in the dark, nobody
17   told me anything.  I had to learn off the news and
18   the internet of what the truth was.  So five months
19   later when I found out the truth, I took immediate
20   action.
21        Q.   Okay.  And I'm just saying, if you had to
22   do it again, would you suspend these officers
23   immediately?
24        A.   And I had the same information and the
25   same exact scenario?
```

Brown Court Reporting, Inc. - (601) 832-4920

```
1         Q.    Yes.
2         A.    Yeah, I mean, I wouldn't know -- I
3    wouldn't know any different than I did in January of
4    '23.  If I was still being lied to and everything
5    else.
6         Q.    I'm just -- I'm just -- I'm trying to get
7    it clear, you're giving me a long answer.  I just
8    want a direct answer.
9              Would you have left these officers on duty
10   and operating in the Rankin County Sheriff's
11   Department if you had found out what you had found
12   out on the scene at that night and the next day
13   through, as you say, the media and everything, would
14   you have left them on duty again?
15        A.    So if you're asking me if I knew the truth
16   about what happened now, I would have arrested them
17   myself that night if I would have known the truth.
18   That evening, I would have called the FBI and
19   arrested them myself that night if I had known the
20   truth that night.  There wouldn't have been no
21   suspension or anything.  They would have been in the
22   jail.
23        Q.    Okay.  Well, I'm not speaking about what
24   you knew later.  I'm talking about from what you
25   gathered just say over the course of the next week.
```

1    When those allegations were made and you had a

2    chance yourself to look over your body-worn camera

3    policy and its exceptions and the taser logs and

4    everything surrounded this, if you had to do it

5    again, would you have suspended those officers from

6    operating in your department much earlier than you

7    did?

8         A.    Again, Mr. Shabazz, I don't get what

9    you're -- because if I had known the truth then they

10   wouldn't be employed, they would have been in jail.

11   I would have arrested them immediately.

12             But if you're asking -- I guess I'm

13   confused on what you're asking me.  Because I did

14   the best that -- I did what I thought was right at

15   the time.  Because I didn't want MBI or FBI saying I

16   was interfering with the investigations by talking

17   to the deputies about the incident which they were

18   investigating.

19             So no, I think it would be completely

20   improper for me to do an internal investigation on

21   an ongoing FBI and MBA case.  Yeah, I think that

22   would be totally improper.

23        Q.    So faced with these same set of facts and

24   circumstances in regards to these officers remaining

25   on duty, you would have done the exact same thing?

```
 1        A.    If I --
 2              MR. DARE:  Are you going to -- so this
 3   sounds like the same question now five different
 4   times and that sounded like the exact same question.
 5              MR. SHABAZZ:  He never answered it.  It's
 6   not the exact same question but he is not answering
 7   the question.  What he's doing is saying that once
 8   the truth came out.  I'm not asking about the truth.
 9   I'm talking about the allegation and the evidence
10   that he had in his hands and that he knew at the
11   time and that he, as he said, he got from me, the
12   press, the shooting.
13              I'm talking about comprehensive,
14   everything that he knew on January 25th through
15   let's just say the 26th, 27th, 28th 29th, would you
16   have done the same thing in regards to these
17   officers' status of employment?  Would you have
18   conducted yourself the same way as you did?
19              MR. DARE:  If he knew the exact same thing
20   to what he knew from January to June, would he have
21   done the exact same thing?  Is that what you're
22   asking?
23              MR. SHABAZZ:  I don't know about January
24   to June.
25        Q.    (By Mr. Shabazz) I'm just talking about
```

1    within one week of this incident.  Within one week

2    of this incident, if faced with this same set of

3    circumstances, this same shooting, this same

4    body-camera turnoff, this same set of facts and

5    circumstances, would you, faced with that today,

6    would you have -- would you do the same thing, let

7    these officers remain on duty and operate in

8    authority in your department?

9         MR. DARE:  I'm going to object to form as

10   you've already been told about two of them who

11   didn't remain on the same way.

12        But with that, you may answer it one more

13   time if you understand.

14        THE WITNESS:  So during your question you

15   said today, if I knew what I knew today, I would

16   arrest them and lock them up that night, if I knew

17   what I knew today.

18        If I knew what I knew a week after the

19   January 23rd incident with the same exact

20   circumstances, again, I would not interfere with a

21   federal of state investigation for an internal

22   investigation.  When it appeared that there was a

23   possibility for much more serious charges to be

24   coming against these individuals.  No, I would not

25   have risked an internal investigation to mess up a

1   state or federal investigation.

2        Q.   (By Mr. Shabazz) Would you have suspended

3   those officers, faced with these same set of

4   circumstances again?  Would you have suspended them?

5        A.   I put one on administrative leave, one was

6   on restricted duty, two of them weren't even there,

7   allegedly, that lied to me, so I didn't even know

8   they were there.  So how could I have taken action

9   on something I don't even know?

10          So if I knew what I knew today, again, I

11  would have arrested all of them myself.  Back then,

12  I mean, like McAlpin and Middleton, they were saying

13  they weren't even there.  Even Mr. Parker gave the

14  same story to the MBI, from what I understand, gave

15  the same story as the deputies, initially.  I

16  understand now that he was scared to death.

17          So, yeah, I mean, based on the

18  circumstances, I would have taken pretty much the

19  same actions with the information that I had at that

20  time.

21       Q.   So faced with that today, you wouldn't

22  act -- you wouldn't take any action today as

23  probably -- you wouldn't suspend them all?

24       A.   I'd arrest all of them.  If I knew what I

25  knew today, I would arrest everyone of them and

```
 1   called the FBI myself.
 2       Q.   I'll move on behind that.
 3           Let me show you -- let me ask you a
 4   question here on these body-worn cameras.  What were
 5   your procedures to ensure that body-worn cameras
 6   were in regular operation and not being turned off
 7   by your deputies?
 8       A.   There was a policy in place that told them
 9   how to do it and when to do it and they would come
10   by and download.  So, really, I wouldn't know if
11   they were cutting it off or not, unless we needed a
12   specific video from a specific case and you went
13   there and that video wasn't there.  Or like say
14   there was a use-of-force and you went to go review
15   the video and the video wasn't there.  And if it
16   popped up that there wasn't any video, then that's
17   how I would found out.
18       Q.   When was the body camera policy
19   established in Rankin?  When were body cameras
20   implemented?
21       A.   We started I think in '21, maybe, like
22   middle to late '21, 2021.
23       Q.   Did you ever find, prior to the Jenkins
24   and Parker incident, did you ever find that he
25   body-worn camera officers -- pardon me.
```

1          Did you ever find that the body-worn
2    cameras by your deputies had been turned off
3    improperly at any time prior to the Jenkins-Parker
4    incident?
5          A.   If it did happen and I was told, I don't
6    remember.  At this time I don't remember a specific
7    case or incident.  So at this time I don't remember
8    any.
9          Q.   So you never found, prior to Jenkins and
10   Parker where your officers had turned their
11   body-worn cameras off?
12         A.   If an incident happened I do not remember
13   at this time.
14         Q.   And in terms of use-of-force reports, was
15   it your policy to review the body-worn camera
16   footage whenever your officers had filled out a
17   use-of-force report?
18         A.   Back -- you're talking about in 2021?
19         Q.   At any point between 2021 and the time
20   that the Jenkins-Parker incident happened?
21         A.   I don't know if it was reviewed on each
22   one, but now it is.  It's definitely on every single
23   use-of-force, the compliance director reviews the
24   video that goes along with that use-of-force.
25         Q.   Okay.

 1      A.   So prior to that I don't know if they were

 2  checked on every single incident or not, but now

 3  they are.

 4      Q.   So previously you did not check the

 5  body-worn cameras when reviewing a use-of-force

 6  report?

 7           MR. DARE:  That's not what he said,

 8  Counsel, and you know it.

 9           MR. SHABAZZ:  Okay, I'm asking.

10      Q.   (By Mr. Shabazz) Previously, is it true

11  that you did not check body-worn camera footage in

12  conjunction with reviewing use-of-force reports by

13  your deputies?

14      A.   No, I'm sure that they checked some of it

15  on the -- well, like if there was an injury or

16  something like that, I'm sure somebody reviewed it

17  to go along with the use-of-force.  But, again, I

18  can't tell you specifically which ones were and

19  which ones weren't.

20           Now I can tell you for certain that every

21  single use-of-force, if there's a video to go along

22  with it, it's reviewed.  Actually, the video is

23  reviewed to make sure it is there.

24      Q.   I'm getting to your changes.  And I

25  clearly understand why you made those changes.  But

1    I want to go in to what happened before those

2    changes were made.

3             Now, you say "they", who is the "they"

4    that reviewed the body-worn camera footage in

5    conjunction with the use-of-force reports?

6        A.   Well, the captain of patrol would have or

7    if there had been a complaint filed, then they would

8    have pulled it then.  I think at that time -- I

9    can't remember now if we had some in the jail, a

10   couple of body cameras back there, and then I think

11   we had a couple -- because like I said, we ordered

12   the body cameras.  It took a while to get them, to

13   get a policy in place, then to get them up and

14   going, the technical part of it.

15            So I don't -- they slowly grew throughout

16   the department.  It wasn't like everybody got one

17   immediately.  So it took a little while to get them

18   all up and going.  Even now everybody doesn't have

19   one, but all the patrol people do or the high-risk

20   people, like warrants officers and stuff like that

21   have them.  But it took a while to build up to that

22   point.

23            So, you know, I guess, like the captain of

24   court services, if he had a deputy going to serve a

25   warrant on somebody, there was a conflict there then

1    that should have been reviewed on the video.  If

2    there was some kind of use-of-force issue with a

3    traffic stop on patrol and there were injuries

4    involved with it, I would assume the captain of

5    patrol would have reviewed it.  Same thing with the

6    jail, the jail administrator would have reviewed

7    those back there.

8              But, again, now, every single use-of-force

9    is reviewed by the compliance director and that's in

10   every part of the department, the jail, court

11   services and patrol.

12       Q.   But prior to that, none of that was in

13   place, correct?

14       A.   You know, I just told you that, yes, I

15   would have to go back and see which ones were and

16   which ones weren't.  But the captain of patrol or

17   the captain over at court services would have

18   reviewed -- well, I don't even know if the captain

19   of court services could review them initially.  So

20   the captain of patrol or if Paul Holley at one time,

21   he was reviewing them, he could review them on his

22   computer.

23             So, yes, on particular instances, just

24   depending on the incident, it would be reviewed or

25   not.

1    Q.   Okay.  Do you have a record of the times

2    when the body-worn camera has been reviewed by your

3    department according to the various ways you have

4    described?

5        A.   Yes, sir, I do now, yes, sir.  Yes, sir, I

6    can go back and pull every single one of them of

7    when it was reviewed.

8        Q.   You can pull every instance in which the

9    body-worn camera was reviewed by your department?

10       A.   Yes, sir, now I can.  Yes, sir, since we

11   started the compliance director.

12       Q.   No, prior to Michael Jenkins and

13   Eddie Parker being in the incident, can you pull

14   those records for your review of body-worn cameras?

15       A.   I would have to check with the patrol and

16   the undersheriff files and stuff to see if a record

17   was kept then or not.  And there may be something --

18   I'm not familiar enough with the camera system,

19   there may be something on the camera system that

20   shows whether it was reviewed or not.  There may be

21   a supervisory check or something on there.  I would

22   have to review and see.  I'm not very technical.

23       Q.   So you -- is it true that you really did

24   not have a recordkeeping system of your review of

25   body-worn cameras and the reason that they were

1  reviewed prior to you putting your new system in

2  place?

3       A.   No, sir, I would have to go back and see

4  which ones were reviewed and why they were reviewed

5  and report that back to you.

6       Q.   Did you review the body-worn cameras at

7  any point?

8       A.   No, sir.  I don't have access to the

9  program.  Again, I'm not very technical on it.  So,

10  no, I have not reviewed any.

11       Q.   Now, if you came to understand that

12  testimony in this case was stated by some of your

13  administrators that you were -- that you were the

14  person that would review the body-worn camera

15  footage, what would your response be?

16       A.   That I would review something if they sent

17  it to me.  I don't have the camera system on my

18  computer.  So if they sent -- if they had one that

19  they thought I needed to look at, they would email

20  it to me or call me in their office and I would

21  watch it.

22            So, yeah, I would review it that way but

23  not -- I would -- as part of my job, I don't sit

24  down and go through and randomly check videos.

25       Q.   Okay.  So you did review some body-worn

1    camera footage?

2         A.   Oh, yeah, I'm sure I've seen -- if

3    something happened on one, they'd call me in there

4    to look at it or say you need to take a look at this

5    or sent it to me, then, yeah, I have reviewed them.

6         Q.   Can you like -- can you just recall before

7    the Jenkins-Parker incident, the last time you

8    reviewed an officer body-worn camera footage in

9    response to any set of circumstances?

10        A.   No, sir, I can't remember the last time

11   I've looked at one.  I would have to go back and

12   check my emails.

13        Q.   Any time -- do you remember any time?

14        A.   Yes, sir, I've had them emailed to me

15   before.  They had asked me to come into the

16   undersheriff's office and I would look at their

17   computer and watch it.

18             I tell you, the last one was probably a

19   different officer-involved shooting we had a couple

20   years ago were two deputies' body cameras and the

21   guy came out of the attic, that's the last one I

22   remember reviewing.

23        Q.   Who was that?

24        A.   What deputies?

25        Q.   What case?  What matter was that?

1        A.   It was an officer-involved shooting and

2    the deputies were Pickle (sic), I can't remember the

3    other one, I would gave to go back to pull the case

4    up.  But the guy came down out of the attic with a

5    gun and started shooting at the deputies.  That's

6    the last one that I remember watching.

7        Q.   And you reviewed the body-worn camera

8    footage in that matter?

9        A.   Yes, sir.

10       Q.   And so you can provide us the times that

11   you and your department reviewed body-worn camera

12   footage?  You can provide --

13       A.   I had -- I'm sorry.  Go ahead.

14       Q.   Provide us those details, right?

15       A.   I can look that case back up and let you

16   know -- look the email back up, if they emailed it

17   to me, I'll let you know the date and time I did on

18   that one.

19            Again, now, I think there's a -- with the

20   compliance director, he's reviewing everything on

21   the use-of-force and randomly reviewing them.  And I

22   know that he has a record of all that now.

23       Q.   Body-worn camera footage is critical to

24   ensure that your policies are being adhered to and

25   that your deputies are not violating the civil

1    rights of the citizens of Rankin County; would you

2    agree?

3        A.   You know, we'd operate a long time before

4    without the body-worn cameras, but, you know, we

5    started out with the in-car cameras.

6             So, yes, it's a check and balance.  But,

7    you know, you have to have, you know, an officer, a

8    deputy, you would hope -- your first line of defense

9    is to hire the right man, getting the right person

10   in the right job doing it for the right reasons.

11            So, you know, before all these cameras and

12   everything else, you know, there was trust there.

13            So now, like I said, ever since this deal

14   with Mr. Jenkins and Mr. Parker, it's like Ronald

15   Reagan said, it's trust but verified.  So we're

16   doing our best to verify everything now.

17       Q.   And in the case of body-worn cameras and

18   your other system, you realize that your trust

19   system was not working, correct?

20       A.   In this particular case with these five

21   deputies who, you know, not only had they passed the

22   background investigation for the sheriff's office,

23   four of the five had passed the FBI violent crimes

24   task force.  They had the in-depth background

25   investigation done on them for the FBI violent

 1    crimes task force, all of which they were a member

 2    of.

 3           So, you know, if all these guys had been

 4    doing all this stuff and my complaint system wasn't

 5    working, why wasn't the FBI's complaints -- because

 6    surely the FBI would have gotten a complaint on

 7    them.  As much stuff is being said about them and as

 8    much stuff they're supposed to have done, somebody

 9    besides me should have gotten a complaint.  Wouldn't

10    you agree?

11         Q.   If you had a -- if you had an inadequate

12    complaint system or an inadequate body-camera review

13    system, that would allow them to keep deceiving you,

14    right?  If your systems are not -- and policies, are

15    not designed to hold them accountable --

16         A.   At the time I thought --

17         Q.   -- then that would actually -- that

18    would -- that would be a part of the reason why they

19    would go out and commit the acts that you now say

20    you made changes because of.

21           MR. DARE:  Is there a question in there?

22           MR. SHABAZZ:  Yeah.  Yeah.

23         Q.   (By Mr. Shabazz) Were your policies, which

24    you have described to us as being worthy of serious

25    change, you admit they were --

```
 1              MR. DARE:  I'm already going to object to

 2    the form on that one.

 3         Q.   (By Mr. Shabazz) Do you admit that your

 4    body-worn camera accountability policies were

 5    insufficient?

 6         A.   No, sir, they're not insufficient.  At the

 7    time -- you know, we copied those --

 8         Q.   At the time?

 9         A.   -- from the State of Texas.  I mean, the

10    State of Texas, that's there SOP.  So, no, at the

11    time we thought we had a good SOP in place for the

12    body cameras.  So, no, I thought it was a great

13    policy at the time.

14         Q.   But why did you change it?

15         A.   Because there's a loophole in there that

16    allowed four liars to -- five liars to get around on

17    me.

18         Q.   So it wasn't working, correct?

19         A.   Right, it wasn't working.  But at the time

20    that we implemented the policy, I thought it would

21    be a good policy.

22         Q.   Okay.  And did you -- now with you

23    thinking that it was a good policy, did you have any

24    professional review of your body-worn camera policy

25    to make sure that it was the best body-worn camera
```

1  policy you could have in your department?

2      A.   Well, you know, your attorney is supposed

3  to be good at researching stuff, so one of our

4  attorneys was supposed to research the policies and

5  procedures.  So I guess he thought that was a good

6  policy, good enough for the whole State of Texas, so

7  we adopted that policy of theirs.

8      Q.   Okay.  I want to turn your attention to

9  exhibit number -- let's talk about your changes now.

10  Your changes.  Because you felt that there was a

11  need for serious change in the body-worn camera

12  policy, correct?

13          MR. DARE:  Nobody has ever said that.  I

14  mean, I'm not -- I'm sorry --

15      Q.   (By Mr. Shabazz) Did you say that there

16  was -- did you say you made real serious changes in

17  the body-worn camera policy?

18      A.   No, sir, I never said "serious" that I'm

19  aware of.  If I did, I'm mistaken.

20          But the biggest change in the policy is

21  that one exception for narcotics operations, which

22  we did away with.

23      Q.   What other changes did you make?  Tell me

24  about that change and then -- tell me about that

25  change.

```
1        A.   Well, that change is the one that they
2   used that night for the Jenkins and Parker incident,
3   where they said they were doing a narcotics
4   operation which that policy had an exception for not
5   wearing your camera during undercover operations,
6   involving undercover officers or confidential
7   informants.
8        Q.   Now, what's the reason for that exception?
9   Allowing the camera to be turned off under those
10  circumstances?  What was the reason for that policy?
11       A.   Because a lot of times if you're doing
12  undercover narcotics operations, you don't want to
13  get your confidential informant or your undercover
14  officer on video that could be subpoenaed to court
15  where their identity could be made.
16       Q.   But those are for undercover officers,
17  right?
18       A.   Yes, sir, undercover operations.  Yes,
19  sir.
20       Q.   On the night that the incident happened
21  between Michael Jenkins and Eddie Parker, these
22  officers were in uniform, correct?
23       A.   From the lying version of it or the
24  not-lying version of it?  What actually happened or
25  what they said happened?
```

```
 1        Q.   What actually happened?

 2        A.   All right.  So Brett McAlpin would have

 3   been plain clothes, Middleton would have been plain

 4   clothes.  Did I say -- who did I just say was plain

 5   clothes?

 6             MR. DARE:  McAlpin --

 7        Q.   (By Mr. Shabazz) You said McAlpin and --

 8        A.   All right.  Let me start back over.

 9   McAlpin and Dedmon would have been plain clothes.

10   Middleton, Opdyke and Hunter would have been

11   uniformed.

12        Q.   Now, for those officers in uniform, you

13   knew -- you knew when you arrived on the scene that

14   those officers in uniform did not qualify for the

15   turning off of the body-worn camera exception --

16        A.   No, sir.

17        Q.   -- according to your policy?

18        A.   Well, Christian Dedmon and Brett McAlpin,

19   it's my understanding, told them it was a narcotics

20   operation and that's the reason they didn't wear it.

21   Because they were told it was a narcotics operation,

22   not to wear their cameras.

23        Q.   But I'm just saying your knowledge.  I

24   understand what McAlpin told them.  But, I mean,

25   when you arrived and you knew that Elward, Opdyke
```

1    and Middleton were uniformed, you knew that they

2    were uniformed when you arrived on the scene talking

3    to the MBI, right?

4         A.   Yes.

5         Q.   And you knew that their body-worn cameras

6    had been turned off, correct?

7         A.   No, I mean, it took a minute.  Actually, I

8    think it was Opdyke that I saw and he didn't have

9    his camera in his holder.  So, yeah, and that's when

10   I asked him where his body camera was.

11        Q.   There's no danger to an officer having his

12   body-worn camera visible when he's in official

13   uniform, is it?

14        A.   No, sir.  But what they were using is the

15   excuse of the undercover narcotics operation, I

16   guess, with Dedmon being a narcotics investigator

17   and Brett McAlpin being undercover.  It's my

18   assumption now that that's what they were using is

19   that they were still on an undercover narcotics

20   operation.

21             And, again, I didn't get into it with

22   them --

23        Q.   Undercover --

24             MR. DARE:  Hang on.  Can he finish?

25        Q.   (By Mr. Shabazz) Go right ahead.

1      A.   So in the policy and procedure it says,

2   does not have to wear one with undercover or CIs.

3   And also under the impression that maybe possibly

4   Mr. Jenkins or Mr. Parker was going to be a CI or a

5   help or something like that.

6           Anyway, to make a long story short, I

7   asked them who told you not to wear your body camera

8   and they never would tell me directly.  And that's

9   why I just sort of stopped, that bothered me.  And,

10  again, I was going to write them up the next day.  I

11  didn't realize that the exception was in there for

12  the narcotics thing until it was pointed out to me

13  the next morning.

14          And so I said the best thing to do is not

15  take any action and not interfere with this MBI or

16  FBI investigation.

17     Q.   But you could have taken action against

18  the uniformed officers for not -- for removing their

19  body cameras that night?  You could have taken that

20  action?

21     A.   Sir, I'm telling you that the exception in

22  there -- you're thinking for the narcotics officers

23  wearing it.  Narcotics operations, so uniform guys

24  go help narcotics people.  So apparently -- I'm just

25  guess on this -- McAlpin or Dedmon or one of them

```
 1    told them not to wear their cameras because this was
 2    a narcotics operation that they were doing, which we
 3    all know now it wasn't.  It's a lie.  But that was
 4    their excuse, that exception in that policy is how
 5    they got by on this.
 6         Q.   Okay.  And that wasn't a good policy, was
 7    it?
 8         A.   At the time I thought it was, yes, sir.
 9         Q.   But now you admit that it wasn't?
10         A.   No, I admit that that section on narcotics
11    thing had to be taken out.  The only, you know --
12    there's no reason not to wear a body camera, so we
13    took the part our where anybody could ever not use
14    that part -- not use that exception again.
15         Q.   Because the exception could lead to the
16    kind of things that happened with Jenkins and
17    Parker, correct?
18         A.   In this particular incident they used it
19    to cover up a crime that they were committing in
20    this particular incident.
21         Q.   Do you have a system that tracks the
22    whereabouts of the officers on duty?
23         A.   Yes, sir.
24         Q.   Was this in place at the time of the
25    Jenkins-Parker incident?
```

```
 1        A.    Yes, sir.

 2        Q.    Can you describe that system?

 3        A.    Again, I'm not technical Mr. Shabazz.  So

 4   in dispatch there's all these computer screens and

 5   one of these screens shows a map of Rankin County.

 6   And when this system is working properly, it shows a

 7   deputy's car and his portable radio.  And on that

 8   car they have his badge number and his unit number

 9   and then it'll have his badge number on his walkie

10   talkie.

11            So they're sitting in dispatch, they see

12   this big screen with all the deputies all over the

13   county.  And the purpose of it is to get help to

14   people fastest when 911 call comes in.

15            So a call comes in, if you're in Rankin

16   County and let's say you're in Flowood at a hotel,

17   you dial 911, it's going to pop up on that screen at

18   the hotel that you are at that you're calling 911,

19   but it's going to show -- and I'm using a bad

20   example for Flowood.  Let's move out -- let's say

21   that you're at a hotel out in the county and -- say

22   you're over at the Reservoir at the campground.  So

23   you dial 911 from the campground, it pops up, it's

24   going to show the closest deputies to your location.

25   Dispatch sends those closest deputies to respond to
```

Sheriff Bryan Bailey - January 8, 2025

1   you.

2        Q.    Okay.  So how did that -- how did that

3   tracking system work that night of the incident

4   between Jenkins and Parker?

5        A.    It doesn't -- like a lot of our systems,

6   it doesn't hold the information for very long, maybe

7   like 30 days.  And one thing it actually helped on

8   the investigation on the federal and state

9   investigation on Mr. Parker and Mr. Jenkins is it --

10  the -- I told y'all that the only time I really

11  talked to Brett, initially, Brett McAlpin, was that

12  night.  And even after that it was my impression

13  that he kept telling people that he was never

14  there -- that he had left the scene and not come

15  back until after the officer-involved, the alleged

16  officer-involved shooting.

17          So with him that night it showed -- I

18  think he was in a spare vehicle, so his mobile radio

19  wouldn't be showing up, but he had left his walkie

20  talkie on.  So his walkie talkie showed the time,

21  you know, showed his house, but it actually put him

22  at the residence when he said he wasn't at the

23  residence.

24          And, again, I didn't find this out until

25  later and this is when the MBI -- later on sometime

1    that week after, that's when MBI -- MBI either

2    requested it or somebody at the sheriff's office

3    found it and submitted the information to MBI with

4    all the radio information.

5         Q.   And that officer, again, that you tracked

6    with the walkie talkie that you found, who was that

7    again?

8         A.   Brett McAlpin.  See he said he wasn't at

9    the house during this certain timeframe, but then

10   the walkie talkie wasn't saying the same thing.

11        Q.   Okay.  So you found out within a week that

12   Brett McAlpin had lied to you; is that right?

13        A.   Yeah, later that week, yeah, that he

14   wasn't being truthful about his location or else he

15   had left his walkie talkie at the scene or

16   something.  I don't know, you know, what his excuse

17   would have been.  Again, I wasn't talking to him

18   after that because this case appeared to be getting

19   more serious.

20        Q.   Yeah, but even though you knew that, you

21   allowed Brett McAlpin to continue as one of your

22   supervisors in your department as a chief

23   investigative officer; is that right?

24        A.   Yes, sir, at that time.  Because of the

25   ongoing investigation, I didn't want to interfere

1    with the FBI or the MBI's investigation.

2         Q.   So even though he had lied -- even though

3    you knew for a fact that he lied to you about being

4    in the house during this serious incident, you

5    continued to allow him to function as your --

6    supervisory role as your investigative officer in

7    that department?

8              MR. DARE:  Object to the form.

9              THE WITNESS:  Mr. Shabazz, with all due

10   respect, I just sat there and told you I didn't know

11   if he left his walkie talkie there, I don't know if

12   he had it with him.  I don't know if the times are

13   right on the computer.  I just know it was another

14   red flag in this case.  And we furnished that

15   information to MBI and FBI.

16             So I didn't know for a fact he did

17   anything.  I was still in the dark on everything.

18   MBI and FBI aren't telling me anything.  I'm -- it's

19   a one-way street, information going out.

20             So I'm just -- you asked me how the system

21   worked, I told you how it worked.  Whether it's

22   accurate, whether it's correct or not, I don't know.

23   You asked me how it worked and I told you how it

24   worked that night.

25         Q.   I mean, I understand.  I just wanted to

1   know was he allowed to just continue on --

2        A.   I'm telling you I don't know if he was

3   there or not there.  I don't know if somebody else

4   had his walkie talkie.  I let the FBI and MBI handle

5   that.  So I don't know, I can't tell you.

6        Q.   Let's go here.  Let's go here, sir.  I

7   want you to look at Exhibit No. 7.

8        A.   Okay.

9        Q.   And let me ask you, what -- you said that

10  body cameras was instituted in '20 or 2021?

11       A.   I said I believe it was around possibly

12  October of '21, around there.  But it took a while

13  to get them implemented and up and going.

14       Q.   So was the body-worn camera system in

15  place at the time Damien Cameron was killed?

16            MR. WALKER:  July of '21.

17            THE WITNESS:  No, not for -- if I said we

18  started implementing in October of '21, then that's

19  before -- that's after July of '21.  So I don't -- I

20  think we may have had them, but they hadn't been

21  issued out yet.  Maybe they had shipped them, but

22  they hadn't been issued out.  I'd have to check on

23  that and see.

24       Q.   (By Mr. Shabazz) Okay.  Now, who -- let me

25  ask you this.  Who reviewed the body cameras after

155

```
 1   each shift?
 2        A.   Like?
 3        Q.   Who reviewed the body-worn camera system
 4   to make sure that no cameras were turned off, like
 5   say after the night shift?
 6             Was there somebody in the department that
 7   was in charge of making sure that after the night
 8   shift that there was no cutoffs or improper actions
 9   with the body camera?
10        A.   I don't know of any physical way possible
11   to check every single video, every hour of every
12   video, I don't know of any way you could do that.
13             But, you know, currently, we have Wayne
14   Carter -- let me backup.
15             The captain of patrol and I think -- I
16   don't know if the jail administer does his or not,
17   and the investigators now have -- we have some body
18   cameras back there for them to use.  So they're
19   supposed to -- oh, I know what it is I'm thinking,
20   the lieutenants on each shift are supposed to review
21   X amount of videos per week and maybe even the
22   sergeant's supposed to help them.  I'd have to look
23   that up to tell you for sure.  Then the captain
24   reviews what the lieutenants reviewed.  And then the
25   compliance director reviews and checks up on what
```

1    the captain reviewed.

2              So it's one, two, three, so four different

3    people checking.  But still there's no way you can

4    check every single minute of every single video of

5    every single officer.

6         Q.   Now that review system, was that in place

7    at the time of the Jenkins-Parker incident?

8         A.   No, sir.

9         Q.   Okay.  So these are another one of the

10   changes you made as -- changes you made later,

11   right?

12        A.   Yes, the change to improve the sheriff's

13   office.

14        Q.   Okay.  So this system of the routine or

15   systemic review of body-camera-worn compliance came

16   after the Jenkins-Parker incident, correct?

17        A.   Yeah, the compliance director was

18   definitely started after that.  I'm trying to

19   remember -- I don't remember the exact setup on how

20   they review them, but I think it starts with the

21   sergeant, lieutenant, captain and then the

22   compliance director.  So there's several different

23   layers of people checking.

24        Q.   But you agree without those checks and

25   balances that could encourage officers to turn off

1  their body camera; is that right?

2      A.   No, sir, I wouldn't say that.  I would

3  hope that they would use it the way it was supposed

4  to be used.  That they'd cut it on when they were on

5  a call or dealing with a case, you know, and cut it

6  off afterward and mark it, log it properly, is what

7  I'd hoped they would do.

8      Q.   But earlier you said that you can't trust

9  or you have to verify, is that what you said

10  earlier?

11      A.   Yes, sir, now we're verifying through the

12  compliance director in the steps I just explained to

13  you a minute ago, we're verifying.

14      Q.   And so you weren't verifying compliance

15  with the body-worn camera policy at the time that

16  Jenkins and Parker were -- had their incident?

17      A.   I wouldn't say we weren't verifying.  We

18  were trusting them to do the right thing.  And I

19  guess we'd find out if they weren't doing it

20  properly when we get to look for a video and if it

21  wasn't there, then there would be an issue.  So I

22  wouldn't say we weren't verifying it.

23      Q.   But your verification system was

24  inadequate; is that right?

25      A.   No, at the time I didn't think it was.

1      Q.   But you found out that you had to change

2   it because it wasn't adequate, right?

3      A.   No, I changed it because we want more

4   checks and balances and we're trying to improve the

5   sheriff's office and improve out accountability,

6   so -- but at the time I thought that the system we

7   had was okay.

8      Q.   But you found out that it wasn't when

9   you -- when you had no body-worn camera footage of

10  the Jenkins-Parker incident, you found out that your

11  system was not -- was not --

12     A.   No, I found out that five liars exploited

13  a loophole in our policy and procedure to get around

14  wearing their body cameras.

15     Q.   And that you needed a system in place to

16  deal with liars?

17     A.   I needed to adjust my policy and needed to

18  make our department more accountable.

19     Q.   Policies make up -- strong policies make a

20  strong system; is that right?

21     A.   Yes, sir.  At the time I thought I had

22  strong policies.  I thought I had good, honest

23  people working with me, not five liars, again, who

24  even passed the FBI background investigation.

25     Q.   So when you say you thought, I mean, are

Sheriff Bryan Bailey - January 8, 2025

159

1    your thoughts based on professional advice or are
2    they just your thoughts?
3         A.   At that time, again, the body cam -- the
4    SOP was copied direct from the State of Texas.  I
5    would think that with all of the great minds you
6    have in law enforcement over there, that that would
7    be a pretty good one to start out with to follow.
8    Obviously, it wasn't.  So we had to stop and
9    readjust, you know.  I never would have thought that
10   that loophole would have been in there, but it was.
11        Q.   Okay.  Making readjustments is good, I
12   think that's what society wants.
13             Just so I can be clear, what are the lists
14   of adjustments or changes in specific that you made
15   in the body-worn camera policy after the
16   Jenkins-Parker?
17             We talked about a lot of things, but I
18   just want to get clear of the list of -- official
19   list of changes that you made in body-worn camera
20   compliance after the Jenkins-Parker incident?
21        A.   We would have to get both of them and put
22   them side-by-side to look to make -- I can't give
23   you exact specific changes.  The biggest change we
24   were looking for though was that narcotic exemption,
25   which we've done away with.

1    Q.   Okay.  But you said you made other changes
2    such as weekly reviews -- I'm paraphrasing.  You
3    said you had weekly reviews and a system now that
4    regularly reviews --
5    A.   No, daily reviews.  Yeah, I would have to
6    get the policy and tell you exactly.  I don't have
7    it here in front of me.  But now it's reviewed on a,
8    pretty much a daily basis.
9    Q.   Okay.  It's reviewed on a daily basis?
10   A.   Uh-huh (affirmative response).
11   Q.   And these changes were made because of
12   what happened?
13   A.   Yeah, part of what happened.  Yeah, making
14   ourselves -- improve our department and making
15   ourselves more accountable is exactly why it
16   happened.
17   Q.   Okay.  All right.  Let me -- let me just
18   ask you about use-of-force reports again.
19   A.   Okay.
20   Q.   I'm coming to Exhibit 7 next.
21       When it comes to use-of-force reports, do
22   you have a record -- do you have copies of records
23   of all use-of-force reports that are submitted by
24   your officers?
25   A.   Yes, sir, should be on file.  I started it

 1    when I first got elected, requiring them to fill out
 2    a use-of-force report.
 3         Q.   Okay.  And so if I was to ask you for all
 4    of your use-of-force reports for the year 2022, you
 5    could give them to us, correct?
 6         A.   Yes, sir.  The ones that were turned in
 7    that are on file at the sheriff's office, yes.  If
 8    it's in my possession, we have it.
 9         Q.   And that would be the same for every year
10    you've been sheriff; is that right?
11         A.   Yes, sir.  I think I started -- I don't
12    know if it will be a full year in 2012, but I think
13    I started it in 2012.  So ever since 2012 there
14    should be a full year of them.
15         Q.   Full year of them.
16              Now, you said whenever they were turned in
17    and I'm sure your attorney is going to give us those
18    use-of-force reports.
19              About how many per year would you get from
20    your officers?
21         A.   I'd have to go count them and see.
22    Because it's broken down by the patrol, the jail and
23    the juvenile detention center, so I'd have to give
24    you a breakdown on it.
25         Q.   Okay.  Well, just comprehensive, out of

1   all three of those sources, jail, juvenile

2   detention, patrol, how many use-of-force reports --

3   let's just break it down to the month, about how

4   many per month would you receive?

5        A.   I'm not going to guess.  I'll be glad to

6   go back and give you an exact number.  I'm not going

7   to guess.

8        Q.   But you have copy all -- you have copies

9   of all those use-of-force reports?

10       A.   Yes, sir.

11       Q.   And do you have records of what you did in

12   response to following up on those use-of-force

13   reports?

14       A.   Response to what I did?

15       Q.   Do you have like a logging or tracking

16   system where if you get a use-of-force report and

17   then you took step A, step B in response to that

18   use-of-force report?

19       A.   No, sir, the --

20       Q.   Do you have a tracking system with your

21   use-of-force reports?

22       A.   Yeah, I mean, they're in a filing cabinet

23   sorted by month.  So, I mean, they're easily

24   accessible.  And if anybody used a taser as part of

25   use-of-force, their taser download should be

1    attached to it.  So, yeah, they're all on file there

2    in order by year and by month.

3        Q.    So did every time a deputy use a taser,

4    was a use-of-force report required to accompany that

5    taser use?

6        A.    Yes, sir, they were supposed to fill -- if

7    it was used on a person during a use-of-force

8    incident, then they should have downloaded their

9    taser and printed it off and attached it to the

10   use-of-force report.

11       Q.    So you have use-of-force reports that

12   correspond with all taser use by your deputies?

13       A.    If the taser was used on a human being

14   during a course of arrest or something like that,

15   where a use-of-force report needed to be done, the

16   taser download should be attached to it.

17       Q.    And do you have a system to ensure that

18   your deputies were filling out a use-of-force report

19   in your department every time they used their taser

20   on a human being?

21       A.    Yes, sir, they were, per our policy, they

22   were supposed to fill out a use-of-force report,

23   download their taser and print that download and

24   attach it to the use-of-force and turn it in to

25   their supervisor.

```
 1        Q.   Was that policy in effect at the time of

 2   the Jenkins-Parker incident?

 3        A.   Yes, sir.  I told you I started that when

 4   I became sheriff in 2012.  So maybe that first full

 5   year would be 2013.  But, yes, sir, it started back

 6   then.

 7        Q.   So you have records of the taser use and

 8   use-of-force reports that accompany such taser use?

 9        A.   I don't know where you're going with this.

10   But I have a use-of-force report.  Okay?  If they

11   use force on somebody, they are supposed to turn it

12   in.  So I have this use-of-force report.  If they

13   used their taser on that person, then they are

14   supposed to have attached that taser download to it.

15   That's my answer.

16        Q.   Okay.  What if they didn't?  What if they

17   used a taser and didn't give you a use-of-force

18   report, what system do you have to hold them

19   accountable or check behind to make sure that that

20   taser use had a use-of-force report accompany it?

21        A.   You're going to have to ask the question

22   again, I lost you.

23        Q.   What system did you have in place to make

24   sure that use-of-force reports were being turned in

25   with the taser use that the deputies used?
```

```
 1        A.   Well, their supervisors -- they were
 2   supposed to turn it in to their supervisor, who'd
 3   sign off on it and then that should be turned in to
 4   the captain of patrol or chief investigator or jail
 5   administrator, whoever, and then those would be
 6   filed in the program.
 7           Now that we have the -- you know, the
 8   taser sort of evolved over a period of time and so
 9   did the software.  So now there's a difference
10   between -- you're supposed to be able to tell the
11   difference between somebody just pulling the trigger
12   on a taser or whether it actually made skin contact
13   with somebody.
14           Now I don't know if we have anybody -- I
15   know we don't have anybody to read that information
16   yet, hopefully we will soon, but -- so now all
17   tasers are downloaded quarterly.  Every deputy is
18   supposed to bring in their taser and download it
19   quarterly.  And the taser usage is reviewed
20   quarterly now.
21        Q.   When you say "now" that means after
22   Jenkins and Parker?
23        A.   Yes, sir.  Well, after we changed our
24   policy, again, trying to make the sheriff's office
25   more accountable in verifying them.
```

1      Q.    So prior to that, none of that was taking

2   place, in terms of the downloading of the taser

3   information?

4      A.    Oh, no, sir, they were downloaded all the

5   time.  You know, if they were used, they were

6   downloaded.

7      Q.    Who was in charge -- at the time of

8   Jenkins and Parker, who was in charge of checking

9   behind on that taser use?

10     A.    On downloading the tasers?

11     Q.    Yes.

12     A.    It would have been Dwayne Thornton who was

13  captain of patrol.

14     Q.    Was he doing his job correctly?

15     A.    Was he downloading tasers; is that your

16  question?

17     Q.    Was your system -- at the time of Jenkins

18  and Parker, was your system for ensuring that the

19  deputy's taser use was appropriate?

20           Was your system effective at the time of

21  Jenkins and Parker?

22     A.    You're asking me two different questions,

23  so I -- so if you don't mind, ask me the question

24  you would like for me to answer.

25     Q.    Okay.  You've told me that Mr. Thornton

1    was in charge of it.  Okay.  Did you -- did you have

2    a system where you reviewed the taser use with

3    Mr. Thornton to make sure that, in your supervisory

4    capacity, that your system that you had setup

5    through Mr. Thornton, that it was holding deputies

6    accountable for improper taser use?

7        A.   I told you that Mr. Thornton downloaded

8    the data from the tasers.  And I've told you that if

9    the use-of-force report -- if force was used on

10   somebody, the use-of-force report was filled out.

11            If a taser was also used during that on a

12   human being, then the use-of-force would be attached

13   to that and that attachment would come from

14   Mr. Thornton, who would download, and I'm assuming

15   he would review it when he downloaded it.

16       Q.   Did you review these uses with

17   Mr. Thornton?

18       A.   No, sir.  I mean, not unless there was

19   some kind of issue with it I wouldn't review it.  I

20   would review it if there was an issue brought to my

21   attention.

22       Q.   Okay.  How often would that happen?

23       A.   Not very often.

24       Q.   Okay.  About how often?

25       A.   I can't give you a number.  Not very

1    often.

2         Q.   Once a year, once every two years?

3         A.   I'm not going to give you a number because

4    I don't know.  I would have to, you know -- I don't

5    even know -- I would have to go back and research

6    and go through the -- all of those use-of-force

7    reports and see which ones I could remember or not

8    remember.

9         Q.   Okay.  And the only use-of-force

10   reports -- I know you can't give me an exact number,

11   but, I mean, just on the average, how many

12   use-of-force reports was your deputies in your

13   department turning in every month?

14        A.   I've answered that.  I don't know what to

15   tell you.  More than one.  More than one a month.

16   How about that?

17        Q.   One, two?  I mean, just on a typical month

18   would it be one use-of-force report, two --

19        A.   No, sir, I'm not going to guess.  I'll be

20   glad to find that information for you and get back

21   with you on it and give you some more exact numbers.

22   But I'm not going to guess because I can't even

23   guess.  Because, again, I have patrol, the jail and

24   JDC, so I can't guess.

25        Q.   Okay.  But you will give us copies of your

Sheriff Bryan Bailey - January 8, 2025

169

```
1    use-of-force reports that you received?
2              MR. DARE:  You can ask for them.
3              THE WITNESS:  Yeah.
4              MR. SHABAZZ:  I think we have asked for
5    them, but I can get back on that.
6              MR. DARE:  You want copies of every single
7    use-of-force report?  I must have missed that in the
8    request for production.
9              MR. SHABAZZ:  I got to look back at the
10   request.  But that's fine for now.  Hold one second.
11   One second.
12        Q.   (By Mr. Shabazz) Let's go here.  Let's go
13   here and then I'm going to take a break after this.
14             Let's go to Exhibit 7, please.
15        A.   Yes, sir.
16        Q.   Exhibit 7, it's a composite exhibit.  And
17   do you recognize the individual in these
18   photographs?
19        A.   No, sir, I don't.
20        Q.   This is Mr. Christopher Mack.
21             Mr. Christopher Mack is alleging that he
22   was beaten up inside of the Rankin County jail by
23   your deputies.  Okay?  He's further alleging -- and
24   received these injuries that you see.  Okay?
25             MR. DARE:  To clarify, he's no longer
```

 1   alleging.  That case has been dismissed.

 2            MR. SHABAZZ:  Okay.  He's not alleging,

 3   he's not filing a lawsuit, but he's still alleging

 4   that this occurred, even though the time -- the

 5   timing -- he missed his time on his lawsuit, but

 6   he's still standing by his allegations.

 7        Q.   (By Mr. Shabazz) Okay.  So what I'm

 8   telling you, Mr. Bailey, is that Mr. Christopher

 9   Mack -- are you looking at these photos?

10        A.   Yes, sir, I glanced at them.

11        Q.   You see the one with the two black eyes

12   and the hood on his head?

13        A.   The first picture?

14        Q.   He has two black eyes and a --

15        A.   That one?

16        Q.   Yes, sir.

17        A.   Uh-huh (affirmative response).

18        Q.   Is that the Rankin County Sheriff's

19   Department behind him?

20        A.   Yes, sir, it appears so.

21        Q.   And let's go to the next one.

22            You see that picture with the bruises on

23   his forehead?

24        A.   Yes, sir.  I don't know if that -- I don't

25   know what that is, I don't know it it's bruises or

1    eczema or what, but, yeah, I see marks on his

2    forehead.

3         Q.    And you see the one after that with the

4    black eyes on each side?

5         A.    I got one with the left eye and, okay,

6    yes, sir, I got both of those.

7         Q.    There's one after that with marks on his

8    back?

9         A.    Yes, sir, I see that one.

10        Q.    Bruises on his side?

11        A.    Uh-huh (affirmative response).

12        Q.    And there are a few other photos with

13   bruises on his body and his face.  Do you see those?

14        A.    Yes, sir.

15        Q.    Okay.  Mr. Mack alleges that he was

16   taken to -- that he was beaten inside of the Rankin

17   County jail.  Do you know anything about that?

18        A.    No, sir.  I remember the name but I don't

19   remember the details of the case.  I'd have to

20   research it.

21        Q.    Okay.  So you do remember the name?

22        A.    Yes, the name sounds familiar.  That's all

23   I can tell you.

24        Q.    How do you remember the name?

25        A.    I don't know.  I'd have to research it and

1    read, but I do -- the name sounds familiar, that's

2    all I can tell you.

3        Q.   Okay.  Are you familiar with his claim

4    that he was taken from the jail to the hospital?

5        A.   No, sir, I'd have to review whatever the

6    complaint was and whatever reports we have.  Like I

7    say, the name sounds familiar, but I don't know any

8    details.

9        Q.   Okay.  And in these photographs he's

10   alleging that he was released from the hospital and

11   came to see you personally in your office after his

12   release from the hospital.  Do you recall that?

13       A.   No, sir.

14       Q.   Okay.  And do you recall him complaining

15   to you personally about your deputies beating him in

16   the jail?

17       A.   No, sir.  If he'd came to my office with

18   two black eyes like that I would remember him.  I

19   don't remember him.  I would hope that I would

20   remember him.  But, no, I don't remember him.  Like

21   I say, I would have to research his name and see --

22   see when this was and find some more facts on it.

23       Q.   But if in fact he was -- did receive these

24   injuries from a beating in the jail, that's a matter

25   that you would say should have been investigated; is

1  that right?

2      A.   Yes, sir.

3      Q.   Okay.  And this -- and if he did bring it

4  to your attention, that would have been a matter you

5  should have followed up on, correct?

6      A.   Yes, sir.  Well, I don't -- I think he's

7  mistaken on talking to me.  I don't remember talking

8  to him.  I'll be glad to double check and see.  Is

9  that the date that he was supposed to have come,

10  October '23?

11           MR. WALKER:  No.

12           THE WITNESS:  That's the date he's

13  supposed to come to see me at the sheriff's office?

14           MR. WALKER:  No.

15      Q.   (By Mr. Shabazz) No, no, that's not the

16  date.

17      A.   You can tell the parking lot's empty.  It

18  looks like a weekend or something.

19      Q.   This was around January 20- -- this is in

20  the month of January 2021.

21           MR. DARE:  Or as alleged in the complaint,

22  May of 2021, either one of those two.

23      Q.   (By Mr. Shabazz) Okay.  So are you aware

24  of incidents -- are you aware of incidents in which

25  use-of-force reports -- pardon me.

Sheriff Bryan Bailey - January 8, 2025

174

```
 1              Are you aware of incidents either in the
 2    jail or in the field where use-of-force reports
 3    should have been completed and were not?
 4        A.   Not off the top of my head.  I mean, none
 5    stand out to me.
 6        Q.   None?
 7        A.   Not that I can remember right now, no,
 8    sir.  I mean, I'm not saying there's not any that
 9    should've been done, but I don't know of any off the
10    top of my head.
11        Q.   And assuming that -- making the assumption
12    that Mr. Mack is telling the truth, is there any
13    reason that your deputy should have used this amount
14    of force on him?
15        A.   I don't know enough about that case to
16    make a statement on it, Mr. Shabazz.  I don't know
17    anything about this case.  I'd have to research it.
18              MR. SHABAZZ:  Okay.  All right.  I'm going
19    to take a break right now.
20              (Off the record at 2:31 p.m.)
21        Q.   (By Mr. Shabazz) Mr. Bailey, we're back on
22    the record.  Take you back for a minute here.  Let
23    me -- you stated earlier that the IT department that
24    provided the documents in this case to your
25    attorney; is that right?
```

Sheriff Bryan Bailey - January 8, 2025

175

```
 1        A.   Yeah, our reporting system, the server's
 2   kept at our IT department.  So the information that
 3   they requested, I think it was offense reports, some
 4   offense reports is stored on there.  So they
 5   downloaded it to a hard drive for our attorney who
 6   supplied it to the DOJ.
 7        Q.   And you stated that these IT persons do
 8   not work for you?
 9        A.   No, sir.
10        Q.   Is that true?
11        A.   Right.  Yeah, they work for the IT
12   department.
13        Q.   IT department of who?  Who do they work
14   for?
15        A.   The Rankin County IT department.
16        Q.   Rankin County IT department.  Okay.
17             Do you know who heads that department?
18        A.   Yes, but his name just slipped out of my
19   mind.  I'll think of it in just a second, but
20   Kurt --
21             MR. DARE:  Wiltz.
22             THE WITNESS:  Yeah, Wiltz is his name.
23        Q.   (By Mr. Shabazz) Kurt Wiltz.  Can you
24   spell that?
25        A.   No, sir --
```

1          MR. DARE:  It's Wiltz Cutrer.

2          THE WITNESS:  I can't spell it, no.

3          MR. DARE:  W-I-L-T-Z, C-U-T-R-E-R, I

4    think.  It's Cutrer, though.

5      Q.   (By Mr. Shabazz) Okay.  And he's the

6    person that produced all of those documents that

7    were stored on a hard drive that had been produced

8    in this case?

9          MR. DARE:  No.  I'm sorry.  You were

10   asking about -- and I'm sorry for interrupting.  You

11   were asking about production of documents to the

12   DOJ.

13     Q.   (By Mr. Shabazz) So can you tell me what

14   documents does this IT department possess?  What

15   documents do they possess, not limited to DOJ, just

16   what do they have?

17     A.   I'm not sure what all they asked for what

18   and all was provided for them.  Because our attorney

19   is reviewing the information before it goes to them.

20   So I can't tell you what's been released and what

21   hadn't been released.

22     Q.   Okay.  I mean, do they have your

23   use-of-force reports?

24     A.   Again, I don't know what all of

25   information -- I'm not certain what all they asked

1    for.  They've been doing this through our attorney

2    for the sheriff's office and he's been reviewing it

3    before he releases it to them.  So I don't know what

4    all has been released to them or not released.

5         Q.   Okay.  But they maintain the documents for

6    your department, this IT department, correct?

7         A.   They maintain the server for our reporting

8    system, which is the PTS system we talked about

9    earlier, which would be the offense report system,

10   the jail booking system and the computer-aided

11   dispatch system.

12        Q.   All right.  I'm going to take you back to

13   the taser policy.  Taser policy, couple of

14   questions.

15             Now, your current taser policy in place

16   says what?

17        A.   You're going to have to give me a copy of

18   it and I can read it to you.

19             THE WITNESS:  Do we have that here?

20             MR. DARE:  Do you want him to read the

21   taser policy?

22             MR. SHABAZZ:  Yes.

23             MR. DARE:  Okay.

24        Q.   (By Mr. Shabazz) Can you just go over that

25   for a minute, and your current policy date is

Sheriff Bryan Bailey - January 8, 2025

178

```
 1   November 2023.
 2           Can you just tell me about your taser
 3   policy, your current taser policy?
 4       A.   I'm waiting to get the policy.
 5           MR. SHABAZZ:  Mr. Dare, can you just --
 6   while you get the policy in place I'll just ask a
 7   few other questions so we can make use of time.
 8           THE WITNESS:  Okay.
 9           MR. SHABAZZ:  When you get that in place I
10   want to ask a couple of other questions.
11       Q.   (By Mr. Shabazz) Now, you stated
12   repeatedly that these five deputies lied to you?
13       A.   Yes, sir.
14       Q.   Have you conducted any investigation to
15   see if these deputies had lied to you about other
16   incidents in the past?
17       A.   Yes, I know that we've conducted some more
18   investigations on some allegations that were made
19   against them by -- or some of them by other people.
20   And I'd have to go back through each one to see
21   where the discrepancies were.  But off the top of my
22   head I can't give you a specific case where they
23   lied.  But I know that night of the shooting that
24   they definitely lied to me.
25       Q.   Now, in terms of the other incidents,
```

1    which incidents did you review to see whether or not

2    they had lied to you?

3         A.   Again, I'd have to go back and find the

4    allegations.  Like, I think there were some made in

5    a New York Times article that we went back and

6    reviewed and we took some action on.  But I would

7    have to have those specific names and cases that I'd

8    have to look back up to tell you what happened on

9    each case.

10        Q.   But right now you don't -- you can't --

11   you're saying you don't have a record or a record or

12   a recollection of your review of their past

13   performance?

14        A.   Yes, sir, I have a record and I'm telling

15   you that I can't recall what happened on each one

16   off the top of my head.  I'd have to review each

17   individual case to tell you what happened with it.

18             So, no, I'm not saying I can't recollect.

19   I can recollect that there were some more

20   investigations due to some allegations made against

21   them.  And, yes, there are records, there's

22   investigative reports on these allegations that I'm

23   positive there were some action taken on a few of

24   them.

25        Q.   Let's narrow it down to the action.  The

 1    ones that you took action on, can you recall the

 2    ones you took action on?

 3         A.   Not every single one.  Like I said, there

 4    were names in the article that we did go back and

 5    research.  And I know there were some former

 6    deputies that were still on the reserve program that

 7    I terminated because they would not come in for an

 8    interview on that.  So I know there were three or

 9    four on that one that were terminated.

10              And then I'm not sure on the ones, the

11    original five from that night, which cases they were

12    involved with that on that article.  Again, we would

13    have to go back and look at the article and then go

14    back and find the reports for me to tell you exactly

15    what happened on that.

16         Q.   Now for the ones that were terminated, do

17    you recall which officers were terminated for not

18    coming back in for interviews?

19         A.   Not all of them.  I know it was Cody

20    Grogan, and there was like a couple more.  Cody

21    Grogan and -- it was a reserve, what is his name?  I

22    can't remember his name.  I'd have to get the names

23    for you.  But Cody Grogan and a couple more that

24    were terminated for not cooperating with the

25    investigation or not coming in and giving a

1    statement.

2        Q.   Was one of them Luke Stickman?

3        A.   I want to say Luke was -- he either

4    resigned or was terminated before this happened with

5    the Cody Grogan.  He may have resigned prior to

6    being called in.

7        Q.   Do you know why he resigned?

8        A.   I don't.  I'd have to look at his

9    personnel file.  I can't remember if it's because he

10   found another job, maybe, or if it was related to

11   calling him in for the interview.  But he had

12   resigned.  I want to say that possibly he had just

13   resigned, in general, from the sheriff's office, but

14   I can't remember, I'd have to look at his personnel

15   file and see.

16       Q.   Now how many officers were terminated for

17   refusal to comply with your investigation?

18       A.   Again, it was one, two, maybe three or

19   four, but to give you an exact answer I'd have to go

20   back and review the files and the information to

21   give you an exact answer, which I can do.

22       Q.   We can get that from your attorney or we

23   come back and ask you about it, right?

24       A.   Yes, sir.

25       Q.   Okay.  So to your knowledge is the Goon

1    Squad larger than the officers who were -- than the

2    six officers who were convicted?

3              MR. DARE:  Object to the form.

4              You can answer if you can.

5              THE WITNESS:  I have no knowledge of the

6    Goon Squad.  Never knew there was a Goon Squad at

7    the sheriff's office.  After it was found out --

8    after I was made aware of the term "Goon Squad", my

9    understanding, from being told about it, that it was

10   supposed to have been just Lieutenant Middleton's

11   shift, that's what he called his shift.

12             Again, I didn't know anything about it and

13   we've never had any kind of group called the Goon

14   Squad as long as -- up until this came out in court

15   in June of '23.

16        Q.   So did you say the Goon Squad consisted of

17   Lieutenant Middleton's shift?

18        A.   I didn't say anything about -- I said I

19   never knew or heard of the name Goon Squad.  It's my

20   understanding after this came out that it was

21   supposed to be Middleton's shift.  But, again, I

22   knew nothing about and don't recognize any Goon

23   Squad at the sheriff's office.

24        Q.   Okay.  So how did you come to understand

25   that it's supposed to be Middleton -- I mean, the

1  night shift?

2      A.   That's what was said, I think in the news.

3  It was either the news or in the court documents

4  that that's what Lieutenant Middleton called his

5  shift, was the Goon Squad.

6      Q.   So would it be accurate to say that the

7  entire night shift could be considered the Goon

8  Squad?

9      A.   No, sir, there's two different night

10  shifts, two totally different shifts.

11      Q.   Okay.  Are you certain that this -- that

12  no members of the Goon Squad are still working for

13  Rankin County?

14      A.   I've never recognized the Goon Squad,

15  never heard of the Goon Squad.  And I don't know any

16  members being on there of a Goon Squad, besides,

17  like I said, what was in the court paperwork,

18  Middleton talking about this shift.

19      Q.   Okay.  I'll come back to that.

20          Okay.  So you did conduct an

21  investigation --

22          MR. SHABAZZ:  Okay, this is a good time,

23  let's go to Exhibit No. 8, Trent, because I want

24  to -- let me just ask you about --

25          MR. DARE:  What's Exhibit 8?

Sheriff Bryan Bailey - January 8, 2025

184

```
 1              MR. SHABAZZ:  Exhibit 8 is the mugshots,
 2    much of which appeared in the New York Times.
 3              MR. DARE:  So are you asking me to print
 4    off four copies of 50 pages each?
 5              MR. SHABAZZ:  I don't know about four
 6    copies.  I thought it was printed out already and he
 7    could just review his copy.
 8              MR. DARE:  No.
 9              MR. SHABAZZ:  We just one copy.
10              MR. DARE:  We don't have any copies.
11              MR. WALKER:  Do you have it on your
12    screen?
13              MR. DARE:  No.  And I can pull it up on my
14    screen.
15              MR. WALKER:  And you don't have it at all?
16              THE REPORTER:  No.
17              MR. SHABAZZ:  Okay.  What are we going to
18    do, Trent?
19              MR. WALKER:  We can ask -- we can nicely
20    ask Jason if he would print at least two copies so
21    the Sheriff can look at one and one can be marked by
22    our court reporter.
23              MR. DARE:  And I'm going to object to all
24    of the other language and everything else in there.
25    Of course, specifically since it was just produced.
```

Sheriff Bryan Bailey - January 8, 2025

185

```
 1                MR. WALKER:  May I make a suggestion?

 2                MR. DARE:  Please.

 3                MR. WALKER:  If you're going to be kind

 4     enough to copy these, then post-deposition we can

 5     just cut them off so we're just dealing with the

 6     mugshots and not any of the other language.

 7                MR. DARE:  All right.  Do you want to come

 8     back to that and I can probably work that out?

 9                MR. SHABAZZ:  While we get it printed out

10     we can come back to it.

11                MR. DARE:  I got your -- I got the policy

12     4.06, the Conducted Energy Device Policy, if you

13     would like to ask questions on that.

14                MR. SHABAZZ:  Okay, I will.  Let's just

15     cover that.

16          Q.   (By Mr. Shabazz) Okay.  What's your RC

17     number?

18          A.   My badge number?

19                MR. WALKER:  No.

20                MR. SHABAZZ:  On his discovery.

21                MR. DARE:  I'm not sure that this was

22     Bates stamped.

23                MR. SHABAZZ:  I see RC stamp on it.

24                MR. DARE:  What's yours?

25                MR. SHABAZZ:  It starts at 1806.
```

Brown Court Reporting, Inc. - (601) 832-4920

```
 1              Anyway, I'll just have the sheriff -- I'll
 2    just have talk about it.
 3              MR. DARE:  Well, you're asking for the
 4    current policy that has an effective date of
 5    November 20, 2023, correct?
 6              MR. SHABAZZ:  Correct.
 7              MR. DARE:  Policy 4.06.
 8         Q.   (By Mr. Shabazz) Okay.  Sheriff, can you
 9    just -- can you just describe that to me.  I got a
10    couple of questions to ask you about it.  Can you
11    tell me about your current taser policy?
12         A.   In addition to the specifications in this
13    policy, deputies of the Rankin County Sheriff's
14    Department shall follow the requirements of all
15    other applicable policies, including but not limited
16    to the standards in policy number 4.01.
17              Deputies shall only use a conducted energy
18    device, CED, typically, an Axon taser, in a
19    nondiscriminatory manner and only when such force is
20    objectively reasonable and consistent with current
21    Rankin County Sheriff's Department policies and
22    training governing the use-of-force procedures.
23              Issuance and carrying CEDs:  Only deputies
24    who have successfully completed Rankin County
25    Sheriff's approved training, including certification
```

1    and/or recertification may be issued and may carry

2    the CED.

3            The Rankin County Sheriff's Department

4    will keep a log of issued CEDs and the serial

5    numbers of cartridges/magazines, issued to deputies.

6            CEDs are issued for use during a deputy's

7    current assignment.  Those leaving a particular

8    assignment may be required to return the CED to the

9    Rankin County Sheriff's Department inventory.

10            Deputies shall only use the CED

11    cartridges/magazines that have been issued by the

12    Rankin County Sheriff's Department.

13            Uniformed deputies who have been issued

14    the CED shall wear the device in approved holster

15    and on the side opposite the duty weapon.

16            CEDs should be clearly distinguishable to

17    differentiate them from duty weapon and other

18    device.

19            For single shot devices, whenever

20    practical, deputies should carry an additional

21    cartridge on their person when carrying a CED.

22            Non-uniformed deputies may secure the CED

23    in a concealed secured location in the driver's

24    compartment of their vehicle.

25            The deputy should not hold a firearm and a

1    CED at the same time.

2            Training:  Personnel who are authorized to

3    carry the CED shall be permitted to do so only after

4    successfully completing the initial Rankin County

5    Sheriff's Department approved training.

6            Any personnel who have not carried the CED

7    as part of their assignments for a period of six

8    months or more, shall be recertified by a qualified

9    CED instructor prior to again carrying or using the

10   device?

11           Proficiency training for personnel who

12   have been issued CEDs should occur annually.

13           A reassessment of a deputy's knowledge and

14   or practical skills may be required at any time if

15   deemed appropriate by the training director.

16           All training and proficiency for CEDs will

17   be documented in a deputy's training file.

18           The training director is responsible for

19   ensuring that all Rankin County Sheriff's Department

20   personnel who carry CEDs have received initial and

21   annual proficiency training.  Periodic audits should

22   be used for verification.

23           Application of CEDs during training could

24   result in injuries and should not be mandatory for

25   certification.

1              As part of any training or retraining, the

2      training director should consider the following

3      topics.  A review of this policy, a review of the

4      use-of-force policy, performing weak hand draws or

5      cross draws into proficient to reduce the

6      possibility of unintentional drawing and firing a

7      firearm.

8              Target area of consideration is to include

9      techniques or options to reduce unintentional

10     application approved to the head, neck, area of the

11     heart, and groin.

12             Scenario based training, including virtual

13     reality training when available, handcuffing a

14     subject during the application of the CED and

15     transitioning to other force options, deescalation

16     techniques, restraint techniques that do not impair

17     respiration following the application of the CED.

18             Proper use of covering, concealment during

19     deployment of CED for purposes of deputy safety.

20     Proper tactics and techniques relating to the

21     multiple applications of CEDs.

22             The deputy shall be responsible for

23     ensuring that their Rankin County Sheriff's

24     Department issued CED is properly maintained in a

25     good working order.  This includes a function test

1    and battery life monitoring as required by the

2    manufacturer and should be completed prior to the

3    beginning of a deputy's shift.

4            CEDs that are damaged or inoperative or

5    cartridges/magazines that are expired or damaged

6    shall be returned to the deputy supervisor.

7            Warnings:  A verbal warning of the

8    intended use of the CED should precede this

9    application unless it would otherwise endanger the

10   safety of the deputies or when it is not practical

11   due to circumstances.

12           The purpose of this warning is to, one,

13   provide the individual with a responsible

14   opportunity to voluntarily comply.  Two, provide

15   other deputies and individuals with a warning that

16   the CED may be deployed.

17           Warnings, (B):  If after a verbal warning

18   the individual fails to voluntarily comply with the

19   deputy's lawful orders and it appears both

20   reasonable and feasible under the circumstances, the

21   deputy may, but is not required to activate any

22   warning on the device, which may include display of

23   the electric arc, an audible warning or the laser in

24   an attempt to further gain compliance prior to the

25   application of the CED.  The laser should not be

Sheriff Bryan Bailey - January 8, 2025

1    intentionally directed in anyone's eyes.

2          The fact that a verbal or other warning

3    was given or the reasons it was not given shall be

4    documented by the deputy deploying the CED in the

5    related report.

6          Use of the CED.

7       Q.    Chief -- Chief, that's -- I appreciate

8    you.  No, honestly, I appreciate you.  What I want

9    to do is just, I want to ask you some questions on

10   that, so we make use of our time here.  Okay?  Just

11   hold on to that policy.

12          What I want to ask you is, who is

13   providing that training right now for your

14   department?

15       A.    AJ DeMartino is the training director.

16   And I just went through the training, the

17   recertification myself on the taser and it was our

18   jail administrator, Daniel Barnett is one instructor

19   and the other instructor in that class -- shoot,

20   there's another deputy that instructed the class.  I

21   think we have probably three or four taser

22   instructors.

23       Q.    Which include Mr. Barnett, Mr. Martino

24   (sic)?

25       A.    Yeah, there's some more, I just can't

```
 1   think of their names right now.  I can get those to
 2   you though.
 3       Q.   Okay.  Now at the time of the incident
 4   between Jenkins and Parker, how many -- how many
 5   personnel did you have that were training on the
 6   taser, proper taser use?
 7       A.   That were certified instructors?
 8       Q.   Yes.
 9       A.   I'll have to go back and check see what
10   dates they got certified.  Like I said, I know
11   that -- I just went through the class and -- dang, I
12   can't remember his name.  I got three or four of
13   them, but I don't know if they were certificated
14   then -- already certified then or if they just went
15   through the certification in the past two years.  So
16   I would have to get you a list of who and when they
17   were certified.  I just can't remember the dates or,
18   you know, the names or the dates they were
19   certified.  I would have to look up in their
20   personnel file, the training file.
21       Q.   Did you have a certified training
22   instructor working for the department at the time of
23   the incident between Michael Jenkins and
24   Eddie Parker?
25       A.   I think I did, but I'd have to go back and
```

1  verify to get you a name and a date that they were

2  certified.

3      Q.   So you're not sure if you had one at that

4  time?

5      A.   I'm fairly confident that I did, but,

6  again, I'd have to go back and research it to give

7  you a name and -- or when they were certified.

8      Q.   Okay.  And you said that you have just

9  become certified or recertified?

10      A.   Yes, sir, we just had recertification a

11  couple months ago.

12      Q.   Okay.  And what is your understanding on

13  how tasers record their use?  What's your

14  understanding?

15      A.   My understanding is that -- and, again,

16  I'm not technical, I'm not an instructor.  But it

17  will tell you every time it's cut off and on, every

18  time the trigger is pulled.  And if you have the

19  right taser and the right software it will tell you

20  when it actually contacts skin, I think that's

21  called a pulse graph.

22      Q.   Okay.  Now, how -- we went through some of

23  this.  But now how does your department document

24  that taser use?

25      A.   Now we do -- again, it's the same as

1    before with a use-of-force report, they have to

2    download their taser, just as they did before.  And

3    then quarterly everybody, including myself, you have

4    to bring your taser in and have it downloaded and

5    reviewed, its usage reviewed.

6         Q.   And these are changes and reforms you've

7    made, right?

8         A.   The downloading the taser and attaching it

9    to the use-of-force report, we've always done, done

10   it for years.  And we did change the quarterly

11   downloads, where now you have to bring it in and

12   have it downloaded quarterly.

13        Q.   And this change is from your past policy

14   and what respect?

15        A.   That we download and review the tasers

16   quarterly now, where, before, they were only

17   downloaded if they were used or if there was an

18   issue or problem with them not working or something.

19   Like I said, before we've always downloaded the

20   taser data to go with the use-of-force report.  Now

21   we download everybody's taser quarterly, all issued

22   tasers quarterly to review taser usage.

23        Q.   Because previously deputies could have

24   been using their tasers and without a quarterly

25   review or review time, you wouldn't know, unless it

Sheriff Bryan Bailey - January 8, 2025

195

1    was attached to a use-of-force report, right?

2         A.   Right, or if somebody left and they

3    downloaded it.  I think they'd occasionally they'd

4    download one when somebody left, but most times it

5    would be downloaded -- or all the time it was

6    supposed to be downloaded for the use-of-force

7    report.

8         Q.   You're aware that tasers were used on

9    Mr. Parker and Mr. Jenkins, right?

10        A.   Yes, sir, from the court documents and the

11   news I learned that, yes, sir.  Well, actually,

12   the -- I learned about the tasers actually from you

13   when you did the news release, was it the next day?

14        Q.   At some point.

15        A.   Yeah.

16        Q.   Okay.  And, I mean, is it fair to say that

17   at the time of the Jenkins-Parker incident that

18   taser use by the department was largely unregulated?

19        A.   No, sir, I think that people were

20   following our policy and procedure and when they

21   were used they were downloaded and a printout

22   attached to the use-of-force.  So I think that they

23   were, at that time that was being used properly.

24        Q.   But you cannot say that every time that

25   taser was used a use-of-force report was completed?

1        A.    No, because, I mean, if you -- the taser,

2   like I said, if you cut it on or if you pull the

3   trigger -- because, you know, most of the time when

4   you issue somebody a taser or if we're fixing to go

5   do -- arrest somebody, the first thing you do is

6   take your taser out, take the cartridge out, cut it

7   on, pull the trigger, make sure it's working.  Do a

8   function check, check on it, put it back on.

9            So there's going to be times when it's

10  used, when it's cut on and activated but was never

11  used against anybody.

12            The way you find out if it was used

13  against somebody is sending that data into the taser

14  to Axon and getting that pulse graph done, because

15  it could tell you if it hit skin or not.

16            And that's, you know, one thing we're

17  working towards, is hopefully having somebody that

18  can read those pulse graphs, eventually, to see if

19  it contacts skin or not.

20       Q.    All right.  So I mean, specifically, I

21  mean, when it's used on a person -- when it was used

22  on a person at the time of Jenkins and Parker, you

23  cannot state that every time it was used on a person

24  that a use-of-force report was attached to that

25  taser use?

```
1        A.   I can't say if it was used on a person or
2   not, because I can't read the pulse graph.  So if it
3   was cut on and activated, I don't know if it was
4   used on anybody or not, I can't tell that.  But like
5   I said, with this pulse graph technology, hopefully,
6   we'll be able to tell if it made contact with skin
7   or not.
8        Q.   Okay.  Let me ask you this.  In terms of
9   these reforms that you've made, I'm assuming that
10  you were -- you're trying to achieve your best
11  practices as a sheriff; is that right?
12       A.   Yes, sir, I want to have the best
13  department I can and give the best service and
14  protection to the people of Rankin County that I
15  can.
16       Q.   Who is that that you consulted with on
17  these best practices?
18       A.   There's been several people.  Our
19  attorney, I contracted with an outside -- a former
20  FBI agent has a company, consult with him to review
21  our policies and procedures and give us
22  recommendations.  So it's more like a group of
23  people.
24       Q.   Who is that company, the former FBI, who
25  is that?
```

```
 1        A.    I'll think of it in just a second.  Artis.
 2   Jeffrey Artis.
 3        Q.    Jeffrey Artis.  What is his company?
 4        A.    Can I look at my phone to give you the
 5   name of it?
 6        Q.    Sure.
 7        A.    It's called J. Artis -- that's just the
 8   letter J. A-R-T-I-S Consulting.
 9        Q.    J. Artis Consulting?
10        A.    Yes, sir.
11        Q.    Okay.  Now, at the time of the incident
12   you were relying on the deputies to self-report
13   their tasers; is that fair to say?
14        A.    Yes, sir, to attach it to the use-of-force
15   report if it was used on somebody.
16        Q.    So that was self-reporting by the
17   deputies?
18        A.    Yes, sir.
19        Q.    And is a taser test different -- that's
20   different from taser use, isn't it?
21        A.    Is a taser test different from a taser
22   use?
23        Q.    Uh-huh (affirmative response).
24        A.    That's what I was telling you, when you
25   cut the taser on it'll record that.  And when you
```

1  pull the trigger, like if you do a function test on

2  it.  But as I say that the technology has advanced

3  now where you can tell if it was a skin contact or

4  if it's -- a cartridge was used and if either one

5  made skin contact.  That's where we are trying to

6  get to where we can use that, get that kind of

7  information.

8      Q.   Okay.  A test is three seconds while the

9  use of the taser would be five or more seconds; is

10 that correct?

11     A.   Yeah, if they're still the same.  I'd have

12 to check the specs on tasers to see if they've

13 changed anything.  I haven't used one in so long.  I

14 mean, I've used one but I haven't, you know, read up

15 on them.

16     Q.   And the use -- and would you agree that

17 the use of more than 10 seconds of a taser -- the

18 use of a taser for more than 10 seconds, that would

19 be inappropriate; is that right?

20     A.   No, sir, I can't say it would be

21 inappropriate because you don't know if it's making

22 contact or not.  If you're doing a dry stun, if it's

23 not making contact with the skin.  And I've seen

24 several cases where you shoot the probes and one of

25 them like went into a guy's leather belt or went

1    into his boot, where it doesn't make any contact at

2    all.  So you could do it for several cycles and,

3    again, not have any affect on a guy.  So it depends

4    on each circumstance.

5         Q.   Well, what if is it making contact?

6         A.   If it makes contact, most time I've seen

7    it just takes once, sometimes twice to get somebody

8    under control.  But, again, I've seen several cases

9    where it didn't work.

10        Q.   So are you saying that if it is making

11   contact the use of it for more than 10 seconds would

12   be -- is that okay?

13        A.   I'd say that it's on a case-by-case basis

14   when it's used whether it's -- whether it's -- if

15   it's being effective or not, it would have to be a

16   case-by-case basis.

17        Q.   Now has anything changed in that regard

18   between now and then?  Between now or when you

19   changed your policy in the time of Jenkins and

20   Parker?

21        A.   Really, the only change that stands out to

22   me is the quarterly downloads now, where we actually

23   review the downloads of the tasers to make sure that

24   if there's any activation on there that there's some

25   reasoning for it, use-of-force, or it was tested

1    prior to duty or something like that.  So they're

2    being reviewed, the taser activations are being

3    reviewed.

4        Q.   Okay.  Let me follow-up on something

5    before.

6            Doesn't the taser company inform that

7    discharges are longer than -- doesn't the taser

8    company tell you that the discharge of a taser of

9    longer than 10 seconds is inappropriate?

10       A.   Again, I guess if it was making contact.

11   I'd have to read that in person to see if that's

12   correct.  But, again, it's a case-by-case basis.

13   Because if you don't make contact it's not -- it

14   doesn't apply to it, I wouldn't think.

15       Q.   Well, we're assuming you're making

16   contact.

17       A.   I can just tell you the times that I've

18   had to use a taser that most of the time one -- once

19   is all you need.  But I have seen cases where it

20   takes more than one activation of it to get the

21   person in custody.

22       Q.   I want to ask you about your complaint

23   process.  Before you said that, you know, if you

24   determine that a complaint was violent then it would

25   be escalated or referred to Mr. Godfrey or that

1    action would be taken on it.  If you deem that it

2    was a valid complaint; is that fair -- is that an

3    accurate characterization of what you said?

4            MR. DARE:  Object to form.

5            You can answer.  But, I mean, Counsel

6    knows you never said that.

7        Q.   (By Mr. Shabazz) Let me rephrase my

8    question.

9            How did you ascertain the validity of a

10   complaint that you were able to find out about?

11       A.   When you say complaints, I tell you we get

12   a lot of complaints.  So, I mean, if it was like an

13   accident report where one of the drivers didn't

14   agree with the way the deputy wrote the accident up,

15   I would talk with the chief -- the captain of patrol

16   and get him to review the information and, you know,

17   get his opinion on it and see if there was anything

18   to it.

19           If it was a complaint in the jail, like

20   the heat's not working or something like that, then

21   I'd call the jail administrator.

22           If there was a complaint on food in the

23   jail or them not getting their commissary, not

24   getting to see medical, then I would give the

25   complaint to the jail administrator or the captain

203

1    or whoever and they would follow-up on it.

2        Q.    And you would were the decider of the

3    validity of the compliant or how it would be

4    handled?

5        A.    If I was the one that got the complaint.

6    Now the complaints would come into the jail

7    administrator directly, they would come into the

8    sheriff's office and I may not be there and they'd

9    transfer it to court services, you know, if somebody

10   complained about how a deputy talked to them when

11   they were getting served a paper.

12            So it wasn't just me.  But the ones that I

13   would get, I would refer the complaint to the

14   department head.

15       Q.    And the methods of these complaints again

16   are either someone would call on the telephone or

17   write it down on a piece of paper?  Just help me be

18   clear on the methods that these complaints came in.

19       A.    Yes, they would come in on the telephone.

20   They could come in possibly through the mail.  Or

21   I've had people come and complain in person and I've

22   talked to them.

23       Q.    You recall a lady named April Pohl?

24       A.    April Pohl?  I don't remember the last

25   name Pohl.

```
1        Q.    P-O-H-L.

2        A.    P-O-H-L?

3        Q.    Uh-huh (affirmative response).

4        A.    I don't remember a Pohl, no, sir.

5        Q.    Okay.  Let me just come back to -- on

6   Jenkins and Parker.

7              How did you become aware of the incident

8   between Eddie Parker and Michael Jenkins?  How did

9   you become aware?

10       A.    Of him being shot?

11       Q.    Yeah.  How did you become aware of it?

12             MR. DARE:  Asked and answered.

13             THE WITNESS:  Yeah, I told you earlier --

14   went back through it.  But I've told you I believe

15   it was Brett McAlpin called me and told me.  And

16   then I don't remember if dispatch called again or

17   not.  So I got dressed and started heading that way.

18       Q.    (By Mr. Shabazz) Okay.  So did you speak

19   with the communications office or dispatch, you

20   know, during the time of this incident?

21       A.    That's what I just told you, I'm not sure

22   if I spoke -- I don't know if I spoke to Brett and

23   dispatch or I may have just spoke to Brett.  But

24   then I turned around and called MBI.  I can't

25   remember if I talked to dispatch or not.  I'm sure I
```

1    must have said something to him on the radio to let

2    them know I was in the car or something.  But on the

3    phone, I don't remember if I talked to them or not.

4         Q.   But you know you spoke to Mr. McAlpin?

5         A.   Yes, sir, I'm pretty sure I did.  Yes,

6    sir, fairly certain.

7         Q.   Okay.  And did you review the taser logs

8    regarding this specific incident?

9         A.   It seems like I glanced over the -- I know

10   I glanced over one set.  I don't know how to read

11   them like some other people do.  But they just told

12   me -- I asked them what it meant and they said the

13   taser had been maybe activated or cut on numerous

14   times, like 12 to 15 times or something like that.

15             And, again, that's what I told you before,

16   that was like a big red flag to me after hearing on

17   the media what was alleged to have happened to him.

18             But, again, at the time I was being lied

19   to and didn't know the truth.

20        Q.   So what was your conclusion from -- pardon

21   me.

22             What did you do once you read those

23   reports, those taser reports and you reviewed those

24   taser logs, what did you do after that?

25        A.   We -- I didn't do it, but somebody in

 1    administration would have released them or

 2    transferred them to Mississippi Bureau of

 3    Investigations.

 4        Q.   What was the policy regarding the review

 5    of taser logs at that time, following the reported

 6    deployment of a taser?

 7        A.   I would have to look at that policy then.

 8    Because this is dated November '23, so I would have

 9    to look at the one that was dated before this to see

10    exactly what it said.  I can't tell you

11    word-for-word what it said.

12        Q.   But, I mean, just from your knowledge as

13    the sheriff, as a supervisor, when the taser was

14    used and the review of the logs, I mean, is it --

15    what would happen with the review of the logs once

16    the taser would be used?

17             MR. DARE:  Asked and answered.  And this

18    one has been at least five times now again.

19        Q.   (By Mr. Shabazz) So only if a use-of-force

20    report was turned in by that deputy would that taser

21    log be reviewed?  I just want to be clear.

22        A.   Yes, sir, it was reviewed when the

23    use-of-force was turned in.  It was downloaded and

24    printed off and attached to the use-of-force.

25        Q.   Okay.  Now do you know who was on dispatch

1    when you -- who was on dispatch when you -- the

2    night of the incident between Jenkins and Parker, do

3    you know who that dispatch officer was that you

4    spoke with?

5        A.    They would be -- I don't know if I spoke

6    to them or not, I can't remember who all I talked to

7    on the phone.  But I seem fairly confident that

8    Brett was the one that initially called me.  Now if

9    dispatch called me too, I can't remember right now.

10   But there's -- there would be more than one

11   dispatcher.  There would be three to four working at

12   any one time.  So I could go back to the shift and

13   look and see who was working that night and if -- I

14   think they still have it, if it's saved for long

15   enough, there should be a telephone -- if there's a

16   telephone conversation, a radio conversation between

17   me and dispatch, it should be saved.

18       Q.    Okay.  So you do have that recording of

19   your communications with dispatch that night?

20       A.    I'd have to look back and see how long

21   they save it on the system.  But I want to say I'm

22   fairly certain that either the MBI or FBI had

23   already asked for all the radio and phone traffic,

24   so it's possibly already with them in their case

25   file.

```
 1        Q.   And you can give that -- you can give that
 2   to your attorney to furnish to us; is that right?
 3        A.   If I can locate the information, yes, sir.
 4   If we still have possession of it, we can get it for
 5   you.
 6        Q.   And you say you did turn it into the MBI
 7   and the FBI?
 8        A.   I know they asked for radio traffic and
 9   phone traffic from that night and we produced it to
10   them.
11        Q.   Okay.  But back to that night.  When did
12   you come to know that Michael Jenkins had been shot
13   inside of his mouth?
14        A.   Well, they just told me that -- Hunter
15   told me that he was across the bed from Mr. Jenkins
16   and that --
17        Q.   Hold on.  Who told you this?
18        A.   Hunter Elward.
19        Q.   When you arrived at the scene?
20        A.   Sometime after I arrived at the scene,
21   yeah.
22        Q.   Okay.  Just quickly, how long were you at
23   the scene before MBI arrived?
24        A.   I'd have to check the radio log and see.
25   Maybe -- they were there pretty quick, maybe like an
```

 1   hour -- less than an hour, I would think, you know.

 2         Q.   So you were on the scene with the deputies

 3   for an hour?

 4         A.   No, I can't give you an exact time.  I can

 5   go back and look at the radio logs and give you an

 6   exact time.  But I don't know how long I was there

 7   before MBI arrived.

 8         Q.   Approximately.  Approximately.

 9   Approximately an hour; is that fair?

10         A.   I can give you the exact time -- I'd feel

11   more comfortable giving you the exact time from the

12   radio logs.

13         Q.   So when Hunter Elward told you that

14   Michael Jenkins had been shot from inside of the

15   mouth, what was your response?

16              MR. DARE:  I'm going to object to form.

17              I mean, Counsel, the misrepresentations

18   are getting to me here.  I mean you know

19   specifically that's not what this witness testified

20   to.

21              MR. SHABAZZ:  Okay.  Okay.  I'm sorry.

22         Q.   (By Mr. Shabazz) Hunter Elward told you

23   that he had been shot.  When did you find out that

24   Michael Jenkins had been shot from inside of his

25   mouth?

1      A.   It had to be -- I'm thinking it was June,

2  the same time that I found out everything else.  I

3  can't remember if something was said before about

4  the possibility of it.

5      Q.   So you -- are you saying that you did not

6  know that Michael Jenkins was shot from inside of

7  his mouth until June?

8      A.   I don't remember what date.  I'm telling

9  you I don't remember when.  It seems like something

10  was said about that prior to it, but I knew it for a

11  fact in June when the court documents came out.

12      Q.   Because your deputies were at the hospital

13  where he received surgery?

14      A.   Yes, sir, the deputies were there.  The

15  deputies -- not the deputies involved.  No, there

16  were detention officers.  He was taken into custody.

17  Matter of fact, he was taken to the hospital and did

18  surgery.  Because I remember that, because we -- I'm

19  pretty confident his mother wanted to go see him.  I

20  let his mother go see him and I know we paid the

21  hospital bill on it, like over $100,000.

22      Q.   Okay.  But what I'm asking was, from that,

23  did you know that -- from his surgery which took

24  place while he was in custody, did you come to

25  understand that he was shot inside of his mouth?

1      A.   No, sir.  No information was ever

2  communicated to me from MBI or FBI about the

3  damages.  It was later on that I found out that he

4  was shot in the mouth.

5      Q.   But you didn't even know he was shot in

6  the mouth until later?

7      A.   I didn't know -- yeah, I knew that he was

8  shot through the mouth is what the deputy -- was

9  what Hunter Elward told me when I got there.  He

10  said that he was on one side of the bed, Mr. Jenkins

11  was on the other, that Mr. Jenkins was supposed to

12  cooperate with him or something and then all of a

13  sudden he came out with a gun from under the bed.

14  And Hunter said he drew his weapon and fired and

15  struck him in the mouth and that they called for

16  medical.

17          Now it wasn't until later on that I found

18  out that he had stuck the gun -- that Deputy Elward

19  had actually placed the gun inside the mouth of

20  Mr. Jenkins.  That was -- it may have been June, it

21  may have been a little bit before June.  But I

22  didn't find out the total -- all the truth until

23  June of 2023.

24      Q.   Now you said that you watched several of

25  my news conferences or my and Attorney Walker's news

1  conferences, and I think you said you read our news

2  releases; is that right?

3      A.   I didn't read your -- I read some articles

4  in the paper, but I did see one of your initial

5  press releases.

6      Q.   And didn't they all say that he was shot

7  from inside of his mouth?

8      A.   I don't remember that, no.

9      Q.   But even when you heard that he was shot

10 in the mouth -- did you know he was shot in the

11 mouth when he had that surgery?  Because he had

12 surgery on his face and mouth?

13     A.   You're confusing me here, because you're

14 saying in the mouth, in the mouth.  Did I know he

15 was shot with a gun inside his mouth?  No, I did

16 not.

17     Q.   But you knew he was shot?

18     A.   Through the mouth.

19     Q.   Through the mouth right away?

20     A.   Yes, sir, that was obvious from that

21 night, from the description of everything that

22 happened.

23     Q.   And what was your response to that?

24     A.   My response to what?

25     Q.   Knowing that he had been shot in the

 1   mouth?

 2         A.   At the time, Deputy Hunter Elward was

 3   lying to me and told me that he shot him from across

 4   the bed through the mouth, is the information I had

 5   that night.

 6         Q.   Did you ever see the gun that

 7   Michael Jenkins supposedly had?

 8         A.   Yes, I saw it laying on the floor up under

 9   the bed.  Like the door to the -- I guess you'd call

10   it a bedroom, but the door was open and you could

11   see the gun up under the bed or by the edge of the

12   bed on the bedside facing the front of the house.

13         Q.   What did you do in regard to that, to

14   Michael Jenkins allegedly having that gun?  Did you

15   ask any questions about that?

16         A.   Ask any questions to who?

17         Q.   Your deputies about what --

18         A.   No, I just stated -- I'm sorry.  Go ahead.

19         Q.   I'm talking about whether or not that was

20   his weapon or not?

21         A.   No, sir.  When I got on scene, Deputy

22   Hunter Elward told me that he was standing in the

23   bedroom, I guess you'd call it the bedroom of the

24   house, and that Michael Jenkins was supposed to be

25   cooperating with them or something like that, and

1    that they were going to make a phonecall to somebody

2    and buy some dope.  And he said that Jenkins came

3    out with a gun from under the bed.  And that Hunter

4    said he drew his weapon and shot at Jenkins and hit

5    him -- shot him through the mouth with his service

6    weapon.  And there was a gun laying by the bed where

7    he described, laying on the floor.

8          Q.    Who took possession of the gun?

9          A.    MBI took over the investigation.  MBI took

10    possession of it.

11          Q.    That night?

12          A.    Yes, sir.

13          Q.    Are you aware of Hunter David's -- Hunter

14    Elward's -- pardon me -- affidavit that was

15    submitted, I think the next day to your department,

16    his affidavit about Michael Jenkins having a gun and

17    trying to harm Elward?

18          A.    Are you talking about the criminal

19    affidavit for assault on a police officer that he

20    filed?

21          Q.    Yes.

22          A.    Yeah.  Yes, sir.

23          Q.    You're familiar with that?

24          A.    Yes, sir.

25          Q.    When did you first see that?

Sheriff Bryan Bailey - January 8, 2025

215

```
1        A.   I don't know if I actually saw it, but I
2   know that it was filed.  They filed charges the next
3   day.
4        Q.   Okay.  And did you -- did you review those
5   charges?
6        A.   No, sir.
7        Q.   Did you review his affidavit?
8        A.   No, sir.
9        Q.   Okay.  Why not?
10        A.   I never review affidavits or warrants.
11        Q.   Even in this case where somebody was shot
12   in the face and under these high profile
13   circumstances?
14        A.   No, sir, I've never reviewed a
15   investigator or deputy's affidavit or warrant.  At
16   that time they were, like I told you, they were
17   lying to me and still lying to me.  So at the time I
18   thought he was telling me the truth.  I thought the
19   affidavit was true.
20        Q.   So you did see it?
21        A.   No, sir, I didn't see it.  I never said I
22   saw it.
23        Q.   So when did you -- when did you come to
24   believe that it was true?
25        A.   Based on Hunter Elward telling me that
```

 1   that's what happened that night, that Mr. Jenkins

 2   pulled a gun on him and he was defending himself and

 3   returned fire.

 4       Q.   I get his word -- I get his word that

 5   night.  But I'm saying for the affidavit, did you

 6   review the affidavit?

 7            MR. DARE:  Asked and answered now five

 8   times.

 9       Q.   (By Mr. Shabazz) Okay.  So you didn't --

10            MR. SHABAZZ:  He says that he -- I'm not

11   clear on that answer.  I can't say asked and

12   answered.

13       Q.   (By Mr. Shabazz) I just want to know did

14   you -- when did you -- when did you review the

15   affidavit?

16       A.   I have never laid eyes on the affidavit.

17   I have not reviewed it.  I never review affidavits

18   or warrants.  That's a judge's job, to review them.

19       Q.   So in your department, does anybody review

20   the affidavit of the charging document?

21       A.   Some of them will get our sheriff's office

22   attorney to review it if they have a question.  Some

23   people go to the district attorney's office and get

24   them reviewed occasionally.  But there's an

25   affidavit book, there's -- most of the forms are

1  preset on the computer to type out, so.  But, no,

2  I've never reviewed affidavits and warrants.

3       Q.   So in your department you're saying -- who

4  in the department -- I know you said you don't

5  review affidavits or warrants, even in this case,

6  where you appeared personally on the scene.  Well,

7  who did?  Who was in charge of reviewing the

8  affidavit and the charging documents?

9       A.   I would assume somebody at the DA -- or

10  one of the assistant DAs and the judge would review

11  it before he signed it.

12       Q.   But there is no one in your department

13  that reviews an affidavit or was responsible for

14  reviewing Hunter Elward's affidavit to see whether

15  it was authentic or not?

16       A.   I've never known of anybody reviewing

17  affidavits in law enforcement agencies.  I mean,

18  for -- a ticket is an affidavit, nobody reviews

19  them.  We get a copy of them.  But you turn it into

20  justice court.  Misdemeanor, affidavits and

21  warrants, you turn into justice court.  Nobody ever

22  reviews it except for the judges before they sign

23  the affidavit or warrant.  I've never heard of

24  anybody reviewing affidavits or warrants.

25       Q.   This is a use of deadly force.  This use

```
 1    of -- this a affidavit turned in your department

 2    that details the use of deadly force.

 3         A.   By a lying -- by a lying deputy turned

 4    that in.

 5              MR. DARE:  That's not a question.

 6         Q.   (By Mr. Shabazz) Okay.  A lying deputy

 7    turned it in.  Was there anybody above that lying

 8    deputy that reviews the affidavit stating that --

 9    reviewed that affidavit?

10         A.   I'm not aware of anybody reviewing it

11    besides somebody at the DA's office may have, and

12    the judge I'm sure would have reviewed it before he

13    signed it.

14         Q.   Where is this -- okay.  Let me ask this.

15    Are they reviewed now?

16         A.   No, sir, I don't review -- I don't review

17    any affidavits or warrants.  The chief investigator

18    may review some for some of the newer investigators

19    or something, but I don't review affidavits and

20    warrants.

21         Q.   So now are you saying that the affidavit,

22    such in the case of the use of deadly force, they

23    are reviewed inside your -- inside your department

24    now?

25              MR. DARE:  Object to form.
```

```
 1          Q.    (By Mr. Shabazz) Are they now reviewed?

 2                MR. DARE:  Counsel, you're going through

 3    the exact same question again and again and again

 4    until you're hoping to get the answer that you want.

 5                MR. SHABAZZ:  No, I'm not.  No, I'm not.

 6    What I'm doing, respectfully, what I'm doing is

 7    trying to -- if he says that no one in the

 8    department, including him, would review the

 9    affidavit --

10                MR. DARE:  Before.

11                MR. SHABAZZ:  -- that Hunter Elward put

12    forth --

13                MR. DARE:  Right.  And then he literally

14    just said that's essentially the same now.

15                MR. SHABAZZ:  No, I'm just -- he says now

16    that some people in the department are performing

17    that function, and I'm trying to get --

18                THE WITNESS:  No, sir, I didn't say that.

19          Q.    (By Mr. Shabazz) So what are you saying

20    about now, in terms of these affidavits and charging

21    documents?  Are they reviewed now inside of your

22    department?

23          A.    They're not routinely reviewed by anyone

24    in the department.  What I said to you earlier, in

25    the earlier question was there may be a new
```

1    investigator, possibly a new investigator that's new

2    at filling out the affidavits and warrants that may

3    ask the chief investigator, they may ask -- you

4    know, could possibly one day ask me, hey, does this

5    look all right to you?  You know, so they may

6    have -- that's the only reviewing I would think of

7    is for somebody new.  But as far -- no, nothing has

8    changed in the department.

9            I've never reviewed affidavits or

10   warrants.  And we're still -- I still don't do it.

11   And I'm not aware of anybody that does do it, except

12   for the judges, the county prosecutor and somebody

13   from the district attorney's office possibly reviews

14   them when they get them.

15       Q.   So are you saying today that if a lying

16   officer shot a resident in the mouth and then

17   produced a affidavit claiming that that person had a

18   weapon and that was the justification for shooting

19   them in the mouth, that that affidavit and charging

20   document would not be reviewed by your department

21   today?

22       A.   If I knew that they were lying, I would

23   arrest the deputy immediately and call the FBI.

24       Q.   But you would have to -- you would have to

25   review that to ascertain whether they were lying or

Sheriff Bryan Bailey - January 8, 2025

221

1  not, right?

2      A.   No, how would I know if they're lying or

3  not?

4      Q.   I'm just -- and I'm not trying to be

5  argumentative with you.  I just wanted to know has

6  anything changed?  Since Hunter Elward put that

7  false affidavit in and false charging documents,

8  have you -- are you continuing the same procedures

9  or have you changed?

10          MR. DARE:  With warrants?  Or are you

11 opening it up to all procedures?

12          MR. SHABAZZ:  Right now I'll just limit it

13 to the use of deadly force.

14          MR. DARE:  Well, actually, you were

15 talking about with warrants against somebody and

16 charging affidavits.  Is that what we're talking

17 about, changing policy?

18          MR. SHABAZZ:  Yes.

19          MR. DARE:  Okay.  So, again, you may

20 answer again if you understand the question.  If not

21 ask him to rephrase it.

22          THE WITNESS:  Please ask me the question

23 again.

24     Q.   (By Mr. Shabazz) Are you saying that no

25 charging documents are reviewed by supervisory

1    personnel in your department prior to them being

2    turned over to prosecutorial authorities?

3        A.    No, sir.   All affidavits and warrants are

4    turned over to either justice court or circuit court

5    where they're reviewed by the judge.

6             And backing up, I can say that we --

7    you're talking about serious crimes, there has been

8    occasion where I know that the district attorney's

9    office helped draft affidavits and warrants for some

10   crimes.  But as a regular and routine practice, the

11   sheriff's office does not review any affidavits or

12   warrants before an investigator or deputy turns them

13   in to the court system.

14       Q.    Okay.  So what do the supervisors do in

15   your department, since they do not review the

16   actions of the deputies?

17             MR. DARE:  What?

18             THE WITNESS:  I don't understand the

19   question.

20       Q.    (By Mr. Shabazz) What do supervisors do in

21   your department do since they do not review these

22   actions, these specific actions of the deputies, in

23   terms of the affidavits and the warrants -- and the

24   application for warrants that they put in with the

25   court system?

```
 1        A.   So you're asking what they do -- what else
 2   the supervisors do?
 3             MR. DARE:  Are we talking about just with
 4   warrants and affidavits?
 5             MR. SHABAZZ:  Specifically on that.
 6             THE WITNESS:  I'm lost.  You're going to
 7   have to rephrase the question.  I'm sort of lost
 8   with you.
 9        Q.   (By Mr. Shabazz) Okay.  I understand you
10   on that.
11             Let me ask you this.  You paid
12   Michael Jenkins -- you all paid Michael Jenkins'
13   hospital bill.  Why did you do that?
14        A.   Because he was in our custody.  We do that
15   for all -- any inmate that's in our custody that
16   gets transported to the hospital, we're liable for
17   the hospital bill.
18             MR. SHABAZZ:  Okay.  Let me -- let me go
19   to Exhibit No. 8 right now.  Can we load this
20   composite exhibit of Exhibit No. 8.
21             (Exhibit 8 marked for identification.)
22        Q.   (By Mr. Shabazz) Do you have that?
23        A.   Yes, sir, Exhibit 8.
24        Q.   Okay.  Just clear me up on this complaint
25   process before we start this.
```

```
 1          If Christian Dedmon had a complaint, he
 2   would have to -- if a complaint was lodged against
 3   Christian Dedmon, the resolution of that complaint
 4   would go to Brett McAlpin; would that be fair to
 5   say?
 6        A.   Yes, sir.  Back then, if I would have
 7   gotten a complaint prior to January of '23, if I
 8   would have gotten a complaint on Christian Dedmon,
 9   then, yeah, I would have referred it to Brett
10   McAlpin, his supervisor.
11        Q.   Okay.  And if there was a complaint about
12   anything on the night shift, that complaint would go
13   to Jeffrey Middleton to be resolved; is that fair?
14        A.   No, sir, that would go -- any complaint on
15   patrol would go to the captain over patrol.
16        Q.   And who was that captain?  Who was the
17   captain over the night shift?
18        A.   In January of '23?
19        Q.   Yes.
20        A.   It would be Dwayne Thornton.
21        Q.   Dwayne Thornton in 2023?
22        A.   Yeah.
23        Q.   Let me just ask you this question.  Do you
24   exercise any oversight over the sheriff's department
25   on a day-to-day basis?
```

1        A.   Can you ask me that again.

2        Q.   Do you exercise any oversight over the

3   sheriff's department on a day-to-day basis?

4        A.   Yes, sir, I oversee the sheriff's

5   department every day, 365 days a year, 24 hours a

6   day.

7        Q.   You do currently?

8        A.   I always have been.  I was elected to be

9   sheriff of the county, so to the best of my ability

10  I try to keep up with everything that's going on

11  that I possibly can.

12       Q.   And at the time of this incident, you were

13  oversight -- you were doing day-to-day oversight and

14  supervision of this department?

15       A.   You're going to have to define oversight

16  and supervision.  Was I supervising individual

17  people?  No.  Was I supervising supervisors?  Yes.

18       Q.   But so -- is it true -- are you saying

19  that you did exercise oversight of the sheriff's

20  department on a day-to-day basis when the Jenkins

21  and Parker incident happened?

22       A.   I'm confused on the question.

23            Oversight of what?

24       Q.   Of the sheriff's department?

25       A.   I'm the sheriff, yeah.  I was over the

1   sheriff's office at the time Mr. Jenkins was shot.

2       Q.   Okay.  How so did you exercise day-to-day

3   oversight?

4       A.   I guess I'm --

5       Q.   It's a straight question, because --

6       A.   How --

7       Q.   I don't think we need to reiterate how

8   bad -- how bad things were and bad things were

9   happening.  So that's why I'm asking you, were you

10  exercising day-to-day oversight over this

11  department?

12      A.   You're talking about bad things happening

13  on one single night by five individuals who lied to

14  me, who not only passed my background investigation

15  but passed the FBI background investigation.

16           So, yeah, they lied to me.  And, yes, it

17  was horrible.  And, yes, I hate it ever happening

18  and everything.  But I'm over the sheriff's office.

19  My oversight is every single day.  Can I keep up

20  with every single individual?  There's no way.  No

21  way I can.

22      Q.   All right.  I just asked were you on this

23  assignment every day.  Okay.  Now, you say one

24  single night, but okay, Schmidt, Mr. Schmidt, that

25  was another night, right?

Sheriff Bryan Bailey - January 8, 2025

227

```
 1        A.   Okay.  So you had -- and I don't know who
 2   all -- I can't remember who all was there, so you
 3   had Dedmon and Opdyke on two different deals.  So
 4   you have two bad situations out of my 12 years, 365
 5   days a year.  I mean, you know, you -- it's bad
 6   situations.  I don't know why, you know, if these
 7   guys had been doing so much bad stuff, why hasn't
 8   the FBI been involved before?  Why don't they have
 9   to -- how did five of these guys pass the FBI
10   background investigation if they had all these
11   complaints and things against them?  I can't
12   comprehend that.  I can't understand that.  Can you?
13        Q.   It could come from lack of oversight and
14   supervision, that they could have passed all of
15   those tests and due to not being supervised --
16        A.   So you're saying not only my lack of
17   supervision but the FBI?
18        Q.   Well, no, I'm talking about you.  It could
19   come from a lack of supervision and oversight from
20   you is the reason why these people who were
21   qualified resulted in, perhaps, the worst police
22   brutality incident in American history.
23             MR. DARE:  Counsel.
24             MR. SHABAZZ:  This happened under your
25   supervision.
```

```
1              MR. DARE:  Hang on, Counsel.  You haven't
2    asked a question.  And you're not going to sit here
3    and badger the witness like this.  We're going to
4    take a break.
5              MR. WALKER:  Yeah.
6              MR. SHABAZZ:  Okay.
7              (Off the record at 4:21 p.m.)
8              MR. SHABAZZ:  I just emailed two exhibits,
9    so I think this one page is -- actually just one --
10             MR. DARE:  Do we need to go back off the
11   record?
12             MR. SHABAZZ:  No, no, no, stay on the
13   record.  We'll get back to that.  Let me do this
14   here.
15        Q.   (By Mr. Shabazz) Okay, Chief Bailey.
16             MR. DARE:  Sheriff.
17             MR. SHABAZZ:  What did you say, sir?
18             MR. DARE:  Sheriff.
19             MR. SHABAZZ:  Okay.  All right.
20        Q.   (By Mr. Shabazz) Okay.  We're back on the
21   record.  Let me ask you a couple of questions.
22             When did -- what was Brett McAlpin's
23   training to become the chief investigative officer?
24        A.   I'd have to go back and look at his
25   personnel file.  I'm pretty sure he has a bachelor's
```

 1    degree from may be Southern and he had several years

 2    experience on the road and experience as a narcotics

 3    investigator.

 4         Q.   Do you have a copy of his trainings or his

 5    sign-in sheets before he assumed that position?

 6         A.   I could look at his personnel file and his

 7    training file and tell you everything that's been

 8    turned in to the sheriff's office as far as his

 9    train and his education.

10         Q.   And do you have a copy of his records from

11    his job?  In conducting his duties as chief

12    investigative officer, do you have his records?

13         A.   I have his personnel file and his training

14    records.

15         Q.   I understand his personnel file and his

16    training record.  But do you have a record of the

17    actions and the investigations that he conducted?

18         A.   Yeah, I mean, in the offense report system

19    you can pull up reports by officers.  So, yes, I

20    could pull up the cases he was involved with.

21         Q.   And you -- and you met with him regularly;

22    is that right?

23         A.   Remember earlier we talked about that

24    investigators' meeting, I would see him in that

25    meeting some.  And then, of course, he would report

1  to me anything serious or major that was going on.

2      Q.   And how often did you or the department

3  review Brett McAlpin's performance?

4      A.   I mean, I didn't review his performance.

5  He was a chief investigator, one of the admin staff.

6  I mean, I didn't review his performance as chief

7  investigator.

8      Q.   You haven't had a review of how

9  Brett McAlpin was performing his job?

10      A.   I've never reviewed Brett McAlpin's

11  performance as chief investigator.  I never had

12  any -- any major issues that I can think of.

13      Q.   Okay.  And so he was never disciplined?

14      A.   I can't say he was never disciplined.  I'd

15  have to go back and look at his personnel file to

16  see if there's any discipline in there.  But I can't

17  remember any discipline while he was chief

18  investigator.

19      Q.   Okay.  Do you recall if Hunter Elward was

20  ever disciplined?

21      A.   Yes, I do remember one incident where he

22  was written up, yes.

23      Q.   What was that for?

24      A.   It involved having -- drinking alcohol and

25  operating a sheriff's office vehicle.

```
 1        Q.   What year was that?

 2        A.   I'd have to go back to his file and pull

 3   it and see.

 4        Q.   What about Opdyke, was he ever disciplined

 5   by the department?

 6        A.   I'd have to -- I can't think of anything

 7   coming to mind, but I'd have to review his personnel

 8   file to give you an answer.

 9        Q.   Christian Dedmon, was he ever disciplined

10   by the department?

11        A.   Same thing, I'd have to review his file

12   and see what was in his file.

13        Q.   But nothing you can recall at this time?

14        A.   Like I said, the only one I can recall

15   specific was Hunter Elward.  I'm not saying the rest

16   of them don't have anything.  I'm saying that's the

17   only one I can personally recall right now.

18        Q.   Did you ever -- for the lawsuits that

19   Brett McAlpin was involved in, did you ever discuss

20   or review those with him?

21        A.   No, sir.

22        Q.   Did you ever review Gearhardt lawsuit?

23   Are you familiar with the Gearhardt lawsuit?

24        A.   I remember the name, but at that time I

25   wasn't sheriff.
```

1      Q.   But when you became sheriff did you ever
2  review the Gearhardt lawsuit with Mr. Christian
3  Dedmon?
4      A.   Mr. Dedmon?
5      Q.   Yeah, Christian Dedmon I'm talking about.
6      A.   I don't recall reviewing anything -- any
7  lawsuit with Christian Dedmon.
8      Q.   Okay.  Yeah, I skipped around.
9           So you don't recall Dedmon ever being
10  disciplined, am I right on that?
11      A.   No, sir, I never said that.  I said you
12  would have to let me look at his personnel file to
13  give you a correct answer.
14      Q.   After the incident with Jenkins and
15  Parker, did you review all these officers
16  disciplinary records?
17      A.   Yes, I reviewed their files because we
18  gave copies of them -- of their personnel files to
19  the FBI and MBI.
20      Q.   Do you recall that lawsuit, the Gearhardt
21  lawsuit was still in effect while you were in
22  sheriff's -- while you were sheriff?
23      A.   I don't recall.  I would have to research
24  that lawsuit or get a copy of it to see the dates on
25  it.  I don't remember any details of that one.

1    Q.    Let me ask you this.  At the time of the

2    incident with Jenkins and Parker or even before

3    that, at the time of the incident with Mr. Schmidt,

4    let me ask you this, was there a policy in place

5    that accounted for the use-of-force and ammunition?

6    Specifically who would account for a deputy

7    discharging his firearm?

8    A.    Well, if he discharged his firearm there

9    should have been, unless it was like qualifications

10   or something like that, then if he discharged his

11   firearm then he should have produced a use-of-force

12   report to why he discharged his firearm.  He should

13   have written a report on it.

14   Q.    So if the deputy didn't initiate the

15   use-of-force report, was there any system that you

16   had in place to count the ammunition of your

17   deputies to make sure that they weren't in the field

18   discharging their firearms?

19   A.    No, sir, I don't count the ammunition

20   because you can buy it at any store around here.  We

21   don't count the ammunition.  We issue new ammunition

22   when we do qualifications, but we don't count the

23   bullets, no, sir.

24   Q.    So a deputy could fire his weapon as many

25   times he desired as long as he didn't fill out a

 1    use-of-force report, the use of his firearm would

 2    not be detected by you and your system; is that fair

 3    to say?

 4         A.   I can say I don't know of any way that you

 5    can detect when a firearm was fired or not.  I don't

 6    know how you would do that.

 7         Q.   Okay.  So still to this day, a deputy can

 8    shoot as many rounds as they want in the field and

 9    if they don't fill out a use-of-force report, they

10    would be fine; is that right?

11         A.   Like I said, I know of no way to account

12    for bullets, especially when you can go buy bullets

13    yourself.  And if somebody wanted to practice with

14    their weapon at home in their backyard, then I

15    wouldn't see an issue with that.  So I don't

16    understand how you would account for bullets being

17    discharged.

18         Q.   All right.  So the answer is no, that

19    there's no system in place to ensure that the

20    deputies are discharging their -- discharging rounds

21    if they don't report it themselves?

22         A.   No, that wasn't my answer.

23              MR. DARE:  Counselor, hang on let me make

24    sure I get it clear.  Are you talking about county

25    rounds or individual rounds from a County weapon or

Sheriff Bryan Bailey - January 8, 2025

235

```
 1   both?
 2           MR. SHABAZZ:  I'm talking about rounds
 3   from a county weapon.
 4       Q.   (By Mr. Shabazz) If a County weapon is
 5   discharged, are you saying that you had no system in
 6   place to keep track of that?  Hold officer
 7   accountable for shooting off his weapon?
 8       A.   I don't know of any way that you can
 9   account for the bullets being fired out of a weapon
10   unless you put a serial number on each bullet and
11   told them they could not use it -- they couldn't
12   fire anytime -- I don't know how you would do that.
13   I don't know how you would account for that.
14       Q.   Okay.  I get that.
15           So is it fair to say that a lot of the way
16   that things operated prior to January 2023 was
17   dependent on trust and not verification; is that
18   correct?
19           MR. DARE:  Object to form.
20           You can answer.
21           THE WITNESS:  No, that's not correct.
22       Q.   (By Mr. Shabazz) Okay.  Well, how is it
23   not correct?  How is that not correct?
24       A.   Because I had the unfortunate circumstance
25   of having five deputies lie to me over several
```

1    major, serious issues in one night.  And I think

2    that that's a unique, rare circumstance.  You know,

3    I have 120 deputies and had five of them mess up.

4    So that still means I have 115 that are doing the

5    right thing.  And, you know, I have one of the

6    lowest crime rates in the country.  So the majority

7    of my people are doing the right thing.  Did I have

8    five guys do something bad?  Yeah, they did

9    something bad and they lied to me.

10        Q.   Now, you stated earlier that because they

11    had lied to you, you went back and reviewed other

12    cases they were involved in to see whether they were

13    lying about these other situations, right?

14        A.   No, sir.  I told you that -- if you're

15    talking about the New York Times article, then there

16    were different people listed in that article that we

17    did an investigation on the ones -- some of the ones

18    listed in that article.  Is that the one you're

19    talking about?

20        Q.   I'm taking about the article and just your

21    statement that you said that you went back and

22    looked at previous incidents that these officers or

23    deputies were involved in and you had -- to see

24    whether they were lying to you in the past.

25        A.    If anything improper was brought to our

1   attention, then we investigated it.  Especially

2   after this, when so many people were claiming so

3   many different things, we investigated pretty much

4   each and every claim that we could on any officer.

5        Q.   Did you find that these officers had been

6   lying to you in the past?

7        A.   I would have to go back and look at the

8   files and see what the internal affairs

9   investigation said on it.  But I can tell you that

10  the night of Mr. Jenkins and Mr. Parker that they

11  definitely lied to me.

12       Q.   They were also lying when Mr. Schmidt was

13  assaulted and abused, correct?

14       A.   I'd have to go and see who was asked what

15  questions before I could tell you if anybody was

16  lying.

17       Q.   Okay.  And other deputies -- other

18  deputies you said resigned rather than to be

19  questioned about things that you read in the New

20  York Times?

21            MR. DARE:  Object to form.

22       Q.   (By Mr. Shabazz) Is that a fair recount of

23  what you said?

24       A.   No, sir.

25       Q.   What did you say?

```
 1        A.   I said that we opened an investigation on
 2   the allegations made in the New York Times article.
 3   And that I told you Cody Grogan, and I can't
 4   remember, there was a reserve officer and there may
 5   have been one more that we terminated because they
 6   failed to come in and cooperate with the
 7   investigation.
 8        Q.   And have you determined that they were,
 9   based on them resigning and their conduct during
10   your investigation, have you determined that they
11   were also lying to you?
12        A.   I don't know if they were lying or not.
13   They didn't cooperate.  And they didn't resign, we
14   terminated them for not cooperating with the
15   investigation.
16        Q.   So what were your findings from the New
17   York Times article that you read?  What were your
18   ultimate findings?
19        A.   I'd have to go back and pull each
20   individual and let you know what the individual
21   finding was.  I can't remember off the top of my
22   head what each one of them was.
23        Q.   But can you recall whether any of them
24   were found to be guilty of misconduct?
25        A.   I can't remember.  I'd have to check each
```

Sheriff Bryan Bailey - January 8, 2025

239

```
 1   individual case and let you know.
 2        Q.   Okay.  Did you -- was there an internal
 3   affairs report regarding the Parker-Jenkins matter?
 4        A.   Yes, I think there was towards the end.
 5   Again, we didn't do anything on the front end of it
 6   because of the MBI and FBI investigation.  But I
 7   think there was an internal affairs report done at
 8   the end of it when we did find out the truth.
 9        Q.   So you do have a written report on it?
10        A.   I believe so.  Yes, sir, I believe so.
11        Q.   And can you produce that report to your
12   attorney for furnishing us?
13        A.   Yes, sir.
14             MR. DARE:  You already have it.
15             MR. SHABAZZ:  Okay.
16        Q.   (By Mr. Shabazz) Who conducted that
17   investigation?
18        A.   You have to let me pull the report and
19   see.  I can't remember right now if it was -- I
20   can't remember who exactly did the investigation.
21        Q.   Let's go here to the mugshots.  Let's go
22   here to the mugshots.  Okay.  Let me ask you this
23   right before we go to the mugshots.
24             Let me ask you quickly, when an injury
25   occurs to a person that is detained or -- detained
```

1    or in jail, what is the follow-up that your

2    department did at the time of the Jenkins-Parker

3    incident?

4         A.    What kind -- you're going to have to let

5    me know what kind of injury.

6         Q.    A person is injured in jail -- let's say a

7    person is injured in the course of being arrested,

8    or a person's injured in the jail or some kind of

9    altercation with the officer.  What is the follow-up

10   procedure?

11        A.    Well, the first thing that they would do

12   is -- there's so many different injuries that you're

13   talking about here.  Like say if there's an

14   individual that had a -- let's say you had a pursuit

15   and you wrecked and he got injured during the wreck,

16   then we'd take him to the hospital.  The hospital

17   would evaluate him and let us know if he was capable

18   of being incarcerated or not.  If he wasn't capable

19   of being incarcerated, he would be released on his

20   own recognizance, unless it was a very serious crime

21   then we would put a guard with him.

22             And then the same thing with the deputies.

23   Let's say that they, for instance, make a traffic

24   stop and they get in a struggle with somebody and

25   the person gets a cut or some kind of injury.

1  Pretty much they're going to have to take that

2  individual to the hospital to be checked out before

3  the jail will accept them.

4          And then inside the jail, if there's an

5  accident or use-of-force, anything inside the jail,

6  the person would be taken to medical and evaluated

7  by medical and then sent out for further care, if

8  needed.  And then, of course, returned to the jail.

9  But at all times they would have a guard with them

10  and all.

11          Then outside of that -- that's most of the

12  ways that injuries are dealt with.

13     Q.   I understand.  So in both cases if someone

14  is -- pardon me -- someone was dispatched to the

15  hospital to speak to the doctor to understand what

16  were the injuries or the treatment for that patient

17  or that detainee or person that was in jail, you'd

18  dispatch someone there; is that right?

19     A.   No, sir, I don't dispatch anybody to talk

20  to the doctor.  If somebody has to go to the

21  hospital, then most of the time two jailers or two

22  deputies go with them and sit with that person until

23  the treatment is complete then they're transported

24  back to the jail.

25          Most of the time our medical in the jail

1    would communicate with the doctor and the medical

2    staff on the status of the person that's in the

3    hospital.

4         Q.   So the deputies would do the security and

5    the person at the jail would communicate by phone

6    with the doctor; is that right?

7         A.   Yeah, most times that's the way it

8    happens, yes, sir.

9         Q.   And that's true for both persons that may

10   be injured in the field before they're booked as

11   well as persons in the jail after they're in jail?

12        A.   Well, the only thing, if they're injured

13   in the field before they go to the jail, the medical

14   may not know to call and check with them.  You see

15   what I'm saying?  Because the medical has no idea

16   that they're in the hospital because they went

17   straight from the -- from the -- from the street to

18   the hospital.  So it may take a little time for them

19   to be made aware of it.

20             Now if they come from the jail, if they're

21   in the jail and they're transported to the hospital,

22   then, yes, medical definitely knows all about it and

23   they keep up with it.

24        Q.   Can we go to Exhibit 8.  Let's go to

25   Exhibit 8.  I want to run some photos by you, see if

```
 1    you're familiar with these persons.

 2         A.   Uh-huh (affirmative response).

 3              MR. SHABAZZ:   This is Exhibit 8; am I

 4    right, Trent?

 5              MR. WALKER:   Yes.

 6         Q.   (By Mr. Shabazz) I'm showing you a mugshot

 7    of Mr. Jeremy Travis Paige that was arrested in

 8    August of 2018.  Are you familiar with Mr. Paige?

 9    Yes, that's correct.

10              Are you familiar with Jeremy Travis Paige?

11         A.   No, sir, I'm not.

12         Q.   Are you familiar with his allegations?

13         A.   Not -- I would have to read them.  I may

14    have read them in the past but I don't remember

15    them.

16         Q.   And in your review of your New York Times

17    article did you -- so you're not familiar with

18    Mr. Paige at all?

19         A.   No, sir, I would have to -- if he's in the

20    New York Times article I would have to read the

21    article again.

22         Q.   And can you see from his mugshot that he's

23    been beaten up?

24              MR. DARE:   Object to form.

25              THE WITNESS:   No, I can't tell.  It looks
```

1    like he has some marks on his face, but I can't tell

2    from the picture if it's -- what type of injuries

3    they are.  I mean, I don't know him.

4        Q.   (By Mr. Shabazz) So you know nothing of

5    his matter.

6             Do you know anything about the involvement

7    of Brett McAlpin, Deputy Thornton, Rayburn or

8    Stickman in the incident with Jeremy Travis Paige?

9        A.   I would have to reread the article to

10   remember what the allegations are to put it all

11   together.

12       Q.   But you did not review his case?

13       A.   I'm not saying I didn't.  I said I don't

14   remember it right now.  I would have to reread the

15   allegations and see what kind of case file we have

16   on him.

17       Q.   What about Mr. Maurice Porter, number two?

18       A.   The name sounds familiar.

19       Q.   Can you tell me did you review his

20   situation?

21       A.   I don't recall it specifically, I would

22   have to look at it again.  If he's in the New York

23   Times article, I would have to review the article

24   and see what our case file says on it.

25       Q.   You can't recall reviewing him at this

```
 1   time?

 2        A.   No, sir, I can't.  Not specifically, no.

 3        Q.   Let's go to Carvis Johnson here next.  Are

 4   you familiar with Carvis Johnson?

 5        A.   I remember the name.  And I want to say

 6   that there was something that happened in the jail

 7   with him, but I can't remember specifically what.

 8        Q.   Do you recall that it was alleged that one

 9   of your deputies branded a letter on his body?

10        A.   Branded a letter?  No, sir, first I've

11   heard of that.

12        Q.   Okay.  And do you recall the allegations

13   made in Carvis Johnson's lawsuits filed against

14   Rankin County?

15        A.   Was that the one -- did he make some

16   allegations in the jail?

17        Q.   Yes.

18        A.   Yeah, I would have to -- I would have to

19   reread it.  I vaguely remember it, but I don't

20   remember specific details.

21        Q.   Have you taken any action in reference to

22   the Carvis Johnson case?

23        A.   I would have to review the case file on it

24   and see.

25        Q.   Okay.
```

```
 1              MR. DARE:  If I may and it may just help
 2    clarify, Mr. Johnson, you may not recognize him by
 3    name.  He was the individual who was stuffing feces
 4    all over his --
 5              THE WITNESS:  That's what I thought -- I
 6    was thinking that.
 7              MR. DARE:  -- into the door and all over
 8    the walls.
 9              THE WITNESS:  And all over the walls in
10    the cell, yeah, I thought it was, but I wasn't sure.
11              MR. DARE:  And to -- I just wanted to
12    clarify because -- to make sure that it was
13    understood who this individual was.
14         Q.   (By Mr. Shabazz) Okay.  Ronald Shinstock
15    is the next one.  Do you see him?
16         A.   Yes, sir.
17         Q.   Ronald Shinstock is alleging that in 2015
18    that he was abused by your deputies.  Are you
19    familiar with his claim?
20         A.   I remember the name and I know there's a
21    case file on it, but I can't remember the -- I can't
22    remember what he -- what he says happened.  So I
23    would have to review that case file too.
24         Q.   But do you know if this is one of the
25    cases you reviewed when you were going back to see
```

1   whether the deputies that were convicted were lying

2   to you?  Is this one of the cases --

3       A.   I don't remember.  I just remember the

4   name, Shinstock.  It's a unique name, so I do

5   remember his name.  But I would have to look, read

6   the details of the case to see what the outcome was

7   with it.

8       Q.   And, again, with all of these cases you

9   looked back on and you said you did reach some

10  outcomes; is that right?  You said you reached some

11  outcomes when you looked back about previous actions

12  in the Goon Squad?  You said you had reached some --

13      A.   The only actions I can tell you that I for

14  sure did was terminate the ones that did not come in

15  to cooperate with the investigation.  The rest of

16  them I would have to go back individually.

17      Q.   I know you terminated some officers who

18  didn't come in.  But did you reach any conclusions

19  on the allegations of these persons that were making

20  allegations in the New York Times, did you make any

21  conclusions that they had -- they had actually

22  suffered from police misconduct?

23      A.   I would have to go back to each individual

24  case and let you know individually after reviewing

25  the cases.

```
 1              MR. DARE:  And, Counsel, are you
 2    representing that each of these individuals in
 3    Exhibit 8 were actually referenced in the New York
 4    Times article?
 5              MR. SHABAZZ:  Some are, some are not.
 6    Some are, some are not.
 7              MR. DARE:  Some that the New York Times
 8    couldn't even substantiate, basically?
 9              MR. SHABAZZ:  Okay.  Well, I don't know
10    about your characterization.  But what I'm saying is
11    that Chief has previously said that he reached some
12    determinations, in terms of some of those
13    allegations in the New York Times, he can't recall
14    them.  So I'm trying to see, well, how many did you
15    reach a determination that they were actually a
16    victim of police misconduct?
17              MR. DARE:  Thank you for the
18    clarification.
19         Q.   (By Mr. Shabazz) Do you know how many,
20    roughly, that you reached a conclusion for?
21         A.   No, sir, I would have to go back and
22    review all of them and let you know.
23         Q.   But you do have written conclusions on the
24    ones that you did reach a determination on?
25         A.   Yes, sir.  If there was an internal
```

1    investigation done related to that New York Times

2    article, then there would be a case and a some kind

3    of results or something with that, that I would be

4    able to report.

5         Q.   And you can produce that to your attorney?

6         A.   Yes, sir.

7              MR. DARE:  From the IA file.  That's what

8    you're talking about?

9              MR. SHABAZZ:  I got to keep moving right

10   now.

11        Q.   (By Mr. Shabazz) Gary Frith, are you

12   familiar with him?

13        A.   I'm familiar with the name.

14        Q.   Did you review his case, his allegations?

15        A.   I would have to go back and see what

16   happened with the internal affairs investigation.

17        Q.   Mr. Dustin Hale, did you review his

18   allegations?

19        A.   I don't recognize that name.  I'd have to

20   review the article and the case file.

21             Which one is he?  See if I recognize him.

22        Q.   Back to Carvis Johnson did not allege

23   branding, just to be clear.  He alleged that Elward

24   and others attacked him and beat him in the jail.

25             Are you familiar with that allegation by

1    Carvis Johnson?

2        A.    No, I think he had several different

3    allegations against us from the jail.  I can't

4    remember everything on it.  But like I say, I know

5    it's on record at the sheriff's office and I can

6    pull it up and let you know.

7        Q.    Okay.  All right.  What about Mr. -- next

8    man here, Mr. Dustin Hale?  Dustin Hale, are you

9    familiar with his --

10       A.    No, same thing.  I would have to review

11   what we had on him up there.

12       Q.    Okay.  What about Christopher Hillhouse.

13   Are you familiar with that name?

14       A.    Yes, sir, I remember that name, but I

15   can't remember any details of it.

16       Q.    So he may be in your findings?

17       A.    Which one is he?  Can you show me the

18   picture you're looking at.

19       Q.    Mr. Hillhouse does not have a picture.

20   He's -- did you say you remember his name?

21       A.    Yeah, the name sounds familiar.

22             MR. DARE:  Counsel, I'm going to show you

23   this.  Are you referring to this one?

24             MR. SHABAZZ:  No, he doesn't even have a

25   mugshot.

1      Q.    (By Mr. Shabazz) Hillhouse does not have a

2    mugshot.

3      A.    Okay.

4      Q.    But he said he remembers the name,

5    Hillhouse; is that right?

6      A.    Yeah, the name sounds familiar, yeah.

7      Q.    What about the picture you were just shown

8    Joe Dwayne Frazier?

9      A.    Yeah, I know -- I remember reading an

10   offense report with his name in it.  But, again, I

11   don't remember the details of it.  I remember the

12   name.

13     Q.    And did you review his case, his

14   situation?

15     A.    If I did, it's been so long that I don't

16   have any details in my mind, I would have to review

17   it again to refresh my memory on it.

18     Q.    Robert Jones?

19     A.    Vaguely, I mean, I remember that name

20   being mentioned somewhere.  I don't know if it's

21   that New York Times article or not.  But, yeah, I

22   think there was something on him.  And, again, I

23   would have to review the internal affairs case.

24     Q.    And you will give us your review on him,

25   your report on him?

 1       A.   Yes, sir, whatever the -- our attorney

 2   says that we can release, yes, sir.

 3       Q.   Are you familiar with

 4   Mr. Fredrick Trimble?

 5       A.   No, sir.

 6       Q.   Are you familiar with the gentlemen here,

 7   Jerry Manning, James Lynch, Garry Curro and

 8   Adam Porter, do you recall any of these prisoners?

 9       A.   Do you know, was this an incident that

10   happened in Pearl?

11       Q.   This is -- Pearl, Mississippi, yes.

12       A.   Yeah, I vaguely remember that Curro guy's

13   name.  Curro sounds familiar.  And Cody Porter

14   sounds familiar.  So there's possibly something on

15   them.  That does sound familiar.

16       Q.   Okay.  So you did review these allegations

17   of June 2018 that --

18       A.   I'd have to look at -- look at our case

19   file to be able to tell you whether I reviewed it or

20   not.

21       Q.   And in all your reviews, did you find that

22   any of your deputies had committed similar acts of

23   abuse to what they did on January 24th, 2023 with

24   Jenkins and Parker?

25       A.   I don't know of -- I'd have to go back and

1    look it all up to see, but I don't remember anything

2    as bad as what happened to Mr. Jenkins and

3    Mr. Parker, nothing even close.

4         Q.   Do you recall in the New York Times that

5    different allegations were made by these persons,

6    some of which matched up to what happened to

7    Michael Jenkins and Eddie Parker?

8              MR. DARE:  Object to form.

9              THE WITNESS:  Like I said, it's been well

10   over a year since I probably read the article.  I'd

11   have to read it again and check to see what files we

12   have on it.

13        Q.   (By Mr. Shabazz) But you'll get us all

14   files and conclusions from the New York Times, your

15   New York Times investigation?

16        A.   Yes, sir.

17        Q.   What about --

18             MR. DARE:  And by the way, he's going to

19   get it to me and as soon as I get a request, I'll

20   get you a response.

21             MR. SHABAZZ:  Yes, sir.

22        Q.   (By Mr. Shabazz) Mitchell Hobson and

23   Rick Loveday, are you familiar with their

24   allegations?

25        A.   I don't know about the Mitchell Hobson,

1    but the Loveday guy -- did he used to be a detention

2    officer for Hinds County?

3            MR. WALKER:  Yes.

4            THE WITNESS:  Okay.  Yeah, the Loveday

5    guy, I vaguely remember it.  I remember he was

6    supposed to be selling dope out there and we

7    arrested him or the narcotics people had arrested

8    him and charged him.  Because I remember getting a

9    call about him back when all that happened.  But I

10   don't remember what allegations he's making against

11   the deputies.

12       Q.   (By Mr. Shabazz) Okay.  Do you recall that

13   Loveday claims that the deputies poured spices on

14   his buttocks, smashed a chocolate cake in his face,

15   attempted to shove a mag light into his anus and

16   beat him?

17           Do you recall him making those

18   allegations?

19           MR. DARE:  Object to form.

20           THE WITNESS:  No, sir, I don't.

21       Q.   (By Mr. Shabazz) So is it fair to say that

22   even though you did an internal investigation on all

23   the New York Times allegations, that you don't have

24   an independent recollection of the allegations or

25   findings from your reviews?

```
 1        A.   No, sir.  No, sir.

 2        Q.   You don't -- you don't -- you don't have

 3   that recollection?

 4        A.   No, sir, I don't agree with what you're

 5   saying at all.  I'm telling you that as much

 6   information that comes across my desk and that I'm

 7   given, you're going to have to let me get time to go

 8   back and review each one of these cases you're

 9   asking me about before I can give you what the

10   results were from the investigation.

11        Q.   So that means right now you cannot give me

12   a investigation result based on your New York Times

13   review of the --

14        A.   I'm not comfortable --

15             MR. DARE:  Asked and answered.  And,

16   Counsel, it's 5:10.

17             MR. SHABAZZ:  I got you, I got you.  We'll

18   keep moving.

19             MR. DARE:  No, hey, I'm going give you the

20   15 minutes grace period.  In five minutes we're

21   done.

22             MR. SHABAZZ:  I got you.

23        Q.   (By Mr. Shabazz) Can you see here that --

24   did Mr. Loveday call and tell you that he was beaten

25   by the deputies?
```

1        A.    I don't recall him calling me and telling

2    me he was beaten by the deputy.  Somebody called me,

3    and I want to say maybe it was a supervisor at Hinds

4    County jail, somebody called me about him and I

5    just -- I just remember him because he was a

6    detention officer or something over there with Hinds

7    County and sold dope out there at Cedar Ridge near

8    the prison.  That's about all I can tell you about

9    him.

10        Q.    But you can't give me the result of your

11   investigation into his claims?

12        A.    Yes, sir, I can give you the results once

13   I review them.

14        Q.    What about Robert Grozier, is it the same

15   case with him?

16        A.    I remember the name, I remember something

17   coming across on him.  I can't remember specifically

18   what, but I can tell you once I review that case

19   file.

20        Q.    Okay.  Is that the same answer for Samuel

21   Carter and Christopher Holloway?

22        A.    I remember Sam Carter because he has been

23   a frequent flier in the jail, he's had several

24   charges against him.  I remember something came up

25   about some allegations with the deputies, I can't

1    remember specifically.  I'll have to review his case

2    and let you know the specifics on it.

3        Q.    Okay.  All right.  Coming to the last

4    three questions here.  They said that -- at the

5    sentencing for Christian Dedmon, it's a public

6    document.  Christian Dedmon says that there was a --

7    speaking of the Rankin County Sheriff's Department.

8    He says, there's a culture of doing things and I'm

9    probably the only person, 28 years old, that was

10   never -- that was ever promoted to narcotics

11   investigator in a county as big as Rankin and as

12   fast as I was.  And instead of choosing the right

13   thing, I chose to be a showoff for the expectations

14   of the ones that came before me and became my boss.

15            What is your response to Mr. Dedmon's

16   statement at his sentencing?

17            MR. DARE:  Object to form.

18            THE WITNESS:  You're going to have to let

19   me read the whole statement.  I can't just react to

20   what you just read.  My mind can't comprehend it

21   that fast.

22       Q.    (By Mr. Shabazz) It is alleging a culture

23   of violence at the department.

24       A.    Then I disagree with that.  I disagree

25   with his statement then.

258

1      Q.   Now in Hunter Elward's sentencing, he

2   says -- I could go -- he says, quote, I could go

3   back and do what's right.  Meaning, I would need to

4   go back seven years to the first time I saw that

5   kind of behavior, speaking of the violence in the

6   department.

7           What would be your response to that?

8           MR. DARE:  Object to form.

9           THE WITNESS:  You would have to let me see

10  the exhibit and read it.  I don't know what he's

11  talking about going back seven years to do what's

12  right.  You say "violence", it could be maybe he had

13  an alcohol problem.  I don't know what the seven

14  years he's talking about.

15      Q.   (By Mr. Shabazz) We'll come back to that.

16          So let me ask you, lastly, would it be

17  fair to say that you knew nothing of the Goon Squad

18  and nothing of these deputies operating outside of

19  the boundaries of law and you knew nothing of the

20  incident which Adam Schmidt -- pardon me -- Alan

21  Schmidt, that you knew nothing of this incidents?

22      A.   You're going to have to -- I guess you

23  need to ask those questions one at a time.

24      Q.   Would it be fair to say you knew nothing

25  of the Goon Squad and nothing of these deputies

1    operating outside of the boundaries of law prior to

2    the incident on January 2024?

3        A.    Right, I had no knowledge of the Goon

4    Squad and no idea that they were -- I wouldn't have

5    allowed that to happen.  I would have stopped it.

6        Q.    And is it fair to say that you knew

7    nothing of the incident with Alan Schmidt for which

8    the deputies pled guilty?  You knew nothing of that?

9        A.    I knew about it at the time that they

10   plead guilty.

11       Q.    Okay.

12       A.    At the end of June, I can't remember the

13   exact date.

14       Q.    And let me ask you, did you know, did

15   Hunter Elward have an alcohol problem?

16       A.    He had an incident where he was demoted

17   and written up for alcohol.  I told you about that

18   earlier, that it's in his personnel file.  I don't

19   have the date and time on it.  But, yeah, he was

20   moved because of alcohol one time.

21            But you were saying going back seven

22   years, I don't know, you know, you implied violence,

23   I may imply that he had an alcohol problem.  So I

24   don't know what he was talking about going back

25   seven years.

```
 1        Q.   Okay.  But if he was -- if he was speaking
 2   of violence, what would be your response?
 3             MR. DARE:  Object to form.
 4             THE WITNESS:  Well, if "if" and "buts"
 5   were candy and nuts, it would be Christmas all year
 6   long.
 7        Q.   (By Mr. Shabazz) Okay.
 8        A.   I'm not going to answer a question with an
 9   "if" in it.
10        Q.   Okay.  All right.  And lastly --
11             MR. DARE:  I thought that was the last
12   question.  You're at 5:16 now.
13             MR. SHABAZZ:  Okay, I'm done.
14             MR. DARE:  All right.  I'm going to get an
15   electronic copy.
16             THE REPORTER:  Okay.  Quick question, we
17   didn't mark that taser policy, were we supposed to
18   mark it?
19             MR. DARE:  That's fine, he read most of it
20   anyway.
21             MR. WALKER:  Go ahead and mark it, just to
22   be complete.
23             MR. DARE:  As what, nine?
24             MR. WALKER:  Yeah, nine.
25             (Exhibit 9 marked for identification.)
```

SIGNATURE/NOT WAIVED


        (Whereupon, the above-entitled deposition was

concluded at 5:17 p.m.)

```
1                    CERTIFICATE OF DEPONENT

2      DEPONENT:  Bryan Bailey
       DATE:  January 8, 2025
3      CASE STYLE:  Parker, et al vs. Rankin Co., et al
       ORIGINAL TO:  Malik Shabazz, Esq.
4             I, the above-named deponent in the
       deposition taken in the herein styled and numbered
5      cause, certify that I have examined the deposition
       taken on the date above as to the correctness
6      thereof, and that after reading said pages, I find
       them to contain a full and true transcript of the
7      testimony as given by me.
              Subject to those corrections listed below,
8      if any, I find the transcript to be the correct
       testimony I gave at the aforestated time and place.
9      Page      Line                   Comments
       ____      ____     _____
10     ____      ____     _____
       ____      ____     _____
11     ____      ____     _____
       ____      ____     _____
12     ____      ____     _____
       ____      ____     _____
13     ____      ____     _____
       ____      ____     _____
14     ____      ____     _____
       ____      ____     _____
15     ____      ____     _____
       ____      ____     _____
16

17         This the ____ day of _____, 2025

18                              _____
                               Bryan Bailey
19
       State of Mississippi
20     County of _____

21         Subscribed and sworn to before me, this the
       _____ day of _____, 2025.
22

23     My Commission Expires:

24     _____        _____
                                     Notary Public
25
```

Brown Court Reporting, Inc. - (601) 832-4920

CERTIFICATE OF COURT REPORTER

I, Lori W. Busick, Court Reporter and Notary Public, in and for the State of Mississippi, hereby certify that the foregoing contains a true and correct transcript of the testimony of Bryan Bailey, as taken by me in the aforementioned matter at the time and place heretofore stated, as taken by stenotype and later reduced to typewritten form under my supervision by means of computer-aided transcription.

I further certify that under the authority vested in me by the State of Mississippi that the witness was placed under oath by me to truthfully answer all questions in the matter.

I further certify that, to the best of my knowledge, I am not in the employ of or related to any party in this matter and have no interest, monetary or otherwise, in the final outcome of this matter.

Witness my signature and seal this the 20th day of January, 2025.



_____
Lori W. Busick, CVR-S #7510, CCR #1677
My Commission Expires:
August 22, 2026