

IN THE UNITED STATES DISTRICT COURT FOR THE

SOUTHERN DISTRICT OF MISSISSIPPI

NORTHERN DIVISION


MICHAEL COREY JENKINS, et al.,

        Plaintiffs,

                      Civil Action

vs.                     No. 3:23-cv-374-DPJ-FKB

RANKIN COUNTY, MISSISSIPPI, et al.,

        Defendants.


DEPOSITION OF

STEVEN N. GODFREY


TAKEN ON
MONDAY, NOVEMBER 11, 2024
10:11 A.M.

578 HIGHLAND COLONY PARKWAY, SUITE 100
RIDGELAND, MISSISSIPPI 39157





(800) 528-3335 | NAEGELI DEPOSITION & TRIAL Established 1980 | NAEGELIUSA.COM

EXHIBIT 3

STEVEN N. GODFREY                November 11, 2024                        2
79776

```
 1                          APPEARANCES

 2

 3  Appearing on behalf of Plaintiffs:

 4  MALIK Z. SHABAZZ, ESQUIRE (Via Zoom)

 5  Shabazz Law Offices

 6  6305 Ivy Lane

 7  Suite 608

 8  Greenbelt, MD 20770

 9  (301) 513-5445

10  (301) 513-5447

11  attorney.shabazz@yahoo.com

12  -and-

13  TRENT WALKER, ESQUIRE

14  Walker Law Offices

15  5255 Keele Street

16  Suite A

17  Jackson, MS 39206

18  (601) 321-9540

19  (601) 398-3918 (Fax)

20  trent@trentwalkerlaw.com

21

22

23

24

25

26
```

STEVEN N. GODFREY                    November 11, 2024                           3
79776

```
 1                APPEARANCES (CONTINUED)

 2

 3    Appearing on behalf of Defendants:

 4    JASON E. DARE, ESQUIRE

 5    Biggs, Ingram and Solop, PLLC

 6    578 Highland Colony Parkway

 7    Suite 100

 8    Ridgeland, MS 39157

 9    (604) 987-5307

10    (604) 398-3918

11    jdare@bislawyers.com

12

13    ALSO PRESENT:

14    Tom Hazelhurst, NDT Technician

15

16

17

18

19

20

21

22

23

24

25

26
```

STEVEN N. GODFREY                    November 11, 2024                          4
79776

1                          EXAMINATION INDEX

2                                                    PAGE

3    EXAMINATION BY MR. SHABAZZ                        7

4    EXAMINATION BY MR. DARE                          142

5    FURTHER EXAMINATION BY MR. SHABAZZ               144

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

STEVEN N. GODFREY                November 11, 2024                          5
79776

```
 1                    EXHIBIT INDEX

 2    Plaintiff's Exhibit                    PAGE

 3      1    RESPONSES TO FIRST SET            49

 4           INTERROGATORIES

 5      2    ORGANIZATIONAL CHARTS             49

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26
```

1                        DEPOSITION OF

2                      STEVEN N. GODFREY

3                          TAKEN ON

4                  MONDAY, NOVEMBER 11, 2024

5                          10:11 A.M.

6

7             THE REPORTER:  So we are on record.  The

8    time now is 10:11 a.m., and Mr. Godfrey, may I get

9    you to raise your right hand, please?

10             MR. GODFREY:  Yes, ma'am.

11             THE REPORTER:  Do you affirm under penalty

12   of perjury that the testimony you're about to give

13   will be the truth, the whole truth and nothing but

14   the truth?

15             THE DEPONENT:  I do, ma'am.

16             THE REPORTER:  Thank you.  All right.

17   Will each attorney please state your name and whom

18   you represent for the record?

19             MR. SHABAZZ:  Okay.  My name is Attorney

20   Malik Shabazz, S-H-A-B-A-Z-Z, and I'm an attorney

21   for the Plaintiff in this matter.

22             MR. WALKER:  Trent Walker, attorney for

23   the Plaintiffs in this matter.

24             MR. DARE:  Jason Dare.  I am representing

25   Rankin County and Sheriff Bryan Bailey in this

STEVEN N. GODFREY                November 11, 2024                        10
79776

 1      A.   1975, after graduating for college, I went

 2  to work for the BIBB, B-I-B-B County Sheriff's

 3  Office in Macon, M-A-C-O-N, Georgia.  Of course, all

 4  hired as start in the jail, and you work your way

 5  through the dispatching into the road.

 6           I worked there from 1975 to 1981.  In

 7  1981, I applied to and was hired by the Georgia

 8  Bureau of Investigation as a special agent for them.

 9  I worked for them just under three years.  In 1984,

10  June 4th of 1984, I was sworn into the Federal

11  Bureau of Investigation as a special agent trainee.

12           I completed the FBI Academy, Quantico,

13  Virginia, and then was assigned to field work.  I

14  left the -- I left the FBI in 2010, May 31st of

15  2010, as I aged out at 57.  After that, worked as --

16  I did background investigations for the FBI on a

17  contract basis.  I also worked for the Mississippi

18  Bureau of Investigation for a period of 18 to 24

19  months on cold case homicides as a contract

20  investigator.  And then started working part-time at

21  --

22      Q.   Slow down for one second.  Slow down for

23  one second.

24      A.   Yes, sir.

25      Q.   Let's back up for a minute.

STEVEN N. GODFREY          November 11, 2024                    17
79776

1      Q.   Okay, at the MBI.  And then that brings us
2   up to Rankin County; is that correct?

3      A.   Yes.  Yes, sir.

4      Q.   Okay.  Now what were you -- what were you
5   recruited to do at Rankin County by Sheriff Bailey?

6      A.   I had run the SWAT team for the FBI, the
7   local office team.  I had -- was a tactical
8   instructor, a firearms instructor, things along
9   those lines.  So I was brought over to -- to one is
10  the SRT team, the Special Response Team.  I was
11  brought over to run the firearms program and
12  basically help with training and, of course, I
13  pretty much did anything he wanted me to do.

14          In fact, if somebody needed help on an
15  interview, I was glad to do that.  Pretty much just
16  anything they wanted me to do.

17     Q.   Okay, okay.  So you were brought in to do
18  SWAT, firearms and what positions -- how long did
19  you stay at Rankin County?

20     A.   Ten years.

21     Q.   How long did you --

22     A.   About at ten years, yes sir.

23     Q.   Okay.  So you left in -- you left in what
24  year?  When did you leave?

25     A.   Last November.

1    Q.   November of 2023?

2    A.   Yes, sir.

3    Q.   Okay.  That seems to be about 13 years; is

4  that correct?

5    A.   No, sir.  I didn't go to work immediately

6  for Rankin again.  I started at MBI, and I was doing

7  --

8    Q.   February 2012?

9    A.   About 2012, but at first I was part-time

10  over there.  So I wasn't -- that was not accruing

11  PERS time, retirement qualifications.

12         So what I did was after I left MBI and I

13  stopped doing Bibbs, because I got tired of fooling

14  with federal rules and regulations, I went out there

15  as a -- I was designated full-time less than 40

16  hours.  That I guess a PERS designator.  So I could

17  -- that qualified me for retirement credits so --

18    Q.   Okay.  When did you come to full time at

19  Rankin County?

20    A.   Sometimes in 2012 maybe, 2013.  I accrued

21  enough -- I think you have to have ten hours at --

22  nine or ten to retire from PERS.  And so that's --

23  as soon as I got the time.  You've got to contact

24  Personnel in Rankin, and they could tell you when I

25  -- all these different things.

 1      Q.    Okay.  Now so you said you came in to help

 2  with the SWAT Department?

 3      A.    The tactical team, yes sir.

 4      Q.    And with firearms?

 5      A.    Yes, sir.  Running the program.

 6      Q.    What other position did you hold in Rankin

 7  County?

 8      A.    I think if you're looking for a title,

 9  it's probably Training Director, which is kind of

10  misnomer.  I mean there's really -- there's no

11  Academy, so to speak.  There is a -- they have an

12  Academy there that's basically they run a program at

13  Rankin for -- reserve, reserve officer program.

14          I didn't participate in that.  That was

15  already up and running by other people there, so I

16  didn't get involved in it and I helped a little bit

17  on Internal Affairs investigations.  Not many, just

18  one.  They would occasionally ask me to look into

19  some allegation.

20      Q.    Okay.  So did you ever serve as an

21  Internal Affairs officer for Rankin County?

22      A.    Again, I would do some.  I wouldn't -- I

23  wouldn't say I was the Internal Affairs

24  investigator.  They really at the time didn't have

25  one.

STEVEN N. GODFREY                November 11, 2024                          20
79776

1        Q.    They did not have one?

2        A.    To the best of my recollection.

3        Q.    They did not have an internal

4   investigation department -- Rankin did not have an

5   Internal Affairs Department during the time of your

6   tenure in Rankin, is that right?

7        A.    Not a department, no sir.  Nobody assigned

8   full-time to that position, no.

9        Q.    Okay.  So and -- and so just -- when were

10  you able to participate in certain investigations?

11       A.    When I asked to by the Sheriff.

12       Q.    Okay.  And when were those occasions?

13       A.    Once again you asked this.  It's over ten

14  years, and it's been a while.  I've worked several,

15  and most of them were just the Sheriff would say can

16  you look into this.  There's been an allegation of

17  this.  Can you look into it?  I would do a short

18  investigation, put some interviews together and I

19  would get the package back to the Sheriff.

20       Q.    Okay.  So is it fair to say that your

21  assignment was not formal in that regard but --

22       A.    Yeah, yeah.  That was probably be a good

23  statement.  Not formal, but I was asked to do them

24  on occasion.

25       Q.    Okay.  And do you recall the

STEVEN N. GODFREY              November 11, 2024                    21
79776

1    investigations that you did participate in?

2         A.   A few.

3         Q.   Do you recall those investigations?

4         A.   Sir?

5         Q.   Do you recall those investigations?

6         A.   A few of them.  You would have to ask me

7    specifics.  Generally, I remember one I did on a

8    correctional officer who was accused of having sex

9    with a trustee one time, and another one --

10        Q.   Do you remember that officer's name?

11        A.   No.  That was when I first started there.

12   That was probably back in about 2012.  He was a

13   sergeant in the jail is all I can tell you.

14        Q.   Do you remember the deputy's name?

15        A.   It was a sergeant in the jail.  That's all

16   I can tell you.

17        Q.   Okay.  And about how many, just because it

18   doesn't seem to be that many --

19        A.   Right.

20        Q.   But in your career, how many

21   investigations did you participate in?

22        A.   Eight, ten.  Some of them were just quick,

23   you know, turnaround things --

24        Q.   Okay.  Okay.  I'm sorry.

25        A.   No, that's fine.

1      Q.    Okay.  They were -- do you have

2  documentation that reflects your investigations?

3      A.    Not after, no sir.  I didn't keep anything

4  when I left.

5      Q.    Okay.  And did you participate in

6  producing documents and records of the

7  investigations that you did participate in?

8      A.    I would prepare a packet and give it back

9  to the Sheriff, yes.  It would mostly be -- it will

10  just be results of the interviews or anything else

11  that was involved.  Again, maybe eight, ten the

12  whole time I was there.

13      Q.    Okay.  And you did -- you did have written

14  documentation for those eight to ten investigations

15  you did?

16      A.    That would be hard to say.  Again, I gave

17  everything back to the Sheriff.

18            MR. DARE:  If I may, I think you are

19  asking if this witness personally has any, is that

20  right?

21            MR. SHABAZZ:  No, sir.

22            MR. DARE:  I want to make sure that the

23  record was clear.  Can you ask that question again,

24  counsel?

25  BY MR. SHABAZZ:

STEVEN N. GODFREY                 November 11, 2024                              23
79776

1      Q.   Okay.  I'm just asking did he produce

2  documentation in reference to the eight to ten

3  investigations that he says he participated in?

4      A.   Again, eight to ten is WAG.  I did on

5  occasion, yes sir, if I thought it was necessary.

6      Q.   Okay.

7      A.   I'll give you a good example if I wouldn't

8  prepare a document, okay?  The Sheriff would come

9  and say this person called and said this deputy did

10 something.  Was ugly to them on the road, cursed at

11 or whatever.

12         If I called the person and they didn't

13 return my call, didn't answer my call or decided

14 they wanted to pursue it, didn't want to come in and

15 make full statement or anything like that, I would

16 just go back to the Sheriff and say they wouldn't

17 come in and make a statement type thing.

18     Q.   Okay.  So you wouldn't -- you wouldn't --

19 would you write anything formal when that happened?

20     A.   No.  Generally not, no.  Again, it was an

21 informal thing.  I was not assigned as the Internal

22 Affairs investigation.  There was no standard

23 operating procedure that I knew of how to handle an

24 Internal Affairs investigation.  I just tried to

25 find out what went on and let the Sheriff know.

STEVEN N. GODFREY                    November 11, 2024                    24
79776

 1      Q.    Okay.  So did Rankin County in the times -
 2  - in your tenure, did Rankin County have written
 3  procedures for internal investigations?
 4      A.    I'm sure there is one in the SOP, but it's
 5  just general.  I couldn't quote it.
 6      Q.    Okay.  Okay.  Now you said that your --
 7  that you at time to time did internal
 8  investigations; correct?
 9      A.    Yes, sir.  Yes, sir.
10      Q.    Okay.  Was there an Internal Affairs
11  officer during your tenure?
12      A.    I still don't think there's one full-time.
13  I think there's a guy that's assigned to do them now
14  in the Investigative Division.  A lot of times what
15  would happen is a complaint would come -- again
16  speculation, would come in, an allegation against a
17  patrol deputy that was rude to a person.
18          That would just be passed to the Chief of
19  Patrol, who would handle it.  It would be passed to
20  the chief investigator to handle, those type of
21  things.
22      Q.    Okay.  Now you -- you left -- when you
23  left Rankin County, why did you leave Rankin County?
24      A.    I had enough time to retire.  It was time.
25  I'm 70 years old --

STEVEN N. GODFREY                November 11, 2024                25
79776

1      Q.    Okay.

2      A.    It isn't what it used to be.

3      Q.    Okay.  You're familiar with the case of

4  Michael Jenkins and Eddie Parker; is that correct?

5      A.    Is this the shooting?  Yes, sir.  Yes,

6  sir.

7      Q.    Okay.  Did you participate in that

8  investigation?

9      A.    No, sir.

10     Q.    Okay.

11     A.    I did take the Garrity statements.  I took

12 Garrity statements from each of them at the request

13 of counsel and the Sheriff.

14     Q.    Okay.  Can you describe what that is?

15     A.    A Garrity statement?

16     Q.    Yes.  Can you describe what that is?

17     A.    It's when you interview -- you interview

18 the deputy and ask him what happened.

19     Q.    Okay.  So you did interview each deputy in

20 the -- in the Michael Jenkins/Eddie Parker matter?

21     A.    Yes, sir.

22     Q.    Okay.  When did you -- when did you

23 interview them?

24     A.    A week later, maybe.

25          MR. DARE:  And you can only testify as to

1  what you specifically recall.

2          THE DEPONENT:  Yeah.  Maybe a week later,

3  five days later.

4  BY MR. SHABAZZ:

5      Q.   Okay.  And --

6      A.   I don't happen to know, sir.

7      Q.   Well, that's okay.  But did you produce --

8      A.   Yes, sir.

9      Q.   -- okay.  Did you produce records in

10 regards to your investigation?

11     A.   The interviews, yes sir.

12     Q.   Your interviews?

13     A.   Yes, sir.

14     Q.   Okay.  And Rankin County's in possession

15 of those, those records; is that correct?

16     A.   I have no idea.  I would assume they

17 would.

18     Q.   Okay.  So exactly what did you do with

19 those deputies?

20     A.   Did I do with the deputies?

21     Q.   Yeah.  When you --

22     A.   Nothing.  I had them come in, interviewed

23 them, gave the results to the Sheriff.

24     Q.   Gave the results to Sheriff Bailey.  Okay.

25 And you said maybe about a week or so after?

STEVEN N. GODFREY                    November 11, 2024                    27
79776

1        A.   That's a guess again.  That's been several

2   years ago now, and I don't particularly remember.

3        Q.   Okay.  But were you asked to -- did you

4   reach any findings or conclusions or make any

5   recommendations based on your interview?

6        A.   No, sir.  Not my job.

7        Q.   Okay.  Now when you were SWAT commander,

8   you say you were a SWAT commander?

9        A.   Yes, sir.  I was the overall commander,

10  team leader, whatever you want to call it for the

11  SRT team, yes sir.

12       Q.   Okay.  What year was that?

13       A.   From the time I started til the time I

14  left.

15       Q.   Okay.  So your entire tenure you were a

16  SWAT commander?

17       A.   Yes, sir.

18       Q.   Okay.  Now were any of the deputies that

19  were involved in the Michael Jenkins matter --

20       A.   Yes, sir.

21       Q.   I'm specifically speaking of Christian

22  Dedmon, Lieutenant Middleton.

23       A.   Yes, sir.

24       Q.   Brett McAlpin?

25       A.   No.  He was not on the team.  He was on

1 the team to begin with, but he stepped off the team

2 when he became Chief Investigator.

3     Q.   Okay.  I'm going to ask you about each of

4 them and their involvement with the SWAT team.

5     A.   Yes, sir.

6     Q.   Okay.  Okay.  Well, let's just go down.

7 Was Dedmon a member of the SWAT team while you were

8 the commander?

9     A.   Yes, sir.

10     Q.   And was Middleton -- was Middleton a

11 member of the SWAT team while you were commander?

12     A.   Yes, sir.

13     Q.   Okay.  Do you recall the years for those

14 two, when they were SWAT team members?

15     A.   Middleton, I think, was on the team when I

16 got there.  Dedmon was not.  Dedmon tried out for

17 the team

18 after I was there, when he came over from Pearl.

19     Q.   Okay.  He tried out for the team.  About

20 what year was that?

21     A.   Anything I would tell you would be a

22 guess, sir.

23     Q.   That's okay.  I'm asking for your

24 recollection.

25          MR. DARE:  I would only say don't

STEVEN N. GODFREY                    November 11, 2024                    29
79776

1  speculate.

2         THE DEPONENT:  Five years after I started,

3  six years.  I don't know when he came from Pearl.

4  BY MR. SHABAZZ:

5     **Q.   Okay.  Mr. McAlpin, was he a member of the**

6  **SWAT team?**

7     A.   He was -- yes sir, he was there.  He was

8  on the team when I got there.

9     **Q.   Okay.  And how long did he serve on the**

10 **SWAT team, McAlpin?**

11    A.   I think he stepped off when he became

12 Chief Investigator.

13    **Q.   What year was that?**

14    A.   I don't know, sir.

15    **Q.   Approximately.**

16    A.   Three years before.  When did I leave?

17 This is `20.  Maybe four years ago.

18    **Q.   Roughly around 2019?**

19    A.   I guess.  Again sir, I can't answer that

20 specifically.

21    **Q.   That's okay.**

22    A.   I understand.

23    **Q.   That's okay.**

24    A.   I understand.

25    **Q.   We're putting some approximations here.**

1   Okay.  So McAlpin served on the SWAT team up til

2   about 2019; correct?

3        A.   Possibly, yes sir.

4        Q.   Okay.  And what about Deputy Opdyke?

5        A.   Yes, sir.  He was on.  He'd only been on a

6   couple of years, I think.

7        Q.   A couple of years?

8        A.   He was one of the newest members of the

9   team, yes sir.

10       Q.   When you arrived?

11       A.   No, sir.  Before I left.

12       Q.   When you left?

13       A.   Yes, sir.

14       Q.   Okay.  Okay.  Well, what about Hunter

15   Elward?

16       A.   He was there.  He was also on the team,

17   yes sir.

18       Q.   He was a member of the SWAT team?

19       A.   Yes, sir.

20       Q.   And what years was he a member?

21       A.   It would be about a year longer than

22   Opdyke, I think.  Maybe two.

23       Q.   So, okay.  Maybe roughly around 2019-2020?

24       A.   I guess.  This is all -- should be all in

25   their personnel files.

1    Q.   Okay.  I think you said Dedmon had to --
2    did you say he had to qualify for the SWAT team?
3    A.   Had to try out.  Yes, sir.  Anybody that
4    comes in and wants to be on the team had to go
5    through a tryout.  Unless you're on another team
6    that has the same standard operating procedures and
7    have been to the same schools that Rankin County
8    sends their guys to.
9    Q.   Okay.  And so did -- were you -- were you
10   the person that determined the qualifications of the
11   deputy to join the SWAT team?
12   A.   We had come up -- basically, we had -- the
13   basic PT test was adopted from the one the FBI uses,
14   and then they do a few other things.  Some team-
15   building exercises, some firearms, check their
16   firearms score, check their team-building skills,
17   and then the decision will be made mostly by the
18   whole team.
19   Q.   Okay.  Well, what was the PT test?
20   A.   So you have to be outstanding.  It's a --
21   consists of a mile and a half run, a 40 yard spring
22   with body armor carrying a weapon, a certain amount
23   of pullups wearing body armor, a shuttle run, and
24   that was about it.
25   Q.   Okay.  Okay.  In terms of what other

STEVEN N. GODFREY                    November 11, 2024                    32
79776

1   qualifications --

2        A.   They certainly had to pass the firearms,

3   firearms scores.

4        Q.   Okay.  What else?

5        A.   That was pretty much it to be -- to be

6   going to the interview and pass the interview that

7   was run by the whole team.

8        Q.   Okay.  And you were -- were you the person

9   to determine whether they joined the SWAT team?

10       A.   No, sir.  I certainly had a -- I had a say

11  in it, but it was a team decision.

12       Q.   Okay.  Who was that team?

13       A.   The whole team.

14       Q.   Okay.  Which was?  Which --

15       A.   The whole team.

16       Q.   Okay.  Who was the whole team?

17       A.   Whoever was on the team at that time when

18  they tried out.  Because consistent --

19       Q.   Was Sheriff Bailey a part of that team?

20  Was Sheriff Bailey a part of that team?

21       A.   No.

22       Q.   Okay.  So who would -- who would typically

23  be a part of that team?

24       A.   I'm trying to answer.  It would be the SRT

25  team.  The whole team would come out for the

STEVEN N. GODFREY                November 11, 2024                        38
79776

1  investigating allegations against SWAT team members?

2            MR. DARE:  I'm going to object to the

3  form, but you can answer if you know.

4            THE DEPONENT:  No, sir.  I don't ever

5  remember us being investigated.  If it was an

6  officer-involved shooting, MBI came in and worked

7  it.

8  BY MR. SHABAZZ:

9       Q.   Okay.  But I'm saying other -- other,

10 other allegations.

11      A.   You have to talk to the Sheriff, sir.

12      Q.   Okay.  And so what was the Sheriff's role

13 in supervising the SWAT team?

14      A.   On a day-to-day basis?  Not much.  I

15 generally handle the day-to-day workings of anything

16 that the SRT team did.  Of course, on any kind of

17 emergency callout, the Sheriff was generally on

18 scene commander.  He is the Sheriff.

19      Q.   Okay.  So now on a day-to-day basis, how

20 often -- how often did you all report to Sheriff

21 Bailey on the actions of the SWAT team?

22      A.   I'm not really clear.

23      Q.   How often did you meet with Sheriff Bailey

24 in terms of the actions of the SWAT unit?

25      A.   Not many times at all.  I mean again, it's

1  a small -- the Sheriff would know if we've been out.

2  We would go in now and tell him what had happened or

3  something along those lines.  The team was not that

4  active.

5      **Q.   Hold one second.  Now you said the Sheriff**

6  **would know --**

7          MR. DARE:  He was in the middle of

8  responding to your earlier question.  If you can

9  allow him to finish to your question, and then ask

10  your next one.  Were you through?

11          THE DEPONENT:  Yes.

12          MR. SHABAZZ:  Go ahead.

13          THE DEPONENT:  Just ask the next question,

14  counsel.  Let me -- let me rift off here just a

15  minute.  The SRT team mostly was for high risk

16  situations, any kind of hostage situation, any kind

17  of barricade situation, fugitives, searches, stuff

18  along those lines, emergency situations.

19          The team was not active on a day-to-day

20  basis.  It was not a full-time entity.  The

21  assignment to the SRT was not a full-time position.

22  It was an ancillary duty.  We may go out -- some

23  months we didn't do anything.  Some months we may

24  have two or three callouts.

25  BY MR. SHABAZZ:

1     Q.   Okay.  So you had an average of about two

2     or three callouts per month?

3          A.   Maybe.  We could go several months, excuse

4     me just a minute.  Can I get a glass or a bottle of

5     water?

6               MR. DARE:  Yeah.

7               THE DEPONENT:  Can I step away?

8               MR. DARE:  Let's go off the record real

9     quick.

10              THE REPORTER:  We're off record.  The time

11    now is 10:50.

12              (WHEREUPON, a recess was taken.)

13              THE REPORTER:  The time is 10:53, and

14    we're back on record.

15    BY MR. SHABAZZ:

16         Q.   Okay.  Did you say FOAC before?

17         A.   Yes.

18         Q.   Okay.  Did you tell -- what is FOAC?

19         A.   It's called FOAC.  It's Field Office

20    Administration and Communication.  It was how to do

21    Bureau paperwork.  The Bureau has a very rigid --

22    back in my day, it had a very rigid standard.

23              You had -- you had yellow copies and blue

24    copies and green copies, and you had to know the

25    flow of information.  And so that was -- and that

1  was actually one of the tougher things that we

2  studied, because it was so foreign to anything I'd

3  ever seen before.

4        Q.   Okay.  So it is a -- is it fair to say

5  that in your law enforcement career, that you were -

6  - you were not trained as an Internal Affairs

7  investigator?

8        A.   That would be very correct, sir.

9        Q.   Okay.  Now did you -- are you familiar

10  with the case of Damien Cameron?

11       A.   Not by name.  If you could give me a

12  little detail.

13       Q.   In 2021, Damien Cameron was involved in an

14  incident with Hunter Elward and --

15       A.   I know what you're talking about.

16       Q.   Okay.  Did you investigate that case?

17       A.   No, sir.

18       Q.   Did you have any role in that case at all,

19  in reviewing that?

20       A.   No, sir.  No, sir.

21       Q.   Did Bryan Bailey review any of those -- of

22  that case with you?

23       A.   You'd have to ask Bryan Bailey.

24       Q.   Okay.

25       A.   I have no idea.

STEVEN N. GODFREY                November 11, 2024                      42
79776

1      Q.   Okay.  So I mean if in fact Bryan Bailey

2   said that you had some role in investigating that

3   case, what would your response be?

4      A.   I'd have to see the paperwork or you'd

5   have to enlighten me on it as to what I did, because

6   I do not remember it.

7      Q.   You don't recall being involved in that

8   case; correct?

9      A.   No sir, I do not.

10     Q.   And what -- okay.  Do you recall the

11  Pierre Woods matter?  Do you recall Pierre Woods?

12     A.   No, sir.

13     Q.   Okay.  Now, okay.  You're not familiar

14  with the Pierre Woods matter?

15     A.   No, sir.  If you could give me some

16  details, I might remember an incident.  I don't

17  remember names.

18     Q.   I think the SWAT team -- from my

19  understanding, the SWAT team was involved in Pierre

20  Woods' case, and Pierre Woods was shot and killed?

21     A.   In Pelahatchie?  Yeah.  Yes, sir.  I was

22  on scene.

23     Q.   You were on the scene in that case?

24     A.   Yes, sir.

25     Q.   Okay.  And did you participate in -- what

1  was your role in the -- in the investigation of what

2  happened in that matter?

3        A.   Did not run anything on the investigation,

4  sir.  It was a OIS.  It was investigated by the

5  Mississippi Bureau of Investigation.

6        Q.   Okay.  One second.

7        A.   Yes, sir.

8        Q.   Okay.  Now in terms of your knowledge, how

9  did -- how did Rankin County review the internal

10 actions of its officers, to ensure that the

11 Constitution and Rankin County Department policy

12 were being followed?  How did Rankin County -- well,

13 how did they go about that?

14       A.   The Sheriff handled everything.  If he had

15 you do something he wanted to do, he told you.

16       Q.   Okay.  So you're saying that the Sheriff

17 handled all reviews of the internal actions of the

18 officers --

19            MR. DARE:  Objection.

20            MR. SHABAZZ:  -- to see whether or not

21 they were involved or compliant with the

22 Constitution?

23            MR. DARE:  Object to form.  That's not

24 what he said.

25 BY MR. SHABAZZ:

STEVEN N. GODFREY                November 11, 2024                        44
79776

1      Q.   Okay.  Well, explain that to me again, so
2  I can understand.  How did -- how did Rankin County
3  review the internal actions of its officers, to
4  assure that the Constitution and department policy
5  was being followed?
6      A.   I can't answer that question.
7      Q.   Okay.  But you said -- you can't answer
8  it?
9      A.   I didn't say I wouldn't.  I said I can't.
10  I don't know what the policy was, how it was
11  handled, that Rankin County handled it.
12      Q.   Okay.  Well, how did Bryan Bailey handle
13  it?
14      A.   You'd have to ask Bryan Bailey.
15      Q.   But just -- previously, you just said that
16  Bryan Bailey, Bryan Bailey handled all of that?
17      A.   He is the Sheriff, sir.  He supervises the
18  whole department.  If the Sheriff told me to do
19  something, I did it.  If he told someone else to do
20  something, I assume they did it.
21      Q.   Okay.  So if a deputy was accused of
22  beating a citizen, how did the Sheriff's Department
23  handle that matter?
24      A.   I was never asked to interview -- conduct
25  any investigation into the beating of anyone that I

STEVEN N. GODFREY                November 11, 2024                           45
79776

1  can recall.  So I can't tell you what was done.

2  Again, most of the time it was passed to the Chief

3  Investigator or the Chief Deputy in charge of Patrol

4  or anything along those lines.

5      **Q.   Okay.  But there was nothing formal?  You**

6  **don't have a -- was there a formal procedure in**

7  **place?**

8      A.   Not that I know of, sir.

9      **Q.   Okay.  So pretty much you're saying that**

10  **whatever Sheriff Bailey said what happened, that's**

11  **what would happen?  Is that what you're saying?**

12      A.   Yes.  He is the Sheriff.

13      **Q.   Okay.  Now when you said that -- what was**

14  **the role of the special investigator?**

15      A.   I'm not -- I'm not familiar with that term

16  "special investigator."

17          MR. WALKER:  Do you mean "Chief

18  Investigator"?

19          THE DEPONENT:  Chief Investigator?

20  BY MR. SHABAZZ:

21      **Q.   Let me look at my chart.  Yeah.  What was**

22  **the -- I'm sorry, strike that.  What was the role of**

23  **the Chief Investigator?**

24      A.   He supervised investigations and the

25  investigators.

STEVEN N. GODFREY                November 11, 2024                          55
79776

1  putting him on the team roster.  I mean I don't

2  really --

3      **Q.    Okay.**

4      A.    We did not have a separate file for SRT

5  members.  It was they had their personnel file.

6      **Q.    Okay.  I'm talking about them being**

7  **accepted on SRT.  Being accepted on SRT by the team**

8  **you described, and did this team keep any records or**

9  **notes of the people they admitted to the SRT team?**

10     A.    No, no, no.

11     **Q.    No records were kept?**

12     A.    No

13     **Q.    Okay.  In terms of Michael Jenkins and**

14  **Eddie Parker, what was your purpose of interviewing**

15  **officers involved?**

16     A.    I was told by the Sheriff and counsel to

17  conduct a Garrity interview.

18     **Q.    Okay.  And did you reach any findings or**

19  **conclusions from your interview?**

20     A.    Conducted the interview, wrote down their

21  statement, provided it to the Sheriff.

22     **Q.    And did you -- did you compile any other**

23  **reports as to your views or opinions about what had**

24  **happened?**

25     A.    No, sir.  I wasn't asked to do opinions or

STEVEN N. GODFREY                November 11, 2024                        56
79776

1  anything along those lines.

2      Q.   Are you -- are you saying that you took --

3  you took the reports on it?

4      A.   Not the report.  Their statement.

5      Q.   You took their statement only and made a

6  report?

7      A.   I took their statement, compiled them and

8  gave them to the Sheriff or to you.  I don't -- I

9  mean I passed them on to the Sheriff or the counsel.

10 I don't remember exactly.

11     Q.   Okay.  Do you know -- were you the first -

12 - were you the first official in Rankin to interview

13 these deputies?

14     A.   Not to my knowledge.

15     Q.   Okay.  Who was the first?

16     A.   I don't know, sir.  Again, I was not

17 involved in the investigation.

18     Q.   Okay.  Well, you just -- you stated that

19 you -- you interviewed the officers?

20     A.   Yes, sir.

21     Q.   As part of the -- as part of the

22 investigation?

23     A.   I conducted a Garrity interview with each

24 individual deputy.  I did not --

25     Q.   That is -- that is part of the

1  investigation, isn't it?

2      A.  If you'd like to call it that, yes sir.

3      Q.  Okay.  And you say you were not the first

4  to interview them?

5      A.  I don't know if I was.  I don't think so.

6  I would imagine the people who were on the scene

7  that night interviewed them.

8      Q.  Okay.  And you made no reports to Sheriff

9  Bailey on your assessment of these interviews that

10  you did?

11      A.  I did not provide an assessment.  I took

12  their statement and provided a statement for the

13  Sheriff.

14      Q.  Okay.  Then --

15      A.  I was not asked what I thought.

16      Q.  All right, okay.  I understand.  All

17  right.  Let me show you what's been marked as

18  Plaintiff's Exhibit 1.  I'm going to put it up on

19  the screen and --

20      A.  Is this the lawsuit?

21      Q.  This is the interrogatories provided by

22  Defendant in this lawsuit.

23      A.  Yes, I see it.

24      Q.  Okay.  Can you -- I want you to -- can you

25  turn your attention to page number eight of what we

STEVEN N. GODFREY            November 11, 2024                    64
79776

```
 1        Q.   Well, why would you assume that?

 2        A.   Most departments have them.

 3        Q.   Did Rankin have one?

 4             MR. DARE:  Asked and answered.

 5  BY MR. SHABAZZ:

 6        Q.   Okay.  Okay.  Indulge me for a second.

 7        A.   Yes, sir.

 8        Q.   Okay.  You said that you were -- you

 9  supervised training at Rankin during your roughly

10  decade-long tenure; is that correct?

11        A.   Yes.  You could say that, yes sir.

12        Q.   Okay.  Could you -- could you describe

13  your -- your duties and responsibilities in general,

14  outside of SRT, your training responsibilities

15  internally?

16        A.   Mostly maintain the training records.

17        Q.   Okay.  You just maintained the records?

18        A.   Yes, sir.

19        Q.   Okay.  Did you -- did you conduct the

20  training?

21        A.   Firearms or something like that.  Maybe we

22  would have something small like that, yes sir.  But

23  I never -- I never was -- never participated in any

24  department-wide instruction as an instructor.

25        Q.   Okay.  When you began, who was in -- who
```

1  actually did the training?  Who was in charge of the

2  training when you came on in Rankin?

3      A.    Who's the guy that's -- the counsel.

4            MR. DARE:  I can't give you answers.

5  You've got to testify --

6            THE DEPONENT:  Okay.  There was a guy who

7  was an off -- in-house counsel.  He kind of ran the

8  training program then too.  I'm just drawing a blank

9  now.  I'm sorry.  At 71, I have a little trouble --

10 BY MR. SHABAZZ:

11     Q.    So what now?  Tell me that -- tell me that

12 again?

13     A.    When I started there, the in-house counsel

14 also ran the training program.

15     Q.    You're talking about an attorney?

16     A.    Yes, sir.  That would be in-house counsel.

17     Q.    Okay.  Who would that be?

18            MR. DARE:  If you don't recall the name

19 just --

20            THE DEPONENT:  I don't.  I mean I know it.

21 I just can't bring it up right now.

22 BY MR. SHABAZZ:

23     Q.    Okay.  In-house counsel or lawyer ran the

24 Rankin training up until when?

25     A.    Til he left.  Well, no.  Kind of after I

1  got there and got my feet on the ground, kind of --

2  I was in charge of training.  Six months maybe, a

3  year maybe.

4        Q.   Okay.  And but you don't recall his name?

5        A.   It will come to me, and in fact I'll

6  probably interrupt you in a minute when it pops into

7  my brain.

8        Q.   Okay.  That's fine.  We can come back to

9  it.  Okay.  So after that person, who was in charge

10  of the training?

11        A.   I was nominally in charge of it.

12        Q.   Okay.  For how long?

13        A.   Until I left.

14        Q.   And so you were in charge of the training

15  of the officers, of all of the Rankin deputies for

16  your -- from when that in-house counsel left up to

17  the end of your tenure?

18        A.   I think I said that.

19        Q.   Okay.  Now a moment ago, you said that --

20  that you were reviewing.  That means that you

21  participated in the firearms aspect of the training?

22        A.   Well, I ran the firearms program.  Yes,

23  sir.

24        Q.   Okay.  But now when you say that you were

25  in charge of the training for your entire tenure,

STEVEN N. GODFREY                November 11, 2024                    67
79776

1  could you give me a further description on your

2  duties and responsibilities there?

3          MR. DARE:  Object to form.  You can

4  answer.

5  BY MR. SHABAZZ:

6      Q.   What were your duties -- I'll repeat it.

7  What were your duties and responsibilities as the

8  training officer?

9      A.   I kind of kept up with the records, and

10 that was about it.

11     Q.   Okay.  But who conducted the trainings?

12     A.   What kind of training are you talking

13 about?  I mean that's -- that's a -- that runs a

14 wide gamut.  We sent people outside the department.

15 The last couple of years I was there, we contracted

16 with the Virtual Academy, which is a private entity,

17 to provide online training.

18          If they needed DUI training, they went to

19 any academy that was offering such.  A lot of

20 training offers would be sent through me.  I would

21 get in an email this course is being offered, that

22 course is being offered, and I would send it out to

23 the department.  Anyone interested, please let me

24 know.

25          But generally, the Sheriff or the

1   Undersheriff made the decision who would go.  I was

2   mostly just a conduit for that.

3        **Q.   Okay.  And what training -- other than the**

4   **firearm training, what trainings did the deputies in**

5   **Rankin receive?**

6        A.   Again, if you wanted to go to a training.

7   If you as an individual deputy, if you were

8   interested in something and you heard about or saw a

9   course being offered, they might ask me to go to

10  something.  They may go to the Sheriff and ask.

11  They may go to the Undersheriff and ask, and it

12  would be approved and they would be sent to the

13  training.

14       **Q.   Okay.  What about specifically for**

15  **excessive force training?**

16       A.   I think they had --

17       **Q.   Emphasis on excessive force.**

18       A.   I don't remember.  I know I never put on

19  any kind of in-house personally training on

20  excessive force.  They covered that in basic, I'm

21  assuming, and I think Jeff Artis came in and put on

22  a Color of Law school once.

23       **Q.   Okay.**

24       A.   Again, this -- I kept records, sir.  I

25  didn't set up most of the training.

STEVEN N. GODFREY                November 11, 2024                        114
79776

```
 1        Q.    Anyone else?

 2        A.    No.  That would just be speculation on my

 3   part.

 4        Q.    Okay.  Did the Department of Justice --

 5   did the Department of Justice interview you in

 6   regards to the operations of the Rankin County

 7   Sheriff's Department?

 8        A.    This is the first deposition or interview

 9   I have been involved in concerning the Rankin County

10   Sheriff's Office.

11        Q.    Okay.  Now in January 2023, you were --

12   you said you were over training.  Does that mean you

13   were over the Training Division?

14        A.    There is no division, sir.  It was me.

15        Q.    Okay.  So you were the one man in charge

16   of all training?

17        A.    Again, I maintained the records.

18        Q.    You maintained the records.  Now in terms

19   of the -- I just want to get clear.  In terms of

20   excessive force, was there a specific training

21   mandate for the deputies to be trained on -- on the

22   proper use of force?

23        A.    We asked them to take a couple of course

24   on Virtual Academy, and I don't remember any one

25   particularly named excessive force.  But there were
```

1  some involving civil rights and stuff along those

2  lines.

3       Q.   Did you -- you asked them to take this

4  course?

5       A.   They were assigned to take the course, yes

6  sir.

7       Q.   Every deputy?

8       A.   Yes, sir.

9       Q.   Okay.  What was that training about?

10      A.   I'm sorry.  What was that?

11      Q.   What was the name of that training you

12  were --

13      A.   I can't -- I can't recall the specific

14  name of it right now.  I have to look at the Virtual

15  Academy roll sheet.

16      Q.   And what was the --

17      A.   They should be able to provide that.  They

18  should be able to provide that to you.

19      Q.   Okay.  What was the description?  Help me

20  out with the description of the training.

21      A.   Sir, I don't remember.  That's four years

22  ago, close to four years ago, three years ago.

23      Q.   Okay.  Other than that, any other specific

24  trainings that were -- that were mandated by Rankin

25  County that deal with the use of force?

1  -- he would do a download from their taser, attach

2  the download data to the use of force report.

3      **Q.   Okay.  Who was responsible for determining**

4  **-- determining whether those tasers had been used**

5  **appropriately?**

6      A.   I would assume it would be Chief of Patrol

7  and in counsel with the Undersheriff and the

8  Sheriff.

9      **Q.   The Undersheriff and the Sheriff were**

10  **responsible for determining whether that taser had**

11  **been used correctly?**

12      A.   Ultimately, it's always the Sheriff's

13  decision.  I don't really know who's included.  I

14  mean he may ask two or three people.  I don't know.

15      **Q.   But ultimately, that rests on the -- it**

16  **comes to the Sheriff; correct?**

17      A.   He is the Sheriff.

18      **Q.   Ultimately then, the Sheriff would receive**

19  **these taser reports?**

20      A.   I'm assuming.

21      **Q.   Okay.  And what about firearm use?  Whose**

22  **responsibility was it to determine whether a firearm**

23  **had been used appropriately?**

24      A.   Again, that would additionally be the

25  Sheriff.

STEVEN N. GODFREY                November 11, 2024                          125
79776

1      Q.   Okay.  Okay.  So like for example in the
2  case of Mr. Schmidt, where it's a fact that the
3  firearm was discharged in the course of interactions
4  with Mr. Allen Schmidt.  Would Bryan Bailey be
5  notified that that firearm had been used?

6            MR. DARE:  Object to form.

7            THE DEPONENT:  I don't --

8            MR. SHABAZZ:  Would Bryan Bailey know that
9  a deputy had used that -- discharged his firearm as
10 in the case of Mr. Schmidt?

11           MR. DARE:  My objection was just that it
12 was a fact that it had been discharged.  But I mean
13 if you know, you can answer.

14           THE DEPONENT:  From what I can deduct, I
15 don't think it was ever reported as a discharge, was
16 it?

17 BY MR. SHABAZZ:

18     Q.   I'm asking you.

19     A.   I'm telling you.  I don't think it was
20 ever reported.

21     Q.   Okay.  Well, you say that all discharges
22 are reported; correct?

23     A.   They're supposed to be.

24     Q.   Okay.  Well, what is the system to -- to
25 know whether or not a deputy has discharged their

1  firearm?  Is there a system in place?

2      A.   I don't know how you would do that, unless

3  you counted their ammo every day when they went on

4  shift, and counted it every day when they went off

5  shift, and then check their car and see if they had

6  extra ammo every day.  You kind of have to trust

7  your people.

8      Q.   Okay.  So what are you saying?  You're

9  saying that -- what are you saying when you say

10  that?

11      A.   I don't -- I don't know if any department

12  that has the ability to do that.

13      Q.   Okay.  But you said that -- did you say

14  that Sheriff Bailey would be aware of all firearm

15  discharges?

16      A.   If they are reported.

17      Q.   Okay.  Indulge me one second.  And a gun

18  discharge, does a gun discharge constitute the use

19  of force?

20      A.   Not necessarily.

21      Q.   Okay.  Can you explain that?  Why wouldn't

22  it?

23      A.   If you're at home playing with your

24  firearm and you shoot your television, that's not a

25  use of force.

STEVEN N. GODFREY                November 11, 2024                          127
79776

 1      Q.   Well, I'm talking about in the line of
 2 duty.  Discharge of firearm in the line of duty.  Is
 3 that considered the use of force?
 4      A.   It certainly should be.
 5      Q.   Okay.  And did Rankin County have in place
 6 any policies or procedures that monitored the use of
 7 -- I mean the discharge of firearms?
 8      A.   You were supposed to report that, but if
 9 it wasn't reported, you had no way of knowing.  And
10 again, I don't know how you would know.
11      Q.   Okay.  So that would be no?
12      A.   That would be an "I don't know."
13      Q.   Okay.  All right.  I need five minutes,
14 and then I'm going to finish up.  Give me five
15 minutes.  I'll come right back, we'll finish it up.
16           THE REPORTER:  Okay.  We're off the
17 record.  The time now is 1:04 p.m.
18           (WHEREUPON, a recess was taken.)
19           THE REPORTER:  We're back on record.  The
20 time now is 1:16 p.m.
21 BY MR. SHABAZZ:
22      Q.   Okay.  Mr. Godfrey, at the time of the
23 Michael Jenkins incident, you're familiar with the
24 term "chain of command"; correct?
25      A.   Yes, sir.

STEVEN N. GODFREY                November 11, 2024                        142
79776

1      Q.   We're talking about Rankin.  There is no

2  system in place?

3      A.   No.

4           THE REPORTER:  I need to remind you two to

5  please speak one at a time, so I can record more

6  clearly.

7           MR. SHABAZZ:  Okay.  All right.  All

8  right.  I have no further questions.

9           THE DEPONENT:  Excellent.

10 EXAMINATION

11 BY MR. DARE:

12     Q.   I have just a handful of follow-ups.

13 Earlier in your deposition, you made reference to a

14 DT training.  What does the DT stand for?

15     A.   Defensive tactics.

16     Q.   And what generally is a defensive tactics

17 training?

18     A.   It's depending on what style your

19 particular officer chooses, it could be a Gracie

20 jujitsu style, it could be just some standard

21 handcuffing techniques.  Generally, what it starts

22 as, the basic handcuffing techniques.  It will

23 expand to taser use.  It could expand to use of

24 baton, less than lethal force, grappling techniques.

25 It could be one of a number of different things.

STEVEN N. GODFREY                November 11, 2024                        143
79776

1        Q.   Based on your knowledge of training
2    requirements on or prior to January of 2023, what
3    did the state require of Sheriff's Department
4    deputies as far as annual training, the state of
5    Mississippi?
6        A.   None.
7        Q.   You were also asked about investigations
8    into the Damien Cameron incident.  Did I understand
9    you correctly that you don't recall investigations
10   by the name of the individual, is that right?
11       A.   Now is that the investigation with Elward?
12       Q.   So I'm going to represent to you that
13   Damien Cameron was the individual who was
14   unconscious in the back of Hunter Elward's vehicle.
15       A.   Yeah.  I know what you're talking about.
16       Q.   And later died in a -- in a hospital.
17       A.   Right.
18       Q.   Did you ever interview Hunter Elward
19   following the Damien Cameron incident?
20       A.   Officially, no.
21       Q.   Did you speak with him about the incident?
22       A.   Yes.  I asked him what happened one time.
23   In general, any time somebody was involved in any
24   kind of altercation, I would ask them what happened
25   just for knowledge.  Perhaps there's a chance to add

1  into future training or seek proper training out.

2      Q.   I think you testified to this, and I want

3  to make sure.  Now OIS is what?

4      A.   Officer-involved shooting.

5      Q.   And during your time at the Rankin County

6  Sheriff's Department, how were OISs investigated, if

7  the OIS occurred -- if a deputy with the Rankin

8  County Sheriff's Department was involved in the OIS?

9      A.   When I first got there, I remember the

10 first one or two I think were probably investigated

11 internally.  And after that, they started assigning

12 them to MBI.  And I -- I can't give you a specific

13 date or time that MBI started doing.

14         There were -- when I first got there, they

15 were very rare.  They were very rare when I first

16 started there, because I remember the first one

17 after I started there.  It had been the first one

18 they'd had in years.

19     Q.   To your knowledge, was it a requirement

20 that MBI investigate OISs for Sheriff's Departments?

21     A.   Not to my knowledge.  I don't know.

22         MR. DARE:  Tender the witness back to you,

23 counsel.

24 FURTHER EXAMINATION

25 BY MR. SHABAZZ:

STEVEN N. GODFREY              November 11, 2024                    145
79776

1     Q.   Okay.  So you were not the Internal

2  Affairs officer for Rankin County at the -- at any

3  time, Internal Affairs officer for Rankin County at

4  any time?

5     A.   We didn't have Internal Affairs officer

6  when I was there.

7     Q.   Oh.  And you weren't the person

8  responsible for investigating allegations of -- of

9  violations of department policy by the deputies in

10  Rankin, were you?

11     A.   Not unless the Sheriff asked me to look

12  into a particular matter.

13     Q.   Okay.  And that occurred rarely?  I mean

14  just on sporadic occasions?

15     A.   It was pretty rare, yes sir.

16     Q.   Okay.  Did you -- just on investigations,

17  did you investigate the use of force at the

18  Sheriff's Office?  Did you investigate the use of

19  force by a gentleman by the name of Christopher

20  Mack, who in 2021 claims that he was beaten in the

21  jail by Rankin deputies?  Early and either between

22  January and May of 2021?  Christopher Mack claimed

23  he was beaten by a deputy at Rankin Jail.  Are you

24  familiar with that?

25          MR. DARE:  I'm going to object to the --

CERTIFICATE

         I, Nicole Smith, do hereby certify that I
reported all proceedings adduced in the foregoing
matter and that the foregoing transcript pages
constitutes a full, true and accurate record of said
proceedings to the best of my ability.

         I further certify that I am neither
related to counsel or any party to the proceedings
nor have any interest in the outcome of the
proceedings.

         IN WITNESS HEREOF, I have hereunto set my
hand this 15th day of November, 2024.


                    Nicole Smith