1

1          IN THE UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF MISSISSIPPI
2                     NORTHERN DIVISION

3    MICHAEL COREY JENKINS, et al.              PLAINTIFFS

4    VS.                        CAUSE NO. 3:23-cv-374-DPJ-ASH

5    RANKIN COUNTY, MISSISSIPPI, et al.          DEFENDANTS

6

7          ****************************************
8             DEPOSITION OF EDDIE TERRELL PARKER
9          ****************************************
10

11

12                    Taken at offices of
              Trent Walker, Counselor at Law, PLLC,
13                5255 Keele Street, Suite A,
                      Jackson, Mississippi,
14              on Friday, February 24, 2025,
              beginning at approximately 11:05 a.m.
15

16

17

18

19

20         ****************************************
21                  CATHY M. WHITE, CCR
22            Certified Court Reporter #1309
                      Notary Public
23

24

25

2

1                    A P P E A R A N C E S

2

3    TRENT L. WALKER, ESQUIRE
     Trent@Trentwalkerlaw.com
4    Trent L. Walker, Counselor at Law, PLLC
     5255 Keele Street, Suite A
5    Jackson, Mississippi  39206
     601.321.9540
6
              COUNSEL FOR PLAINTIFFS
7

8    JASON E. DARE, ESQUIRE
     jdare@bislawyers.com
9    Biggs, Ingram & Solop
     Post Office Box 14028
10   Jackson, Mississippi  39236-4028
     601.987.5307
11
              COUNSEL FOR DEFENDANTS
12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                              INDEX

2

   Style  . . . . . . . . . . . . . . . . . . .   1

3

   Appearances  . . . . . . . . . . . . . . . .   2

4

   Index  . . . . . . . . . . . . . . . . . . .   3

5

   Eddie Terrell Parker

6

      BY MR. DARE . . . . . . . . . . . . . . .   4

7

      BY MR. WALKER . . . . . . . . . . . . . .  82

8

      FURTHER BY MR. DARE . . . . . . . . . . .  90

9

   Certificate of Court Reporter  . . . . . . .  93

10

   Certificate of Deponent  . . . . . . . . . .  94

11

12

13

14                          EXHIBIT INDEX

15                                                MAR
   Exhibit

16   1       Amended Complaint (not attached)       11

17   2       1/24/23 Statements and incident reports
             (not attached)                         65

18

     3       Incident reports of various dates

19           (not attached)                         72

20

21

22

23

24

25

Eddie Parker - February 24, 2025

4

```
 1              EDDIE TERRELL PARKER,
 2   having been duly sworn, was examined and testified as
 3   follows:
 4                    EXAMINATION
 5   BY MR. DARE:
 6       Q.  Can you state your full name for the record,
 7   please, sir?
 8       A.  Eddie Terrell Parker.
 9       Q.  Mr. Parker, my name is Jason Dare.  I am
10   representing Sheriff Brian Bailey in a lawsuit that
11   you and Michael Jenkins filed, and we're going to
12   discuss some of the facts about that here today.  Have
13   you ever given a deposition before?
14       A.  No, sir.
15       Q.  I'll walk you through a few ground rules, and
16   you'll hear a lot from your counsel and from me on
17   some of these issues.  You notice that we don't have a
18   judge here, we don't have a jury here, but we've got a
19   court reporter, and she's taking down everything that
20   you say and everything that I say.
21       A.  Okay.
22       Q.  So when I'm asking a question, wait until I
23   finish asking before you start answering.
24       A.  Okay.
25       Q.  So that the court reporter can get everything
```

Eddie Parker - February 24, 2025

12

1    even through today's date, made or been paid any

2    amount of money as a result of the incident that

3    occurred on January 24 of 2023?

4         A.  No, sir.

5              MR. WALKER:  For my edification, when you say

6         "paid any amount of money," you mean made in

7         settlement or what exactly?

8              MR. DARE:  Any amount of money for any

9         reason.

10             MR. WALKER:  You can answer.

11        A.  No.

12    BY MR. DARE:

13        Q.  You've given statements about the incident to

14    several news media -- news outlets.  Right?

15        A.  Yes, sir.

16        Q.  In fact, some of these were done out of

17    state.  Right?

18        A.  Uh-huh.

19        Q.  "Yes"?

20        A.  Yes.  My bad.

21        Q.  Where all have you been to provide statements

22    about this incident?

23        A.  Places or states?

24        Q.  States will be fine.

25        A.  Washington, D.C., was the only one.

Eddie Parker - February 24, 2025

13

1      Q.   Who did you give a statement to when you went

2  up to Washington, D.C.?

3      A.   CNN.  You know what I'm saying?  Was there

4  another one?  There's another one.  I can't remember

5  the name of it.  I can't recall that one.  It was one

6  more.  State of the Nation, something like that.  I

7  can't remember the exact name.

8      Q.   Somebody else, though?

9      A.   Yeah, it was another one.

10      Q.   How long did you stay up in D.C.?

11      A.   I would say maybe a little over a month.

12      Q.   Where did you stay when you were up in D.C.?

13      A.   We stayed in -- I think it was a house that

14  was owned by Mr. Shabazz.

15      Q.   How did you get up to D.C.?

16      A.   A plane ticket was provided.

17      Q.   By who?

18      A.   I think it was maybe donation.  And they were

19  coming in from -- I don't know where, you know.  I

20  just know it was donations, you know, bought it for

21  us, so we took it and pretty much used it for, I

22  guess, safety reasons, yeah.

23      Q.   When you were up there, did you have spending

24  cash?

25      A.   We didn't really need anything as far as

Eddie Parker - February 24, 2025

14

1   spending.  You know, everything that was -- that we

2   had was provided as far as food and all.  But we

3   didn't -- we didn't really need any spending.  We

4   didn't need to go anywhere to spend.

5        Q.  Your food, was the house that you were

6   staying in, was that fully stocked with all the food

7   that you wanted?

8        A.  Yes, sir.  Yes, sir.

9        Q.  And so to your knowledge, Mr. Shabazz

10  provided you with the food for staying up there?

11       A.  Yes, sir.

12       Q.  Did he also provide you clothes or things to

13  wear, shoes, anything else?

14       A.  We took all that with us.

15       Q.  From Mississippi?

16       A.  Yes, sir.

17       Q.  Yes.  Do you remember the address of the

18  house where you stayed?

19       A.  The road was Sheriff Road.  I can't remember

20  the numbers.

21       Q.  Sheriff?

22       A.  (Witness nods head up and down.)

23       Q.  S-H-E-R-I-F-F?

24       A.  Yes, sir.

25       Q.  Road?

Eddie Parker - February 24, 2025

15

```
 1        A.   Yes.

 2        Q.   What was the city?

 3        A.   All I know is Washington, D.C.  We were

 4   maybe, I want to say, 15, 20 minutes from our state's

 5   Capitol -- or our nation's Capitol.

 6        Q.   Did Mr. Shabazz also get y'all a car, a

 7   vehicle to ride around in?

 8        A.   We did Uber while we was there.

 9        Q.   Did you ever have to pay for the Uber?

10        A.   No, sir.

11        Q.   Mr. Shabazz paid for all that?

12        A.   Everything was provided through donations.

13        Q.   The house was provided through donations?

14        A.   I'm not sure.

15        Q.   How do you know that, as you say, everything

16   was provided for by donations?

17        A.   That was -- it was the thing -- that what he

18   was telling us, you know, we have --

19             MR. WALKER:  Anything that was discussed

20        between you and any of your attorneys does not

21        have to be disclosed under the attorney-client

22        privilege.

23             MR. DARE:  Correct.

24   BY MR. DARE:

25        Q.   So continue your answer, but without you
```

Eddie Parker - February 24, 2025

16

1    including anything that Mr. Shabazz or Mr. Walker told

2    you.

3        A.   Just going on, you know, as far as what we,

4    you know, knew, I mean, where we have, you know,

5    people that were donating, you know, to us, so we was

6    under that impression, you know, where these -- you

7    know, it was given to us.  I mean, hey, we don't -- we

8    didn't do anything more than what we, I guess, planned

9    on doing, mainly going for safety, so we didn't need

10   anything more than that.

11       Q.   Did you know who those donors were?

12       A.   No, sir.  I have a laundry list online that

13   they kept, you know, whenever they donate.  We didn't

14   ever go, you know, through it and just, you know,

15   single out and, you know, look at all of them.

16       Q.   But you do have a list available of those

17   donors?

18       A.   Well, the internet has a list, you know.

19           MR. WALKER:  Let me break in.  There was, at

20           one point in time after the incident, there was a

21           GoFundMe that was set up in particular because

22           Michael had an extensive amount of medicals that

23           were expected, and so that is what he's referring

24           to.

25           MR. DARE:  And I'm just trying to get what

Eddie Parker - February 24, 2025

17

1          Mr. Parker knows.

2               MR. WALKER:  Sure.

3               MR. DARE:  Actually, and for the record,

4          Rankin County paid for Michael's medicals.  But we

5          can get into that later.

6     BY MR. DARE:

7          Q.  According to your knowledge, where did this

8     money come from?

9          A.  It was, like I said, everything was online,

10    GoFundMe.  That's what -- you know, that's what we

11    saw.

12         Q.  Did you set up the GoFundMe?

13         A.  No.  No, sir.

14         Q.  Who set it up, to your knowledge?

15         A.  I'm not -- I'm not sure on that.

16         Q.  Would you -- if you went up there and had to

17    stay in D.C. and you had to pay for it out of your own

18    pocket with the food, the Ubers, and everything else

19    that you got out of it, do you think that would -- the

20    value of that would exceed $1,500?

21              MR. WALKER:  Object to the form of the

22         question.

23              You can answer if you know.

24         A.  If I didn't -- I can't tell you because I

25    didn't keep up with the number.  I didn't have any

18

1  receipts.  I didn't have any, you know, card or

2  anything to -- I guess I was glad everything was done,

3  you know, through the way it was done.  So we had

4  someone taking care of that.  We didn't really have

5  any, you know, money, and I guess I wasn't really

6  paying.

7  BY MR. DARE:

8      Q.  From your understanding, the person taking

9  care of that was Mr. Shabazz?

10     A.  Well, someone he, you know, had or head of

11 that, I don't know.  But it was just, you know, we

12 were following, you know, his advice on, you know, a

13 lot of things.  So I can't say it was provided, you

14 know, out of his pocket at all.

15     Q.  You've got Exhibit 1 before you, and I'm

16 going to start out with paragraph 16 of your Amended

17 Complaint.  A lot of these initial paragraphs talk

18 about what the deputies did before arriving at 135

19 Conerly Road.  Do you have any personal firsthand

20 knowledge of what the deputies were doing and the text

21 messages they sent prior to arriving at 135 Conerly?

22     A.  No, I do not.

23     Q.  What had you been doing that day prior to the

24 deputies' arrival?

25     A.  Mainly what I did every day, clean, cleaning.

21

1       A.  No, sir.

2       Q.  Do you know his name?

3       A.  No, sir.

4       Q.  Was there a lot of crime that happened at 135

5   Conerly while you were staying there?

6           MR. WALKER:  Object to the form.

7           You can answer if you know.

8   BY MR. DARE:

9       Q.  If you know.

10      A.  No.

11      Q.  I've seen, in some of the records, that

12  Michael Jenkins had a vehicle broken into at 135

13  Conerly at one point.

14      A.  I'm not sure.

15      Q.  Did you know anything about that?

16      A.  No, sir.

17      Q.  Did y'all ever have parties at 135 Conerly

18  when Kristi wasn't there?

19      A.  No.

20      Q.  Were there ever drugs being used at 135

21  Conerly that you saw?

22      A.  Yes.

23      Q.  How often would that happen?

24      A.  Not as often as -- I can think -- it wasn't

25  very often.

Eddie Parker - February 24, 2025

22

1      Q.   What day of the week was January 24th, 2023?

2      A.   I want to say it was a Wednesday, Thursday.

3      Q.   Were you friends with Michael Jenkins before

4  this incident?

5      A.   Yes, sir.

6      Q.   Do you know why he was over at the house that

7  afternoon?

8      A.   He was there working with a guy that rented a

9  room out there.

10      Q.   What was that guy's name?

11      A.   John.  I can't remember his last name.

12      Q.   And John had been renting a room out, you

13  said?

14      A.   Yes.

15      Q.   Now, and recall I had asked you earlier about

16  everybody who lived there on January 24 of '23.  Was

17  John living there at that time?

18      A.   Yes.

19      Q.   Was there anybody else beside you, Kristi,

20  and John living there?

21      A.   No.

22      Q.   Do you know where John is today?

23      A.   No.

24      Q.   So John had been at 135 Conerly earlier in

25  the day with Michael Jenkins?

39

```
 1        A.  Yes, sir.
 2        Q.  And this was before any of the milk, or
 3   alcohol, or anything else.  Right?
 4        A.  Yes.
 5        Q.  Now, after the dildo, were you still sitting
 6   on the couch area?
 7        A.  Yes, sir, for a moment.
 8        Q.  And the deputies were asking you what as they
 9   were doing these acts?
10        A.  They asked what were we doing there, why are
11   we, you know, why are we over there, why are we -- are
12   we supposed to be there, whatever, you know, why
13   y'all -- why you got jugs around and all this over
14   here.  It was just, you know, coming from here to here
15   to here.  You know what I'm saying?  Like, you know,
16   they're trying to answer, just -- it was kind of
17   kamikaze there.
18        Q.  And did you have any drugs in the house on
19   that day?
20        A.  No, sir.
21        Q.  Have you ever done drugs in that house?
22        A.  Yes, sir.
23        Q.  But you just didn't have any that day?
24        A.  No, sir.
25        Q.  When they were pouring milk and alcohol, were
```

57

1           And, "Brother, they shot me.  They shot me."

2           When they come back in, they picked -- got me

3     up.  You know, they went over and checked on him.

4     They said, "He's bleeding fast.  He's bleeding fast."

5           They got me up, took me out, took me through

6     the kitchen, through the laundry room, out the back

7     door on the, you know, the carport, took me around the

8     house back around to the front, put me in the second

9     police truck that was parked there by the carport.

10    Q.   Okay.

11    A.   Because it was like the carport and the

12    grass.  One was pulled in the grass and the other one

13    was right behind it.  So right behind it facing

14    Kristi's door, I could see, you know -- like, couldn't

15    see Michael's face or anything, but I could see him,

16    his body, you know, through the crack.  And I was

17    sitting in the truck looking at him on the floor.  And

18    when I went out, I think it was like three of them, so

19    I want to say Brett McAlpin, Middleton, and I don't

20    know who else, were back in the huddle, you know,

21    talking and, you know, I guess what they were trying

22    to come up with, whatever they were coming up with.

23          And then one of them walked me around.  I

24    can't remember who exactly, which one it was, walked

25    me around and put me in the truck.  After that, it was

Eddie Parker - February 24, 2025

58

1   more I was like sitting out there watching it, you

2   know, seeing them all go through the house and they

3   had the flashlights on, see them all just going

4   through the house.  And it was raining and all, so I

5   couldn't really hear anything, you know.  And so I was

6   just basically sitting there watching shadows and

7   light and all, you know.

8        And that's when McAlpin come out and got me

9   out and started going over with me what he wanted me

10  to say.

11       Q.   Okay.  What did he tell you exactly?

12       A.   He came out.  He said, "What happened?  I

13  wasn't here."

14       I'm like, "You just saw him shoot him.  You

15  know they shot at him."

16       He said, "I wasn't here."  You know, I didn't

17  understand.  I'm looking at him like...

18       So I kind of, you know, got the gist without

19  him telling me, you know, say this, say that, he

20  wasn't there.  He was there.  He came and he let

21  Michael got shot, and then he come back, and I didn't

22  see anything, I was being walked out while, you know,

23  when the gunshot went off, so my vision was blocked,

24  so I don't know.  You know what I'm saying?  If

25  Michael, you know, tried to go in or what.  I don't

59

1    know.  I just know, you know, I was being walked out.

2    I didn't see anything.  All I heard was a gunshot.

3            MR. WALKER:  Just so I'm not confused, the

4        last part of what you just said, is that what

5        happened or is that what you were told to say?

6            MR. DARE:  Counsel, you can clarify it.

7            MR. WALKER:  Okay, yeah.  To clarify, is that

8        what happened or --

9            MR. DARE:  Well, no.  I mean, you can ask

10       questions when it's your turn to ask questions.

11           MR. WALKER:  Okay.  Fine.

12           THE WITNESS:  That's what I was coerced to

13       say.

14   BY MR. DARE:

15       Q.  Do you remember him, McAlpin, telling you to

16   say anything else?

17       A.  Only thing he said was he wasn't there.

18       Q.  And he was telling you to lie about what

19   happened before anybody else got there.  Right?

20       A.  Yes.

21       Q.  He was telling you to lie to the Sheriff, to

22   other investigators, to everybody else.  Is that

23   right?

24           MR. WALKER:  Object to the form.

25           You can answer if you know.

60

1        A.  That was the --

2   BY MR. DARE:

3        Q.  Yeah.

4        A.  He didn't tell me who to lie to or who to

5   tell.

6        Q.  Everybody.

7        A.  Yes, everybody, whoever asked.

8        Q.  Right.

9        A.  Yes.

10        Q.  And, in fact, I think the next day, you were

11   sat down and you talked with somebody from MBI.

12   Right?

13        A.  Yes.

14        Q.  You had an interview about this incident?

15        A.  Yes.

16        Q.  And you did, in fact, lie during that

17   interview?

18        A.  Yes.  Yes.

19        Q.  Even though you knew that that was a crime to

20   lie during that interview?

21            MR. WALKER:  Object to the form.

22            You can answer.

23   BY MR. DARE:

24        Q.  And I'm not faulting you for it.  You were

25   told to lie?

Eddie Parker - February 24, 2025

61

1      A.  Yes.

2      Q.  And you did?

3      A.  Yes.

4      Q.  And, well, I guess, did you know, prior to

5  all of these deputies being arrested and incarcerated

6  for lying about it, did you know that it was a crime

7  to lie to investigators about it?

8      A.  Under certain circumstances, my knowledge

9  was, I tell them what they want me to tell them, I'm

10  not lying.

11      Q.  If you tell the investigators what McAlpin

12  wanted you to tell them, then you weren't lying?  It

13  was still lying.

14      A.  It would be lying for McAlpin.

15      Q.  Right.  You were lying for McAlpin?

16      A.  (Witness nods head up and down.)

17      Q.  Is that right?

18      A.  Yes.

19      Q.  And you didn't stay in jail very long, did

20  you?

21      A.  No, sir.

22      Q.  In fact, Sheriff Bailey released you the very

23  next day, did he not?

24      A.  Yes, sir.

25      Q.  Did you talk with Sheriff Bailey at all that

62

1  night of the incident?

2      A.  No, sir.

3      Q.  And did you talk with Sheriff Bailey at all

4  since that incident?

5      A.  No, sir.

6      Q.  Have you ever spoken with Sheriff Bailey?

7      A.  Yes.

8      Q.  Before all this?

9      A.  Yes.

10     Q.  All right.  Was that when you were in jail?

11     A.  Yes.

12     Q.  And Sheriff Bailey would come around.

13  There's been some testimony about him bringing

14  presents to folks around Christmas.  I think he also

15  brought turkeys around Thanksgiving.  Is that when you

16  were talking with him?

17         MR. WALKER:  Object to form.

18         You can answer if you know.

19     A.  I don't remember no turkeys, but he brought

20  us a bag from -- yes, I guess from the jail.

21  BY MR. DARE:

22     Q.  Were you ever a trustee over there?

23     A.  No, sir.

24     Q.  Did you ever get together through any of

25  Brother Aubrey's classes, the Christian Ministry

63

1   classes?

2       A.  As far as that went, I did the Bible studies

3   and I got baptized again, so that's as far as I went

4   with the ministry, yes, sir.

5       Q.  Did you ever take any of the GED classes

6   or -- like, you already had your high school.

7       A.  Yes, sir.

8       Q.  Did you ever get to take any of the college

9   classes?

10      A.  No, sir.

11      Q.  So as far as your conversations with Sheriff

12  Bailey, all those were positive.  Right?

13      A.  Yes, sir.

14          MR. WALKER:  Object to the form.

15          You can answer.

16      A.  More of, "Hi, how you doing," that sort of

17  context.  It wasn't -- it wasn't an elaborate, you

18  know, just catching up or anything, you know.

19  BY MR. DARE:

20      Q.  Right.

21      A.  It was just a, "Hey, how you doing," told him

22  my name.

23      Q.  You had some pictures taken after you got out

24  of jail.  I think they were of your back.

25      A.  Yes, sir.

64

1        Q.   What was that showing?

2        A.   Where I got hit in the back with the board,

3    and where I was tased and they pulled the prongs out,

4    whatever those are.

5        Q.   And did you have any other lasting effects

6    from the alcohol, or the milk, or the grease, or --

7    and the Tasers, anything else?

8             MR. WALKER:   Object to the form.

9    BY MR. DARE:

10       Q.   You can answer it.

11       A.   I mean, as far as where the prongs went in,

12   they kind of -- you know, they had a little irritation

13   to it.

14       Q.   On your back?

15       A.   Yes, sir.

16       Q.   Okay.  How long did that last?

17       A.   Maybe two, three days.

18       Q.   Anything else?

19       A.   I'm scared to drink milk to this day.

20       Q.   Don't like milk?

21       A.   Huh-uh.  I don't drink alcohol.  I quit

22   drinking alcohol before that, you know, but I -- it

23   made me not even want to touch it even more.

24       Q.   Did McAlpin or any of the other deputies give

25   you any other cover-up story to give to investigators?

65

```
 1        A.   No.
 2        Q.   Did you ever see them take down the video
 3   cameras from the front?
 4        A.   No, they didn't take down the camera.
 5        Q.   Okay.  So they never took any of those down?
 6        A.   They didn't mess with the cameras.  Only the
 7   modem is what the -- where it recorded.
 8        Q.   Did you see them do that?
 9        A.   No, sir.
10        Q.   You just heard about it afterwards?
11        A.   When I made it back home, I saw it was gone.
12        Q.   You know it was there beforehand?
13        A.   Positive.
14        Q.   In earlier depositions in this matter, I'll
15   represent to you that both Sheriff Bailey and
16   Christian Dedmon testified they didn't know what the
17   Good Squad was before this.  Had you ever heard of
18   Goon Squad before this?
19        A.   No, sir.
20             MR. DARE:  Let's go off the record.
21             (Recess.)
22             (Exhibit No. 2 marked.)
23   BY MR. DARE:
24        Q.   Mr. Parker, I've had marked as Exhibit 2 to
25   your deposition certain statements and incident
```

66

1    reports that were turned over to the Rankin County

2    Sheriff's Department after this January 24, 2023,

3    incident.  These are the incident report from

4    Christian Dedmon, which is RC0248; Hunter Elward's

5    incident report, RC0249; Brett McAlpin's incident,

6    report RC0250; Daniel Opdyke's incident report,

7    RC0251; and next, the last couple of supplements, and

8    then Lieutenant Middleton's supplement, which is

9    RC0252.  I had this marked when we were off the record

10   and gave you the opportunity to read through those.

11        A.  Uh-huh.

12        Q.  Have you had a chance to look over each of

13   those?

14        A.  Yes.

15        Q.  Is there anything truthful about anything in

16   Exhibit 2 to your deposition or are all of these

17   incident reports and supplements false?

18        A.  All of them are false.

19        Q.  Except for maybe the date that all of this

20   happened?

21        A.  The date, the names and the papers is the

22   only thing that's real about this.

23        Q.  Right.

24        A.  Yes.

25        Q.  Now, after meeting with MBI, did you also

 1    meet with agents from the FBI?

 2         A.  No, sir.

 3         Q.  So the only time that you've ever given an

 4    interview to anyone with either FBI or MBI was that

 5    day after the incident.  Correct?

 6         A.  Correct.

 7              MR. WALKER:  Excuse us.

 8              Back on.

 9    BY MR. DARE:

10         Q.  And during the prosecution of these six

11    officers, five of whom were from Rankin County, did

12    you assist the U.S. Attorney's Office with the

13    prosecution at any point in time?

14         A.  I wasn't questioned by them, so I mean, as I

15    say, wasn't anything more than what the -- I mean, I

16    can't remember if I -- I don't remember being, like,

17    asked any questions as far as interrogation by them.

18         Q.  You didn't provide any set of -- you didn't

19    provide the true statement of facts to anybody with

20    the state or federal government as part -- as part of

21    the initial investigation or anything up to

22    sentencing?

23         A.  No, sir.

24         Q.  And the only time that you provided a

25    statement about anything was when it was leading into

68

1    sentencing and they had already pled guilty.  Is that

2    right?

3        A.  Yes, I would say.  I think it was.

4        Q.  And did you know --

5            MR. WALKER:  Hold on.  Let's go off the

6        record for a second.

7            MR. DARE:  He can only -- he's got to testify

8        about what he knows and what he doesn't know.

9            THE WITNESS:  Like, well, okay.  What I'm

10       going to try to understand is -- okay.  If you're

11       asking me was I questioned by any attorney from

12       the U.S. office --

13           MR. WALKER:  U.S. Attorney?

14           THE WITNESS:  -- U.S. Attorney's Office, I

15       mean, I wasn't interrogated.  I wasn't sat down

16       and talked to no more than what I did with MBI.

17       MBI was the only thing that I was -- I talked

18       with, you know, before the FBI come and did the

19       search of the property, you know.  They come and

20       did a search.  I didn't talk to anybody from the

21       FBI as far as about what happened, or they didn't

22       ask me any questions about anything.  They just

23       told me what they found and gave me, you know, a

24       paper to sign.  Other than that, they wasn't -- we

25       didn't go anywhere with the Attorney General and

69

1          sat down and talked with them about it or anything

2          like that.

3      BY MR. DARE:

4          Q.   That's what I was asking.

5          A.   Yeah, yeah, yeah.  So the only thing, you

6      know, was from MBI.

7          Q.   And were you aware that Sheriff Bailey was

8      the one that called in MBI to investigate the

9      incident?

10         A.   No, sir.

11         Q.   MBI was already there and investigating by

12     the time that you got out and had gotten back to the

13     house.  Correct?

14         A.   Before I left the house.

15         Q.   They were already there and investigating

16     before you even left the house?

17         A.   Yes.  MBI came maybe around -- I want to say

18     around 2:00 that morning.  And, see, I was questioned.

19     Then he told me he would be back -- he would be in to

20     see me that morning when I was in jail to requestion

21     me with a recorder, yes.

22         Q.   So he actually questioned you when you were

23     sitting in the back of Opdyke's vehicle?

24         A.   Yes, sir.  I got out of the vehicle.

25         Q.   And "he" being the MBI agent?

1      A.  Yes.

2      Q.  You stepped out?

3      A.  Yes, sir.

4      Q.  But you gave him the exact same statement

5  that McAlpin had told you to say that night.  Right?

6      A.  Well, what McAlpin had coerced me to say.

7      Q.  Right.

8      A.  Yeah.

9      Q.  Demanded that you say.

10      A.  Yeah.

11      Q.  However you want to put it.

12      A.  He didn't give me any words.  He just, you

13  know, coerced me pretty much.

14      Q.  Sure.  How did you first meet Malik Shabazz?

15      A.  I met Malik Shabazz through a phone call

16  through me and Michael's dad.  He told me he had an

17  attorney he wanted me to talk to about, you know, the

18  case.

19      Q.  Michael's dad did?

20      A.  Yes.

21      Q.  Did you know Mr. Shabazz or anything about

22  what he did prior to that phone call?

23      A.  I never knew the man existed.

24      Q.  When you were living at 135 Conerly, how much

25  was your rent?

1    getting that.  I'm not getting anything.  I guess they

2    was thinking -- a lot of people were thinking that we

3    had already gotten a check or gotten paid, you know,

4    from Rankin County or -- how, I don't know.  But I

5    mean, when you sit back and talk, you know, with them

6    now, you know, that's what it was.  There's envy now.

7    You know, it was not a problem -- you know, I call her

8    and she talk to me all the time.  So I mean, it's like

9    it just happened, used to it happened, you know.  It

10   was just another day and a different time.

11       Q.   You've got Exhibit 3 still?  All right.  So

12   flipping back RC-338 and 339.  Remember when you get

13   booked in over at the jail and they ask you about all

14   these questions and --

15       A.   Uh-huh.

16       Q.   -- see what's going on with you.  And then

17   you actually sign it on the back.  Right?  On 338,

18   that's your signature?

19       A.   Uh-huh.

20       Q.   "Yes"?

21       A.   Yes, sir.

22       Q.   And it asks, "Does inmate have any visible

23   signs of trauma, illness, obvious pain or bleeding

24   requiring immediate medical attention?"  The answer

25   was "yes," and said that you had a small cut on your

Eddie Parker - February 24, 2025

78

1    head.  Do you see that?

2         A.   Yes.

3         Q.   Is that all correct?

4         A.   Yes, I had a small cut on my head.

5         Q.   But nothing else was disclosed.  And

6    understand, I'm not saying it didn't happen.  Nothing

7    else was disclosed at that time that it happened.

8    Right?

9         A.   I mean, the marks and stuff on my back, but I

10   mean, it wasn't -- didn't need medical attention.

11        Q.   And were you trying to keep that hidden from

12   the folks at the jail because of what Brett McAlpin

13   had told you?

14        A.   No.  It was noticed upon my entrance into

15   the back of the jail, before I passed the nurse's

16   office.  You know, when I was changing out, that's

17   when he was -- the guy asked me if I wanted to see the

18   nurse, you know, and I told him yeah, I will, just in

19   case.  And it was all told, it was all, you know,

20   noticed, you know, by eye, by vision, you know.

21        Q.   Okay.  So they noticed that you had some

22   marks on your back?

23        A.   Yeah.  I told them I had the, you know,

24   marks, and they -- they saw my face all disheveled and

25   all.

Eddie Parker - February 24, 2025

79

1        Q.   And what did they give you?

2        A.   Nothing.  I mean, she may have wrapped it or

3    put a bandage on it or somehow, I can't remember.  I

4    mean, nothing that she could have gave me to, I guess

5    make it a -- relieve anything.

6        Q.   Did you need any other medical attention?

7        A.   Not really, no more than what I -- I couldn't

8    feel, you know, that night, but I mean, the next

9    morning was more just soreness, you know.  I wasn't --

10   don't think anything was broken where I couldn't

11   function, I guess.

12       Q.   You've sued Sheriff Bailey in this lawsuit,

13   but you said you only talked to him a handful of times

14   and that's when he was bringing gifts to the jail.  Is

15   that right?

16       A.   One time.

17       Q.   One time?

18       A.   (Witness nods head up and down.)

19       Q.   Do you wish that you had told Sheriff Bailey

20   or MBI or anybody else the truth earlier on?

21           MR. WALKER:  Object to the form of the

22       question.

23           You can answer.

24       A.   I wish I had a chance to privately, you know,

25   have a talk with him about what had went on, yeah.

1                 CERTIFICATE OF COURT REPORTER

2             I, Catherine M. White, CSR, and Notary Public

3   in and for the County of Rankin, State of Mississippi,

4   hereby certify that the foregoing pages, and including

5   this page, contain a true and correct transcript of

6   the testimony of the witness, as taken by me at the

7   time and place heretofore stated, and later reduced to

8   typewritten form by computer-aided transcription under

9   my supervision and to the best of my skill and

10  ability.

11            I further certify that I placed the witness

12  under oath to truthfully answer the questions in this

13  matter under the power vested in me by the State of

14  Mississippi.  I further certify that I am not in the

15  employ of or related to any counsel or party in this

16  matter, and have no interest, monetary or otherwise,

17  in the final outcome of the proceedings.

18            Witness my signature and seal this the 10th

19  day of March, 2025.

20            _____

21            CATHERINE M. WHITE, CSR No. 1309

22  My Commission Expires:
    February 1, 2026

23

24

25