UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


MICHAEL COREY JENKINS, ET AL            PLAINTIFFS


V.                          CAUSE NO. 3:23-CV-374-DPJ-ASH


RANKIN COUNTY, MISSISSIPPI, ET AL            DEFENDANTS


**********************************************************

DEPOSITION OF ALAN JACKSON SCHMIDT

Taken at the offices of Rankin County Sheriff's
Department, 221 North Timber Street, Brandon,
Mississippi, on Wednesday, February 12, 2025, beginning
at approximately 9:16 a.m.

**********************************************************

APPEARANCES:

      TRENT WALKER, ESQUIRE
      Attorney at Law
      5255 Keele Street, Suite A
      Jackson, Mississippi  39206
          PRESENT AND REPRESENTING PLAINTIFF ALAN JACKSON
          SCHMIDT

      JASON DARE, ESQUIRE
      Biggs, Ingram & Solop
      Post Office Box 14028
      Jackson, Mississippi  39236-4028
          PRESENT AND REPRESENTING DEFENDANT RANKIN
          COUNTY SHERIFF'S DEPARTMENT

REPORTED BY:

                TRUDIE QUINN
          Davis Court Reporting
            Post Office Box 44
         Madison, Mississippi  39130
             (601) 454-3298

2

1                              I N D E X

2                                                        PAGE

3

Style, Number and Appearances ..................... 1

4

Index ............................................. 2

5

EXAMINATION OF ALAN JACKSON SCHMIDT:

6

        By Mr. Dare ............................. 3

7

Reporter's Page ................................... 63

8

Signature Page .................................... 64

9

Certificate of Reporter ........................... 65

10

                           - o -

11

                        E X H I B I T S

12

1  -  Booking Photo ............................... 38

13

2  -  Booking File ................................ 42

14

3  -  Partial Transcript .......................... 48

15

                           - o -

16

17

18

19

20

21

22

23

24

25

Alan Schmidt - February 12, 2025

3

1                    P R O C E E D I N G S
2                    ALAN JACKSON SCHMIDT,
3        called as a witness, having been duly sworn,
4              was examined and deposed as follows:
5    EXAMINATION BY MR. DARE:
6        Q.    Can you state your full name for the record,
7    please.
8        A.    Alan Jackson Schmidt.
9        Q.    Spell your last name, just to make sure we
10   got it right.
11       A.    S-c-h-m-i-d-t.
12       Q.    Mr. Schmidt, have you ever given a deposition
13   before similar to what we're here doing?
14       A.    No, sir.
15       Q.    So I'm gonna go through just a few ground
16   rules with you.  This is similar to court, but as you
17   notice we don't have a judge or a jury here.
18          We do have a court reporter who is taking down
19   everything that I say and everything that you say, and
20   it's all gonna end up on a sheet of paper.
21          To make sure that that sheet of paper is clear on
22   what I'm saying and what you're saying, if you could wait
23   until after I finish asking my question before you
24   answer, that will make everything clear.  Is that all
25   right?

4

1      A.      Yes, sir.

2      Q.      Also in Mississippi we have a tendency of

3  saying uh-huh and huh-uh a lot.  If you do that I'm gonna

4  ask you to verbalize your response in a yes or no so that

5  that's also clear.

6      A.      Yes, sir.

7      Q.      And if the answer to this question, it's one

8  that I ask of everybody, but if the answer is yes, I

9  don't want to know what it is, but are you on any type of

10  medication or have you taken anything that would impair

11  your ability to understand my questions or answer

12  truthfully and honestly?

13      A.      No, sir.

14      Q.      Finally, attorneys have a tendency of asking

15  confusing questions.  I'm sure I am guilty of that as

16  well.  If you ever don't understand my question, can you

17  ask me to rephrase it?  Would that be all right?

18      A.      Yes, sir.

19      Q.      I will not be offended if you do that,

20  however, if you answer the question that I have on the

21  table I'm gonna presume that you understood the question

22  and answered truthfully and honestly.  All right?

23      A.      Yes, sir.

24      Q.      So I'm not gonna get too far down into this,

25  and I don't want to know anything about underlying facts.

Alan Schmidt - February 12, 2025

5

1   We're taking this deposition here at the Rankin County

2   Sheriff's Department, and you're currently incarcerated

3   in the Rankin County Jail, is that right?

4       A.    Yes, sir.

5       Q.    What is the charge currently pending against

6   you?

7       A.    What do you mean?

8       Q.    Why are you here?

9       A.    Oh.  Why I'm in jail?

10      Q.    Yes.

11      A.    Just old fines.

12      Q.    Prior to coming to jail, where did you live?

13      A.    Georgia.

14      Q.    Where in Georgia?

15      A.    Norman Park.

16      Q.    How long did you live in Georgia?

17      A.    Just for like two months.

18      Q.    What were you doing in Georgia?

19      A.    I got reunited with my grandparents who I

20  ain't seen in 17 years, and then I come back here, got

21  pulled over and went to jail.

22      Q.    So you were living with your grandparents?

23      A.    Yes, sir.

24      Q.    Over the past let's say two years, where have

25  you been employed and just generally the names and

6

```
 1    locations of your employer?
 2         A.    Pearl, Mississippi, with Sunbelt Sealing
 3    right there on Farish Street, and then Oxford
 4    Construction, and then the others I've just been like a
 5    handyman.
 6         Q.    Did you say Sunbelt Sealant?
 7         A.    Yes, sir.
 8         Q.    And when you say handyman, what generally do
 9    you do?
10         A.    Repair the houses, driveways, pools, just
11    electric, light fixtures, stuff like that.
12         Q.    Anything that needs to be done basically?
13         A.    Yes, sir.  Jack of all trades and master of
14    none.
15         Q.    Can you provide me the benefit of your
16    educational background?
17         A.    Well, I went to Pearl High School to 9th
18    grade, and then from 9th grade I dropped out and went to
19    Youth Challenge Academy, and then that was it.
20         Q.    So what is the highest degree that you've
21    achieved?
22         A.    GED.
23         Q.    When did you obtain that?
24         A.    2012.
25         Q.    We're gonna get into a little bit more, but
```

Alan Schmidt - February 12, 2025

7

1   when you were incarcerated here from '22 to '23, you were

2   in the trustee program as well?

3        A.    Yes, sir.

4        Q.    Did you take any classes through the trustee

5   program?

6        A.    No, sir.

7        Q.    Do you still have any family living in and

8   around the central Mississippi area?

9        A.    My grandmother.

10       Q.    What's her name?

11       A.    Mary Ann Pierce.

12       Q.    Anybody else?

13       A.    My Aunt Louise.  Just general family on my

14   mother's side and my two kids, I have two kids.

15       Q.    Your Aunt Louise, what's her last name?

16       A.    Reel, Louise Reel.

17       Q.    R-e-a-l?

18       A.    R-e-e-l.

19       Q.    Mary Ann, one word, two words?

20       A.    Two words.  It's A-n-n M-a-r-y.

21       Q.    Are either of your children over the age of

22   18?

23       A.    No, sir.

24       Q.    Who do they live with?

25       A.    Their mother.

Alan Schmidt - February 12, 2025

8

1    Q.    And what's her name?

2    A.    Mary Gregory -- or Mary Thames, my bad.  She

3 just got married.

4    Q.    You ever been married?

5    A.    No, sir.

6    Q.    All right.  So we're here today about an

7 incident that occurred in December of '22.  Prior to that

8 time had you ever been arrested by anybody with the

9 Rankin County Sheriff's Department?

10    A.    No, sir.

11    Q.    Prior to that time did you even know

12 Christian Dedmon or any of the folks that you had met on

13 I-20?

14    A.    Yes, sir.  I knew Christian Dedmon, Opdyke

15 and Brett McAlpin.  I didn't know Hunter Edward, though.

16    Q.    Elward.  It's spelled E-l-w-a-r-d.  So you

17 did not know Hunter Elward but you knew Opdyke, Dedmon

18 and McAlpin?

19    A.    Yes, sir, and then there were two other ones,

20 too.  One had a tattoo on his face.  I don't know his

21 name.  I just remember his tattoo on his face because

22 he's the one that held me in the ants.

23    And there was a black cop there, too, and I

24 believe his name was Andrews.  Officer Roosevelt told me

25 that his name was Andrews.

Alan Schmidt - February 12, 2025

9

1      Q.      My initial question was had you ever been

2  arrested by anybody with the Rankin County Sheriff's

3  Department before?

4      A.      No, sir.

5      Q.      Your arrest prior to December of '22 were

6  predominantly with Pearl PD, correct?

7      A.      Yes, sir.

8      Q.      The arrest prior to December of '22 -- well,

9  had you ever been incarcerated in the Rankin County Jail

10  prior to December of '22?

11      A.      Yes.

12      Q.      And the arrests were generally from what I've

13  seen -- were they drug related issues?

14      A.      No, sir.  Well, a couple paraphernalias and

15  then like traffic tickets and DUI, one DUI.

16      Q.      So in December of '22 you were pulled over

17  for allegedly stealing a bunch of equipment from an

18  employer, is that right?

19      A.      No, sir.  I was pulled over for no sticker on

20  the tag.

21      Q.      You were eventually charged, though, with

22  stealing a bunch of equipment from an employer?

23      A.      Yes, sir.

24      Q.      Who was that employer?

25      A.      Steven Sandifer.

Alan Schmidt - February 12, 2025

10

1       Q.      And what was the equipment that you had

2    stolen?

3       A.      It was a broke down generator and Kubota saw,

4    and that's the only thing I took.  They said pressure

5    washer, but.

6       Q.      Where did the pressure washer go, if you

7    know?

8       A.      I never took the pressure washer.  I just

9    took the generator and a saw.

10      Q.      And you had sold it to a guy named Tom-Tom in

11   Jackson?

12      A.      Yes, sir.  Name is Thomas Stevens to be

13   correct, but Dedmon already knew the location that Thomas

14   Stevens was at because he's had dealings over here.

15      Q.      Thomas Stevens has had dealings over --

16      A.      Dealings with narcotics and stuff over here.

17      Q.      So Thomas Stevens goes by Tom-Tom, is that

18   right?

19      A.      Yes, sir.

20      Q.      And how did you know Thomas Stevens?

21      A.      Just like a family friend, you know.  When I

22   was homeless he was kind of the guy that brought me a

23   plate and some food and socks and clothes and stuff.

24      Q.      Okay.  How much money or what did you receive

25   in return for the generator and the saw that you had

Alan Schmidt - February 12, 2025

1    stolen from Steven Sandifer?

2       A.     $30 of cash and that was it.

3       Q.     And did you bring that generator and saw and

4    get the $30 in cash on the same day that you were

5    arrested, December 4, '22?

6       A.     No, sir.

7       Q.     When was that done?

8       A.     Thanksgiving.

9       Q.     Where does Thomas Stevens live?

10      A.     I don't know.  I no longer talk to him.

11      Q.     Where did he live in December of '22?

12      A.     On McDowell Road.  I believe it was Hill

13    Street but not 100 percent honest.

14      Q.     Hill?

15      A.     Hill, like H-i-l.

16      Q.     How long had you worked for Steven Sandifer?

17      A.     I was off and on with him for about six

18    months, you know, a couple of times, you know, not that

19    one time, but it was about six months.

20      Q.     And were you still working for him in

21    December of '22?

22      A.     No, sir.  Well, he didn't fire me yet, so.

23      Q.     What were generally your job responsibilities

24    when you were working with Steven Sandifer?

25      A.     Laying sewer and water lines.

Alan Schmidt - February 12, 2025

1       Q.      And when you stole this generator and saw,

2   was that something that you were able to acquire while on

3   the job or did you have a key to get into --

4       A.      I had a key to enter.

5            BY MR. WALKER:  Wait, wait, wait.  Let him

6       ask his question and then answer.

7       Q.      Walk me through how you acquired the

8   generator and saw.

9       A.      Pulled in the driveway, got the generator, it

10  was beside the building, and then got the key because it

11  was on the outside of the shed and then unlocked the door

12  and grabbed the saw and left.

13      Q.      Was this at night?

14      A.      Yes, sir.

15      Q.      You said before Thanksgiving?

16      A.      Yes, sir.  Well, it was right on

17  Thanksgiving.

18      Q.      Right around that same week of Thanksgiving?

19      A.      Yes, sir.

20      Q.      Do you think it was before Thanksgiving or

21  maybe after Thanksgiving?

22      A.      No.  I think it was on Thanksgiving.

23      Q.      Like the actual Thanksgiving day?

24      A.      Yes, sir, but at night.

25      Q.      Was anybody else with you when you stole the

Alan Schmidt - February 12, 2025

13

1    generator and saw?

2        A.    Yes, sir.

3        Q.    Who?

4        A.    Just like a -- she was just a family girl,

5    you know.

6        Q.    What's her name?

7        A.    I have no clue to be honest.  It was like

8    just a one night stand kind of thing, you know.

9        Q.    When you say a family girl --

10       A.    Well, I mean, she was like a one night stand,

11   just like a friend.

12       Q.    But you don't know her name?

13       A.    No, sir.

14       Q.    Where had you met her on Thanksgiving?

15       A.    On Thanksgiving, well, she was just at a

16   friend's house where we hang out and stuff over there,

17   you know.

18       Q.    Who?

19       A.    Over there near Gallatin.

20       Q.    What was the friend's name?

21       A.    What was the friend's name?

22       Q.    Yes.

23       A.    Wayne.

24       Q.    Wayne what?

25       A.    Wayne Stevens.

Alan Schmidt - February 12, 2025

14

1      Q.      And was it this girl's idea to go and steal
2   the generator and saw or how did that plan come about?
3      A.      Ran out of gas basically and it was in the
4   area, and Steven owed me money.  And I did the wrong
5   thing, you know, going take something instead of waiting
6   for him to pay me my paycheck.
7      Q.      All right.  So walk me through kind of the
8   plan.  You're at Wayne Steven's house, there's some girls
9   over there including the family girl, as you say, you
10  just don't remember her name.  How did the plan come
11  about to go over to Mr. Sandifer's and steal equipment?
12     A.      Well, we ran out of -- you know, the gas was
13  low and we needed money, and Steven owed me money, too,
14  so that was the only way I knew to get some money, so.
15     Q.      Where did you run out of gas?
16     A.      Well, I didn't run out of gas all the way.  I
17  was in Richland and my gas light was on on the back way
18  of Monterey, and that's the reason I used the gas jug to
19  put gas in the truck.
20     Q.      And so you stole this property in Richland,
21  is that right?
22     A.      Yes, sir.
23     Q.      And where was the facility, where was this
24  property in Richland when you stole it?
25     A.      In front of Christian Dedmon's house.

Alan Schmidt - February 12, 2025

1      Q.    And then you brought it back to McDowell,
2  Hill Street in Jackson?
3      A.    Took it to Gallatin and Tom-Tom took it to
4  his house.
5      Q.    So when you took it to Gallatin that's when
6  you exchanged the property for the cash?
7      A.    Yes, sir.
8      Q.    Where on Gallatin?
9      A.    Jubilee Street.  It's right there by the
10 Shell.
11     Q.    You got $30 worth of gas?
12     A.    I got $30 cash, a 20 dollar bill and a 10
13 dollar bill.
14     Q.    What did you use the $30 for?
15     A.    $10 in gas and then $10 for some narcotics
16 and $10 for beer.
17     Q.    What kind of narcotics?
18     A.    Crack-cocaine, but I no longer do that no
19 more.
20     Q.    Who did you buy the crack-cocaine from?
21     A.    Tom-Tom.
22     Q.    So I guess I'm confused.  Did he give you the
23 $30 in cash and then you gave him some of the cash back
24 for the cocaine?
25     A.    Yes, sir.  Because like when you bring him

Alan Schmidt - February 12, 2025

16

1    stuff like items and stuff he'll give you cash for it and

2    then do you want to transaction something else, you know,

3    then you just give him his cash back.  It's like retail

4    but not legal.

5        Q.    What kind of vehicle were you driving on

6    Thanksgiving of '22?

7        A.    I believe it was a Sports Edge but I'm not

8    for sure.

9        Q.    What's that?

10       A.    Like an SUV truck.  My bad, it was a Ford

11   Expedition but the truck style.

12       Q.    Is that your vehicle?

13       A.    Yes, sir.

14       Q.    You still own that vehicle?

15       A.    No, sir.  When Dedmon towed it, you know, it

16   was gone.

17       Q.    You never got it back?

18       A.    No, sir.  I was in jail, so nobody could go

19   get it for me.

20       Q.    Where is it now?

21       A.    Back at Double D's, Ellis Finance Center.

22       Q.    So it was repoed?

23       A.    Yes, sir.

24       Q.    Did you ever have any conversations with

25   Steven Sandifer between Thanksgiving and December 4th

Alan Schmidt - February 12, 2025

17

1  about who stole property from -- or who stole this

2  generator and saw from his residence or his place?

3      A.    No, sir.  I just text him and told him I

4  wasn't coming to work because my stomach was upset, and

5  then eventually I didn't show up.

6      Q.    When did you text him and say you're not

7  coming to work?

8      A.    The day after Thanksgiving.

9      Q.    That Friday?

10     A.    Yes, sir.

11     Q.    Did you ask him on that Friday for the money

12 that he owed you?

13     A.    Yes, sir.

14     Q.    Did he pay you?

15     A.    No, sir.

16     Q.    Has he ever paid you even until today's date?

17     A.    No, sir.

18     Q.    What day of the week was December 4th?

19     A.    December 4th was on a Sunday.

20     Q.    Did you work at all the Monday through

21 Saturday after Thanksgiving?

22     A.    Yes, sir, just like my little AJ Home & Lawn

23 Care.

24     Q.    What's the AJ stand for?

25     A.    Alan Jackson.

Alan Schmidt - February 12, 2025

1      Q.      That's what I thought.  Have you come across

2  the girl you were with on Thanksgiving again at all since

3  Thanksgiving of '22?

4      A.      Yes.

5      Q.      Still hadn't gotten her name, though?

6      A.      No, sir.  To be honest, I can't think of her

7  name.

8      Q.      She have a nickname?

9      A.      I think it's Peaches, but.

10     Q.      Well, did Peaches also use any of the

11 crack-cocaine on Thanksgiving?

12     A.      Yes, sir.

13     Q.      And have you used crack-cocaine with Peaches

14 since Thanksgiving of '22?

15     A.      No, sir.

16     Q.      Explain what you were doing generally that

17 Saturday and Sunday leading up to your arrest?

18     A.      Well, I was doing my few lawns I had to do

19 and then just hanging out, hanging out with my kids and

20 then, you know, just like.

21     Q.      Was crack-cocaine the only drug that you were

22 using back then?

23     A.      Yes, sir.  That's the only drug I've ever

24 used.

25     Q.      And again, back in '22, understand that you

19

1    don't do that anymore --

2         A.    No, sir.  I smoke weed and that's it.

3         Q.    -- but how often back in the fall of '22 did

4    you use crack-cocaine?

5         A.    Well, the fall of '22 --

6         Q.    Thanksgiving '22 to December?

7         A.    I relapsed.  That's when I relapsed that

8    night, so.

9         Q.    And so between Thanksgiving and that whole

10   next week, when you were out doing yard work and you were

11   getting paid, were you turning back around and going and

12   buying crack-cocaine with it?

13        A.    Yes.

14        Q.    So would you agree with me that you were

15   using pretty frequently pretty much every night for the

16   week leading up to your arrest on December 4th?

17        A.    Yes, sir.

18        Q.    Had you used crack-cocaine on December 4th,

19   2022, prior to being arrested?

20        A.    No, sir.

21        Q.    Not at all on that Sunday?

22        A.    No, no, sir -- well, earlier that morning but

23   way earlier, because that's when I met Tom-Tom in the

24   parking lot and he told me Dedmon was looking for me.

25        Q.    All right.  Explain that.

Alan Schmidt - February 12, 2025

20

1    A.    Well, we pulled on Valley Street at the

2    church right there and Tom-Tom was like, when you get

3    pulled over just don't say nothing, you know, they're

4    looking for you, you know, just don't be a snitch and I

5    wasn't.  Somebody in the hood told on me and told Dedmon

6    where Tom-Tom lived.

7    Q.    So from your understanding Dedmon had already

8    gone and obtained all of the property that you had stolen

9    and sold to Tom-Tom by that time?

10    A.    No, sir.

11    Q.    So somebody else had snitched and said you

12    stole property, sold it to Tom-Tom?

13    A.    Yes, sir.

14    Q.    And Tom-Tom knew that Dedmon knew?

15    A.    Yes, sir.

16    Q.    Did Tom-Tom say that he had spoken with

17    Dedmon?

18    A.    He didn't say.

19    Q.    He just knew somebody had snitched?

20    A.    Yes, sir.

21    Q.    Now, during your arrest on December 4, 2022,

22    you admitted that you had stole the property, correct?

23    A.    No, sir.

24    Q.    Never did?

25    A.    Never admitted it, no, sir.

Alan Schmidt - February 12, 2025

21

1     Q.     When the property was reacquired from Tom-Tom

2   you were in the back of the vehicle?

3     A.     No.  I was on the outside of the vehicle.

4     Q.     But you were at Tom-Tom's place?

5     A.     Me and Hunter Edwards was standing at the

6   back of the vehicle in the SUV, the silver one.

7     Q.     Right.  And did you ever tell anybody that

8   the property was at Tom-Tom's, did you ever say here is

9   where Tom-Tom lives, did you ever say anything to the

10  officers about where that property was?

11    A.     No, sir.

12    Q.     Do you know as you sit here today how the

13  officers knew that that stolen property was at Tom-Tom's?

14    A.     No, sir.

15    Q.     But you admit today that you were the one

16  that took the property and you did sell it to Tom-Tom?

17           BY MR. WALKER:  Asked and answered.

18    Q.     You can answer.

19    A.     Yes, sir.

20    Q.     Where on I-20 were you when you were first

21  pulled over?

22    A.     Right there as soon as you go over the bridge

23  that's where Rankin County turned the lights on, right at

24  Hinds County.

25    Q.     Who was the one that pulled you over?

Alan Schmidt - February 12, 2025

22

1      A.      I don't know his name.  I just know it was

2   that black guy but I believe it was -- I don't know his

3   name.

4      Q.      So I guess from the time that you got pulled

5   over to the time that you're getting loaded up into a

6   vehicle, walk me through what you can recall happening?

7      A.      Well, on the night of December 4th of 2022, I

8   was going down I-20 and then Rankin County turned their

9   lights on and then -- Andrew was his name.

10         Andrew pulled me out the vehicle, wanted to

11   search the vehicle.  He already paged Dedmon to be on the

12   way.  Well, when Dedmon got there he pulled in and said

13   bring him over here to my car; brought me to his car.

14         Andrews is the one that handcuffed me.  Dedmon

15   then pushed me down and hit my head on the back right

16   fender wheel of the Expedition.

17         And then Brett McAlpin, Hunter Edward and Opdyke

18   all started beating on me, and then after that I looked

19   at them and told them they hit like a female, and then

20   they started hitting on me again.

21         And then after that the guy with the tattoo on

22   his face and a scar right here held me in fire ants, and

23   whole time I'm praying to God because, you know, they

24   were going to kill me and then he tased me three times

25   and then --

Alan Schmidt - February 12, 2025

23

1    Q.    He who?

2    A.    Christian Dedmon, used Hunter Edward's taser,

3    and then after that we were walking to the car and

4    Christian Dedmon told Hunter Edward to snatch me to my

5    knees.

6         He snatched me to his knees, he pulled his penis

7    out, put it towards my mouth and I held it like this and

8    then threw me on my back and then they threw me in the

9    car.

10        I did leave out in the beginning he did fire his

11   firearm twice by my head.  Just when I start talking

12   about it it makes me nervous.

13   Q.    So you say a Deputy Andrews.  Did the Deputy

14   Andrews ever touch you?

15   A.    No, sir.  He stood back and just looked, you

16   know, watched.

17   Q.    So the only ones that actually touched you

18   were Brett McAlpin, Hunter Elward, Daniel Opdyke and

19   Christian Dedmon?

20   A.    Yes, sir, and the guy with the tattoo because

21   he held me in the fire ants.

22   Q.    Explain the tattoo on his face?

23   A.    It was like a -- you know that movie Hangover

24   how that guy has a tattoo on his face?

25   Q.    Mike Tyson?

24

1        A.      Yes, sir.  He had it right here on his face

2    and then a scar right here.

3        Q.      So he had a Mike Tyson tattoo on what side of

4    his face?

5        A.      Right side of his face, and the left side of

6    his face he had a scar.

7        Q.      Explain the scar.

8        A.      It was just like on his cheekbone right here.

9    I don't know what it was from or something.

10       Q.      So you're pointing from approximately -- and

11   why I'm having this explained more is because the court

12   reporter can't take down you pointing.

13          So you're pointing approximately from your ear

14   all the way down to your chin area and approximately

15   along the lower jar bone?

16       A.      Yes, sir.

17       Q.      Was the individual with the Tyson tattoo and

18   the scar on the left side of his face, was he wearing a

19   Rankin County shirt and badge?

20       A.      Yes, sir.  He was in one of the little Ford

21   Explorers, fully clothed Rankin County.  Dedmon was the

22   only one that wasn't.

23       Q.      So McAlpin and --

24       A.      And McAlpin had pants on and a shirt.

25       Q.      So McAlpin and Dedmon had on regular street

Alan Schmidt - February 12, 2025

25

1    clothes?

2        A.    Yes.

3        Q.    Elward, Opdyke, Andrews and -- I'm just gonna

4    say Tyson Tattoo, had on sheriff's department gear?

5        A.    Yes.

6        Q.    Now, when you say that Dedmon fired a firearm

7    twice by your head, was that before or after anybody hit

8    you?

9        A.    Well, that was when he snatched me down and

10   hit my head on the fender wheel and then shot it by my

11   head twice, and then they started beating on me.

12       Q.    What part of your head hit the fender wheel?

13       A.    The center part like where your esophagus is.

14       Q.    And when you said they beat on you, I presume

15   the they is McAlpin, Elward, Dedmon and Opdyke, is that

16   right?

17       A.    Yes, sir.

18       Q.    Where were they beating you from your head

19   down?

20       A.    Just my face.

21       Q.    Only on your face?

22       A.    Yes, sir.

23       Q.    Did they kick you in the face?

24       A.    No, sir.

25            BY MR. WALKER:  Yes or no.

26

```
 1                    BY THE WITNESS:  No, sir.

 2                    BY MR. DARE:  He said no.

 3        Q.     How many times did they hit you in the face?

 4        A.     To be honest, I don't know.

 5        Q.     More than 20?

 6        A.     Probably about 10 or 15.

 7        Q.     Closed fist or slaps?

 8        A.     Closed fist.

 9        Q.     Any of them have like rings on their hands?

10        A.     Dedmon did that I can recall, and that's it

11   that I can recall.

12        Q.     Do you remember all four of them hitting you

13   in the face or do you just remember all four of them

14   being there?

15        A.     I remember all four of them hitting me in the

16   face.

17        Q.     You said that Dedmon used Elward's taser to

18   tase you?

19        A.     Yes.

20        Q.     Was this a probe tase or a drive-stun?

21        A.     A probe tase, shot me in my back, middle of

22   my back.

23        Q.     Just once?

24        A.     Shot me once but tased me three times around

25   10 to 15 seconds approximately.
```

Alan Schmidt - February 12, 2025

27

1       Q.      So each time that you were tased by Hunter
2   Elward's taser with Christian Dedmon using it was
3   approximately 5 seconds?
4       A.      Yes.  It seemed like 10 to 15 seconds.
5       Q.      10 to 15 seconds total or 10 to 15 seconds
6   per time?
7       A.      15 seconds in all.
8       Q.      Gotcha.  And were those three times
9   relatively consecutive or were they spaced out?
10      A.      They were consecutive.
11      Q.      So it was shooting probes into your back, you
12  were being tased, then immediately after that's done
13  another 5 seconds of electricity running through those
14  probes, and then immediately after that's done another 5
15  seconds of electricity running through the probes, is
16  that right?
17      A.      Yes, sir.
18      Q.      Where were you when you were tased three
19  times approximately?
20      A.      On the side of I-20 right by the side of the
21  road.
22      Q.      And were you laying faced down when you were
23  first shot with the probes?
24      A.      No, sir.  I was sitting up like lightheaded
25  because that was after they got done beating on me.

Alan Schmidt - February 12, 2025

28

1      Q.      So you were sitting up.  Whose vehicle were
2  you behind?
3      A.      I was on the ground on the grass and they
4  were all sitting around laughing.  I was still praying to
5  God.
6      Q.      Were you in handcuffs when you were being
7  tased?
8      A.      Yes, sir.
9      Q.      Were you in handcuffs when you were beaten
10  for 10 to 15 minutes in the face?
11      A.      Yes, sir.
12      Q.      And I'm sorry, I said 10 to 15 minutes.  You
13  said 10 to 15 times you were hit in the face, is that
14  right?
15      A.      Yes, sir.
16      Q.      How long did that last?
17      A.      Probably like -- to be honest, I don't know.
18      Q.      And then at the end of all of that, one, you
19  never told anybody when you were on the side of the road
20  and whether you were being hit in the face or whether you
21  were being tased, or regardless of what was happening you
22  never said, hey, I stole the property, it's over at
23  Tom-Tom's?
24      A.      No, sir.
25      Q.      Never snitched, you wouldn't do that?

Alan Schmidt - February 12, 2025

29

1       A.      No, sir.  And Dedmon told me that if I said
2  anything that he would have me killed in the jail, so I
3  just kept my mouth shut.
4       Q.      Whose vehicle were you in when you were taken
5  over to Tom-Tom's?
6       A.      Christian Dedmon's, the Expedition, silver.
7       Q.      Was anybody else in the vehicle?
8       A.      Hunter Edward.
9       Q.      Who was driving?
10      A.      Christian Dedmon.
11      Q.      And where was Hunter riding?
12      A.      Passenger seat.
13      Q.      Where were you riding?
14      A.      The back seat.
15      Q.      Driver side or?
16      A.      Passenger, behind Edward.
17      Q.      And you watched as, I guess, Dedmon went up
18  to Tom-Tom's and got the equipment back that had been
19  stolen, right?
20      A.      Yes, sir.  I was took to the back of the car.
21      Q.      Was or either Christian or Hunter abusive to
22  Tom-Tom in getting the equipment back?
23      A.      No, sir.
24      Q.      They hit him or beat him?
25      A.      Not that I recall.  I didn't get to see none.

Alan Schmidt - February 12, 2025

30

1      Q.     Well, you were standing outside the vehicle

2  watching?

3      A.     I was behind Dedmon's car and then Hunter

4  because there was a lot of people running around in the

5  woods and stuff, and then that's when he went and knocked

6  on the door.

7      Q.     Was it just Hunter and Christian there or was

8  there anybody else from Hinds County there?

9      A.     Yes, sir.  There was one Hinds County sheriff

10  but I cannot recall his name.

11      Q.     When you pulled up to Tom-Tom's house, were

12  the blue lights going?

13      A.     No, sir, just his LED strip.

14      Q.     And when you pulled up you saw a bunch of

15  people exit the house and start running?

16      A.     Yes, sir.  And then Christian Dedmon called

17  Steven's brother to get the equipment, the generator and

18  the saw.

19      Q.     Okay.  So who was Steven's brother?

20      A.     That's Sandifer's Construction.  That was my

21  boss Steven.

22      Q.     You said called Steven's brother?

23      A.     Yes, sir.

24      Q.     Who was that?

25      A.     I don't know his name.

Alan Schmidt - February 12, 2025

31

1     Q.    And then so Steven's brother came to

2  Tom-Tom's and picked up the equipment?

3     A.    Yes, sir.

4     Q.    And then where did you go?

5     A.    I came here.

6     Q.    Weren't taken to the hospital or anything

7  beforehand?

8     A.    No, sir.  He told me he was gonna take me if

9  I had to go.  I didn't want to get back in the car with

10  him.

11     Q.    So you were immediately booked into the

12  Rankin County Jail then after leaving Tom-Tom's?

13     A.    Yes.

14     Q.    Had you had a chance to clean up or do

15  anything else between the beating and the tasing and

16  going to Tom-Tom's and then going to jail?

17     A.    No, sir.

18     Q.    And when you're booked into the Rankin County

19  Jail they typically take a booking photo of you, correct?

20     A.    Yes, sir.

21     Q.    And so on December 4th of 2022, they did take

22  a booking photo of you, right?

23     A.    Yes, sir.

24     Q.    They always go through questions with you

25  about are you injured, do you have any injuries that we

Alan Schmidt - February 12, 2025

32

1    should know about, are you taking any medication or

2    anything that we should know about, right?

3         A.    Yes, sir, but the seizures part I had them

4    when I was 12 years old.  I haven't had none since then.

5         Q.    I'm just asking.  Booking typically goes over

6    that with you, correct?

7         A.    Yes, sir.

8         Q.    And that's outside the presence of Christian

9    Dedmon, that's outside the presence of Hunter Elward.

10   You're asked all of those questions by the booking

11   jailer, sergeant, whoever is at the desk, right?

12        A.    Yes.

13        Q.    You were in jail from December 4 to, I think,

14   July of 2023, is that right?

15        A.    Yes, sir.

16        Q.    You were also incarcerated in the Rankin

17   County Jail on a Pearl PD hold, is that right?

18        A.    Yes, sir.

19        Q.    And then the Pearl PD hold, was that the

20   entire time from December until July as well, is that

21   right?

22        A.    Yes, sir.

23        Q.    What was that from?

24        A.    No insurance and no seat belt and following

25   too close to a vehicle.

Alan Schmidt - February 12, 2025

33

1      Q.     And you had gotten a bond immediately after
2  being booked in on December 4th?
3      A.     Yes.
4      Q.     For the felony -- well, what were you charged
5  with?
6      A.     For commercial burglary on December 4.
7      Q.     And that was a felony commercial burglary?
8      A.     Yes, sir.
9      Q.     And you were given a $20,000 bond, I believe?
10      A.     Yes.
11      Q.     And that occurred almost immediately, right?
12      A.     Yes.
13      Q.     But you weren't able to bond out?
14      A.     No, sir.
15           BY MR. WALKER:  Let's go off the record.
16           BY MR. DARE:  Sure.
17                (OFF THE RECORD.)
18      Q.     (By Mr. Dare) Between the time you got booked
19  in on December 4th, 2022, and July of 2023, had the jail
20  already started using tablets for inmates?
21      A.     Yes.
22      Q.     And you could submit grievances via tablets,
23  right?
24      A.     Yes, sir.
25      Q.     If you got any questions about anything that

1    happens back in jail you've got a tablet and you can send

2    that out, right?

3        A.    Yes.

4        Q.    And you've got e-mails through your tablet,

5    correct?

6        A.    Yes.

7        Q.    For those approximately 8 months, you had

8    unlimited phone calls once you became a trustee, correct?

9        A.    Yes, and contact visits.

10       Q.    And contact visits, yes.  I guess one obvious

11   question:  Did you enjoy being a trustee?

12       A.    Yes, sir.  I got to see my grandma.

13       Q.    The contact visits were nice, right?

14       A.    Yes, sir.

15       Q.    Did you go through any of the counseling

16   sessions for drug and alcohol --

17       A.    Narcotic anonymous.

18             BY MR. WALKER:  Keep your voice up loud

19        enough.

20             BY MR. DARE:  Just making sure that the

21        court reporter hears you.

22             BY MR. WALKER:  What did you just say?

23             BY THE WITNESS:  Narcotic anonymous.

24       Q.    And you were able to do that through the

25   trustee program?

1      A.      Yes.

2      Q.      Did you do any of the Christian ministry and

3  the spiritual counseling?

4      A.      With Brother Aubrey, yes, sir.

5      Q.      And for the brief time that you were able to

6  go through those classes and the trustee program while at

7  the Rankin County Jail, do you think that helped in

8  getting you off of crack-cocaine?

9      A.      Yes, sir.

10      Q.      Have you used since you got out in July of

11  2023?

12      A.      Yes, sir.

13      Q.      But generally you would say you're --

14      A.      I relapsed, yes, sir.

15      Q.      But you're a better person after having gone

16  through the trustee program?

17      A.      Yes, sir.

18      Q.      From December 4 of 2022 to July of 2023, you

19  never told anybody with the sheriff's department about

20  what happened to you on the side of the road on I-20, did

21  you?

22      A.      Yes, sir.  I told Officer Roosevelt.

23      Q.      Officer Roosevelt?

24      A.      I believe he was a sergeant.

25      Q.      When did that happen?

1      A.      When I became on the road crew.

2      Q.      So when did that happen?

3      A.      I was in the kitchen for a month.  I became

4  trustee in January.  So like February-ish, the end of

5  February, somewhere in there.

6      Q.      The end of February, and is that when you

7  were put in touch with the FBI and they started

8  investigating everything about that time?

9      A.      Yes, sir.

10     Q.      Between December 4, 2022, and the end of

11 February of 2023, you never had any contact with anybody

12 at the sheriff's department about what had happened, did

13 you?

14     A.      When I was incarcerated, yes, sir, Dedmon

15 when he did the interrogation.

16     Q.      No.  I meant like telling the sheriff here's

17 what happened.

18     A.      I never seen the sheriff.

19     Q.      And you never told any of the administrative

20 staff back in the jail here's what happened?

21     A.      No, sir.  I was scared.

22     Q.      And you know that you could submit grievances

23 on the tablets and told somebody here's what happened,

24 right?

25     A.      Yes, sir.

Alan Schmidt - February 12, 2025

37

1      Q.      And you're saying you never did that because
2  you were scared?
3      A.      Well, yes, sir, I was scared, because Dedmon
4  said that he would have somebody kill me inside the
5  Rankin County Jail, so that's why I didn't express my
6  testimony to -- you know -- well, kind of like testimony
7  about what happened to me in there.
8      Q.      You didn't tell anybody until the end of
9  February, right?
10     A.      Yes, sir.
11     Q.      And also at the end of February is about when
12  everything was coming out about the January incident with
13  Mr. Jenkins and Mr. Parker, is that right?
14     A.      Yes, sir.
15     Q.      So had you already heard everything coming
16  out about the incident with Mr. Jenkins and Mr. Parker
17  and FBI and MBI looking into the five former deputies
18  when you went to Roosevelt and said, hey, yeah, that
19  happened to me, too?
20     A.      That was before -- well, yeah, that was
21  after, yes, sir, that was after.
22     Q.      And that's basically why when you came
23  forward in February to the road crew manager, Mr.
24  Roosevelt, it was because you saw that come out and you
25  were explaining to him basically me, too, right?

1      A.    Yes, sir.

2           BY MR. DARE:  I'm gonna have marked as

3      Exhibit 1 what's Bates Stamped RC1745.

4           (EXHIBIT 1, BOOKING PHOTOGRAPH, WAS MARKED

5      FOR IDENTIFICATION.)

6      Q.    Mr. Schmidt, I'm going to hand you what's

7  marked as Exhibit 1 to your deposition.  It's a color

8  photograph.  What is that?

9      A.    What do you mean, what is this paper?

10     Q.    Yes.

11     A.    This is a definition paper.

12           BY MR. WALKER:  Do you know what it is?

13           BY THE WITNESS:  No, sir.  I don't know

14      what this is.

15     Q.    All right.  Is that you in the picture?

16     A.    Yes, sir.

17     Q.    And that's your booking photo from December

18  4th of 2022, is it not?

19     A.    Yes, sir.

20     Q.    And you notice there's no blood, bruises,

21  anything on your face, is that right?

22     A.    Yes, sir.  There is no bruises except only

23  right here from the ant bites.

24     Q.    So they just didn't hit you hard enough to

25  bruise your face?

Alan Schmidt - February 12, 2025

39

1        A.      Well, I did have a yellow mark, it's my bad,

2    just a yellow mark, not a black eye, but you couldn't

3    really tell because my skin, the tan, it was just like

4    yellow bruising.

5        Q.      So you're saying that this picture actually

6    reflects there is some yellow bruising around your eyes?

7        A.      Yes, sir, right there.  You could see it

8    better in the jail.

9        Q.      I didn't get into the ant bites, let's go

10   back.  When did the ant bites occur in this sequence of

11   events between the beating and the taser and then the --

12       A.      It was immediately after the beating.

13       Q.      How many times were you bitten?

14       A.      It was a lot of ant bites, probably like 10

15   or 15 times, somewhere in there.

16       Q.      And you're pointing to your left arm?

17       A.      Elbow area.

18       Q.      So the left elbow area?

19       A.      Yes, sir.

20       Q.      And your arm was being held down in an ant

21   pile?

22       A.      Yeah, my arm, it was like this, like he had

23   his foot on my head and pushed me down in an ant pile.

24               BY MR. WALKER:  Who is he?

25               BY THE WITNESS:  The Mike Tyson guy.

Alan Schmidt - February 12, 2025

40

1      Q.     The Tyson tattoo?

2      A.     Yes, sir.

3      Q.     Did anybody say hold him down in an ant pile

4  or anything like that?

5      A.     No, sir.

6      Q.     Do you have any reason to suspect that the

7  Tyson tattoo deputy knew that there was an ant pile

8  there?

9      A.     Yes, sir, because I stated to him that he was

10 getting bit by ants, and he said if he get bit then he's

11 gonna whup my butt even more.

12     Q.     Now, I notice you have a fairly elaborate

13 tattoo on the exact same arm that you were being bit by,

14 right?

15     A.     Yes, sir.

16     Q.     Been bitten by ants before, I've never been

17 tattooed.  Which hurts worse?

18     A.     Tattoo, depending on where you get it.

19     Q.     The tattoos on your hands, what does that

20 say?

21     A.     Solo dolo.

22     Q.     What does that mean?

23     A.     Just like by yourself.

24     Q.     Then the 96 on your wrist?

25     A.     Yes, sir.

Alan Schmidt - February 12, 2025

41

1      Q.      What is that?

2      A.      The year I was born and then the cross,

3   another cross and my kids and truly blessed and another

4   cross.

5      Q.      I didn't ask.  Are you affiliated with any

6   gang?

7      A.      No, sir.

8      Q.      Never have been?

9      A.      No.

10     Q.      So when you're being booked in and they're

11  asking you all the medical questions, you have the

12  opportunity to say, yeah, I've got ant bites on my arm,

13  I'm hurt in my face, I got beat up on my face, I've been

14  tased.  You got the opportunity at that point to say all

15  of that, right?

16     A.      Yes, sir.  I did state what happened to me to

17  -- I don't know her name.  She has blonde hair, the

18  jailer that booked me in that night.

19     Q.      Tommy Hildesheim?

20     A.      Yes, sir.

21     Q.      Tommy is a female?

22     A.      No, sir.  Tommy booked me in, but I stated it

23  to the woman that was there with him that night in

24  booking.

25     Q.      You said she had blonde hair?

Alan Schmidt - February 12, 2025

42

1      A.     Yes, sir.  She was a black girl with blonde
2   hair or black woman.
3              BY MR. DARE:  I'm gonna have marked as
4          Exhibit 2, RC1930 through 1943.
5              (EXHIBIT 2, BOOKING FILE, WAS MARKED FOR
6          IDENTIFICATION.)
7      Q.     All right.  I'm gonna hand you what's been
8   marked as Exhibit 2 to your deposition.  Take your time
9   and look through those.
10             (OFF THE RECORD)
11     Q.     (By Mr. Dare) You had an opportunity to
12  review over Exhibit 2 to your deposition?
13     A.     Yes, sir.
14     Q.     If you notice, bottom right-hand corner
15  there's Bates stamped numbers on everything, so if I'm
16  referring to a page that's where I'm referring to.
17         Let's first go to RC1932.  You notice that under
18  visual assessment number 2:  Does inmate have any visible
19  signs of trauma, illness, obvious pain or bleeding
20  requiring immediate medical attention.  What is by that?
21     A.     No.
22     Q.     And you also have the opportunity to sign
23  this document and you did in fact sign this document
24  although not the one that's on Exhibit 2, is that right?
25         You typically go through when you're going

43

1    through the booking process and they ask you all these

2    medical questions, you sign at the bottom saying that

3    everything is true and correct, is that right?

4        A.    Correct, but you don't sign the visual

5    assessment, you don't sign that paper that I'm aware of.

6        Q.    It says:  I certify that I have truthfully

7    answered these questions about my health?

8        A.    Yes, but I'm saying you don't -- see it was

9    like them saying if I had any bodily damage or anything

10   on my face, you know, and my arm.  That you don't see.

11       Q.    And they said you didn't have any signs of

12   poor skin condition or rashes or needle marks.  It did

13   say that you appeared under the influence of drugs or

14   alcohol and the explanation that you were under -- it

15   appeared, though, you were under the influence of drugs,

16   is that right?

17       A.    Correct.

18       Q.    And were you under the influence of drugs

19   when you were booked in on December 4, 2022?

20       A.    No, sir.

21            BY MR. WALKER:  Asked and answered.  You've

22        answered already.

23       Q.    All right.  So flipping back to Christian

24   Dedmon's narrative statement.  This is RC1942.  You had

25   the opportunity to read that, have you not?

44

1      A.      Correct.

2      Q.      And so the evidence was one STIHL cut-off saw

3  valued at $1500; one Storm Responder generator valued at

4  $1200, and a Makita drill set valued at $250 and

5  miscellaneous tools.  One, did I read that correctly?

6      A.      Correct, yes, sir.

7      Q.      But you say that you only stole the saw and

8  generator, is that right?

9      A.      Correct, yes, sir.

10      Q.      You notice on here that it doesn't have

11  anything about taser use or beatings or a penis being

12  pulled out or anything like that, is that right?

13      A.      Yes, sir, because he's not gonna put

14  something that he done wrong to someone, you know, until

15  you have the FBI sit down at them.

16      Q.      If there's not a use of force report done and

17  there's nothing in the incident report and if you don't

18  say anything, explain for me how the sheriff is supposed

19  to know that an incident happened, if you know?

20            BY MR. WALKER:  Object to the form of the

21        question.  It calls for speculation.  You can

22        answer if you know.

23            BY THE WITNESS:  I don't know.  I've never

24        seen the sheriff, you know, besides at Christmas,

25        you know, being incarcerated.

Alan Schmidt - February 12, 2025

45

1    Q.    The sheriff comes by and brings Christmas
2    presents for you and has?
3    A.    $25 basket.
4    Q.    Right, and also allows you to give Christmas
5    presents to your kids, correct?
6    A.    Through Brother Aubrey, yes.
7    Q.    And the sheriff himself has been nothing but
8    good to you while you've been incarcerated, right?
9         BY MR. WALKER:  Object to the form.  You
10        can answer if you know.
11        BY THE WITNESS:  Like I said, I've never
12        seen the sheriff, you know, other than besides at
13        Christmas, you know.  But Captain Bond was, you
14        know, and Ms. Mindy, they were good.
15    Q.    Everybody at the jail has been good to you?
16    A.    Yes, sir, besides the sheriff, the people in
17    the car like the patrol people.
18    Q.    Dedmon, McAlpin, Elward and Opdyke?
19    A.    Yes, sir.
20    Q.    And the Tyson tattoo.  Andrews didn't do
21    anything but he was just there?
22    A.    Yes, sir.
23    Q.    The black deputy, did he do anything or was
24    he just there, too?
25    A.    He was just there.

1              BY MR. WALKER:  For the record, is Andrews

2       the black deputy?

3              BY MR. DARE:  No.

4              BY MR. WALKER:  Okay.  I was a little

5       confused about that.

6       Q.     Well, I guess I'll let you answer.  Was

7   Andrews the black deputy?

8       A.     That's what I was told his name by a white

9   fellow, you know, because I don't know his name, you

10  know.  If I seen him in a lineup I could point him out.

11      Q.     So you've read through RC1942.  Other than

12  omitting any beatings or tasers or the sexual aspect of

13  your arrest, was everything else in RC1942 true, accurate

14  and correct?

15      A.     No, sir.

16      Q.     What do you see wrong in here?

17      A.     Well, the evidence is wrong.

18      Q.     Okay.  What else?

19      A.     And then what he did to me that night should

20  have been in there, you know, but he didn't put that in

21  there.

22      Q.     Understood.  And that's why I clarified other

23  than --

24      A.     And the part right here where I was on

25  Pearson Road in the city of Pearl, because I went to

1    Wendy's and the city of Pearl police got behind me and

2    called Rankin County in, and Pearl followed me until

3    Rankin County got there when Rankin County threw its

4    lights on at the bridge.

5         Q.     Did you see anything else wrong with 1942,

6    RC1942 on Exhibit 2?

7         A.     Where he said I made a driver's side approach

8    coming in contact with a white male identified as Alan

9    Schmidt.  He didn't do the initial stop.

10        Q.     Anything else?

11        A.     No, sir.

12        Q.     You were at Dedmon's sentencing, were you

13   not?

14        A.     No, sir, I was not.

15        Q.     Did you give a statement at all during the

16   sentencing?

17        A.     Yes, sir.  I presented it via to the Court.

18        Q.     It was a written statement?

19        A.     Yes, sir, it was written.

20        Q.     Have you seen any transcripts from Dedmon's

21   sentencing?  Were you able to watch it on TV or do you

22   know anything about the sentencing when Dedmon was able

23   to speak and --

24        A.     Dedmon declined the sexual assault.

25        Q.     Well, not only that he said all he did was

Alan Schmidt - February 12, 2025

48

1    shoot a gun beside your head, right?

2        A.    I don't know --

3        Q.    I'm not saying it's right or wrong.

4              BY MR. DARE:  I'll tell you what, let's

5         have marked as Exhibit 3 the transcript of

6         sentencing.

7              (EXHIBIT 3, PARTIAL TRANSCRIPT, WAS MARKED

8         FOR IDENTIFICATION.)

9        Q.    I'm gonna hand you what's been marked as

10   Exhibit 3 to your deposition.  Flip over for me, I've got

11   some highlighted starting on page 25.

12         And this is a continuation from page 24, and this

13   is Dedmon giving a statement to the Court.  The

14   highlighted portion is where I specifically want to draw

15   your attention.

16         It says:  (Reading) With respect to the I-20

17   incident, sir, the things I pled guilty to against Mr.

18   Schmidt I did; I shot into the ground to scare him to

19   tell me where the stolen property was of a very close

20   family member of mine; it's something I take full

21   responsibility for doing that and I know that it's wrong;

22   but respectfully, sir, the sexual assault just did not

23   happen; I'm sorry, that's just a lie.  One, did I read

24   that correctly?

25       A.    You read that correctly.

49

1      Q.      And it's your testimony here today that even

2    then Dedmon was lying, that the sexual assault did in

3    fact occur?

4      A.      Correct.

5      Q.      And that the beating occurred?

6      A.      All of it occurred, the sexual assault and

7    the beating, but Dedmon declining it but he pled to it in

8    August, and then they set his court date over again.

9      Q.      And you understand that with so many

10   contradicting statements, Dedmon saying that you're

11   lying, you're saying that Dedmon's lying, it's difficult

12   to know who's telling the truth, right?

13               BY MR. WALKER:  Object to the form.

14     Q.      You would agree with me for someone who

15   wasn't there, it's difficult to know who's telling the

16   truth, right?

17               BY MR. WALKER:  Same objection.  You can

18       answer.

19     Q.      You can answer.

20     A.      Correct, I guess, I mean.

21     Q.      You were seen by medical the day after being

22   booked into the jail, were you not?

23     A.      Correct.

24     Q.      And would you be surprised to note that the

25   full medical assessment didn't have any bumps or bruises

Alan Schmidt - February 12, 2025

50

1    or anything on your face?

2         A.    Correct, besides I had yellow bruising under

3    my eyes.

4         Q.    And that should be reflected in your medical

5    records, correct?

6         A.    Yes, sir.

7              BY MR. WALKER:  Object to the form.

8         Q.    And if it's not then the nurse just missed

9    it?

10             BY MR. WALKER:  Same objection.  You can

11       answer if you know.

12        Q.    You can answer it.

13        A.    I guess, I mean, but you can rewind the

14   cameras in 219 east and see it better than that picture

15   probably.

16        Q.    Well, the nurse should have been able to see

17   it if he or she is standing right in front of your face,

18   right?

19        A.    Correct.

20             BY MR. WALKER:  Same objection.

21        Q.    Did you have any other bumps or bruises

22   anywhere on your body other than the yellowing underneath

23   your eyes?

24        A.    No, sir.  But she did give me antibiotic

25   cream for the ant bites.

Alan Schmidt - February 12, 2025

51

```
1        Q.      All right.  So you're here being represented
2   by Mr. Walker, correct, Trent Walker?
3        A.      Yes, sir.
4        Q.      Why is it that you needed representation for
5   this deposition?
6                BY MR. WALKER:  Objection.
7        Q.      If you know.
8                BY MR. WALKER:  Well, I'm gonna object.  I
9           guess the long and short of it is I represent him,
10          he's my client and, therefore, any deposition that
11          he participates in then I will be there to
12          participate.
13               BY MR. DARE:  Understood.
14               BY MR. WALKER:  So I guess my formal
15          objection is that's something that calls for a
16          legal conclusion that he's not qualified to give
17          but I am.
18       Q.      What I'm trying to get at, you haven't filed
19   a lawsuit against Christian Dedmon or Brett McAlpin or
20   any of those individuals, have you?
21               BY MR. WALKER:  Not yet.
22       Q.      I'm gonna have to get you to answer.
23       A.      He's the lawyer.  I don't know.
24       Q.      Did you retain Mr. Walker to file a lawsuit
25   against those guys for what they did to you?
```

52

1                BY MR. WALKER:  You can answer that.

2                BY THE WITNESS:  To be honest if you want

3        the totally truth of it is --

4                BY MR. WALKER:  Stop.  Answer the question

5        you are being asked.

6                BY THE WITNESS:  It's to be able to make

7        Rankin County stop beating on me, you know, people

8        basically, you know.

9        Q.      So the only individuals that you know to have

10   ever beaten on somebody with Rankin County are

11   incarcerated, right?

12       A.      Correct.

13       Q.      And they're incarcerated for quite some time,

14   right?

15       A.      Correct.

16       Q.      They're not gonna be beating on anybody in

17   the future unless it's in the jail cells where they are,

18   right?

19       A.      Correct.

20       Q.      And the intent of any lawsuit that you would

21   have against Rankin County would be to prevent that in

22   the future, is that right?

23                BY MR. WALKER:  Same objection that I made

24        earlier.  It calls for a legal conclusion, but you

25        can answer.

Alan Schmidt - February 12, 2025

53

1      Q.      Why would you want to sue Rankin County?

2      A.      Well, for one to -- to be honest I don't

3   know.  I mean, they done wrongfully to me that night, you

4   know.  I went through a lot of pain and suffering and I

5   steadily go through it daily especially when I see the

6   badges, you know.

7      Q.      And if the individuals with Rankin County who

8   had a badge committed a criminal act against you, which

9   they pled to, right?

10     A.      Yes, sir.

11     Q.      They are in fact doing time as criminals, are

12  they not?

13              BY MR. WALKER:  Object to form.  You can

14        answer.

15              BY THE WITNESS:  Only because the FBI got

16        involved.

17     Q.      And do you know who got the FBI involved?

18     A.      I believe it was Opdyke.

19     Q.      And where did you get that belief from?

20     A.      I can't -- I ain't gonna say.

21              BY MR. WALKER:  You can answer the question

22        if you know the answer.

23              BY THE WITNESS:  I don't know the answer.

24     Q.      So you don't know.  Do you know who got the

25  Mississippi Bureau of Investigation involved?

Alan Schmidt - February 12, 2025

54

1      A.      No, sir.

2      Q.      And would you be surprised to note that it

3  was actually the Rankin County Sheriff's Department and

4  Sheriff Bailey who got MBI involved in investigating,

5  would you be surprised to know?

6      A.      I don't know.  I wouldn't be surprised, I

7  mean, but.

8      Q.      You would not be surprised?

9      A.      Well, because they've always -- it's numerous

10  things of continuous beating, you know.  So it's not like

11  the first time happening.

12              BY MR. WALKER:  Let's go off the record.

13                    (OFF THE RECORD.)

14              BY THE WITNESS:  I don't know.

15      Q.      (By Mr. Dare) Sheriff Bailey has never done

16  anything wrong against you to your knowledge, has he?

17              BY MR. WALKER:  Object to the form of the

18        question.  You can answer if you know.

19              BY THE WITNESS:  I don't know.

20      Q.      You don't know if he's ever done anything

21  wrong against you?

22      A.      Never physically done nothing wrong to me,

23  no.  I will say I have seen Bryan Bailey on Gallatin

24  Street where I was, you know, but never made contact with

25  me.

Alan Schmidt - February 12, 2025

55

1      Q.      When you said physically has --

2      A.      Driving his -- it was a silver Expedition he

3  was in.

4      Q.      Has Bryan Bailey ever arrested you?

5      A.      No, sir.

6      Q.      Bryan Bailey ever beat you?

7      A.      Only thing I've ever done was shake his hand

8  at Christmas, you know, that's it.

9      Q.      So only thing Bryan Bailey has ever done for

10  you is give you Christmas gifts through Brother Aubrey?

11      A.      Well, through Brother Aubrey, but if you're

12  wanting to get to what I'm trying to say is I believe he

13  did know that Christian Dedmon did that stuff that night,

14  you know.  I do 100 percent believe it, not into detail

15  that he didn't know what they did but he knew most of it.

16      Q.      And is that because of what you've read in

17  the paper?

18      A.      Well, media does lie.

19      Q.      I agree.

20          BY MR. WALKER:  Go ahead, answer the

21      question.

22          BY THE WITNESS:  I don't know.  You got to

23      help me.

24          BY MR. WALKER:  I can't help you.  You have

25      to answer the question you're being asked.  If I

Alan Schmidt - February 12, 2025

56

1        have an objection I'll make it.

2        Q.    Your belief, is it coming anywhere other than

3    what you've read in the media?

4        A.    Yeah.  Basically, yes, sir.

5        Q.    All right.  So where else is it coming from

6    besides the media?

7        A.    I don't know.  I don't want to answer that.

8        Q.    You got to answer.

9        A.    Oh, I got to answer?

10       Q.    You can tell me it's not coming from anywhere

11   else and we can move on or you can tell me it's coming

12   from some other source.

13       A.    It's coming from some other source.

14       Q.    What is that other source?

15       A.    Just other people and the things that they've

16   been through with the sheriff's department that's

17   happened yearly through the years.

18       Q.    That you've personally spoken with?

19       A.    I've personally spoken with, yes, sir.

20       Q.    Were those meetings set up by the individuals

21   with the New York Times?

22       A.    No, sir.

23       Q.    Were these meetings --

24       A.    Friends.

25       Q.    Okay.  So this is Tom-Tom and?

Alan Schmidt - February 12, 2025

57

```
 1      A.     Not Tom-Tom but people in Pelahatchie, Pearl,

 2  Brandon, Flowood.

 3      Q.     And they've mentioned Sheriff Bailey

 4  specifically?

 5      A.     Only one incident and that was in the Puckett

 6  one, that's the only time I was acknowledged that, what

 7  they've told me, you know, but that goes he say she say,

 8  you know.

 9      Q.     What we call hearsay, right?  You've heard

10  that term, right?

11      A.     Yes, sir.

12      Q.     I want to know from your own personal

13  experiences other than trying to help you while you're in

14  the jail, has Bryan Bailey done anything to you to hurt

15  you?

16             BY MR. WALKER:  Objection.  Asked and

17        answered at least twice.

18      Q.     Yes or no?  You're shaking your head no.

19             BY MR. WALKER:  You can answer the

20        question.

21             BY THE WITNESS:  No.

22             BY MR. DARE:  Give me about 2 minutes.  I'm

23        gonna go through my notes and I think we might be

24        done.

25                    (OFF THE RECORD)
```

Alan Schmidt - February 12, 2025

58

1    Q.    (By Mr. Dare) Who pulled the taser probes out
2  of your back?
3    A.    To be honest, I don't know.  They were
4  throwing them from the side, you know.
5    Q.    On the side of I-20?
6    A.    Yes, sir.  As soon as you go over the bridge,
7  right there.
8    Q.    When you were pulled over, where were you
9  coming from?
10   A.    Wendy's.
11   Q.    Where were you going to?
12   A.    Gallatin Street.
13   Q.    And all of the actions that you've been
14  referring to, the beatings and the tasing and the hitting
15  your esophagus on the bumper that all --
16   A.    Not the bumper, the fender wheel.
17   Q.    The fender wheel?
18   A.    Yes, sir.
19   Q.    That all occurred on the side of I-20 in the
20  grass?
21   A.    Yes, sir.  Well, Dedmon's car wasn't in the
22  grass, it was the edge of the road.
23   Q.    What fender wheel?
24   A.    The right back passenger.
25   Q.    Who handcuffed you?

Alan Schmidt - February 12, 2025

1      A.      Who handcuffed me, the black cop.  I don't

2  mean to say it like that but I don't know his name,

3  African-American.

4      Q.      Who unhandcuffed you?

5      A.      The jail.

6      Q.      So they had this other deputy's keys?

7      A.      No.  Christian Dedmon uncuffed me coming into

8  the jail.

9      Q.      So Dedmon had the other deputy's keys?

10     A.      I don't know.  I don't know how the cuffs

11  work.

12     Q.      How many different vehicles were out there

13  when the beatings and the tasings were going on?

14     A.      Like three or four and then Pearl police was

15  at the top of the hill.

16     Q.      McAlpin was in his own vehicle?

17     A.      Yes.

18     Q.      And Opdyke was in his own vehicle?

19     A.      Yes.

20     Q.      And then Andrew had his own vehicle?

21     A.      And Hunter had his.

22     Q.      And Hunter had his own vehicle and Christian

23  had his own vehicle?

24     A.      Yes.

25     Q.      And then Tyson tattoo had his own vehicle?

Alan Schmidt - February 12, 2025

60

1      A.     Yes, sir.

2      Q.     So there were six different vehicles?

3      A.     Six vehicles, yes, sir.  And Hunter left his

4   vehicle there, called the S.O. shots, called it back in,

5   and one of the deputies stayed there until the vehicle

6   got, I guess, towed back there.

7      Q.     You ever been in a fight before?

8      A.     Have I ever been in a fight?

9      Q.     Yes.

10     A.     Yes, sir.

11     Q.     You ever lost a fight?

12     A.     Yes, sir.

13     Q.     I'm sure you've won a couple of fights, too?

14     A.     Yes.

15     Q.     When you're looking at pictures of people

16  that have been in a fight and they lost and they got hit

17  especially 10 to 15 times, they don't typically look like

18  Exhibit 1, do they?

19            BY MR. WALKER:  Object to speculation.  Go

20       ahead.  You can answer if you know.

21            BY THE WITNESS:  The picture does not

22       disclose -- I don't know the correct words, but the

23       picture does not show what I'm trying to say.

24     Q.     It doesn't show any injuries, does it?

25            BY MR. WALKER:  Object to the form.

Alan Schmidt - February 12, 2025

61

```
 1              BY THE WITNESS:  No, it doesn't show the
 2        true what happened.  Like the quality of the
 3         picture is not good.
 4      Q.    So if I get the actual photographic picture
 5  --
 6      A.    You could probably zoom and see the black
 7  eyes, you know, the yellow bruising.
 8      Q.    And the folks that you've seen getting beat
 9  up or when you lost a fight in the past, did you actually
10  have to zoom up and look at somebody to tell that they
11  have been beaten up?
12              BY MR. WALKER:  Object to speculation.  You
13        can answer.
14      Q.    Life history?
15      A.    To an extent because they can hit you in
16  certain ways or something, but they were doing it all
17  police brutality.
18      Q.    And it's gonna be your testimony that Exhibit
19  1 represents the way you looked after being hit 10 to 15
20  times by four different officers?
21      A.    It happened, it did.  That's my right hand on
22  the Bible.
23      Q.    You were already sworn in at the beginning of
24  the deposition, so.  I appreciate your time here today.
25              BY MR. DARE:  I'm gonna tender the witness.
```

Alan Schmidt - February 12, 2025

62

1          BY MR. WALKER:  No questions.

2          BY MR. DARE:  Read and sign?

3          BY MR. WALKER:  Yes.

4          BY MR. DARE:  We're off.

5              (CONCLUDED 11:04 A.M.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

63

1               R E P O R T E R ' S   P A G E

2          I, Trudie Quinn, in and for the State of

3    Mississippi, the officer, before whom this sworn

4    testimony was taken, do hereby state on the record:

5          That due to interaction in the spontaneous

6    discourse of this proceeding, dashes (--) have been used

7    to indicate pauses, changes in thought, and/or

8    talk-overs; that same is the proper method for a court

9    reporter's transcription of proceeding; that the dashes

10   (--) do not indicate that words or phrases have been left

11   out of this transcript, and that any words and/or names

12   which could not be verified through reference material

13   have been denoted with the phrase (phonetic).

14                        * * *

15

16

17

18

19

20

21

22

23

24

25

64

1                    CERTIFICATE OF DEPONENT

2   DEPONENT:  Alan Jackson Schmidt
    DATE:  February 12, 2025
3   CASE STYLE:  Jenkins, et al v. Rankin County, et al
    ORIGINAL TO:  Jason Dare
4
            I, the above-named deponent in the deposition
5
    taken in the herein styled and numbered cause, certify
6
    that I have examined the deposition taken on the date
7
    above as to the correctness thereof, and that after
8
    reading said pages, I find them to contain a full and
9
    true transcript of the testimony as given by me.
10
            Subject to those corrections listed below, if
11
    any, I find the transcript to be the correct testimony I
12
    gave at the aforementioned time and place.
13
      Page          Line                    Comments
14   _____         _____         _____
15   _____         _____         _____
16   _____         _____         _____
17   _____         _____         _____

18          This the _____ day of _____, 2025.

19                              _____
                                           WITNESS
20   State of Mississippi
     County of _____
21
         Subscribed and sworn to before me, this the
22   _____ day of _____, 2025.

23   My Commission Expires:

24   _____       _____
                                              Notary Public
25

65

```
1              C E R T I F I C A T E

2              I, Trudie Quinn, Court Reporter and Notary

3    Public, in and for the State of Mississippi, hereby

4    certify that the foregoing contains a true and correct

5    transcript of the proceedings as taken by me at the time

6    and place heretofore stated and later reduced to

7    typewritten form by computer-aided transcription under my

8    supervision and to the best of my skill and ability.

9              I further certify that the witness was placed

10   under oath to truthfully answer the questions in this

11   matter.

12             I further certify that I am not in the employ

13   of or related to any counsel or party in this matter and

14   have no interest, monetary or otherwise, in the final

15   outcome of the proceedings.

16             Witness my signature and seal, this the 20th

17   day of February 2025.

18

19                         _____

20                              TRUDIE QUINN
                                 CCR# 1368

21   My commission expires:
     September 8, 2027

22

23

24

25
```