IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

**MICHAEL JENKINS, *et al.***        :

                             :

      **Plaintiffs,**              :

                             :    **Civil Action No.**

                  **v.**         :    **3:23-cv-374-DPJ-ASH**

                             :

                             :

**RANKIN COUNTY, MISSISSIPPI, *et al.,***  :

                             :

      **Defendants.**             :

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO THE MOTION FOR SUMMARY JUDGMENT
OF DEFENDANT BAILEY PREMISED ON QUALIFIED IMMUNITY**

      Come now the plaintiffs, by and through counsel, and hereby submit their opposition to the

Motion for Summary Judgment Premised on Qualified Immunity filed by defendant Bailey. As

more fully discussed below, the motion filed by defendant Bailey is without legal or factual basis

under applicable law. Of note is the fact that defendant Bailey has not identified a single undisputed

fact that he even suggests exists in this case that entitles him to summary judgement.

## RELEVANT BACKGROUND

      The plaintiffs in this case were the victims of planned torture by five (5) Rankin County

Sheriff's Deputies and one (1) Richland Police Officer. These law enforcement officers

subjected the plaintiffs to all kinds of debasement including threats, sexual assaults with a dildo,

and racial mockery. In addition, they subjected them to beatings, multiple tasings, water

boarding and culminated the ordeal by shooting plaintiff Jenkins in the mouth. As a result of

these atrocities, the responsible law enforcement officers were criminally indicted and pled

guilty to multiple felonies.

The victims of those atrocities filed the instant lawsuit naming Rankin County, Sheriff Bailey, former Deputies Hunter Elward, Brett McAlpin, Christian Dedmon, Daniel Opdyke, and Jeffrey Middleton of the Rankin County Sheriff's Office along with the City of Richland, Mississippi and one of its former Officers, Joshua Hartfield. Plaintiffs' complaint was filed on June 12, 2023. Defendant Bailey sought dismissal of plaintiffs' claims based on the pleadings previously on two (2) occasions. Dkt# 12, 35. Those motions were denied for the most part and discovery was allowed to proceed on the issue of qualified immunity. That discovery closed on March 3, 2025,[1] and defendant Bailey's present motion for summary judgment was filed on March 17, 2025.

## ARGUMENT

### I. Standard of Review

#### a. Summary Judgment

Summary judgment may only be granted if the movant clearly shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As to materiality, the substantive law will identify which facts are material and facts are "material" only if they "might affect the outcome of the suit under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Disputes over material facts qualify as "genuine" within the meaning of Rule 56 when **the evidence is such that a reasonable jury could return a verdict for the nonmoving party**. *Id.*  A claim lacks a

---

[1] There are, however, several discovery issues that remain outstanding including a motion to compel that is currently pending before Magistrate Judge Harris.

genuine dispute for trial only if **the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party**. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

The party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This includes identifying those portions of the record that the party contends demonstrate the absence of a genuine dispute of material fact. Id. When seeking summary judgment on an affirmative defense, the movant "must establish beyond peradventure" each essential element of the defense. *Access Mediquip LLC v. UnitedHealthcare Ins. Co.*, 662 F.3d 376, 378 (5th Cir. 2011), adhered to on reh'g en banc, 698 F.3d 229 (5th Cir. 2012); *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).

While it is true that the movant need not negate the elements of the nonmovant's case, *Austin v. Kroger Tex., LP*, 864 F.3d 326, 335 (5th Cir. 2017), the movant must, however, point[] out that there is no evidence to support a specific element of the nonmovant's claim, rather than making "a conclusory assertion that the nonmovant has no evidence to support his case. *Id*. at 335.

### b.  Qualified Immunity

Qualified immunity protects government officials from liability for damages when they violate the law, but nonetheless reasonably could have believed that they were acting lawfully. Thus, it is said that it balances two competing values: first, "the importance of a damages remedy to protect the rights of citizens"; and second, the need for officials to be free from "undue interference with their duties" and "potentially disabling threats of liability. *Harlow v. Fitzgerald*, 457 U.S. 800, 806–07 (1982).  Therefore, it is somewhat axiomatic that the qualified

immunity defense protects **all but the plainly incompetent or those who knowingly violate the law**. *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

To overcome the defense, a plaintiff must show "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (internal quotation marks and citation omitted). Courts have flexibility as to the order in which they evaluate these two requirements. *Pearson v. Callahan*, 555 U.S. 223, 236, 242 (2009). A right is "clearly established" when its "contours" are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  The Supreme Court has enunciated three ways that a constitutional right, defined with adequate particularity, can be "clearly established" for purposes of qualified immunity: (1) where it is provided by controlling authority; (2) where it is provided by "a robust 'consensus of persuasive authority, *al-Kidd*, 563  U.S. at 742 (quoting *Wilson v. Layne*, 526 U.S. 603, 617, (1999)); and (3) where its violation is  "obvious," *Hope v. Pelzer*, 536 U.S. 730, 741, 122  (2002).

## II.  Statement of Relevant Facts

Although the facts giving rise to this lawsuit are well known throughout the United States, if not the western world, the plaintiffs shall set them forth in a brief manner just to remind the court of the egregious conduct at issue here. The tragic circumstances took place in January 2023, when the plaintiffs were residing at 135 Conerly Road, in Braxton, Rankin County, Mississippi.

On January 24, 2023, defendant McAlpin, supposedly received a complaint from one of his w hite neighbors in Braxton, Mississippi. The neighbor supposedly told him, among other things, that several black males had been at the property, and that had observed suspicious

behavior. In response, defendant McAlpin directed defendant Dedmon to take care of the problem. In response, defendant Dedmon reached out to a group of officers who infamously referred to themselves as "The Goon Squad" because of their willingness to use excessive force with impunity and otherwise abuse the authority provided by their law enforcement badge and the cover that it provided. The Goon Squad was created and led by defendant Middleton, and consisted of defendants Elward, Opdyke, Dedmon, McAlpin, and Hartfield among others.

Initiating the incident, defendant Dedmon sent a group message to three members of the Goon Squad defendants and asked if they were available for a mission. He further advised the others how to avoid cameras, if any were on the property, and how they were to proceed. Noticing a surveillance camera above the front door of the property, defendants Dedmon, Elward and Opdyke walked around to the carport door, which had no surveillance camera covering it, and defendant Hartfield walked around to the back door, which also had no surveillance camera covering it. The defendant deputies proceeded kick in the carport door and the back door of the house in which the plaintiffs were residing. No warrant for these actions existed nor were there any exigent circumstances that authorized entry.

Upon encountering he plaintiffs inside of the property, the defendant deputies began to assault the plaintiffs right away. They tased them, handcuffed them and otherwise mistreated them for no legitimate reason at all. This encounter escalated to a torture event with the plaintiffs' being beaten while handcuffed, tased while handcuffed, and water boarded.

To further traumatize the plaintiffs, defendant Dedmon took out his service weapon, pointed it toward the back of the house, and pulled the trigger. The gun discharged, and the bullet lodged in the wall of the adjoining laundry room.  Shortly thereafter, defendant Opdyke, who had discovered a dildo in the home that belonged to the female owner of the home, mounted the dildo

onto the end of the BB gun and brought the dildo into the living room where plaintiffs were handcuffed and seated on the couch. Defendant Opdyke then forced the dildo into the mouth of plaintiff Parker and attempted to force the dildo into the mouth of plaintiff Jenkins. Defendant Dedmon then grabbed the dildo from defendant Opdyke and repeatedly slapped the plaintiffs in the face with it as they constantly taunted them with racial slurs.

Defendant Dedmon then forced the plaintiffs to their knees with their backs facing him, and threatened to anally rape the plaintiffs with the dildo. To further impress upon the plaintiffs the seriousness of his threat, defendant Dedmon grabbed the back of plaintiff Jenkins' pants and moved the dildo toward his backside. At this point, plaintiff Jenkins lost control of his bowels and defecated on himself.

To further degrade, humiliate, and frighten the plaintiffs, the defendant Deputies forced plaintiffs onto their backs on the floor of the living room where defendant Elward held them down, and defendant Dedmon poured milk, alcohol, and chocolate syrup on their faces and into their mouths. Defendant Elward then began throwing eggs at the plaintiffs. Shortly thereafter, the defendant officers ordered the plaintiffs to strip naked and shower in order to wash away evidence of abuse before they were taken to jail.

After they finished showering to wash away evidence as directed, plaintiffs' ordeal was far from over. They were subjected to even more mistreatment which culminated with defendant Dedmon pulling out his gun and firing it into the yard. Not to be outdone, defendant Elward drew his weapon, removed a bullet from the chamber, forced plaintiff Jenkins onto his knees, stuck the gun into his mouth, and pulled the trigger. The unloaded gun clicked but did not discharge. Defendant Elward then cocked his weapon a second time and put the gun back into plaintiff Jenkin's mouth and pulled the trigger, the gun discharged this time. The bullet lacerated

6

Jenkin's tongue, broke his jaw and exited out of his neck. Miraculously, he survived this sadistic act.

The conduct described herein, though, gruesome pales in comparison to the expanded version contained in the criminal information associated with the defendant deputies. Exhibit 2 (Criminal Information of defendants McAlpin, Elward, Middleton, Dedmon, Opdyke). All of these facts and more are all admitted by the defendant Deputies in their pleas of guilty to the Criminal Information filed on 7/31/23 in Case No. 3:23-cr-00062-TSL-LGI. Exhibit 2. In addition to the facts describing the atrocities inflicted upon the plaintiffs by the defendant deputies, there are other notable facts relating to the conduct of defendant Bailey.

As defendant Middleton made clear, Deputy Sheriffs were not closely supervised by Defendant Bailey and so long as crime was kept in check in Rankin County, deputies were left to their own devices to enforce the law. Exhibit 3 (Middleton Admissions).  In fact, defendant Bailey admits that his way of supervising was to trust people like defendant Middleton to do the right thing.  When asked if that was his basic system of supervision, defendant Bailey was clear:

> Yes, sir, I trust everybody until they give me a reason not to. I have, you know, faith that people were going to do the right thing.

Bailey dep at 85.

It is against the background of these facts, that defendant Bailey has moved for summary judgment premised on qualified immunity without identifying a single undisputed material fact in support thereof. In fact, defendant Bailey does not even allege that an undisputed material fact exists in support of his motion because he knows that there are none. Below, the plaintiffs shall refute Bailey's motion in all applicable respects and clearly identify those facts from which a reasonable jury could conclude that the plaintiffs are entitled to a judgment in their favor.

7

### III.    Chief Bailey Failed to Supervise His Deputies and That Was The Proximate Cause of the Injuries Suffered by The Plaintiffs

Despite the fact that defendant Bailey himself has made the following concessions:

- The buck stops with him.  Bailey dep at 42;

- After what happened with Parker and Jenkins it was obvious that the system that he had was not working.  Bailey dep at 48;

- His basic system of supervision was trusting supervisors to do the right thing.  Bailey dep at 85;

-  This incident showed that we need to improve our record keeping on complaints and internal affairs investigations and have somebody checkup-check behind the supervisors, myself.  That's why we did the compliance director, somebody to have more checks and balances in place.  Bailey dep at 109-110.[2]

The motion presented to the court on behalf of defendant Bailey, seeking summary judgment asserts as its basis "Plaintiffs cannot show that Sheriff Bailey's supervision of the former deputies was inadequate." Mot Mem [Doc. 133]at 6. Not only was Bailey's supervision inadequate it arguably amounted to criminal negligence.  Defendant Middleton was a lieutenant in the Rankin County Sheriff's Office and was in charge of the night shift. He acknowledges that his shift was called the Goon Squad and they were willing to use excessive force and not report it.  Exhibit 4 at pg. 73. (Change of Plea Proceedings Case No. 3:23-cr-00062-TSL-LGI).

---

[2]  As will be discussed in detail infra., the changes that Bailey claims were made are changes that should have been in place long before the incident with the plaintiffs, and the fact that they were not in place, was an extreme violation of national standards and is irrefutable evidence of incompetence, at the very least.

He also admits that there was a culture of violence that existed in the Sheriff's Dept.[3] Exhibit 5, Middleton dep at 51.

Moreover, plaintiffs' will present testimony at the trial of this matter from Thomas Tiderington, a former police chief with over forty years of experience in law enforcement consistent with his Affidavit, which is plaintiffs' Exhibit 6. Having reviewed the discovery in this case as well as the pleadings, he will opine as follows:

> Based on my forty-four-year law enforcement career I know that when a sheriff or police chief fails to establish and enforce systems that promote integrity and prevent abuse of power, that failure cannot be excused or dismissed as ignorance or delegation. It is a core leadership responsibility. A law enforcement agency reflects the tone, values, and standards set at the top. Where honesty and accountability are not enforced by leadership, misconduct can flourish—often with devastating consequences for both the public and the integrity of the justice system

Exhibit 6 at pg. 13 (Tiderington Affidavit).

### a. TASERS

In a puzzling contention, defendant Bailey contends that his supervision of his deputies was adequate because when he first took office he implemented a use of force reporting system whereby the events justifying the force were documented and the deputy's TASER would be downloaded, if a TASER was used. Mot Mem at 4. He then suggests to the court that support for this assertion may be gleaned from Bailey's deposition page 30, even though the word TASER is never spoken on that page of his deposition; and on page 50 of his deposition, even though the

---

[3] After making this bombshell proclamation, Defendant Middleton made several attempts to walk his admission back, however, that's akin to trying to put the milk back in the cow.  It can't be done.

word TASER was never spoken on that page of his deposition either; and to pages 162-63 of his

deposition. No explanation is provided as to how this constitutes adequate supervision, nor is

there a contention that this position is undisputed.

Bailey also points to pages 22-23 of the deposition of Dwayne Thornton even though Mr.

Thornton makes clear that there was no system in place to keep track of when a weapon had been

discharged, other than self-reporting.  Thornton dep at 22.  Addressing this point directly, Mr.

Tiderington states the following:

> Sheriff Bailey testified that the department had no system for routine auditing of
> TASER data until after the Jenkins-Parker incident. This deficiency meant that
> inappropriate or excessive uses of TASERs would go undetected unless a deputy
> voluntarily disclosed their use—an entirely foreseeable and unacceptable risk.
> When asked about data features such as "pulse graphs," Bailey confessed he
> lacked the ability to interpret TASER data and relied on outside experts to explain
> its implications. Dwayne Thorton testified that TASER use logs were not
> reviewed unless triggered by a use-of-force report, again reflecting the
> department's wholly reactive and insufficient oversight process. He also testified
> that while a command officer might conduct a TASER download, it was
> ultimately the Sheriff who was responsible for reviewing and determining
> whether TASER use was proper. This testimony demonstrates a profound failure
> of command-level responsibility. Sheriff Bailey's delegation of TASER oversight
> to subordinates, without ensuring a systematic and documented review process,
> represents a significant deviation from nationally accepted policing standards.
> According to the International Association of Chiefs of Police (IACP), all TASER
> deployments should be reviewed, audited, and reconciled with use-of-force
> reports to ensure accountability, compliance, and officer safety.

Tiderington Affidavit at pg. 30. Not only is the alleged support for defendant Bailey in this

regard disputed, it is demonstrably false as well.

### b.  Body Worn Cameras (BWC)

Giving wide berth to the position of defendant Bailey, it appears that he is suggesting to

the court that because he obtained BWCs for the Sheriff's Office, that somehow supports a

contention that he provided adequate supervision to his deputies.  The court and the plaintiffs are

left to ponder how purchasing BWCs for the Sheriff's Department demonstrates adequate supervision or why their use purportedly being modeled after the policy used in Texas is of any significance.

Nevertheless, plaintiffs question the contention that the use of the BWCs, was patterned after what was done in Texas in light of defendant Middleton's contrary deposition testimony wherein he informed that the policy in Rankin County was based upon whether or not the deputies were working with defendant Dedmon-**Anytime his deputies worked with defendant Dedmon they were to turn body cams off**.  Middleton dep at 38, 41. (Exhibit 5).

Clearly, Bailey's allegation that his department followed the policies implemented in Texas, is disputed. In addition, Bailey fails to explain how, even if it were not, it would be applicable here.  The attack upon the plaintiffs was not a legitimate undercover operation nor did it involve confidential informants as all of the defendant deputies and Richland Officer Hartsfield admit. See Exhibit 2 pgs. 62-67(McAlpin), 73-80(Middleton), 81-93(Dedmon), 94-106(Elward), 108-120(Opdyke), 122-133(Hartsfield).

Nonetheless, on pg. 9 of his motion, Bailey makes the following mis-representation:

> these deputies violated the BWC policy by not having their BWC activated during their interactions with Jenkins, Parker; and/or Schmidt.  Where the deputies violate policy and procedure in causing any constitutional violation, such violation "breaks the causal connection between those official policies and the alleged constitutional violation.' [citations omitted].

Bailey's submission in this regard is not only disputed it is demonstrably false as well. The BWCs of the Rankin County deputies were off because that is what they always did when they were with defendant Dedmon, turn their BWCs off. Middleton dep at 38, 41. As to the suggestion that the deputies were trying to conceal something from Bailey, that too is at odds with the evidence of record.

11

According to defendant Middleton, Dedmon would let Bailey know what he was doing. Middleton dep at 89; he felt that the Bailey was aware of Dedmon's conduct *Id* at 86; he did not want to deal with Dedmon because he was good friends with Bailey, *Id* at 84-85; Dedmon was hyperactive, *Id* at 45; he understood that Dedmon was violent with people, *Id* at 46, 49; he had a fear of backlash if he reported what Dedmon was doing because of the relationship between Bailey and Dedmon, *Id* at 95; everybody knew of the close relationship between Bailey and Dedmon, *Id* at 96-97.

The evidence of record indicates that nothing needed to be concealed from defendant Bailey and nothing was concealed from defendant Bailey. In fact, defendant Middleton indicated in his deposition that defendant Bailey was hands on and to the extent that there was going to be an operation at 135 Conerly, the location where plaintiffs were tortured, defendant Bailey knew about it beforehand:

> Q    Okay. · So if there was going to be a search at 135 Conerly, he probably
>      would have wanted to know about that?
>
> A    And it was my knowledge that he did.

Middleton dep at 88.

The fact of the matter is that the use of body worn cameras was on an ad hoc basis, their use was dependent on the situation and if defendant Dedmon was involved in the situation, they were not to be used.  Mr. Tiderington bluntly stated it thusly:

> In my professional opinion based on decades of law enforcement leadership, Sheriff Bailey's sworn testimony reveals a body-worn camera program that was poorly implemented, lacked meaningful supervision, and deviated significantly from national best practices. His admissions reflect a systemic failure to leverage BWCs as a tool for transparency, accountability, and public trust—objectives that have been universally recognized by law enforcement agencies for nearly a decade. These failures directly contributed to the absence of documentation and

oversight surrounding the events of January 24, 2023, and enabled the misconduct
in this case and others to go undetected and unaddressed.

Tiderington Affidavit at 27. (Exhibit 6). Further assessing the BWC issue, Mr. Tiderington

elaborates:

> In my professional opinion, the Rankin County Sheriff's Office's failure to
> monitor and enforce its body-worn camera policy prior to January 24, 2023,
> represents a serious lapse in law enforcement leadership and supervision. Had
> routine review and enforcement mechanisms been in place, it is likely that
> patterns of misconduct by the deputies involved—including prior failures to
> activate cameras—would have been detected and corrected. This institutional
> failure contributed directly to the unchecked conduct and lack of documentation
> surrounding the incident involving Michael Jenkins and Eddie Parker.

To put this all in proper perspective and to further explain the depth and scope of the grossly

deficient lack of supervision problem that permeated throughout the Sheriff's Office, Mr.

Tiderington continues:

> **Note:** In forming my opinions, I also considered Sheriff Bryan Bailey's
> testimony concerning his initial observations at the scene of the January 24, 2023
> shooting. Sheriff Bailey stated that upon arriving at the scene, he immediately
> noticed that several deputies were not wearing their assigned body-worn cameras,
> or that the devices were not activated or functioning. He further testified that
> despite his attempts to question the deputies involved, he could "never get a
> straight answer" as to why their cameras were not being used as required.
>
> This lack of cooperation from deputies—especially in the immediate
> aftermath of a high-profile use-of-force incident—raises serious concerns about
> Sheriff Bailey's ability to maintain discipline, accountability, and command
> authority within his own department. When frontline officers are unwilling or
> unable to provide a direct explanation to the sheriff himself regarding a basic
> policy requirement, such as the activation of body-worn cameras, it suggests a
> breakdown in the chain of command and a culture resistant to oversight.
> Moreover, the deputies' failure to comply with body-worn camera policy—and
> their subsequent evasion of responsibility—should have prompted immediate
> administrative action, not only to preserve evidence but also to assess whether
> there were broader issues of noncompliance within the department. That no such
> action was taken further reflects a lack of internal accountability and supervisory
> control.

> In my professional opinion, the sheriff's inability to obtain honest and timely answers from his deputies in such a critical moment underscores a systemic failure in leadership and discipline and reinforces the broader pattern of inadequate supervision and policy enforcement that permeated the Rankin County Sheriff's Office prior to the incident.

*Id*. at 22-23.

Meritless and disputed is the only way to describe defendant Bailey's suggestion that he provided adequate supervision by purchasing BWCs for the Sheriff's Dept. in 2021. Furthermore, any suggestion that some policy was violated by the deputies in turning off their BWCs when that is exactly what they were told to do when working with defendant Dedmon borders on the inane and is certainly unsupported by record evidence.[4]

### c. Complaint Procedures

---

[4] Moreover, an official policy establishes culpability, and can arise in various forms, usually in the form of written policy statements, ordinances, or regulations, but may also arise in the form of a widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy. *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir.1984) (en banc). A policy or custom is official "when it results from the decision or acquiescence of the municipal officer or body with `final policymaking authority' over the subject matter of the offending policy." *Jett v. Dallas Indep. Sch. Dist*., 491 U.S. 701, 737 (1989). Here, there is no dispute that defendant Bailey was the final policymaker nor that a policy of turning off BWCs when deputies worked with defendant Dedmon existed. This policy was clearly a direct causal link for the use of excessive force by the Goon Squad.

Defendant Bailey concludes his adequacy of supervision submission by setting forth his manner of handling complaints. Mot Mem at 5. Contrary to Bailey's suggestion that he had a viable complaint system in place, Mr. Tiderington reports otherwise:

> Shockingly, Sheriff Bailey admitted that at the time of the Jenkins-Parker incident, there was no formal complaint form available for citizens to use. Complaints were received informally—over the phone or in person—and there was no standard procedure for documenting, tracking, or following up on these complaints. (Bailey Deposition pgs. 58-72).

Tiderington Affidavit at 10. Not only does Mr. Tiderington torpedo Bailey's complaint system, he explains the consequences of its shortcomings:

> Had a proper complaint system been in place—one that accepted complaints in multiple formats, required written documentation, ensured supervisory review, and tracked allegations over time—it is likely that earlier patterns of misconduct involving the deputies in question would have been detected and addressed. The failure to implement these basic accountability mechanisms created the conditions in which the unlawful, violent, and racially charged acts committed by the so-called "Goon Squad" were able to occur unchecked. In my opinion, this institutional failure was not incidental; it was a direct and foreseeable contributing factor to the events that transpired on January 24, 2023.

*Id*. at 16.

Apparently mindful of the fact that he has not identified a single undisputed fact in support of his rather specious position that he provided adequate supervision to his deputies, nor sufficient facts that even come close to proving his point, Bailey asserts that "No decision by the Supreme Court or the Fifth Circuit Court of Appeal clearly establishes the proper level, amount, and/or means of supervision to be provided at a sheriff's department." Mot. Mem at 6. The applicable law here is well established:

> To establish § 1983 liability against supervisors, the plaintiff must show that: (1) the police chief failed to supervise or train the officer; (2) a causal connection existed between the failure to supervise or train and the violation of the plaintiff's rights; and (3) the failure to supervise or train amounted to deliberate indifference to the plaintiff's constitutional rights.

*City of Canton v. Harris*, 489 U.S. 378 (1989); *Burge v. St. Tammany Parish*, 336 F.3d 363, 370 (5th Cir.2003).

It is undisputed that the plaintiffs' rights were violated. See Exhibits 1,2, &4. It is also undisputed that there is a causal connection between the failure to supervise and the violation of plaintiffs' rights. See Exhibits 4, 5(pgs.38, 41, 86,95-97), & 6. The only element left is the evidence supporting Bailey's deliberate indifference. Bailey admits that his basic system of supervision, prior to the incident with the plaintiffs was, trusting **supervisors to do the right thing**. Bailey dep at 85.  The fact that Bailey did not supervise his subordinates was confirmed by defendant Middleton both in his response to plaintiffs' request for admissions, Exhibit 3 (nos. 2&3), and in his deposition at pgs. 117-18. [D]eliberate indifference requires proof that a municipal actor disregarded a known or obvious consequence of his action.  *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 409 (1997). To establish that a state actor disregarded a known or obvious consequence of his actions, there must be actual or constructive notice that a particular course of conduct caused or led to his employees to violate citizens' rights and he chose not to change what he was doing.  *Id.*

Undoubtedly, defendant Bailey knew about the lawlessness in the Sheriff's Department and didn't care until everybody else found out. The following fourteen (14) facts fully support the plaintiffs' position in this regard:

1.  Defendant Middleton's shift called themselves the "Goon Squad" because they were willing to use excessive force and not report it. Exhibit 4 at pgs. 73, 99-100, 113;

2.  The existence of the Goon Squad was a well-known fact - - Middleton gave him a coin and he assumed that Bailey had one because they were being passed around.  Exhibit 7 at 73-75 (Godfrey dep);

3. Dwayne Thornton who was the Captain of Patrol, and the direct supervisor of Middleton, had a Goon Squad coin. Exhibit 8 at 29, 46 (Thornton dep);

4. It was assumed that Bailey had a coin because Middleton was freely passing them around. Godfrey dep at 75;

5. BWCs were not to be turned on when of the Rankin County deputies were working with defendant Dedmon. Middleton dep at 38, 41;

6. Dedmon would let Bailey know what he was doing, Middleton dep at 89;

7. Bailey was aware of Dedmon's conduct *Id* at 86;

8. Dedmon was good friends with Bailey, *Id* at 84-85;

9. Dedmon was hyperactive, *Id* at 45;

10. Dedmon was violent with people, *Id* at 46, 49;

11. Middleton had a fear of backlash if he reported what Dedmon was doing because of the relationship between Bailey and Dedmon, *Id* at 95;

12. Everybody knew of the close relationship between Bailey and Dedmon, *Id* at 96-97;

13. There was a culture of violence that existed in the Sheriff's Dept, *Id* at 51.

14. Based on my review of the records, sworn testimony, and supporting materials related to this case, the events of January 24, 2023, and the deliberate efforts to conceal what occurred reveal not just isolated misconduct, but a deeply rooted culture of misconduct and corruption within the Rankin County Sheriff's Office. The actions of the involved deputies, including their warrantless entries, repeated use of excessive force, racial abuses, and the fabrication and destruction of evidence-was not only unlawful but brazenly coordinated. These actions could not have occurred in a vacuum.

It is inconceivable to believe that Sheriff Bryan Bailey was unaware of the repeated and egregious misconduct carried out by members of his department, particularly by a group of officers who openly referred to themselves as the "Goon Squad" and operated with apparent impunity. If Sheriff Bailey did in fact know and failed to intervene, he bears direct responsibility for allowing this behavior to continue unchecked. If, on the other hand, he truly did not know, this raises serious concerns about his ability to supervise, manage, or maintain any reasonable level of accountability within his agency. Tiderington Affidavit 13.

For purposes of the pending motion, the court must accept all of these facts as well as all reasonable inferences that flow therefrom as true.

All evidence is viewed in the light most favorable to the nonmoving party and all reasonable inferences are drawn in that party's favor.

*Crawford v. Formosa Plastics Corp., La.*, 234 F.3d 899, 902 (5th Cir. 2000). When one considers that the Sheriff, defendant Bailey, was home in bed when the plaintiffs were tortured, Bailey dep at 114-15; and that the Captain of Patrol, who was the direct supervisor of the leader of the Goon Squad, defendant Middleton, was also home in bed, Thornton dep at 9, a reasonable jury could conclude that the defendant Bailey knew about the planned raid of plaintiffs residence, Middleton dep at 88, and that it was defendant Bailey's desire to have the **asylum left in the hands of the inmates**.  They could further reasonably believe, just as defendant Middleton believed, that so long as crime was kept in check, deputies were left to their own devices.  Exhibit 3.

It is respectfully urged by the plaintiffs that the court cannot view the evidence identified above, through the proper lens, and come to the conclusion that no reasonable jury could find in plaintiffs' favor.  It is again emphasized that summary judgment is only appropriate if the movant shows that there is no genuine dispute as to any material fact, and that the movant is entitled to judgment as a matter of law. Keeping in mind that a genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 417 (5th Cir. 2008). Inasmuch as there are no undisputed material facts identified by Bailey, and there are numerous genuine material facts that exist in the plaintiffs' favor, which have been clearly set forth,

defendant Bailey's motion for summary judgment should be denied on this basis alone. Yet, there are other reasons that also exist.

### III.    The Magnitude of Defendant Bailey's Incompetence Is Startling

Since at least 1986, it has been well established that law enforcement officers that are plainly incompetent or those who knowingly violate the law are not afforded the protection of qualified immunity. *Malley, supra*., at 341 (1986). The evidence of Bailey's incompetence is in abundance and fully described by Mr. Tiderington in his Affidavit on page 14:

1. **Failure to have a proper policy relating to receiving and investigating Complaints from Citizens:**

Shockingly, Sheriff Bailey admitted that at the time of the Jenkins-Parker incident, there was no formal complaint form available for citizens to use. Complaints were received informally—over the phone or in person—and there was no standard procedure for documenting, tracking, or following up on these complaints.  (pgs 58-72).

**2.    The Failure of Sheriff Bailey to Document and Track Complaints**: The fact that Sheriff Bryan Bailey did not have a meaningful system in place to track citizen complaints represents a serious and unacceptable deviation from widely recognized law enforcement standards and professional practices. In modern policing, the ability to receive, document, and analyze complaints is not optional-it is a core function of agency accountability, risk management, and community trust.

**3.    Use of Force Policy**:  A review of the Rankin County Sheriff's Office Use of Force policy reveals significant deficiencies when compared to nationally recognized best practices, such as those outlined by the International Association of Chiefs of Police (IACP). Most notably, Sheriff Bailey's policy fails to require any formal findings following a use-of-force incident. It does not mandate that supervisors determine whether the force used was consistent with policy or whether the incident was "sustained," "exonerated," "unfounded," or "not sustained."

**4.    Steven Godfrey Testimony**: In reaching my conclusions, I also reviewed and considered the deposition testimony of Steven Godfrey, who served in a leadership role within the Rankin County Sheriff's Office. Mr. Godfrey testified that Sheriff Bryan Bailey did not have any formal policy or established procedure in place to address, investigate, or resolve allegations of physical abuse or citizen

complaints made against deputies. According to his testimony, there was no standardized complaint intake process, no system for ensuring timely review, and no consistent follow-up to determine whether such allegations warranted disciplinary action or policy reform.

**5.    Lack of Monitoring Body-Worn Camera Usage**: The department issued body-worn cameras but lacked a system for reviewing footage or ensuring compliance with BWC policy. As Sheriff Bailey acknowledged in his own testimony, supervisory review of camera footage was minimal and occurred only in reaction to complaints or serious incidents-well below accepted standards in policing.

**6.    LACK OF REVIEW AND OVERSIGHT OF TASER USE0**: The evidence in this case demonstrates that the Rankin County Sheriff's Office's policies and practices regarding the use and oversight of TASERs were grossly deficient and deviated substantially from nationally recognized standards in professional policing. These deficiencies reflect systemic failures in training, supervision, accountability, and leadership-failures that directly fostered an environment in which the misuse of Conducted Energy Devices (CEDs) could occur without detection or consequence.

**7    Post-Incident Reforms Could and Should Have Been Implemented Sooner:** According to the testimony of Steven Godfrey and Sheriff Bailey, a number of internal reforms were implemented by the Rankin County Sheriff's Office only after the January 24, 2023 incident involving Michael Jenkins and Eddie Parker. These reforms included the initiation of routine supervisory review of body-worn camera footage, the appointment of a compliance officer tasked with overseeing policy adherence, and the development of new layers of command accountability.

While these steps may appear to signal progress, they are in fact fundamental, long-established accountability measures that have been widely adopted across the country in professional law enforcement agencies-often as a matter of standard practice, and not in response to public scandal. These safeguards are not novel; they represent baseline expectations for departmental transparency and internal oversight, as recognized by the International Association of Chiefs of Police (IACP), CALEA, the Police Executive Research Forum (PERF), and the U.S. Department of Justice.

Not only does Mr. Tiderington identify and spell out defendant Bailey's incompetence, he elaborates in great detail how and why his deficiencies are not mere lapses and instead constitute astounding deviations from what is expected in modern day policing.  His examination

20

and analysis concludes with the observation that defendant Bailey's operation of the Rankin County Sheriff's Office was plagued by gross negligence and incompetence in January 2023.

Additionally, defendant Bailey confirmed the questionable competency of the Sheriff's Dept. when he informed in his deposition that after what happened with Jenkins & Parker it was obvious that the system that he had was not working. Bailey dep at 48; that his basic system of supervision was trusting supervisors to do the right thing. *Id* at 85; and at the time of the plaintiffs' torture event, his BWC accountability policies weren't working. *Id* at 143. As to defendant Bailey's competency, Mr. Tiderington, is unequivocal,

> It is my professional opinion that the Rankin County Sheriff's Office, under the leadership of Sheriff Bryan Bailey, deviated significantly from widely accepted law enforcement standards and failed to implement basic systems of accountability, oversight, and transparency. These failures directly contributed to the unconstitutional conduct and civil rights violations suffered by the plaintiffs. **Sheriff Bailey's incompetent leadership, disregard for policy enforcement, and absence of meaningful internal controls created a permissive culture where abuse could and did occur unchecked**. [emphasis].

Tiderington Affidavit at 4.

### IV. Defendant Bailey Both Ratified and Condoned Plaintiffs' Ordeal

If an authorized policymaker approves a subordinate's decision and the basis for it, such ratification would be chargeable to that policymaker and the municipality because that decision is final. *Peterson, supra.,* at 854. Ratification, however, is limited to "extreme factual situations." *World Wide Street Preachers Fellowship v. Town of Columbia* , 591 F.3d 747, 755 (5th Cir. 2009) (*quoting Peterson,* 588 F.3d at 848). Here, the underlying conduct is not only extreme, it truly shocks the conscience. Torture, sexual assault, threats, racial taunting and a shooting. Simply because a neighbor called and complained about two (2) black men living in the neighborhood.

21

In this case defendant Middleton's Goon Squad existed to provide law enforcement outside the boundaries of the law. They were who they were because they were designed to engage in the use of excessive force and keep it quiet. Exhibit 4. Goon Squad members were actually told by defendant Bailey to make themselves available to work with defendant Dedmon and to turn off their BWCs when doing so. Middleton dep at 33, 38, 41. The existence of the Goon Squad was a well-known fact in the Sheriff's Dept. Godfrey dep at 73. Defendant Dedmon was a member of the Goon Squad. Exhibit 2 at pgs 81-93. Defendant Dedmon was a close friend of Bailey, and kept him apprised of what was going on and what he was doing. Middleton dep at 84-89.  Exhibit 1 depicts the Goon Squad Coin and logo.

    

Lt. Jeffrey Middleton, a supervisor, gave commemorative coins to Goon Squad members.

On the night that plaintiffs were accosted and tortured, defendant Dedmon had alerted Bailey of the situation beforehand because he was very hands on. *Id* at 88. Defendant Bailey ratified the encounter with the plaintiffs beforehand, and condoned it afterwards when he failed to conduct any investigation of any kind. Elward was placed on administrative leave because he was involved in an officer related shooting and Dedmon was assigned to desk duty because of his inordinate number of taser uses while with the plaintiffs. Defendant McAlpin was not disciplined even though he was Bailey's Chief of Investigations and called for the dastardly

operation. Even though defendant Bailey discovered within a week of the incident with the plaintiffs that defendant McAlpin had lied about not being at the location where the torture event took place, Bailey dep at 151-52, he took no disciplinary action. Opdyke was not disciplined nor asked to complete a report. Defendant Middleton, the man in charge of the night shift and the supervisor of Elward and Opdyke was not questioned nor asked to complete a report. Dwayne Thornton was Captain of Patrol and defendant Middleton reported to him. Thornton dep at 29, Godfrey dep at 75. Defendant Bailey directed Dwayne Thornton to respond to the scene where plaintiffs were tortured but did not require him to prepare a report. Thornton dep at 10. After the incident involving the plaintiffs, Dwayne Thornton was promoted to Undersheriff. Godfrey dep at 84-85.

Even after the Goon squad was exposed, no effort was made to determine who had Goon Squad coins. Thornton dep at 68. Even after the Good Squad was publicly exposed, the compliance officer designated by defendant Bailey did not feel that determining who the members were was something that should be looked into. Exhibit 9 at 48 (Deposition of Wayne Carter). Even though there were a number of red flags raised concerning the incident with the plaintiffs, defendant Bailey left defendants McAlpin, Middleton and Opdyke in their positions and on the street.

In sum, based upon the facts set forth herein, a reasonable jury could quite easily conclude that defendant Bailey created the environment for the Goon Squad to exist, condoned the manner in which it operated and ratified its lawlessness as best he could by not investigating its methods, or even identifying its members in the Sheriff's Office. In addition, notwithstanding the fact that glowing red flags were evident, defendant Bailey took no disciplinary action against any of the involved deputies until criminal charges were imminent and after the present lawsuit

was filed on June 12, 2023.[5] At the very least, there are no undisputed facts identified by defendant Bailey which support the contention that he is entitled to summary judgment with respect to the issue of ratification.

### V.    A Pattern of Similar Violations

Lastly, although not necessary to overcome plaintiffs burden to deny qualified immunity to Sheriff Bailey, plaintiffs wish to draw the Court's attention to some serious, violent incidents occurring prior to the Jenkins and Parker ordeal.   The Court Stated in its Order on denying defendant's Motion to Dismiss on the Pleadings:

> Constructive Knowledge: Plaintiffs pleaded a plausible claim that the Goon Squad acted consistently with a widespread pattern of unconstitutional abuse. To begin, when "the violations are flagrant or severe, the fact finder will likely require a shorter pattern of the conduct to be satisfied that diligent governing body members would necessarily have learned of the objectionable practice and acceded to its continuation." Bennett v. City of Slidell, 728 F.2d 762, 768 (5th Cir. 1984) (en banc). The violations here could not be more flagrant, and it is hard to imagine more severe violations of constitutional rights.

At his sentencing hearing for victim Alan Schmidt, defendant Hunter Elward admitted that the vicious conduct at issue in this case has been occurring for years in the Rankin County Sheriff's department:

> I don't want to get too personal, Mr. Jenkins.  I see you every dadgum night.  And I can't go back and do what's right, **because to sit here and say that I could go back and do what's right would mean that I needed to go back 7 years to the first time I saw this type of behavior**. [emphasis added].

Exhibit 10. Elward Sentencing Hearing at pg. 26. (U.S. v. Hunter Thomas Elward, Crim. Nos. 3:23CR62, 3:23CR63 3/19/2024).

In addition, defendant Christian Dedmon has now admitted that there existed a culture of violence and unconstitutionality as alleged in plaintiffs' amended complaint. Speaking to the Honorable Tom S. Lee of this Court, defendant Dedmon pronounced:

I got into law enforcement not as a devil. I really wanted to make a difference in my community. I stand before you today, 29 years old, with a sound mind that I can make choices for myself, sir. As my attorney said, **there was a culture of doing things, and I'm probably the only person 28 years old that was ever promoted to narcotics investigator in a county as big as Rankin as fast as I was, and it was because instead of choosing to do the right thing, I chose to be a show-off for an expectation of the ones that came before me and became my boss.** [emphasis added].

Exhibit 9. Dedmon Sentencing Hearing at pg. 25. (U.S. v. Christian Lee Dedmon, Crim. Nos. 3:23CR62, 3:23CR63 3/20/2024).

On December 4, 2022 Alan Schmidt was brutally victimized in a similar way to Jenkins and Parker, by Dedmon and Elward.   Schmidt's victims impact statement at Dedmon's sentencing read as follows:

….that I'm a human being, just like them. I hurt, just like them. I feel, just like them.
"I finally began to pray to God out loud to save me. I know that nobody is perfect, I know that I've made mistakes in the past, but I would never treat another human being or living creature the way I was treated by the officers sworn to protect the Constitution and our rights. The louder I prayed, the harder I was beaten.
"I began to slip into unconsciousness and passed out, and the assault finally stopped. The pain was excruciating. I was still cuffed from the time Dedmon arrived on scene throughout the assault, being shot at and then sexually assaulted.
"When I was able to gather my bearings and surroundings, I was being walked by Hunter Elward and Christian Dedmon and then forced to my knees in front of Dedmon. Dedmon pulled his private part and began hitting me in the face with it. Dedmon tried to put his privates in my mouth, but I kept my mouth as tight as I could. I could not help but think during this, 'What sick individual does this? He has so much power over us already, so to act this way, he must be truly sick in the head.' I did not think I was in reality anymore. This is not the world we live in. We are better than this.
"Since I would not touch Dedmon or Elward's privates and kept screaming, no, that they are sick for this, they pulled my pants down. I was still handcuffed and defenseless. The officers started touching my private parts. Dedmon grabbed my privates and said, 'My, you have a big one,' and dry-humped me.

> I kept screaming that they are sick and to let me go. The
> assault eventually stopped when the officers took me to jail.
> "My face was injured pretty bad and they knew it, but they
> didn't take me to the hospital or even have medical evaluate me
> at the jail. Nobody cared.

> Christian Dedmon's Sentencing Hearing [Ex. 9]

The brutal Alan Schmidt affair of 12/4/2022 marks striking similarities to the Jenkins and Parker

ordeal and it typifies the lawless environment under Bailey's supervision.

In addition to the Alan Schmidt incident and guilty pleas. Plaintiffs would like the court to

acknowledge the affidavits of Jeremy Travis Paige, Mitchell Hobson, Maurice Porter and

Frederick Trimble and J. Tyler Mote.   Each one of these persons were victimized by Rankin

County deputies, specifically Brett McAlpin and Christian Dedmon in the years preceding the

fateful night of January 24, 2023.  Although these persons were caught up the life of narcotics,

nonetheless the constitutional violations that occurred against them at the hands of Rankin

County deputies, under the leadership of Sheriff Bryan Bailey are intolerable. The acts occurring

against Alan Schmidt and the victims in affidavits in Exhibit 11 are additional evidence that

Sheriff Bailey's incompetence and lack of supervision over the course of several years was the

causative factor behind the tragedy that befell the plaintiff's on 1/24/23.  The testimony of these

victims raise fact issues that preclude granting summary judgment to defendant Bailey.

Wherefore, for the reasons stated herein and in the record of this proceeding, the

plaintiffs submit that in the absence of any identified material undisputed facts, no basis

whatsoever exists for summary judgment to be granted on the issue of alleged qualified

immunity.

Respectfully submitted,

26

  _/s/_ MALIK SHABAZZ _ESQ /S/_
**MALIK SHABAZZ, Esq.**
 The Law Office of Malik Shabazz, Esq.
 D.C. Bar # 458434
 700 Pennsylvania Ave SE
 Washington, DC 20003
 Email:Attorney.shabazz@yahoo.com
 Tel: (301) 513-5445
 Fax: (301) 513-5447
 (Lead counsel for Plaintiff)


  _/S/_ TRENT WALKER ESQ _/S/_
**TRENT WALKER, Esq.**

---

[5] On page 14 of the Mot Mem., defendant Bailey contests the plaintiffs' contention that no adverse action was taken against any of the defendant deputies until after the present lawsuit was filed and criminal charges were imminent. In doing so, Bailey maintains that defendant Elward was placed on administrative leave after the incident and defendant Dedmon was assigned to desk duty. He further indicates that defendant McAlpin was placed on administrative leave on June 3, 2023, defendant Dedmon was placed on administrative leave on June 6, 2023, and defendant Middleton was placed on administrative leave on June 13, 2023. Defendant Bailey does not, however, explain how administrative leave with pay constitutes an adverse employment action or why this would not be a genuinely disputed issue.

[6] Plaintiffs' claim with respect to defendant Bailey is not based upon inadequate or a failure to train the defendant deputies. It is based upon his grossly negligent supervision of the defendant deputies and the adoption of a policies/practices that had the foreseeable consequence of leading to unconstitutional law enforcement actions such as the excessive use of force, and illegal seizures.

The Law Offices of Trent Walker
M.S.B. #10475
5245 Keele Street Suite A
Jackson, Mississippi 39206
Email:Trent@Trentwalkeresq.com
(Mississippi Local Counsel)
(601) 321-954