Jenkins, Parker v. Rankin County et al., Case No. 3:23-cv-00374

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF MISSISSIPPI
# NORTHERN DIVISION

|  |  |
|---|---|
| **MICHAEL JENKINS, et al.**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**RANKIN COUNTY, MISSISSIPPI,** *et al.,*<br><br>*Defendants.* | **Case No. 23:CV-00374-DPJ-ASH**<br><br>**AFFIDAVIT OF**<br><br>**THOMAS J. TIDERINGTON**<br>(Thomas J. Tiderington & Associates-LLC)<br>April 14, 2024 |

HAVING BEEN DULY SWORN, I, ***THOMAS J. TIDERINGTON***, STATE THE FOLLOWING

AND INCORPORATE BY REFERENCE EXHIBITS A, B, C, AND D (attached):

Jenkins, Parker v. Rankin County et al., Case No. 3:23-cv-00374

## AFFIDAVIT OF THOMAS J. TIDERINGTON

### April 14, 2025

### A.    INTRODUCTION

I have been retained by attorneys Malik Shabazz and Trent Walker, representing Plaintiffs Michael Jenkins and Eddie Terrell Parker. I was asked to review the case materials and to provide my professional evaluation and expert opinion regarding the actions and conduct of the Rankin County Sheriff's Office, including Sheriff Bryan Bailey and the deputies under his command. My analysis includes a detailed examination of departmental policies, training protocols, supervisory oversight practices, and the actual conduct of the deputies involved. I have also assessed Sheriff Bailey's role and responsibilities as the chief executive of the agency, particularly regarding his obligations to implement effective policies, ensure proper training, exercise meaningful supervision, and hold personnel accountable. My findings are based on my decades of law enforcement experience, accepted policing standards, and nationally recognized best practices, and are intended to assist the trier of fact in evaluating whether the actions of the Sheriff and his deputies were consistent with professional law enforcement norms and standards.

In conducting this analysis, I have drawn upon my 44 years of law enforcement experience, including my specialized knowledge in criminal investigations, police practices, and training. My conclusions are based on my review of the available case materials, including police reports, deposition transcripts, and relevant Rankin County Sheriff's Office policies and procedures. The following report details my findings, grounded in recognized police protocols and practices.

My opinions and the materials on which I base my opinions are discussed in greater detail below. Attachments to this report include the following:

Attachment A - Complete and detailed curriculum vitae.

Attachment B – List of testimony.

Attachment C - Rate of compensation.

Attachment D – List of materials provided for review.

Of course, if any new material is provided to me related to this matter or my opinions set forth in this report, I will consider it. Therefore, I reserve the right to alter my opinions and/or form additional opinions regarding this case upon disclosing further information or documentation related to this case.

Jenkins, Parker v. Rankin County et al., Case No. 3:23-cv-00374

## Executive Summary

I was retained by counsel for Plaintiffs Michael Jenkins and Eddie Terrell Parker to conduct a professional review and provide an expert opinion on the conduct, practices, and oversight within the Rankin County Sheriff's Office, particularly as it relates to the events of January 24, 2023, and the actions of Sheriff Bryan Bailey and his deputies. Drawing upon over four decades of law enforcement experience, including 20 years as Chief of Police and extensive national training and policy development, I examined the department's policies, internal practices, training standards, supervisory oversight, and use-of-force accountability systems.

My review included extensive documentation, deposition transcripts, official policies, internal records, and national standards issued by the International Association of Chiefs of Police (IACP), the Commission on Accreditation for Law Enforcement Agencies (CALEA), and the Police Executive Research Forum (PERF). I evaluated whether the department's practices met the expected standards of a professionally managed law enforcement agency.

**Key Findings** (as detailed further in this report):

Widespread Misconduct, Incompetence, and Leadership Failure: The actions of deputies—including unlawful entries, excessive force, racial abuse, and coordinated attempts to cover up misconduct—did not occur in isolation. They reflect a broader culture of impunity and lack of accountability within the Sheriff's Office, as explained in multiple sections of this report.

Lack of Oversight and Policy Enforcement: Sheriff Bailey failed to implement or enforce critical policies for complaint handling, use-of-force reviews, TASER oversight, and body-worn camera accountability. These omissions, detailed throughout my analysis, created an environment in which deputies operated without fear of scrutiny or discipline.

Inadequate Complaint and Internal Affairs Procedures: The department lacked a meaningful system to receive, track, and investigate citizen complaints. Testimony and documentation, reviewed and discussed in depth in this report, confirm that complaints were selectively documented and handled informally without oversight or pattern analysis, contrary to professional standards in law enforcement.

Deficient Use-of-Force Policy: The department's policy did not require formal findings, corrective actions, or training referrals following use-of-force incidents. As explained in the policy comparison sections, this failure represents a significant deviation from best practices and hindered internal accountability.

TASER and Technology Mismanagement: Sheriff Bailey was unfamiliar with the capabilities of TASER devices issued to his deputies, and no process was in place for

the routine download, review, or audit of use data. Alternatively, if he was aware of these capabilities, he failed to implement the necessary procedures to ensure proper oversight, policy compliance, and accountability. As detailed in my report, this lack of proactive monitoring prevented early detection of excessive or inappropriate force and represents a clear departure from national guidelines and accepted professional practices.

<u>Post-Incident Reforms Were Delayed and Reactive:</u> Critical reforms—such as supervisory BWC review and compliance tracking—were implemented only after the Jenkins-Parker incident and widespread public attention. As noted in the concluding sections of this report, these are standard accountability measures that should have existed long before the events of January 2023.

<u>Conclusion:</u>

It is my professional opinion that the Rankin County Sheriff's Office, under the leadership of Sheriff Bryan Bailey, deviated significantly from widely accepted law enforcement standards and failed to implement basic systems of accountability, oversight, and transparency. These failures directly contributed to the unconstitutional conduct and civil rights violations suffered by the plaintiffs. Sheriff Bailey's incompetent leadership, disregard for policy enforcement, and absence of meaningful internal controls created a permissive culture where abuse could and did occur unchecked.

## B.   SUMMARY OF QUALIFICATIONS

For the past forty-four years, twenty years as Chief of Police (retired June 2022), I have served as a full-time law enforcement officer with three different police departments and as a Group Supervisor for the United States Drug Enforcement Administration's South Florida Regional Task Force. I have trained over 10,000 federal, state, and local law enforcement officers on police practices and criminal investigations.  For over 30 years, I have been an instructor at numerous regional, national, and international law enforcement training events and have lectured on a wide variety of police practices and criminal investigations.

Over the last five years, I have been engaged as a criminal justice consultant, trainer, case reviewer, and expert witness in law enforcement-related matters.  As a recently retired Police Chief of twenty-plus years, I have reviewed and approved policies and procedures relating to every aspect of police operations, including criminal investigations, case development, report writing, maintenance and retention of police records, complaints against police officers, training, supervision, and employee discipline.   I am currently an active life member of the International Association of Chiefs of Police (IACP), a member of the Police Executive Research Forum (PERF), and a life member of the Michigan Association of Chiefs of Police (MACP).

Jenkins, Parker v. Rankin County et al., Case No. 3:23-cv-00374

Throughout my law enforcement career, I have frequently worked and interacted with federal agencies such as the Federal Bureau of Investigation (FBI), the Department of Homeland Security Investigations (HSI), the Internal Revenue Service (IRS), the Secret Service, the United States Marshalls Service (USMS), the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), the Office of the Inspector General (DOJ-OIG), and the Drug Enforcement Administration (DEA). I have also worked cooperatively with numerous state and local police agencies. As a result of my many decades of working extensively with many federal, state, and local agencies, I am familiar with the many similarities of investigative methods and strategies, as well as nationally acceptable best practices and protocols. I also have many years of extensive practical experience in investigating and supervising complex criminal investigations, including violent crimes and homicide investigations.

During my 44-plus-year law enforcement career, I have been responsible for the review and processing of hundreds of disciplinary actions up to and including suspensions and terminations. I also managed and supervised the accreditation process for both the Fort Lauderdale and Plymouth Township Police Departments. The accreditation process furthers an agency's professional development and ensures that its methods, policies, procedures, and daily operations follow the best practices or "professional standards" in the law enforcement arena. As a Police Chief for over twenty years, I have reviewed and approved policies and procedures of every kind, including (but not limited to) criminal investigations, retention and maintenance of police records, complaints against police officers, training, supervision, and discipline.

My role in presenting this report and any subsequent depositions and trial testimony is to assist the trier of fact in reaching its conclusions. The information that I relied on consists of the type of information that is reasonably relied upon in my field of expertise. All my opinions are rendered to a reasonable degree of professional certainty in the field of police practices, law enforcement training, administration, and discipline and are based upon my education, training, and employment as a law enforcement officer, as well as my work as a law enforcement trainer, and my experience as a consultant in the field.

My qualifications are summarized in greater detail in my curriculum vitae, which is attached to this report. A list of my court and deposition testimony in the last four years is attached to this report. I am being compensated for my time at the rate of $350.00 per hour. My compensation is not contingent on the outcome of this litigation nor on the opinions I express in this report or subsequent court testimony.

**Of Specific Relevance to this Case:**

- o  I have supervised hundreds of Officers during my career and reviewed their compliance with agency policies relating to criminal investigations as a supervisor and later in command and executive management positions. I have reviewed hundreds of internal investigations involving allegations of violations of agency policy.

Jenkins, Parker v. Rankin County et al., Case No. 3:23-cv-00374

o   I have extensive supervisory, management, administrative, investigative, and operational experience in law enforcement, supplemented by practical and formal education and specialized training in law enforcement. I have received over 4,800 hours of specialized and professional training in nearly all areas of law enforcement, including particular emphasis on investigations, arrests, use of force, and policies and procedures. I have also been involved and responsible for developing and updating police policies and procedures for over 25 years during my law enforcement career.

o   For over four decades, I have conducted criminal investigation and use of force training classes for tens of thousands of state, local, and federal law enforcement Officers throughout the United States and abroad.

o   For over five years, I led the United States Drug Enforcement Administration's South Florida Regional Task Force. In this capacity, I oversaw and managed a multi-agency task force that included federal agents and state and local law enforcement officers. My duties encompassed supervising and managing international investigations and handling enforcement requests from various law enforcement agencies.

o   I have developed and established policies, protocols, and procedures governing police investigations, use of force, and follow-up of criminal complaints and allegations of police misconduct.

o   I have examined hundreds of use-of-force incidents to assess compliance with policy, legal requirements, and the appropriateness of the force employed. I have undertaken these reviews in various capacities, including as an instructor, supervisor, command officer, and Chief of Police for over twenty years in Michigan.

o   Since 1984, I have been an instructor and/or adjunct faculty of law enforcement practices at numerous police academies and accredited colleges in Michigan and Florida.

o   During my 38 years in police supervisory and management capacities, I have reviewed and processed hundreds of disciplinary actions, including termination.

o   Over 30 years of experience developing and overseeing use-of-force policies, practices, and training.

o   I was a M.C.O.L.E.S. certified police officer in Michigan for over twenty-two years and taught various in-service classes, including use of force training at Schoolcraft College.

o   I was a F.D.L.E. certified police officer in Florida for over twenty-one years and taught various in-service classes, including use of force training at Broward Community College.

o   I managed and supervised the police department's accreditation process, Commission on Accreditation for Law Enforcement Agencies (CALEA), and the Michigan Law

Jenkins, Parker v. Rankin County et al., Case No. 3:23-cv-00374

Enforcement Accreditation Commission (MLEAC), which underscores identifying and adopting what is considered "Nationwide Best Practices" in law enforcement.

o   I have been recognized as an expert witness in numerous cases involving law enforcement actions and practices in State and Federal courts.

## C.   METHODOLOGY USED TO EVALUATE:

In this case, I applied the same rigorous methodology I have used throughout my forty-four-year law enforcement career when overseeing and evaluating the performance of investigators under my supervision and command. My supervisory experience in criminal investigations has always ensured that proper protocols are followed, evidence is collected and preserved accurately, and that all investigative actions are conducted with integrity and professionalism. Over the years, I have identified deficiencies in investigative procedures, ensured compliance with legal and departmental standards, and provided guidance to detectives to correct and improve their work. My role required me to critically assess the completeness of investigations, including the documentation of witness statements, the preservation of physical evidence, and adherence to policies related to searches, interrogations, and evidence disclosure.

The method I used in reaching my conclusions included a review of materials provided by the Plaintiff's counsel and vetted against what I have come to know through my years of specialized education, training, and experience as generally accepted practices in the field of law enforcement. These standards have also been established in model policies promulgated by professional organizations such as the International Association of Chiefs of Police (IACP)[1] and the Commission on Accreditation for Law Enforcement (CALEA). These practices have also been consistently reinforced by research-based organizations such as the Police Executive Resource Forum (PERF).[2]   Lastly, these practices have been vetted through our courts as evidenced by innumerable United States Supreme Court decisions, some of which are cited

---

[1]   The International Association of Chiefs of Police (IACP) is the world's largest and most influential professional association for police leaders. With more than 32,000 members in over 170 countries, the IACP is a recognized leader in global policing, committed to advancing safer communities through thoughtful, progressive police leadership. Since 1893, the association has been serving communities by speaking out on behalf of law enforcement and advancing leadership and professionalism in policing worldwide.

[2]   The Commission on Accreditation for Law Enforcement Agencies, Inc. (CALEA) was created in 1979 as a credentialing authority through the joint efforts of law enforcement's major executive associations: International Association of Chiefs of Police (IACP), National Organization of Black Law Enforcement Executives (NOBLE), National Sheriffs' Association (NSA), Police Executive Research Forum (PERF).  The CALEA Accreditation programs provide public safety agencies with an opportunity to voluntarily meet an established set of professional standards, which require: Comprehensive and uniform written directives that clearly define authority, performance, and responsibilities, as well as reports and analyses to make fact-based and informed management decisions.

within this report. I mention these important court decisions not to invade the province of the fact finder but because these decisions provide the guiding principles on which law enforcement policy and practices are based.

There is a substantial body of knowledge and literature about the practices and standards that modern, reasonably managed, and administered police agencies across the United States should follow and apply to their operations. These generally accepted practices have developed over time to encourage and assist police agencies in delivering police services to communities that are professional, reasonable, effective, and legal. Many of these generally accepted practices have been developed from law enforcement's critical analysis of field incidents and examinations of incidents reported to cause police liability, deficiencies, and employee misconduct.

**Terminology:**  My opinions in this report may include terminology resembling legal terms or standards. The use of such terms is not intended to draw legal conclusions, undermine the court's role, or improperly influence the trier of fact. Instead, terms such as "reasonable," "reckless," "negligent," "unreasonable," "foreseeable," "excessive," and "gross deviation" are commonly used in my field of expertise and are integral to law enforcement practices. These terms are not only part of my professional vocabulary as a former Police Chief but are also embedded in police department policies and procedures.

Throughout my career, I have routinely used these terms when training, supervising, and communicating with law enforcement personnel. These concepts are fundamental to evaluating officer conduct and decision-making in the field. For example, assessing whether an officer's actions were "reasonable" or whether a particular outcome was "foreseeable" is critical when determining compliance with departmental policies or when evaluating use-of-force incidents. Therefore, while these terms may resemble legal language, they are deeply rooted in the practical application of police work and are essential to my professional assessment of investigative practices.  Such terminology is common in my field and reflects my assessment of the officers' actions relative to accepted police practices. Any legal determination remains the responsibility of the court and factfinders.

My analysis and report avoid determining the credibility of the various parties and witnesses, or choosing between disputed accounts, as that is outside the purview of my work and remains within the province of the fact finder.

Additionally, my opinions are provided to educate the jury on generally accepted police practices and procedures.  They are interspersed throughout this report and extend beyond the explicitly identified opinions.  Excerpts extracted from reports contained within the case file, which are referenced in this report, are indicated in italics.

**Rule 26 Disclosures:**  My qualifications are summarized in greater detail in my curriculum vitae, which is attached to this report. I have also attached my fee schedule and a list of my court and deposition testimony in the last four years.

I declare, in compliance with Rule 26 of the Federal Rules of Civil Procedure, that the following statements represent a complete statement of all opinions to a reasonable degree of professional

Jenkins, Parker v. Rankin County et al., Case No. 3:23-cv-00374

certainty that I will express and the basis and reasons for them, the facts or data considered in forming them, any exhibits that will be used to summarize or support them. If called to testify in this matter, I will express the opinions in this report and any subsequent depositions unless provided with materials that change my opinions.

### D.    SUMMARY OF FACTS:

The criminal complaint in this case outlines a shocking and deeply disturbing case of police misconduct involving six law enforcement officers from the Rankin County Sheriff's Department and the Richland Police Department in Mississippi. These officers, who referred to themselves as the "Goon Squad," were charged with multiple federal felonies, including deprivation of rights under color of law, conspiracy to obstruct justice, obstruction of justice, and the use and discharge of a firearm during a violent crime.





Lt. Jeffrey Middleton, a supervisor, gave commemorative coins to Goon Squad members.

On January 24, 2023, the officers conducted a warrantless entry into a home in Rankin County without legal justification. Once inside, they launched a sustained and brutal assault on the plaintiffs, Michael Corey Jenkins and Eddie Terrell Parker. The officers tased, beat, and humiliated the victims, using racial slurs and issuing threats to "stay out of Rankin County." They escalated the abuse by forcing the victims to strip, pouring milk, alcohol, and cooking grease on them, and physically assaulting them with objects, including a "dildo". At one point, one of the officers shot Michael Jenkins in the mouth with his service weapon, causing catastrophic injuries.

Jenkins, Parker v. Rankin County et al., Case No. 3:23-cv-00374



Michael Corey Jenkins, 32, was hospitalized at the University of Mississippi Medical Center while receiving treatment for a gunshot wound in the mouth. His attorney said Jenkins received that injury by a Rankin County sheriff's deputy who raided a Braxton residence he was at on January 24, 2023. Image courtesy of Malik Shabazz, United States.

Following the attack, the defendant officers coordinated a deliberate cover-up. They concocted a false narrative to justify their actions, planted a BB gun to falsely claim the victim was armed, removed and destroyed surveillance footage, tampered with physical evidence, and submitted false reports to authorities. Despite their attempts to obstruct justice, the truth eventually surfaced, and all six officers pleaded guilty in federal court to charges related to the incident. Their guilty pleas included admissions of excessive force, civil rights violations, lying to investigators, and fabricating evidence.

The plaintiffs allege that the January 24, 2023, incident was not an isolated act of misconduct but rather the result of systemic failures within the Rankin County Sheriff's Office, reflecting a deeply entrenched culture of impunity, abuse, and criminal activity. According to the civil complaint, the so-called "Goon Squad"—a group of deputies known for their violent and unconstitutional conduct—operated openly and notoriously within the department, even adopting a logo to identify themselves. The plaintiffs claim that Sheriff Bryan Bailey and Rankin County had actual or constructive knowledge of this group's pattern of excessive force, racial abuse, and civil rights violations. Despite multiple red flags, public complaints, and prior incidents involving some of the same deputies, the department allegedly failed to take any meaningful corrective action. Plaintiffs assert that the Sheriff's Office not only tolerated but enabled this misconduct through its refusal to supervise, retrain, or discipline its officers, thereby creating an environment where such brutality could flourish unchecked. They argue that this deliberate indifference was a direct cause of the horrific abuse they suffered.

The incident, as detailed in the complaint, stands out as one of the most egregious examples of police brutality and corruption in recent U.S. history. It not only reflects individual criminal behavior but also raises serious concerns about systemic failures, abuse of authority, failure to supervise, and a profound lack of accountability within the Rankin County Sheriff's Department. In response to these serious allegations and similar complaints from the broader community, the U.S. Department of Justice launched a civil "pattern or practice" investigation into the Rankin County Sheriff's Department in December 2023. Separate from the earlier federal criminal

Jenkins, Parker v. Rankin County et al., Case No. 3:23-cv-00374

prosecutions, the civil inquiry aims to determine whether the department has engaged in systemic constitutional violations, including the excessive use of force, unlawful stops, searches, and arrests, and racially discriminatory policing practices. The DOJ's announcement noted that the "sickening acts" of the Goon Squad were part of a wider concern, citing reports of deputies overusing Tasers, unlawfully entering homes, deploying racial slurs, and using cruel tactics against individuals in their custody.



PRESS RELEASE

# Justice Department Announces Civil Rights Investigation of Rankin County, Mississippi, and Rankin County Sheriff's Department

Thursday, September 19, 2024

**For Immediate Release**
Office of Public Affairs

This combination of photos shows former Mississippi law enforcement officers who pleaded guilty to state and federal charges for torturing two Black men, from top left, former Rankin County sheriff's deputies Hunter Elward, Christian Dedmon, Brett McAlpin, Jeffrey Middleton, Daniel Opdyke and former Richland police officer Joshua Hartfield, during court appearances Monday, Aug. 14, 2023, in Brandon, Miss.

Attorney General Merrick Garland emphasized the federal government's commitment to holding law enforcement accountable, stating the investigation would focus on repeated patterns of abuse, not just one egregious incident. Assistant Attorney General Kristen Clarke highlighted the department's duty to examine and address widespread racial discrimination and unconstitutional conduct, while U.S. Attorney Todd Gee underscored that the behaviors described echoed some of the darkest chapters of Mississippi's history. The Justice Department's investigation will include a comprehensive review of RCSD's policies, training, supervision, accountability systems, and community engagement practices. Federal officials have pledged to work with both

Jenkins, Parker v. Rankin County et al., Case No. 3:23-cv-00374

community members and law enforcement personnel to conduct a thorough and impartial inquiry, with the goal of ensuring that civil rights are respected and protected in Rankin County.

**Leadership Responsibility for Ensuring Integrity and Accountability in Law Enforcement:**

Law enforcement officers and deputies are entrusted with extraordinary powers, including the authority to stop, detain, arrest, search, and use force—up to and including deadly force. Because of this immense authority, the public rightly expects law enforcement agencies to be governed by strong internal controls and professional oversight mechanisms that prevent abuse, detect misconduct, and promote ethical behavior at every level.

A sheriff or police chief, as the highest-ranking official within a law enforcement agency, holds the ultimate responsibility for establishing and maintaining the culture, policies, and operational standards of their department. This includes the duty to ensure that policies and procedures are not only in place but are actively enforced to promote honesty, integrity, accountability, and respect for constitutional rights.

In this case, it is the agency head, Sheriff Bailey's, explicit responsibility to ensure those systems exist and are functioning effectively. This includes, but is not limited to:

- Implementing clear, written policies aligned with constitutional standards and best practices.
- Establishing internal accountability mechanisms such as internal affairs, complaint tracking, and use-of-force review systems.
- Enforcing rules consistently and fairly, without favoritism or bias.
- Providing training to ensure all personnel understand and follow departmental policies.
- Taking immediate corrective action when misconduct occurs.

**Professional Standards and Guidance:**

The International Association of Chiefs of Police (IACP) emphasizes that: "The agency's chief executive is ultimately responsible for the ethical climate of the organization. The leader must clearly communicate expectations for integrity and hold personnel accountable through fair and consistent enforcement of policies and discipline."[3]  The U.S. Department of Justice (DOJ) similarly recognizes that: "agency leadership must create a culture of accountability. This starts with clear policies and the consistent application of those policies through supervision, data analysis, training, and discipline."

> *Law enforcement officers possess unique powers and discretion to take actions that require professional supervision, management, oversight, control, and adherence of officers to a rigid code of conduct and professionalism. In response to this, law enforcement agencies have a duty to fully and completely investigate allegations of employee misconduct.*

---

[3] *IACP Standards of Conduct- Ethics Toolkit, 2019*

Jenkins, Parker v. Rankin County et al., Case No. 3:23-cv-00374

> *Through the development of policies and procedures to detect and respond to instances of employee misconduct, a law enforcement agency can protect its interests and reputation, promote public trust, ensure that heightened integrity remains a mainstay of the law enforcement profession, and mitigate potential civil litigation.*
>
> *To be effective, internal investigation and disciplinary procedures must be consistently applied to all employees in an equitable manner. Inconsistent discipline can undermine the entire disciplinary process and lead to charges of disparate treatment and civil litigation. In addition, all employees should be provided with regular training and guidance to foster increased understanding and acknowledgement of agency policy on this topic.* [4]

Based on my forty-four-year law enforcement career, I know that when a sheriff or police chief fails to establish and enforce systems that promote integrity and prevent abuse of power, that failure cannot be excused or dismissed as ignorance or delegation. It is a core leadership responsibility. A law enforcement agency reflects the tone, values, and standards set at the top. Where honesty and accountability are not enforced by leadership, misconduct can flourish—often with devastating consequences for both the public and the integrity of the justice system.

## E.    OPINIONS AND ANALYSIS

**OPINION:**  Based on my review of the records, sworn testimony, and supporting materials related to this case, the events of January 24, 2023, and the deliberate efforts to conceal what occurred reveal not just isolated misconduct, but a deeply rooted culture of misconduct and corruption within the Rankin County Sheriff's Office. The actions of the involved deputies, including their warrantless entries, repeated use of excessive force, racial abuses, and the fabrication and destruction of evidence, were not only unlawful but brazenly coordinated. These actions could not have occurred in a vacuum.

It is inconceivable to believe that Sheriff Bryan Bailey was unaware of the repeated and egregious misconduct carried out by members of his department, particularly by a group of officers who openly referred to themselves as the *"Goon Squad"* and operated with apparent impunity. If Sheriff Bailey did, in fact, know and failed to intervene, he bears direct responsibility for allowing this behavior to continue unchecked. If, on the other hand, he honestly did not know, this raises serious concerns about his ability to supervise, manage, or maintain any reasonable level of accountability within his agency.

The systemic nature of the abuse—combined with the absence of any meaningful corrective action, retraining, or disciplinary measures—reflects widespread institutional failure. The department's lack of oversight and its tolerance of unconstitutional behavior represent a complete breakdown in leadership and a dangerous departure from professional policing standards. These failures created the conditions that allowed the events of January 24, 2023, to occur and directly contributed to the severe and lasting harm suffered by the plaintiffs.

---

[4] IACP – Investigation of Allegations of Employee Misconduct (2019)

Jenkins, Parker v. Rankin County et al., Case No. 3:23-cv-00374

**ANALYSIS:** Based on my decades of experience in law enforcement—including supervising officers, conducting internal reviews, and evaluating department-level practices—I know that police misconduct of this nature does not occur in isolation. It thrives in environments where oversight is weak, accountability is absent, and leadership either ignores or tacitly condones unlawful behavior. In the sections that follow, I will analyze the key deviations from accepted law enforcement standards and explain how the failure to address or prevent the *Goon Squad's* actions represents a complete collapse of professional policing principles.

The absence of documented disciplinary action, corrective training, or meaningful internal review strongly suggests that policies were either ineffective, ignored, or selectively applied.

Failure to enforce department policies not only undermines accountability—it signals to officers that misconduct will be tolerated. The International Association of Chiefs of Police (IACP) emphasizes that for internal investigation and disciplinary procedures to be effective, they must be understood and upheld by all members of the department. Without consistent enforcement, policies lack practical value and fail to guide officer behavior.[5]

The following areas are clear examples of Sheriff Bryan Bailey's failure to implement basic policies, oversight mechanisms, and technological systems that are widely recognized as essential for promoting transparency and accountability in modern law enforcement agencies. As the chief executive of the Rankin County Sheriff's Office, Sheriff Bailey bore the ultimate responsibility for establishing a departmental culture rooted in integrity, oversight, and constitutional policing. Instead, the absence of formal practices that adhere to widely known and accepted standards in these critical areas allowed serious and unimaginable misconduct to flourish unchecked within his department.[6]

1.    **Failure to have a proper policy relating to receiving and investigating Complaints from Citizens:**

   Bailey's Deposition Testimony on January 8, 2025:

   Shockingly, Sheriff Bailey admitted that at the time of the Jenkins-Parker incident, no formal complaint form was available for citizens to use. Complaints were received informally—over the phone or in person—and there was no standard procedure for documenting, tracking, or following up on these complaints.  (pgs 58-72).

---

[5] Building Trust Between the Police and the Citizens They Serve (DOJ/Cops – 2009).
[6] IACP – Investigation of Allegations of Employee Misconduct (2019) – pg. 2

Jenkins, Parker v. Rankin County et al., Case No. 3:23-cv-00374

```
 4        Q.    So do you have any written procedures
 5    regarding your complaint process at the time of the
 6    incident between Jenkins and Parker?
 7        A.    I'd have to go back and look and see.  I
 8    don't remember if we had anything in the policies or
 9    not.  But we do now.
10             We've made it a lot easier for the public
11    to file a complaint online or in person at the
12    sheriff's office.
13             And again, now we're logging and tracking
14    every single complaint, whether it's valid or not,
15    we still have a log of every single complaint that's
16    coming in.
17        Q.    So you're now -- you have official
18    procedures and logging complaints now; is that
19    right?
```
(pg. 62)

Sheriff Bryan Bailey's testimony further underscores the ineffectiveness of the Rankin County Sheriff's Office's complaint-handling policies. He testified that the department would only document complaints that he personally deemed "valid." This practice is a clear deviation from nationally accepted law enforcement standards, which require that all complaints—regardless of their perceived merit—be formally documented, logged, and reviewed.

```
19        Q.    Did you have a form -- go ahead.  I'm
20    sorry.
21        A.    No, no, you go ahead.
22        Q.    Did you have a formal complaint form?
23        A.    No, I didn't have a form that said
24    complaint.  But every report starts with a blank
25    piece of paper, so that blank piece of paper would
```
                                                                72
```
 1    be the complaint form.  The information would be
 2    taken via the telephone or in-person, referred to
 3    the department head and they -- I'd ask them to look
 4    into it and research it and find out if there's a
 5    valid complaint or not.
 6             Now we do have a complaint form that is
 7    available online.
 8        Q.    And you made -- and you made those changes
 9    for specific reasons, right?
10        A.    Yeah, I made those changes specific
11    because five deputies lied to me and committed
12    crimes against two innocent individuals.
```
**(pg. 71-72)**

Agencies are expected to treat every complaint as a matter of record, not only to ensure fairness and transparency, but also to detect patterns of misconduct and prevent future harm.[7] Allowing a department head to act as the sole gatekeeper of what is or is not worthy of documentation compromises public trust and undermines institutional

---

[7] IACP – Investigation of Allegations of Employee Misconduct (2019) (pg. 5)

Jenkins, Parker v. Rankin County et al., Case No. 3:23-cv-00374

accountability. In my professional opinion, this selective approach to complaint handling reflects a serious failure of policy and leadership and contributed directly to the unchecked misconduct that gave rise to the events at the center of this case.

```
 4       Q.    So do you have any written procedures
 5   regarding your complaint process at the time of the
 6   incident between Jenkins and Parker?
 7       A.    I'd have to go back and look and see.  I
 8   don't remember if we had anything in the policies or
 9   not.  But we do now.
10           We've made it a lot easier for the public
11   to file a complaint online or in person at the
12   sheriff's office.
13           And again, now we're logging and tracking
14   every single complaint, whether it's valid or not,
15   we still have a log of every single complaint that's
16   coming in.
17       Q.    So you're now -- you have official
18   procedures and logging complaints now; is that
19   right?
20       A.    Well, I had official procedures before,
21   but now this makes everybody more accountable.
22   Because there's one area for all these complaints to
23   go to where everybody can see them.  Everybody knows
24   about them now, instead of just that department
25   head.  More than one person knows about the
```
(pg. 62)

- Sheriff Bailey acknowledged that he did not maintain a "tracking log" of complaints and that he would have to research each deputize file to determine the number of complaints received in any given year.

```
13       Q.    (By Mr. Shabazz) Do you have a record of
14   the complaints for 2021?
15       A.    If there were any valid complaints that
16   came in that rose to the -- of being written --
17   somebody would have an offense report or a writeup
18   on a deputy or a jailer, employee, wherever the
19   complaint was, dispatch or wherever, it would be in
20   their personnel file.
21           So I would have to look through all the
22   files to see if there was anything in 2021.
```
(pg. 73)

```
14       Q.    Did you have a formal complaint form in
15   place at the time of Michael Jenkins and
16   Eddie Parker's incident?
17       A.    No, sir.  If it rose to -- if it was a
18   substantiated complaint, if there had been an
19   offense report written in the offense report system
20   or if it was serious enough it would be referred to
21   the FBI or attorney general's office.
```

Jenkins, Parker v. Rankin County et al., Case No. 3:23-cv-00374

(pg. 65)

- Bailey acknowledged that his office did not maintain a centralized record of complaints prior to 2023. When asked if he kept records in 2021 or 2022, he replied that complaints might exist only in scattered personnel files or offense reports (pg. 75), and there was no system in place to track complaints department-wide:
- Sheriff Bailey testified that he would subjectively determine the validity of complaints and handle them on a case-by-case basis. While he claimed to occasionally call citizens back with a resolution, there was no consistent written follow-up or formal notification process:
- The department had no full-time internal affairs investigator or unit prior to 2023. Complaints involving misconduct were only investigated if Bailey personally referred them to a designated officer like Steven Godfrey, who admitted he rarely conducted internal investigations—perhaps once or twice a year:
- Admission That Reforms Were Implemented Only After Deputies Lied - Sheriff Bailey candidly admitted that reforms to the complaint system only occurred after the Jenkins-Parker incident, when five deputies "lied to me and committed crimes." This reactive posture underscores the systemic failure to implement policies designed to detect and deter misconduct.

Long before the January 24, 2023, incident, law enforcement agencies across the country were expected to understand and implement meaningful, comprehensive policies for accepting, logging, documenting, and investigating citizen complaints. The importance of a transparent and accountable complaint process has been emphasized for decades by national organizations such as the International Association of Chiefs of Police (IACP), the U.S. Department of Justice, and the Police Executive Research Forum (PERF). These organizations have consistently published model policies and best practice guidelines stressing that agencies must provide multiple accessible avenues for the public to file complaints, must formally document and track all complaints, whether substantiated or not, and must assign trained personnel to conduct thorough, unbiased investigations.[8] These practices are essential not only for maintaining internal discipline, but also for reinforcing public trust and protecting constitutional rights.

Sheriff Bryan Bailey's sworn testimony reflects a significant deviation from these well-established standards. He admitted that, prior to the incident, his office did not have a formal complaint form, did not track complaints in any centralized system, and often handled citizen grievances informally or orally, without generating documentation or consistent follow-up. This failure to implement even the most basic elements of a complaint intake and investigation process is deeply concerning and stands in stark contrast to the professional expectations of modern law enforcement leadership. In my professional opinion, such a deficiency in oversight and accountability contributed directly to the unchecked misconduct that occurred in this case.

---

[8] IACP – Investigations of Allegations of Employee Misconduct (2019).

Jenkins, Parker v. Rankin County et al., Case No. 3:23-cv-00374



Best Practices for Accepting and Investigating Public Complaints (IACP Model Policy-Summary):

- Law enforcement agencies have a duty to ensure that the process of filing complaints is clear, accessible, and transparent to the public. Complaints should be accepted in multiple formats, including in person, by phone, in writing, by email, online, or even anonymously. Allegations raised through social media, litigation, or other channels should also be reviewed and formally documented.

- While any agency employee may receive a complaint, efforts should be made to refer complainants to a supervisor whenever possible. Every complaint should be recorded, assigned a unique tracking number, and evaluated—regardless of whether it results in a formal investigation. The Office of Professional Standards (OPS) or equivalent internal unit should screen all complaints to assess potential policy violations or patterns of misconduct. Even complaints based on misunderstandings may provide insight into training needs or officer behavior.

- Agencies are encouraged to use customized complaint forms that capture comprehensive details of the allegation. These forms should be made available at agency offices, in public spaces, and online. Providing online submission options helps protect complainant confidentiality. Complaint packets should also include clear instructions on the process, expected timelines, and what actions may follow.

- Each complainant should receive a copy of their completed complaint form and be asked to verify its accuracy with a signature. If the complainant declines to sign, the complaint should still be forwarded to OPS and the chief executive or their designee for review.

- While some agencies consider warning complainants about the consequences of filing false complaints, this practice is generally discouraged, as it may deter legitimate

Jenkins, Parker v. Rankin County et al., Case No. 3:23-cv-00374

concerns. However, notices regarding false reporting may be included in complaint materials. In cases where a complaint is determined to be intentionally false, the agency head should decide whether legal or administrative action is warranted.

- Overall, a formal, consistent, and well-documented complaint process is essential for maintaining public trust, ensuring accountability, and identifying areas for improvement within the agency.

2. **The Failure of Sheriff Bailey to Document and Track Complaints:** The fact that Sheriff Bryan Bailey did not have a meaningful system in place to track citizen complaints represents a serious and unacceptable deviation from widely recognized law enforcement standards and professional practices. In modern policing, the ability to receive, document, and analyze complaints is not optional—it is a core function of agency accountability, risk management, and community trust.

Tracking citizen complaints is a fundamental responsibility of law enforcement leadership and an essential element of professional, accountable policing. Police chiefs and sheriffs are entrusted with ensuring that their agencies operate with transparency, integrity, and public trust. A critical part of that duty involves establishing systems that collect, document, and analyze citizen complaints in a consistent and meaningful way.

> *Complaint Tracking A highly effective way to establish both individual and departmental accountability is by collecting, maintaining, and analyzing all complaint data (Internal Affairs Guidelines, 2008). CALEA Accreditation Standard No. 52.1.5 requires that agencies make annual statistical summaries of all records of law enforcement investigations available to the public and all departmental employees.*
>
> *By tracking complaints, management can evaluate the types of offenses that are the most frequent subject of complaints and also identify patterns of behavior related to specific officers.12 This form of tracking will help inform agency-wide training priorities as well as opportunities for individual intervention. Employee evaluations should use the EIS to identify an officer who may have repeated complaints lodged against him or her, and after analyzing the data, management can assist the employee in rectifying the problem behavior. T his kind of tracking contributes to the internal structure that can increase citizen trust in the agency, and decreases the department's (and the city's) legal liability as a risk-management tool.*
>
> *Additionally, by tracking the complaint process and analyzing the data from it, agencies can produce comprehensive, clear, and informative summary reports to disseminate to the public. In accordance with CALEA Accreditation Standard No. 52.1.5, these summary reports should be widely disseminated, "sending a message of transparency and accountability to the public" (Protecting Civil Rights, 2006, 104). Many agencies make this information available in their annual reports, in brochures, on their agency's websites, and through public service announcements. The information from these reports should be used in conjunction with other indicators of citizen satisfaction to ensure the continued integrity of the police department. Routine assessments of the agency are a way to proactively ensure that the high standards of the organization are being implemented and that those standards reflect the needs and desires of the community.[9]*

Sheriff Bailey's failure to track complaints reflects a fundamental breakdown in command-level duties and responsibilities. It stands in stark contrast to accepted national standards and

---
[9]

undermines the basic principles of transparency, fairness, and constitutional policing. It also deprived the Sheriff's Office of one of the most essential tools for evaluating deputy conduct and improving organizational performance. <u>The absence of a complaint tracking system was not merely a policy gap—it was a critical failure of leadership and oversight that contributed directly to the unchecked misconduct at the heart of this case.</u>

A formal, accessible, and consistently enforced complaint system is fundamental to maintaining accountability and transparency within any law enforcement agency. Such a system serves multiple vital purposes: it provides members of the public with a meaningful avenue to report misconduct; it enables agency leadership to detect problematic behavior early; and it establishes a clear framework for evaluating, addressing, and correcting officer conduct. The absence of such a process creates an environment where misconduct can go unchallenged, and where officers—especially those operating in specialized or high-risk units—may feel emboldened to act outside the law without fear of repercussion.

Had a proper complaint system been in place—one that accepted complaints in multiple formats, required written documentation, ensured supervisory review, and tracked allegations over time— it is likely that earlier patterns of misconduct involving the deputies in question would have been detected and addressed. The failure to implement these basic accountability mechanisms created the conditions in which the unlawful, violent, and racially charged acts committed by the so-called "Goon Squad" were able to occur unchecked. In my opinion, this institutional failure was not incidental; it was a direct and foreseeable contributing factor to the events that transpired on January 24, 2023.

It is my professional opinion—based on my forty-four-year career in law enforcement, including extensive experience supervising officers, conducting internal investigations, and evaluating agency policies—that Sheriff Bryan Bailey's failure to implement a critical and well-established process for receiving, documenting, and investigating citizen complaints directly contributed to the misconduct that occurred on January 24, 2023.

**Use of Force Policy:**  A review of the Rankin County Sheriff's Office Use of Force policy reveals significant deficiencies when compared to nationally recognized best practices, such as those outlined by the International Association of Chiefs of Police (IACP)**.** Most notably, Sheriff Bailey's policy fails to require any formal findings following a use-of-force incident**.** It does not mandate that supervisors determine whether the force used was consistent with policy or whether the incident was "sustained," "exonerated," "unfounded," or "not sustained."

**Reporting Requirements:**

The agency's Chief Officer or his designee will be notified immediately when any type of force is used and there is resulting *serious physical injuries or death*.

A *Use of Force Report* shall be completed and submitted, prior to the end of the shift (except for deadly force situations), by any Officer(s) who:
1. Discharges a firearm or electronic weapon for other than training.
2. Takes an action that results in or is alleged to have resulted in bodily injury or death to another person;
3. Applies force through the use of lethal or less-than-lethal weapons; or
4. Applies weaponless physical force at a level as defined by the agency.
5. Charges an arrestee(s) with Resisting Arrest or any crime where physical force, beyond simply handcuffing, was required to effect the arrest.

Each Officer who witnessed the incident or responded to the scene will also complete a written report prior to the end of the shift.  These witness reports will be submitted to the agency's Chief Officer or his designee for review.

Jenkins, Parker v. Rankin County et al., Case No. 3:23-cv-00374

Additionally, Sheriff Bailey's use-of-force report and accompanying policy did not include any requirement to assess whether remedial training, policy revision, disciplinary action, or other corrective measures were warranted as a result of the incident. This omission reflects a critical gap in accountability and fails to align with widely accepted law enforcement standards, which emphasize the importance of conducting thorough post-incident evaluations to determine whether additional oversight, retraining, policy updates, or discipline is necessary to prevent future misconduct.



By contrast, the IACP's *Reporting Use of Force* model policy and supporting guidance emphasize that every use-of-force incident must undergo thorough supervisory review and that the findings of that review must be documented. The IACP policy further requires that departments analyze each incident to determine whether there are deficiencies in training, supervision, equipment, policy, or organizational culture. These reviews are not merely procedural, they are essential for institutional learning, officer accountability, and public transparency. The IACP explicitly states that this kind of analysis should inform potential updates to policy and training protocols and should be used to identify patterns of concern that may signal deeper systemic issues.

The absence of such mechanisms in the Rankin County Sheriff's Office policy represents a serious departure from accepted law enforcement standards. Without a formal process for determining the appropriateness of force used—or for recommending corrective action, the department is unable to ensure consistent accountability or adapt to identified risks. This failure not only weakens internal oversight, but it also increases the likelihood that inappropriate or unlawful uses of force will go unaddressed.  By failing to require such findings, the Rankin County policy left use-of-force reviews incomplete and lacking meaningful oversight. Without a structured process to reach a determination, supervisors were not obligated to make—or document—a judgment about whether the force used was appropriate, excessive, or a violation

Jenkins, Parker v. Rankin County et al., Case No. 3:23-cv-00374

of policy. This omission eliminates an essential safeguard and allows problematic or unlawful uses of force to go undetected or unaddressed.

IACP Recommended Policy Guidelines (in part):

| Reporting Use of Force | Concepts & Issues |
|---|---|

**A. Policy**

Every agency must establish a written policy setting forth the guidelines for the use of force. Such policies should be carefully drafted to ensure that they specifically and clearly define agency requirements—yet provide enough flexibility to deal with the infinite variety of situations that officers may face in the field. The policy must not impose requirements that cannot or will not be observed by officers in use-of-force situations.[4]

As noted, agency policies should not only address the use of force but should also require the reporting of incidents in which force is used. Without this stipulation, the agency will be unable to determine whether the use-of-force policy is being followed, the number of incidents that occur, the types of force employed, or the circumstances surrounding those incidents. The authority to use force carries with it the need for accountability in order to safeguard the rights of the public and to preserve the integrity of the law enforcement agency. As such, it should be the policy of law enforcement agencies that uses of force, as designated by the agency, be reported in a timely, complete, and accurate manner by involved officers and those who witnessed the use of force.

The agency must define the instances in which reporting use of force is required. The policy should ideally cover, with a few specific exceptions, the reporting of any use of force occurring while an officer is acting in their official law enforcement capacity, whether on- or off-duty, in uniform, in plainclothes, or on undercover assignment. Uses of force should include, but need not necessarily be limited to the following:

- *Physical Force:* Use of any part of the officer's body, such as open-handed strikes, punches, or kicks, and the use of law enforcement horses or canines.
- *Chemical Force:* Use of any chemical irritant such as o-chlorobenzylidene malononitrile (CS) or oleoresin capsicum (OC) aerosol or foam spray.
- *Impact Force:* Use of any issued impact weapon (e.g., nightstick, baton, flashlight, bean bag round, or similar impact projectile) or other object.
- *Electronic Force:* Use of any electronic control device.
- *Firearms Force:* The displaying of a firearm for purposes of compelling compliance, to include pointing the weapon at an individual or discharging a firearm.
- *Vehicular Force:* The deliberate use of a vehicle in such a way that could reasonably cause bodily injury. This use of force may include ramming a subject's vehicle during a vehicular pursuit or use of the precision immobilization technique (PIT) maneuver or roadblocks to stop a fleeing subject's vehicle.

For the purposes of this document, use of force should not include the application of handcuffs or similar restraints; the physical removal of passively resisting demonstrators; the mere presence of officers, horses, or canines; or the issuance of verbal commands. In addition to the recommendations included in the model policy, some agencies may elect to include anytime an officer draws a firearm outside of training to provide for self-protection, whether or not the weapon is pointed at an individual.

In professional and reasonably run law enforcement agencies, it is a well-established standard that the review of any use-of-force incident must result in a clearly documented conclusion that determines whether the officer's actions were consistent with department policy, training, and constitutional principles. Nationally recognized organizations such as the Commission on Accreditation for Law Enforcement Agencies (CALEA) and the International Association of Chiefs of Police (IACP) require that every use-of-force investigation includes a supervisory or command-level determination explicitly stating whether the force used was justified and within policy. These findings serve as a cornerstone of effective oversight—they are essential for maintaining internal accountability, tracking patterns in officer behavior, guiding decisions on training and discipline, and sustaining public confidence in the integrity of the department.

Based on my professional experience and review of the policies in this case, it is my opinion that the Rankin County Sheriff's Office use-of-force policy reflects a fundamentally flawed and incomplete approach to oversight and accountability. The failure to require supervisory findings or identify the need for corrective action, retraining, or discipline deprived the agency of the tools necessary to identify emerging problems and prevent future abuse. These omissions

Jenkins, Parker v. Rankin County et al., Case No. 3:23-cv-00374

fostered a permissive environment in which problematic conduct could persist without scrutiny or consequence. Had the department adhered to IACP model policies or comparable best practices, each use-of-force review would have produced actionable conclusions—allowing the department to intervene early, address performance issues, and prevent the kind of egregious misconduct that ultimately occurred in this case.

**Rankin County Sheriff's Office – Patrol Operations Review Form:**  In my review of the materials provided to me, I observed that at the time of the January 24, 2023 incident, the Rankin County Sheriff's Office was utilizing a form titled "Rankin County Sheriff's Office – Patrol Operations Review." While this form appears to have been part of the department's administrative documentation practices, there is no indication that it was systematically linked to use-of-force incidents or incorporated into any formal review or accountability process related to serious misconduct.



Notably, the form does not reference specific use-of-force events, nor does it appear to be integrated into a structured review system involving critical incidents. There is no evidence that this form was cross-referenced with use-of-force reports, TASER deployment data, or body-worn camera footage, as would be expected under nationally recognized law enforcement practices. Instead, it appears that the Patrol Operations Review form was primarily used to document lower-level administrative violations, such as dress code infractions, tardiness, and discourteous behavior, rather than serious allegations involving the use of force or potential civil rights violations.

Based on my decades of police command experience, I know that supervisory reviews of field operations should be integrated with use-of-force oversight to detect patterns of concern, identify training or policy issues, and ensure officer accountability. The failure to systemically connect this "Patrol Operations Review" form with actual use-of-force incidents reflects a fragmented and ineffective oversight process, one that prevents the department from leveraging operational data to improve transparency, training, or risk management.

In my professional opinion, the limited use of the Patrol Operations Review form reflects a fundamental breakdown in the department's accountability infrastructure. Its primary use for administrative infractions—rather than serious misconduct—underscores the broader failure of

the Rankin County Sheriff's Office to implement a unified, data-informed supervisory framework capable of preventing and addressing constitutional violations and serious misconduct.

**Steven Godfrey Testimony:** In reaching my conclusions, I also reviewed and considered the deposition testimony of Steven Godfrey, who served in a leadership role within the Rankin County Sheriff's Office. Mr. Godfrey testified that Sheriff Bryan Bailey did not have any formal policy or established procedure in place to address, investigate, or resolve allegations of physical abuse or citizen complaints made against deputies. According to his testimony, there was no standardized complaint intake process, no system for ensuring timely review, and no consistent follow-up to determine whether such allegations warranted disciplinary action or policy reform.

```
21        Q.    Okay.  So if a deputy was accused of
22   beating a citizen, how did the Sheriff's Department
23   handle that matter?
24        A.    I was never asked to interview -- conduct
25   any investigation into the beating of anyone that I
                                                    Page 45
 1   can recall.  So I can't tell you what was done.
 2   Again, most of the time it was passed to the Chief
 3   Investigator or the Chief Deputy in charge of Patrol
 4   or anything along those lines.
 5        Q.    Okay.  But there was nothing formal?  You
 6   don't have a -- was there a formal procedure in
 7   place?
 8        A.    Not that I know of, sir.
 9        Q.    Okay.  So pretty much you're saying that
10   whatever Sheriff Bailey said what happened, that's
11   what would happen?  Is that what you're saying?
12        A.    Yes.  He is the Sheriff.
```

Based on my decades of experience in police leadership, this lack of a formalized process represents a clear and unacceptable deviation from nationally recognized law enforcement standards and best practices. Agencies across the country, particularly those operating under professional guidelines established by organizations such as the International Association of Chiefs of Police (IACP) and the Commission on Accreditation for Law Enforcement Agencies (CALEA), are expected to implement comprehensive and transparent systems for receiving, documenting, investigating, and resolving citizen complaints—especially those involving allegations of excessive force or abuse of authority.

A failure to implement such systems not only undermines internal accountability but also sends a dangerous message to both the public and the department's personnel: that misconduct will not be taken seriously, and that officers may act without fear of review or consequence. From a leadership standpoint, the absence of a formal complaint-handling structure reflects a fundamental breakdown in supervision, risk management, and ethical responsibility.

In my professional opinion, the testimony of Mr. Godfrey underscores the broader systemic issues within the Rankin County Sheriff's Office—specifically, Sheriff Bailey failed to adopt even the most basic measures necessary to detect and respond to patterns of abuse, thereby exposing the community to continued harm and eroding trust in law enforcement.

3. **Lack of Monitoring Body-Worn Camera Usage:** The department issued body-worn cameras but lacked a system for reviewing footage or ensuring compliance with BWC policy. As Sheriff Bailey acknowledged in his own testimony, supervisory review of camera

Jenkins, Parker v. Rankin County et al., Case No. 3:23-cv-00374

footage was minimal and occurred only in reaction to complaints or serious incidents, well below accepted standards in policing.

- Although the department introduced body-worn cameras around "late 2021", Sheriff Bailey testified that there was no formalized or structured policy in place to ensure that BWC footage was routinely reviewed by supervisors. He admitted that his own review of footage was infrequent, unstructured, and typically occurred only when a problem was brought directly to his attention. Specifically, he stated: "I don't have the camera system on my computer... if they had one that they thought I needed to look at, they would email it to me or call me in their office and I would watch it." (Deposition, pgs. 138–140).

- Bailey acknowledged that he could not recall the last time he reviewed footage prior to the Jenkins-Parker incident and that there was no reliable system for tracking reviews or matching them to specific complaints or use-of-force reports. He testified: *"I don't sit down and go through and randomly check videos as part of my job."* (Deposition, p. 138).

- In the aftermath of the incident, when it was discovered that none of the deputies had their body-worn cameras activated, Bailey acknowledged that he believed this was a violation of policy. He initially intended to discipline the officers involved: *"I was so mad they didn't have their body cameras on. I said... I'm going to write them all up for it and punish them."* (Deposition, p. 121).

- However, no disciplinary action was ultimately taken, and Bailey cited a policy exception for undercover operations, despite the public nature of the encounter. He also admitted that, prior to this incident, it was not standard practice to review BWC footage for every use-of-force report: *"I don't know if it was reviewed on each one, but now it is. It's definitely on every single use-of-force."* (Deposition, p. 134).

- Following the Jenkins-Parker incident, the Rankin County Sheriff's Office implemented a multi-layered review system designed to enhance accountability and oversight. This system now includes routine supervisory review of use-of-force incidents by sergeants, lieutenants, captains, and a newly appointed compliance officer. Sheriff Bailey testified that this level of oversight did not exist prior to the January 24, 2023, event, stating: *"Now... the compliance director, he's reviewing everything on the use-of-force and randomly reviewing them."* (Deposition, p. 140). While these changes represent a positive step toward aligning with accepted law enforcement practices, they are not innovative reforms—they are standard oversight mechanisms that should have been in place well before the Jenkins-Parker incident occurred. Nationally recognized bodies such as the International Association of Chiefs of Police (IACP) and the Commission on Accreditation for Law Enforcement Agencies (CALEA) have long recommended such review structures as basic components of a professional use-of-force oversight system.

The fact that these measures were implemented only after a high-profile civil rights violation occurred reflects a reactive approach to leadership rather than a proactive commitment to accountability. In my professional opinion, had this level of supervisory review been established

Jenkins, Parker v. Rankin County et al., Case No. 3:23-cv-00374

and enforced prior to January 24, 2023, it is foreseeable that troubling patterns of behavior—particularly among deputies known as the "Goon Squad"—could have been identified and addressed before escalating into egregious misconduct. The belated implementation of these standard practices highlights the department's earlier failure to meet its responsibility to prevent abuse and ensure constitutional policing.

In reaching my opinions, I conducted a comparison between the nationally accepted best practices outlined by the International Association of Chiefs of Police (IACP)[10] and the implementation of body-worn cameras (BWCs) under Sheriff Bryan Bailey's leadership reveals significant and troubling deviations.

According to IACP guidance, agencies should implement clear and consistently enforced policies requiring officers to activate BWCs during all law enforcement-related encounters, including arrests, stops, searches, and any interaction likely to result in enforcement action. Once activated, the camera should remain on until the event has concluded. However, Sheriff Bailey testified that no such consistent enforcement existed within his department. Deputies were expected to follow department policies based on trust, and there was no supervisory mechanism to ensure compliance.

National best practices also call for routine and documented supervisory review of BWC footage. These reviews should occur regularly, both randomly and in response to specific incidents, especially use-of-force events—and should be used to assess compliance, guide training, and detect misconduct. Yet, Bailey admitted under oath that his department did not conduct routine reviews. Footage was only examined reactively—typically when a complaint was received or when footage was found to be missing. He also acknowledged that no documented audit system or recordkeeping process existed to monitor or track these reviews prior to the January 2023 incident.

IACP standards emphasize the need for centralized tracking and footage management systems to store, categorize, and oversee BWC content. These systems ensure accountability and support the use of recordings in investigations, court proceedings, and officer training. In contrast, Bailey confirmed that no such system existed in Rankin County at the time. If someone wanted him to view footage, they had to reach out manually, and there was no mechanism in place to track which incidents were recorded, which footage was reviewed, or by whom.

Additionally, the best practices require that departments impose disciplinary consequences for officers who fail to comply with BWC policies, including the failure to activate cameras or improper handling of footage. Supervisors are expected to document these violations and initiate appropriate corrective or punitive action. Bailey admitted that he was angry when he discovered that deputies had failed to record the Jenkins-Parker incident and initially intended to discipline them. However, he ultimately took no action, citing a loosely interpreted exception for undercover operations. This failure to hold officers accountable reflects a lack of consistent enforcement and undermines the very purpose of having a BWC policy.

---

[10] IACP Body Worn Camera (2020).

Jenkins, Parker v. Rankin County et al., Case No. 3:23-cv-00374

It is also noteworthy that meaningful reforms to the department's BWC program—including the implementation of a multi-layered review system involving supervisors, command staff, and a compliance officer—were instituted only after the Jenkins-Parker incident gained national attention and prompted a federal investigation. Bailey acknowledged that no such oversight system existed beforehand, despite widespread awareness within the law enforcement profession of the importance of proactive review and compliance audits.

In my professional opinion based on decades of law enforcement leadership, Sheriff Bailey's sworn testimony reveals a body-worn camera program that was poorly implemented, lacked meaningful supervision, and deviated significantly from national best practices. His admissions reflect a systemic failure to leverage BWCs as a tool for transparency, accountability, and public trust—objectives that have been universally recognized by law enforcement agencies for nearly a decade. These failures directly contributed to the absence of documentation and oversight surrounding the events of January 24, 2023, and enabled the misconduct in this case and others to go undetected and unaddressed.

**BWC Policy - Comparison to Accepted Standards:**  Sheriff Bailey's admissions reflect a significant deviation from these standards. The absence of proactive oversight and consistent enforcement rendered the department's body-worn camera program ineffective, undermining the very accountability and transparency that BWCs intend to provide.

> Sheriff Bailey Testified (in summary):
>
> - Body-worn cameras were introduced to the department around late 2021. However, he acknowledged that the department did not have a formalized system for ensuring that BWC footage was routinely reviewed. He confirmed that he generally became aware of issues involving video only when a problem was brought to his attention or when footage was missing during an investigation.(pgs. 132-134).
> - Sheriff Bailey further admitted that prior to the events involving Jenkins and Parker, there was no structured or documented process for reviewing BWC footage, nor did he personally conduct regular audits. He testified that any review he undertook was reactive in nature—typically triggered by someone calling him in or emailing him about a specific incident.(pgs. 138-140).
> - Sheriff Bailey confirmed that only after the incident did the department implement a multi-layered compliance and review system involving line supervisors, command staff, and a newly appointed compliance officer. He stated that prior to that, the department largely relied on trust—expecting deputies to self-regulate and follow policy without active supervisory oversight. (pgs. 155-157).
> - Sheriff Bailey admits that daily reviews and body-worn camera oversight were instituted only after the incident with Jenkins and Parker as part of broader departmental reforms. (pg. 160).
>
> These excerpts from Sheriff Bailey's testimony support the conclusion that while the department had policies related to BWCs, those policies were inconsistently enforced and not systematically monitored prior to the incident.

Nationally accepted best practices—outlined by organizations such as the International Association of Chiefs of Police (IACP), the Police Executive Research Forum (PERF), and the U.S. Department of Justice—make clear that body-worn camera programs must be supported by:

- Clearly articulated policies mandating camera activation.

Jenkins, Parker v. Rankin County et al., Case No. 3:23-cv-00374

- Routine, documented review of footage by supervisors, especially in all use-of-force incidents.
- Centralized tracking systems for footage audits.
- Disciplinary consequences for policy violations.

In my professional opinion, the Rankin County Sheriff's Office's failure to monitor and enforce its body-worn camera policy prior to January 24, 2023, represents a serious lapse in law enforcement leadership and supervision. Had routine review and enforcement mechanisms been in place, it is likely that patterns of misconduct by the deputies involved—including prior failures to activate cameras—would have been detected and corrected. This institutional failure contributed directly to the unchecked conduct and lack of documentation surrounding the incident involving Michael Jenkins and Eddie Parker.

Middleton's Deposition Testimony:  Middleton testified that it was commonly known throughout the department that deputies assigned to narcotics operations with Christian Dedmon were instructed not to activate their body-worn cameras. He acknowledged that this was standard practice, even though not all drug-related activities involved confidential informants. He further stated that this understanding was never challenged or corrected by supervisors, indicating that Sheriff Bailey either approved of this practice or failed to exercise appropriate oversight of his deputies' activities.

Note:  In forming my opinions, I also considered Sheriff Bryan Bailey's testimony concerning his initial observations at the scene of the January 24, 2023, shooting. Sheriff Bailey stated that upon arriving at the scene, he immediately noticed that several deputies were not wearing their assigned body-worn cameras, or that the devices were not activated or functioning. He further testified that despite his attempts to question the deputies involved, he could "never get a straight answer" as to why their cameras were not being used as required.

```
 8        Q.    Okay.  States that you told Holifield that
 9   when he arrived -- Holifield states that when he
10   arrived he met with you and you stated that no
11   deputy had their body cameras on during the
12   shooting; is that true?
13        A.    Well, yes, sir.  I noticed that one deputy
14   didn't have his body camera on.  I said, Where's
15   your body camera?  And I'm trying to remember -- I
16   think it was Opdyke.  And I said, Where's your body
17   camera at?  He said, We were told not to wear it.  I
18   said, Who told you not to wear it?  And he never
19   would answer me, he never would give me a straight
20   answer.  And then I found out that none of them had
21   recorded it.
22             Because at the time I still believed that
23   Brett had not been there and that Middleton was not
24   there.  So I thought it was just these deputies
25   there.  And none of them could tell me why their --
```

(pg. 119).

This lack of cooperation from deputies—especially in the immediate aftermath of a high-profile use-of-force incident—raises serious concerns about Sheriff Bailey's ability to maintain discipline, accountability, and command authority within his own department. When frontline

officers are unwilling or unable to provide a direct explanation to the sheriff himself regarding a basic policy requirement, such as the activation of body-worn cameras, it suggests a breakdown in the chain of command and a culture resistant to oversight. Moreover, the deputies' failure to comply with body-worn camera policy—and their subsequent evasion of responsibility—should have prompted immediate administrative action, not only to preserve evidence but also to assess whether there were broader issues of noncompliance within the department. That no such action was taken further reflects a lack of internal accountability and supervisory control.

In my professional opinion, the sheriff's inability to obtain honest and timely answers from his deputies in such a critical moment underscores a systemic failure in leadership and discipline and reinforces the broader pattern of inadequate supervision and policy enforcement that permeated the Rankin County Sheriff's Office prior to the incident.

**OPINION:  LACK OF REVIEW AND OVERSIGHT OF TASER USE -** The evidence in this case demonstrates that the Rankin County Sheriff's Office's policies and practices regarding the use and oversight of TASERs were grossly deficient and deviated substantially from nationally recognized standards in professional policing. These deficiencies reflect systemic failures in training, supervision, accountability, and leadership—failures that directly fostered an environment in which the misuse of Conducted Energy Devices (CEDs) could occur without detection or consequence.

**ANALYSIS:**  TASERs, also known as Conducted Energy Devices (CEDs), are not only use-of-force tools—they are also accountability instruments, specifically engineered to provide objective, auditable data about their deployment. These devices are designed to record and document critical information each time they are activated, and this data serves an essential role in ensuring that officers' use of force is lawful, proportionate, and consistent with departmental policy.  Modern TASERs, such as those produced by Axon (formerly Taser International), are equipped with internal data recording systems that automatically log each activation. This includes detailed information such as:

- Date and time of each trigger pull
- Duration of each activation (how long the probes or drive-stun contact was applied)
- Number of trigger cycles
- Whether the cartridge was deployed or whether the device was used in drive-stun mode
- Device serial number and user identification when assigned.

This built-in accountability is integral to their intended function in modern policing.  According to the International Association of Chiefs of Police (IACP), the regular download, review, and retention of TASER data is a critical component of a department's internal accountability system.

- At the time of the January 24, 2023, incident, there was no meaningful process in place at the Rankin County Sheriff's Office to track, audit, or review TASER deployments. Sheriff Bryan Bailey testified that prior to that incident, he had never reviewed or even requested TASER download data and was unaware that the devices recorded detailed activation logs, including function testing, trigger pulls, cycle durations, and other usage

Jenkins, Parker v. Rankin County et al., Case No. 3:23-cv-00374

information. Such unfamiliarity with a widely issued force option represents a profound lack of command-level oversight and contradicts even the most basic supervisory expectations in professional law enforcement.

- National standards from the International Association of Chiefs of Police (IACP) clearly established that TASER use should be treated as a reportable use of force and be subject to prompt documentation, supervisory review, and data analysis. These standards emphasize that internal data stored on the device must be routinely downloaded, reviewed, and cross-referenced with use-of-force reports to identify concerning patterns, training needs, or potential misconduct.  Yet, in Rankin County, TASER data was only reviewed if a deputy self-reported a use-of-force incident. There were no regular audits, no integration of TASER logs into supervisory reviews, and no consistent tracking mechanisms. This reactive and fragmented approach to oversight not only contradicted best practices but also effectively enabled deputies to deploy TASERs without fear of scrutiny or accountability.

- Modern TASERs, such as the X26P issued to Rankin County deputies, are designed with built-in event logs that record the date, time, duration, and mode of each use. This information is easily downloadable using tools such as Axon's EVIDENCE Sync software, requiring no specialized or proprietary systems. These logs serve as critical tools for oversight, allowing agencies to flag patterns of excessive force, identify high-risk behavior, and implement early interventions. According to the IACP, routine review of this data is essential not just for compliance, but also for officer protection, community trust, and risk management.

- Sheriff Bailey testified[11] that the department had no system for routine auditing of TASER data until after the Jenkins-Parker incident. This deficiency meant that inappropriate or excessive uses of TASERs would go undetected unless a deputy voluntarily disclosed their use—an entirely foreseeable and unacceptable risk. When asked about data features such as "pulse graphs," Bailey confessed he lacked the ability to interpret TASER data and relied on outside experts to explain its implications. Dwayne Thorton testified that TASER use logs were not reviewed unless triggered by a use-of-force report, again reflecting the department's wholly reactive and insufficient oversight process. He also testified that while a command officer might conduct a TASER download, it was ultimately the Sheriff who was responsible for reviewing and determining whether TASER use was proper.  This testimony demonstrates a profound failure of command-level responsibility. Sheriff Bailey's delegation of TASER oversight to subordinates, without ensuring a systematic and documented review process, represents a significant deviation from nationally accepted policing standards. According to the International Association of Chiefs of Police (IACP), all TASER deployments

---

[11] •    Sheriff Bailey's failure to understand or utilize these tools reflects a breakdown in operational leadership. In his deposition, he acknowledged that TASER deployment information was only accessed after the Jenkins-Parker incident. He further admitted that he lacked the expertise to interpret TASER pulse graphs, stating, "I can't say if it was used on a person or not... I can't tell that. But like I said, with this pulse graph technology, hopefully, we'll be able to tell if it made contact with skin or not." (Deposition, pp. 195–197). Such statements underscore the absence of basic technological literacy and supervisory control over a high-risk use-of-force option.

Jenkins, Parker v. Rankin County et al., Case No. 3:23-cv-00374

should be reviewed, audited, and reconciled with use-of-force reports to ensure accountability, compliance, and officer safety.

A review of the International Association of Chiefs of Police (IACP) Model Policy on Electronic Control Weapons (ECWs) reveals numerous standards that directly support and align with my professional opinion regarding the failures of the Rankin County Sheriff's Office under Sheriff Bryan Bailey. The IACP policy makes clear that ECWs, such as TASERs, are not only force options but also essential tools for accountability, supervision, and documentation. Agencies are expected to implement clear, comprehensive policies that govern TASER use, ensure consistent supervisory oversight, and maintain a transparent system for data collection and review.

- According to the IACP, every deployment of an ECW must be reported, and officers are required to notify a supervisor as soon as practical following its use. The data from the device, including trigger pulls, discharge duration, and number of cycles—should be downloaded and reviewed as part of the use-of-force investigation process. Sheriff Bailey, however, testified that prior to the January 2023 incident, he did not know TASERs even recorded this kind of data. He had never requested a data download and was unaware that TASERs functioned as digital evidence tools, despite this being standard practice in law enforcement for many years.

- The IACP recommends periodic and random audits of ECW data, with review by supervisory or internal oversight personnel. This data should be reconciled with use-of-force reports to identify patterns of misuse, assess training needs, and ensure accountability. Sheriff Bailey admitted that no such system existed in his department at the time. There were no routine audits, no tracking of TASER deployments, and no protocol for correlating TASER use with officer reports. He relied entirely on deputies to self-disclose their use of force, a practice that is inconsistent with the most basic standards of law enforcement supervision and risk management.

- The IACP also considers ECW use to be a reportable use of force requiring full documentation, including the number and length of each discharge. Justification is particularly important when multiple or extended TASER cycles are used. In the Jenkins-Parker incident (and other incidents documented in this report), deputies reportedly deployed their TASERs multiple times without any contemporaneous documentation or oversight. Had the department followed IACP protocols, these repeated discharges would have triggered immediate scrutiny and internal investigation—possibly preventing the misconduct from escalating.

The following are the IACP-recommended reporting requirements for TASER deployments compared to the policy implemented and approved by Sheriff Bailey:

| IACP Recommended Reporting: | Rankin County Sheriff's Policy: |
| --- | --- |
|  |  |

Jenkins, Parker v. Rankin County et al., Case No. 3:23-cv-00374

## F. Reporting

Pointing, deploying, or using an ECW against a subject is a use of force and should be reported in the same manner as other uses of force.[6] Therefore, with the exception of deliberate discharges for training purposes, all instances of discharge, including unintentional discharge, should be reported via the appropriate chain of command. In addition to the information collected in a standard use-of-force report, the report should include the following:

- The make, model, and serial numbers of the ECW and its cartridges. Some models, for example, are computer controlled and have the capability of downloading operational data. They can provide data that addresses date and time, duration, temperature, battery status, and other forensic information of all discharges. This information is invaluable when investigating claims of improper or excessive use of force involving the ECW. Some agencies conduct random data downloads at varying time intervals—regardless of reported use—for review by the agency's professional standards or similar oversight authority.
- The range at which the unit was deployed or discharged.
- The point(s) of contact on the subject.
- The number of five-second cycles and total discharge duration used and justification if more than three cycles were discharged.
- The type of clothing the probes encountered.
- The type and serial number of cartridge(s) used.
- The type of discharge (probe, arc, or cartridge on contact.)
- Evaluation of the effectiveness of the ECW.
- After-discharge actions taken by the officers.
- Any injuries observed or reported as a result of using the ECW.

**Reporting Requirements:**

The agency's Chief Officer or his designee will be notified immediately when any type of force is used and there is resulting *serious physical injuries or death.*

A *Use of Force Report* shall be completed and submitted, prior to the end of the shift (except for deadly force situations), by any Officer(s) who:

1. Discharges a firearm or electronic weapon for other than training.
2. Takes an action that results in or is alleged to have resulted in bodily injury or death to another person;
3. Applies force through the use of lethal or less-than-lethal weapons; or
4. Applies weaponless physical force at a level as defined by the agency;
5. Charges an arrestee(s) with Resisting Arrest or any crime where physical force, beyond simply handcuffing, was required to effect the arrest.

Each Officer who witnessed the incident or responded to the scene will also complete a written report prior to the end of the shift. These witness reports will be submitted to the agency's Chief Officer or his designee for review.

**Note:** In reviewing all the use-of-force reports provided to me in connection with this case, I did not observe any accompanying witness statements, despite the fact that such statements are explicitly required by the Rankin County Sheriff's Office's own policy. This raises one of two possibilities: either the required witness statements were not included in the materials produced for my review, or they were never obtained in the first place. If the latter is true, this would represent not only a deviation from widely accepted law enforcement standards and best practices, but also a direct violation of the department's own policies. The failure to obtain or preserve witness accounts in connection with a use-of-force incident undermines the integrity of the investigative process and significantly impairs the agency's ability to ensure accountability and transparency.

The Use of Force form used by the Rankin County Sheriff's Office merely requires that TASER data be downloaded, but it does not mandate any meaningful analysis or interpretation of that data. This falls short of nationally recognized standards. According to the International Association of Chiefs of Police (IACP) and widely accepted professional police practices, a thorough and documented review of TASER activation data—including trigger pulls, cycle durations, and deployment context—is essential for ensuring proper use, policy compliance, and accountability. Simply downloading the data without requiring analysis renders the review process ineffective and undermines the TASER's role as a key tool for both force application and supervisory oversight.

The IACP emphasizes that ECWs are designed with accountability in mind. They function as digital witnesses to their own use, and law enforcement leaders are expected to understand and utilize this functionality to protect both the public and the officers. Sheriff Bailey's testimony

Jenkins, Parker v. Rankin County et al., Case No. 3:23-cv-00374

revealed a lack of familiarity with this most basic feature of the devices under his command, further highlighting the systemic failure of leadership and supervision within the Rankin County Sheriff's Office.

> Bailey acknowledged in his deposition that TASER deployment information was only downloaded after the January 24, 2023, incident and not as part of regular oversight. He testified (in part):
>
> *….And that's, you know, one thing we're working towards, is hopefully having somebody that can read those pulse graphs, eventually, to see if it contacts skin or not. (pg. 195-196).*
>
> *... I can't say if it was used on a person or not, because I can't read the pulse graph. So if it was cut on and activated, I don't know if it was used on anybody or not, I can't tell that. But like I said, with this pulse graph technology, hopefully, we'll be able to tell if it made contact with skin or not. (p. 197).*

- Nationally recognized best practices—such as those recommended by the International Association of Chiefs of Police (IACP) and the Police Executive Research Forum (PERF)—require that all TASER uses be treated as serious use-of-force incidents, subject to prompt documentation, supervisory review, and data analysis. These standards emphasize that the internal data stored in TASER devices must be routinely downloaded and analyzed to confirm proper use, identify emerging patterns of concern, and flag individual officers who may require retraining, counseling, or disciplinary action. Had Sheriff Bailey instituted a proper audit and review process; deputies would have understood that any unauthorized use of TASERs would be identified and scrutinized. Instead, the absence of oversight signaled to deputies that improper deployments would go unnoticed, creating a permissive environment that emboldened misconduct. This failure in policy and supervision contributed directly to the pattern of abuse uncovered in this case.

- These capabilities offer law enforcement agencies a powerful tool for supervisory oversight, early intervention, and risk management. Agencies can use this data to identify unusual patterns of force, flag potential misuse, and take corrective action before misconduct escalates.

- Given the significance of this feature, it is my professional opinion that Sheriff Bryan Bailey had a clear responsibility to understand the capabilities of the TASER equipment issued to his deputies. As the agency head, he is ultimately accountable for ensuring that all department-issued force equipment is properly utilized, monitored, and reviewed. His testimony that he was unaware of the TASER's ability to store and provide deployment data reflects a fundamental failure of leadership and operational oversight. The sheriff's lack of knowledge regarding one of the department's primary force options deprived his agency of a critical accountability tool and contributed to an environment where deputies could use TASERs without fear of scrutiny or consequences. In accordance with national

Jenkins, Parker v. Rankin County et al., Case No. 3:23-cv-00374

standards set by the IACP and PERF, every law enforcement leader is expected to ensure that use-of-force technologies are not only properly deployed but also subject to regular review, documentation, and supervisory oversight. Sheriff Bailey's failure to do so represents a substantial departure from accepted law enforcement practices.

- It was entirely foreseeable that, had Sheriff Bailey implemented a proper and consistent review and audit process, deputies would have understood that any unauthorized or questionable use of their TASERs would be detected and subject to command-level inquiry. This awareness alone would have acted as a deterrent and promoted policy compliance. Conversely, the absence of any routine review created an environment where deputies reasonably believed that inappropriate or excessive TASER use would go unnoticed and unchallenged. In my professional opinion, this lack of oversight not only emboldened misconduct but also reflects a fundamental breakdown in leadership, supervision, and risk management within the Rankin County Sheriff's Office.



**Event Log**

The Event log tracks events and may help protect a user from claims of excessive use of force by providing documentation of the time and date for each CEW deployment. The Event log also provides agencies with a powerful management tool to track usage patterns and help prevent misuse. You do not need to download the X26P to EVIDENCE.com services to obtain the Event log – this can be downloaded directly to your PC using the EVIDENCE Sync (Offline) software.

The Event log includes the following information for the most recent (approximately) 16,000 entries:

- Each entry contains the date and time of each event.
- Entries include Armed, Safe, Trigger, USB connection, PowerSave mode, software updates, time synchronizations, language changes, flashlight on/off, etc.
- The duration of each Trigger event.
- The duration of each Safe event (when the safety switch was moved to the down [SAFE] position and how long the CEW was armed).
- The internal temperature is shown for armed session events except for Trigger events.
- Battery percentage is shown for all armed session events (Armed, Trigger, Safe).

(Taser X26P CEW User Manual)

Sheriff Bailey's failure to implement the IACP's well-established guidelines for TASER oversight represents a significant deviation from accepted national standards. These omissions contributed directly to the lack of accountability, documentation, and intervention in cases of excessive force. In my professional opinion, these failures were not administrative oversights—they were critical lapses that allowed unconstitutional conduct to occur unchecked.

TASER logs should be reviewed:

- After each deployment involving the use of force
- Periodically during performance audits
- In response to complaints or investigations
- To detect emerging patterns or repeated misuse

Jenkins, Parker v. Rankin County et al., Case No. 3:23-cv-00374

These records help ensure that each use of force is properly justified, consistent with training, and compliant with agency policy. Additionally, maintaining and reviewing TASER data protects both the officer and the public by creating a transparent and objective record of what occurred.

The failure to routinely download, analyze, or even understand the existence of this data—as was admitted by Sheriff Bryan Bailey in his sworn deposition—is a serious departure from accepted law enforcement standards. TASERs are designed not just to incapacitate, but also to document and preserve evidence of their use, thereby serving as a critical safeguard against abuse and a tool for improving training, supervision, and officer performance.

**OPINION:    Post-Incident Reforms Could and Should Have Been Implemented Sooner-**
According to the testimony of Steven Godfrey and Sheriff Bailey, a number of internal reforms were implemented by the Rankin County Sheriff's Office only after the January 24, 2023, incident involving Michael Jenkins and Eddie Parker. These reforms included the initiation of routine supervisory review of body-worn camera footage, the appointment of a compliance officer tasked with overseeing policy adherence, and the development of new layers of command accountability.

**ANALYSIS:**  While these steps may appear to signal progress, they are in fact fundamental, long-established accountability measures that have been widely adopted across the country in professional law enforcement agencies—often as a matter of standard practice, and not in response to public scandals. These safeguards are not novel; they represent baseline expectations for departmental transparency and internal oversight, as recognized by the International Association of Chiefs of Police (IACP), CALEA, the Police Executive Research Forum (PERF), and the U.S. Department of Justice.

**Steven Godfrey's Testimony vs. Nationally Accepted Best Practices:**

| Category | Godfrey's Testimony (Rankin County Practice) | Nationally Accepted Best Practices[12] |
|---|---|---|
| | | |
| Internal Affairs Process | No formal Internal Affairs Division or process. Complaints were handled when Sheriff Bailey asked him to "look into it.." (pgs. 20-24) | IACP and PERF recommend a clearly designated Internal Affairs unit or process, with written procedures, trained investigators, and a centralized tracking system. |
| Complaint Documentation | Investigations were rarely documented. If any report was created, it was given to the Sheriff | DOJ and IACP stress that all complaints—regardless of substantiation—should be |

---

[12] Having been directly involved in the law enforcement accreditation process for two separate agencies, I have developed a thorough and practical understanding of what constitutes widely accepted standards and best practices in professional policing. This experience has given me firsthand knowledge of the policies, procedures, and oversight mechanisms that are expected of agencies committed to accountability, transparency, and constitutional policing.

Jenkins, Parker v. Rankin County et al., Case No. 3:23-cv-00374

| | and not retained in a systematic way (pp. 21–22). | formally documented, tracked, and analyzed for patterns or trends. |
|---|---|---|
| Complaint Intake and Follow-Up | Citizens often failed to follow through, and cases were closed without formal investigation. No standardized follow-up process (p. 23). | Best practice requires multiple avenues for complaint intake (in-person, anonymous, online), with follow-up contact and clear procedures even if the complainant is uncooperative. |
| Supervisor Accountability | Godfrey deferred oversight and discipline decisions solely to the Sheriff. No supervisory system was in place (pp. 43–46). | IACP and DOJ call for a supervisory chain-of-command review of all policy violations, with written findings, discipline recommendations, and documentation of final actions. |
| Use-of-Force or Misconduct Review | No routine or structured investigations into use of force unless directed by the Sheriff. No formal process. (pp. 43–45). | IACP Model Policy on Use of Force mandates mandatory review of all use-of-force incidents, data tracking, and supervisory audits for compliance with policy and training. |
| Policy Compliance System | Godfrey could not identify a department-wide system to ensure policy compliance or address violations (p. 44). | National best practice requires agencies to routinely audit officer conduct for policy adherence, supported by training, discipline, and data analysis systems. |

The departmental reforms initiated following the Jenkins-Parker incident—including routine supervisory review of BWC footage and the appointment of a compliance officer—are widely recognized in the law enforcement profession as basic accountability measures. These safeguards are not innovative; they are well-established standards that departments across the country have adopted proactively—often in response to guidance from professional organizations, court rulings, or federal oversight.   Steven Godfrey and Sheriff Bailey's acknowledgments that such procedures were only adopted after the January 24, 2023, incident demonstrates a failure in foresight and leadership. These practices could and should have been implemented much earlier, particularly given the department's existing history of excessive force complaints and the known behavior of the so-called *"Goon Squad."* The failure to act until after a high-profile civil rights violation occurred suggests not only reactive management but a disregard for recognized professional standards in law enforcement supervision.

In my professional opinion, the failure to proactively enforce the department's body-worn camera policy and the delayed implementation of standard accountability measures reflect a significant lapse in leadership and a departure from accepted law enforcement practices. The tools to prevent and detect misconduct were available but were not utilized. This absence of oversight created a permissive environment in which deputies operated without fear of

Jenkins, Parker v. Rankin County et al., Case No. 3:23-cv-00374

accountability, contributing directly to the egregious misconduct suffered by the plaintiffs.

**Absence of an Internal Affairs Function:**  Sheriff Bailey never established a dedicated Internal Affairs Division or formal complaint review system. As testified by former commander Steven Godfrey, internal investigations were conducted informally, without structure, documentation, or follow-up.  Serious allegations—including excessive force and citizen complaints—were often left unaddressed or resolved at the discretion of the Sheriff without transparency or accountability.

**No Pattern Analysis or Early Intervention System:**  The department lacked a system to track patterns of complaints, uses of force, or other risk indicators among personnel. Such systems are widely used to flag officers whose conduct may require additional training, supervision, or intervention. The absence of this tool contributed to the continued misconduct by the so-called "Goon Squad," who operated without meaningful supervision for years.

**The plaintiffs in this case further allege that there were numerous warning signs and prior incidents of serious misconduct involving deputies from the Rankin County Sheriff's Office—many of which were ignored, inadequately addressed, or never properly investigated.**  These red flags, according to the complaint, included a pattern of excessive force, racial discrimination, unlawful searches, and other forms of unconstitutional behavior occurring well before the January 24, 2023, incident. Despite the gravity of these allegations, department leadership failed to conduct meaningful investigations or implement corrective action. No formal internal review process appears to have been initiated in response to these recurring issues.

**Jeffrey Middleton's Deposition Testimony:**

During his deposition, Deputy Middleton was asked whether other members of the department were aware of the so-called "Goon Squad." He responded that the commemorative coin—also referred to as a challenge coin—associated with the group was widely circulated throughout the department, Middleton further testified that he personally recalled giving one of the coins to Paul Holley, who served as the department's legal counsel at the time and reported directly to Sheriff Bryan Bailey.  (deposition – pg. 106-107).



The coin has since become symbolic of the misconduct and culture of impunity that, according to the plaintiffs, was allowed to thrive within the Rankin County Sheriff's Office. Its open

Jenkins, Parker v. Rankin County et al., Case No. 3:23-cv-00374

circulation within the department underscores the extent to which the Goon Squad operated openly and without fear of oversight.

Middleton also confirmed that multiple deputies were aware of problematic behavior by Dedmon, who was described as "hyperactive" and prone to unprofessional conduct. While Middleton distanced himself from that behavior, he testified that others had complained about Dedmon's conduct and that he had heard of Dedmon being violent with arrestees on multiple occasions. This admission reinforces the notion that red flags regarding Dedmon's behavior were circulating within the department—and should have been recognized and addressed by Sheriff Bailey and his command staff.

pg. 95 -

```
 4        Q.    I want to back up just a second.  You said
 5   that you knew that Dedmon and Sheriff Bailey were
 6   friends.  And not to put words in your mouth but you
 7   thought it might be futile to try to report anything
 8   on Dedmon to Bailey because you thought Bailey
 9   should already know.
10        Is that a fair statement that I just made?
11        A.    I'd say fair statement and just a small
12   part of fear of backlash to me.
13        Q.    From Sheriff Bailey?
14        A.    Correct.
15        Q.    That if you reported on Dedmon that the
16   backlash would fall on you?
17        A.    Correct.  But that was only my personal
18   thoughts and opinions, not that I have nothing that
19   I'd gotten from anybody else.
20        Q.    Well, you'd been working at the department
21   at that point in time 13 years.  What led you to
22   think that there would be backlash?
23        A.    Because of their relationship.
```

pgs. 96-97 -

```
 7        Q.    But do you think that it was well known
 8   within the department based on your observation that
 9   Mr. Dedmon and Sheriff Bailey had a close, personal
10   relationship?
11        MR. DARE:  Object to the form.
12        THE WITNESS:  Sure.  Yes.  I mean, just
13   based off of what I've seen on, like I say, Facebook
14   or hearing other people say it.  I mean, yes.
15   BY MR. WALKER:
16        Q.    What did you see on Facebook?
17        A.    They were out at a restaurant eating.
18   Dedmon was still with his wife at the time and
19   Sheriff Bailey, they took like a group picture or
20   something.  And I can't remember all the things that
21   I've seen but I mean, I just, you, like I said,
22   after all that time you hear people talk.  You see
23   little bits and pieces here so you put a puzzle
24   together.  And I cannot give you specifics.
25        Q.    But you felt enough that there would be
                                              Page 97
 1   backlash if you went to Sheriff Bailey and said,
 2   hey, Dedmon's behavior is not something that should
 3   be accepted in this department?
 4        A.    Correct.
 5        Q.    And you felt that Sheriff Bailey would get
 6   angry and upset at you for telling him that?
 7        A.    I think it's possible that -- not that he
 8   would like -- this is just my opinion, like not that
 9   he would get upset and do anything to me right then
10   but maybe, you know, that might would -- I would
11   have a mark on my back or something.  I don't know.
12   That was just my personal opinion.  Like when you
13   see somebody who's got a -- are here or have put all
14   these pieces together, they've got a close
15   relationship, I'm not going to go try to get that
16   person in trouble.
```

Jenkins, Parker v. Rankin County et al., Case No. 3:23-cv-00374

**Sheriff Bailey's Deposition Testimony:**  Based on Sheriff Bailey's deposition testimony, it is clear that his supervisory approach was grounded in **personal trust** rather than formal oversight mechanisms. He testified that his "basic system of supervision" relied on trusting deputies like Jeffrey Middleton to "do the right thing," stating, "I trust everybody until they give me a reason not to" and that he had "faith that people were going to do the right thing."

```
10          Q.   And you said your basic system was to
11    trust officers like Jeffery Middleton to do the
12    right thing?
13          A.   Yes, sir.
14          Q.   That was your basic system of supervision?
15          A.   Yes, sir, I trust everybody until they
16    give me a reason not to.  I have, you know, faith
17    that people were going to do the right thing.
18          Q.   And you trusted Jeffrey Middleton?
19          A.   Yes, sir, I trusted him.  I trusted all
20    five of them.
```
**pg. 85**

While trust is indeed an admirable and necessary trait in police leadership**,** it cannot serve as a substitute for structured supervision, internal accountability, and procedural safeguards**.** In modern law enforcement, particularly in agencies tasked with high-risk duties and public safety responsibilities, trust must be balanced with robust systems of checks and balances**,** including regular audits, body-worn camera reviews, complaint tracking, and command-level oversight.

Nationally accepted police practices—as outlined by the International Association of Chiefs of Police (IACP), emphasize that supervision must be active, documented, and based on objective indicators**,** not merely subjective belief in an officer's integrity.[13] While trust can foster morale and cohesion, it does not absolve leadership of the duty to verify compliance, detect misconduct, or intervene when patterns of abuse emerge**.**

Sheriff Bailey conceded/testified that the department previously lacked adequate systems for ensuring accountability, stating the changes were necessary because "we need to improve our recordkeeping on complaints and internal affairs investigations." However, he also maintained that the system in place prior to the incident was working—until, as he put it, "these five deputies committed this crime and lied and just messed everything up for the whole department."

---

[13]IACP -  Standards of Conduct (pg. 3)

Jenkins, Parker v. Rankin County et al., Case No. 3:23-cv-00374

```
12          I think that a man's word should mean
13   something still these days.  And these guys, again,
14   these guys, all five of them lied.  And, I mean,
15   they hid this from me from the getgo before the FBI
16   or MBI ever showed up.  They lied to me from the
17   very beginning on this.  So they were covering this
18   up from me.
19          And like I say, if I had any way to
20   prevent it before then, I sure would have.  But now
21   I hope I have taken the steps to prevent anything
22   like this from ever happening again.
23      Q.   And you do that by instituting a better
24   system of accountability; is that right?
25      A.   I've instituted a better system of

1   accountability on the complaints and I hope it does
2   make a difference and improves the department.
3      Q.    And investigation, your whole
4   investigation system, you made serious changes
5   there, haven't you?
6      A.    Made serious changes in investigations?
7      Q.    In your internal investigation department
8   and procedures, you made some serious changes,
9   haven't you?
10      A.    I think the compliance director is the
11   biggest change.  But the internal affairs
12   investigators, I mean, I think they're doing the
13   same thing.  But now I have a more centralized
14   system in keeping up with complaints and more than
15   one or two people know about the complaints.  So,
16   yeah, I think I have a better system now.
```

(pgs. 109-111)

This perspective reveals a concerning misunderstanding of supervisory responsibility and modern police management. While deputies may have concealed the specific events of January 24, the broader issues that allowed such misconduct to occur—such as the absence of proactive audits, inadequate complaint tracking, and a failure to monitor problematic officers reflect leadership and systemic failures, not isolated deceit.

**U.S. Department of Justice:**  As part of my review, I was provided with a large volume of digital files—consisting of what appear to be hundreds, if not thousands, of pages of records— that I am informed were submitted to the U.S. Department of Justice as part of its ongoing pattern-or-practice investigation into the Rankin County Sheriff's Department. However, based on my preliminary assessment, these materials are highly disorganized, fragmented, and lack any coherent structure or indexing system. They do not reflect the hallmarks of a systematic internal review, nor do they meet the expected standards of recordkeeping and investigative protocol typically observed by law enforcement agencies.  The disorder of these records, coupled with the department's failure to track, document, or analyze prior complaints, strongly supports the conclusion that systemic issues within the Rankin County Sheriff's Office were either neglected or deliberately concealed. In my professional opinion, the absence of a centralized mechanism to monitor misconduct, identify high-risk personnel, or implement corrective action demonstrates a

Jenkins, Parker v. Rankin County et al., Case No. 3:23-cv-00374

serious breakdown in internal accountability and reflects institutional incompetence at the leadership level. This failure further reinforces the plaintiffs' claim that department leadership, including Sheriff Bryan Bailey, failed to take reasonable and necessary action in response to repeated civil rights violations, thereby enabling a culture of abuse and misconduct to persist without meaningful oversight or accountability.

## CONCLUDING STATEMENT

I have offered these opinions based on my training, experience, and review of hundreds of pages of records in this case, applying generally accepted police management principles and methods. I hold these opinions to a reasonable degree of professional certainty, grounded in longstanding and well-established law enforcement practices. If additional information becomes available, I am willing to review it and reserve the right to supplement or modify this report and my opinions accordingly.

*I declare, pursuant to 28 U.S.C. § 1746 (Unsworn Declarations Under Penalty of Perjury), under penalty of perjury, that the statements contained in this affidavit are true and correct to the best of my knowledge.*

*Thomas J. Tiderington*

/s/Thomas J. Tiderington
April 14, 2025

ATTACHMENT "A"



**Thomas J. Tiderington**
**Chief of Police**
(Retired 2022)
Law Enforcement Training / Case Consultant / Expert Witness
Fort Lauderdale, Florida / Plymouth, Michigan
ttiderington@aol.com  -  734 231-2305

**EXPERIENCE OVERVIEW:**

- Chief of Police with over forty-four years of experience with four law enforcement agencies.   Responsible for personnel, budgeting, crime reduction, internal affairs, investigations, policies, training, and overall department leadership.
- Police Training Instructor and Adjunct College Instructor-Criminal Justice Courses.
- Commissioner – Michigan's Human Trafficking Commission 2015 – 2019.
- Southeast Florida Regional DEA Task Force - Supervisor
- Graduate of the Southern Police Institute (SPI).
- Bachelor's Degree in Police Administration.
- Police practices and procedures expert witness.
- Case Consultant (civil and criminal).

**Chief Thomas J. Tiderington** is an expert witness and consultant in police policies and practices, criminal investigations, use of force, search warrants, and arrest procedures. He has helped attorneys secure over 100 million dollars in settlements and judgments and has likewise defended the actions of law enforcement officers and federal agents. As a police officer for over 44 years with four different police agencies, he has extensive practical experience as a street cop and detective, and served as police chief for over twenty years; he has consulted on over 100 cases in state and federal courts.

Throughout his law enforcement career, he has been a highly sought-after police instructor and lecturer training tens of thousands of state, local, and federal law enforcement agencies, both nationally and internationally, on a variety of topics, including (but not limited to) criminal investigations, human trafficking, use of force, international drug investigations, money laundering, undercover operations, and police-involved shootings.   He is knowledgeable in all

aspects of law enforcement operations, including policing best practices, policy, procedures, use of force, risk mitigation, police training, and defensive tactics, including the use of K9s and CEWs (TASER).

During his forty-four-year law enforcement career, he served eight years as an undercover agent assigned to the department's Organized Crime Division, where he was an undercover operative in hundreds of cases. As an undercover agent, he infiltrated and investigated Colombia-based international cocaine smuggling cartels. One investigation resulted in the seizure of over 3000 kilograms of cocaine and the arrest and conviction of notorious drug smuggler George Jung. This extensive undercover operation formed the basis for the book and major motion picture, **"BLOW."**

For over five years, he was assigned to the United States Drug Enforcement Administration (DEA) as the Group Supervisor-in-Charge of the South Florida Regional Drug Task Force. Under his leadership, the "Task Force" conducted one of the most sophisticated and successful international money laundering investigations (Operation Princess) to date. This operation resulted in the seizure of more than 100 million dollars in cash worldwide and over 5 tons of cocaine. Chief Tiderington is prominently featured in a second book, authored by New York Times bestselling writer Bruce Porter, which details this global investigation and the abduction of his informant in Colombia, South America. The true story titled **"SNATCHED"** was published by St. Martin's Press in April of 2016, and the book has been optioned by Leonardo DiCaprio's movie production company, Appian Way.

Before retiring in 2022, he served as Chief of Police for over 20 years and is one of the longest-serving police chiefs in the United States. Chief Tiderington is extremely knowledgeable in all aspects of law enforcement operations, including policing best practices, policy, procedures, use of force, risk mitigation, accreditation, police liability, active shooters in schools, police training, investigations, and emergency management planning, to name a few. As Police Chief, his duties included the overall operation and management of the Plymouth Township Police Department and the multi-agency Plymouth Communications Center and Prisoner Lock-Up Facility (PCC).

**For over 35 years Chief Tiderington served as a law enforcement trainer:**

| Partial Listing of Training Classes Taught: | |
| --- | --- |
| • Undercover Survival/Raids/Informants-developed and presented training since 1987- over 10,000 state, local & federal officers have attended this training. | • Instructor- DEA-State & Local Training Programs – (Throughout the US since 1987). |
| • Lead Instructor – Nevada HIDTA Training – Undercover Operations/Informants/Raids. | • Schoolcraft College – Criminal Justice / Adjunct Instructor (since 2005). |
| • Keynote Speaker - Entrepreneurs' Organization – Detroit Chapter (2011) | • United States Coast Guard – Criminal Investigations (Miami/Key West, Florida) |
| • Young Presidents Organization (YPO) - Barcelona, Spain – Guest Speaker (2010) | • Michigan State Police – Criminal Investigations - Lead Instructor, Drug Unit Commanders School, Detroit, MI. |
| • Michigan State Police – Undercover Survival Training – Houghton Lake, MI. | • National Alliance of State Drug Enforcement Agencies (NASDEA), Mackinaw Island- Lead Instructor. |
| • Strategic Vice Investigations – Lead Instructor | • Broward Intelligence Group, Money Laundering Investigations, Key West, Florida. |
| • International Money Laundering Investigations Conference – Presenter on behalf of the Department of Justice (DOJ) - Rome, Italy. | • Florida Department of Law Enforcement, Money Laundering Investigations. |
| • NARC RAIDS – Developed and presented training since 1990-over 10,000 officers have attended. | • Narcotics Instructor. Broward Criminal Justice Institute (since 1985). |
| • Narcotics Instructor, Investigators Drug School (since 1985) | • Gwinnett, Georgia – Undercover Survival & Police Raids |
| • International Narcotics Enforcement – Speaker – Madrid, Spain (1992). | • Director and lead instructor, Drug Enforcement Seminars, Ft. Lauderdale, FL (since 1984) |
| • Drug Interdiction Instructor, United States Coast Guard, Tactical Law Enforcement Team (smuggling investigations). | • Minnesota State Association of Narcotics Investigators (M.S.A.N.I.) - Undercover Survival |
| • Indiana Drug Enforcement Association Annual Conference, (1998). | • Southeastern Public Safety Institute-St. Petersburg Junior College- Criminal Investigations. |
| • Tallahassee Police Department-In-Service Training-Informant Handling/ Raids | • International Association of Chiefs of Police (IACP)- Orlando, Florida - Use of Force. |
| • National Intelligence Academy, Coral Springs, FL | • Michigan State Police, Street Level Lieutenant's Conference – Undercover Operations / Raids/Search Warrants/Informants/VICE. |
| • Presenter Department of Defense (DOD)- United States Navy- USS Theodore Roosevelt, *While Underway* - Atlantic Ocean/International Waters | • In-Service Police Training Instructor, Rio Rancho Department of Public Safety, New Mexico. |

| | |
|---|---|
| • Charlotte-Mecklenburg Police Institute, Charlotte, NC (since 1997). | • Lead Presenter – Human Trafficking Investigations- Ft. Lauderdale, FL (2014). |
| • Michigan Association of Chiefs of Police – 2015 Winter Training Conference - Police Policy and Practices – Presenter. | • Undercover Survival & NARC Raid – Raleigh, NC. |
| • National Summit on Human Trafficking and the State Courts- New York City (2015). | • St. Louis County and Municipal Police Academy, St. Louis, MO- Police Raids/Undercover. |
| • Michigan Association of Chiefs of Police – Human Trafficking & Prostitution Investigations 2017 Summer Conference- Presenter | • Columbus Ohio Regional Police Academy – Undercover Survival & Narc Raids Training. |
| • Young Presidents Organization (YPO) - International Drug Trafficking (2019). | • Broward Crime Commission – Presenter (2020). |
| • Certified Law Enforcement Instructor (MCOLES & FDLE). | • Broward County Police Academy classes. |

## Areas of Instruction/Topics Provided by Thomas J. Tiderington:
(Partial List)

| | |
|---|---|
| Undercover Operations | Human Trafficking |
| Use and Management of Confidential Informants. | Prostitution Investigations-Hotel/Motel Investigations |
| High-Risk Warrant Service | "Sneak & Peek" Warrants" |
| Coercive Deception | Use of Hidden Cameras |
| Alternatives to Dynamic Entries. | International Cartels and Criminal Organizations * Fugitives and Arrest Warrants |
| Search Warrants/Warrantless Entries | Conspiracy Investigations |
| Dangers of using "boilerplate" affidavits | Money Laundering |
| Narcotics Investigations | High-Risk Police Tactics |
| Criminal Cartels | Use of Deadly Force |
| Wrong Door Raids | Developing Probable Cause |
| Controlled Drug Deliveries | Kidnapping Investigations |
| Drug Identification | SWAT- use and policies. |
| Drug Interdiction and Smuggling Operations | Medical Marijuana and the use of force |

| Task Force Operations | Risk and Threat Assessment |
|---|---|
| Use of Force Policy and Procedures | Police Ethics |
| Firearms Use and Policy | Vehicle Pursuit Procedures |
| Less than lethal options (CEW/TASER) | Mistaken Identity Shootings |
| Concepts of Evidence/rules of evidence | Traffic Stop and Procedures |
| Community Policing and Crime Statistics | Handcuffing policy and procedures |
| Threat Assessment & Risk Avoidance in Tactical Operations | Interview and Interrogation Techniques |
| SWAT Operations | Internal Investigations |

## **Professional Law Enforcement Experience**

**Chief of Police**
Plymouth Township Police Department (2001-2022)
Michigan

- A "seasoned" executive experienced in all aspects of police operations, policy development/implementation, labor relations, internal affairs, and community involvement.
- One of the longest-serving police chiefs in the country.
- Led the accreditation process.
- Effective leadership skills in personnel selection, training, and reorganizing staff into cohesive motivated teams.
- Introduced and managed community policing strategies to address strengthening police-community relations.

**Police Officer/Supervisor/Senior Management**
Fort Lauderdale Police Department (1981–2001)
Florida

- Broward Police Academy (comparative compliance program).
- Patrol Division – a highly diverse population of 250,000 residents and millions of visitors each year.  Assigned to all areas of the city in every patrol assignment.
- Organized Crime Bureau (OCB) – Detective charged with investigating international crime cartels.

- Supervisor and Management Positions – Served in a variety of progressively responsible leadership executive positions.
- Administrative Services Captain – Budget, Purchasing, CALEA Manager. Accreditation Management, Grants and Planning, Training.
- Patrol Captain – In charge of crime prevention initiatives as well as the delivery of police uniformed patrol services.
- Captain / Special Investigations Division – Management and oversight of over fifty detectives charged with conducting specialized investigations targeting criminal organizations. Units included: VICE/Human Trafficking, Criminal Investigations, Narcotics, Task Force Operations, Technical Support, Nuisance Abatement Board, Street Crimes, and Major Narcotics.

**United States Drug Enforcement Administration (DEA)**
Southeast Florida Regional Task Force (1990-1996)

Group Supervisor in Charge of the South Florida Regional Task Force Initiative – HIDTA Task Force charged with the responsibility of identifying and dismantling international criminal cartels and organizations. Supervised and managed one of the most sophisticated and successful worldwide money laundering investigations (Operation Princess). Seizing more than 100 million dollars in cash and over 5 tons of cocaine.

**Detroit Police Department (1978 -1980):**
Diverse uniformed patrol and investigative assignments

- Detroit Police Academy.
- Patrol Experience
- Community Policing – Detroit Police Sub-Station Program.
- Motorcycle Training
- Pistol Team

*1980 – One of 1500 police officers was laid off due to budget reductions.*

**<u>Education:</u>**

- Mercy College of Detroit – Criminal Justice/associate degree
- Florida Atlantic University – Police Administration/bachelor's degree
- University of Louisville/Southern Police Institute – Command Officers Development Course (CODC)
- Detroit Police Academy (Class 78K)
- In-Service Police Training - over 4800 hours of advanced police training and leadership classes.

**Secondary Teaching Experience:**

- Broward Community College – Adjunct Faculty
- Schoolcraft College – Adjunct Faculty|

**Expert Witness and Consulting Experience:**

Chief Tiderington has been retained as an expert witness or case consultant in over one hundred (100) cases throughout the United States. His considerable expertise involves meticulous case review, enabling him to deliver comprehensive reports and opinions to the Court. Furthermore, he has extensive experience in providing testimony during depositions and trials in both state and federal courts.  He has been retained by the Department of Justice to examine and review the investigative actions of agents with the Federal Bureau of Investigation (FBI), the US Marshall's Service, and the US Customs and Border Protection (CBP).

**Provides consulting and expert witness services on a wide range of law enforcement issues including, but not limited to:**

| | |
|---|---|
| Police Use of Force | Wrongful Convictions |
| Standard operating procedures, policies, and rules and regulations of police agencies. | Selection, retention, supervision, discipline, and training of law enforcement officers. |
| Internal Investigations | Police Administration |
| Police Procedures and Investigations | Pursuits (vehicle & foot) |
| Police Corruption | Human Trafficking/Prostitution |
| Criminal Investigations | Interviews and Interrogations |
| Police Arbitration Cases | Accidental Police Shootings/Mistaken Identity |
| Civil Rights Violations | Immigration Issues |
| Police recognition of and reaction to emotionally disturbed persons. | Workplace Violence and Harassment |
| 911 and Police Dispatch Operations | Homicide & Violent Crime Investigations |
| Police Response to an Active Shooter | Raid Planning and Execution |
| Adult Entertainment Establishments | "Wrong-Door" Raids & Search Warrants |
| Search Warrants & Affidavits | Use of Hidden Cameras & Surveillance |
| Use of Anticipatory Warrants | Controlled Delivery Investigations |
| Domestic and International Narcotics Trafficking and Enforcement. | Fugitives / Arrest Warrants (Domestic & Foreign) |
| Premises Liability (Human Trafficking) | Crime Prevention Techniques |
| Handcuffing Techniques | Police Use of K9s |
| Police Use of CEW's (TASER) | Use and Management of Informants |
| Police Shootings | Extradition Issues |
| International Investigations | Monell Claims |
| | |

**PRIVATE SECURITY EXPERIENCE**

Provides guidance to commercial property owners and served as a security consultant for bars, hotels, and commercial business establishments. Offers advice and expertise in crime prevention strategies and employee training pertaining to security concerns, particularly addressing criminal activity on or near their properties.

**TRAINING COURSES ATTENDED**

Received over 4,800 hours of specialized and professional training in nearly all areas of law enforcement including particular emphasis in criminal investigations, arrests, use of force, and policies and procedures.

**<u>PROFESSIONAL ACTIVITIES:</u>**

**Human Trafficking Commissioner - Appointed by Michigan Governor Rick Snyder (2015 – 2019).**

The mission of the Human Trafficking Commission:

1. Designed to identify sources for grants that will assist in examining and countering human trafficking.
2. Fund research programs to determine the extent and nature of human trafficking in the state of Michigan, and provide information and training to police officers, prosecutors, court personnel, social services personnel, and other individuals.
3. Collect and analyze information regarding human trafficking in this state, identify state and local agencies within this state and other states, as well as, within the federal government, that are involved with issues relating to human trafficking.
4. Coordinate the dissemination of information regarding human trafficking in the state of Michigan to those agencies, review the existing services available to assist victims of human trafficking, including crime victim assistance, health care, and legal assistance, and establish a program to make those victims better aware of the services that are available to them.
5. Establish a program to improve public awareness of human trafficking review existing state laws and administrative rules relating to human trafficking and make recommendations to the legislature to improve those laws and rules to address human trafficking violations in this state.

**Western Wayne Criminal Investigations:  Board of Directors / Chairman**

A Multi-Agency Task Force consortium (Federal, State & Local Agencies) designed to provide the benefit of regional criminal investigative teams.  Includes the Western Wayne County Community Response Team (CRT).

**Western Wayne Special Operations Team (SWAT):**
Board of Directors / Chairman


**<u>Professional Affiliations:</u>**
(either current or at one time affiliated with)

Wayne County Police Chiefs Association
Western Wayne Chiefs Association
Southeast Michigan Chiefs of Police Association
Fraternal Order of Police/Florida
Police Executive Research Forum (PERF)
International Narcotics Enforcement Officers Association
State Certified Law Enforcement Instructor (Florida)
Southern Police Institute (SPI)-Alumnus
International Association of Chiefs of Police (IACP) – Life Member
National Drug Enforcement Officers Association (NDEA)
International Law Enforcement Educators and Trainers Association (ILEETA)
Michigan Association of Chiefs of Police (MACP)
Western Wayne Special Operation Team – Board of Director
National Tactical Officers Association (NTOA)
International Crime Scene Investigators Association (ICSIA)
Michigan Municipal Risk Management Authority (MMRMA)
Michigan's Human Trafficking Commission

**Thomas J. Tiderington & Associates - LLC**
*Police Practices & Procedures Experts / Law Enforcement Training & Consulting*
Ft. Lauderdale, Florida - Plymouth, Michigan
734 231-2305 * ttiderington@aol.com

## List of Deposition and Trial Testimony:

(as of 04-10-2025)

| Date Testified | Testimony | Court | Case Name & Number: | Attorney |
|---|---|---|---|---|
| April 2025 | Deposition | United States District Court Eastern District of Michigan | Lulgjuraj v Metro Parks 23-cv-1231 | Edward M. Turfe |
| March 2025 | Deposition | United States District Court Northern Illinois | Cruz v City of Chicago 23-cv-04268 | Ariel Olstein Stuart Chanen |
| March 2025 | Trial | United States District Court Eastern District of Wisconsin | Trevor v Allen 21-cv-565 | Richard Student |
| March 2025 | Deposition | Jefferson Circuit Court Louisville, Kentucky | Paul Paris v Louisville Metro PD 21-ci-00-4809 | Sam Aguiar Sara Collins Lonita Baker |
| Jan. 2025 | Deposition | United States District Court Northern Illinois | 18-cv-2342 Maysonet v City of Chicago | Bonjean Law Group Jennifer Bonjean Ashley Cohen |
| Nov. 2024 | Deposition | In the United States District Court For the Eastern District of Kentucky | 5:22-CV-300-KKC LaDuke v. Horton | Jonathan B. Fannin |
| Nov. 2024 | Deposition | District Court, Chaffee County, Colorado | 23-cv-30010 Athanas v Orth/Horton | Kevin Mehr Mehr Law PLLC |
| August 2024 | Deposition | United States District Court of Texas | 1:21-cv-00374- | Lamar Treadwell |

**Thomas J. Tiderington & Associates - LLC**
*Police Practices & Procedures Experts / Law Enforcement Training & Consulting*
Ft. Lauderdale, Florida - Plymouth, Michigan
734 231-2305 * ttiderington@aol.com

|  |  | Austin Division | Watsky v. Williamson |  |
|  |  |  |  |  |
| June 2024 | Deposition | United States District Court Southern District of Ohio | 2:19-cv-00849 M.A. v. Wyndham | Matt Schultz Chris Tisi Levin Papantonio Rafferty |
|  |  |  |  |  |
| March 2024 | Deposition | Circuit Court- Seventh Circuit- Volusia County | Jarvis v City of Daytona | Arthur A. Huggins |
|  |  |  |  |  |
| March 2024 | Deposition | United States District Court Western District of Michigan | 1:22-cv-00277-PLM Phillips v. City of Lansing | Johnson Law Aristidi D. Papaioannou |
|  |  |  |  |  |
| March 2024 | Deposition | United States District Court- Northern Illinois | 1:20-CV-02977 Ochoa v City of Chicago | Bonjean Law Group Jennifer Bonjean Ashley Cohen |
|  |  |  |  |  |
| February 2024 | Deposition | United States District Court Northern Illinois | 18-cv-2342 Maysonet v City of Chicago | Bonjean Law Group Jennifer Bonjean Ashley Cohen |
|  |  |  |  |  |
| Sept. 2023 | Deposition | United States District Court Northern Illinois Eastern Division | 1:20-CV-04156 Johnson v City of Chicago | Loevy & Loevy Anand Swaminathan |
|  |  |  |  |  |

**Thomas J. Tiderington & Associates - LLC**
*Police Practices & Procedures Experts / Law Enforcement Training & Consulting*
Ft. Lauderdale, Florida - Plymouth, Michigan
734 231-2305 * ttiderington@aol.com

| August 2023 | Deposition | United States District Court Northern Illinois Eastern Division | 1:18-cv-03335 Gomez v City of Chicago | Loevy & Loevy Sean Starr |
|---|---|---|---|---|
| | | | | |
| August 2023 | Deposition | United States District Court Northern Illinois Eastern Division | 1:17-cv-00204 Savory v City of Peoria | Loevy & Loevy Megan Pierce Steven Art |
| | | | | |
| August 2023 | Deposition | United States District Court Western District of Kentucky Louisville Division | 3:22-CV-00218-GNS-LLK Sterusky v Cooper | Sam Aguiar Sara E. Collins Nicholaus P. Wilson |
| | | | | |
| June 2023 | Deposition | United States District Court District of Nevada | 2:20-cv-01743-RFB-DJA Jesus v City of Las Vegas | Michael J. Mcavoy Timothy E. Revero |
| | | | | |
| April 2023 | Deposition | United States District Court Northern Illinois | 18-cv-2342 Maysonet v City of Chicago | Bonjean Law Group Jennifer Bonjean Ashley Cohen |
| | | | | |
| March 2023 | Deposition | United States District Court Eastern District of Arkansas | 4:21-cv-00879-JM | Laux Law Group Mike J. Laux |
| | | | | |
| March 2023 | Trial Testimony | Broward County FL 17th Judicial Circuit | 18-006079 | Hamilton, Miller Jerry Hamilton Derrick Kelley |
| | | | | |
| Feb. 2023 | Deposition | United States District Court Northern Illinois | 1:19-cv-6508 Inglesias v City of Chicago | Loevy & Loevy Rachal Brady Anand Swaminathan |
| | | | | |

**Thomas J. Tiderington & Associates - LLC**
*Police Practices & Procedures Experts / Law Enforcement Training & Consulting*
Ft. Lauderdale, Florida - Plymouth, Michigan
734 231-2305 * ttiderington@aol.com

| Feb. 2023 | Deposition | United States District Court Eastern District of Arkansas | 4:21-cv-00763 Davis v City of Little Rock | Laux Law Group Mike J. Laux |
|---|---|---|---|---|
| | | | | |
| Dec. 2022 | Deposition | United States District Court Northern Illinois | 1:18-cv-03029 Sierra v City of Chicago | Loevy & Loevy Anand Swaminathan |
| | | | | |
| Oct. 2022 | Deposition | United States District Court Northern Illinois | 1:18-cv-1028, 1:18-cv-2312 Reyes v City of Chicago | Loevy & Loevy Anand Swaminathan |
| | | | | |
| Aug. 2022 | Trial | United States District Court Northern Georgia | 1:19-cv-02047-SCJ Blasingame v Grubb | Johnson Law Ven Johnson |
| | | | | |
| May 2022 | Deposition | United States District Court Western District of Texas | SA-20-CV00466-XR Bailey v Ramos | Grable Grimshaw Mora PLLC Brandon Grable |
| | | | | |
| April 2022 | Deposition/ Hearing | Fifth Judicial Circuit Citrus County, Florida | 21-CF-253 State of FL v Waite | Law Offices of Michael Graves Alexei V. Lizanich |
| | | | | |
| Jan. 2022 | Deposition | United States District Court Southern District of Florida | 9:21-CV-80873-DMM Jane Doe v Love Hotel | Newsome-Melton Law Firm Maegen Peek-Luka |
| | | | | |
| **July 2022** | Deposition | United States District Court Eastern District of Wisconsin | 21-cv-565 Trevor v Allen | Richard Student |
| | | | | |

**Thomas J. Tiderington & Associates - LLC**
*Police Practices & Procedures Experts / Law Enforcement Training & Consulting*
Ft. Lauderdale, Florida - Plymouth, Michigan
734 231-2305 * ttiderington@aol.com

| Oct. 2021 | Deposition | United States District Court Arizona | CV-19-05216-PHX-MTL | Goodwin Law BRETT M. SCHUMAN |
|-----------|------------|--------------------------------------|---------------------|------------------------------|
|           |            |                                      |                     |                              |
|           |            |                                      |                     |                              |

ATTACH. C

**Thomas J. Tiderington & Associates-LLC**

Phone:  734 231-2305

E-mail:  ttiderington@aol.com

**Fee Schedule:**
**2025**

Case review and expert report…………..$375.00 per hour.

Deposition Testimony…………………..$2,400.00 (half day/4hrs.)

Trial Testimony………………………$4,500.00 per day.

Jenkins, Parker v. Rankin County et al., Case No. 23-cv-00374

**LIST OF CASE MATERIALS:**
**(as of 04-10-2025)**

## I. Recordings and Communications

- Radio Calls – January 24, 2023

---

## II. Discovery Responses

- Defendants' Answers and Supplemental Answers to Plaintiffs' Requests for Production of Documents and Interrogatories
- Plaintiffs' Production to Defendants (Bates Nos. 1–571)
- Jenkins and Parker: Answers to Interrogatories and Request for Production of Documents
- Christopher Mack – Photographs

---

## III. Rankin County Documents

### A. Policies and Procedures

- RC 001–050 – Policies and Procedures
- RC 1802–1823 – Updated Policies

### B. Training Files

- RC 051–068 – Christian Dedmon
- RC 069–087 – Jeffrey Elward
- RC 088–167 – Brett McAlpin
- RC 168–202 – Jeffrey Middleton
- RC 203–243 – Joseph Opdyke
- RC 1997–2073 – Supplemental Training Records

### C. Use of Force Reports

- RC 1824–1888 – Dedmon UOF Reports
- RC 1889–1890 – McAlpin UOF Reports
- RC 1891–1911 – Elward UOF Reports
- RC 1912–1929 – Opdyke UOF Reports

Jenkins, Parker v. Rankin County et al., Case No. 23-cv-00374

**D. Incident-Related and Other Files**

- RC 244–1272 –  Jenkins & Parker Records
- RC 1273–1801 – Miscellaneous Records (Others)
- RC 1930–1943 – Alan Schmidt Records
- RC 1944–1973 – Jenkins & Parker Supplemental Records
- RC 1974–1996 – Opdyke TASER Download
- RC 2074–2769 – DOJ Submission Documents
- RC 2770–3352 – Complaints and Review Files
- RC 3353–4346 – Additional Supplemental Records (Others)
- RC 4347- 4354 - TASER Download

---

## IV. Deposition Transcripts

1. Sheriff Bryan Bailey
2. Steven Godfrey
3. Wayne Carter
4. Dwayne Thornton
5. Jeffrey Middleton
6. Alan Schmidt

Thomas J. Tiderington & Associates, LLC