<pre>
 1                 IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                          NORTHERN DIVISION

 3


 4   UNITED STATES OF AMERICA

 5   VERSUS                    CRIMINAL NO. 3:23-CR-00062-TSL-LGI

 6   BRETT MORRIS MCALPIN
     JEFFREY ARWOOD MIDDLETON
 7   CHRISTIAN LEE DEDMON
     HUNTER THOMAS ELWARD
 8   DANIEL READY OPDYKE
     JOSHUA ALLEN HARTFIELD                            DEFENDANTS

 9

10

11               CHANGE OF PLEA PROCEEDINGS
             BEFORE THE HONORABLE TOM S. LEE,
12         UNITED STATES DISTRICT COURT JUDGE,
                    AUGUST 3, 2023,
13                JACKSON, MISSISSIPPI

14

15             (APPEARANCES NOTED HEREIN.)

16

17

18

19

20

21

     REPORTED BY:
22
         CANDICE S. CRANE, RPR, RCR, CCR #1781
23       OFFICIAL COURT REPORTER
         501 E. Court Street, Suite 2.500
24       Jackson, Mississippi  39201
         Telephone:  (601)608-4187
25       E-mail:  Candice_Crane@mssd.uscourts.gov
</pre>

```
 1   A P P E A R A N C E S:

 2

     FOR THE GOVERNMENT:  ERIN O. CHALK, ESQ.
 3                        GLENDA R. HAYNES, ESQ.
                          CHRISTOPHER PERRAS, ESQ.
 4                        DANIEL GRUNERT, ESQ.

 5   FOR THE DEFENDANTS:  AAFRAM Y. SELLERS, ESQ.
                          For Defendant Brett Morris McAlpin
 6
                          E. CARLOS TANNER, III, ESQ.
 7                        For Defendant Jeffrey Arwood Middleton

 8                        MICHAEL V. CORY, ESQ.
                          For Defendant Christian Lee Dedmon
 9
                          JOSEPH M. HOLLOMON, ESQ.
10                         For Defendant Hunter Thomas Elward

11                        JASON M. KIRSCHBERG, ESQ., AND
                          JEFFERY P. REYNOLDS, ESQ.
12                        For Defendant Daniel Ready Opdyke

13                        VICKI L. GILLIAM, ESQ., AND
                          ROBERT F. LINGOLD, JR., ESQ.
14                        For Defendant Joshua Allen Hartfield

15   ALSO PRESENT:

16      MARY HELEN WALL, ESQ.

17

18

19

20

21

22

23

24

25
```

**TABLE OF CONTENTS**

Style and appearances................................... 1-2

Court Reporter's Certificate........................... 137

1            **IN OPEN COURT, AUGUST 3, 2023**

2

3            THE COURT:  Be seated.

4            The case that is presently before the Court this

5     morning is No. 3:23-62 on the criminal docket, United

6     States versus Brett Morris McAlpin, Jeffrey Arwood

7     Middleton, Christian Lee Dedmon, Hunter Thomas Elward,

8     Daniel Ready Opdyke, and Joshua Allen Hartfield, before the

9     Court today on the Court's understanding that the

10    defendants, having been before the Court, the magistrate

11    judge, earlier this morning and having entered pleas of not

12    guilty on an information filed, are now before the Court to

13    enter a plea of guilty on the charges.

14            Is the Government ready for trial -- for the

15    proceeding?

16            MS. CHALK:  We are, Your Honor.  And if I may for

17    the record --

18            THE COURT:  Yes, ma'am.

19            MS. CHALK:  -- Erin Chalk on behalf of the United

20    States for the Southern District of Mississippi.  I have

21    Christopher Perras and John -- and, excuse me -- Daniel

22    Grunert from the Civil Rights Division, Glenda Haynes from

23    the U.S. Attorney's Office, and Mary Helen Wall designated

24    as a special assistant.

25            THE COURT:  Thank you.  And the Government is ready

1    to proceed?

2         MS. CHALK:  We are, Your Honor.

3         THE COURT:  Are the defendants ready to proceed?  If

4    you lawyers will do so, identify yourselves for the record.

5         MR. SELLERS:  Yes, sir, Your Honor.  If I may

6    proceed on behalf of Brett Morris McAlpin, Aafram Sellers,

7    and we're ready to proceed.

8         MR. TANNER:  Good morning, Your Honor.  Carlos

9    Tanner on behalf of Jeffrey Arwood Middleton, and

10   Mr. Middleton is ready to proceed.

11        MR. CORY:  Your Honor, Michael Cory on behalf of

12   Christian Dedmon, and Mr. Dedmon is ready to proceed.

13        MR. HOLLOMON:  Good morning, Your Honor.  Joe

14   Hollomon on behalf of Hunter Elward.  He is present this

15   morning, and we're prepared to proceed.

16        MR. REYNOLDS:  Your Honor, Jeff Reynolds on behalf

17   of Daniel Opdyke.  I and my partner, Jason Kirschberg,

18   represent him, and Mr. Opdyke is here and ready to proceed.

19        MS. GILLIAM:  Your Honor, Vicki Gilliam and Robert

20   Lingold on behalf of Joshua Allen Hartfield.  We're ready

21   to proceed.

22        THE COURT:  All right.  You can be seated.

23        Let the defendants come to the podium.  I would like

24   for you to be positioned in the order in which your names

25   appear on the information.  You can come around and...

1          The Court is informed that you all wish to change

2     the pleas previously entered this morning of not guilty to

3     a plea of guilty to the information.

4          Is that correct, Mr. McAlpin?

5          DEFENDANT MCALPIN:  Yes, Your Honor.

6          THE COURT:  Mr. Middleton?

7          DEFENDANT MIDDLETON:  Yes, Your Honor.

8          THE COURT:  Mr. Dedmon?

9          DEFENDANT DEDMON:  Yes, sir.

10         THE COURT:  Mr. Elward?

11         DEFENDANT ELWARD:  Yes, sir.

12         THE COURT:  Mr. Opdyke?

13         DEFENDANT OPDYKE:  Yes, Your Honor.

14         THE COURT:  Opdyke.

15         And, Mr. Hartfield?

16         DEFENDANT HARTFIELD:  Yes, sir, Your Honor.

17         THE COURT:  Before accepting your pleas, there's a

18    series of questions that I'll need to ask to be sure that

19    the pleas are valid.  If you don't understand a question or

20    at any time need to talk to your lawyer, you should do so,

21    because it's essential to a valid plea that you understand

22    questions before you undertake to answer them.

23         Let the clerk administer the oath to the defendants.

24         *(Whereupon, the defendants were placed under oath.)*

25         THE COURT:  Do you understand that, having been

1  sworn, you could be subjecting yourselves to a future

2  prosecution for perjury if you don't answer truthfully the

3  questions that I pose to you this morning, perjury being

4  the false swearing under oath?

5      Do you understand that, Mr. McAlpin?

6      DEFENDANT MCALPIN:  Yes, Your Honor.

7      THE COURT:  Mr. Middleton?

8      DEFENDANT MIDDLETON:  Yes, Your Honor.

9      THE COURT:  Mr. Dedmon?

10      DEFENDANT DEDMON:  Yes, sir.

11      THE COURT:  Mr. Elward?

12      DEFENDANT ELWARD:  Yes, Your Honor.

13      THE COURT:  Mr. Opdyke?

14      DEFENDANT OPDYKE:  Yes, Your Honor.

15      THE COURT:  And, Mr. Hartfield?

16      DEFENDANT HARTFIELD:  Yes, Your Honor.

17      THE COURT:  I'm going to take each one of you

18  individually and ask you a few questions.

19      Mr. McAlpin, how old are you?

20      DEFENDANT MCALPIN:  I'm 52 years old.

21      THE COURT:  What education do you have?

22      DEFENDANT MCALPIN:  I have a bachelor's degree.

23      THE COURT:  Where do you live?

24      DEFENDANT MCALPIN:  I live in Braxton, Mississippi.

25      THE COURT:  What is your occupation?

 1          DEFENDANT MCALPIN:  I'm a former chief investigator

 2     for the Rankin County Sheriff's Department.

 3          THE COURT:  Are you married?

 4          DEFENDANT MCALPIN:  No, sir.

 5          THE COURT:  Have you ever been married?

 6          DEFENDANT MCALPIN:  Yes, sir.

 7          THE COURT:  Do you have children?

 8          DEFENDANT MCALPIN:  Yes, sir.

 9          THE COURT:  How many children and what ages?

10          DEFENDANT MCALPIN:  I have two boys, 23 and age 20.

11          THE COURT:  Mr. Middleton, how old are you?

12          DEFENDANT MIDDLETON:  Forty-five years old, Your

13     Honor.

14          THE COURT:  What education do you have?

15          DEFENDANT MIDDLETON:  High school diploma.

16          THE COURT:  What has been your occupation?

17          DEFENDANT MIDDLETON:  Lieutenant with the Rankin

18     County Sheriff's Department.

19          THE COURT:  Where do you live?

20          DEFENDANT MIDDLETON:  I live in Florence,

21     Mississippi.

22          THE COURT:  Are you married?

23          DEFENDANT MIDDLETON:  Yes, sir.

24          THE COURT:  Do you have children?

25          DEFENDANT MIDDLETON:  Yes, Your Honor.

1        THE COURT:  How many and what are their ages?

2        DEFENDANT MIDDLETON:  I have two.  I have my

3  daughter that's 12 and a son that's 15.

4        THE COURT:  Mr. Dedmon, how old are you?

5        DEFENDANT DEDMON:  Twenty-eight.

6        THE COURT:  What education do you have?

7        DEFENDANT DEDMON:  High school diploma.

8        THE COURT:  What is your occupation?

9        DEFENDANT DEDMON:  Former narcotics investigator for

10  the Rankin County Sheriff's Office.

11        THE COURT:  Where is your home?

12        Dd:  Pearl, Mississippi.  Pearl, Mississippi.

13        THE COURT:  Are you married?

14        Dd:  No, sir.

15        THE COURT:  Have you ever been married?

16        DEFENDANT DEDMON:  Yes, sir.

17        THE COURT:  Do you have children?

18        DEFENDANT DEDMON:  Yes, sir.

19        THE COURT:  How old are they and -- what are their

20  ages?

21        DEFENDANT DEDMON:  One daughter who's six.

22        THE COURT:  Mr. Elward, am I pronouncing your name

23  correctly?

24        DEFENDANT ELWARD:  Yes, Your Honor.

25        THE COURT:  How old are you?

1      DEFENDANT ELWARD:  Thirty-one years old.

2      THE COURT:  What education do you have?

3      DEFENDANT ELWARD:  High school diploma.

4      THE COURT:  Where is your home?

5      DEFENDANT ELWARD:  Florence, Mississippi.

6      THE COURT:  What has been your occupation?

7      DEFENDANT ELWARD:  A patrol deputy for the Rankin

8  County Sheriff's Department.

9      THE COURT:  Are you married?

10      DEFENDANT ELWARD:  I am.

11      THE COURT:  Do you have children?

12      DEFENDANT ELWARD:  I do.

13      THE COURT:  How many children and how old are they?

14      DEFENDANT ELWARD:  I got twin boys just turned nine

15  and a younger one that's six.

16      THE COURT:  Mr. Opdyke, is that the correct

17  pronunciation of your name, Opdyke?

18      DEFENDANT OPDYKE:  Yes, Your Honor.

19      THE COURT:  How old are you?

20      DEFENDANT OPDYKE:  Twenty-seven.

21      THE COURT:  What education do you have?

22      DEFENDANT OPDYKE:  High school diploma.

23      THE COURT:  What is your occupation?

24      DEFENDANT OPDYKE:  Former patrol deputy for the

25  Rankin County Sheriff's Department.

```
1           THE COURT:  Where is your home?

2           DEFENDANT OPDYKE:  Florence, Mississippi.

3           THE COURT:  Are you married?

4           DEFENDANT OPDYKE:  Yes, sir.

5           THE COURT:  Do you have children?

6           DEFENDANT OPDYKE:  Yes, sir.

7           THE COURT:  How many children, and what are their

8  ages?

9           DEFENDANT OPDYKE:  One son.  He's 11.

10          THE COURT:  Mr. Hartfield, how old are you?

11          DEFENDANT HARTFIELD:  Thirty-one, sir.

12          THE COURT:  What education do you have?

13          DEFENDANT HARTFIELD:  High school, Your Honor.

14          THE COURT:  What is your occupation?

15          DEFENDANT HARTFIELD:  Former narcotics investigator

16  at Richland Police Department.

17          THE COURT:  Where is your home?

18          DEFENDANT HARTFIELD:  Florence, Mississippi.

19          THE COURT:  Are you married?

20          DEFENDANT HARTFIELD:  Yes, sir, I am.

21          THE COURT:  Do you have children?

22          DEFENDANT HARTFIELD:  Yes, sir, I do.  Seven and

23  six.

24          THE COURT:  Have you taken any drugs, medicine, or

25  pills or drunk any alcoholic beverages over the last
```

1    24 hours, Mr. McAlpin?

2         DEFENDANT MCALPIN:  No, Your Honor.

3         THE COURT:  Mr. Middleton.

4         DEFENDANT MIDDLETON:  No, Your Honor.

5         THE COURT:  Mr. Dedmon?

6         Dd:  No, sir.

7         THE COURT:  Mr. Elward?

8         DEFENDANT ELWARD:  No, sir.

9         THE COURT:  Mr. Opdyke?

10        DEFENDANT OPDYKE:  Yes, sir.

11        THE COURT:  What have you taken?

12        DEFENDANT OPDYKE:  Drank alcohol yesterday

13   afternoon.

14        THE COURT:  I didn't understand specifically.

15        DEFENDANT OPDYKE:  I drank alcohol yesterday

16   afternoon.

17        THE COURT:  How much and --

18        DEFENDANT OPDYKE:  A couple beers about 3:00 in the

19   afternoon.

20        THE COURT:  Would that in any way affect your

21   ability to be rational and think this morning?

22        DEFENDANT OPDYKE:  No, Your Honor.

23        THE COURT:  Mr. Hartfield?

24        DEFENDANT HARTFIELD:  Yes, sir.  Prescription

25   medication.

```
 1              THE COURT:  Does it influence your mental processes?
 2              DEFENDANT HARTFIELD:  No, sir, Your Honor, it does
 3    not.
 4              THE COURT:  All right, sir.
 5         Have you ever been treated by a doctor or other
 6    medical professional, either in a hospital or a clinic,
 7    under any circumstances, Mr. McAlpin?
 8              DEFENDANT MCALPIN:  No, Your Honor.
 9              DEFENDANT MIDDLETON:  No, Your Honor.
10              DEFENDANT ELWARD:  No, Your Honor.
11              THE COURT:  With a mental sickness, disease, or
12    disorder?
13              DEFENDANT MCALPIN:  No, Your Honor.
14              THE COURT:  All right.
15              DEFENDANT MIDDLETON:  No, Your Honor.
16              DEFENDANT ELWARD:  No, Your Honor.
17              DEFENDANT DEDMON:  No, Your Honor.
18              DEFENDANT OPDYKE:  No, sir.
19              DEFENDANT HARTFIELD:  No, Your Honor.
20              THE COURT:  In order to enter a valid plea, you must
21    be mentally competent to do so, which means that you must
22    be able to understand what is happening, what this hearing
23    is about, its seriousness and potential consequences to
24    your future, and you must be able to consult with your
25    attorney or attorneys and understand their advice to you
```

 1   and act accordingly.

 2       Under that definition, are you mentally competent to

 3   enter a valid plea?

 4       DEFENDANT MCALPIN:  Yes, Your Honor.

 5       THE COURT:  Are you sir?

 6       DEFENDANT MIDDLETON:  Yes, Your Honor.

 7       DEFENDANT DEDMON:  Yes, Your Honor.

 8       DEFENDANT ELWARD:  Yes, Your Honor.

 9       DEFENDANT OPDYKE:  Yes, Your Honor.

10       DEFENDANT HARTFIELD:  Yes, Your Honor.

11       THE COURT:  You must have also been competent at the

12   time alleged in the information, which is on or about

13   January 24th, 2003 *[sic]*.  There's a different definition

14   of competence applicable for this purpose.  You must have

15   been able on or about that date to know the difference

16   between right and wrong.

17       Back in January of this year, did you know right

18   from wrong, Mr. McAlpin?

19       DEFENDANT MCALPIN:  Yes, Your Honor.

20       THE COURT:  Mr. Middleton?

21       DEFENDANT MIDDLETON:  Yes, Your Honor.

22       THE COURT:  Mr. Dedmon?

23       DEFENDANT DEDMON:  Yes, Your Honor.

24       THE COURT:  Mr. Elward?

25       DEFENDANT ELWARD:  Yes, Your Honor.

```
1          THE COURT:  Mr. Opdyke?

2          DEFENDANT OPDYKE:  Yes, Your Honor.

3          THE COURT:  Mr. Hartfield?

4          DEFENDANT HARTFIELD:  Yes, Your Honor.

5          THE COURT:  I'll ask counsel for Mr. McAlpin what

6   position you take as to your client's competence to enter a

7   plea and his competence at the time alleged in the

8   information.

9          MR. SELLERS:  Your Honor, we raise no issue as to

10  competency at either time.

11         THE COURT:  What's your position, Mr. Tanner?

12         MR. TANNER:  Your Honor, on behalf of Mr. Middleton,

13  we raise no issues as to his competency.

14         THE COURT:  And with regard to Mr. Dedmon, sir?

15         MR. CORY:  On behalf of Mr. Dedmon, we raise no

16  issues of competency.

17         THE COURT:  What position do you take with regard to

18  Mr. Elward?

19         MR. HOLLOMON:  Your Honor, on behalf of Mr. Elward,

20  we raise no issue of competence.

21         THE COURT:  Mr. Opdyke?

22         MR. REYNOLDS:  Yes, sir.  Jeff Reynolds on behalf of

23  Mr. Opdyke.

24         Your Honor, we don't raise issues of competence as

25  to the two incidents charged, the one in December of 2022
```

1   and the one in January of this year.

2           THE COURT:  All right.

3           MR. LINGOLD:  Your Honor, Robert Lingold on behalf

4   of Joshua Hartfield.

5           We raise no issue as to competence.

6           THE COURT:  I'm realizing that, of course, there's a

7   second information, and I won't ask any questions about

8   that until another hearing later today.

9           I conclude that based on my observation of you, your

10  respective demeanors, and your answers to questions, and

11  reinforced by your lawyers' expression of opinion that you

12  are all indeed competent to enter a plea and that you were

13  competent at the time alleged in the information.

14          Have you had an adequate or satisfactory opportunity

15  to discuss your case with your attorney or attorneys and

16  consider any possible defenses to the charges?

17  Mr. Middleton -- McAlpin, rather?

18          DEFENDANT MCALPIN:  Yes, Your Honor.

19          THE COURT:  Mr. Middleton?

20          DEFENDANT MIDDLETON:  Yes, Your Honor.

21          THE COURT:  Mr. Dedmon?

22          DEFENDANT DEDMON:  Yes, Your Honor.

23          THE COURT:  Mr. Elward?

24          DEFENDANT ELWARD:  Yes, Your Honor.

25          THE COURT:  Mr. Opdyke?

```
 1              DEFENDANT OPDYKE:  Yes, Your Honor.

 2              THE COURT:  Mr. Hartfield?

 3              DEFENDANT HARTFIELD:  Yes, Your Honor.

 4              THE COURT:  Are you satisfied with your attorney's

 5   representation, the amount of time that he or she has

 6   dedicated to your case, and that -- the advice you received

 7   from them?  Mr. McAlpin?

 8              DEFENDANT MCALPIN:  Yes, Your Honor.

 9              THE COURT:  Mr. Middleton?

10              DEFENDANT MIDDLETON:  Yes, Your Honor.

11              THE COURT:  Mr. Dedmon?

12              DEFENDANT DEDMON:  Yes, Your Honor.

13              THE COURT:  Mr. Opdyke?

14              DEFENDANT OPDYKE:  Yes, Your Honor.

15              THE COURT:  Mr. Hartfield?

16              DEFENDANT HARTFIELD:  Yes, Your Honor.

17              MR. HOLLOMON:  Your Honor, I believe Mr. Elward

18   should respond.

19              THE COURT:  Mr. Elward, I'm -- go ahead.

20              DEFENDANT ELWARD:  Yes, Your Honor.

21              THE COURT:  Yes, I skipped, and I was coming back to

22   that.

23              All of you have certain rights under the

24   Constitution and laws of this country that I will now

25   explain to you.  You have a right to be tried in front of a
```

1    jury of 12 people.  All of them would have to vote guilty;

2    that is, unanimous, before you could be found guilty.

3            Do you understand that, Mr. McAlpin?

4            DEFENDANT MCALPIN:  Yes, Your Honor.

5            THE COURT:  Mr. Middleton?

6            DEFENDANT MIDDLETON:  Yes, Your Honor.

7            THE COURT:  Mr. Dedmon?

8            DEFENDANT DEDMON:  Yes, Your Honor.

9            THE COURT:  Mr. Elward?

10           DEFENDANT ELWARD:  Yes, Your Honor.

11           THE COURT:  Mr. Opdyke?

12           DEFENDANT OPDYKE:  Yes, Your Honor.

13           THE COURT:  Mr. Hartfield?

14           DEFENDANT HARTFIELD:  Yes, Your Honor.

15           THE COURT:  Under our system of justice, you're

16   presumed to be innocent.  You don't have to prove your

17   innocence.  If your cases were to go to trial, the

18   Government, the prosecution, would have the burden of

19   proving your guilt by competent evidence beyond a

20   reasonable doubt.

21           Do you understand that, Mr. McAlpin?

22           DEFENDANT MCALPIN:  Yes, Your Honor.

23           THE COURT:  Mr. Middleton?

24           DEFENDANT MIDDLETON:  Yes, Your Honor.

25           THE COURT:  Mr. Dedmon?

```
 1              DEFENDANT DEDMON:  Yes, Your Honor.

 2              THE COURT:  Mr. Elward?

 3              DEFENDANT ELWARD:  Yes, Your Honor.

 4              THE COURT:  Mr. Opdyke?

 5              DEFENDANT OPDYKE:  Yes, Your Honor.

 6              THE COURT:  Mr. Hartfield?

 7              DEFENDANT HARTFIELD:  Yes, Your Honor.

 8              THE COURT:  At a trial, the Government would have to

 9    bring to court the witnesses against you who would testify

10    in front of you and your lawyer or lawyers.  Your counsel

11    would have the right to object to testimony on the basis of

12    it being inadmissible under the rules of evidence and could

13    cross-examine witnesses and present testimony in your own

14    defenses, including your own testimony if you decide to

15    testify.  And there would be available to you the subpoena

16    power of the Court to compel or require the attendances --

17    the attendance of witnesses that you wanted to have here.

18              Do you understand that, Mr. McAlpin?

19              DEFENDANT MCALPIN:  Yes, Your Honor.

20              THE COURT:  Mr. Middleton?

21              DEFENDANT MIDDLETON:  Yes, Your Honor.

22              THE COURT:  Mr. Dedmon?

23              DEFENDANT DEDMON:  Yes, Your Honor.

24              THE COURT:  Mr. Opdyke?  Mr. Elward and then

25    Mr. Opdyke.
```

```
 1          DEFENDANT ELWARD:  Yes, Your Honor.

 2          DEFENDANT OPDYKE:  Yes, Your Honor.

 3          THE COURT:  And, Mr. Hartfield?

 4          DEFENDANT HARTFIELD:  Yes, Your Honor.

 5          THE COURT:  I just referenced the fact you could

 6     testify.  You would also have the right not to testify,

 7     which means that if you elected not to testify, the

 8     Government -- no one on behalf of the Government could make

 9     any comment or reference whatsoever to the fact that you

10     didn't testify.  For example, that it's suspicious or maybe

11     you must be guilty since you didn't defend yourself in

12     testimony.

13          Do you understand that?

14          DEFENDANT MCALPIN:  Yes, Your Honor.

15          THE COURT:  Do you also?

16          DEFENDANT MIDDLETON:  Yes, Your Honor.

17          THE COURT:  Mr. Dedmon?

18          DEFENDANT DEDMON:  Yes, Your Honor.

19          THE COURT:  Mr. Elward?

20          DEFENDANT ELWARD:  Yes, Your Honor.

21          THE COURT:  Mr. Opdyke?

22          DEFENDANT OPDYKE:  Yes, Your Honor.

23          THE COURT:  Mr. Hartfield?

24          DEFENDANT HARTFIELD:  Yes, Your Honor.

25          THE COURT:  If you go forward with guilty pleas,
```

1   you'll be waiving, or giving up, your right to a trial and

2   these various rights that I've just now explained to you.

3   Once I receive your plea, you won't be able then to change

4   your mind, withdraw your plea, and expect to have a trial.

5        Do you understand that, Mr. McAlpin?

6        DEFENDANT MCALPIN:  Yes, Your Honor.

7        THE COURT:  Mr. Middleton?

8        DEFENDANT MIDDLETON:  Yes, Your Honor.

9        THE COURT:  Mr. Dedmon?

10       DEFENDANT DEDMON:  Yes, Your Honor.

11       THE COURT:  Mr. Elward?

12       DEFENDANT ELWARD:  Yes, Your Honor.

13       THE COURT:  Mr. Opdyke?

14       DEFENDANT OPDYKE:  Yes, Your Honor.

15       THE COURT:  Mr. Hartfield?

16       DEFENDANT HARTFIELD:  Yes, Your Honor.

17       THE COURT:  Also, before I will accept your pleas,

18  I'll need to be satisfied that the pleas are appropriate,

19  which means that you will have to give up, or waive, your

20  right to remain silent, your right not to incriminate

21  yourself, and acknowledge your guilt before I'll accept

22  your pleas.

23       Do you realize that, Mr. McAlpin?

24       DEFENDANT MCALPIN:  Yes, sir.

25       THE COURT:  Mr. Middleton?

```
 1          DEFENDANT MIDDLETON:  Yes, Your Honor.

 2          THE COURT:  Mr. Dedmon?

 3          DEFENDANT DEDMON:  Yes, sir.

 4          THE COURT:  Mr. Elward?

 5          DEFENDANT ELWARD:  Yes, Your Honor.

 6          THE COURT:  Mr. Opdyke?

 7          DEFENDANT OPDYKE:  Yes, Your Honor.

 8          THE COURT:  And Mr. Hartfield?

 9          DEFENDANT HARTFIELD:  Yes, Your Honor.

10          THE COURT:  After this explanation by me and having

11   heard the explanation of your right to a trial and all the

12   other rights, I'll ask you whether you still want to go

13   forward with a guilty plea.

14          Mr. McAlpin?

15          DEFENDANT MCALPIN:  Yes, Your Honor.

16          THE COURT:  Mr. Middleton?

17          DEFENDANT MIDDLETON:  Yes, Your Honor.

18          THE COURT:  Mr. Dedmon?

19          DEFENDANT DEDMON:  Yes, sir.

20          THE COURT:  Mr. Elward?

21          DEFENDANT ELWARD:  Yes, Your Honor.

22          THE COURT:  Mr. Opdyke?

23          DEFENDANT OPDYKE:  Yes, Your Honor.

24          THE COURT:  Mr. Hartfield?

25          DEFENDANT HARTFIELD:  Yes, Your Honor.
```

1          THE COURT:  I'm going to now make an explanation of

2    the information that's been filed.  Consists of 13 counts,

3    some of them applicable to all of you, others to some of

4    you.  All of the counts state and then reallege that at all

5    times on the day of this -- the events of this information,

6    Mr. McAlpin, you were employed as the chief investigator

7    with the Rankin County Sheriff's Office in Rankin County.

8          Mr. Middleton, you were employed as a lieutenant

9    with the Rankin County Sheriff's Office.

10          Mr. Dedmon, you were employed as a narcotics

11    investigator by the Rankin County Sheriff's Office.

12          Mr. Elward, you were employed as a patrol deputy

13    with the Rankin County Sheriff's Office.

14          And, Mr. Opdyke, you were employed as a patrol

15    deputy with the Rankin County Sheriff's Office.

16          And, Mr. Hartfield, you were employed as a narcotics

17    investigator with the Richland Police Department.

18          And then there are a number of paragraphs setting

19    out facts, introductory facts, background information, and

20    then events detailing alleged acts.

21          Count 1 then specifically alleges that on or about

22    January 24th, 2023, in Rankin County, in the Northern

23    Division of the Southern District of Mississippi, and it

24    names all six of you, while acting under color of law,

25    knowingly and willfully conspired and agreed to injure,

1  oppress, threaten, and intimidate MJ and EP, the initials

2  of the two individuals, in their free exercise and

3  enjoyment of the right, secured to them by the Constitution

4  and laws of the United States, to be free from unreasonable

5  searches and seizures, which includes the right to be free

6  from unlawful, warrantless entry into a home and from the

7  use of unreasonable force by a law enforcement officer.

8      In furtherance of the conspiracy and to effect the

9  objects thereof, you, the six of you, committed the overt

10  acts set forth in other paragraphs 21 through 56 of the

11  information.

12      The essential elements of this crime, this criminal

13  offense, are explained as follows:  Title 18, United States

14  Code 241 makes it a crime for anyone to knowingly agree

15  with another person to injure, oppress, threaten, or

16  intimidate another person in the free exercise and

17  enjoyment of the rights secured to him by the Constitution

18  and laws of the United States.  And there are four elements

19  or components of this charge:

20      First, that the defendants entered into a conspiracy

21  to injure, oppress, threaten, or intimidate one or more

22  persons.

23      Second, that they specifically intended by the

24  conspiracy to hinder, prevent, or interfere with MJ's and

25  EP's enjoyment of the rights secured by the Constitution or

laws of the United States.  The constitutional right at
issue in Count 1 is the right to be free from unreasonable
searches and seizures, which includes the right to be free
from unlawful, warrantless entry into a home and the right
to be free from the use of unreasonable force by a law
enforcement officer.

Third, that the defendants acted under color of law.

And, fourth, that at least one member of the
conspiracy committed an overt act in furtherance of the
conspiracy.

There are four elements that are required to
establish a Fourth Amendment violation under a malicious
prosecution theory, and they are:

One, that the defendants made, influenced, or
participated in the decision to bring criminal charges
against the defendant.

Two, that there was no probable cause for the
prosecution.

Third, as a consequence, the victims suffered a
deprivation of liberty apart from the initial arrest.

And, fourth, that the criminal proceeding was
resolved in the victim's favor.

And a definition of conspiracy is an agreement
between two or more persons to join together to accomplish
some unlawful purpose.  It's a kind of partnership in crime

1    in which each member of the conspiracy becomes the agent of
2    every other member.
3        Now, after that explanation by me, I'll ask you
4    whether you understand with what criminal offense you're
5    charged in Count 1 of the indictment, Mr. McAlpin?
6        DEFENDANT MCALPIN:  Yes, sir.
7        THE COURT:  Mr. Middleton?
8        DEFENDANT MIDDLETON:  Yes, Your Honor.
9        THE COURT:  Mr. Dedmon?
10       DEFENDANT DEDMON:  Yes, sir.
11       THE COURT:  Mr. Elward?
12       DEFENDANT ELWARD:  Yes, Your Honor.
13       THE COURT:  Mr. Opdyke?
14       DEFENDANT OPDYKE:  Yes, Your Honor.
15       THE COURT:  Mr. Hartfield?
16       DEFENDANT HARTFIELD:  Yes, Your Honor.
17       THE COURT:  And let me say that some of the -- after
18   this first one, some of the counts charge violations of the
19   same or similar statutes or laws, and much of the language
20   regarding the essential elements of these respective
21   criminal offenses is similar and repetitious, even
22   identical in some respects.  But I want to be sure that
23   there's an accurate, clear, and complete explanation for
24   each one.  And there's going to be some repetition, but
25   many of these charges are similar, but I'm going to cover

1    all the elements with one each.

2         Count 2 is as follows, and of course there's the

3    introductory part of your capacity since you were acting in

4    the introductory paragraphs.  Then, specifically, Count 2

5    alleges that on or about January 24th, 2023, in Rankin

6    County, all six of you, while acting under color of law and

7    aiding and abetting one another, willfully deprived MJ of

8    the right, secured and protected by the Constitution and

9    laws of the United States, to be free from unreasonable

10   seizures, which includes the right to be free from the use

11   of unreasonable force by a law enforcement officer.

12        Specifically, the defendants, one, physically

13   assaulted MJ while he was handcuffed and compliant by

14   punching and kicking him; Tasing him; throwing eggs at him;

15   and pouring milk, alcohol, and chocolate syrup over his

16   head and into his mouth; and, two, failed to intervene to

17   protect MJ from being assaulted, despite the opportunity to

18   do so.  This offense involved the use of dangerous weapons

19   and resulted in bodily injury to MJ.

20        Now, the essential elements of the offense described

21   in Count 2 are now explained.  Title 18, United States

22   Code, Section 242 makes it a crime for anyone acting under

23   color of law to willfully deprive any person of a right

24   secured by the Constitution or laws of the United States.

25        There are four elements of this crime:

First, that the defendants, all of you charged, deprived a person of a right secured by the Constitution or laws of the United States by committing one or more of the acts charged in the information.  The constitutional right at issue in Count 2 is MJ's right to be free from unreasonable seizures, which includes the right to be free from the use of unreasonable force by a law enforcement officer.

Second, that the defendants acted willfully; that is, if they committed such act or acts with a bad purpose to disobey or disregard the law specifically intending to deprive the person of that right.

Third, that they acted under color of law.

And, fourth, that bodily injury resulted from the defendants' conduct or that the offense involved the use of a dangerous weapon.

Definition of "bodily injury" is a cut, abrasion, bruise, burn, or disfigurement; physical pain, illness, impairment of a function of a bodily member, organ, or mental faculty; or any other injury to the body, no matter how temporary.

Following that explanation, I'll ask each of you whether you understand with what criminal offense you're charged in Count 1 -- Count 2, rather, of the information.

Mr. McAlpin?

```
 1          DEFENDANT MCALPIN:  Yes, Your Honor.

 2          THE COURT:  Mr. Middleton?

 3          DEFENDANT MIDDLETON:  Yes, Your Honor.

 4          THE COURT:  Mr. Dedmon?

 5          DEFENDANT DEDMON:  Yes, Your Honor.

 6          THE COURT:  Mr. Elward?

 7          DEFENDANT ELWARD:  Yes, Your Honor.

 8          THE COURT:  Mr. Opdyke?

 9          DEFENDANT OPDYKE:  Yes, Your Honor.

10          THE COURT:  Mr. Hartfield?

11          DEFENDANT HARTFIELD:  Yes, Your Honor.

12          THE COURT:  Count 3 realleges all of the first 81

13    paragraphs, and then paragraph 87 specifically charges,

14    again, all six of you, on or about January 24th, 2023, in

15    Rankin County, Mississippi, while acting under color of law

16    and aiding and abetting one another, willfully deprived EP

17    of the right secured and protected by the Constitution and

18    laws of the United States to be free from unreasonable

19    seizures, which includes the right to be free from the use

20    of unreasonable force by a law enforcement officer.

21          Specifically, you're all charged with physically --

22    and there are two specifically:  One, physically assaulted

23    EP while he was handcuffed and compliant by punching and

24    kicking him; striking him with objects, including a metal

25    sword, pieces of wood, and a wooden kitchen implement;
```

1    Tasing him; throwing eggs at him; and pouring milk,

2    alcohol, and chocolate syrup over his head and into his

3    mouth; and, two, failed to intervene to protect EP from

4    being assaulted, despite the opportunity to do so.  This

5    offense involved the use of a dangerous weapons and

6    resulted in bodily injury to EP.

7         The essential elements charged in Count 3 are as

8    follows:  Title 18, United States Code, Section 242 makes

9    it a crime for anyone acting under color of law to

10   willfully deprive any person of a right secured by the

11   Constitution or the laws of the United States.

12        There are four elements of this crime:

13        First, that the defendants deprived a person of a

14   right secured by the Constitution or laws of the United

15   States by committing one or more of the acts charged in the

16   information.  The constitutional right at issue is Count

17   3 -- in Count 3 is EP's right to be free from unreasonable

18   seizures, which includes the right to be free from the use

19   of unreasonable force by a law enforcement officer.

20        Second, that the defendants acted willfully; that

21   is, that they committed such act or acts with a bad purpose

22   to disobey or disregard the law, specifically intending to

23   deprive the person of that right.

24        Third, that they acted under color of law.

25        And, fourth, that bodily injury resulted from the

1    defendants' conduct, or that the offense involved the use

2    of a dangerous weapon.  And I've given the definition of

3    bodily injury, and that's apparent.

4         Do you understand the essential elements of the

5    crime charged in Count 3 of the indictment?

6         DEFENDANT MCALPIN:  Yes, Your Honor.

7         THE COURT:  Do you also?

8         DEFENDANT MIDDLETON:  Yes, Your Honor.

9         THE COURT:  Mr. Dedmon?

10        DEFENDANT DEDMON:  Yes, Your Honor.

11        THE COURT:  Mr. Elward?

12        DEFENDANT ELWARD:  Yes, Your Honor.

13        THE COURT:  Mr. Opdyke?

14        DEFENDANT OPDYKE:  Yes, Your Honor.

15        THE COURT:  And Mr. Hartfield?

16        DEFENDANT HARTFIELD:  Yes, Your Honor.

17        THE COURT:  Under Count 4, Mr. Dedmon, you're

18   charged as follows:  On or about January 24th, 2023, in

19   Rankin County, you, while acting under color of law,

20   willfully deprived EP of the right secured and protected by

21   the Constitution and laws of the United States to be free

22   from unreasonable seizures.  Specifically, you discharged a

23   firearm in close proximity to EP for the purpose of scaring

24   EP.  This offense involved the use of a dangerous weapon.

25        The essential elements involved in Count 4 are as

1    follows:  Title 18, United States Code, Section 242 makes

2    it a crime for anyone acting under color of law to

3    willfully deprive any person of a right secured by the

4    Constitution or laws of the United States.

5        There are two elements of this crime:

6        First, that you deprived a person of a right secured

7    by the Constitution or laws of the United States by

8    committing one or more of the acts charged in the

9    information.  The constitutional right at issue in Count 4

10    is EP's right to be free from unreasonable searches.

11        And, second, that you acted willfully; that is, that

12    you committed such act or acts with a bad purpose to

13    disobey or disregard the law, specifically intending to

14    deprive the person of that right, and that you acted under

15    color of law as charged in Count 3.

16        And then, fourth, that the offense involved the use

17    of a dangerous weapon.

18        Mr. Dedmon, do you understand the criminal offense

19    with which you're charged in Count 4 of the indictment?

20        DEFENDANT DEDMON:  Yes, sir.

21        THE COURT:  Count 5 also charges you, Mr. Dedmon, as

22    follows:  that on or about January 24th, 2023, in Rankin

23    County, you did knowingly use, carry, brandish, and

24    discharge a firearm; that is, a Glock 17 Gen5,

25    nine-millimeter caliber pistol, serial number BGSX861,

1   during and in relation to a crime of violence for which you

2   may be prosecuted in a court of the United States; that is,

3   deprivation of rights under color of law under Title 18,

4   United States Code, Section 242 as charged in Count 4 of

5   this information.

6        The essential elements of this crime are now

7   explained.  Title 18, United States Code, Section 924(c)(1)

8   makes it a crime for anyone to knowingly use, carry,

9   brandish, and discharge a firearm during or in relation to

10   a crime of violence.

11        There are two elements of this -- or components of

12   this crime:

13        First, that you committed the offense alleged in

14   Count 4 and that deprivation of rights under color of law

15   as charged in Count 4 is a crime of violence.

16        And, second, that you knowingly used and carried and

17   brandished and discharged a firearm during and in relation

18   to your commission of the crime charged in Count 4.

19        Using a firearm during and in relation to a crime of

20   violence means that you actively employed the firearm in

21   the commission of Count 4, such as a use that is intended

22   to bring about a change in the commission of Count 4, such

23   as the use that is intended to bring about a change in the

24   circumstances of the commission of that count.

25        "Active employment" means and includes brandishing,

1   displaying, referring to, bartering, striking with, firing,

2   or attempting to fire the firearm.  Use is more than mere

3   possession of a firearm or having it available during the

4   crime of violence.

5       To prove that you carried a firearm during and in

6   relation to a crime of violence means that you carried the

7   firearm in the ordinary course of the word "carry," such as

8   by transporting a firearm on the person or in a vehicle,

9   and that your carrying the firearm cannot be merely

10   coincidental or unrelated to the crime of violence.

11       "Brandish" means with respect to a firearm to

12   display all or part of the firearm or otherwise make the

13   presence of the firearm known to another person in order to

14   intimidate that person, regardless of whether the firearm

15   is directly visible to that person.

16       Having made that explanation to you, do you

17   understand with what criminal offense you are charged in

18   Count 5 of the indictment?

19       DEFENDANT ELWARD:  Yes, sir, I do.

20       THE COURT:  Then Count 6 charges Mr. Dedmon,

21   Mr. Elward, and Mr. Opdyke as follows:  It's alleged that

22   on or about January 24th, 2023, in Rankin County,

23   Mississippi, the three of you, while acting under color of

24   law and aiding and abetting one another, willfully deprived

25   EP of the right, secured and protected by the Constitution

 1   and laws of the United States, not to be deprived of

 2   liberty without due process of law, which includes the

 3   right to bodily integrity.  Specifically, it's charged that

 4   Mr. Dedmon and Mr. Opdyke assaulted EP in the mouth and

 5   face with a dildo without EP's consent or a legitimate law

 6   enforcement purpose; and Elward failed to intervene to

 7   protect EP from being assaulted with a dildo, despite the

 8   opportunity to do so.  This offense involved the use of a

 9   dangerous weapon and resulted in bodily injury to EP.

10       The essential elements of this crime are now

11   explained.  Title 18, United States Code, Section 242 makes

12   it a crime for anyone acting under color of law to

13   willfully deprive any person of a right secured by the

14   Constitution or laws of the United States.

15       There are four elements of this charge:

16       First, that you, the three of you, are charged with

17   depriving a person of a right secured by the Constitution

18   or laws of the United States by committing one or more of

19   the acts charged in the information.  The constitutional

20   right at issue is Count 6 -- or, rather, in Count 6 is EP's

21   right not to be deprived of liberty without due process of

22   law, which includes the right to bodily integrity.

23       Second, that you acted willfully; that is, that the

24   defendant committed -- the defendants committed such act or

25   acts with a purpose to disobey or disregard the law,

```
1    specifically intending to deprive the person of that right.
2         Third, that the defendants acted under color of law.
3         And, fourth, that the bodily injury resulted from
4    the defendants' conduct, or that the offense involved the
5    use of a dangerous weapon.
6         Mr. Dedmon, Mr. Elward, and Mr. Opdyke, do you
7    understand the criminal offense with which you're charged
8    in Count 7 of the indictment?
9         DEFENDANT DEDMON:  Yes, sir.
10        DEFENDANT ELWARD:  Yes, sir.
11        DEFENDANT OPDYKE:  Yes, Your Honor.
12        MS. CHALK:  Your Honor, I apologize for the
13   interruption, but that was Count 6.
14        THE COURT:  Six?  I was taking them in order, and I
15   perhaps had one stuck to my fingers.
16        MS. CHALK:  Your Honor, I believe it could clear it
17   up if you asked those three defendants if they understood
18   the elements as charged in Count 6 of the information.
19        THE COURT:  All right.  Do the three of you who are
20   charged in Count 6 understand the criminal offense with
21   which you are charged in Count 6?
22        DEFENDANT ELWARD:  Yes, sir.
23        DEFENDANT OPDYKE:  Yes, Your Honor.
24        DEFENDANT DEDMON:  Yes, Your Honor.
25        THE COURT:  All right.  I'm going to take a moment
```

1 to get the papers in order.

2       The next count I'm going to discuss is Count 7.

3 Count 7 also charges Mr. Dedmon, Mr. Elward, and Mr. Opdyke

4 as follows: On or about January 24, 2023, in Rankin

5 County, the three of you, while acting under color of law

6 and aiding and abetting one another, willfully deprived MJ

7 of the right, secured and protected by the Constitution and

8 laws of the United States, not to be deprived of liberty

9 without due process of law, which includes the right to

10 bodily integrity. Specifically, Mr. Dedmon and Mr. Opdyke

11 assaulted MJ in the mouth and face with a dildo without

12 MJ's consent or a legitimate law enforcement purpose. And

13 Elward failed to intervene to protect MJ from being

14 assaulted with a dildo, despite the opportunity to do so.

15 This offense involved the use of a dangerous weapon and

16 resulted in bodily injury to MJ.

17       The essential elements of Count 7 are now explained.

18 Title 18, United States Code, Section 242 makes it a crime

19 for anyone acting under color of law to willfully deprive

20 any person of a right secured by the Constitution or laws

21 of the United States.

22       There are four essential elements of this crime:

23       First, that the defendants, that you, deprived a

24 person of a right secured by the Constitution or laws of

25 the United States by committing one or more of the acts

1   charged in the information.  The constitutional right at

2   issue in Count 7 is MJ's right not to be deprived of

3   liberty without due process of law, which includes the

4   right to bodily integrity.

5       Second, that you acted willfully; that is, that you

6   committed such act or acts with a bad purpose to disobey or

7   disregard the law, specifically intending to deprive the

8   person of that right.

9       Third, that you acted under color of law.

10      Fourth, that bodily integrity resulted *[sic]* from

11  your conduct, and that the offense involved the use of a

12  dangerous weapon.

13      Carrying a firearm during and in relation to a crime

14  of violence means that you carried the firearm in the

15  ordinary meaning of the word "carry," such as by

16  transporting a firearm on the person or in a vehicle, and

17  carrying the firearm cannot be merely coincidental or

18  unrelated to the crime of violence.  And "brandishing"

19  means with respect to a firearm displaying all or part of

20  the firearm or otherwise making the presence of a firearm

21  known to another person in order to intimidate the person,

22  regardless of whether the firearm is directly visible to

23  that person.

24      And the essential elements of Count 8 -- of Count 7,

25  rather, are now explained.  Title 18, United States Code,

1    Section 242 makes it a crime for anyone acting under color

2    of law to willfully deprive any person of a right secured

3    by the Constitution or laws of the United States.

4         And there are four essential elements of this crime:

5    First --

6         MS. CHALK:  Excuse me, Your Honor.  I hate to

7    interrupt, but we -- we're on Count 7, and I believe that

8    you've read the elements for Count 7.  And there may have

9    been a page out of order.

10        THE COURT:  I've covered Count 7.  Thank you, ma'am,

11   for calling that to my attention.

12        MS. CHALK:  Yes, Your Honor.

13        THE COURT:  The next count is Count 8, alleges

14   that --

15        MS. CHALK:  Your Honor, if I may, before you go into

16   Count 8, would you ask those three defendants if they

17   understand those elements as charged in Count 7?

18        THE COURT:  Do you understand the elements as

19   charged in Count 7?

20        DEFENDANT MIDDLETON:  Yes, sir.

21        THE COURT:  Mr. Elward?

22        DEFENDANT ELWARD:  Yes, Your Honor.

23        THE COURT:  Mr. Hartfield?

24        DEFENDANT HARTFIELD:  Yes, Your Honor.

25        THE COURT:  Count 8 charges -- and, again,

1  Mr. Elward, you're the sole defendant in this charge -- on

2  or about January 24th, 2023, in Rankin County, you,

3  Mr. Elward, while acting under color of law, willfully

4  deprived MJ of the right, secured and protected by the

5  Constitution and laws of the United States, to be free from

6  unreasonable seizures, which includes the right to be free

7  from the use of unreasonable force by a law enforcement

8  officer.

9       Specifically, it's charged that you forced your gun

10  into MJ's mouth and pulled the trigger.  The gun

11  discharged, and the bullet lacerated MJ's tongue, broke

12  MJ's jaw, and exited out of MJ's neck.  The offense

13  involved the use of a dangerous weapon.

14       And the essential elements of this charge are

15  explained as follows:  Title 18, United States Code,

16  Section 242 makes it a crime for anyone acting under color

17  of law to willfully deprive any person of a right secured

18  by the Constitution or laws of the United States.

19       There are four essential elements of this crime:

20       First, that you deprived a person of a right secured

21  by the Constitution or laws of the United States by

22  committing one or more of the acts charged in the

23  information.  The constitutional right at issue in Count 8

24  is MJ's right to be free from unreasonable seizures, which

25  includes the right to be free from the use of unreasonable

1 force by a law enforcement officer.

2      Second, that you acted willfully; that is, that you

3 committed such act or acts with a bad purpose to disobey or

4 disregard the law, intending to deprive the person of that

5 right.

6      Third, that you acted under color of law.

7      And, fourth, that the law involved the use of a

8 dangerous weapon.

9      DEFENDANT ELWARD:  Yes, Your Honor.

10      THE COURT:  Do you understand that crime that you're

11 charged with?

12      DEFENDANT ELWARD:  Yes, Your Honor.

13      THE COURT:  Count 9 alleges, Mr. Elward, that on or

14 about January 24th, 2023, in Rankin County, you knowingly

15 used, carried, and discharged a firearm; that is, a Glock

16 17 Gen5, nine-millimeter caliber pistol, serial number

17 BWMD253, during and in relation to a crime of violence for

18 which you may be prosecuted in a court of the United

19 States; that is, deprivation of rights under color of law

20 under Title 18, United States Code, Section 242 as charged

21 in Count 8 of the indictment.

22      MR. HOLLOMON:  Your Honor, may I have just a moment?

23      THE COURT:  Yes, sir.

24      MS. CHALK:  Your Honor, if I may interrupt, in the

25 Court's recitation of the count as charged in Count 9,

1    knowingly used, carried, brandished, and discharged a

2    firearm, it identifies a Glock 17 Gen5, nine-millimeter.

3    Mr. Hollomon and Mr. Elward tell me that that is a Glock 45

4    pistol.  At this time, we make a motion for a scrivener's

5    error to replace the description of the Glock 17 to a Glock

6    45.

7            THE COURT:  That motion is granted.

8            MS. CHALK:  Thank you, Your Honor.

9            MR. HOLLOMON:  Thank you, Your Honor.

10           THE COURT:  I've stated what Count 9 alleges.

11           The essential elements of Count 9 as charged are

12    stated as follows:

13           First, that you committed the offense alleged in

14    Count 8 and that deprivation of rights under color of law

15    as charged in Count 8 is a crime of violence.

16           And, second, that you knowingly used, carried,

17    brandished, and discharged a firearm during or in relation

18    to your commission of the crime charged in Count 8.

19           And the defendant using the firearm during and in

20    relation to a crime of violence means that the defendant

21    actively employed the firearm in the commission of Count 8

22    such as a use that is intended to or brings about a change

23    in the circumstances of the commission of that count.

24           Active employment may include brandishing,

25    displaying, referring to, bartering, striking with, firing,

1    or attempting to fire the firearm.

2         Use is more than mere possession of a firearm or

3    having it available during the crime of violence.

4         And carrying a firearm during and in relation to a

5    crime of violence means that you carried the firearm in the

6    ordinary meaning of the word "carry," such as by

7    transporting the firearm on your person or in a vehicle.

8    Your carrying of the firearm cannot be merely coincidental

9    or unrelated to the crime of violence.

10        The term "brandish" means with respect to a firearm

11   to display all or part of the firearm or otherwise make the

12   presence of the firearm known to another person in order to

13   intimidate the person, regardless of whether the firearm is

14   directly visible to that person.

15        After that explanation, I ask you whether you

16   understand with what criminal offense you're charged in

17   Count 9 of the information?

18        DEFENDANT ELWARD:  Yes, Your Honor.

19        THE COURT:  Count 10 charges all six of you.  I'm

20   not going to state -- give your names again, but all six of

21   you are charged, and it's alleged that on or about

22   January 24th, 2023, in Rankin County, six of you, while

23   acting under color of law, willfully deprived MJ of the

24   right, secured and protected by the Constitution and laws

25   of the United States, not to be deprived of liberty without

 1  due process of law, which includes an arrestee's right to

 2  be free from a law enforcement officer's deliberate

 3  indifference to his serious medical needs.

 4       Specifically, after Elward shot MJ in the mouth and

 5  MJ was bleeding from the mouth and neck, in clear need of

 6  medical care, you attempted to cover up the misconduct

 7  rather than provide MJ with medical care, thereby acting

 8  with deliberate indifference to a substantial risk of harm

 9  to MJ.

10       And the essential elements or components of this

11  crime, Count 10, are now explained.  Title 18, United

12  States Code, Section 242 makes it a crime for anyone acting

13  under color of law to willfully deprive any person of a

14  right secured by the Constitution or laws of the United

15  States.

16       There are four essential elements of this crime:

17       First, that you deprived -- all of you deprived MJ

18  of a right secured by the Constitution or laws of the

19  United States, specifically MJ's right not to be deprived

20  of liberty without due process of law, which includes an

21  arrestee's right to be free from a law enforcement

22  officer's deliberate indifference to his serious medical

23  needs.

24       Second, that you acted willfully; that is, that all

25  of you committed such act or acts with a bad purpose to

 1   disobey or disregard the law, specifically intending to

 2   deprive MJ of that right.

 3        Third, that you acted under color of law.

 4        And, fourth, that bodily injury resulted from your

 5   conduct.

 6        "Bodily injury" means -- it's a number of -- but

 7   shooting him is clearly a bodily injury.  I'm not going to

 8   go into all of that.

 9        Do you understand the criminal offense that you're

10   charged with in Count 10 of the indictment, Mr. McAlpin?

11        DEFENDANT MCALPIN:  Yes, Your Honor.

12        THE COURT:  Mr. Middleton?

13        DEFENDANT MIDDLETON:  Yes, Your Honor.

14        THE COURT:  Mr. Dedmon?

15        DEFENDANT DEDMON:  Yes, sir.

16        THE COURT:  Mr. Elward?

17        DEFENDANT ELWARD:  Yes, Your Honor.

18        THE COURT:  Mr. Opdyke?

19        DEFENDANT OPDYKE:  Yes, Your Honor.

20        THE COURT:  Mr. Hartfield?

21        DEFENDANT HARTFIELD:  Yes, Your Honor.

22        THE COURT:  Then Count 11 is subtitled "Conspiracy

23   to Obstruct Justice."  It alleges a conspiracy as follows:

24   From on or about January 24th -- if I didn't say all six of

25   you, all six of you are charged here.  From on or about

1    January 24th, 2023, through on or about April 2023, in

2    Rankin County, each one of you, all of you, knowingly and

3    willfully conspired and agreed to knowingly corruptly

4    persuade, attempt to corruptly persuade, or engage in

5    misleading conduct toward another person, with the intent

6    to hinder, delay, or prevent the communication to a federal

7    law enforcement officer or judge of information relating to

8    the commission or possible commission of a federal offense,

9    in violation of Title 18, Section 1512(b)(3).

10           And the purpose of the conspiracy was to cover up

11    your official misconduct, including but not limited to,

12    acts set forth in paragraphs 21 through 56.

13           The manner and means by which it's alleged that you

14    sought to accomplish the objects and purposes -- purpose of

15    the conspiracy included advising a false cover story, as

16    set forth in paragraphs 57 through 60 of the information,

17    and engaging in a variety of obstructive acts to

18    corroborate that false cover story and cover up your

19    misconduct, as set forth in paragraphs 61 through 81 of

20    this information.  And there are various overt acts in

21    furtherance of the conspiracy that are charged in

22    paragraphs 61 through 81.

23           I'll ask each one of you whether you understand with

24    what criminal offense you are charged in Count 11 of the

25    indictment.

DEFENDANT MCALPIN:  Yes, Your Honor.

DEFENDANT MIDDLETON:  Yes, Your Honor.

DEFENDANT DEDMON:  Yes, Your Honor.

DEFENDANT ELWARD:  Yes, Your Honor.

DEFENDANT OPDYKE:  Yes, Your Honor.

DEFENDANT HARTFIELD:  Yes, Your Honor.

THE COURT:  Count 12 charges -- yes, ma'am?

MS. CHALK:  Would you mind reading the elements for Count 12, Your Honor, before -- for Count 11 before proceeding to Count 12?

THE COURT:  Well, I'm sorry I missed that.  There are four -- and thank you for calling that to my attention.

MS. CHALK:  Thank you, Your Honor.

THE COURT:  Title 18, United States Code, Section 1512(k) makes it a crime for two or more persons -- wait, I'm on Count 11.  That's right?

MS. CHALK:  Yes, Your Honor.

THE COURT:  I'm going to start over with Count 11. Title 18 -- with reading the essential elements.  Title 18, United States Code, Section 1512(k) makes it a crime for two or more persons to knowingly conspire to commit any offense under this subsection, including a violation of Section 1512(b)(3), which makes it a crime to knowingly hinder, delay, or prevent the communication to a law enforcement officer or a judge of the United States of

1    information relating to the commission or possible

2    commission of a federal offense.

3          There are four essential elements of this crime:

4          First, that you -- I'm addressing all of you --

5    knowingly and willfully conspired and agreed to knowingly

6    corruptly persuade, attempt to corruptly persuade, or

7    engage in misleading conduct toward another person.

8          Second, that you acted with the intent to hinder,

9    delay, or prevent the communication of information to a

10   federal law enforcement officer or judge.

11         Third, that the information at issue related to the

12   commission or possible commission of a federal offense.

13         And, fourth, that there was a reasonable likelihood

14   that the communication would reach a federal official.

15         An act is done corruptly if a defendant acted

16   knowingly and dishonestly with the specific intent to

17   subvert or undermine the due administration of justice.

18         The term "misleading conduct" means knowingly making

19   a false statement; intentionally omitting information from

20   a statement and thereby causing a portion of such statement

21   to be misleading or intentionally concealing a material

22   fact, and thereby creating a false impression by such

23   statement with intent to mislead; knowingly submitting or

24   inviting reliance on a writing or recording that is false,

25   forged, altered, or otherwise lacking in authenticity with

1    the intent to mislead; knowingly submitting or inviting

2    reliance on a sample, specimen, map, photograph, boundary

3    mark, or other object that is misleading in a material

4    respect; or knowingly using a trick, scheme, or device with

5    the intent to mislead.  That's the explanations of Count 11

6    of the indictment.

7           Mr. McAlpin, do you understand what the charge is?

8           DEFENDANT MCALPIN:  Yes, Your Honor.

9           THE COURT:  Mr. Middleton?

10          DEFENDANT MIDDLETON:  Yes, Your Honor.

11          THE COURT:  Mr. Dedmon?

12          DEFENDANT DEDMON:  Yes, Your Honor.

13          THE COURT:  Mr. Elward?

14          DEFENDANT ELWARD:  Yes, Your Honor.

15          THE COURT:  Mr. Opdyke?

16          DEFENDANT OPDYKE:  Yes, Your Honor.

17          THE COURT:  Mr. Hartfield?

18          DEFENDANT HARTFIELD:  Yes, Your Honor.

19          THE COURT:  Then Count 12 charges each and all of

20   you as follows:  From on or about January 24th, 2023, and

21   continuing to on or about February 3rd, 2023, in Rankin

22   County, all six of you, aiding and abetting one another,

23   knowingly corruptly persuaded, attempted to corruptly

24   persuade, and engaged in misleading conduct toward another

25   person with the intent to hinder, delay, and prevent the

1  communication to a federal law enforcement officer and

2  judge of information relating to the commission and

3  possible commission of a federal offense.  Specifically,

4  Defendants McAlpin, Middleton, Dedmon Elward, Opdyke, and

5  Hartfield committed the obstructive acts set forth in

6  paragraph 61 of this information.

7      And the essential elements or components of this

8  charge are now explained.  Title 18, United States Code,

9  Section 1512(b)(3) makes it a crime for anyone to knowingly

10  corruptly persuade, attempt to corruptly persuade, or

11  engage in misleading conduct toward another person with the

12  intent to hinder, delay, or prevent the communication to a

13  law enforcement officer or judge of the United States of

14  information relating to the commission or possible

15  commission of a federal offense.

16      There are four essential elements of this charge:

17      First, that you knowingly corruptly persuaded,

18  attempted to corruptly persuade, or engaged in misleading

19  conduct toward another person.

20      Second, that you acted with the intent to hinder,

21  delay, or prevent the communication of information to a

22  federal law enforcement officer or judge.

23      Third, that the information at issue related to the

24  commission or possible commission of a federal offense.

25      And, fourth, that there was a reasonable likelihood

1    that the communication would reach a federal official.

2         An act is done corruptly if one acted knowingly and

3    dishonestly with a specific intent to subvert or undermine

4    the due administration of justice.

5         The term "misleading conduct" means, A, knowingly

6    making a false statement; B, intentionally omitting

7    information from a statement and thereby causing a portion

8    of such statement to be misleading, or intentionally

9    concealing a material fact and thereby creating a false

10   impression by such statement; C, with intent to mislead,

11   knowingly submitting or inviting reliance on a writing or

12   recording that is false, forged, altered, or otherwise

13   lacking in authenticity; D, with intent to mislead,

14   knowingly submitting or inviting reliance on a sample,

15   specimen, map, photograph, boundary mark, or other object

16   that is misleading in a material respect; or, E, knowingly

17   using a trick, scheme, or device with intent to mislead.

18        Following my recitation of the essential elements of

19   the count charged in 12, do you know -- do you understand?

20        DEFENDANT MCALPIN:  Yes, Your Honor.

21        THE COURT:  Do you also, sir?

22        DEFENDANT MIDDLETON:  Yes, Your Honor.

23        THE COURT:  Mr. Dedmon?

24        DEFENDANT DEDMON:  Yes, sir.

25        THE COURT:  Mr. Elward?

1          DEFENDANT ELWARD:  Yes, sir.

2          THE COURT:  Mr. Opdyke?

3          DEFENDANT OPDYKE:  Yes, Your Honor.

4          THE COURT:  And, Mr. Hartfield?

5          DEFENDANT HARTFIELD:  Yes, Your Honor.

6          THE COURT:  Then the final count, 13, accuses or

7     charges three of you, Brett Morris McAlpin, Christian Lee

8     Dedmon, and Hunter Thomas Elward, that on or about

9     January 24th, 2023, to on or about January 25th, 2023, in

10    Rankin County, the three of you knowingly and willfully

11    conspired and agreed to injure, oppress, threaten, and

12    intimidate MJ in his free exercise and enjoyment of the

13    right, secured to him by the Constitution and laws of the

14    United States, to be free from unreasonable seizures, which

15    includes the right to be free from malicious prosecution.

16         Specifically, the three of you are charged with

17    conspiring to charge MJ with felony assault on a police

18    officer, felony possession of methamphetamine, and

19    misdemeanor disorderly conduct, without probable cause to

20    believe that MJ had committed those crimes.  And Dedmon and

21    Elward knowingly included false and misleading information

22    in the charging documents, as set forth in paragraphs 75

23    through 79.  As a consequence, MJ was initially detained

24    and deprived of liberty pending resolution of the charges,

25    which were eventually dismissed.

1   The essential elements of Count 13 are now

2   explained.  Title 18, United States Code, Section 241 makes

3   it a crime for anyone to knowingly agree with another

4   person to injure, oppress, threaten, or intimidate another

5   person in the free exercise and enjoyment of a right

6   secured by -- to him by the Constitution or laws of the

7   United States.

8   There are four elements of this crime:

9   First, that you entered into a conspiracy to injure,

10  oppress, threaten, or intimidate one or more persons.

11  Second, that you specifically intended by the

12  conspiracy to hinder, prevent, or interfere with MJ's

13  enjoyment of a right secured by the Constitution or laws of

14  the United States, specifically MJ's constitutional right

15  to be free from unreasonable seizures, which includes the

16  right to be free from malicious prosecution.

17  Third, that you acted under color of law.

18  And, fourth, that at least one member of the

19  conspiracy committed an overt act in furtherance of the

20  conspiracy.

21  Now, to establish a Fourth Amendment violation under

22  a malicious prosecution theory, there are four elements:

23  First, that you made, influenced, or participated in

24  the decision to bring criminal charges against the victim.

25  Second, that there was no probable cause for

1    prosecution.

2         Third, that as a consequence, the victim suffered a

3    deprivation of liberty apart from the initial arrest.

4         And, fourth, that the criminal proceeding was

5    resolved in the victim's favor.

6         Mr. McAlpin, Mr. Dedmon, and Mr. Elward, do you

7    understand the charge in Count 13?  Do you?

8         DEFENDANT MCALPIN:  Yes, Your Honor.

9         DEFENDANT DEDMON:  Yes, sir.

10        THE COURT:  And do you also?

11        DEFENDANT ELWARD:  Yes, Your Honor.

12        THE COURT:  Normally at this point in a change of

13   plea proceeding, I would go over the maximum penalty for

14   each count.  I've gone over the elements but not the

15   penalties.  I would go over the maximum penalty for each

16   count and confirm a defendant's understanding of the

17   potential penalty.  Rather than do that presently with all

18   of you collectively, I think the better course is to do so

19   with each defendant individually, which I will do so in a

20   few minutes.

21        Also, it's the Court's understanding that each

22   defendant has entered into a plea agreement with the

23   Government.  I haven't gone into the particulars of it, but

24   it's my intention soon to confirm this and go over the

25   terms of each defendant's plea agreement with that

1    individual defendant.

2         Before doing so, however, I would ask the Government

3    is there anything common to all defendants in the plea

4    agreements that you could express to all of them now?

5         MS. CHALK:  Yes, Your Honor.  In all six defendants'

6    cases, they have a plea agreement that illustrates waivers,

7    and they are common to each defendant.  In each of the plea

8    agreements, each defendant hereby expressly waives the

9    following rights, except that the defendant reserves the

10   right to raise ineffective assistance of counsel claims.

11        Each defendant waives the right to appeal the

12   conviction and sentence or the manner in which that

13   sentence was imposed under any ground whatsoever.

14        Each defendant waives the right to contest the

15   conviction and sentence or the manner in which the sentence

16   was imposed in any postconviction proceeding, including,

17   but not limited to, a motion under Title 28, United States

18   Code, Section 2255, and any type of proceeding claiming

19   double jeopardy or excessive penalty as a result of any

20   forfeiture ordered in this case.

21        Each defendant waives any right to seek attorney's

22   fees and costs.

23        Each defendant waives all rights, whether asserted

24   directly or by a representative, to request or receive

25   records about this case under the Freedom of Information

1  Act or the Privacy Act.

2      Each defendant further acknowledges and agrees that

3  any factual issues regarding the sentencing will be

4  resolved by the sentencing judge under a preponderance of

5  the evidence standard, and each defendant waives any right

6  to a jury determination of these sentencing issues.

7      Each defendant further agrees that in making its

8  sentencing decision, the District Court may consider any

9  relevant evidence, without regard to its admissibility

10  under the rules of evidence applicable at trial.

11      Your Honor, that's the common language in the plea

12  agreements for each defendant.  And we would ask when you

13  are going through more particulars with each defendant,

14  we'll ask the Court to have each defendant confirm that

15  they understand the terms of those plea agreements and plea

16  supplements.

17      THE COURT:  All right.  I will ask you now -- I want

18  to confirm with each of you that you understand these

19  various terms and provisions that have just been expressed

20  by counsel for the Government in anticipation of my

21  reviewing them and after the agreements have been approved.

22      Do you understand what they are, Mr. McAlpin?

23      DEFENDANT MCALPIN:  Yes, Your Honor.

24      THE COURT:  Mr. Opdyke?

25      DEFENDANT MIDDLETON:  Middleton.  Middleton, Your

1    Honor.

2         THE COURT:  I've got a different list there.  Go

3    ahead, sir.

4         DEFENDANT MIDDLETON:  Yes, Your Honor.

5         DEFENDANT DEDMON:  Yes, Your Honor.

6         DEFENDANT ELWARD:  Yes, Your Honor.

7         DEFENDANT OPDYKE:  Yes, Your Honor.

8         DEFENDANT HARTFIELD:  Yes, Your Honor.

9         THE COURT:  All right.  We're going to take a recess

10   now for 30 minutes, and I'll ask counsel whether it's --

11   we're going to take a recess, but I will be influenced by

12   how much time you would request.  What amount of time would

13   you ask for?  I could take less or more.

14        MS. CHALK:  Your Honor, we defer to the Court.

15   We're ready to proceed when the Court is.

16        THE COURT:  You're ready?

17        Are counsel for the defendants ready to proceed in

18   just a few minutes?

19        Okay.  We're going to recess now for 15 minutes.

20        MS. THOMAS:  All rise.

21             (A lunch recess was taken.)

22        THE COURT:  We're resuming, and the Court is going

23   to consider each defendant separately with regard to

24   explaining the maximum penalties for each count, and then

25   whether or not there's been a plea agreement and terms of

1    that, and determining, if there is such an agreement,

2    whether it would be filed with the Court.

3         So the first defendant we will take is Brett Morris

4    McAlpin.  Let Mr. McAlpin with his lawyer come up.

5         Mr. McAlpin, I'm going to explain to you the maximum

6    possible penalty on each count to which you've entered a

7    plea -- to which you are here with regard to entering a

8    plea of guilty.  Count 1 and Count 13 each -- maximum

9    penalty could be ten years' imprisonment, a $250,000 fine,

10   three years of supervised release, and a $100 special

11   assessment.  That's ten years on Count 1, and ten years on

12   Count 13.

13        Do you understand that?

14   DEFENDANT MCALPIN:  Yes, Your Honor.

15   THE COURT:  Then with regard to Counts 2, 3, and 10,

16   deprivation of rights under color of law, the maximum

17   penalty on Count 2 is ten years' imprisonment, a $250,000

18   fine, three-year term of supervised release, and $100

19   special assessment; that applies for Count 2.  It also is

20   applicable to Count 3, ten years, $250,000 fine, and three

21   years' supervised release.  And Count 10, the same ten

22   years maximum, $250,000 fine maximum, and three-year term

23   of supervised release maximum.

24        Then with regard to Count 11, conspiracy to obstruct

25   justice, the maximum term of imprisonment is 20 years'

1  imprisonment, then a fine of $250,000, and three years of

2  supervised release with a $100 special assessment.

3       Then the other count, which is Count 12, obstruction

4  of justice, the maximum penalty is 20 years' imprisonment,

5  a $250,000 fine, and three years' supervised release along

6  with the $100 special assessment.

7       Do you understand all of that, or do I need to

8  explain anything to you about it?  I didn't ask you for

9  each count, but do you understand that?

10      DEFENDANT MCALPIN:  Yes, Your Honor, I understand.

11      THE COURT:  Has anyone threatened, coerced,

12  harassed, intimidated you in any way to persuade you to

13  come to court today to plead guilty?

14      DEFENDANT MCALPIN:  No, sir, Your Honor.

15      THE COURT:  Are you appearing voluntarily of your

16  own free will?

17      DEFENDANT MCALPIN:  Yes, Your Honor.

18      THE COURT:  Have you entered into a plea agreement

19  with a supplement with the Government?  There are two

20  documents, and your lawyer may need to explain that to you

21  if you're not sure of my question.

22      DEFENDANT MCALPIN:  Yes, Your Honor.

23      THE COURT:  Did you read, understand, or with the

24  assistance of counsel understand these documents and then

25  also sign them?

1    DEFENDANT MCALPIN:  Yes, sir, Your Honor.

2    THE COURT:  As counsel for your client, Mr. Sellers,

3    did you go over the documents with him, explaining them to

4    him as necessary, and have you also signed them?

5    MR. SELLERS:  Yes, sir, Your Honor.

6    THE COURT:  Let me ask counsel for the Government

7    to -- well, describe or reference terms of the plea

8    agreement that are not common to the others.  You heard the

9    explanation by your associate before lunch about the --

10   about that and that there would -- then there are matters

11   that are not common.  Are you able to tell the Court what

12   they are?

13   MR. PERRAS:  Yes, Your Honor.  The material terms of

14   the plea agreement with Defendant McAlpin are as follows:

15   Mr. McAlpin has agreed to plead guilty to Counts 1,

16   2, 3, 10, 11, 12, and 13 as charged in the criminal

17   information.  In exchange for the defendant's agreement to

18   plead guilty to those counts, the Government will recommend

19   that the defendant be sentenced as set forth in the plea

20   supplement that will be filed under seal.  The plea

21   agreement and plea supplement have been executed by the

22   defendant, his attorney, and counsel for the Government.

23   The plea agreement includes waiver of trial and

24   appellate rights previously addressed by Ms. Chalk.  And at

25   this time, Your Honor, the United States would recommend

1    that the Court have the defendant personally confirm that

2    he understands and agrees with the terms of the plea

3    agreement and supplement, including the waivers as outlined

4    by the Government.

5         THE COURT:  Mr. McAlpin, is the explanation by

6    counsel consistent with your understanding of your plea

7    agreement?

8         DEFENDANT MCALPIN:  Yes, Your Honor.

9         THE COURT:  First, you indicated previously that you

10   understood these various agreements and waivers and

11   understood what they were.  Do you now tell the Court that

12   you agree to specifically all of these terms and provisions

13   as well as what was just now referenced?

14        DEFENDANT MCALPIN:  Yes, Your Honor.

15        THE COURT:  Do you realize with regard to any

16   recommendations by the Court, the Government -- the Court

17   oftentimes follows such recommendations, but I'm not bound

18   to.  Do you understand that?

19        DEFENDANT MCALPIN:  Yes, Your Honor.

20        THE COURT:  For example, if I end up giving you a

21   sentence that you don't like, do you realize you won't then

22   be able to withdraw your plea and demand a trial?

23        DEFENDANT MCALPIN:  Yes, Your Honor.

24        THE COURT:  Nor will you be able to appeal your

25   conviction or sentence, because you've given that right up

1   in these agreements you've made.

2          DEFENDANT MCALPIN:  Yes, Your Honor.

3          THE COURT:  Very well, then.  Let the plea agreement

4   with the supplement be filed with the clerk and made a part

5   of the record and the supplement be filed under seal.

6          MR. SELLERS:  May I approach, Your Honor?

7          THE COURT:  Yes, sir.  I'm going to ask counsel for

8   the Government now to state the factual basis for the

9   anticipated pleas.

10          MR. PERRAS:  Yes, Your Honor.  The Government would,

11   if put to its burden at trial, it would prove the following

12   facts, which the defendant has stipulated to in paragraph 8

13   of the plea supplement.

14          On January 24th, 2023, Brett McAlpin was employed as

15   chief investigator with the Rankin County Sheriff's Office.

16   That night, McAlpin received a complaint from his neighbor

17   about the residents of 135 Conerly Road, Braxton,

18   Mississippi.  McAlpin called Christian Dedmon, a narcotics

19   investigator with the Rankin County Sheriff's Office, and

20   told Dedmon to get some guys together, go to the property,

21   and handle the problem.

22          McAlpin surveilled the property from down the street

23   and coordinated over the radio with Dedmon and the other

24   officers:  Lieutenant Jeffrey Middleton, Deputy Hunter

25   Elward, Deputy Daniel Opdyke, and Richland Police

1   Department Officer Joshua Hartfield.  The other officers

2   drove past McAlpin and parked in the property's driveway.

3   McAlpin followed them and parked in the driveway.

4        McAlpin exited his vehicle and walked to the carport

5   door, which other officers had kicked down.  McAlpin

6   entered the house without consent, a warrant, or exigent

7   circumstances.  McAlpin knew that it was unlawful to enter

8   a home without consent, a warrant, or exigent

9   circumstances.

10        McAlpin saw two black men inside:  MJ and EP.  The

11   men were not resisting, but officers were yelling at them

12   and Tasing them.  McAlpin knew that if he witnessed another

13   officer using excessive force, he had a duty to intervene.

14   Despite having the time and opportunity to intervene,

15   McAlpin did not intervene.

16        Dedmon pulled out his gun, aimed it out the back

17   door, and fired.  McAlpin knew that it was unlawful for an

18   officer to fire a weapon without a legitimate law

19   enforcement purpose, but McAlpin did not intervene or order

20   Dedmon to stop.

21        MJ and EP, still handcuffed, were brought to the

22   living room.  Officers called them racial slurs, including

23   the word spelled n-i-g-g-e-r, and warned them to stay out

24   of the neighborhood.

25        Middleton and McAlpin went into the back bedroom and

1    discussed another case.  During their conversation, McAlpin

2    heard Taser sounds and screams of pain coming from the

3    living room, where his subordinates, Dedmon, Elward, and

4    Opdyke, were detaining MJ and EP.  Despite having the time

5    and opportunity to intervene, McAlpin did not intervene.

6         Later on, MJ and EP were brought to the side

7    bedroom.  The officers began discussing the comparative

8    strength of their respective Tasers, and they decided to

9    test their Tasers out on MJ and EP to see which one was the

10   most powerful.  Dedmon, Elward, Hartfield, and Middleton

11   each Tased MJ and EP while MJ and EP were handcuffed and

12   not resisting.  McAlpin knew that it was unlawful to Tase a

13   handcuffed and compliant arrestee.  Despite having the time

14   and opportunity to intervene, McAlpin did not intervene.

15        McAlpin and Middleton left the side bedroom and

16   walked to the front bedroom to steal personal property that

17   had caught their attention during an earlier search of the

18   house.  McAlpin and Middleton each stole rubber bar mats,

19   brought them out to their vehicles, and then came back

20   inside to the back bedroom.  McAlpin knew that it was

21   unlawful to steal personal property during a search or

22   arrest.

23        McAlpin heard two gunshots coming from the direction

24   of the side bedroom.  Elward told McAlpin that he had

25   messed up and shot one of the men.

All six officers huddled up on the back screened-in porch to discuss what to do.  They devised and agreed on a false cover story: that Elward brought MJ into the side bedroom to conduct a controlled drug buy over the phone; that Elward had removed MJ's handcuffs; that MJ had reached for a gun; and that Elward shot MJ in self-defense.

Elward said that he would take care of the gun. Dedmon said that he would take care of the drugs.  McAlpin understood those comments to mean that Elward would plant a gun on MJ, and Dedmon would plant drugs on MJ.  McAlpin knew that it was unlawful to plant evidence on a suspect, but he did not intervene.

In order to limit the number of witnesses to the shooting, the officers agreed to tell investigators that at the time of the shooting, McAlpin and Middleton had left the property and were driving home; Dedmon and Hartfield were at Dedmon's truck; and Opdyke was escorting EP to a patrol car.

In order to corroborate his false cover story, McAlpin told Dedmon that he was leaving and to call him in a few minutes.  McAlpin drove off in his Rankin County Sheriff's Office-issued vehicle, which was enabled with GPS tracking.  Dedmon called him, and then McAlpin returned to the scene.

McAlpin told the other officers that he would take

1    care of EP.  McAlpin ordered Opdyke to take EP from the

2    side bedroom, put him in the back of Opdyke's patrol car,

3    and then unlock the back door so McAlpin could talk to EP.

4    McAlpin opened the back door of Opdyke's patrol car, told

5    EP that investigators with the Mississippi Bureau of

6    Investigation were on their way, and asked EP what he was

7    going to tell them.  McAlpin suggested to EP that if EP

8    went along with the cover story, then McAlpin would make

9    sure that EP would be released from jail.

10        McAlpin wrote and submitted a false report, knowing

11   at the time that it was false, for the purpose of covering

12   up their misconduct.  McAlpin was interviewed by

13   investigators with the Mississippi Bureau of Investigation.

14   Middleton -- sorry.  McAlpin lied to MBI investigators and

15   withheld material information for the purpose of covering

16   up their misconduct.

17        McAlpin, Dedmon, and Elward agreed to file false

18   charges on MJ in order to corroborate their false cover

19   story.  MJ was charged with felony aggravated assault on a

20   police officer, felony possession of methamphetamine, and

21   misdemeanor disorderly conduct.

22        McAlpin knew that as a law enforcement officer, it

23   was unlawful to write a false report, to give a false

24   statement to investigators, and to charge a person with

25   crimes that he did not commit.

1          All of this occurring in Rankin County, in the

2     Northern Division of the Southern District of Mississippi

3     within the jurisdiction of this Court.

4          THE COURT:  Mr. McAlpin, is what counsel just

5     detailed to the Court as to your commission of these

6     various offenses which you're before the Court on true and

7     accurate?

8          DEFENDANT MCALPIN:  Yes, Your Honor.

9          THE COURT:  Do you dispute anything that he said

10    about your involvement in this -- these crimes?

11         DEFENDANT MCALPIN:  No, Your Honor.

12         THE COURT:  Are you, in fact, guilty of the offenses

13    charged in Count 1 and 13, conspiracy against rights;

14    Counts 2, 3, and 10, deprivation of rights under color of

15    law; Count 11, conspiracy to obstruct justice; and

16    Count 12, obstruction of justice?

17         DEFENDANT MCALPIN:  Yes, Your Honor.

18         THE COURT:  Since you acknowledge that you are, in

19    fact, guilty as charged in the information as to all

20    counts, since you know your right to a trial, what the

21    maximum possible punishment is, and since you're

22    voluntarily pleading guilty, I will accept your guilty plea

23    and enter a judgment of guilty in your case.

24         The probation office will initiate and conduct a

25    presentence investigation, in which event you will be

1   interviewed with your lawyer present with regard to that

2   investigation.  After it's been completed, a written

3   presentence investigation report will be prepared and

4   submitted.

5       You and your attorney will have the opportunity to

6   inspect that report.  If you should contend that there are

7   errors in the report, either as to proposed factual

8   findings or guideline sentence application, then your

9   attorney may take that up with the probation officer and

10  can file written objections.  If there are any outstanding

11  issues or disputes on the day of sentencing, I will resolve

12  them after first giving you a chance to present anything

13  that you need to present in support of your position.

14      After we consider -- the Court considers all six of

15  the cases, I'll arrive at a date for the sentencing

16  disposition, but that concludes -- does the Government have

17  any comment to make or the defendant about this?

18      MR. PERRAS:  Your Honor, the defendants are all in

19  custody.  We would move that they remain in custody pending

20  sentencing pursuant to 18 USC 3143(a)(2).

21      THE COURT:  Yes, sir.  I understand.

22      And do you have any response to that?

23      MR. SELLERS:  No, sir, Your Honor.

24      THE COURT:  Okay.  Y'all can be seated.

25      MR. SELLERS:  Your Honor, may we approach briefly?

1          THE COURT:  Yes, sir.

2          (An off-the-record bench conference was held.)

3          THE COURT:  Let Mr. Jeffrey Middleton come to the

4    podium with his counsel.

5          Mr. Middleton, I'm now going to explain to you the

6    maximum possible penalties applicable in the various counts

7    that are under consideration by the Court.

8          Count 1, the conspiracy against rights charge, has a

9    maximum sentence of ten years' imprisonment and a $250,000

10   fine with a term of three years' supervised release and a

11   $100 special assessment.

12         Counts 2, 3, and 10 provide -- which are all --

13   subtitle is "Deprivation of Rights Under Color of Law,"

14   call for a maximum sentence of imprisonment of ten years,

15   $250,000 fine and three years' supervised release and a

16   $100 special assessment, and, again, three separate counts,

17   and those maximum penalties apply to each.

18         With regard to Count 11, conspiracy to obstruct

19   justice, the maximum penalty is 20 years' imprisonment, a

20   $250,000 fine, and a term of three years' supervised

21   release and a $100 special assessment.

22         With regard to Count 12, obstruction of justice, the

23   maximum possible penalty is 20 years' imprisonment, a

24   $250,000 fine and three years' supervised release and a

25   $100 special assessment.

1          Do you understand the maximum penalties on each of

2     these charges?

3          DEFENDANT MIDDLETON:  Yes, Your Honor.

4          THE COURT:  Do you need any further explanation?

5     Are you unclear about any part of it?  They're separate

6     charges with separate maximums that could be accumulated.

7          DEFENDANT MIDDLETON:  Yes, Your Honor, they're all

8     clear to me.

9          THE COURT:  All right.  Has anyone threatened,

10    harassed, coerced you, or intimidated you in any way to get

11    you to come to court today to plead guilty?

12         DEFENDANT MIDDLETON:  No, Your Honor.

13         THE COURT:  Are you appearing voluntarily and of

14    your own free will?

15         DEFENDANT MIDDLETON:  Yes, Your Honor.

16         THE COURT:  Have you entered into a plea agreement

17    with the Government that would consist of two documents: a

18    plea agreement and a plea supplement?

19         DEFENDANT MIDDLETON:  Yes, Your Honor.

20         THE COURT:  Did you read, understand, and sign both

21    of these agreements and with the assistance of your

22    counsel?

23         DEFENDANT MIDDLETON:  Yes, Your Honor.

24         THE COURT:  Did he explain to you as you might have

25    needed?

1    DEFENDANT MIDDLETON:  Yes, Your Honor.

2    THE COURT:  Mr. Tanner, have you been over the plea

3    agreement and supplement with your client, explained them

4    to him as was required or necessary, and have you also

5    signed them?

6    MR. TANNER:  I have, Your Honor.

7    THE COURT:  Let me ask counsel for the Government to

8    detail provisions that were in addition to or not common to

9    the announcement made previously on these waivers and so

10   forth.

11   MS. CHALK:  Thank you, Your Honor.

12   In this case, Defendant Middleton has agreed to

13   plead guilty to Count 1, 2, 3, 10, 11, and 12 as charged in

14   the criminal information charged in this matter.  In

15   exchange for the defendant's agreement, the Government will

16   recommend the defendant be sentenced as set forth in the

17   plea supplement that will be filed under seal.  The plea

18   agreement and plea supplement have been executed by this

19   defendant, his attorney, and counsel for the Government.

20   The plea agreement also makes mention of waivers

21   affecting trial and appellate rights that were previously

22   addressed.  And at this time, Your Honor, the United States

23   requests the Court have the defendant personally confirm

24   that he understands and agrees with the terms of the plea

25   agreement and supplement, including the waivers as outlined

 1    by the Government.

 2          THE COURT:  All right.  Mr. Middleton, you were

 3    present when counsel set out some waivers and provisions,

 4    and you told me -- along with the rest of the defendants,

 5    you told me that you understood what they provided for.

 6    I'm referencing that and also what counsel has just now

 7    said to the Court, and is all of this consistent and in

 8    accordance with your understanding of your plea agreement

 9    and supplement?

10          DEFENDANT MIDDLETON:  Yes, Your Honor.

11          THE COURT:  You -- the Government makes

12    recommendations in the plea supplement.  Do you realize

13    that while I pay attention to them and often follow them,

14    I'm not bound to it?  I have to know more about the case in

15    order to make a definite decision about recommendations by

16    the Government.

17          DEFENDANT MIDDLETON:  Yes, sir.  Yes, Your Honor.

18          THE COURT:  If you end up getting a different

19    sentence than what you expect, do you realize you won't

20    then be able to withdraw your plea and demand a trial,

21    because you've given that right up in the agreement that

22    you've made with the Court?

23          DEFENDANT MIDDLETON:  Yes, Your Honor.

24          THE COURT:  Nor will you be able to appeal your

25    conviction or sentence.

1       DEFENDANT MIDDLETON:  Yes, Your Honor.

2       THE COURT:  Very well, then.  Let the plea agreement

3 and supplement be filed with the clerk and admitted into

4 the record.

5       MR. TANNER:  May I approach, Your Honor?

6       THE COURT:  Yes, sir.

7       I'll ask the Government to summarize the

8 Government's case or give the factual basis for the plea.

9       MS. CHALK:  Thank you, Your Honor.

10       If the Government were to be put to its burden at

11 trial, we would show in this case, and the defendant and

12 the Government have stipulated to, the following facts:

13       On January 24, 2023, Jeffrey Middleton was employed

14 as a lieutenant with the Rankin County Sheriff's

15 Department -- Sheriff's Office.  Middleton supervised the

16 11:00 a.m. to 11:00 p.m. shift, and among the officers he

17 supervised were Deputy Hunter Elward and Deputy Daniel

18 Opdyke.  Middleton's shift called themselves "the Goon

19 Squad."  Middleton's shift was willing to use excessive

20 force and not to report it.  Middleton ordered and

21 distributed challenge coins with the unofficial Goon Squad

22 logo on the front, and on the back, it contained the

23 official Rankin County Sheriff's Office logo.

24       On January 24th, 2023, Christian Dedmon, a narcotics

25 investigator with the Rankin County Sheriff's Office, sent

1   a text message to Opdyke, Middleton, and Elward asking

2   them, "Are y'all available for a mission?"  Dedmon messaged

3   the group that they were going to a property on Conerly

4   Road and warned them:  "There's a chance of cameras.  Let's

5   approach east and work easy."  Middleton understood "work

6   easy" to mean knock on the door, rather than kick it down.

7   Elward texted back an eye roll emoji, and Opdyke texted a

8   GIF of a baby crying.  Dedmon messaged the group, "If we

9   don't see cameras, go."  Middleton understood that to mean

10  if they don't see surveillance cameras at the property,

11  then they should enter the property without a warrant.

12       Dedmon messaged the group, "No bad mugshots."

13  Middleton understood "No bad mugshots" to be a green light

14  to use excessive force on parts of the body not captured by

15  a mugshot.

16       Opdyke, Middleton, and Elward drove their Rankin

17  County Sheriff's Office-issued vehicles to the Cato

18  Volunteer Fire Department, parked their vehicles, and

19  waited for Dedmon.  When Dedmon's truck drove past them,

20  Opdyke, Middleton, and Elward pulled out from the Cato

21  Volunteer Fire Department and followed Dedmon to the

22  property.  When they arrived at the property, they all

23  parked in the driveway.  Chief Investigator Brett McAlpin,

24  who had been surveilling the property from down the street,

25  pulled in behind them.

1    Middleton exited his vehicle and walked to the

2    carport door, which other officers had kicked down.

3    Middleton entered the house without consent, a warrant, or

4    exigent circumstances.  Middleton knew that it was unlawful

5    to enter a home without consent, a warrant, or exigent

6    circumstances.

7    Middleton saw two Black men inside:  MJ and EP.  The

8    men were in handcuffs, and the officers were yelling at

9    them.  Dedmon asked EP where they were keeping the drugs.

10   Dedmon pulled out his gun, aimed it out the back door, and

11   fired.  Dedmon again demanded to know where the drugs were.

12   Middleton knew that it was unlawful for an officer to

13   attempt to coerce a confession by firing a gun, but

14   Middleton did not intervene.

15   Middleton and McAlpin went into the back bedroom and

16   discussed another case.  During their conversation,

17   Middleton heard Taser sounds and screams of pain coming

18   from the living room, where his subordinates, Elward and

19   Opdyke, were detaining MJ and EP.  Middleton knew that he

20   had a duty to intervene and stop officers from using

21   excessive force on an arrestee.  Despite that training, and

22   despite having the time and opportunity to intervene,

23   Middleton did not intervene.

24   Middleton went outside to retrieve his flashlight.

25   And when Middleton came back inside, he observed MJ and EP

1    covered in chocolate syrup and other liquids.  Shortly

2    thereafter, MJ and EP were ordered to strip naked and

3    shower off.  Their handcuffs were removed.

4        After MJ and EP showered off and changed into clean

5    underwear and sweats, they were handcuffed again and

6    brought to the side bedroom adjacent to the carport.

7    Middleton grabbed a metal sword and assaulted EP with the

8    sword.  The officers began discussing the comparative

9    strength of their respective Tasers, and they decided to

10   test their Tasers on MJ and EP to see which one was the

11   most powerful.  Dedmon, Elward, Hartfield, and Middleton

12   each Tased MJ and EP while MJ and EP were handcuffed and

13   not resisting.  Middleton knew that it was unlawful to Tase

14   a handcuffed and compliant arrestee, and that he had a duty

15   to intervene.  Despite having the opportunity to intervene,

16   Middleton did not do so.

17       Middleton and McAlpin left the side bedroom and

18   walked to the front bedroom to steal personal property that

19   had caught their attention during an earlier search of the

20   house.  McAlpin and Middleton each stole rubber bar mats,

21   brought them out to their vehicles, and then came back

22   inside the back bedroom.  Middleton knew that it was

23   unlawful to steal personal property during a search or

24   arrest.

25       Middleton and McAlpin heard two gunshots coming from

1    the direction of the side bedroom.  Middleton walked into

2    the hallway, and Elward told him that he had messed up.

3    Middleton walked into the side bedroom and observed MJ

4    handcuffed and bleeding from the mouth and neck.  Middleton

5    understood that he and other officers had a duty to render

6    medical aid to MJ.  Middleton did not provide medical aid,

7    and Middleton did not observe any other officer providing

8    medical aid.

9         All six officers huddled up on the back screened-in

10   porch to discuss what to do.  They devised and agreed on a

11   false cover story: that Elward brought MJ into the side

12   bedroom to conduct a controlled drug buy over the phone;

13   that Elward had removed MJ's handcuffs; and that MJ had

14   reached for a gun; and that Elward had shot MJ in

15   self-defense.

16        Middleton offered to plant a "throw-down" gun on MJ.

17   Middleton kept in his patrol car a Titan Tiger .38 Special

18   snub-nosed revolver that was not registered to him in case

19   a gun needed to be planted on a victim.  Elward responded

20   that he would use the BB gun they had found in the house.

21   Dedmon said that he would take care of the drugs.

22   Middleton understood those comments to mean that Elward

23   would plant the gun on MJ, and Dedmon would plant drugs on

24   MJ.  Middleton knew that it was unlawful to plant evidence

25   on a suspect, but he did not intervene.

1      When Middleton returned to the side bedroom, MJ was

2 no longer handcuffed, and the BB gun that Hartfield had

3 previously seen in the front middle bedroom was planted

4 next to MJ.

5      In order to limit the number of witnesses to the

6 shooting, the officers agreed to tell investigators that at

7 the time of the shooting, McAlpin and Middleton left the

8 property and were driving home; Dedmon and Hartfield were

9 at Dedmon's truck; and Opdyke was escorting EP to a patrol

10 car.

11      In order to corroborate his false story, McAlpin

12 told Dedmon that he was leaving and to call him in a few

13 minutes.  McAlpin drove off in his Rankin County Sheriff's

14 Office-issued vehicle, which was enabled with GPS tracking.

15 Dedmon called him, and then McAlpin returned to the scene.

16      Several officers began looking for the shell casings

17 fired from Dedmon's gun.  Middleton and the other officers

18 looked but could not find the shell casing from Dedmon's

19 second shooting.

20      McAlpin and Middleton each threatened the other

21 officers and told them that if any of them told the truth

22 about what happened that night, McAlpin and Middleton would

23 find out and kill them.

24      Middleton wrote and submitted a false report,

25 knowing at the time that it was false, for the purpose of

 1    covering up their misconduct.

 2         Middleton was interviewed by investigators with the

 3    Mississippi Bureau of Investigation.  Middleton lied to the

 4    Mississippi Bureau of Investigation investigators and

 5    withheld material information for the purpose of covering

 6    up their misconduct.  Middleton knew that as a law

 7    enforcement officer, it was unlawful to write a false

 8    report and give a false statement to investigators.

 9         All of this occurring within Rankin County, in the

10    Northern Division of the Southern District of Mississippi

11    and within the jurisdiction of this Court.

12         THE COURT:  Counsel referred to the presentation as

13    a stipulation.  Mr. Middleton, is what she said just now to

14    the Court true and correct?

15         DEFENDANT MIDDLETON:  Yes, Your Honor.

16         THE COURT:  Do you dispute or disagree with anything

17    she said about this account?

18         DEFENDANT MIDDLETON:  No, Your Honor.

19         THE COURT:  Are you, in fact, guilty of the crimes

20    charged in the various counts of the indictment that I have

21    explained to you?

22         Let me get the numbers of them again.  Count 1,

23    conspiracy against rights; Counts 2, 3, and 10, deprivation

24    of rights; Count 11, conspiracy to obstruct justice; and

25    Count 12, obstruction of justice:  Are you guilty of all

1    those?

2         DEFENDANT MIDDLETON:  Yes, Your Honor.

3         THE COURT:  Since you acknowledge that you are, in

4    fact, guilty as charged in the information as to all

5    counts, since you understand your right to a trial and what

6    the maximum possible punishment is, and since you're

7    voluntarily pleading guilty, I'm accepting your guilty plea

8    and will enter a judgment of guilty in your case.

9         There will be a presentence investigation conducted

10    by the probation office.  The probation officer will be

11    talking to you, interviewing you about the case and with

12    your lawyer having the right and opportunity to be present.

13         Once the investigation is concluded, a written

14    report will be prepared and submitted.  You and your lawyer

15    will have access to that report to inspect it.  If you

16    should contend that there are errors in the report, either

17    as to proposed factual findings or guideline sentence

18    application, Mr. Tanner can file objections.  And if any

19    are unresolved on the day of sentencing, I will make a

20    decision as to any dispute after first giving you a chance

21    to present anything that you think supports your position

22    in support of such issues.

23         I'm going to set a sentencing disposition in a few

24    minutes as soon as I've finished with the other defendants

25    to determine a time to impose sentencing.  So that

1   concludes this hearing.

2       Does the Government or defendant have anything to

3   say further about this?

4       MS. CHALK:  Your Honor, we would move that the

5   defendant remain detained pursuant to Title 18, United

6   States Code, Section 3143.

7       THE COURT:  All right.  That motion is granted.

8       The next case -- or the next defendant is -- let's

9   see.  Christian Lee Dedmon, with your attorney, Mr. Cory,

10  with you.

11      Mr. Dedmon, before I go any further, I want to

12  explain to you the maximum possible punishment upon

13  conviction of these various counts with which you are

14  charged.

15      Counts 1 and 13, conspiracy against rights, carries

16  a maximum sentence of ten years for each, ten years on 1

17  and ten years on 13, and a fine on each of $250,000

18  maximum, and a term of supervised release -- maximum term

19  of three years with a $100 special assessment.

20      With reference to Counts 2, 3, 4, 6, 7, and 10,

21  subtitled "Deprivation of Rights Under Color of Law," the

22  maximum punishment on each of these is ten years'

23  imprisonment, $250,000 fine, a term of three years'

24  supervised release, and a $100 special assessment.  And,

25  again, each -- that's the maximum for each of these.  Do

1    you understand that?

2         DEFENDANT DEDMON:  Yes, sir.

3         THE COURT:  Has anyone coerced, threatened, or

4    attempted to threaten you or in any way prevail on you to

5    come to court today to plead guilty?

6         DEFENDANT DEDMON:  No, sir.

7         THE COURT:  Are you appearing voluntarily and of

8    your own free will?

9         DEFENDANT DEDMON:  Yes, sir.

10        THE COURT:  Have you entered into a plea agreement

11   with supplement with the Government?

12        DEFENDANT DEDMON:  Yes, sir.

13        THE COURT:  Two documents?

14        DEFENDANT DEDMON:  Yes, sir.

15        THE COURT:  Did you read and understand or at least

16   have explained to you by your lawyer such that you had a

17   complete understanding of these documents?

18        DEFENDANT DEDMON:  Yes, sir.

19        THE COURT:  And did you then sign them both?

20        DEFENDANT DEDMON:  Yes, sir.

21        THE COURT:  Mr. Cory, did you go over the plea

22   agreement and supplement with your client, explain them to

23   you as necessary, and then execute them yourselves?

24        MR. CORY:  Yes, Your Honor.

25        THE COURT:  I'll ask counsel for the Government to

1    express any basic terms of the plea agreement that have not

2    already been detailed.

3         MS. CHALK:  Thank you, Your Honor.

4         Defendant Dedmon has agreed to plead guilty to

5    Counts 1, 2, 3, 4, 5, 6, 7, 10, 11, 12, and 13 as charged

6    in the criminal information in the matter before the Court,

7    and in exchange for the defendant's agreement, the

8    Government will recommend that the defendant be sentenced

9    as set forth in the plea supplement that is filed under

10   seal.  The plea agreement and plea supplement have been

11   executed by the defendant, his attorney, and counsel for

12   the Government.  The plea agreement includes waivers of

13   trial and appellate rights previously described earlier

14   today.

15        At this time, Your Honor, the United States requests

16   the Court have the defendant personally confirm that he

17   understands and agrees with the terms of the plea agreement

18   and supplement, including the waivers as outlined by the

19   Government.

20        THE COURT:  Counsel earlier set forth to the Court

21   with all of you present various provisions, primarily

22   waivers, that were -- that are in the proposed plea

23   agreement.  I inquired of you and the others if you

24   understood what they are, and you confirm to me now that

25   you continue to understand them.

1          Are you -- having executed the agreement, do you

2   agree with all the provisions and the waivers that she's

3   set forth?

4          DEFENDANT DEDMON:  Yes, sir.

5          THE COURT:  She referenced a recommendation by the

6   Government.  The Government makes recommendations, which

7   the Court often follows, but I'm not bound to do so.  I

8   have to develop a firm opinion after knowing a little about

9   the case.  But do you understand that when I give you your

10  sentence, if it's something you don't like, you won't then

11  be able to withdraw your guilty plea and expect to have a

12  trial?

13         DEFENDANT DEDMON:  Yes, sir.

14         THE COURT:  Nor will you be able to appeal your

15  conviction or sentence, because you've given those rights

16  up in the agreements that you've made with the Court.

17         DEFENDANT DEDMON:  Yes, sir.

18         THE COURT:  Very well, then.  Let the plea agreement

19  with supplement be filed with the court and made a part of

20  the record in this case, the supplement to be under seal.

21         MR. CORY:  May I approach, Your Honor?

22         THE COURT:  Yes.  Let counsel for the Government

23  detail the factual basis for the plea.

24         MS. CHALK:  Thank you, Your Honor.

25         The Government, when put to its burden at trial in

1    this case, we would show, as well as the defendant and

2    Government having stipulated to the following in paragraph

3    8 of the plea supplement:  That on January 24th, 2023,

4    Christian Dedmon was employed as a narcotics investigator

5    with the Rankin County Sheriff's Office.  That night,

6    Dedmon was cooking at his neighbor's house with his

7    neighbor and Joshua Hartfield, an officer with the Richland

8    Police Department.  Dedmon received a call from Brett

9    McAlpin, the chief investigator for the Rankin County

10   Sheriff's Department.  McAlpin instructed Dedmon to get

11   some guys together, go to 135 Conerly Road, in Braxton,

12   Mississippi, and lock up anyone there.  Dedmon invited

13   Hartfield to ride along with him in Dedmon's Rankin County

14   Sheriff's Office-issued truck.

15         Dedmon sent text message to three colleagues with

16   the sheriff's department:  Lieutenant Jeffrey Middleton,

17   Deputy Hunter Elward, and Deputy Daniel Opdyke.  That text

18   read, "Are y'all available for a mission?"  Dedmon messaged

19   the group that they were going to the property on Conerly

20   Road and warned them, "There is a chance of cameras...

21   let's approach east and work easy."  Dedmon meant that if

22   they encountered cameras at 135 Conerly Road, they should

23   knock on the door, rather than kick it down.

24         Elward texted back an eyeroll emoji, and Opdyke

25   texted back a GIF of a baby crying.  Dedmon messaged the

1    group, "If we don't see cameras, go."  Dedmon meant that if
2    they did not see surveillance cameras at the property, then
3    they should enter the property without a warrant.  Dedmon
4    messaged the group, "No bad mugshots."  Dedmon meant "No
5    bad mugshots" to be a green light to use excessive force on
6    parts of the body not captured by a mugshot.

7        As Dedmon and Hartfield were driving to the
8    property, they passed Middleton, Elward, and Opdyke, who
9    were parked at the Cato Volunteer Fire Department.  Opdyke,
10   Middleton, and Elward pulled out from the fire department
11   and followed Dedmon and Hartfield to the property.  When
12   they arrived at that property, they all parked in the
13   driveway.  Chief Investigator Brett McAlpin, who had been
14   surveilling the property from down the street, pulled in
15   behind them.

16       Noticing a surveillance camera above the front door
17   of the property, Dedmon, Elward, and Opdyke walked around
18   to the carport door, which had no surveillance camera
19   covering it.  Dedmon and Opdyke each kicked the carport
20   door, but it did not open.  Elward kicked the carport door
21   and it swung open.  Opdyke, Dedmon, and Elward entered the
22   home without consent, a warrant, or exigent circumstances.
23   Dedmon knew that it was unlawful to enter a home without
24   consent, a warrant, or exigent circumstances.

25       Dedmon saw two Black males inside:  MJ and EP.

1    Officers issued them commands, and they complied.  Dedmon

2    handcuffed MJ and Tased him a couple of times.  Elward

3    handcuffed EP and Tased him a couple of times.  There was

4    no probable cause to believe that MJ or EP had committed

5    any crimes, and there was no reason to Tase them.

6         Dedmon asked EP where they were keeping the drugs.

7    Dedmon pulled out his gun, aimed it at the back door, and

8    fired.  Dedmon again demanded to know where the drugs were.

9    Dedmon knew that it was unlawful for an officer to attempt

10   to coerce a confession by firing a gun.

11        The defendants moved MJ and EP, who were still

12   handcuffed, to the living room, taunted them, accused them

13   of taking advantage of the white woman who owned the house,

14   and warned them to stay out of Rankin County and go back to

15   Jackson or to "their side" of the Pearl River, areas with

16   higher concentrations of Black residents.  Dedmon

17   drive-stunned MJ with his Taser repeatedly, and Dedmon knew

18   that it was unlawful to Tase a handcuffed and compliant

19   arrestee.

20        Opdyke left the living room and returned with a

21   dildo mounted onto the end of a BB gun.  Opdyke forced the

22   dildo in the mouth of EP, and attempted to force the dildo

23   in the mouth of MJ.  Dedmon grabbed the dildo from Opdyke

24   and slapped EP and MJ in the face with it.  Dedmon knew it

25   was unlawful to assault an arrestee with a dildo, and that

1  he had a duty to intervene to stop another officer from

2  doing so.  Despite having the time and opportunity to

3  intervene, Dedmon did not intervene.

4       Dedmon forced EP and MJ onto their backs on the

5  floor of the living room.  Elward held them down.  Dedmon

6  poured milk, alcohol, and chocolate syrup on their faces

7  and into their mouths.

8       MJ and EP were ordered to strip naked and shower

9  off.  Their handcuffs were removed.  After MJ and EP

10  showered off and changed into clean underwear and sweats,

11  they were handcuffed again and brought to the side bedroom

12  adjacent to the carport.  The officers then began

13  discussing comparative strength of their respective Tasers,

14  and they decided to test their Tasers on MJ and EP to see

15  which one was most powerful.  Dedmon, Elward, Hartfield,

16  and Middleton each Tased MJ and EP while MJ and EP were

17  handcuffed and not resisting.  Dedmon knew that he had a

18  duty to intervene if he observed officers using excessive

19  force on an arrestee.  Despite having the time and

20  opportunity to intervene, Dedmon did not intervene.

21       Dedmon stepped from the side bedroom into the

22  adjoining carport, pulled out his gun, and fired into the

23  yard.  Shortly thereafter, Dedmon heard a loud noise coming

24  from the side bedroom.  Dedmon stepped back into the side

25  bedroom and observed Elward, Opdyke, MJ, and EP in the

1  room.  MJ, who was still in handcuffs, had been shot and

2  was bleeding.

3      All six officers huddled up on the back screened-in

4  porch to discuss what to do.  They devised and agreed on a

5  false cover story: that Elward brought MJ into the side

6  bedroom to conduct a controlled drug buy over the phone;

7  that Elward had removed MJ's handcuffs; and that MJ had

8  reached for a gun; and that Elward shot MJ in self-defense.

9      Elward said that he would take care of the gun.

10 Dedmon understood Elward's comment to mean that Elward

11 would plant a gun on MJ in order to corroborate the false

12 cover story.  Dedmon knew that it was unlawful to plant a

13 gun on an arrestee, but did not intervene.

14     In order to cover up their entry into the property

15 without a warrant, the defendants agreed to tell

16 investigators that when defendants arrived at the house,

17 they observed a Black male in the driveway; that Dedmon

18 obtained the man's consent to search his pockets and found

19 two baggies of methamphetamine; and that man fled into the

20 house and Dedmon ran after him.

21     In order to corroborate that false cover story,

22 Dedmon retrieved some methamphetamine he had previously

23 obtained from a subject-turned-informant but had not

24 entered into evidence, divided it into two baggies, and

25 later submitted them to the crime lab as belonging to MJ.

1  Dedmon knew that it was unlawful to plant drugs on an

2  arrestee.

3      In order to limit the number of witnesses to the

4  shooting, the officers agreed to tell investigators that at

5  the time of the shooting, McAlpin and Middleton had left

6  the property and were driving home.  Dedmon and Hartfield

7  were at Dedmon's truck, and Opdyke was escorting EP to a

8  patrol car.

9      McAlpin left the scene to corroborate his cover

10  story that he had not been present during the shooting.

11  McAlpin told Dedmon that he was leaving and instructed

12  Dedmon to call him in a few minutes.  McAlpin drove away,

13  Dedmon called him, and McAlpin returned to the scene.

14      Dedmon picked up spent Taser cartridges and got rid

15  of them.  Dedmon searched for all the shell casings from

16  the two times he fired his gun.  Opdyke told Dedmon that

17  Opdyke had picked up the first shell casing.  Dedmon looked

18  in the carport and the side bedroom for his second shell

19  casing but could not find it.

20      While Dedmon and other officers were attempting to

21  cover up their misconduct, MJ was bleeding in the side

22  bedroom.  Dedmon understood that he and the other officers

23  had a duty to render medical aid to MJ.  Dedmon did not

24  provide medical aid, and Dedmon did not observe any other

25  officer providing medical aid.

1     Dedmon wrote and submitted a false report, knowing

2  at the time it was false, for the purpose of covering up

3  their misconduct.  Dedmon was interviewed by investigators

4  with the Mississippi Bureau of Investigation, and Dedmon

5  lied to those investigators and withheld material

6  information for the purpose of covering up their

7  misconduct.

8     McAlpin, Dedmon, and Elward agreed to file false

9  charges on MJ in order to corroborate the false cover

10 story.  On January 25th, 2023, Dedmon signed a sworn

11 affidavit that MJ had committed felony possession of

12 methamphetamine, in violation of Mississippi Code Section

13 41-29-139(c).  Upon the filing of Dedmon's affidavit, MJ

14 was charged with felony possession of methamphetamine.  The

15 maximum punishment for that offense is eight years in

16 prison.

17    Dedmon also signed a sworn affidavit that MJ

18 committed misdemeanor disorderly conduct, in violation of

19 Mississippi Code Section 97-35-7, by "refusing to follow

20 verbal commands and to stop running after locating a felony

21 amount of methamphetamine on his person."  Upon the filing

22 of Dedmon's affidavit, MJ was charged with misdemeanor

23 disorderly conduct.  The maximum punishment for that

24 offense is one year in prison.

25    Dedmon knew that as a law enforcement officer, it

1  was unlawful to write a false report, to give a false

2  statement to investigators, to charge a person with crimes

3  they did not commit, and to include false and misleading

4  information in a sworn charging affidavit.  All of this

5  conduct occurring in Rankin County, in the Northern

6  Division of the Southern District of Mississippi within the

7  jurisdiction of this Court.

8          THE COURT:  Ms. Chalk referenced a stipulation from

9  which she read.  The stipulation being -- what she said,

10  all of which was agreed to by you.  Is what she represented

11  to the Court all true and correct?

12          DEFENDANT DEDMON:  Yes, sir.

13          THE COURT:  Is there anything that was -- from your

14  perspective that was untrue or that you dispute?

15          DEFENDANT DEDMON:  No, sir.

16          THE COURT:  Are you, in fact, guilty of the crimes

17  charged in Counts 1, 2, 3, 4 -- I want to refer to them a

18  little differently.  Counts 1 and 13 subtitled "Conspiracy

19  Against Rights"; Counts 2, 3, 4, 6, 7, and 10 referenced as

20  "Deprivation of Rights Under Color of Law"; Count 5, use

21  and carry and brandish and discharge of a firearm during a

22  crime of violence; Count 11, conspiracy to obstruct

23  justice; and Count 12, obstruction of justice.  Are you, in

24  fact, guilty of every one of those criminal offenses?

25          DEFENDANT DEDMON:  Yes, sir.

1      THE COURT:  Since you've acknowledged that you're,

2 in fact, guilty as charged in the information in all

3 respects, since you know your right to a trial and what the

4 maximum possible punishment is, and since you are

5 voluntarily pleading guilty, I'm accepting your guilty plea

6 to all counts and will enter a judgment of guilty in your

7 case.

8      A presentence investigation will be initiated and

9 conducted by the probation office.  The probation officer

10 will be interviewing you with your counsel present in

11 connection with that investigation as to the facts of this

12 case and information about yourself, and once the

13 investigation has been completed, the probation officer

14 will prepare and submit a written presentence investigation

15 report.  You and your attorney, Mr. Cory, will have the

16 opportunity to inspect that report.  And if you should take

17 the position that there are errors in it, such as proposed

18 findings of fact and guideline sentence application, then

19 you can take that up with your -- or conclusions of law,

20 you can take that up -- your attorney can take that up with

21 the probation officer and file written objections.

22      If there are any outstanding objections or disputes

23 on the day of sentencing before I impose sentence, you will

24 have the chance to present anything that you think supports

25 your position, and I'll resolve it.

1    Is there anything further from the Government or

2  defendant?  I've already said that I'm going to set the

3  sentencing disposition at the end of this hearing.

4    MS. CHALK:  Your Honor, for the record, we would

5  move the defendant be detained pursuant to Title 18 --

6    THE COURT:  Yes, ma'am.

7    MS. CHALK:  -- United States Code, Section 3143.

8    THE COURT:  I understand the magistrate judge this

9  morning entered an oral order of detention, and I'm

10  acknowledging that, and that is the status of the cases.

11  These defendants are detained.  You can be seated.

12    The next defendant whose case will be considered is

13  Hunter Thomas Elward.  Mr. Elward and his attorney come

14  back to the podium.

15    Mr. Elward, I previously explained the charges that

16  are filed against you, and now I'm going to explain the

17  maximum possible penalties applicable to these charges.

18    Counts 1 and 13, conspiracy against rights, in those

19  the maximum punishment is ten years' imprisonment and a

20  fine of $250,000 with a term of supervised release of three

21  years, and then there's a $100 special assessment.

22    Then with regard to Counts 2 -- and I said 1 and 13.

23  That's applicable for each count, the ten years'

24  imprisonment for each.

25    Then with regard to Counts 2, 3, 6, 7, 8, and 10,

1   deprivation of rights under color of law, the maximum term

2   of imprisonment is ten years' imprisonment, and that's for

3   each one of those counts, and a $250,000 fine with a term

4   of supervised release of three years maximum and a $100

5   special assessment.

6         And with regard to Count 9, using and carrying and

7   brandishing and discharging a firearm during a crime of

8   violence, the maximum possible penalty is -- the minimum

9   imprisonment is ten years, not more than life, to run

10  consecutive, as it's stated in this information I have, as

11  well as a $250,000 fine.

12        And on Count 11, conspiracy to obstruct justice, the

13  maximum punishment is 20 years' imprisonment and a fine of

14  $250,000 along with a term of supervised release of three

15  years and a $100 special assessment.

16        Then on Count 12, obstruction of justice, the

17  maximum term of imprisonment is 20 years' imprisonment and

18  a $250,000 fine and a term of three years' supervised

19  release, and then there's the $100 special assessment.

20        After that explanation, I'll ask you whether you

21  understand the maximum term of imprisonment for each one of

22  these counts?

23        DEFENDANT ELWARD:  Yes, sir, Your Honor.

24        THE COURT:  I moved through them pretty fast.  If

25  you end up not clear about anything, let me know, but

1   you're telling me you understand all of that?

2       DEFENDANT ELWARD:  Yes, Your Honor.

3       THE COURT:  Has anybody threatened, coerced, or

4   harassed you in any way to prevail on you to come to court

5   today to plead guilty?

6       DEFENDANT ELWARD:  No, Your Honor.

7       THE COURT:  Are you appearing voluntarily of your

8   own free will?

9       DEFENDANT ELWARD:  Yes, Your Honor.

10      THE COURT:  Have you entered into a plea agreement

11  with the Government that would consist of two documents: a

12  plea agreement and plea supplement?

13      DEFENDANT ELWARD:  Yes, Your Honor.

14      THE COURT:  Did you read, understand, and sign both

15  of them?

16      DEFENDANT ELWARD:  Yes, Your Honor.

17      THE COURT:  Did Mr. Hollomon confer with you about

18  it and explain them to you as was necessary for you to have

19  a complete understanding?

20      DEFENDANT ELWARD:  Yes, Your Honor.

21      THE COURT:  Mr. Hollomon, did you go over the plea

22  agreement and supplement with your client, explaining them

23  to him as necessary, and then also execute them?

24      MR. HOLLOMON:  I did, Your Honor.

25      THE COURT:  Let counsel for the Government state the

1   fundamental terms of the plea agreement, those that were

2   not in common with those previously referenced.

3          MS. CHALK:  Yes, Your Honor.  Defendant Elward has

4   agreed to plead guilty to Counts 1, 2, 3, 6, 7, 8, 9, 10,

5   11, 12, and 13 as charged in the criminal information that

6   is before the Court.  In exchange for the defendant's

7   agreement, the Government will recommend that this

8   defendant be sentenced as set forth in the plea supplement

9   that is filed under seal.  The plea agreement and plea

10  supplement have been executed by the defendant, his

11  attorney, and counsel for the Government.

12         The plea agreement also makes reference to waivers

13  of trial and appellate rights that were previously

14  addressed earlier today in this hearing, and at this time,

15  Your Honor, the United States requests the Court have the

16  defendant personally confirm that he understands and agrees

17  with the terms of the plea agreement, plea supplement,

18  including the waivers as outlined by the Government.

19         THE COURT:  All right.  Ms. Chalk has previously

20  described a number of waivers and provisions, and do you

21  confirm that you understood them when you told me earlier

22  that you did understand them this morning?

23         DEFENDANT ELWARD:  Yes, sir.

24         THE COURT:  And she has additionally explained other

25  terms of the plea agreement.  Is her explanation of all of

1   this consistent with your understanding of your plea

2   agreement?

3       DEFENDANT ELWARD:  Yes, Your Honor.

4       THE COURT:  And do you specifically tell the Court

5   that you agree to and -- all of these agreements and

6   waivers that are set out?

7       DEFENDANT ELWARD:  I do.

8       THE COURT:  There is a recommendation that is in the

9   plea supplement by the Government.  The Court pays

10  attention to recommendations and often follows them, but

11  I'm not bound to.  Do you understand that after I give you

12  your sentence, that you won't be able to withdraw your plea

13  and expect to have a trial?

14      DEFENDANT ELWARD:  Yes, Your Honor.

15      THE COURT:  Nor will you be able to appeal your

16  conviction or sentence, because you've given that -- those

17  rights up along with the others in the plea agreement that

18  you made with the Government.

19      DEFENDANT ELWARD:  Yes, Your Honor.

20      THE COURT:  Very well, then.  Let the plea agreement

21  and supplement be filed with the clerk --

22      MR. HOLLOMON:  May I approach, Your Honor?

23      THE COURT:  Mr. Hollomon, did I verify with you that

24  you had gone over the plea agreement with your client?

25      MR. HOLLOMON:  Judge, I don't remember that, but

1   I'll state that --

2       THE COURT:  Sir?

3       MR. HOLLOMON:  Judge, I don't recall that, but I'll

4   state it on the record here.

5       THE COURT:  Okay.  I take the position I always do,

6   but I want to confirm now -- it just sort of occurred to

7   me -- you talked to your client, went over both agreements

8   with him, and explaining to him and also executing them; is

9   that right?

10      MR. HOLLOMON:  Yes, Your Honor.

11      THE COURT:  Okay.  Let the plea agreement and the

12  plea supplement be filed with the clerk and made a part of

13  the record in this case.

14      Ms. Chalk, will you summarize the Government's case

15  or give the factual basis for the anticipated plea.

16      MS. CHALK:  Yes, Your Honor.  In this case defendant

17  Elward has agreed to plead guilty to Counts 1, 2, 3, 6, 7,

18  8, 9, 10, 11, 12, and 13.

19      The defendant has also agreed to the following facts

20  that we would prove if we were put to our burden at trial

21  in the form of a stipulation that's contained in the plea

22  supplement.

23      On January 24th, 2023, Hunter Elward was employed as

24  a patrol deputy with the Rankin County Sheriff's Office.

25  Elward worked the 11:00 a.m. to 11:00 p.m. shift along with

1  Lieutenant Jeffrey Middleton and Deputy Daniel Opdyke.

2  Their shift called themselves the Goon Squad because of

3  their willingness to use excessive force and not to report

4  it.  Middleton provided Elward a challenge coin with the

5  unofficial Goon Squad logo on the front and the official

6  Rankin County Sheriff's Office logo on the back.

7       On January 24th, 2023, Christian Dedmon, a narcotics

8  investigator with the Rankin County Sheriff's Office, sent

9  a text message to Opdyke, Middleton, and Elward asking

10  them:  Are you all available for a mission?  Dedmon

11  messaged the group that they were going to the property on

12  Conerly Road and warned them:  There's a chance of cameras;

13  let's approach east and work easy.  Elward understood "work

14  easy" to mean knock on the door rather than kick it down.

15  Elward texted back an eye role emoji, and Opdyke texted a

16  GIF of a baby crying.

17       Dedmon messaged the group:  If we don't see cameras,

18  go.  Elward understand that to mean if they do not see

19  surveillance cameras at the property, then they should

20  enter the property without a warrant.

21       Dedmon messaged the group:  No bad mugshots.  Elward

22  understood "no bad mugshots" to be a green light to use

23  excessive force on parts of the body not captured by a

24  mugshot.

25       Opdyke, Middleton, and Elward each drove to the Cato

1  Volunteer Fire Department, parked their vehicles, and

2  waited for Dedmon.  When Dedmon's truck drove past them,

3  Opdyke, Middleton, and Elward pulled out from the Cato

4  Volunteer Fire Department and followed Dedmon to the

5  property.

6       When they arrived at the property, they all parked

7  in the driveway.  Chief investigator Brett McAlpin, who had

8  been surveilling the property from down the street, pulled

9  in behind them.

10      Noticing a surveillance camera above the front door

11 of the property, Dedmon, Elward, and Opdyke walked around

12 to the carport door, which had no surveillance camera

13 covering it.  Dedmon and Opdyke each kicked in the carport

14 door, but it did not open.  Elward kicked in the carport

15 door, and it swung open.  Opdyke, Dedmon, and Elward

16 entered the home without consent, a warrant, or exigent

17 circumstances, and Elward knew it was unlawful to enter a

18 home without consent, a warrant, or exigent circumstances.

19      Elward saw two Black men inside:  MJ and EP.

20 Officers issued them commands, and they complied.  Dedmon

21 handcuffed MJ and Tased him multiple times.  Elward

22 handcuffed EP and Tased him multiple times.  Opdyke kicked

23 EP in the ribs.  There was no probable cause to believe

24 that MJ or EP had committed any of the crimes, and there

25 was no reason to kick or Tase them.

1      Dedmon asked EP where are they keeping the drugs?

2  Dedmon pulled out his gun, aimed it at the back door, and

3  fired.  Dedmon again demanded to know where the drugs were.

4  Elward knew that it was unlawful for an officer to attempt

5  to coerce a confession by firing a gun, but Elward did not

6  intervene.

7      The defendants moved MJ and EP, who were still

8  handcuffed, to the living room, taunted them, accused them

9  of taking advantage of a white woman who owned the house,

10  and warned them to stay out of Rankin County and go back to

11  Jackson or to their side of the Pearl River, areas with

12  higher concentration of Black residents.

13      Opdyke left the living room and returned with a

14  dildo mounted on the end of a BB gun.  Dedmon grabbed the

15  dildo from Opdyke and slapped EP and MJ in the face with

16  it.  Dedmon forced MJ and EP onto their knees with their

17  backs to Dedmon, and Dedmon threatened to anally rape MJ

18  and EP with a dildo.  Dedmon grabbed the back of MJ's pants

19  and moved the dildo towards MJ's backside, but Dedmon

20  stopped when he noticed that MJ had defecated on himself.

21  Elward knew that it was unlawful to sexually assault an

22  arrestee and that he had a duty to intervene and stop it.

23  Despite having the time and opportunity to intervene,

24  Elward did not intervene.

25      Dedmon forced MJ and EP onto their backs on the

1   floor of the living room.  Elward held them down, and

2   Dedmon poured milk, alcohol, and chocolate syrup on their

3   faces and into their mouths.  Elward grabbed a carton of

4   eggs from the kitchen and threw the eggs at MJ and EP.  MJ

5   and EP were ordered to strip naked and shower off.  Their

6   handcuffs were removed.

7        After MJ and EP showered off and changed into clean

8   underwear and sweats, they were handcuffed again and

9   brought to the side bedroom adjacent to the carport.  The

10  officers began discussing the comparative strengths of

11  their respective Tasers, and they decided to test their

12  Tasers on MJ and EP to see which one was the most powerful.

13  Dedmon, Elward, Hartfield, and Middleton each Tased MJ and

14  EP while MJ and EP were handcuffed and not resisting.

15  Elward knew that it was unlawful to Tase a handcuffed and

16  compliant arrestee.  Elward also knew that he had a duty to

17  intervene if he observed officers using excessive force on

18  an arrestee.  Despite having the time and opportunity to

19  intervene, Elward did not intervene.

20       Elward surreptitiously removed a bullet from the

21  chamber of his gun.  Elward forced his gun into MJ's mouth

22  and pulled the trigger.  The unloaded gun clipped but did

23  not discharge.  Elward racked the slide, forced the gun

24  back into MJ's mouth, and pulled the trigger again.  This

25  time the gun discharged, and MJ collapsed on the floor.

1    All six officers huddled up on the back screened-in

2    porch to discuss what to do.  They devised and agreed on a

3    false cover story:  that Elward brought MJ to the side

4    bedroom to conduct a controlled drug buy over the phone,

5    that Elward had removed MJ's handcuffs, and that MJ had

6    reached for a gun and that Elward shot MJ in self-defense.

7    Elward said that he would take care of the gun.

8    Elward went back inside, grabbed the BB gun, and brought it

9    to the side bedroom, where MJ was still bleeding from the

10   mouth and neck and was not receiving any medical attention.

11   Elward removed MJ's handcuffs and planted the BB gun next

12   to MJ.  Dedmon said that he would take care of the drugs.

13   Elward understood Dedmon's comment to mean that Dedmon

14   would plant drugs on MJ.  Elward knew that it was unlawful

15   to plant evidence on a suspect, but he did not intervene.

16   In order to limit the number of witnesses to the

17   shooting, the officers agreed to tell investigators that at

18   the time of the shooting McAlpin and Middleton had left the

19   property and were driving home, Dedmon and Hartfield were

20   at Dedmon's truck, and Opdyke was escorting EP to the

21   patrol car.

22   While Elward and the other officers were attempting

23   to cover up their misconduct, MJ was bleeding in the side

24   bedroom.  Elward understood that he and the other officers

25   had a duty to render medical aid to MJ.  Elward did not

1    provide medical aid, and Elward did not observe any other

2    officer providing medical aid.

3         Elward wrote a report and submitted -- wrote and

4    submitted a false report, knowing at the time that it was

5    false, for the purpose of covering up their misconduct.

6         Elward was interviewed by the investigators with the

7    Mississippi Bureau of Investigation.  Elward lied to the

8    Mississippi Bureau of Investigation investigators and

9    withheld material information for the purpose of covering

10   up their misconduct.

11        McAlpin, Dedmon, and Elward agreed to file false

12   charges on MJ in order to corroborate their false cover

13   story.

14        On January 25th, 2023, Elward signed a sworn

15   affidavit that MJ committed felony aggravated assault on a

16   police officer, in violation of Mississippi Code Section

17   97-3-7(2) under circumstances manifesting extreme

18   indifference to the value of human life by obtaining a

19   firearm and then aiming and pointing it in the direction of

20   Deputy Elward.

21        Upon the filing of Elward's affidavit, MJ was

22   charged with felony aggravated assault on a police officer.

23   The maximum punishment of that offense is 30 years in

24   prison.  Elward knew that as a law enforcement officer it

25   was unlawful to write a false report, to give a false

1    statement to investigators, to charge a person with crimes

2    he did not commit, and to include false and misleading

3    information in a sworn charging affidavit.

4        Your Honor, all of this conduct occurring in Rankin

5    County, in the Northern Division of the Southern District

6    of Mississippi within the jurisdiction of this Court.

7        THE COURT:  Mr. Elward, Ms. Chalk referenced a

8    stipulation to which you'd agreed.  Is everything that she

9    read in that stipulation as the factual basis for the plea

10   true and accurate?

11       DEFENDANT ELWARD:  Yes, Your Honor.

12       THE COURT:  Is there anything that you take issue

13   with, anything that you dispute?

14       DEFENDANT ELWARD:  No, Your Honor.

15       THE COURT:  Since you admit that you are guilty as

16   charged, the Court finds that you are guilty of every one

17   of these counts that are alleged in the information that

18   have been referenced and will enter a judgment of guilty in

19   this case.

20       A presentence investigation will be initiated and

21   conducted by the probation officer.  The probation office

22   will interview you and with your counsel present about

23   this, case your commission of these offenses, and

24   background information about you.

25       Once the investigation has been completed, a

1  presence investigation report will be prepared and

2  submitted that you and Mr. Hollomon will have the

3  opportunity to inspect.  If you contend that there are

4  errors in the presentence report, both as to matters of

5  fact or as to guideline sentence application, then you

6  can -- or any errors of law, then Mr. Hollomon can take

7  that up with the probation officer and file written

8  objections.  If there are any unresolved objections that

9  continue on the day of sentencing, I will resolve them

10  after first giving you a chance to present anything that

11  you think supports your position.

12        Is there anything further from the Government or the

13  defendant?

14        MS. CHALK:  Your Honor, I may have missed it, but

15  would you mind just confirming for the record that the

16  defendant is in fact pleading guilty to all of the counts

17  charged in the information?

18        THE COURT:  I went over each one of them with him,

19  the maximum penalty.  And I am now having you confirm, if

20  it wasn't clear, that you're pleading guilty to every one

21  of the counts that charge you in the information?

22        DEFENDANT ELWARD:  Yes, Your Honor.

23        THE COURT:  All right.  Okay.

24        MR. HOLLOMON:  Judge, there's nothing else from the

25  defendant.

```
 1              THE COURT:  Do you have anything further?

 2              MS. CHALK:  We just move under 18 U.S.C. 3143 that

 3      the defendant remain in custody, Your Honor.

 4              THE COURT:  The motion is granted.

 5              MR. HOLLOMON:  Thank you, Your Honor.

 6              THE COURT:  Mr. Opdyke, I now am going to -- after

 7      explaining the various charges against you, I'm now

 8      explaining to you the maximum possible penalty upon -- for

 9      each one of these counts in which you're charged and which

10      I understand you plan to plead guilty.

11              Count 1 carries a mandatory -- not a mandatory -- a

12      maximum sentence of ten years' imprisonment and a $250,000

13      fine with a term of three years' supervised release and a

14      $100 special assessment.  Do you understand that?

15              DEFENDANT OPDYKE:  Yes, Your Honor.

16              THE COURT:  Counts 2, 3, 6, 7, and 10 each charge a

17      deprivation of rights under color of law.  There are five

18      of these counts, and each one has a maximum penalty -- a

19      maximum penalty of ten years' imprisonment -- now, that's

20      ten for each -- a $250,000 fine, three years' supervised

21      release, and $100 special assessment.  Do you understand

22      that?

23              DEFENDANT OPDYKE:  Yes, Your Honor.

24              THE COURT:  Count 11, conspiracy to obstruct

25      justice, provides for a maximum sentence of 20 years'
```

1 imprisonment, a fine of $250,000, and a three-year term of

2 supervised release and a $100 special assessment.

3 And then Count 12, obstruction of justice, has a

4 maximum sentence of 20 years' imprisonment, $250,000 fine,

5 a three-year term of supervised release, and a $100 special

6 assessment.

7 I've given the maximum for each one of these counts.

8 Do you understand that, or do you need any further

9 explanation from me about it?

10 DEFENDANT OPDYKE:  No.  I understand, Your Honor.

11 THE COURT:  Has anyone threatened, coerced,

12 harassed, or intimidated you in any way to prevail on you

13 to come to court today to plead guilty?

14 DEFENDANT OPDYKE:  No, sir, Your Honor.

15 THE COURT:  Are you appearing voluntarily and of

16 your own free will?

17 DEFENDANT OPDYKE:  Yes, sir.

18 THE COURT:  Have you entered into a plea agreement

19 that would consist of two instruments, a plea agreement and

20 a supplement?

21 DEFENDANT OPDYKE:  Yes, Your Honor.

22 THE COURT:  Did you read, understand, and confer

23 with your lawyer before you signed it, and then sign both

24 of them?

25 DEFENDANT OPDYKE:  Yes, Your Honor.

```
 1          THE COURT:  As counsel for your client, sir, have

 2    you been over the plea agreement and supplement, explained

 3    them to him as necessary, and then also executed them?

 4          MR. REYNOLDS:  Your Honor, between me and my

 5    partner, Jason Kirschberg, who's here with me this

 6    afternoon, yes.  We've gone over it line by line.

 7          THE COURT:  You and Mr. Kirschberg together have

 8    done that?

 9          MR. REYNOLDS:  Well, I've done it some and

10    Mr. Kirschberg has done it some, but he's been fully

11    apprised.

12          THE COURT:  Would you just confirm, sir, that you

13    have participated in the -- did I hear he's here with you

14    this afternoon?  Just confirm that you have helped --

15          MR. KIRSCHBERG:  Yes, sir, I have.

16          THE COURT:  All right.  Thank you.  Have one or both

17    of you signed the plea agreement?

18          MR. REYNOLDS:  Yes, Your Honor.  We both have.

19          THE COURT:  The plea agreement and supplement.

20          All right.  Let counsel for the Government set forth

21    the factual basis for the plea.

22          MS. CHALK:  Your Honor, at this time the Defendant

23    Opdyke has agreed to plead guilty to Count 1, 2, 3, 6, 7,

24    10, 11, and 12 as charged in the criminal information

25    before the Court.  In exchange for the defendant's
```

1 agreement, the Government will recommend the defendant be

2 sentenced as set forth in the plea supplement that is filed

3 under seal.  The plea agreement and plea supplement have

4 been executed by the defendant, his attorney, and counsel

5 for the Government.  The plea agreement also includes

6 waivers of trial and appellate rights that were previously

7 discussed earlier in this hearing.

8   And at this time, Your Honor, the United States

9 requests the Court have the defendant personally confirm

10 that he understands and agrees with the terms of the plea

11 agreement and plea supplement, including the waivers as

12 outlined by the Government.

13   THE COURT:  Mr. Opdyke, earlier today Ms. Chalk

14 represented various -- there were various waivers and

15 provisions of the plea agreement, which had not been

16 entered into or accepted by the Court at that time, but you

17 said then that you understood them all.  Do you confirm

18 that?

19   DEFENDANT OPDYKE:  Yes, Your Honor.

20   THE COURT:  And then you've heard what she's

21 additionally stated to the Court, so I ask you now if her

22 representation as to the terms of -- all the terms of the

23 plea agreement is consistent and in accordance with your

24 understanding of your plea agreement and supplement, and

25 whether you specifically agree to all of these provisions

1    and waivers?

2         DEFENDANT OPDYKE:  Yes, Your Honor.

3         THE COURT:  In the plea supplement, there's a

4    recommendation that's set forth by the Government that's

5    been referred to previously.  And I often follow

6    recommendations, but the plea agreement also says that I'm

7    not bound by it.  Do you understand that?

8         DEFENDANT OPDYKE:  Yes, Your Honor.

9         THE COURT:  If I should impose a sentence that you

10   don't like, do you realize -- or different from what you

11   anticipate from the agreement, do you realize that you

12   won't then be able to withdraw your guilty plea and demand

13   a trial?

14        DEFENDANT OPDYKE:  Yes, Your Honor.

15        THE COURT:  Nor will you be able to appeal your

16   conviction or sentence, because you've given that up in the

17   plea agreement that you made.

18        DEFENDANT OPDYKE:  Yes, Your Honor.

19        THE COURT:  Very well, then.  Let the plea agreement

20   and supplement be filed with the clerk and made a part of

21   the record in this case, the supplement to be filed under

22   seal.

23        MR. REYNOLDS:  Yes, sir.

24        THE COURT:  Let the Government state the factual

25   basis for the plea.

1        MS. CHALK:  Thank you, Your Honor.

2        The Government, if put to its burden at trial, we

3  would show in this case, and that the defendant and the

4  Government have stipulated to the facts contained in

5  paragraph 8 of the plea supplement:  That on January 24th,

6  2023, Daniel Opdyke was employed as a patrol deputy with

7  the Rankin County Sheriff's Office.

8        Opdyke worked the 11:00 a.m. to the 11:00 p.m. shift

9  along with Lieutenant Jeffrey Middleton and Deputy Hunter

10  Elward.  Their shift called themselves the "Goon Squad"

11  because of their willingness to use excessive force and not

12  to report it.  Middleton provided Opdyke with a challenge

13  coin with the unofficial Goon Squad logo on one side and

14  the official Rankin County Sheriff's Office logo on the

15  back.

16        On January 24th, 2023, Christian Dedmon, a narcotics

17  investigator with the Rankin County Sheriff's Office, sent

18  a text message to Opdyke, Middleton, and Elward asking

19  them, "Are y'all available for a mission?"  Dedmon messaged

20  the group that they were going to the property on Conerly

21  Road and warned them, "There's a chance of cameras...let's

22  approach east and work easy."  Opdyke understood "work

23  easy" to mean knock on the door, rather than kick it down.

24        Elward texted back an eyeroll emoji, and Opdyke

25  texted a GIF of a baby crying.  Dedmon messaged the group,

1   "If we don't see cameras, go."  Opdyke understood that to
2   mean if they did not see surveillance cameras at the
3   property, then they should enter without a warrant.  Dedmon
4   messaged the group, "No bad mugshots."  Opdyke understood
5   "No bad mugshots" to be a green light to use excessive
6   force on parts of the body not captured by a mugshot.

7        Opdyke, Middleton, and Elward each drove their
8   Rankin County Sheriff's Office-issued vehicles to the Cato
9   Volunteer Fire Department, parked their vehicles, and
10  waited for Dedmon.  When Dedmon's truck drove past them,
11  Opdyke, Middleton, and Elward pulled out from the Cato
12  Volunteer Fire Department and followed Dedmon to the
13  property.  When they arrived at the property, they all
14  parked in the driveway.  Chief Investigator Brett McAlpin,
15  who had been surveilling the property from down the street,
16  pulled in behind them.

17       Noticing a surveillance camera above the front door
18  of the property, Dedmon, Elward, and Opdyke walked around
19  to the carport door, which had no surveillance camera
20  covering it.  Dedmon and Opdyke each kicked the carport
21  door, but it did not open.  Elward kicked the carport door,
22  and it swung open.  Opdyke, Dedmon, and Elward entered the
23  home without consent, a warrant, or exigent circumstances.
24  Opdyke knew that it was unlawful to enter a home without
25  consent, a warrant, or exigent circumstances.

1     Opdyke saw two Black men inside:  MJ and EP.

2   Officers issued them commands, and they complied.  Dedmon

3   handcuffed MJ and Tased him multiple times.  Elward

4   handcuffed EP and Tased him multiple times.  Opdyke kicked

5   EP in the ribs.  There was no probable cause that MJ or EP

6   had committed any crime, and there was no reason to kick or

7   Tase them.

8     Dedmon asked EP where were they keeping the drugs.

9   Dedmon pulled out his gun, aimed it out the back door, and

10  fired.  Dedmon again demanded to know where the drugs were.

11  Opdyke knew it was unlawful for an officer to attempt to

12  coerce a confession by firing a gun, but Opdyke did not

13  intervene.

14    Officers moved MJ and EP to the living room area and

15  yelled at them.  The officers accused MJ and EP of taking

16  advantage of the white woman who lived there.  The officers

17  said things like "Stay out of Rankin County" and "Go back

18  to Jackson."

19    Opdyke kicked in the padlocked door to the front

20  bedroom and observed, among other things, a BB gun and a

21  white-flesh-toned dildo.  Opdyke mounted the dildo on the

22  end of a BB gun and brought the dildo into the living room,

23  where MJ and EP were handcuffed and seated on the couch.

24  Opdyke forced the dildo into the mouth of EP, and attempted

25  to force the dildo into the mouth of MJ.  Dedmon grabbed

1    the dildo from Opdyke and slapped EP and MJ in the face

2    with it.  Opdyke walked from the living room to the front

3    bedroom.  After a short period, Dedmon came into the front

4    bedroom and said something to the effect of, "I tried to

5    put it in his ass and he shat himself."

6         Dedmon forced MJ and EP onto their backs on the

7    floor of the living room.  Elward held them down.  Dedmon

8    poured milk, alcohol, and chocolate syrup onto their faces

9    and into their mouths.  Opdyke was present but did not

10   intervene.

11        MJ and EP were ordered to strip naked and shower

12   off.  Their handcuffs were removed.  After MJ and EP

13   showered off and changed into clean underwear and sweats,

14   they were handcuffed again and brought to the side bedroom

15   adjacent to the carport.  The officers began discussing the

16   comparative strength of their respective Tasers.  They

17   decided to test their Tasers on MJ and EP to see which one

18   was the most powerful.  Dedmon, Elward, Hartfield, and

19   Middleton each Tased MJ and EP while MJ and EP were

20   handcuffed and not resisting.  Opdyke knew that it was

21   unlawful to Tase a handcuffed and compliant arrestee, and

22   that he had a duty to intervene, but Opdyke did not

23   intervene.

24        Elward surreptitiously removed a bullet from the

25   chamber of his gun.  Elward forced his gun into MJ's mouth

1    and pulled the trigger.  The unloaded gun clicked but did

2    not discharge.  Elward racked the slide, forced the gun

3    back into MJ's mouth, and pulled the trigger again.  This

4    time, the gun discharged, and MJ collapsed on the floor.

5         All six officers huddled up on the back screened-in

6    porch to discuss what to do.  They devised and agreed on a

7    false cover-up story:  That Elward brought MJ into the side

8    bedroom to conduct a controlled drug buy over the phone;

9    that Elward had removed MJ's handcuffs; that MJ had reached

10   for a gun; and that Elward shot MJ in self-defense.

11        Middleton offered to plant a "throw-down" gun on MJ.

12   Elward said he would take care of the gun.  Dedmon said he

13   would take care of the drugs, and Opdyke understood those

14   comments to mean that Elward would plant a gun on MJ and

15   Dedmon would plant the drugs on MJ.  Opdyke knew that it

16   was unlawful to plant evidence on a suspect, but he did not

17   intervene.

18        McAlpin ordered them to get rid of the surveillance

19   system.  Hartfield and Opdyke returned to the side bedroom.

20   Opdyke unplugged the surveillance system, and Hartfield

21   grabbed the hard drive.  When Opdyke returned to the side

22   bedroom, MJ was no longer handcuffed, and a toy gun that

23   Hartfield had previously seen in the front middle bedroom

24   was planted next to MJ.  That's the reference to the BB

25   gun.

1      In order to limit the number of witnesses to the

2  shooting, the officers agreed to tell investigators at the

3  time of the shooting McAlpin and Middleton had left the

4  property and were driving home.  Dedmon and Hartfield were

5  at Dedmon's truck, and Opdyke was escorting EP to a patrol

6  car.

7      In order to corroborate his false cover story,

8  McAlpin told Dedmon that he was leaving and to call him in

9  a few minutes.  McAlpin drove off in his Rankin County

10  Sheriff's Office-issued vehicle, which was enabled with GPS

11  tracking.  Dedmon called him, and then McAlpin returned to

12  the scene.

13      McAlpin said that he would take care of EP.  McAlpin

14  ordered Opdyke to take EP from the side bedroom and put him

15  in the back of Opdyke's patrol car, and then unlock the

16  back door so McAlpin could talk to EP.

17      Several officers began looking for shell casings

18  fired from Dedmon's gun.  Opdyke picked up the shell casing

19  in the hallway from Dedmon's first shooting.  Opdyke and

20  the other officers looked for but could not find the shell

21  casing from Dedmon's second shooting.

22      While Opdyke and the other officers were attempting

23  to cover up their misconduct, MJ was bleeding in the side

24  bedroom.  Opdyke understood that he and the other officers

25  had a duty to render medical aid to MJ.  Opdyke did not

1   provide medical aid, and Opdyke did not observe any other

2   officer providing medical aid.

3       Later that night on his drive home, Opdyke put the

4   shell casing in a water bottle, secured the top, and threw

5   the bottle into tall grass on the side of Cato Road in

6   Braxton, Mississippi.

7       Opdyke wrote and submitted a false report, knowing

8   at the time it was false, for the purpose of covering up

9   their misconduct.  Opdyke was interviewed by investigators

10  with the Mississippi Bureau of Investigation, and Opdyke

11  lied to the Mississippi Bureau of Investigation

12  investigators and withheld material information for the

13  purpose of covering up their misconduct.  Opdyke knew that

14  as a law enforcement officer, it was unlawful to write a

15  false report and give a false statement to investigators.

16      All this conduct occurring in Rankin County, in the

17  Northern Division of the Southern District of Mississippi

18  and within the jurisdiction of this Court.

19      THE COURT:  Mr. Opdyke, in presenting the factual

20  basis for the plea, counsel referenced, as she called it, a

21  stipulation between the Government and you and represented

22  that you had agreed to all this.  Now, having heard her

23  state all of these facts, is everything that she said true

24  and correct?

25      DEFENDANT OPDYKE:  Yes, Your Honor.

1       THE COURT:  Is there anything that you dispute or

2  you take issue with?

3       DEFENDANT OPDYKE:  No, Your Honor.

4       THE COURT:  Are you, in fact, guilty of these

5  various offenses -- excuse me -- these various offenses:

6  Count 1, Count 2, Count 3, Count 6, Count 7, Count 10,

7  Count 11, and Count 12?

8       DEFENDANT OPDYKE:  Yes, Your Honor.

9       THE COURT:  Are you guilty of all of these counts --

10      DEFENDANT OPDYKE:  Yes, Your Honor.

11      THE COURT:  -- that are set forth in the

12  information?

13      Since you admit that you're in fact guilty as

14  charged in the information and since you know and

15  understand your right to a trial and what the maximum

16  possible punishment is and since you're appearing

17  voluntarily before the Court, I'm accepting your guilty

18  plea, and will enter a judgment of guilty in your case as

19  to all of these counts.

20      A presentence investigation will be conducted by the

21  probation office.  As part of the investigation, the

22  probation officer will be interviewing you and with your

23  client *[sic]* having an opportunity to be there and

24  talking -- covering the facts of the case and just

25  information about you.

1          Once the presentence investigation has been

2    concluded, the probation office will prepare and submit a

3    presentence investigation report.  You and your attorney

4    will have access to that report.  If you contend that there

5    are errors in the report, both as to matters of fact and

6    guideline sentence application, then your attorney may take

7    that up with the probation officer and file written

8    objections.  If there are any objections that are

9    unresolved on the day of sentencing before I impose

10   sentence, you can present anything that you contend

11   supports your position as to such issues or disputes, and I

12   will resolve it.

13          I'm going to -- as I've indicated, and you've been

14   in the courtroom, I'm going to set a date or dates for

15   sentencing a little bit later when I've finished with the

16   pleas.

17          Do you have anything further from the Government or

18   the defendant?

19          MS. CHALK:  Your Honor, we do move the defendant be

20   continued to be detained pursuant to Title 18, United

21   States Code, Section 3143.

22          THE COURT:  That motion is granted.

23          MR. REYNOLDS:  Nothing further from the defendant,

24   Your Honor.

25          MS. THOMAS:  Counsel needs to sign the plea

1    agreement.

2         THE COURT:  Ma'am, I'm sorry?

3         MS. THOMAS:  Counsel needs to sign the plea

4    agreement.

5         THE COURT:  Okay.  The plea agreement is not signed

6    by counsel.

7         MS. THOMAS:  By the Government.

8         MR. REYNOLDS:  We signed it.

9         MS. CHALK:  May we approach?

10        THE COURT:  Okay.  All right.  Thank you.

11        MR. REYNOLDS:  We'll get that handled.

12        THE COURT:  That concludes this hearing.

13        THE REPORTER:  I need a break, Judge.

14        THE COURT:  Okay.  We'll take a ten-minute recess.

15                   (A recess was taken.)

16        THE COURT:  We're proceeding now with the sixth

17   defendant in this case, Mr. Hartfield, with counsel,

18   Ms. Gilliam and Mr. Lingold.

19        MS. GILLIAM:  Your Honor, I'm going to stand here as

20   well.

21        THE COURT:  Yes, ma'am, that's fine.

22        Mr. Hartfield, the Court is now going to resume with

23   the rest of the hearing for you.  Let me initially, as I've

24   been doing with the other defendants, explain to you the

25   maximum possible penalties for each one of the counts in

1    which you're charged.  I have explained each charge to you,

2    but now comes the explanation of the maximum penalties.

3         In Count 1, conspiracy against rights, there's a

4    maximum penalty of ten years' imprisonment, $250,000 fine,

5    and three-years term of supervised release, along with $100

6    special assessment.

7         In Counts 2, 3, 10, and 10 *[sic]*, I'm referencing

8    them as deprivation of rights under color of law, for each

9    of these counts, the maximum term is ten years'

10   imprisonment, $250,000, and a term of supervised release of

11   three years, and a $100 special assessment.  That's three.

12   They could be aggregated, but it's three per count -- I

13   mean, ten years per count.

14        Then with regard to Count 11, conspiracy to obstruct

15   justice, the maximum penalty is 20 years' imprisonment, a

16   $250,000 fine, term of three years of supervised release,

17   and a $100 special assessment.

18        And then on Count 12, I'm referencing it as

19   obstruction of justice, the maximum term of imprisonment is

20   20 years' imprisonment, $250,000 fine, three years'

21   supervised release, and a $100 special assessment.

22        Now, I've marched through that pretty fast.  Do you

23   understand the maximum penalty on each count, or do you

24   have any questions about any of it?

25        DEFENDANT HARTFIELD:  Yes, sir, Your Honor, I

1    understand.

2         THE COURT:  Has anyone threatened, coerced,

3    harassed, or intimidated you in any way to persuade you to

4    come to court today to plead guilty?

5         DEFENDANT HARTFIELD:  No, sir, Your Honor, they

6    haven't.

7         THE COURT:  Are you appearing voluntarily and of

8    your own free will?

9         DEFENDANT HARTFIELD:  Yes, sir, Your Honor, I am.

10        THE COURT:  Have you entered into a plea agreement

11   with the Government?  It would consist of a plea -- one

12   document, plea agreement, and another one a plea

13   supplement.

14        DEFENDANT HARTFIELD:  Yes, sir, Your Honor, I have.

15        THE COURT:  Did you read, understand, and sign them?

16        DEFENDANT HARTFIELD:  Yes, sir, I have, with my

17   attorneys.

18        THE COURT:  And you -- I was just about to confirm

19   did you -- whether you did so with your two lawyers.

20   They've been over it with -- them with you and signed them?

21   Both have signed them?

22        DEFENDANT HARTFIELD:  Yes, sir.

23        THE COURT:  Okay.  And let me confirm with counsel.

24        MR. LINGOLD:  Yes, Your Honor.  We have both gone

25   over -- both myself and Ms. Gilliam have gone over the plea

1    agreement and the supplement line by line with

2    Mr. Hartfield.  He does understand.

3         THE COURT:  All right.  Let counsel for the

4    Government set forth the fundamental terms of the plea

5    agreement.

6         MS. CHALK:  Thank you, Your Honor.

7         Defendant Hartfield has agreed to plead guilty to

8    Count 1, 2, 3, 10, 11, and 12 as charged in the criminal

9    information that is before the Court.  In exchange for the

10   defendant's agreement, the Government will recommend the

11   defendant be sentenced as set forth in the plea supplement

12   to be filed under seal.  The plea agreement and plea

13   supplement have been executed by the defendant, his

14   attorneys, and counsel for the Government.  The plea

15   agreement also includes waivers of trial and appellate

16   rights that were previously addressed earlier in the

17   hearing.

18        At this time, Your Honor, the United States requests

19   the Court have the defendant personally confirm that he

20   understands and agrees with the terms of the plea agreement

21   and plea supplement, including the waivers as outlined by

22   the Government.

23        THE COURT:  All right.  Mr. Hartfield, earlier

24   counsel made an explanation to you of various waivers and

25   provisions, and you indicated that you understood them.  Do

1  you remember that this morning?

2       DEFENDANT HARTFIELD:  Yes, sir, Your Honor.

3       THE COURT:  Now, having had the whole agreement and

4  supplement submitted, do you specifically agree to all of

5  the provisions and terms and waivers that were set forth

6  this morning and in the -- and referenced by counsel and in

7  the instruments, all of that?

8       DEFENDANT HARTFIELD:  Yes, sir, Your Honor, I do.

9       THE COURT:  The Government made a recommendation

10 or -- in the plea supplement with regard to a sentence.  Do

11 you realize that while the Court oftentimes, even usually,

12 follows Government recommendations, I'm not bound to do so,

13 and I have to develop an independent judgment?

14      And I tell you that now that if -- if I should give

15 you a sentence that you're not expecting or that you don't

16 like, you won't then be able to withdraw your guilty plea

17 and demand a trial.

18      DEFENDANT HARTFIELD:  Yes, sir, I understand.

19      THE COURT:  Nor will you be able to appeal your

20 conviction or sentence, because you've given all that up in

21 the agreements you've made with the Government.

22      DEFENDANT HARTFIELD:  Yes, sir, I understand.

23      THE COURT:  All right.  Then I'll ask counsel to

24 state the factual basis for the plea.

25      MS. CHALK:  Thank you, Your Honor.

1          If the Government were put to its burden at trial,

2     we would show in this case, as well as the Government and

3     the defendant stipulating to the facts contained in

4     paragraph 8 of the plea supplement:  That on January 24th,

5     2023, Joshua Hartfield was employed as a narcotics

6     investigator and flex officer with the Richland Police

7     Department.

8          Christian Dedmon, a narcotics investigator with the

9     Rankin County Sheriff's Office, invited him to participate

10    in an operation at 135 Conerly Road, in Braxton,

11    Mississippi.  Hartfield and Dedmon got into Dedmon's Rankin

12    County Sheriff's Office-issued truck and began driving to

13    the property.  On their way, they passed three Rankin

14    County Sheriff's Office vehicles parked at the Cato

15    Volunteer Fire Apartment.  Inside those vehicles were

16    Lieutenant Jeffrey Middleton, Deputy Hunter Elward, and

17    Deputy Daniel Opdyke, who pulled out from the Cato

18    Volunteer Fire Department and followed Dedmon and Hartfield

19    to the property.

20         When they arrived at the property, they all parked

21    in the driveway.  Chief investigator Brett McAlpin, who had

22    been surveilling the property from down the street, pulled

23    in behind them.

24         Hartfield got out of Dedmon's truck, ran around the

25    property to cover the back door, as Dedmon had instructed

1   him to.  Hartfield heard a loud boom, which he understood

2   to be the other officers kicking down the carport door.

3        Hartfield kicked the back door and entered the

4   house.  Hartfield observed a Black man in handcuffs, EP,

5   next to Elward and Opdyke.  EP had Taser wire sticking out

6   of his body, and Elward and Opdyke were kicking him.

7   Hartfield had been trained to intervene if he observed

8   officers using excessive force on an arrestee.  Despite

9   that training and despite having the time and opportunity

10  to intervene, Hartfield did not intervene.

11       Dedmon asked EP where they were keeping the drugs.

12  Dedmon pulled out his gun, aimed it out the back door, and

13  fired.  Dedmon again demanded to know where the drugs were.

14  Hartfield knew that it was unlawful for an officer to

15  attempt to coerce a confession by firing a gun, but

16  Hartfield did not intervene.

17       Hartfield walked into the back bedroom.  He

18  overheard officers yelling in the living room area.  The

19  officers were saying things like "Stay out of Rankin

20  County."  "Go back to Jackson."  Hartfield also heard the

21  sound of Tasers going off, followed by screams of pain.

22       When Hartfield returned to the living room area, he

23  observed EP and another Black man, MJ, covered in milk and

24  chocolate syrup.  MJ and EP were ordered to strip naked and

25  shower off.  Hartfield turned on the shower and collected

1   their soiled clothes.

2        McAlpin ordered Hartfield to get rid of the soiled

3   clothes.  Hartfield attempted to light them on fire, but

4   they were too wet, so Hartfield disposed of the soiled

5   clothes in the woods behind the property.  Hartfield knew

6   that it was unlawful to destroy or tamper with or destroy

7   evidence.

8        When Hartfield came back inside, everyone was in the

9   side bedroom adjacent to the carport.  MJ and EP were

10  handcuffed, wearing different clothes, and seated on the

11  floor.  The officers began discussing the comparative

12  strength of their respective Tasers, and they decided to

13  test their Tasers on MJ and EP to see which one was most

14  powerful.  Dedmon, Elward, Hartfield, and Middleton each

15  Tased MJ and EP while MJ and EP were handcuffed and not

16  resisting.  Hartfield knew that it was unlawful to Tase a

17  handcuffed and compliant arrestee.

18       Dedmon and Hartfield stepped onto the adjacent

19  carport.  Dedmon drew his gun and fired it into the yard.

20  Shortly thereafter, Hartfield heard a second gunshot coming

21  from the side bedroom.  Hartfield stepped back into the

22  side bedroom and observed Elward, Opdyke, MJ, and EP in the

23  room.  MJ, who was still in handcuffs, had been shot and

24  was bleeding.  Elward said, "I shot him."  Hartfield told

25  McAlpin and Middleton what happened, and then all six

1  officers huddled up on the back screened-in porch to

2  discuss what to do.  They devised and agreed on a false

3  cover story:  That Elward brought MJ into the side bedroom

4  to conduct a controlled drug buy over the phone; that

5  Elward had removed MJ's handcuffs; that MJ had reached for

6  a gun; and that Elward shot MJ in self-defense.

7      Elward said that he would take care of the gun.

8  Dedmon said that he would take care of the drugs.

9  Hartfield understood those comments to mean that Elward

10  would plant a gun on MJ, and Dedmon would plant drugs on

11  MJ.  Hartfield knew that it was unlawful to plant evidence

12  on a suspect, but he did not intervene.

13      McAlpin ordered Hartfield to get rid of the

14  surveillance system.  Hartfield and Opdyke returned to the

15  side bedroom.  Opdyke unplugged the surveillance system,

16  and Hartfield grabbed the hard drive and put it in Dedmon's

17  truck.

18      When Hartfield returned to the side bedroom, MJ was

19  no longer handcuffed, and a toy gun that Hartfield had

20  previously seen in the front middle bedroom was planted

21  next to MJ.

22      In order to limit the number of witnesses to the

23  shooting, the officers agreed to tell investigators that at

24  the time of the shooting, McAlpin and Middleton had left

25  the property and were driving home.  Dedmon and Hartfield

1    were at Dedmon's truck, and Opdyke was escorting EP to a

2    patrol car.  In order to corroborate his false cover story,

3    McAlpin and Dedmon -- McAlpin told Dedmon that he was

4    leaving and to call him in a few minutes.

5         McAlpin drove off in his Rankin County Sheriff's

6    Office-issued vehicle, which was enabled with GPS tracking.

7    Dedmon called him, and then McAlpin returned to the scene.

8         McAlpin said that he would take care of EP.

9    Hartfield observed McAlpin walk to the patrol car where EP

10    had been taken, open the back door, and talk to EP.  After,

11    McAlpin told Hartfield that he had spoken with EP, and that

12    EP would stick to the story.

13         Several officers began looking for the shell casings

14    fired from Dedmon's gun.  Hartfield observed Opdyke pick up

15    the shell casing in the hallway from Dedmon's first

16    shooting.  Hartfield and the other officers looked for but

17    could not find the shell casing from Dedmon's second

18    shooting.

19         While Hartfield and the other officers were

20    attempting to cover up their misconduct, MJ was bleeding in

21    the side bedroom.  Hartfield understood that he and the

22    other officers had a duty to render medical aid to MJ.

23    Hartfield did not provide medical aid, and Hartfield did

24    not observe any other officer providing medical aid.

25         Later that night at Dedmon's house, Dedmon told

1  Hartfield that he would get rid of the used Taser

2  cartridges if Hartfield would get rid of the hard drive to

3  the surveillance system.  On his drive home, Hartfield

4  stopped at the Steen Creek Bridge on Highway 469 South near

5  Eagle Post Road in Florence, Mississippi, and threw the

6  hard drive into the creek.

7       Dedmon later told Hartfield that Hartfield needed to

8  write a report about the incident and submit it to the

9  Rankin County Sheriff's Office.  Dedmon provided Hartfield

10  a copy of Dedmon's report, and Dedmon told Hartfield to

11  write that Hartfield was at Dedmon's truck at the time of

12  the shooting.  Hartfield wrote and submitted a false

13  report, knowing at the time that it was false, for the

14  purpose of covering up their misconduct.

15       Hartfield was interviewed by the investigators with

16  the Mississippi Bureau of Investigation, and Hartfield lied

17  to the MBI investigators, and withheld material information

18  for the purpose of covering up their misconduct.  Hartfield

19  knew that as a law enforcement officer, it was unlawful to

20  write a false report and give a false statement to

21  investigators.

22       All of this conduct occurring in Rankin County, in

23  the Northern Division of the Southern District of

24  Mississippi within the jurisdiction of this Court.

25       THE COURT:  Mr. Hartfield, Ms. Chalk just

1   represented to the Court what are the facts of the case, a

2   summary of the judgment's case -- of the Government's case,

3   and is there anything that she stated to the Court that is

4   untrue, that you dispute, or with which you disagree?

5          DEFENDANT HARTFIELD:  No, Your Honor.  I don't

6   dispute anything.

7          THE COURT:  Is it all true?

8          DEFENDANT HARTFIELD:  Yes, Your Honor.

9          THE COURT:  Are you, in fact, guilty of all of the

10  criminal offenses alleged in Count 1, conspiracy against

11  rights; Count 2, Count 3, and Count 10, deprivation of

12  rights under color of law; Count 11, conspiracy to obstruct

13  justice; and Count 12, obstruction of justice?

14         DEFENDANT HARTFIELD:  Yes, Your Honor.

15         THE COURT:  Since you admit that you're in fact

16  guilty as charged in the information as to all counts,

17  since you understand your right to a trial, since you know

18  what the maximum possible penalty is, and since you're

19  voluntarily pleading guilty, I'm accepting your guilty plea

20  and will enter a judgment of guilty in your case as to all

21  counts.

22         The probation office will initiate and conduct a

23  presentence investigation.  During the course of that

24  investigation, you will be interviewed by the probation

25  officer.  Your lawyers will have access to that interview.

1   And once the interview has been completed, and together

2   with other information obtained, a written presentence

3   investigation report will be prepared and submitted.  You

4   and your counsel will have the chance to review that

5   report, and if you should contend that there are errors in

6   the report, either as to proposed factual findings or

7   guideline sentence application, your counsel can take that

8   up with the probation office and file written objections.

9        Should there be written objections filed that are

10  unresolved by the time of sentencing, I will resolve them

11  after first giving you a chance to present anything that

12  you think supports your position.

13       I'm going -- I'm setting this -- saying this and

14  saying it for all of you, and I'll give you a chance -- I'm

15  about to set the date of a sentencing disposition.  If

16  there's any serious questions or conflicts about that,

17  bring it up now.  But I'm going to set tentatively the

18  dates of November 14, 15, and 16 for sentencing in this

19  case and in the other case.  We'll set specific times, and

20  if counsel have particular problems with those dates or any

21  of those dates, let the Court know promptly, and then we

22  will work out times on those days to have the sentencing

23  dispositions.

24       Is there any -- anything --

25       MR. LINGOLD:  May I approach --

1    THE COURT:  Yes, sir.

2    MR. LINGOLD:  -- and file the plea agreement and

3  supplement that is sealed?

4    THE COURT:  I neglected to have that admitted.  The

5  plea agreement is admitted, and the plea supplement is

6  admitted under seal.

7    MR. LINGOLD:  Thank you, Your Honor.

8    THE COURT:  Before the Court adjourns, is there

9  anything from any counsel from any of these parties, the

10  Government, or any of these parties that you need to bring

11  to my attention before we adjourn?

12    MS. CHALK:  If I may, Your Honor, specific as to

13  Defendant Hartfield, we do move for detention pursuant to

14  Title 18, United States Code, Section 3143.

15    THE COURT:  That motion is granted.

16    MS. CHALK:  Thank you, Your Honor.

17    And I would also mention for the record that the

18  victims in this case were notified of the hearings and of

19  their opportunity to attend the hearing.

20    THE COURT:  All right.  And as I indicated, we'll

21  have some specific times for those three days for

22  sentencing.

23    MR. LINGOLD:  Thank you, Your Honor.

24    MS. GILLIAM:  Thank you.

25    THE COURT:  Is there anything further from any of

```
 1   the counsel or the defendants?  Anything to bring to my

 2   attention?

 3        MS. CHALK:  Not in this case, Your Honor.  But we're

 4   ready to proceed on the next information when the Court is

 5   ready.

 6   **************************************************************
```

1                 **CERTIFICATE OF COURT REPORTER**

2

3       I, Candice S. Crane, Official Court Reporter for

4 the United States District Court for the Southern District

5 of Mississippi, do hereby certify that the above and

6 foregoing pages contain a full, true, and correct

7 transcript of the proceedings had in the forenamed case at

8 the time and place indicated, which proceedings were

9 stenographically recorded by me to the best of my skill and

10 ability.

11       I further certify that the transcript fees and

12 format comply with those prescribed by the Court and

13 Judicial Conference of the United States.

14       THIS, the 16th day of October, 2023.

15

16                 /s/ Candice S. Crane, RPR, RCR, CCR

17                 Candice S. Crane, RPR, RCR, CCR #1781
                      Official Court Reporter

18                 United States District Court
                      Candice_Crane@mssd.uscourts.gov

19

20

21

22

23

24

25