IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


UNITED STATES OF AMERICA                        GOVERNMENT

VS.                    CRIMINAL NOS. 3:23CR62 AND 3:23CR63

CHRISTIAN LEE DEDMON                              DEFENDANT


**TRANSCRIPT OF SENTENCING**


BEFORE THE HONORABLE TOM S. LEE
UNITED STATES DISTRICT JUDGE


MARCH 20, 2024
JACKSON, MISSISSIPPI


REPORTED BY:  TERI B. NORTON, RMR, FCRR, RDR
              501 E. COURT STREET, SUITE 2.500
              JACKSON, MISSISSIPPI  39201
              (601)608-4186

```
 1    APPEARANCES:

 2

      FOR THE GOVERNMENT:
 3      ERIN O'LEARY CHALK, ESQUIRE
        GLENDA R. HAYNES, ESQUIRE
 4      U.S. ATTORNEY'S OFFICE
        501 E. COURT ST., SUITE 4.430
 5      JACKSON, MISSISSIPPI  39201

 6      CHRISTOPHER PERRAS, ESQUIRE
        UNITED STATES DEPARTMENT OF JUSTICE
 7      150 M STREET, NE
        WASHINGTON, D.C.  20002
 8
        DANIEL GRUNERT, ESQUIRE
 9      UNITED STATES DEPARTMENT OF JUSTICE
        950 PENNSYLVANIA AVE NW
10      WASHINGTON, D.C.  20530

11    FOR THE DEFENDANT:
        MICHAEL CORY, ESQUIRE
12      DANKS, MILLER & CORY
        213 SOUTH LAMAR STREET
13      JACKSON, MISSISSIPPI  39201

14    PROBATION OFFICERS:  ALLIE WHITTEN, JAMIE HARRELL, JAMES TUCKER

15    ALSO PRESENT:  TODD GEE, U.S. ATTORNEY
                     PAT LEMON, ASSISTANT U.S. ATTORNEY
16                   LINDSAY CRANFORD, DEPUTY ATTORNEY GENERAL
                     LUKE WILLIAMSON, DEPUTY DIRECTOR OF PUBLIC
17                   INTEGRITY DIVISION, ATTORNEY GENERAL'S OFFICE

18                   MALIK SHABAZZ, ESQ., AND TRENT WALKER,ESQ.,
                     REPRESENTING EDDIE PARKER AND MICHAEL JENKINS.
19

20

21

22

23

24

25
```

1          **THE COURT:**  In the cases that the Court has been

2    considering this week, Numbers 3:23cr62 and 63 respectively,

3    the matter now set for hearing is the sentencing of

4    Mr. Christian Dedmon.  So come to the podium with your lawyer.

5          **MR. CORY:**  Good afternoon, Judge.

6          **THE COURT:**  Good afternoon.

7          Mr. Dedmon, back on August 3rd of last year, you entered a

8    plea of guilty in these cases with regard to the following

9    counts:  In Case Number 3:23cr62, Counts 1 and 13, conspiracy

10   against rights, that's the denomination for each; Counts 2, 3,

11   4, 6, 7 and 10, all of which charged deprivation of rights

12   under color of law; Count 5, discharge of a firearm during a

13   crime of violence; Count 11, conspiracy to obstruct justice;

14   Count 12, obstruction of justice; and in Case Number 3:23cr63,

15   Counts 1 and 2, each charging deprivation of rights under color

16   of law; and Count 3, discharge of a firearm during a crime of

17   violence.  And you are before the Court this afternoon for

18   sentencing.

19         I've read the presentence investigation report in your

20   case.  Have you read the report with your attorney?

21         **THE DEFENDANT:**  Yes, sir.

22         **THE COURT:**  Did you understand it?  Did he answer any

23   questions that you might have, and are you now able to tell the

24   Court that you understand what the factual allegations are in

25   the presentence report?

1          **THE DEFENDANT:**  Yes, sir.

2          **THE COURT:**  Mr. Cory, do you confirm that you went

3    over the presentence report with your client, explaining to him

4    as necessary and answering questions, and that you believe that

5    he understands what is reported in the presentence report?

6          **MR. CORY:**  Yes, Your Honor, I do.

7          **THE COURT:**  In the case objections were filed by

8    counsel on your behalf, Mr. Dedmon, and the probation officer

9    submitted an addendum which has been filed, an addendum to the

10   presentence report, which references that certain objections

11   were made, and that after a conference, the findings needed to

12   be made or required are, first, that the Court must determine

13   if the four-level aggravating role adjustment under Guideline

14   Section 3B1.1 was appropriately applied, and also that the

15   Court must determine if the five-level enhancement for serious

16   bodily injury to EP was appropriately applied under Guideline

17   Section 2A2.2(b)(3)(B).

18        Mr. Cory, does that correctly cover the outstanding

19   matters for the Court to resolve?

20         **MR. CORY:**  Yes, Your Honor.

21         **THE COURT:**  On those two issues -- and I read what

22   you said in the paper that you filed -- do you have anything

23   further to add in support of those objections?

24         **MR. CORY:**  No, Your Honor.  We would stand on our

25   previous submissions.

THE COURT:  Both of these objections are due to be overruled for the reasons set out by the probation officer. And it's not a lot said, so I will state what the addendum reflects as the recommendation to the Court, which the Court is adopting.

As to the defendant's objection to the aggravating role adjustment under Section 3B1.1, as reflected -- and there's no rebuttal argument to that -- as reflected in paragraph 98, after being contacted by McAlpin, the defendant contacted Middleton, Opdyke and Elward and instructed them to avoid surveillance cameras and not to use excessive force on anyone's face.  That is a justification that supports a finding that the adjustment was appropriately applied.

And on the other one, as to the defendant's objection to the serious bodily injury enhancement for EP, again, there was no rebuttal argument.  The term "serious bodily injury" is defined in the application notes to Guideline Section 1B. -- let me get it right -- 1B1.1, comment in 1(M), as injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty.  While no medical aid was rendered to EP following his assault, he went through a prolonged beating and was tased multiple times to the point where he defecated on himself.  So the Court finds that EP suffered serious bodily injury and the enhancement was appropriately applied.

1    I've already referenced the counts of conviction, but I'm

2    now going to specifically do so.  Counts 1, 2, 3, 4, 6, 7, 10,

3    and 13 provide for a statutory sentence of not more than ten

4    years.  Count 5 provides for not less than 10 years,

5    consecutive to all other counts.  Counts 11 and 12 provides for

6    not more than 20 years.  And in Case Number 3:23cr63, Counts 1

7    and 2 provide for a statutory sentence of not more than 10

8    years.  Then with Count 3, a sentence of not less than 10

9    years, consecutive to all other counts.

10    So to summarize and give the guideline provisions, Count 5

11    provides for a ten-year consecutive sentence, consecutive with

12    all other counts, as does Count 3 that I just referenced.  All

13    of the other counts provide for a guideline range of 210 months

14    to 262 months.

15    Do counsel for the government and for the defendant

16    understand the counts of conviction, the statutory sentences,

17    and the guidelines that I've just enunciated?

18    **MS. CHALK:**  Your Honor, the government does agree

19    with the guideline calculations and assessments that the Court

20    has just read into the record, but for the purposes of the

21    record, may I add a couple of statements to the objections?

22    **THE COURT:**  Yes, ma'am.

23    **MS. CHALK:**  I want to make clear that part of the

24    government's argument in support of the aggravating role

25    enhancement under Section 3B1.1, as the Court has already

1    applied to this defendant in reading what was referenced in the

2    addendum, that this defendant was involved in -- with otherwise

3    more than five participants, the defendant being one of the

4    participants.  He directed Hartfield, Opdyke and Middleton, as

5    well as Elward, for a total of five participants, where to

6    meet, how to enter, where to go, he created the text thread, he

7    gave instructions.  And all of that information, along with the

8    extensive participation in the cover-up, the false reports,

9    telling Hartfield also what to do subsequent to the entrance to

10    the home and when they were gathering evidence for them to

11    discard, that all warrants, along with what the Court has

12    noted, the aggravating role enhancement.

13        And additionally, I want to correct one thing in the

14    addendum that supports the enhancement for serious bodily

15    injury pursuant to Section 2A2.2(b)(3)(B).  EP did not defecate

16    on himself.  That was MJ only, Your Honor.  However, the

17    emotional and the extreme physical pain, as the Court noted,

18    does warrant the serious bodily injury enhancement.  I just

19    wanted to make that clear for the record.

20        **THE COURT:**  I was referencing the addendum with

21    reference to that part of it.  Mr. Cory, do you agree with the

22    computation of the guidelines, what I've already expressed?

23        **MR. CORY:**  Yes, Your Honor, we agree that the

24    guidelines have been calculated properly.

25        **THE COURT:**  And that the total offense level is 37,

1    and the Criminal History Category is I.

2         With that understanding, the Court adopts the presentence

3    investigation report in its entirety both as to proposed

4    findings of fact and including proposed guideline sentence

5    application.

6         I'm now -- you may be seated.  I'm going to call on the

7    government with regard to the issue of victim impact, including

8    the restitution.

9              **MS. CHALK:**  Thank you, Your Honor.

10        We do intend to have our victims speak this afternoon.

11   Mr. Jenkins and Mr. Parker are present with their families.

12   Alan Schmidt, who is the victim in this companion information,

13   has chosen not to be present, and I will read his statement.

14   But we are seeking restitution in the amount of $48,000 for Mr.

15   Jenkins and $31,500 for Eddie Parker.

16             **THE COURT:**  All right.  I have those figures.

17             **MS. CHALK:**  Thank you, Your Honor.  If I may call up

18   the victims.

19             **THE COURT:**  Yes, ma'am.

20             **MS. CHALK:**  Thank you, Your Honor.

21             **THE COURT:**  All right.  Proceed.

22             **MR. SHABAZZ:**  Good afternoon, Your Honor.

23             **THE COURT:**  Good afternoon.

24             **MR. SHABAZZ:**  Malik Shabazz.  I'm going to read the

25   statement of victim Michael Jenkins.  And then I will bring

1  before you to make his own statement victim Eddie Parker and

2  Mr. Melvin Jenkins.

3          **THE COURT:**  All right.

4          **MR. SHABAZZ:**  This is what Michael Jenkins has to

5  say.

6      "This day brings back bad memories for me.  Deputy Dedmon

7  is the worst example of a police officer in the United States

8  of America.  Deputy Dedmon was the most aggressive, most

9  vicious, sickest, and wicked of those that attacked me.

10      "Dedmon is responsible for trying to take my manhood.

11  Dedmon is deadly and responsible, and I would hope that you,

12  Your Honor, hold him accountable to the maximum extent of the

13  law.

14      "January 24th was the worst day of my life.  I was

15  brutally beaten and nearly killed by the Rankin County

16  Sheriff's Department, also known as the Goon Squad, which one

17  of its leaders is Mr. Christian Dedmon.  I never would have

18  thought a night of hanging out with friends would nearly cost

19  me my life.  They beat, kicked, tased, insulted me,

20  waterboarded me, and they humiliated me, and that will be

21  forever engraved in my mind and in my heart.

22      "I'm hurt, I'm broken, I'm ashamed and embarrassed by the

23  entire situation.  They did some unimaginable things to me that

24  affects me, and it will forever linger in my life.  Every time

25  I try to take a bite of food, the pain reminds me of what

1    happened that night.

2         "All the things I used to enjoy doing in my life have been

3    affected.  I'm a musician and a singer, and now, because of a

4    gunshot wound to my jaw, I can no longer do what I love to do,

5    and that's sing.  I play the drums for my church, and because I

6    was shot in the face, it affected my vision, so I can no longer

7    play.  Waking up at night covered in sweat because of the

8    nightmares of the attack, loud noises, police lights, sirens,

9    they all give me fear and anxiety.  I'm broken inside.  I don't

10   ever think I will be the person that I was.  I try every day to

11   do some of the simple things that I used to enjoy doing, but

12   can't, all because the real goons took it upon themselves to

13   shoot me.  I could be dead and gone, but the God I serve had

14   other plans.

15        "I'm currently undergoing therapy from my psychologist in

16   order to heal from what happened to me.  I want all of them to

17   remain behind bars and to be off the streets, and I'm praying

18   for the maximum time for the Goon Squad."

19        That is Michael Jenkins' statement, and I now bring before

20   you Mr. Eddie Parker, who will speak for himself.

21        **MR. EDDIE PARKER:**  Thank you for giving me this

22   chance, Your Honor, to speak.  It happened on January 24th.  It

23   raised a lot of memory.  It stopped a lot of time.  It made a

24   lot of sense.  It broke a lot of dark and light, if that makes

25   sense.

1    I've been in Rankin County for 39 years of my life.  I
2    kind of know the ins and outs of a lot of things.  I've had my
3    share of getting in trouble, you know, doing this and that,
4    never to be considerate of others, as far as I guess my
5    troubles that I got into.  I'm not making light of it in no
6    way.  To grow up and not experience and then have the type of
7    life that -- I guess that warrants what happened.  I knew, you
8    know, what it was, as soon as I saw them walk through the door.
9        When I walked out of my bedroom door, I saw this guy here,
10   Christian Dedmon, his flashlight.  I'm like, oh, man, that's
11   what it is.  It made me realize just being out in the streets,
12   you know, they say trouble will find you, you will find
13   trouble, you will find evil.  That night I saw the devil come
14   to me.  I saw the devil in my face, in my home, where I was
15   supposed to have been safe, where I was supposed to be out of
16   trouble.  What did I do to get this?  Nothing.  Why would
17   I (unintelligible), no reason.  Why he called and say black
18   people was in his neighborhood?  I didn't see a sign on the end
19   of the road that said, this is this guy's road, please no black
20   people allowed.
21       I'm the only black guy on that road.  I know this for a
22   fact.  I'm not there because I choose to be.  I'm not there
23   because I have to be.  I'm there helping a friend that has been
24   paralyzed for over 20 years, that this man has been there
25   countless times terrorizing.  This done happened more than once

1    at this 135 Conerly Road.  I went there knowing that that
2    happened at 135 Conerly Road, more than once.
3        You know, if nobody do anything good, it will follow.
4    right?  It will.  When it's too much good, that's when the
5    devil come out.  Maybe I was doing too good.  I sat there and I
6    told that man -- I pleaded with him, This is not what I'm here
7    for.  I'm telling him, This is what I'm here for.  This is my
8    friend, I'm helping my friend.  Didn't get any kind of -- did I
9    get any kind of understanding?  Not once.  No sympathy.  I
10   didn't need it.
11       That man sat on the bed Indian style smiling the whole
12   time.  It was funny for them.  It was like they were going to
13   play basketball.  Pass me the ball.
14       I'm sitting there and Mike asked me, You think they are
15   going to let us go?  What I knew to say to this guy, that I
16   knew but he didn't, it killed me not to tell him the God honest
17   truth what I thought was going to happen to us.  In my head, we
18   were fixing to die.  I told him, no, we are going to jail, we
19   are fixing to go to prison, going to get about 30 or 40 years.
20   Check that record.  I've been there.  I've heard it.
21   Thirty-four years with this Goon Squad.
22       That last time he asked me did I think he was going to let
23   us know, I promised him that I was going to make sure he was
24   going to be all right when we got in jail.  I told him, I got
25   you, bro.  I got you.  Thirty seconds later, he was saying, He

1    shot me, man.  He shot me.

2        What did he do?  Nothing.  What did any one of them do?

3    Nothing.  Can I ask something to you, like, on this -- that a

4    lot of them don't pinpoint?  That they had a lot of time while

5    Michael Jenkins was laying on that floor bleeding out.  They

6    picked me up.  The big house (unintelligible) -- brought me

7    through the kitchen, around back, and then out front through

8    the rain, no shoes on, no shirt.  So the washing off that we

9    just got was for no reason.

10       They uncovered evidence.  They didn't -- you know, they

11   didn't get anything.  I found the shell casing.  I found the

12   bullet that went through my friend.  I found everything they

13   tried to get.  If God wasn't there, we wouldn't be here.  So

14   the devil came and tried to take me, you know.  He tried to

15   take me, man.  God, God made sure.

16       They were so sloppy, because you don't pay attention, you

17   don't pay attention, you will let evil back.  If you don't pay

18   attention, you will slip up and let people know how evil you

19   are.  God did that.  Everybody there that had anything to do

20   with this case, I mean, I think about it too, God was with me.

21   The FBI did an awesome job with this.  I could solve my case.

22   I solved our case.  You know, God solved our case.  And the

23   reason why we solved our case was because the devil was sloppy.

24   Don't let the sloppy devil get out of here and think that he

25   can go out there and do this all the time.

```
 1          I've been waiting on this for ten years.  Ten years they
 2     been brutalizing my friends.  I have a friend down there now
 3     that's on probation for 30 years.  Why?  Because he played with
 4     the devil.  The devil shouldn't be let loose.  You see, God had
 5     a lot of time down.  He had to lock him up.  You hear around
 6     the world all the time, folks (unintelligible) -- the screams
 7     and all coming out from some kind of crack or something.  The
 8     devil is wanting to get out.  The devil wanting to get out.
 9     Well, let me tell you something, God got him.
10          Judge, today God got you.  Tomorrow has you.  Go with God
11     today, tomorrow.  You know what is right.  We know what is
12     right.  What the devil did was wrong.  Christian Dedmon is a
13     prime example, I mean.  Look at him.  He's the devil.  In God
14     we trust?  In God we trust.  Thank you, Judge.
15              THE COURT:  All right.
16              MR. SHABAZZ:  Thank you, Your Honor.  Mr. Melvin
17     Jenkins, and then we will be done.  Thank you, Your Honor.
18              THE COURT:  All right.
19              MR. MELVIN JENKINS:  Your Honor, good afternoon.
20              THE COURT:  Good afternoon.
21              MR. MELVIN JENKINS:  Your Honor, again, I apologize.
22     When you know better, you do better.  So I'm going to do
23     better.
24          But Your Honor, you don't keep kicking a dead horse, so I
25     won't keep going over and over it, but I would like to ask you,
```

1    if you would, to give this guy as much time as you can.

2         My son told me he laid on that floor -- now, he told me 45

3    minutes, but I'm sure by being shot, he don't really know.  But

4    you could see the puddle of blood on the floor, you can tell

5    that he laid there for quite a while.  It was massive.  You

6    know the carpet soaked a lot of it up, but you could see just a

7    massive amount of blood.  I went out there the next day.

8         My son said that when they shot him, they still didn't

9    unhandcuff him.  They left him handcuffed on that floor face

10   down.  So when they run out -- they went out, and they would

11   come back in, one of them would come back in and kick him in

12   the head to see if he was dead.  Didn't call the ambulance,

13   hadn't -- hadn't took the handcuffs off.  They just -- I mean,

14   what kind of people are these guys?

15        And I have noticed they are young.  I mean, they are not

16   old.  I mean, how do you learn this much hatred in that little

17   short length of time?  I saw the daddy said he taught the boy

18   right, but what happened?  I mean, what happened to him?  Where

19   did they go astray?  Where did they get this from?  And like I

20   said, they are so young.

21        It's only a couple of them that could even have known

22   "Goon" Jones, because I'm 68.  And as young as he is, he

23   probably didn't even know "Goon" Jones.  So where is this

24   coming from is my question?  How do you do another human being

25   like this?

1        Your Honor, I'm not criticizing the lawyer, the last

2   lawyer, and I know you told me not to say -- not to criticize,

3   and I'm not.  I just want to quote.  It's not really a quote,

4   it's just something he said that stuck to me.  I don't know the

5   law.  I don't know how the points and stuff works, but he was

6   trying to say that his client did less than this client.  His

7   client was on I-20.  He wasn't even there.  He didn't tase

8   nobody, but he was there.  He took a part in it, and he's a --

9   I'm so thankful to you that you saw through them alligator

10  tears and you gave him as much time as he could get.

11       And to me, it is a group thing.  If you was there, you

12  participated, you ought to get the same -- all of y'all should

13  get 20 years.  No, no, I take that back.  You ought to get

14  life.  If you can treat another human like that, you don't

15  deserve to be on God's green earth, to tell you the truth.  I

16  couldn't even imagine doing another human like that.

17       Thank you, Your Honor.

18            **THE COURT:**  All right, sir.

19            **MR. SHABAZZ:**  Thank you, Judge.

20            **THE COURT:**  Ms. Chalk, do you have anything further?

21            **MS. CHALK:**  Yes, Your Honor, I do.  Your Honor, Alan

22  Schmidt, who is the victim in 3:23cr63 submitted the following

23  impact statement.

24       "Dear Honorable Judge Lee:  My name is Alan Schmidt.  I'm

25  a victim of the former Rankin County Sheriff Officers Christian

1  Dedmon, Hunter Elward and Daniel Opdyke.  Before I get into the
2  graphic details of the dreadful night of December 4, 2022, when
3  I was assaulted by Dedmon, Elward, and Opdyke, I want to
4  express that I pray to God for these officers' souls to be
5  healed from the evil within to cause them to commit these acts
6  on others.  I pray every day that I can forgive them one day
7  and hopefully forget the humiliation and the evil physical and
8  sexual assaults that I endured from Dedmon, Elward, and Opdyke.

9       "I know that I'm not their only victim, and I pray for
10  each victim that has crossed paths with the Goon Squad members
11  Dedmon, Elward and Opdyke.  The acts committed upon me on
12  December 4, 2022 have impacted my life in such a negative way
13  that it will take years to lead to a somewhat normal life
14  without having flashbacks of the night of December 4, 2022.

15       "On the night of the assault, I was pulled over for an
16  expired tag near I-20 and State Street near the border of
17  Rankin and Hinds County.  A traffic stop initiated and I
18  complied with the original officer's commands.  And then
19  Christian Dedmon arrived shortly thereafter, immediately
20  ordering officers to cuff me and take me to Dedmon's vehicle.
21  When Dedmon got me to his vehicle, he yanked me down, hitting
22  my head on the back right quarter panel of Dedmon's Rankin
23  County Sheriff's Department-issued vehicle.

24       "My head hit the panel by the wheel, leaving a dent on the
25  vehicle, and my eyes began to see spots.  I could not think

1    clearly, I could not see, I could not protect myself, and I was

2    scared for my life already.  I was already scared for my life

3    as I was being assaulted on the side of the road, and then my

4    life flashed before my eyes.  I thought I died.  I knew my time

5    was over.

6         "Christian Dedmon demanded that I confess and disclose the

7    location of stolen items in Jackson, Mississippi, which I did

8    not know.  Dedmon responded to my lack of knowledge by

9    discharging his gun towards me.  Then I felt the barrel of the

10   gun on my temple.  I was shaking.  I almost used the restroom

11   on myself.  I was humiliated.  I was scared.  It is hard to

12   finish writing this paragraph.

13        "The images are so graphic.  The fear is unexplainable.  I

14   did not know it was possible for any human to feel this way.

15   Dedmon asked me several more times where the stolen items were.

16   I did not know.  So I told him that I did not have what he was

17   looking for.  This time Dedmon shot the gun closer to my head.

18   I thought, this is it.  I will never see my family again and

19   these officers will get away with it.  At this point, I was in

20   shock.

21        "The next thing I remember is being beaten, punched and

22   kicked.  I thought to myself it would stop soon.  They were on

23   a power trip and would stop.  I was wrong.  It seemed like it

24   was going to last forever.  Nobody helped me.  Nobody stepped

25   in to stop them.  Nobody cared.  I wish the officers understood

1    that I'm a human being, just like them.  I hurt, just like

2    them.  I feel, just like them.

3          "I finally began to pray to God out loud to save me.  I

4    know that nobody is perfect, I know that I've made mistakes in

5    the past, but I would never treat another human being or living

6    creature the way I was treated by the officers sworn to protect

7    the Constitution and our rights.  The louder I prayed, the

8    harder I was beaten.

9          "I began to slip into unconsciousness and passed out, and

10   the assault finally stopped.  The pain was excruciating.  I was

11   still cuffed from the time Dedmon arrived on scene throughout

12   the assault, being shot at and then sexually assaulted.

13         "When I was able to gather my bearings and surroundings, I

14   was being walked by Hunter Elward and Christian Dedmon and then

15   forced to my knees in front of Dedmon.  Dedmon pulled his

16   private part and began hitting me in the face with it.  Dedmon

17   tried to put his privates in my mouth, but I kept my mouth as

18   tight as I could.  I could not help but think during this,

19   'What sick individual does this?  He has so much power over us

20   already, so to act this way, he must be truly sick in the

21   head.'  I did not think I was in reality anymore.  This is not

22   the world we live in.  We are better than this.

23         "Since I would not touch Dedmon or Elward's privates and

24   kept screaming, no, that they are sick for this, they pulled my

25   pants down.  I was still handcuffed and defenseless.  The

1  officers started touching my private parts.  Dedmon grabbed my

2  privates and said, 'My, you have a big one,' and dry-humped me.

3  I kept screaming that they are sick and to let me go.  The

4  assault eventually stopped when the officers took me to jail.

5      "My face was injured pretty bad and they knew it, but they

6  didn't take me to the hospital or even have medical evaluate me

7  at the jail.  Nobody cared.

8      "I have flashbacks to this day if certain things happen.

9  If my pants are around my knees with me pulling them up, I

10  think about it and get short of breath.  If I see a cop car, I

11  break out in sweats.  I'm terrified of guns and shake if I hear

12  a loud unexpected noise.  When I drive down I-20 where the

13  incident took place, I think about it every time.

14      "This will not escape me.  I never want to see these

15  officers again.  They sexually assaulted me.  They physically

16  and mentally abused me.  My life has forever changed because of

17  the actions of these officers.  I pray that the justice system

18  will hold them to the fullest extent of the law for all our

19  sakes.  Police are supposed to serve and protect.

20      "This is my truth.  This is what happened to me.  Thank

21  you for taking the time to read my statement.  I have the

22  utmost faith that justice will be served.  Yours truly, Alan

23  Schmidt."

24      Your Honor, that is all we have from the victims.

25          **THE COURT:**  All right.  The last couple of sentences,

1    when the time came for the defendant to exercise his right of

2    allocution, the process has been for the defendant and his --

3    he and his counsel make a presentation, followed by the

4    government.  Then the defendant may conclude.  Is that

5    agreeable to both sides?

6              **MR. CORY:**  Yes, Your Honor.

7              **MS. CHALK:**  Yes, Your Honor.

8              **THE COURT:**  Okay.  Let Mr. Dedmon come to the podium

9    with counsel.

10         As I just indicated, Mr. Dedmon, you have the right of

11   allocution.  You may tell me anything I need to hear with

12   regard to the sentence to be imposed in these cases, with

13   particular emphasis on matters that you contend should be

14   considered in mitigation of punishment.  You can speak, your

15   lawyer may do so, or both of you may.  And then if you have

16   anything further, you can present that.

17             **MR. CORY:**  Your Honor, Mr. Dedmon wishes to allocute,

18   but we will rely primarily on our sentencing memorandum that

19   was previously submitted and the letters that we submitted.  I

20   do have one point I want to emphasize from our sentencing

21   memorandum.

22             **THE COURT:**  Hold on to your thoughts, but I will -- I

23   have read all the letters, and they will be made a part of the

24   record, as well as your sentencing memorandum, and if there's

25   anything you want to emphasize, and you just indicated you

1    wanted to say something, but proceed.

2         **MR. CORY:**  Yes, Your Honor.  The government in this

3    particular case is asking for this Court to sentence Mr. Dedmon

4    to 41 years for what happened that night.  And while there's no

5    excusing what happened, there's no justifying his behavior, and

6    I don't want to make any comparisons to anybody else, I do

7    think it is important that the Court consider the differences

8    in the people that were there that night and what their roles

9    were.

10        To sentence Mr. Dedmon to 15 or 20 years more than anyone

11   else, and in particular the supervisors that were there that

12   night, I believe would create an unwarranted sentencing

13   disparity and an unfair sentencing disparity, even in light of

14   the charges that Mr. Dedmon has pled guilty to.

15        The chief investigator for the Rankin County Sheriff's

16   Department, and I know the Court already knows most of this and

17   I don't want to belabor the point, but that was Brett McAlpin.

18   He put everything in motion when he told Christian Dedmon to

19   take care of the problem at Conerly Road.

20        Christian Dedmon was 28 at the time.  He had been at

21   Rankin County for 6 or 7 years.  He should have known better,

22   but everybody knew what that expectation was.  Everybody knew

23   that was the culture of the department, and that's how you got

24   ahead, that's how you did it.  Again, that is no excuse,

25   because everybody could have made different choices, but the

1  people -- the concept that the supervisors, who are the bosses

2  that have that responsibility, can escape or have lower

3  responsibility than the people they supervise when they are on

4  the scene I think is an unwarranted sentencing disparity.  The

5  supervisors are the ones that are supposed to be there for a

6  reason.

7        Former Lieutenant Middleton and Chief Investigator

8  McAlpin, they were both there that night.  They were present.

9  And just because they didn't put their hands on Mr. Parker and

10  Mr. Jenkins does not exonerate them or entitle them to be

11  sentenced below or Mr. Dedmon and others to be sentenced to

12  significantly greater terms when they were simply abiding by

13  the culture.  And again, that's not to excuse anything that

14  happened or any decision Christian Dedmon made.

15        But when -- I mean, Lieutenant Middleton presented a chart

16  to the Court, and they could have added another column on that

17  chart that said, "What did the supervisors do to stop any one

18  of those things."  Everybody had a responsibility to do

19  something, but the supervisors had the most responsibility to

20  stop and stop what was happening.  And if Christian Dedmon and

21  Mr. Opdyke and Mr. Elward were not doing exactly what their

22  supervisors wanted, they would have intervened, they would have

23  stopped it, but that's not what happened.  And that does not

24  excuse it, but it is significant to me that the government is

25  asking -- despite the inexcusable conduct of Mr. Dedmon, they

1    are asking for 15 or 20 years more than the supervisors in

2    time.  And the question about what happened to these gentlemen,

3    they went to work for the Rankin County Sheriff's Department,

4    and they should have left, but they didn't.  But that's the

5    full picture.

6         And when Christian Dedmon fired his gun the first time,

7    which he should have never done, he did it to intimidate and

8    scare Mr. Jenkins and Mr. Parker.  There's no excuse.  But his

9    boss was there.  He was there.  He heard it, at the very least,

10   even if he was back in the room with Lieutenant Middleton

11   trying to get whatever he could out of the room.

12        And my only point is, to me, it's an injustice to sentence

13   Christian Dedmon to significantly more time than his

14   supervisor, who was there, who initiated it, who didn't stop

15   it, and who obviously -- that was what was expected of these

16   gentlemen.

17        With that being said, that's all I have.  I don't know if

18   the government wants to respond to that, or Mr. Dedmon is

19   prepared to allocute.

20             **THE COURT:**  Does Mr. Dedmon want to address the Court

21   now or after the government's --

22             **MS. CHALK:**  We prefer to make our statement in

23   response after Mr. Dedmon allocutes, if that's okay with the

24   Court.

25             **THE DEFENDANT:**  Judge, thank you for giving me this

1    time.  I want to tell Mr. Eddie and Mr. Parker how sorry I am

2    for what they went through, what they are going through and

3    what they will go through forever.

4         The lies I told on them, I will never forgive myself for

5    it.  The pain I caused them, I will never forgive myself for

6    it.  If I could take every bit of it back, I promise you I

7    would, or if I could take it myself, I would.

8         Sir, I got into law enforcement not as a devil.  I really

9    wanted to make a difference in my community.  I stand before

10   you today, 29 years old, with a sound mind that I can make

11   choices for myself, sir.  As my attorney said, there was a

12   culture of doing things, and I'm probably the only person 28

13   years old that was ever promoted to narcotics investigator in a

14   county as big as Rankin as fast as I was, and it was because

15   instead of choosing to do the right thing, I chose to be a

16   show-off for an expectation of the ones that came before me and

17   became my boss.  That is not an excuse, but it is the truth,

18   sir.

19        I take full responsibility for what I done.  Mr. McAlpin,

20   Mr. Middleton, Mr. Elward, Mr. Opdyke, nobody made me do the

21   things I done, and I will live with them for the rest of my

22   life.

23        With respect to the I-20 incident, sir, the things I pled

24   guilty to against Mr. Schmidt, I did.  I shot into the ground

25   to scare him, to tell me where stolen property was of a very

1    close family member of mine.  It's something I take full

2    responsibility for doing that, and I know that it's wrong.  But

3    respectfully, sir, the sexual assault just did not happen.  I'm

4    sorry.  That's just a lie.

5          I hope all three of these gentlemen can forgive me one

6    day, and I hope that after my time that I can be a part of my

7    little girl's life and be a contributing member to society and

8    make up for the person that I became.  Thank you, sir.

9                THE COURT:  All right.  Proceed for the government.

10               MS. CHALK:  May I have just a moment, Your Honor.

11               THE COURT:  Yes, ma'am.

12               MS. CHALK:  Thank you, Your Honor.

13         I'm going to touch on a couple of things that were just

14   stated by Mr. Cory and his client before I read a little bit

15   more into the record.

16         Mr. Cory is making the argument that his client should not

17   receive a sentence that is greater than one of the supervisors

18   and that this Court did sentence Mr. Middleton earlier, but

19   Mr. Middleton did not have the same charges that this defendant

20   is facing.  So there is no unwanted or unwarranted disparity.

21         He initiated the incident after he received the call from

22   McAlpin.  He called those officers he knew would carry out what

23   he wanted to do.  He started the text thread.

24         Part of the sentencing memo Mr. Cory has submitted to the

25   Court, he indicates that Dedmon did not direct anyone to cause

1    serious bodily injury to anyone and he did not personally cause

2    serious bodily injury to anyone, he was not in charge at the

3    scene, and he did not direct the subsequent cover-up.  Your

4    Honor, we submit, based on everything the Court has heard, that

5    that is just simply not true.

6        He initiated the incident once he received the call.  His

7    use of the taser from the minute they entered into that

8    residence, unwarranted, not a "knock and talk," simply a bust

9    through the door, with no rhyme or reason.  Initiating his use

10   of taser gave the okay for everyone else who had a taser to use

11   theirs or to use their hands and fists if they didn't have a

12   taser.

13       And the assault and the torture started then and did not

14   end for at least 88 minutes.  Mr. Dedmon claims he did not

15   personally cause serious bodily injury to anyone.  Your Honor,

16   you have heard from Mr. Jenkins and Mr. Parker and their family

17   members about the injuries that they endured, from the food

18   poured on them, to the repeated tasers, to the force to be

19   showered together, to the hitting with swords and wooden --

20   pieces of wood and a wooden kitchen implement, just to name a

21   few.

22       And I believe you just heard Mr. Parker talk to you about

23   he saw Christian Dedmon sit on a bed Indian style and watch.

24   How is that someone who is not in control of a scene?

25       He was extremely involved in the cover-up.  He came up

1  with the drugs to submit to a crime laboratory in the name of
2  Michael Jenkins, when not the first piece of narcotics was
3  recovered from that home.  He orchestrated that.  He
4  orchestrated the picking up of the shell casings.  He made sure
5  that the DVR player had been removed from that home.

6      Let's talk a little bit about the I-20 incident.  When
7  this defendant pled guilty before Your Honor, the government
8  read the following into the record:  "Dedmon, who did not have
9  his firearm with him, reached over and took Opdyke's firearm
10 from its holster.  Dedmon got in AS's face, raised the gun and
11 pointed it away from AS, then fired multiple shots.  Dedmon
12 also grabbed and squeezed AS's genitalia and threatened to kill
13 him in order to extract a confession.  Dedmon knew that it was
14 unlawful for an officer to attempt to coerce a confession by
15 firing a gun using excessive force and making a threat to
16 kill."

17     When those facts were read into the record, Your Honor,
18 the defendant agreed with those facts and at no time corrected
19 those but would like the Court now not to believe the
20 recitation that was provided to the Court at the time of his
21 change of plea or by the victim's statement.

22     And as we've been stating to the Court, on January 24,
23 2023, this defendant and his codefendants, while acting as
24 sworn law enforcement officers, some in uniform, and all in
25 Rankin County issued vehicles, brutally terrorized and carried

1      out crimes of hate against Michael Jenkins and Eddie Parker at

2      135 Conerly Road in Braxton, Rankin County, Mississippi.

3          As we've discussed with the Court, on the evening hours of

4      January 24th, McAlpin received a complaint from a white

5      neighbor that there were several African American males staying

6      at the home on 135 Conerly and had observed suspicious

7      behavior, and Dedmon was called by McAlpin to take care of it,

8      and Dedmon took it from there.

9          He notified his codefendants, Elward, Opdyke, and

10     Middleton, about a mission.  Why did he choose those particular

11     individuals?  He had done stuff with them before.  Just 30

12     days, 45 days earlier on the side of the road on Interstate 20,

13     he had done something almost similar.

14         In a group text, Dedmon wrote, "Are you available for a

15     mission," a phrase all were familiar with.  He warned the group

16     to the possibility of cameras at the home, told his

17     codefendants, "There's a chance of cameras, let's approach east

18     and work easy."

19         Dedmon knew and the others knew that this meant to knock

20     on the door rather than knock it down if there were cameras.

21     And Elward and Opdyke responded with their affirmation as well,

22     with an eyeroll emoji and a GIF of a baby crying.  That was

23     followed up with Dedmon saying, "If we don't see cameras, go,

24     and no bad mugshots."  Because previously, as we put in our

25     sentencing information, this defendant has been involved in an

1    incident where a defendant was hit in the face.  And based on

2    that hitting in the face, the phrase "no bad mugshots" came

3    about.  So you are free to hit people.  Just don't do it where

4    somebody can see it.

5         Based upon those texts, Middleton, Elward, and Opdyke

6    headed to that Cato volunteer fire department to wait for the

7    go signal, and Dedmon had told the group he had his friend

8    Hartfield with him, a Richland Police Department officer.  And

9    it's important to note that they weren't out working.  They had

10   been at a neighbor's house barbecuing or getting ready to eat

11   dinner.  And at no time was a question asked, hesitation noted,

12   or unwillingness to participate stated.

13        Dedmon and Hartfield proceeded to that meet location, but

14   they didn't stop.  They flew on by as quickly as they could to

15   get to that location to inflict the torture and abuse that

16   ensued.  They were not serving and protecting on that night.

17   They didn't have that in mind at all.

18        As they got to the property, they noticed the camera above

19   the front door, so Dedmon, Elward, and Opdyke went to a

20   different door where no camera was present.  They didn't knock,

21   they didn't ring the doorbell, they just started kicking the

22   door open.

23        And there's a reason why Elward and Opdyke were chosen.

24   Recall their size as they have appeared before the Court.  Once

25   they entered, Elward and Opdyke immediately encountered Mr.

1  Jenkins and Mr. Parker, two African American men, in the

2  hallway.  They placed them in handcuffs and tased them multiple

3  times.  They continued to tase them and scream at them.

4      Hartfield forcefully entered through the back door, and

5  moments later Middleton and McAlpin go through the residence.

6  Dedmon all the while was demanding to know where the drugs

7  were.  When Mr. Parker responded that there were no drugs, he

8  became more enraged, gust as you heard on the side of

9  Interstate 20.  He unholstered his gun and fired toward the

10  back of the house.  Sounds extremely familiar to a previous

11  incident that we have discussed.

12      At no time did anyone intervene, yell "Stop," or render

13  aid to Mr. Jenkins or Mr. Parker.  They continued to perpetuate

14  the hate crime.  This defendant and his other white

15  codefendants continued the unimaginable torture by moving Mr.

16  Jenkins and Mr. Parker to the living room where they were

17  called racial slurs, like the N word, monkey, and boy, and

18  accused them of taking advantage of the white woman who lived

19  in the home, warning them to go back to Jackson, to their side

20  of the river, all the while this defendant was repeatedly

21  dry-stunning Michael Jenkins with his taser.

22      But that was not enough.  During the search of the home,

23  Opdyke kicked in a padlocked door and found a BB gun and a

24  flesh-toned dildo.  The dildo was placed at the end of the BB

25  gun, and Dedmon and Opdyke forced it into the mouths of Mr.

1    Jenkins and Mr. Parker, and then Dedmon began to hit them in

2    the face with it.  They were forced then on their backs, still

3    handcuffed, and this defendant took the dildo and threatened to

4    anally rape Michael Jenkins but was not successful because

5    Michael Jenkins had defecated on himself.

6         The abuse and torture did not end here.  Still, not a

7    single law enforcement officer intervened, not a single law

8    enforcement officer said, "Stop," and not a single law

9    enforcement officer rendered aid.  The torture and abuse

10   continued with Elward holding Michael Jenkins and Eddie Parker

11   down while Dedmon went to the kitchen, into the refrigerator,

12   grabbed milk, found alcohol and chocolate syrup, poured it on

13   their faces and in their mouths, and Elward followed that up by

14   throwing eggs at the wall.

15        When they realized they couldn't take them to jail or

16   anywhere else with the food all over their faces, they forced

17   them to take their clothes off, took the handcuffs off and

18   forced them to shower.  After the shower, they were allowed to

19   get dressed, but they were rehandcuffed and taken to another

20   room.

21        The defendants then found other items inside the house to

22   continue the torture, like a sword used by Middleton, a wooden

23   kitchen implement used by Opdyke, and pieces of wood used by

24   Dedmon to hit and strike Michael Jenkins and Eddie Parker.  And

25   still no one said, "Stop."

1        And we've discussed much about the difference in tasers.

2    And the defendants in this case discussed it a lot as well that

3    night.  Hartfield had a different taser because he was with the

4    Richland Police Department.  And those with the Rankin County

5    Sheriff's Department, their tasers didn't seem to be as strong.

6    They engaged in a game of taser hot potato.  Which one hurts

7    worse?  So Dedmon, Hartfield, Middleton, and Elward all took

8    turns using those tasers on Michael Jenkins and Eddie Parker,

9    inflicting serious bodily injury.

10        McAlpin and Middleton found a moment to step away to see

11   if there was anything in the house that might be of interest to

12   them.  They found some rubber bar mats to steal and even took

13   them out to their cars.  Meanwhile, Michael Jenkins and Eddie

14   Parker continued to scream from pain and torture that was being

15   inflicted upon them from the moment this defendant and his

16   codefendants entered that house.  Those cries were ignored by

17   everyone.  They continued to inflict pain and torture.  They

18   failed to intervene and they failed to protect as they had

19   sworn to do so.

20        A second time Dedmon felt it necessary to remove his

21   firearm from his holster at 135 Conerly Road when he fired out

22   into the yard to inflict fear in Michael Jenkins and Eddie

23   Parker.  Around the same time, Elward removed his firearm from

24   the holster, removed a bullet from the chamber, stuck it in

25   Michael Jenkins' mouth while he was in handcuffs and pulled the

trigger.  The gun didn't fire.  Elward put his firearm back
inside Michael Jenkins' mouth a second time and fired, but this
time a bullet severed Michael Jenkins' tongue and exited out of
his neck, causing permanent life-threatening injuries.  He was
left bleeding on the floor next to his friend, Eddie Parker,
instead of rendering aid.

Dedmon and all the other defendants went outside, huddled
up to figure out what to do next.  Never once was the idea to
call 911 or render aid at that moment.

The cover-up included lying to investigators, an offer to
plant a throw gun, manipulating the GPS data in Rankin County
Sheriff's Office radios and the patrol vehicles, planting the
BB gun, pressuring Eddie Parker to go along with a story
McAlpin told him, writing false reports, filing false
affidavits and arrest warrants, sending drugs to the lab that
were not recovered or at all connected, hide those soiled
clothes that had been removed from Mr. Jenkins and Mr. Parker,
but they were too wet to burn.  They removed the hard drive,
they removed a shell casing, and all agreed to go along with
it.  And McAlpin and Middleton ensured that that would be the
plan because they threatened to kill everyone.

They had no little regard for their actions that not only
was the pouring of milk, chocolate syrup, alcohol, and I failed
to mention grease on Mr. Jenkins and Mr. Parker, additional
food was left out in the residence for coming days to cause an

1    odor.  And McAlpin urinated in a closet.

2         And I don't want the other indictment -- excuse me, the

3    other information to get lost of the activity that Mr. Dedmon

4    participated in.  He told you the exact reason why he went out

5    there.  It was for his own selfish gain.  He manipulated the

6    fact that he was a law enforcement officer to terrorize another

7    member of the community.  He used a license plate tracking

8    system to notify him when that vehicle associated with Alan

9    Schmidt was found driving, he had it stopped, and he had those

10   officers call him and hold Mr. Schmidt on the side of the road

11   until this defendant arrived.

12        Eerily familiar to the events in January, in December he

13   grabbed a gun from Opdyke's holster, he fired it at the ground

14   to scare, and he grabbed Mr. Schmidt's genitalia and threatened

15   to kill him, trying to extract a confession.  That was not

16   enough.  They didn't take him to jail.  Dedmon and Elward then

17   continued to abuse him by taking him in Dedmon's truck to a

18   home in Jackson where they thought the stolen property was

19   ultimately located.  And Dedmon never reported these actions to

20   the Rankin County Sheriff's Department.  He was not at all

21   remorseful at that time.

22        This defendant organized both of these missions.  He

23   organized and participated in countless other missions that are

24   referenced in the presentence investigation report, beginning

25   on page 48 and 49, Your Honor.  We ask the Court to take note

1   of all the events that are listed in the presentence

2   investigation report and this defendant's involvement.  It goes

3   through page 58.

4       He was not at all afraid to use excessive force on any of

5   these incidents.  He had been with the sheriff's department for

6   7 to 8 years, as his counsel just told the Court.  He may be

7   young, but he had the experience.  He had the experience not to

8   do what he was doing.  He hid behind his badge and gun.

9       His acts are egregious, they are serious, they are

10  lawless.  The acts committed prior to December, 2022, the acts

11  committed on December 4, 2022, and in January 2023 warrant and

12  demand a sentence at the top of the guideline range.  The

13  evaluation of the 3553(a) factors, as the Court notes what

14  those factors are, they all warrant and demand that sentence of

15  502 months imprisonment, and we ask the Court to sentence

16  accordingly.

17          **THE COURT:**  Conclude with the presentation of

18  allocution for the defendant, if you have anything further.

19          **MR. CORY:**  Judge, we don't have anything further.

20          **THE COURT:**  All right.  I want to be sure that the

21  record includes the various letters, character letters

22  submitted for Mr. Dedmon, I think there are around 23 of them,

23  as well as the respective sentencing memoranda for the

24  government and the defendant.  The letters from the -- the

25  members of the NAACP are already in the record with regard to

1    previous sentences.

2              **MS. CHALK:**  Your Honor, if I may, we would request

3    that our sentencing memo be filed publicly with PACER and our

4    remaining sentencing documents be filed under seal.

5              **THE COURT:**  That request is granted.

6              **MS. CHALK:**  Thank you, Your Honor.

7              **THE COURT:**  The Court is ready to pronounce sentence.

8    Let the defendant and counsel come to the podium.

9        Mr. Dedmon, besides Mr. McAlpin and Mr. Middleton, whose

10   roles in the crimes charged related to the attack on Mr.

11   Jenkins and Mr. Parker is exacerbated largely because of their

12   role as the superior officers on scene and their having been

13   primarily responsible for devising the cover-up scheme, you,

14   Mr. Dedmon committed the most egregious acts on both that

15   attack and the attack on Mr. Schmidt.  By that, I don't mean

16   that just the most egregious conduct of all the defendants

17   before me in these cases but the most shocking, brutal and

18   cruel acts imaginable, and you deserve to be punished

19   accordingly.

20       The Court, therefore, imposes sentence accordingly.  The

21   Court has considered the advisory guideline computations and

22   the sentencing factors under 18, United States Code, Section

23   3553(a), and it's the judgment of the Court that you, Christian

24   Lee Dedmon, serve a term of 120 months imprisonment as to

25   Counts 1, 2, 3, 4, 6, 7, 10, and 13, all to run concurrently

1    with each other, Counts 11 and 12 and Counts 1 and 2 of Docket

2    Number 3:23cr63.  As to Count 5, you shall serve a term of 120

3    months, to run consecutively to all counts.  As to Counts 6 and

4    11, you shall serve a term of imprisonment of 240 months to run

5    concurrently to Counts 1, 2, 3, 4, 6, 7, 10, and 13, and Counts

6    1 and 2 of Docket Number 3:23cr63, and consecutively to Count 5

7    and Count 3 of Docket Number 3:23cr63.  As to Counts 1 and 2 of

8    Docket Number 3:23cr63, you shall serve a term of 120 months,

9    to run concurrently to Count 1, 2, 3, 4, 6, 7, 10, 11, 12 and

10   13, and consecutively to Count 5 of Docket Number 3:23cr62.  As

11   to Count 3, you shall serve a term of 120 months imprisonment

12   to run consecutively to all other counts, for a total

13   imprisonment term of 480 months in the custody of the U.S.

14   Bureau of Prisons.  These sentences shall run concurrent to the

15   anticipated state court sentence.

16        Based on your financial condition, the Court finds that

17   you don't have the ability to pay a fine in addition to

18   mandatory restitution, so no fine is imposed.  Restitution in

19   the amount of $79,500 is ordered and payable immediately and

20   during the term of incarceration.  Restitution is ordered

21   payable to the U.S. Clerk of Court, who will forward the

22   payments to the victims as listed on the judgment order.  This

23   payment amount is payable jointly and severally with the

24   codefendants in this case.  In the event that the restitution

25   is not paid in full prior to termination of supervised release,

1    you are ordered to enter into a written agreement with the

2    financial litigation program of the U.S. Attorney's Office for

3    payment of the remaining balance.

4         Additionally, the value of future discovered assets may be

5    applied to offset the balance of criminal monetary penalties.

6    You may be included in the Treasury Offset Program allowing

7    qualified federal benefits to be applied to offset the balance

8    of criminal monetary penalties.

9         The term of imprisonment shall be immediately followed by

10   a three-year term of supervised release as to each count, to

11   run concurrently with each other.  Within 72 hours of release

12   from the custody of the Bureau of Prisons, you will report to

13   the probation office in the district to which you are released.

14        While on supervised release, you shall comply with the

15   mandatory conditions pursuant to 18 United States Code, Section

16   3583(d).

17        Further, the Court finds the standard conditions of

18   supervision as listed on the judgment order and in part G of

19   the presentence investigation report, which have been adopted

20   by this Court, are reasonably related to the factors set forth

21   in 18, United States Code, Section 3553(a)(1), (a)(2)(B), (C),

22   and (D), and involve no greater deprivation of liberty than

23   reasonably necessary for the purposes set forth in that

24   section.

25        Further, these conditions are consistent with the policy

1    statements issued by the Sentencing Commission pursuant to 26,

2    United States Code, Section 994(a).  Therefore, you will comply

3    with the standard conditions of supervision on the judgment

4    order, which includes the prohibition of possessing a firearm.

5           In addition, the following special conditions, totaling

6    five, are imposed:  One, you must not communicate or otherwise

7    interact with the victims MJ, EP or AS either directly or

8    through someone else without first obtaining the permission of

9    the probation officer.

10          Two, you shall not incur new credit charges or open

11   additional lines of credit without the approval of the

12   probation officer unless you are in compliance with the

13   installment payment schedule.

14          Three, you shall provide the probation office with access

15   to any requested financial information.

16          Four, you shall pay outstanding restitution imposed by the

17   Court in accordance with the schedule of payments sheet of this

18   judgment.  You must also notify the Court of any changes in

19   economic circumstances that might affect the ability to pay

20   restitution.

21          Five, based on the nature of the instant offense,

22   offenses, you shall submit your person, property, house,

23   residence, vehicle, papers, or office to a search conducted by

24   a United States Probation Officer.  Failure to submit to a

25   search may be grounds for revocation of release.  You shall

1    warn any other occupants that the premises may be subject to

2    searches pursuant to this condition.  An officer may conduct a

3    search pursuant to this condition only when reasonable

4    suspicion exists that you have violated a condition of your

5    supervision and that the area to be searched contains evidence

6    of this violation.  Any search must be conducted in a

7    reasonable time and in a reasonable manner.

8        The Court notes that if it erred in the calculation of the

9    sentencing guidelines, the Court would have imposed the same

10   sentence as a variance based on the offense conduct in this

11   case, your characteristics, and the other factors found at 18,

12   United States Code, Section 3553(a).

13       I made an inadvertent error in pronouncing the sentence.

14   It had been prepared and I misstated in this respect.  The

15   Court imposes a term of 240 months imprisonment as to Counts 2

16   and 12, not 6 and 11, as previously stated.  And I'm misreading

17   again.  As to Counts 11 and 12, not what I said.  I'm going to

18   state it again.  The Court imposes a term of 240 months

19   imprisonment as to Counts 11 and 12, not 6 and 11 as previously

20   stated.  I had prepared it and I had done some interlining and

21   I misread it.

22       That concludes the sentencing in the case.  Is there

23   anything further from the government or the defendant?

24       **MS. CHALK:**  Your Honor, I may have missed it, but the

25   special assessment, was it imposed, a hundred dollars per

1    count?

2         **THE COURT:**  It very well may not have been.   The

3    error I made has been called to my attention, and I probably

4    missed it, but there's a special assessment of a hundred

5    dollars per count, payable immediately.  It's the total number

6    of counts times a hundred is the amount of the special

7    assessment.

8         **MR. CORY:**  Judge, just so I'm clear, the total

9    sentence of the Court is 480 months?

10        **THE COURT:**  That's right.

11        **MR. CORY:**  Also, we would ask, I know it's just a

12   recommendation, but if the Court would recommend placement at

13   the nearest facility available near Rankin County for Mr.

14   Dedmon.

15        **THE COURT:**  That will be the recommendation of the

16   Court, the nearest.  And again, you understand that I don't

17   have the authority, but I can make recommendations, and

18   oftentimes the Bureau of Prisons follows those recommendations,

19   and I will make that recommendation.

20        **MR. CORY:**  Thank you.

21        **THE COURT:**  Anything further?

22        **MS. CHALK:**  No, Your Honor.

23        **THE COURT:**  That concludes the sentencing, and Court

24   is adjourned until 9:00 tomorrow morning.

25                        (HEARING CONCLUDED)

1

2                    CERTIFICATE OF COURT REPORTER

3

4          I, Teri B. Norton, RMR, FCRR, RDR, Official Court

5    Reporter for the United States District Court for the Southern

6    District of Mississippi, appointed pursuant to the provisions

7    of Title 28, United States Code, Section 753, do hereby certify

8    that the foregoing is a correct transcript of the proceedings

9    reported by me using the stenotype reporting method in

10   conjunction with computer-aided transcription, and that same is

11   a true and correct transcript to the best of my ability and

12   understanding.

13         I further certify that the transcript fees and format

14   comply with those prescribed by the Court and the Judicial

15   Conference of the United States.

16

17

18

19       S/ *Teri B. Norton*
         TERI B. NORTON, RMR, FCRR, RDR
20       OFFICIAL COURT REPORTER

21

22

23

24

25