IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


UNITED STATES OF AMERICA                           GOVERNMENT

VS.                        CRIMINAL NOS. 3:23CR62, 3:23CR63

HUNTER THOMAS ELWARD                                DEFENDANT



**TRANSCRIPT OF SENTENCING**



BEFORE THE HONORABLE TOM S. LEE
UNITED STATES DISTRICT JUDGE



MARCH 19, 2024
JACKSON, MISSISSIPPI



REPORTED BY:  TERI B. NORTON, RMR, FCRR, RDR
              501 E. COURT STREET, SUITE 2.500
              JACKSON, MISSISSIPPI  39201
              (601)608-4186

```
 1   APPEARANCES:

 2

     FOR THE GOVERNMENT:
 3     ERIN O'LEARY CHALK, ESQUIRE
       GLENDA R. HAYNES, ESQUIRE
 4     U.S. ATTORNEY'S OFFICE
       501 E. COURT ST., SUITE 4.430
 5     JACKSON, MISSISSIPPI  39201

 6     CHRISTOPHER PERRAS, ESQUIRE
       UNITED STATES DEPARTMENT OF JUSTICE
 7     150 M STREET, NE
       WASHINGTON, D.C.  20002
 8
       DANIEL GRUNERT, ESQUIRE
 9     UNITED STATES DEPARTMENT OF JUSTICE
       950 PENNSYLVANIA AVE NW
10     WASHINGTON, D.C.  20530

11   FOR THE DEFENDANT:
       JOSEPH M. HOLLOMON, ESQUIRE
12     JOSEPH M. HOLLOMON & ASSOCIATES, PA
       107 NORTH STATE STREET
13     JACKSON, MISSISSIPPI  39201

14   PROBATION OFFICERS:  ALLIE WHITTEN, JAMIE HARRELL

15

16   ALSO PRESENT:  TODD GEE, U.S. ATTORNEY
                    PAT LEMON, ASSISTANT U.S. ATTORNEY
17                  LINDSAY CRANFORD, DEPUTY ATTORNEY GENERAL
                    LUKE WILLIAMSON, DEPUTY DIRECTOR OF PUBLIC
18                  INTEGRITY DIVISION, ATTORNEY GENERAL'S OFFICE

19
                    MALIK SHABAZZ, ESQ., AND TRENT WALKER,ESQ.,
20                  REPRESENTING EDDIE PARKER AND MICHAEL JENKINS.

21

22

23

24

25
```

1

TABLE OF CONTENTS

2

3   WITNESSES FOR THE DEFENDANT:

4   EDDIE ELWARD

5       Direct Examination By Mr. Hollomon  ....................19

6   TERRI ELWARD

7       Direct Examination By Mr. Hollomon  ....................22

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    **THE COURT:**  Good morning.  In Case Number 3:23cr62

2  and Case Number 3:23cr63, the sentencing disposition for Hunter

3  Thomas Elward is set for this morning.

4      I see Mr. Hollomon representing Mr. Elward, Ms. Chalk and

5  Ms. Haynes.  Ms. Chalk, would you introduce your colleagues to

6  the Court, please, ma'am.

7    **MS. CHALK:**  Yes, Your Honor.  Next to me is

8  Christopher Perras.  And next to him is Glenda Haynes.  And on

9  the other side of Glenda Haynes is Daniel Grunert.  Christopher

10  and Daniel are both with the Criminal Civil Rights Division out

11  of Main Justice, Your Honor.

12    **THE COURT:**  Thank you.  Let the defendant, Mr.

13  Elward, and his counsel come to the podium.

14    **MR. HOLLOMON:**  Good morning, Your Honor.

15    **THE COURT:**  Good morning.

16      Mr. Elward, back in August of last year, you entered a

17  plea of guilty in these two cases, 11 counts in 3:23cr62 in an

18  information, and one count in 3:23cr63, as follows:  Counts 1

19  and 13, conspiracy against rights; Counts 2, 3, 6, 7, 8 and 10,

20  deprivation of rights under color of law; Count 9, discharge of

21  a firearm during a crime of violence; Count 11, conspiracy to

22  obstruct justice; and Count 12, obstruction of justice.

23      And then you pled guilty to -- in Case Number 3:23cr63, to

24  a count of deprivation of rights under color of law.  And you

25  are before the Court today for sentencing.

1    Have you received and read the presentence investigation

2  report with your lawyer, Mr. Hollomon?

3            **THE DEFENDANT:**  Yes, Your Honor.

4            **THE COURT:**  Did you understand and was he able to

5  answer questions that you needed to fully understand the

6  report?

7            **THE DEFENDANT:**  Yes, Your Honor.

8            **THE COURT:**  Mr. Hollomon, do you confirm that you

9  went over the presentence report, explained it to him as

10  necessary, answering any questions, and do you believe that he

11  understands what is reported in the presentence investigation

12  report?

13            **MR. HOLLOMON:**  I do, Your Honor.  We went over the

14  report extensively and filed objections.

15            **THE COURT:**  With regard to objections, the addendum

16  filed by the probation officer reflects that there is an

17  outstanding objection in the addendum -- I have a lot of

18  papers, and I'm looking for the copy of the -- a sentencing

19  enhancement of two levels for more than minimal planning.  Does

20  that accurately describe it, Mr. Hollomon?

21            **MR. HOLLOMON:**  It does, Your Honor.

22            **THE COURT:**  Do you have anything else to say in

23  support of that objection?

24            **MR. HOLLOMON:**  No, Your Honor, we stand on the

25  submission.

1      **THE COURT:**  The Court resolves that objection with a

2  ruling that there was more than minimal planning shown in the

3  messages and preparation by the officers before they made their

4  break-in to the house where the victims were located.  So that

5  objection is overruled.

6      **MR. HOLLOMON:**  Thank you, Your Honor.

7      **THE COURT:**  Is there anything further in connection

8  with any of that?

9      **MR. HOLLOMON:**  No, Your Honor.  The probation officer

10  agreed to our initial objection on the -- with regard to

11  paragraphs 151 and 157 and guideline 2A2.2(b)(2)(B), so no

12  further argument.

13      **THE COURT:**  I noted that, and the probation officer

14  said that that was the lone remaining objection.

15      **MR. HOLLOMON:**  Yes, Your Honor.

16      **THE COURT:**  There is a motion pending by the

17  government.  I'm going to ask counsel to come to the bench to

18  deal with that.

19   **(THE BENCH CONFERENCE IS SEALED AND FILED UNDER SEPARATE**

20  **COVER.)**

21      **THE COURT:**  With regard to the presentence report,

22  I'm confirming the counts of conviction, Counts in 23-62, Count

23  1, 2, 3, 6, 7, 8, 10, and 13, which provide for not more than

24  ten years imprisonment, and Count 1 of the other case, 63,

25  which provides for not more than ten years imprisonment, Counts

1    11 and 12 in Case Number 62, not more than 20 years, and then

2    Count 9, ten years consecutive to all other counts.

3        So the guideline provisions in this case, the ranges for

4    all counts except Count 9 -- I say case, cases, both cases --

5    is 97 to 121 months, and additionally, for Count 9, ten years

6    consecutive to all other counts.  Do counsel for both sides

7    understand that, and is there any need for further explanation?

8            **MS. CHALK:**  The government agrees, Your Honor.

9            **MR. HOLLOMON:**  The defendant agrees, Your Honor.

10           **THE COURT:**  All right.

11           **MR. HOLLOMON:**  Your Honor, should we go back to the

12   podium at this point?

13           **THE COURT:**  Yes, sir.  With that said, the Court

14   adopts the presentence investigation report both as to proposed

15   factual findings and guideline sentence application.

16       I'm going to ask counsel for the government, do you have

17   submissions to offer with regard to victim -- victims' impact

18   and statements by victims?

19           **MS. CHALK:**  Yes, Your Honor, we have submitted the

20   victim impact statements for EP, MJ, and AS to the Court.  EP

21   would like to make a statement to the Court.  I plan to read

22   the victim impact statement for MJ and AS.  And I have one,

23   maybe two statements for MJ's family.

24           **THE COURT:**  We will take all of that up now and you

25   may return to counsel table.

1          **MR. HOLLOMON:**  Thank you, Your Honor.

2          **MS. CHALK:**  Thank you, Your Honor.

3          **THE COURT:**  While she is preparing, the Court will

4    acknowledge having received sentencing memoranda from both the

5    government and the defense, including exhibits.  I've received

6    some character letters attesting to positive attributes of the

7    defendant from family members and friends.  Then, in addition,

8    a number of letters from members on the letterhead of the NAACP

9    of Rankin County and a petition, with many people having signed

10   that.  All of that will be handed forth to the clerk for

11   insertion into the record.  And I think I referenced the

12   sentencing memorandum.  Okay.  Proceed.

13         **MS. CHALK:**  Thank you, Your Honor.

14   With me is Attorney Malik Shabazz, Your Honor, and he

15   intends to read the victim impact statement for Eddie Parker

16   and Michael Jenkins, and then I will continue from there, if it

17   please the Court.

18         **THE COURT:**  All right.  Proceed, Mr. Shabazz.

19         **MR. SHABAZZ:**  Good morning, Your Honor.  My name is

20   Malik Shabazz, M-A-L-I-K, S-H-A-B-A-Z-Z.  I am attorney for

21   Mr. Michael Jenkins and Eddie Parker, the victims in this

22   matter, who will not be speaking.  I will speak on their behalf

23   due to the trauma they have undergone.

24   This is Michael Jenkins statement:

25   "January 24th was the worst day of my life.  I was

1  brutally beaten and nearly killed by the Rankin County

2  Sheriff's Department, also known as the Goon Squad.  I never

3  would have thought a night of hanging out with friends would

4  nearly cost me my life.  They beat, kicked, tased, insulted,

5  waterboarded and humiliated me, and that will forever be

6  engraved in my mind and my heart.

7      "I am hurt.  I am broken.  I am ashamed and embarrassed by

8  the entire situation.  They tried to take my manhood from me.

9  They did some unimaginable things to me, and the effects of it

10  will linger with me for the rest of my life.

11      "All of the things I used to enjoy doing in my life has

12  been affected.  I'm a musician and a singer, and now, because

13  of a gun shot wound to my jaw, I can no longer do what I love,

14  and that is to sing.

15      "I play the drums for my church, and because I was shot in

16  the face, it affected my vision, so I can no longer play.  My

17  timing, my train of thought, my judgment has been so clouded

18  since I was shot by Hunter Elward.

19      "Waking up at night covered in sweat because of the

20  nightmares of my attack; loud noises, police lights, sirens,

21  all give me fear and anxiety.

22      "I'm broken inside.  I don't ever think I will be the

23  person that I was.  I try every day to do some of the simple

24  things I used to enjoy, but I can't, all because the real goons

25  took it upon themselves to torture me and shoot me.  I could be

1   dead and gone, but the God I serve has other plans.

2       "I am currently undergoing therapy from my psychologist in

3   order to heal from what happened to me.  I want all of them to

4   remain behind bars and off of the streets, and I, Michael

5   Jenkins, am praying for the maximum sentence for the Goon

6   Squad."

7       This is the statement on behalf of Mr. Michael Jenkins.

8   Could you stand, sir, and let Your Honor see you.

9       Thank you, sir.  Thank you, Your Honor.

10      This is the victim impact statement of Mr. Eddie Terrell

11  Parker:  "The very bad actions of the Rankin County Goon Squad

12  severely impacted me and has left a scar on me that will last

13  forever.  I never knew the ones that were sworn to protect and

14  serve me would be the ones that I needed protection from.  I

15  don't know if I will ever be able to sleep again at night.  I

16  am in constant fear someone will break into my home and

17  terrorize me.

18      "I fear that I will be attacked again or even killed by

19  the police in Rankin.  The humiliation, the embarrassment from

20  the sexual assault is too great for me to talk about.

21  Therefore, I am in therapy now and in the future.

22      "My family is also affected by this.  They worry about my

23  safety.  My financial situation has taken a very crucial hit

24  also.  I am terrified of the public.

25      "My mind is all messed up and my emotions are sometimes

1    all over the map.  What happened should have never happened.

2    Damien Cameron and a very long list of other victims would

3    agree, but they can't because they have been killed by the Goon

4    Squad.

5         "My life wasn't perfect, but it was mine.  I doubt if I

6    will ever experience it again.  I wish I didn't have to

7    experience the memory of this torture session, but I can't do

8    that either.  I can't erase my memories, but I will struggle to

9    live on.  They should be given what they gave me and Michael

10   Jenkins, which was no mercy, and they should be given the

11   maximum sentence."

12        That's the statement on behalf of the victim, Mr. Eddie

13   Terrell Parker.  Thank you, Your Honor, Mr. Parker.

14             **THE COURT:**  All right, sir.

15             **MR. SHABAZZ:**  And I thank you, Your Honor.

16             **MS. CHALK:**  Your Honor, next I have Ms. Mary Jenkins.

17             **THE COURT:**  Okay.

18             **MS. CHALK:**  Ms. Jenkins, would you state your name

19   and spell it for the record.

20             **MS. MARY JENKINS:**  Mary Jenkins, M-A-R-Y

21   J-E-N-K-I-N-S.

22             **THE COURT:**  Good morning.

23             **MS. MARY JENKINS:**  Good morning, Your Honor.

24        I just wanted to come and say a few words about the

25   morning I found out that my son had been shot in the mouth.  My

1    first instinct was just to see if he was alive, because I know

2    a bullet to the head, he probably wouldn't survive.

3        So I called Rankin County, and I couldn't get enough

4    information from them, and they kept saying they were in a

5    meeting, emergency meeting.  So, finally, someone called me,

6    and I asked them about my son.  I said, "Is my son alive?"  And

7    this deputy I talked to was rude.  I was upset, I was crying,

8    because at that point I just knew my son was dead, but I just

9    wanted information.  I wanted it confirmed if he was dead or

10   not.  This deputy said -- I asked him, I said, Is my son alive?

11   He said, As far as I know, he is.  I said, "Well, can I see

12   him?"  He said, "You can see him when I let you see him."  He

13   said, "Michael is my property, is our property now."  That's

14   how they referred to my son, and I'm a mother asking about my

15   child, that you can see him when I let you see him.

16       They put him on an alias, so we were calling all around

17   the hospitals trying to find him, but they put him on an alias,

18   so I was asking for Michael Jenkins, and all the hospitals were

19   saying they didn't have a Michael Jenkins.  So I was at a loss.

20       And Your Honor, I don't know if you have children, but

21   when you are sitting there and you can't find any information

22   about your son, all you know is he'd been shot, that's the fear

23   that was going through me and my husband.

24       My husband was trying to prepare me for the worst.  He

25   said, Mary, we will try to find him, but please be prepared for

1    the worst.

2        So Your Honor, I want the same consideration for these

3    peoples that they gave to my son when they placed a gun in his

4    mouth and pulled the trigger.  They should get the maximum,

5    because my son was not an animal.  I am not an animal.  I am a

6    mother.

7        Although my skin is black, that doesn't make me less of a

8    woman or less of a mother when it comes to my child.  These men

9    need to pay for what they did to my son.

10       And thank you, Your Honor.

11           **THE COURT:**  That was a horrifying experience.  Thank

12   you, ma'am.

13           **MS. LINDA RAWLS:**  Your Honor, my name is Linda Rawls,

14   and I am Eddie Terrell's aunt.

15           **THE COURT:**  Good morning.

16           **MS. LINDA RAWLS:**  L-I-N-D-A, R-A-W-L-S.  And I helped

17   raise Eddie, because my brother is deceased.  His mama is ill.

18       So on January 24th, '23, he called me.  He was crying, and

19   he told me what happened.  I knew he wasn't lying.  When I got

20   to him, he was distraught.

21       Your Honor, don't nobody know what go on behind closed

22   doors.  There have been many nights he had called me.  I have

23   to go.  I have to go to make sure he is okay.  A lot of

24   sleepless nights, won't eat, won't come around family, nothing.

25           But Your Honor, I ask that they get the maximum sentence

1    they can.  They didn't deserve this.  Thank you, Your Honor.

2            **THE COURT:**  Thank you.

3            **MS. CHALK:**  Your Honor, I'm going to read the victim

4    impact statement from Alan Schmidt, who was the victim in

5    Criminal Number 3:23cr63.

6        "My name is Alan Schmidt.  I'm a victim of the former

7    Rankin County Sheriff Officers Christian Dedmon, Hunter Elward

8    and Daniel Opdyke.  Before I get into the graphic details of

9    the dreadful night of December 4, 2022, when I was assaulted by

10   Dedmon, Elward and Opdyke, I want to express that I prayed to

11   God for these officers' souls to be healed of the evil within

12   to cause them to commit these acts on others.  I pray every day

13   that I can forgive them one day and hopefully forget the

14   humiliation and the evil physical and sexual assaults that I

15   was endured from Dedmon, Elward, and Opdyke.

16       "I know that I'm not their only victim, and I pray for

17   each victim that has crossed paths with the Goon Squad members,

18   Dedmon, Elward and Opdyke.  The acts committed upon me on

19   December 4, 2022, have impacted my life in such a negative way

20   that it will take years to lead to a somewhat normal life

21   without having flashbacks of the night of December 4, 2022.

22       "On the night of the assault, I was pulled over for an

23   expired tag near I-20 and State Street near the border of

24   Rankin and Hinds County.  A traffic stop initiated, and I

25   complied with the original officer's commands.  Then Christian

Dedmon arrived shortly after, immediately ordering officers to cuff me and take me to Dedmon's vehicle.

"When Dedmon got to his vehicle, he yanked me down, hitting my head on the back of the right quarter panel of Dedmon's Rankin County Sheriff's Department-issued vehicle. My head hit the panel by the wheel, leaving a dent on the vehicle, and my eyes began to see spots. I could not think clearly. I could not see. I could not protect myself. I was scared for my life already. I was already scared for my life as I was being assaulted on the side of the road, and then my life flashed before my eyes. I thought I died. I knew my time was over.

"Christian Dedmon demanded that I confess and disclose the location of stolen items in Jackson, Mississippi, which I did not know. Dedmon responded to my lack of knowledge by discharging his gun towards me. Then I felt the barrel of the gun on my temple. I was shaking. I almost used the restroom on myself. I was humiliated. I was scared.

"It is hard to finish writing this paragraph. The images are so graphic. The fear is unexplainable. I did not know it was possible for any human to feel this way.

"Dedmon asked me several more times where the stolen items were. I did not know, so I told him I did not have what he was looking for. This time Dedmon shot the gun closer to my head. I thought, this is it, I will never see my family again, and

1    these officers will get away with it.  At this point, I think I
2    was in shock.

3        "The next thing I remember is being beaten, punched and
4    kicked.  I thought to myself it would stop soon, and they were
5    on a power trip and would stop.  I was wrong.  It seemed like
6    it was going to last forever.  Nobody helped me.  Nobody
7    stepped in to stop them.  Nobody cared.

8        "I wish the officers understood that I'm a human being,
9    just like them.  I hurt just like them.  I feel just like them.
10   I finally began to pray to God out loud to save me.  I know
11   that nobody is perfect.  I know that I have made mistakes in
12   the past, but I would never treat another human being or living
13   creature the way I was treated by officers sworn to protect the
14   Constitution and our rights.  The louder I prayed, the harder I
15   was beaten.

16       "I began to slip into unconsciousness and passed out, and
17   the assault finally stopped.  The pain was excruciating.  I was
18   still cuffed from the time Dedmon arrived on scene throughout
19   the assaults, being shot at, then sexually assaulted.  When I
20   was able to gather my bearings and surroundings, I was being
21   walked by Hunter Elward and Christian Dedmon, then forced to my
22   knees in front of Dedmon.  Dedmon pulled his private part and
23   began hitting me in the face with it.  Dedmon tried to put his
24   privates in my mouth, but I kept my mouth as tight as I could.
25   I could not help but think during this, 'What sick individual

1    does this?  He has so much power over us already, so to act

2    this way, he must be truly sick in the head.'  I did not think

3    I was in reality anymore.  This is not the world we live in.

4    We are better than this.

5         "Since I would not touch Dedmon or Elward's privates and

6    kept screaming, no, that they were sick for doing this, they

7    pulled my pants down.  I was still handcuffed and defenseless.

8    The officers started touching my private parts.  Dedmon grabbed

9    my privates and said, 'My, you have a big one' and dry-humped

10   me.  I kept screaming that they are sick and to let me go.

11        "The assault eventually stopped when the officers took me

12   to jail.  My face was injured pretty bad, and they knew it but

13   didn't take me to the hospital or even have medical evaluate me

14   at the jail.  Nobody cared.  I have flashbacks to this day if

15   certain things happen.  If my pants are around the knees, with

16   me pulling them up, I will think about it and get short of

17   breath.  If I see a cop car, I break out in sweats.  I am

18   terrified of guns and shake if I hear loud, unexpected noises.

19   When I drive down I-20, where the incident took place, I think

20   about it every time.  This will not escape me.

21        "I never want to see these officers again.  They sexually

22   assaulted me.  They physically and mentally abused me.  My life

23   has forever changed because of the actions of these officers.

24   I pray that the justice system will hold them to the fullest

25   extent of the law for all our sakes.

1    "Police are supposed to serve and protect.  This is my

2    truth.  This is what happened to me.  Thank you for taking the

3    time to read my statement.  I have the utmost faith that

4    justice will be served.  Yours truly, Alan Schmidt."

5        Your Honor, the government does not have any further

6    witnesses or other impact statements to read.

7        **THE COURT:**  With regard to the issue of restitution,

8    is there a presentation to make?  I've seen some forms filled

9    out by some of the victims.  What is the status of that?

10        **MS. CHALK:**  Your Honor, all of the documentation that

11    we have received from Mr. Parker and Mr. Jenkins regarding a

12    request for restitution has been calculated and provided to

13    probation and the Court.  We are seeking that restitution be

14    made to Mr. Jenkins and Mr. Parker.  We are seeking restitution

15    in the amount of $48,000, as requested by Michael Jenkins, and

16    a total of $31,500 as requested by Eddie Parker.  There was not

17    a claim of restitution made by Alan Schmidt.

18        **THE COURT:**  Thank you.  Do you have anything further?

19        **MS. CHALK:**  Not for a victim impact statement, Your

20    Honor, or restitution.  I will note for the record, you have

21    heard from the victims in this case and their families, and our

22    victims have been notified, and many of them did choose to be

23    in court today, and the others that did not did provide the

24    victim impact statement.

25        **THE COURT:**  All right.  I'm addressing the

1  restitution part of it.  Mr. Elward, you can return to the

2  podium with your lawyer.

3      Before I impose sentence, you have the right of allocution

4  and may tell me anything that you think I need to hear before I

5  give you your sentence, with particular emphasis on matters

6  that you contend should be in mitigation of punishment.  You

7  can speak, your lawyer may do so, or both of you may, and if

8  you have any witnesses, of course, you may present them.  Mr.

9  Hollomon, what is your position on that?

10          **MR. HOLLOMON:**  Thank you, Your Honor.  My client

11  would like to speak by way of allocution, but before that, we

12  have two witnesses we would like to call, Your Honor.  We would

13  call, first, Mr. Eddie Elward.

14          **THE COURT:**  Okay.

15          **THE CLERK:**  If you would place your left hand on the

16  Bible and raise your right hand, please.

17      **(OATH ADMINISTERED.)**

18          **MR. HOLLOMON:**  May I proceed, Your Honor?

19          **THE COURT:**  Yes, sir.

20                    **EDDIE ELWARD,**

21  **having first been duly sworn, testified as follows:**

22              **DIRECT EXAMINATION**

23  **BY MR. HOLLOMON:**

24  Q.  Good morning, Mr. Elward.

25  A.  Good morning.

1    Q.   If you would, keep your voice up and speak into that

2    microphone so the court reporter can take down what you say.

3    A.   Yes, sir.

4    Q.   State your name for the record.

5    A.   Edward Douglas Elward, Jr.

6    Q.   Mr. Elward, where do you live?

7    A.   In Florence, Mississippi.

8    Q.   Are you married?

9    A.   I am.

10   Q.   Who is your wife?

11   A.   Terri.

12   Q.   And are you related to Hunter Elward?

13   A.   He is my son.

14   Q.   Okay.  Now, you know why we are here today, correct?

15   A.   Yes, sir.

16   Q.   We are here for the sentencing of Hunter on these charges.

17   What would you like the Court to know before the Court imposes

18   sentence in this case?

19   A.   Well, nothing prepares a parent for this, I guess, but

20   first I would like to apologize and let the victims and their

21   family know that what happened to them is unexplainable.  It

22   never should have happened, and I apologize.  And I hope and

23   pray that you are able to eventually find some healing in this

24   process.

25        It's going to happen -- there's many more victims in this

1    than just these gentlemen here, with Hunter's family and all of

2    us.   I think it was March when he came to me and we sat down

3    and he was able to tell me what had actually happened that

4    night and how distraught he was about what had happened.   And I

5    explained to him the only way we can heal from this is to tell

6    the truth.   Let's step up and do what we need to do to make

7    this right or to make it get better, and that we would look at

8    this point that we are going to do what we can to make sure

9    this doesn't happen in Rankin County again.

10        It is a terrible, terrible thing.   I am very upset with

11   the county and the powers that be.   He is a very good kid.   He

12   was a very hard-working young man.   Unfortunately, he felt the

13   need to have to work overtime, and at the Rankin County

14   Sheriff's Department, you can't work overtime unless you work

15   with these guys he was having to work with, and Brett McAlpin

16   was the worst person for him to have to work with.

17        But he is going to take and own what he did, and he is

18   going to do his time for what he did.   And I pray that there's

19   some mercy somewhere along the way that helps him get back to

20   his family, to his boys, and also would help the victims and

21   their family recover or find some healing in this process.

22            **MR. HOLLOMON:**  Thank you, Mr. Elward.

23            **THE WITNESS:**  Thank you.

24            **MR. HOLLOMON:**  That's all I have of this witness,

25   Your Honor.

1          **THE COURT:**  All right.

2          **MS. CHALK:**  No questions.

3          **MR. HOLLOMON:**  Your Honor, we would next call Terri

4    Elward.

5          **THE CLERK:**  If you would place your left hand on the

6    Bible and raise your right hand, please.

7          **(OATH ADMINISTERED.)**

8          **MR. HOLLOMON:**  May I proceed, Your Honor.

9          **THE COURT:**  Yes, sir.

10         **MR. HOLLOMON:**  Thank you.

11                        **TERRI ELWARD,**

12   **having first been duly sworn, testified as follows:**

13                     **DIRECT EXAMINATION**

14   **BY MR. HOLLOMON:**

15   Q.  State your name for the record.

16   A.  Terri Elward.

17   Q.  Ms. Elward, was that your husband Eddie that testified a

18   minute ago?

19   A.  Yes, it was.

20   Q.  And are you related to Hunter?

21   A.  I am his mother.

22   Q.  Again, you know why we are here today?

23   A.  Um-hm.

24   Q.  For the sentencing of Hunter.  And I would ask you the

25   same question.  Is there anything that you think the Court

1   should know about Hunter that you can provide to the judge this

2   morning before he imposes sentence?

3   A.  Yes, sir.

4   Q.  Okay.

5   A.  Thank you, Judge, for giving me this opportunity.  Hunter

6   was born and raised in Rankin County, been there all his life

7   in the Richland/Florence community.  He is a seventh generation

8   Rankin Countian, and most of us still live there.  He has got

9   lifelong friends.  He was very active.  He did all the normal

10  things that a teenage boy does.  I'm not going to tell you he

11  was perfect by any sense of the imagination, but he was a good

12  kid.  He hunted, he fished, he played baseball, and played

13  baseball.  He hung out with his friends.  He hung out with his

14  friends' parents.  He was just a liked child.

15      When it comes to his family, he was always there, he was

16  always there when -- he's the youngest of four, and when his

17  older brothers and sisters got married and started -- the

18  nieces and the nephews started coming, he was the cool uncle.

19  He was the one they always wanted to play with.  I couldn't

20  have been more proud of him the day he told me he was going to

21  be a Rankin County Deputy, and I'm still proud of him.  I was a

22  little scared about that decision because it wasn't exactly the

23  best time to become a police officer.

24      Hunter has got three little boys, nine-year-old twins and

25  a seven-year-old, and they've really suffered from what

1    happened that night.  They didn't know what to think of it.

2    They didn't know what to do.  And we and his ex-wife did a

3    remarkable job of trying to keep them within their age limit of

4    what happened.  They have since told me that they know what

5    daddy did was wrong but that they forgive him and that they

6    love him.  And they talk to him as often on the phone as he

7    can.

8        I want you to know that the remorse that Hunter has had

9    for this has been absolutely unbearable.  I've never seen him

10   this way.  I've never even in one moment in my life had anybody

11   tell me or see anything that would make me think that Hunter

12   was a racist.  He has friends all over the community, all over

13   the county, of every age, every color.  He has never, ever

14   shown any racism that I could have -- that I've ever seen.  But

15   since he's been incarcerated, I think he has learned a lot.  I

16   think that he -- he's been humbled a bit.  I think that when he

17   comes out of this, he is going to be a much better man.

18       I certainly believe that there's -- I hate to say the

19   cliché that things happen for a reason, because I don't really

20   think that all the time, but I do think that there's always --

21   God has a plan, and I believe that the years that he's going to

22   spend in jail are part of Hunter's plan that God has for him.

23       I just hope that as you impose this sentence on him, you

24   will remember what telling the truth took from him.  It took

25   his children's whole entire childhood.  By the time he gets

1    out, they will be grown, and he will have missed it.  I just

2    ask -- I want to tell you that I believe that there's a lot of

3    great left in Hunter.  I believe that he is going to do

4    something great when he gets out, and I just hope that you will

5    remember that as you impose this sentence.

6            **THE COURT:**  All right.

7            **THE WITNESS:**  Thank you.

8            **MR. HOLLOMON:**  Thank you, Ms. Elward.  That's all I

9    have, Your Honor.

10           **THE COURT:**  Does the government have any questions?

11           **MS. CHALK:**  No, Your Honor.

12           **THE COURT:**  Thank you, ma'am.  You are excused.

13           **MR. HOLLOMON:**  Judge, finally, Hunter -- Your Honor,

14    that is all we have by way of evidence.  My client would like

15    to speak by way of allocution before the Court imposes

16    sentence.

17           **THE COURT:**  Very well.

18           **THE DEFENDANT:**  Your Honor, I would like to start off

19    by saying that I'm not a man of excuses.  They leave a bad

20    taste in anybody's mouth.  I've fought hard with myself ever

21    since that night, but it wasn't never -- I know when most

22    people get in trouble like this, they are only mad that they

23    got caught.  A lot of people are only mad that they got caught.

24    This would probably be a lot easier for me if I was only mad

25    that I got caught, but I hate that I was involved in this, and

 1    I hate what's happened to them.

 2         I chose this line of work, and the key word there is

 3    choice.  That was my choice.  And I'm not speaking for the

 4    other guys, but I took that choice from them.  I have to live

 5    every night with what I see in my mind, the things that I've

 6    been through, the things I've seen and done, and because of

 7    what I did, I made them see something every night when they go

 8    to sleep or try to go to sleep.  And that's on me.  And I would

 9    like to say that I am so dadgum sorry for what happened -- or

10    to them.

11         I am apologizing to the Court, but I really want y'all to

12    know that I am sorry, if it's all right if I look at them.  If

13    they are okay with it, I would like to address them directly,

14    if that's all right.

15         I don't want to get too personal, Mr. Jenkins.  I see you

16    every dadgum night.  And I can't go back and do what's right,

17    because to sit here and say that I could go back and do what's

18    right would mean that I needed to go back 7 years to the first

19    time I saw this type of behavior.  And like I said, that is

20    just an excuse.  But I hear what you said, I see the way you

21    looked, and that's just when I lay down.  God, there's no

22    telling what you see.  And I'm sorry.  I truly am.  I'm so

23    sorry that I caused that.

24         I hope and I pray -- I was raised Christian.  I slacked

25    off, but I am going to do better and seek counseling.  I would

1  like to learn a lot more.  That's my way out.  That's the only

2  choice I've got now.  You know, I've got to seek that counsel.

3  And I'm -- it's such a hard road to get over mental health.

4  I'm there, I am, but I gave it to you, and I hate myself for

5  it.  I hate that I gave you that, all of y'all involved.  All

6  of y'all.  And I'm going to pray that you get that type of

7  healing.  I truly am.

8       And I accept all responsibility, and I'm going to accept

9  the Court's decision today.  That was regardless.  I just hope

10  you -- hope all of y'all understand that I am truly sorry.

11       **MR. EDDIE PARKER:**  I forgive you, man.

12       **THE DEFENDANT:**  Huh?

13       **MS. HAYNES:**  He said he forgives you.

14       **THE DEFENDANT:**  That's all I've got.

15       **MR. HOLLOMON:**  On behalf of my client, Judge, I would

16  simply say that I do believe Hunter has accepted responsibility

17  for his actions, and he's prepared to face the consequences.

18  He hasn't tried to point the finger of blame anywhere else

19  because he accepts that responsibility.  But he doesn't bear

20  sole responsibility.

21       Hunter was not a hateful or mean person when he started

22  work at the Rankin County Sheriff's Office back in 2017.  But

23  there, very early on, Hunter was exposed to brutal conduct.  He

24  watched as others above him in uniform and in rank turned a

25  blind eye to outrageous conduct, disregard of the law.  This

1   activity was condoned and even rewarded until it became the new

2   norm.  In other words, it became institutional.  And

3   unfortunately, Hunter was initiated into this culture of

4   corruption in the Rankin County Sheriff's Office, and that's

5   why he is here today.

6          So, Judge, he accepts his responsibility, but he was

7   taught this behavior as a young man when he began policing over

8   there, so there is responsibility there also that we want to

9   make the Court aware of.  I'm sure the Court is aware of it.

10         But Your Honor, that's all that we have at this time.  We

11  rest.

12              **THE COURT:**  All right, sir.  You may be seated.

13              **MR. HOLLOMON:**  Thank you.

14              **THE COURT:**  Does the government have any comment to

15  make in the exercise of the government's allocution?

16              **MS. CHALK:**  We do, Your Honor.

17         Your Honor, we tendered the Court a sentencing memorandum

18  that we would request be filed in ECF.  It was tendered to the

19  Court, as well as a sealed sentencing recommendation.  We would

20  ask that that remain sealed, but we would ask that our

21  sentencing memo be filed in ECF publicly.

22              **THE COURT:**  All right.

23              **MS. CHALK:**  Your Honor, on January 24, 2023, this

24  defendant, Hunter Thomas Elward, and his codefendants, while

25  acting as sworn law enforcement officers, brutally terrorized

1    and carried out crimes of hate against MJ and EP at 135 Conerly

2    Road in Braxton, Rankin County, Mississippi.

3        In the evening hours of January 24th, McAlpin received a

4    complaint from a white neighbor that there were several African

5    American males staying at the home of 135 Conerly and had

6    observed suspicious behavior.  McAlpin called Dedmon and told

7    him to take care of it.  Codefendant Dedmon then notified this

8    defendant and other codefendants, including Daniel Opdyke,

9    shift supervisor Lieutenant Middleton about a mission, in a

10   group text that they all willingly participated in where Dedmon

11   wrote, "Are you available for a mission," a phrase all were

12   familiar with.  Dedmon warned the group to the possibility of

13   cameras at the home and told his codefendants, "There's a

14   chance of cameras.  Let's approach east and work easy."

15       Elward and the others knew that this meant to knock on the

16   door, that this meant, if there were cameras, to knock on the

17   door rather than knock it down.  Elward responded to these

18   texts with an eyeroll emoji.  Opdyke responded with a GIF of a

19   baby crying.  Dedmon followed up with, "If we don't see

20   cameras, go, and no bad mug shots."

21       Based upon the texts, Middleton, Elward and Opdyke headed

22   to the Cato Volunteer Fire Department to wait for the go

23   signal.  Dedmon told the group he had someone with him to cover

24   the back door.  At no time was a question asked, hesitation

25   noted, or unwillingness to participate stated.  Elward

1  proceeded to that meet location to gather with the others that

2  he swore to serve and protect, but serving and protecting was

3  not what they had in mind on the night of January 24, 2023.

4      As they approached the property, Dedmon, Elward, and

5  Opdyke noticed the camera above the front door, so they opted

6  to walk around to the carport door where no camera was noticed

7  or present.  They did not knock.  They did not ring the

8  doorbell.  Instead, they began kicking open the door.

9      Once they entered, Elward and Opdyke immediately

10 encountered Michael Jenkins and Eddie Parker, two African

11 American men in the hallway.  Mr. Jenkins and Mr. Parker were

12 placed in handcuffs, tased multiple times, and even kicked for

13 no apparent reason.  Dedmon, Elward and Opdyke continued to

14 tase and scream at Michael Jenkins and Eddie Parker.

15     At this time, Hartfield then entered forcefully through

16 the back door.  And within moments, Middleton and McAlpin also

17 entered the residence.  Dedmon was demanding to know where the

18 drugs were, and when Mr. Parker responded that there were no

19 drugs at the home, Dedmon became more enraged, unholstered his

20 gun and fired towards the back of the house.  At no time did

21 anyone intervene, yell "Stop" or render aid to Michael Jenkins

22 or Eddie Parker.

23     Elward and his codefendants continued to perpetuate the

24 hate crime.  Elward and his other white codefendants continued

25 the unimaginable torture while moving the handcuffed Jenkins

1    and Parker to the living room where they were called racial

2    slurs, with the N word, monkey, and boy, and accused them of

3    taking advantage of a white woman.  They warned them to go back

4    to Jackson to their side of the river.  All the while, Dedmon

5    was repeatedly dry-stunning Michael Jenkins with his taser.

6        During the search of the home, Opdyke kicked in a padlock

7    door and found a BB gun and a flesh-toned dildo.  The dildo was

8    placed at the end of the BB gun and Dedmon and Opdyke forced it

9    into the mouths of Michael Jenkins and Eddie Parker and then

10   began to hit them in the face with it.  They were then forced

11   on their backs, still handcuffed, where they were threatened

12   and attempted to be anally raped by Dedmon.

13       The abuse and torture did not end here.  Not a single law

14   enforcement officer intervened, not a one of the six.  Not a

15   single law enforcement officer said, "Stop," not a single law

16   enforcement officer rendered aid, even though several of them

17   were in uniform.

18       The torture and abuse continued with Elward holding MJ,

19   Michael Jenkins, and EP, Eddie Parker, down, while Dedmon

20   poured milk, alcohol, and chocolate syrup on their faces, and

21   Elward followed up by throwing eggs.

22       They were then forced to shower off the evidence of some

23   of this abuse they had just endured.  After they were showered,

24   they had the handcuffs placed back on.  Then several of the

25   defendants found objects inside the house to continue the

1   abuse, like a sword used by Middleton, a wooden kitchen

2   implement used by Opdyke, and pieces of wood also used.  Still,

3   no one intervened and no one rendered aid.

4        The torture continued with taser hot potato.  The

5   defendants wanted to see which taser was more powerful and more

6   painful, so Dedmon, Hartfield, Middleton, and Elward all took

7   turns using the tasers that Hartfield, Dedmon and Elward had.

8   They deployed these tasers and dry-stunned Jenkins and Parker

9   repeatedly and asked them which one hurt worse.

10        McAlpin and Middleton at some point stepped away just to

11   see if there were any items in the house that may be of

12   interest to them.  They found some rubber bar mats and even

13   took them out to their cars to steal them.  Meanwhile, Mr.

14   Jenkins and Mr. Parker were screaming and crying in pain from

15   the torture being inflicted upon them by Elward and others.

16   McAlpin and Middleton ignored those cries for help.  They

17   failed to intervene and they failed to protect, as they had

18   sworn to do so.  Their failure allowed Elward and his

19   codefendants to continue perpetuating the torture.  And it did

20   not stop here.

21        Dedmon then removed his firearm from a holster a second

22   time when he fired out into the yard.  Around the same time,

23   Elward removed his firearm from his holster, removed a bullet

24   from the chamber, stuck the gun in Michael Jenkins' mouth while

25   he was handcuffed, pulled the trigger.  The gun dry-fired, but

1     that was not it.  He put the firearm back inside of Michael

2     Jenkins' mouth and fired a second time.  This time a bullet

3     severed Michael Jenkins' tongue and exited out of his neck,

4     causing permanent life-threatening injuries.  He was left

5     bleeding on the floor right next to his friend, Mr. Parker.

6          Instead of rendering aid, this defendant and others went

7     outside to huddle up to come up with a plan.  They all agreed

8     to lie, create elaborate stories to cover up the abuse and

9     torture that was inflicted inside that home.  The cover-up

10    included lying to investigators, an offer to throw a plant gun,

11    manipulating the GPS data in the Rankin County Sheriff's Office

12    radios and patrol vehicles, planting a BB gun, pressuring Eddie

13    Parker to go along with what McAlpin told him, writing false

14    reports, filing false affidavits and arrest warrants, sending

15    drugs to a lab that was not even recovered at this residence

16    and not at all connected to Michael Jenkins or Eddie Parker.

17    They hid the soiled clothes, they removed a hard drive, they

18    recovered a shell casing, and they all agreed to go along with

19    it.

20         Some of the codefendants ensured everyone would go along

21    with it by planning to threaten to kill them.  This defendant

22    had so little regard for the actions, additional food was

23    placed around the residence by other defendants to cause odor

24    in the coming days.  And to top it off, McAlpin urinated in a

25    closet.

1    But this is not the only activity that this defendant is

2  involved in.  As the Court is aware, he also pled guilty to the

3  companion information, and on December 4, 2023 (sic), this

4  defendant participated in a traffic stop of a white man, Alan

5  Schmidt.  He was believed to have stolen some lawn equipment.

6  And instead of investigating the crime, this defendant watched

7  as Dedmon hit, punched and slapped Mr. Schmidt on the side of

8  Interstate 20.  Elward failed to intervene, and he also failed

9  to intervene when Dedmon grabbed the gun from Opdyke's holster

10  and fired it.  He also failed to intervene when Dedmon grabbed

11  Mr. Schmidt's genitalia and threatened to kill him while

12  extracting a confession.

13    This defendant never protected Alan Schmidt that night

14  from Dedmon, and he continued to participate in the crime and

15  the torture when they took Mr. Schmidt to Jackson to try and

16  recover some property.

17    The egregiousness, the seriousness of the brazen lawless

18  acts that this defendant chose to participate in, and the

19  injuries, physical, emotional and mental distress that these

20  victims have received that were committed by this defendant in

21  January 2023 and December of 2022, warrant and demand a

22  sentence at the top of the guideline range for a total sentence

23  of 241 months imprisonment.

24    And Your Honor, an evaluation of the 3553(a) factors also

25  warrant a sentence at the top of the guideline range.  We would

1   ask the Court to impose a sentence of 241 months for this

2   defendant, and we also stand behind our recommendations in the

3   plea supplement that has been filed under seal.

4           **THE COURT:** All right.  Mr. Hollomon, do you have

5   anything finally to say?

6           **MR. HOLLOMON:** No, Your Honor.

7           **THE COURT:** I've debated with myself whether I should

8   say anything in explanation of my decision on the sentence to

9   be imposed in this case.  There's so much that could be said,

10  but I don't think any extended commentary by me is really

11  necessary because it's so clearly apparent from the egregious

12  and despicable nature of the defendant's crimes and the

13  traumatic effects that his and his codefendants' conduct have

14  had on their victims, that a sentence at the top of the

15  guidelines range is justified, more than justified.  It's what

16  the defendant deserves, and it's what the community and

17  defendant's victims deserve.

18      Law enforcement officers are charged to serve and protect,

19  to protect the safety and well-being of all citizens.  Despite

20  the horrendous actions of the defendants in this case, I remain

21  convinced that the vast majority of those in the law

22  enforcement community take that commitment seriously and are as

23  thoroughly appalled by the defendants' actions as the Court.

24      The defendants' actions have doubtless served to erode, or

25  in the eyes of some, I'm sure, to further erode public trust in

1  law enforcement.  And in doing so, they have made us all

2  victims.

3      Therefore, the judgment of the Court is as follows:  The

4  Court has considered the advisory guideline computations and

5  the sentencing factors under Title 18, United States Code,

6  Section 3553(a), and it is the judgment of the Court that you,

7  Hunter Thomas Elward, serve a term of 121 months imprisonment

8  as to Counts 1, 2, 3, 6, 7, 8, 10, 11, 12, and 13, and Count 1

9  of Docket Number 3:23cr63, all to run concurrently to each

10 other.  As to Count 9, you shall serve a term of 120 months to

11 run consecutively to all counts for a total imprisonment term

12 of 241 months in the custody of the U.S. Bureau of Prisons.

13 These sentences shall run concurrently to the anticipated state

14 court sentences.

15     Based on your financial condition, the Court finds that

16 you don't have the ability to pay a fine in addition to

17 mandatory restitution, and no fine is ordered.

18     Restitution in the amount of $79,500 is ordered and

19 payable immediately and during the term of incarceration.  The

20 restitution is ordered payable to the U.S. Clerk of Court, who

21 will forward the payments to all the victims as listed on the

22 judgment order.  This amount is payable jointly and severally

23 with the codefendants in this case.  In the event the

24 restitution is not paid in full prior to the termination of

25 supervised release, you are ordered to enter into a written

1    agreement with the financial litigation program of the U.S.

2    Attorney's Office for payment of the remaining balance.

3        Additionally, the value of future discovered assets may be

4    applied to offset the balance of criminal monetary penalties.

5    You may be included in the Treasury Offset Program allowing

6    qualified federal benefits to be applied to offset the balance

7    of criminal monetary penalties.

8        The term of imprisonment shall be immediately followed by

9    three-year terms of supervised release as to all counts to run

10    concurrently with each other.  Within 72 hours of release from

11    the custody of the Bureau of Prisons, you shall report to the

12    probation office in the district to which you are released.

13        While on supervised release, you shall comply with the

14    mandatory conditions pursuant to Title 18, United States Code,

15    Section 3583(d).  Further, the Court finds that the standard

16    conditions of supervision as listed on the judgment order and

17    in part G of the presentence investigation report, which have

18    been adopted by this Court, are reasonably related to the

19    factors set forth in Title 18, United States Code, Section

20    3553(a)(1), (a)(2)(B), (C), and (D), and involve no greater

21    deprivation of liberty than reasonably necessary for the

22    purposes set forth in that section.

23        Further, these conditions are consistent with the policy

24    statements issued by the Sentencing Commission pursuant to 26,

25    United States Code, Section 994(a).  Therefore, you will comply

1    with the standard condition of supervision in the judgment

2    order, which includes the prohibition of possessing a firearm.

3        Then there are special conditions now imposed in addition:

4    One, you must not communicate or otherwise interact with the

5    victims MJ, EP or AS, either directly or through someone else,

6    without first obtaining the permission of the probation

7    officer.

8        You shall not incur new credit -- the second one, you

9    shall not incur new credit charges or open additional lines of

10    credit without the approval of the probation officer unless you

11    are in compliance with the installment payment schedule.

12        Three, you shall provide the probation office with access

13    to any requested financial information.

14        Four, you must pay outstanding restitution imposed by the

15    Court in accordance with the schedule of payments sheet of the

16    judgment, and you must also notify the court of any changes in

17    economic circumstances that might affect your ability to pay

18    restitution.

19        Five, based on the nature of the offenses, you shall

20    submit your person, property, house, residence, vehicle, papers

21    or office to a search conducted by the United States Probation

22    Officer.  Failure to submit to a search may be grounds for

23    revocation of release.  You shall warn any other occupants that

24    the premises may be subject to searches pursuant to this

25    condition.  An officer may conduct a search pursuant to this

1    condition only when reasonable suspicion exists that you have

2    violated a condition of your supervision and the areas to be

3    searched contain evidence of this violation.  Any search must

4    be conducted at a reasonable time and in a reasonable manner.

5         The Court notes that if it erred in the calculation of the

6    sentencing guidelines, the Court would have imposed the same

7    sentence for a variance based on an offense conduct in this

8    case, your characteristics, and the other factors found at

9    Title 18, United States Code, Section 3553.

10        It is further ordered that you pay a special assessment

11   fee of $100 per count, for a total of $1,200, which is

12   mandatory and due immediately.  You are remanded to the custody

13   of the U.S. Marshals Service to await designation by the Bureau

14   of Prisons.  That concludes the Court's sentence in the case.

15   Is there anything further from the government or counsel for

16   the defendant?

17             **MS. CHALK:**  Not from the government, Your Honor.

18             **MR. HOLLOMON:**  Your Honor, if the Court please, I do

19   believe I heard the Court state that this sentence was to run

20   concurrently to an anticipated state court sentence.

21             **THE COURT:**  That is correct.  I did say that.

22             **MR. HOLLOMON:**  Thank you, Your Honor.  The other

23   thing I want to ask, Judge, we would ask the Court to recommend

24   designation to the Bureau of Prisons facility in Talledega.

25             **THE COURT:**  All right.  You realize that the Court

1   doesn't have the prerogative, the power to do that, but the

2   Court can make recommendations and oftentimes the Bureau of

3   Prisons does adopt and follow recommendations of the sentencing

4   court, so that will be the recommendation of the Court.

5            **MR. HOLLOMON:**  Thank you, Your Honor.  That's all we

6   have.

7            **THE COURT:**  Very well, then.  That concludes this

8   hearing, and Court is recessed until 1:00.

9                    (HEARING CONCLUDED)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    CERTIFICATE OF COURT REPORTER

3

4        I, Teri B. Norton, RMR, FCRR, RDR, Official Court

5   Reporter for the United States District Court for the Southern

6   District of Mississippi, appointed pursuant to the provisions

7   of Title 28, United States Code, Section 753, do hereby certify

8   that the foregoing is a correct transcript of the proceedings

9   reported by me using the stenotype reporting method in

10  conjunction with computer-aided transcription, and that same is

11  a true and correct transcript to the best of my ability and

12  understanding.

13       I further certify that the transcript fees and format

14  comply with those prescribed by the Court and the Judicial

15  Conference of the United States.

16

17

18

19       s/ _Teri B. Norton_
         TERI B. NORTON, RMR, FCRR, RDR
20       OFFICIAL COURT REPORTER

21

22

23

24

25