Michael Jenkins, et al.

v.

Rankin County, Mississippi, et al.,

Dwayne Thornton
February 21, 2025

***Brown Court Reporting & Litigation Support***
***4780 I-55 North, Suite 100***
***Jackson, MS 39211***
***julie@browncourtreporting.com***
***(601) 203-0071 phone | (601) 709-4611 fax***



1· · · · · · ·IN THE UNITED STATES DISTRICT COURT

2· · · · · FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

3· · · · · · · · · · ·NORTHERN DISTRICT

4
· ·MICHAEL JENKINS, et al.· · · · · · · · ·PLAINTIFF
5
· ·VS.· · · · · · · · · CAUSE NO.· 3:23-cv-374-DPJ-ASH
6
· ·RANKIN COUNTY,· · · · · · · · · · · · ·DEFENDANT
7· ·MISSISSIPPI, ET AL.

8
· ·*****************************************************
9· · · · · · ·DEPOSITION OF DWAYNE THORNTON
· ·*****************************************************
10

11· · · · Taken at the instance of the Plaintiffs at
· · · · The Rankin County Courthouse, 117 North
12· · · · Timber Street, Brandon, Mississippi on
· · · · · February 21, 2025 beginning at
13· · · · · · approximately 10:04 a.m.

14

15

16· · · · · · · ·(APPEARANCES NOTED HEREIN)

17

18
· · · · · · · · · * * * * * * * *
19
· · · · · · ·Reported Stenographically by
20· · · · · ·JULIE BROWN, RPR, CCR 1587
· · · · · · · Brown Court Reporting
21· · · · ·1888 Main Street, Suite C #289
· · · · · · · · Madison, MS 39110
22· · · · · · · (601) 832-4919
· · · · · · julie@browncourtreporting.com
23

24

25

```
 1    APPEARANCES OF COUNSEL:

 2          For the Plaintiffs:

 3                TRENT WALKER, ESQ.
                  The Law Offices of Trent Walker
 4                5245 Keele Street, Suite A
                  Jackson, MS  39206
 5                (601) 321-9540
                  trent@trentwalkeresq.com
 6
                  MALIK SHABAZZ, ESQ. (VIA ZOOM)
 7                The Law Office of Malik Shabazz, Esq.
                  700 Pennsylvania Avenue SE
 8                Washington, DC 20003
                  (301) 513-5445
 9                Attorney.shabazz@yahoo.com

10

11          For the Defendants:

12                JASON E. DARE, ESQ.
                  Biggs, Ingram & Solop PLLC
13                Paragon Two
                  578 Highland Colony Parkway
14                Suite 100
                  Ridgeland, Mississippi  39157
15                (601) 987-5307
                  jdare@bislawyers.com
16

17

18

19

20

21

22

23

24

25
```

Dwayne Thornton - February 21, 2025

3

```
 1                   I N D E X

 2

 3   Appearances                          2
     Certificate of Court Reporter        76
 4   Certificate of Deponent              77

 5

 6               INDEX OF EXAMINERS

 7
     EXAMINATION BY MR. WALKER            4
 8

 9

10                 EXHIBIT INDEX

11
     (No exhibits were marked during this deposition.)
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    DWAYNE THORNTON,
 2    appeared before me, having been first duly sworn,
 3    was examined and testified as follows, to-wit:
 4                 E X A M I N A T I O N
 5    EXAMINATION BY MR. WALKER:
 6         Q.    We are on the record in the deposition of
 7    Dwayne Thornton who was formerly with the Rankin
 8    County Sheriff's Department, but is now retired; is
 9    that right?
10         A.    Yes, sir.
11         Q.    And, while we were off record, I think we
12    established that we went to high school together?
13         A.    Correct.
14         Q.    And therefore -- I normally refer to
15    people as Mr. Or by their title, but you don't mind
16    terribly if I just call you Dwayne?
17         A.    That's fine.
18         Q.    Have you had your deposition taken
19    before?
20         A.    No, sir.
21         Q.    Okay.  I'm sure that Jason went over this
22    with you before you began, but just a couple of
23    things.  I'm going to try my best to ask clear,
24    concise questions.  Sometimes I'm more successful
25    with that than others.
```

 1          Please let me ask my whole question and
 2    then I will try to be quiet and let you give your
 3    whole answer.  And that will allow Ms. Brown to be
 4    able to take down what we each say without us
 5    talking over each other.
 6          A.    Yes.
 7          Q.    Because she's taking us down word for
 8    word, okay.
 9          The other thing, if I ask a question and
10    you do not understand the question I asked you, ask
11    me to rephrase it or to ask it over again.  I'm more
12    than happy to do that, okay.
13          A.    Yes, sir.
14          Q.    And you'll be reading and signing, also?
15          MR. DARE:  We will.
16    BY MR. WALKER:
17          Q.    All right.  So, that being said, I
18    believe we agreed to the usual stipulations earlier.
19          So would you state your whole name?
20          A.    Howard Dwayne Thornton.
21          Q.    And, Dwayne, you're currently retired.
22    How long were you with the Rankin County Sheriff's
23    Department?
24          A.    I started in '99.  I'm not for sure of
25    the correct month.

 1          Q.    Okay.  Were you in law enforcement before

 2    1999?

 3          A.    No, sir.

 4          Q.    Okay.  What did you do prior to joining

 5    the sheriff's department?  You don't have to tell me

 6    every last job.

 7          A.    Before I came to the sheriff's office, I

 8    worked for Rankin County Cablevision or cable

 9    company.

10          Q.    Okay.  And, when you joined the sheriff's

11    department, that was your first job in law

12    enforcement, correct?

13          A.    So I -- let me correct myself.  I started

14    as a reserve.  I think that was also '99.  And then,

15    after a few months as a reserve, I come full-time as

16    a jailer.

17          Q.    As a jailer?

18          A.    Yes, sir.

19          Q.    All right.  And how long were you a

20    jailer?

21          A.    Approximately a year.

22          Q.    And, after you were a jailer, what was

23    the next position that you took within the sheriff's

24    department?

25          A.    I went and became a certified officer and

 1    was a school resource officer.

 2        Q.    How long did you work as a school

 3    resource officer?

 4        A.    I don't remember.  Approximately four

 5    years.

 6        Q.    Okay.  What was your next position after

 7    that?

 8        A.    It's running together, so.

 9        Q.    Just give me a general idea.  I don't

10    particularly need you to be exact, just estimate.

11        A.    So the school resource officer.  Then I

12    did some juvenile investigations while I was in the

13    school.  And I was -- they called it a floater at

14    that time.  If the schools were full, I would, in

15    lieu of going to a school, I would come in and help

16    with juvenile investigations.

17        Q.    Okay.

18        A.    So I did that approximately four years.

19    And then, from there, I went to patrol and worked

20    the road for probably another four years.

21        Q.    And at some point did you become captain

22    of patrol?

23        A.    Captain/chief deputy, yes.

24        Q.    Do you remember when that was?  In round

25    figures.

1        A.    It was during -- probably around COVID.

2   So approximately '19, sometime in that era.

3        Q.    Okay.  So you worked several years as

4   school resource officer and in juvenile

5   investigations before you went to patrol?

6        A.    Yes.

7        Q.    Okay.  And, as chief deputy and captain

8   of patrol, what would you say were your job duties?

9        A.    So just really the day-to-day function of

10  patrol.  I had four shifts, so each shift had a

11  lieutenant, a sergeant and a corporal.  And they, in

12  effect, ran the shift.  I basically -- if they had

13  any questions or needed anything, I supplied that.

14       Q.    Not trying to put words in your mouth,

15  but you were kind of the chief administrator of

16  patrol?

17       A.    Ultimately, the chief administrator would

18  be the sheriff, but yes, sir.  Patrol division fell

19  under me.

20       Q.    Yes.

21       A.    Yes.

22       Q.    I guess that's what I'm asking.

23       A.    Yes.

24       Q.    And were you chief deputy or chief of

25  patrol on January 24th of 2023?

9

```
 1        A.    Yes.

 2        Q.    How did you become aware of the incident

 3   that we're here about today that occurred at 135

 4   Conerly Road in Braxton?

 5        A.    I got a phone call from dispatch.

 6        Q.    Do you remember what time that call came

 7   in?

 8        A.    I do not.  It was -- I go to bed early.

 9   I was in bed, so it was -- I don't recall.  It was

10   probably 9 to 11, somewhere in that ballpark.

11        Q.    And there was a phone call from dispatch,

12   it wasn't from anybody that was on the scene?

13        A.    Correct.

14        Q.    In other words, any of the five deputies

15   who were on the scene and participating.

16        A.    No, sir.  Dispatch called me.

17        Q.    Okay.  Do you know who called dispatch?

18              If you don't know --

19        A.    Rephrase.  Like who?

20        Q.    You got a call from dispatch saying,

21   there's an incident, it requires your getting out of

22   bed and going to see about it?

23        A.    Yeah, dispatch.  Sorry.  Dispatch called

24   me and said, "Hey, the sheriff needs you to respond

25   to this address."
```

1      Q.    Okay.  So, to the best of your knowledge,

2   the sheriff had already been made aware of what was

3   going on or that --

4      A.    Yes.

5      Q.    -- there had been an incident?

6      A.    Yes.

7      Q.    And you got out of bed and responded to

8   that address?

9      A.    Correct.

10      Q.    Did you have to prepare any reports about

11   your observations or investigation on the scene?

12      A.    No, sir.

13      Q.    Tell me what happened when you arrived at

14   135 Conerly.

15      A.    I arrived on scene.  The sheriff --

16   because I didn't know what the context of the call

17   was until I arrived.  I had no idea.  When I got

18   there, there was several deputies out in the yard.

19      Q.    Do you remember who they were?

20      A.    I remember McAlpin, I remember

21   Zetterholm, I remember Middleton, Opdyke and Elward.

22   And I can't for sure remember Dedmon was there, but

23   I'm sure he was.  And I can't remember any other

24   deputies that were there at that time -- well, let

25   me rephrase.  Randy Gray was there, the sheriff was

1    there.  And that's my recollection.

2        Q.    All right.  And is Zetterholm another

3    patrol officer?

4        A.    Yes.

5        Q.    So, when you got there, what did you do?

6        A.    I asked Randy what the deal was.  And

7    Randy said, Elward, somebody -- one of the suspects

8    went for a gun, and Elward shot him.  And I said,

9    "So none of our guys are shot?"  Because, honestly,

10   that was my worry when I got there.

11           I had thought maybe one of our guys got

12   shot because when dispatch called me they said

13   that -- because I said, "Well, what's the deal?"

14   And they said, "We just know that EMS got called out

15   there."  So I didn't know when I got there.  So I

16   asked Randy what the deal is, and he told me that.

17   And I just kind of stood by.

18       Q.    Okay.  So a couple of questions.

19   Question one:  Do you recall if the Richland

20   officer, Hartfield, was there when you got there?

21       A.    I can't recall.

22       Q.    Okay.  And did you end up having to

23   prepare any sort of report based on your observation

24   at the -- once you reported to 135 Conerly, did you

25   later have to prepare any sort of report?

```
 1          A.    I do not recollect preparing a report.

 2          Q.    Okay.  And, other than your conversation

 3    with Randy, did you have any other discussions?

 4    Like once you found out what happened, did you talk

 5    directly to Elward?

 6          A.    On -- I can't recall any particulars to

 7    Elward on the scene.  The sheriff come up to me and

 8    said, "Guess what, D'Lo, they didn't have their

 9    cameras on."  And --

10          Q.    Explain to me why that's a problem.

11          A.    Well, because it wasn't videoed.

12          Q.    And there was a departmental policy in

13    effect at the time that interactions should be

14    videoed; is that right?

15          A.    So it depends on the context.  If you're

16    on normal patrol and -- without getting into policy

17    because I don't have it in front of me.  But, if

18    you're on patrol and you are interacting with the

19    public, then you should have your camera on.

20    However, that being a narcotics situation, there was

21    something at that time in the policy about not

22    having a camera on.  I think that was why they

23    didn't have their camera on -- or cameras.

24          Q.    Their stated reason was that this was a

25    narcotic investigation.  Am I --
```

```
 1        A.    I can't answer that.  I assumed that's
 2   what it was.
 3        Q.    They certainly said it was a narcotics
 4   investigation, to your understanding?
 5        A.    I don't remember them telling me that.
 6        Q.    But, just so I'm clear, the sheriff told
 7   you, Guess what, they don't have their cameras on or
 8   they didn't have their cameras on?
 9        A.    Correct.
10        Q.    And, other than some narcotics
11   investigations, everyone's body-worn cameras are
12   supposed to be on when they interact with the public
13   and certainly if there's an attempt to make an
14   arrest or otherwise confront a suspect; would that
15   be correct?
16        A.    Under a normal patrol situation, yes, I
17   would expect them to have their camera on.
18             MR. WALKER:  Let's go off for a second.
19                 (Off the record.)
20   BY MR. WALKER:
21        Q.    And I had previously shown counsel, and
22   I'm going to show you -- and if we need to go off
23   the record while you look at that.  With the
24   exception that there were not two, but four
25   exceptions for when body-worn cameras should be
```

```
 1    activated.  If you want to look just briefly and
 2    familiarize yourself with that, then you can.
 3              (Off the record.)
 4    BY MR. WALKER:
 5         Q.    So, when we went off, we were discussing
 6    body-worn cameras.  And it seemed like the sheriff
 7    was a little surprised that nobody had a camera on.
 8    Would that be a fair assessment?
 9         A.    Yes.
10         Q.    Okay.
11         A.    Surprised I don't know.  He was agitated.
12         Q.    He was agitated that nobody had a camera
13    on?
14         A.    Yes.
15         Q.    And what else do you recall him saying,
16    other than, Guess what, nobody's cameras were on?
17         A.    I don't recall really a whole lot else
18    from the sheriff.
19         Q.    Okay.  But he was clearly agitated?
20         A.    He wasn't happy, in my perception.  And
21    that's my perception.
22         Q.    Yes.
23              And, in your perception, he was not happy
24    because nobody's camera was on; would that be fair?
25         A.    I think fair is, you know, policy out the
```

 1    window.  He would have expected the cameras to have

 2    been on under normal circumstances.  I think they

 3    felt like, since it's a narcotics operation, that's

 4    the reason it wasn't on.  I don't know if the

 5    sheriff at that point was thinking, Ah, this is a

 6    narcotics operation, that's why the cameras were

 7    off.

 8         Q.    Do you know if you had that particular

 9    discussion with Sheriff Bailey?

10         A.    No, sir, I did not.

11         Q.    And, to your knowledge, who was the

12    highest ranking officer on the scene at the time

13    that Michael Jenkins was shot?

14         A.    That would have been Brett.

15         Q.    McAlpin, the chief investigator?

16         A.    Uh-huh.

17         Q.    And what about Lieutenant Middleton?

18         A.    He -- Brett would have outranked him.

19         Q.    Brett would have outranked lieutenant

20    Middleton?

21         A.    Uh-huh.

22         Q.    Lieutenant Middleton would have been the

23    highest ranking patrol officer?

24         A.    Yes.

25         Q.    And would it have been unusual for a

 1    patrol officer to be on a narcotics investigation?

 2         A.    No.

 3         Q.    Would it have been unusual for the patrol

 4    lieutenant to be out on a narcotics investigation?

 5         A.    I don't think so.

 6         Q.    Okay.  Why was there an assumption that

 7    it was a narcotics investigation?

 8         A.    Whose assumption?

 9         Q.    There seemed to have been -- again, going

10    back to nobody's camera being on, that was the

11    stated reason; am I correct?

12         A.    Yes.  I don't know.  That's what I was

13    told.  I do not know why they had their cameras off.

14         Q.    Okay.

15         A.    It was told to me after because I asked,

16    "Why did you guys have your cameras off?"  And

17    that's what they told me, because it was a narcotics

18    deal.  It's not uncommon for patrolmen to assist

19    with a narcotics arrest or something after hours.

20              In that particular case, Jeffrey, the best

21    I remember, was either coming on or coming off of a

22    shift.  And I think Brett -- I say I think.  I was

23    told Brett asked them or Middleton, one of them

24    asked them, Hey, can you help with this.  So that's

25    why, in my understanding.  Most of those guys were

```
 1    on a shift that had expired at 11, so maybe it was

 2    after 11.

 3         Q.    But, as we sit here today, we now know

 4    that the excuse that it was a narcotics

 5    investigation was a cover story, correct?

 6         A.    I can't answer that.  I think there's no

 7    question they were there due to narcotics, in my

 8    understanding.

 9         Q.    That they were there due to narcotics?

10         A.    That's my understanding, yes.

11         Q.    Based on what you have come to know since

12    the night of January 24th of '23, do you have any

13    reason to believe that any of these deputies were

14    there for any legitimate purpose, based on what you

15    know now?

16         A.    I think my understanding was that Brett

17    received a call from a neighbor about disturbance,

18    narcotic use.  So that's why they originally went to

19    that address.

20         Q.    And I guess my question is:  Based on

21    your current understanding, was that legitimate or

22    was that a cover story?

23         A.    I think they legitimately went out there

24    with the intent to figure out either the disturbance

25    if they were out -- because I was told, Hey, we got
```

18

```
 1    a call.  They're drunk out in the yard and selling
 2    dope, was what I was told.
 3          Q.    Who told you that?
 4          A.    Brett.
 5          Q.    Okay.  You started in '99.  When did
 6    Brett start?
 7          A.    At the sheriff's office?
 8          Q.    Yes.
 9          A.    I don't recollect.
10          Q.    Did Brett ever tell you that the real
11    purpose of their going to 135 Conerly was to conduct
12    an illegal operation?
13          A.    No.
14          Q.    In your 20-plus years with the
15    department, had you ever heard the term "mission"?
16          A.    No.
17          Q.    You've never heard that used?
18          A.    Mission?
19          Q.    Yes.
20          A.    Yeah.  Well, I mean, when we had a SWAT
21    mission, you know, it may be referred to as a
22    mission, but I don't remember.  I think the context
23    you're going with -- I don't remember any of those
24    guys saying, Hey, we got a mission we're going to go
25    do, no.
```

```
 1        Q.    You never heard that?

 2        A.    No, sir.

 3        Q.    How did you become familiar with Brett

 4   McAlpin, to the best of your recollection?

 5        A.    Familiar with Brett?  Familiar?

 6        Q.    Yes.  How did y'all become familiar with

 7   each other as --

 8        A.    Through work.

 9        Q.    Through work?

10        A.    Yes, sir.

11        Q.    And what about Middleton, how did you

12   become familiar with him?

13        A.    The same, through work.

14        Q.    Did you have any relationship with either

15   of the two of them outside of work?

16        A.    No, sir.

17        Q.    Do you know in round numbers how long you

18   had a working relationship with Brett McAlpin?

19        A.    Brett had been there awhile.  Brett had

20   been there 24, 25 years.  Jeff had been there, and

21   I'm guessing here, 12 maybe, ballpark.

22        Q.    Okay.  Did you work the night shift as

23   captain of patrol?

24        A.    No, sir.  I was Monday through Friday.

25        Q.    Monday through Friday?
```

```
 1          A.    Eight to 5.

 2          Q.    Bankers' hours?

 3          A.    Yes, sir.

 4          Q.    What was the protocol from the beginning

 5     to the end of any particular shift?  And by

 6     protocol, I mean what are patrol officers required

 7     to do with regard to their equipment?  Is there any

 8     sort of logs that they have to keep?

 9            Let me be specific.  Are there any sort of

10     logs that they would have to keep regarding

11     firearms?

12          A.    No, sir, not that I recall.

13          Q.    All right.  According to department

14     policy, a discharge of a firearm would be considered

15     a use of force whether or not anybody was actually

16     struck; would that be true?

17          A.    I don't -- I don't totally agree with

18     that.  Let me explain.  If you had an AD, accidental

19     discharge, for some reason --

20          Q.    Okay.

21          A.    -- you should document it.

22          Q.    Right.

23          A.    But it would -- in my opinion, that

24     wouldn't rise to a use of force.

25          Q.    Because it would be an accidental
```

1    discharge?

2        A.    Yeah.  You shot your window out.

3        Q.    But, nonetheless, you would have to

4    report that you accidentally discharged your weapon?

5        A.    I would think you should.  Again, I don't

6    have policy in front of me, so I don't want to quote

7    policy.  But I would expect, if I had a deputy that

8    fired or discharged a weapon, that it should be

9    documented.

10        Q.    I'm going to refer you to policy and

11    procedures manual.  It looks like Bates stamped page

12    RC042.

13            MR. DARE:  So this appears to be the old

14    use of force policy.

15            THE WITNESS:  Okay.

16    BY MR. WALKER:

17        Q.    Okay.  According to the policy that

18    you're reading right now, any discharge of a weapon

19    would be documented, accidental or otherwise,

20    correct?

21        A.    Correct.

22        Q.    And as you -- I think consistent with

23    what you stated earlier, in documenting, you'd have

24    to fill out what a use of force report for an

25    intentional discharge of a weapon?

```
 1        A.    Yes.

 2        Q.    Okay.  How do you, as a supervisor, how

 3   do you keep up with whether or not a weapon has been

 4   discharged, other than it being reported?

 5        A.    Then there was -- we didn't.

 6        Q.    You didn't.

 7             So it was really up to an individual

 8   officer to have the integrity to report?

 9        A.    Correct.

10        Q.    Before your retirement, do you know if

11   any of those protocols were updated?

12        A.    Yes.

13        Q.    Okay.  How were they updated?

14        A.    So we would do a random download on the

15   tasers.

16        Q.    Okay.

17        A.    Where, in the past, the only way we'd do

18   a download was if it was involved in a use of force

19   and I had that report and knew to do it.

20        Q.    And a use of the taser would have to be

21   documented in all cases, correct?

22        A.    Yes.

23        Q.    Are you able to read those taser reports?

24        A.    Explain.  When you say read --

25        Q.    Well, when you download them, if you were
```

 1    to generate a paper trail regarding the usage of, it
 2    gives you several different readings regarding the
 3    time of discharge, arming or triggering.  Are you
 4    able to read those and tell what they mean
 5    individually?
 6        A.    Yeah.  You can look and tell a specific
 7    time, date, if it's armed, if it's fired and the
 8    duration.
 9        Q.    And how does it arm?
10        A.    It's got a safety and a fire switch.
11        Q.    Okay.  And, if it's triggered, that means
12    it's actually fired?
13        A.    My understanding, yes.
14        Q.    All right.  And how are you able to tell
15    the difference between whether the prongs are
16    discharged or whether it's a dry stun?
17        A.    I never could.
18        Q.    Okay.
19        A.    I don't know if we can now.  I think
20    there is maybe a way to do that, but at that time we
21    did not have access to that.  We could just tell if
22    it was fired.
23        Q.    Okay.  And did the deputies ever carry
24    batons for any reason?
25        A.    Ever?

24

```
 1        Q.    To your knowledge.

 2        A.    I did.

 3        Q.    You did.  On patrol?

 4        A.    Back in -- yes, sir.  But we phased those

 5   out.  To my knowledge, I hadn't seen what we call an

 6   ASP baton, collapsible baton, I hadn't seen one of

 7   those on a deputy in 20 years probably.

 8        Q.    Kind of tasers replaced those; would that

 9   be fair?

10        A.    Yes, sir.

11        Q.    And just to make sure I'm understanding

12   what you're saying, a taser usage or a discharge of

13   a firearm should always be documented, accidental or

14   otherwise?

15        A.    Yes.

16        Q.    And on January the 24th, 2023, the night

17   of the Conerly incident, there was really more of a

18   trust system in place than a documentary system?

19        A.    We had a documentation system that we had

20   no reason to believe was -- would be compromised

21   that way.  And you're right, we relied on our guys

22   to do the right thing.

23        Q.    Did you, as the captain of patrol, have

24   any responsibility to make sure that the firearms

25   had proper ammunition, the ammunition was counted or
```

1  to check the tasers at the end of each shift?

2      A.    No.

3      Q.    You did not?

4      A.    I did not.  We had -- if we went to the

5  firing range quarterly, we would a lot of times use

6  that, rounds that they had and then resupply them,

7  but I didn't do that.  We had our training officer.

8  Most of those duties fell to them.

9      Q.    The reason I ask this question, Christian

10 Dedmon, among the charges that he pled to were two

11 counts of discharging a firearm during the

12 commission of a felony, neither of which I believe

13 was reported and on -- or reported according to

14 departmental procedures.

15         And, on January 24th of 2023, other than

16 his telling his superiors that he had discharged his

17 firearm, there was no procedure in place to keep up

18 with that; is that right?

19     A.    I do not recall any.

20     Q.    Was there any sort of different

21 investigation conducted if there was a use of deadly

22 force versus a nondeadly use of force?

23     A.    So, on a deadly use of force, usually MBI

24 would come in and conduct that investigation.

25     Q.    And that was certainly standing policy

```
 1     before January 2023, correct?
 2          A.    Yeah.  It would still be the same, to my
 3     knowledge, now.  If we have a deadly encounter, we
 4     would not investigate our own use of force under
 5     that circumstance.
 6          Q.    That's what I was asking.
 7               And that is not something that came into
 8     place after January 2023, it was the standing policy
 9     at that time?
10          A.    Yes.
11          Q.    Okay.  If an individual was injured in an
12     encounter with the sheriff's department and had to
13     be taken to the hospital, then what procedure was
14     followed then, to the best of your recollection?
15          A.    They would do a use of force.
16          Q.    Meaning the deputy who used the force?
17          A.    Yes.
18          Q.    All right.  Was any supervisor deployed
19     to the hospital to interview or otherwise make
20     contact with the injured subject?
21          A.    I can say -- I can't say that they never
22     did, but I don't know that we would send someone if
23     someone was injured during -- if they can arrest.
24     Normally, they would -- someone would go to the
25     hospital with them.  If we were going to detain
```

 1    them, we stayed with them.  When I say "we," the
 2    department, somebody, be it the jailer or whomever.
 3    Then they would have been interviewed later at the
 4    sheriff's office.
 5         Q.    Once they were released from the
 6    hospital?
 7         A.    Yes, sir.
 8         Q.    Do you know if medical personnel were
 9    interviewed regarding any injuries suffered by an
10    individual incident to an encounter with a sheriff's
11    deputy?  In other words, in Michael Jenkins' case,
12    would somebody have went and talked to the hospital
13    personnel about their observations about his
14    injuries?
15         A.    I would think not because at that time
16    MBI was conducting that investigation.
17         Q.    What's a CAD system or a C-A-D system?
18         A.    It's something to do with dispatch, I
19    guess the way they log the calls, but I'm not
20    familiar with CAD.  I'm not a computer guy.
21         Q.    So that was beyond your pay grade?
22         A.    I didn't do the computer stuff, yeah.
23         Q.    How did the sheriff's department account
24    for the deputies during the course of a shift.  Was
25    each deputy -- well, do you need me to expound on

Dwayne Thornton - February 21, 2025

28

1   that?

2        A.    Sure.

3        Q.    How did you account for the whereabouts

4   of each deputy during the course of a shift?

5        A.    So they would go 10-8 at their required

6   time.

7        Q.    What is that, 10-8?

8        A.    10-8 means in service.

9        Q.    Okay.

10       A.    They'd go in service.  And you had a

11   lieutenant, you had a sergeant and you had a

12   corporal.  All three of those were on that shift

13   when it went in service.

14       Q.    Okay.

15       A.    And then you had -- generally, you had,

16   depending on the shift being full or not, but you

17   generally had three or four deputies on the north

18   end of the county, three or four on the south end of

19   the county.  And, when the calls come out, they

20   would disperse them to them.

21            Now, we didn't have a meeting or a -- you

22   mentioned CAD.  You know, there was some tracking on

23   the vehicles.  But, you know, generally, you expect

24   the guys to be in their assigned areas and answer

25   the calls.

```
 1        Q.    So, more or less, you had a certain
 2   number of deputies would be in north Rankin County
 3   and a certain number that would be in south Rankin
 4   County?
 5        A.    Right.
 6        Q.    Where is kind of the boundary between
 7   north and south, to the best of your knowledge?
 8        A.    Highway 80.
 9        Q.    Highway 80?
10        A.    Uh-huh.
11        Q.    So everything below Highway 80 would be
12   south Rankin County --
13        A.    Toward Florence.
14        Q.    Toward Florence and Star?
15        A.    South.
16        Q.    Yes.  Okay.  And then everything north
17   out to the Reservoir --
18        A.    Yes.
19        Q.    -- and so forth?
20              Did either Middleton or McAlpin report to
21   you?
22        A.    Yes -- no.  Middleton did, McAlpin
23   didn't.
24        Q.    Okay.  Because he's chief investigator?
25        A.    Right.
```

1          Q.    So would you have considered him to be,

2     if you're looking at an office flowchart, he'd be on

3     the same level as you?

4          A.    Yes.  I would think so.  He commanded

5     investigations, the division of investigations.

6          Q.    Okay.  I was asking about everybody being

7     in their zone and so forth.  It seems like these

8     five deputies went off grid for about two hours the

9     night of this incident.  How is it possible for them

10    to do that?

11         A.    So my recollection was you had three of

12    those deputies, Middleton, Elward and Opdyke were on

13    the same shift.  Their shift was either about to be

14    over or was over.  So the new shift had come out at

15    11 to answer the calls.

16              So my understanding was they were asked,

17    Hey, can you help us?  We're going to do -- we're

18    going to Conerly.  Can you guys hang out late and

19    help us?  That was my understanding of the

20    situation.

21         Q.    Okay.  I just want to make sure I

22    understand what you're saying.  Their shift would

23    have ended at 11?  Yes?

24         A.    Yeah.  It was 11A to 11P, I believe at

25    that time.

1     Q.    And, when it was near 11, they were asked

2  presumably by McAlpin and Dedmon to hang out and go

3  out around here, and therefore, they would have had

4  no responsibility to report their whereabouts, I

5  guess would be fair?

6     A.    Well, at that time, you know, you had a

7  lieutenant over shift, which was Middleton, and you

8  had a chief investigator, which was McAlpin.

9     Q.    Yes.

10     A.    So, you know, at that time McAlpin would

11  have had the authority to say, hey, you guys stay

12  out late and help me.

13     Q.    Okay.

14     A.    They wouldn't have had to call the

15  sheriff and say, hey, sheriff, we're going to stay

16  out late for ten minutes or five minutes, if that

17  makes sense.

18     Q.    And if they went there say 9 or 9:30ish,

19  would it still not been a problem if they were off

20  grid for in excess of an hour before the end of

21  their shift?

22     A.    If they had sufficient manpower and we

23  weren't busy, I could see it happening if they went

24  a little early.  Obviously, if we had something pop

25  loose in the county that required more than the

1    deputies that weren't allocated to this scene, then

2    I would have expected them or one of them to have

3    left to cover the calls or whatever emergency popped

4    up.

5        Q.    Did Sheriff Bailey ask you to provide him

6    with any information about the Jenkins and Parker

7    incident?

8        A.    No.

9        Q.    Were you asked to complete any type of

10   report explaining how this incident occurred?

11       A.    No.

12       Q.    Were you asked to speak to or interview

13   anybody regarding the Jenkins and Parker incident?

14       A.    No.

15       Q.    Were you ever asked to review any other

16   incident reports authored by any of these deputies

17   involved in the Jenkins and Parker incident to see

18   if there were any similarities to the Jenkins and

19   Parker incident?

20       A.    No.

21       Q.    Were you ever asked to do any

22   determination as to how often these deputies

23   utilized force or how often they were involved in a

24   use of force?

25       A.    No.   So part of that after that incident

```
 1   we did change the use of force.  We updated a lot of
 2   things to include the taser downloads periodically
 3   as opposed to just doing your taser download when
 4   you had an activation.
 5        Q.   And I don't want to get too far afield,
 6   but you brought up the changes to the policy.  Were
 7   you involved in the change of policy?
 8        A.   No.
 9        Q.   Okay.  Who was involved in the change of
10   policy?
11        A.   I don't know for 100 percent sure.  I
12   believe Dare was involved, but anyone else I don't
13   know for sure.
14        Q.   Do you know if any outside consultants
15   were utilized?
16        A.   I do not know.
17        Q.   Were you given any responsibility to
18   gather radio transmissions involving these deputies
19   involved in the Jenkins and Parker incident?
20        A.   No, I was not.
21        Q.   How did the sheriff's department track
22   its vehicles when they're in service?
23        A.   I don't know.  I know there is a way
24   through dispatch, that some of the vehicles have a
25   tracking system --
```

34

```
 1        Q.    But not all of them?
 2        A.    -- through their radio.  But to sit here
 3   and tell you every single one of them or which ones
 4   did, I couldn't answer that.
 5        Q.    Do you know how many deputies would
 6   typically be on the night shift in the county?
 7        A.    Probably around eight.
 8        Q.    Eight total.
 9              Would there also be eight on the day shift?
10        A.    Yeah, give or take.  And then, you know,
11   during the day, you've got more departments that are
12   available.
13        Q.    Meaning other municipalities?
14        A.    No.  When I say department, you know,
15   you've got court services, school resource officers.
16   Most of those are 8 to 5, 7 to 3.
17        Q.    Yeah.  I guess I was specifically talking
18   about patrolman and investigators.
19        A.    Yeah.  So investigations is usually 8 to
20   5.  And then the narcotics were whenever.  They come
21   out --
22        Q.    They had a lot of flexibility?
23        A.    A lot of flexibility, yeah, due to the
24   nature of the game.
25        Q.    On the night of the incident, did you
```

```
 1   make any attempt to track the location of these
 2   deputies after you became aware of the incident?
 3        A.    No.
 4        Q.    Now, I believe Sheriff Bailey testified
 5   that you were the particular person who was tasked
 6   with downloading tasers; is that right?
 7        A.    Uh-huh.
 8        Q.    And --
 9              MR. DARE:  Yes?
10              THE WITNESS:  Yes.
11   BY MR. WALKER:
12        Q.    And how did you go about doing that?
13        A.    If they filled out a use of force, they
14   would put the use of force in my little door.  I had
15   a little hole for my -- put the paperwork in.  And I
16   would come in in the morning, and the first
17   opportunity that I got whenever they'd come back to
18   work or if they were still working, I would get them
19   to come by and download the taser.
20        Q.    Okay.  And, when you examined that, what
21   exactly were you looking for in examining the taser
22   report?
23        A.    I would look at the use of force report
24   and see that it correlated with what the report
25   said.
```

1      Q.    So, in other words, if somebody said, I
2   deployed the taser on this individual twice, you
3   would look to see if it was deployed twice?
4      A.    Yes.
5      Q.    If they said, I deployed it for five
6   seconds, you'd look to see if that was consistent?
7      A.    More so not the time limit, but the
8   amount of trigger activations, yes.
9      Q.    Was there a policy regarding what number
10   of trigger activations would be considered to be
11   excessive?
12      A.    I don't recall.
13      Q.    As a certified law enforcement officer,
14   would there be a number of activations that would
15   raise some suspicion in your mind?
16      A.    It would depend on the situation.  I
17   don't want to be cloudy, but there's a lot of
18   variables that would go into why or how many times
19   you would use your taser.  As long as you had a
20   combative subject, you -- I could articulate using
21   the taser until the threat was stopped if that's
22   what I was using the taser for.
23      Q.    Have you or anyone in the department, to
24   your knowledge, been told that using or deploying a
25   taser over a certain number of times on a subject

1    could be potentially dangerous to the subject?

2         A.    No.   And again, if you were deploying

3    your taser numerous times, you should have a reason

4    to do that.   You should have someone that is still

5    aggressively fighting or noncompliant, whatever the

6    case is, that you are using that taser to get them

7    into -- under control or in custody.

8         Q.    Would there ever, in your opinion or in

9    your experience, be a reason to use a taser on

10   someone who was compliant and in custody?

11        A.    No.

12        Q.    As a for instance, once somebody is

13   handcuffed, they're not trying to run.   Is there a

14   reason to use a taser?

15        A.    I guess unless they're kicking you or

16   fighting you, but no.   If you have a compliant

17   subject and he's in cuffs, there's no -- in my

18   opinion, you should not be tasing at that point.

19        Q.    After you identified or reviewed the

20   taser information, what would be done with the taser

21   log?

22        A.    I would attach it to the use of force,

23   make a copy.   And then we would give it to the --

24   Amanda, I believe at that time, one of the office

25   clerks.   And then she would file it.

38

```
 1          Q.    Do you know her last name?

 2          A.    Prewitt.

 3          Q.    Amanda Prewitt.  Okay.

 4                And did the officers have to become

 5   certified in taser use?

 6          A.    Yes.

 7          Q.    All right.  And you're certified in the

 8   use of a taser?

 9          A.    Yes.

10          Q.    And did you separately -- I know you just

11   said you give the taser logs and the use of force

12   report to Amanda.  Did you give them to Sheriff

13   Bailey or are you depending on Amanda to give it to

14   Sheriff Bailey?

15          A.    Best I recollect, we would -- the sheriff

16   would also possibly get a copy to his door if he

17   wasn't there.

18          Q.    Okay.  Were you personally responsible

19   for delivering it to his door --

20          A.    No.

21          Q.    -- or you just know that it happened?

22          A.    Yeah.  A lot of times, you know -- the

23   main objective was to get it and file it with

24   Amanda.  But there were times that I would see them

25   put them on the door.  Now, whether Amanda did that
```

 1    or one of the other deputies took his own copy.

 2         Q.    In January of 2023, was there an Internal

 3    Affairs division in the Rankin County Sheriff's

 4    Department?

 5         A.    Yes.

 6         Q.    And who would have been responsible for

 7    the Internal Affairs division at that time?

 8         A.    My dates may be wrong, but I believe

 9    Godfrey was doing those at that time.

10         Q.    Steven Godfrey?

11         A.    Yes, sir.

12         Q.    And would Steven Godfrey have been the

13    person who's responsible for investigating

14    allegations of excessive force by any deputy in

15    2023?

16         A.    If it arose to an IA, yes.

17         Q.    How would something arise to an IE?

18         A.    IA.

19         Q.    IA.  I'm sorry.

20         A.    Multiple ways.  If there would have been

21    a reason -- if there was a report that a deputy used

22    excessive force, that deputy's supervisor, whomever

23    he fell under, would have gotten a complaint.  So it

24    would have fallen on that supervisor, that

25    department head to investigate it.  Then if it --

 1    you know, there's nothing concrete that says a

 2    reprimand or does this go to an IA, but obviously if

 3    it was serious enough, it would be an IA.  An

 4    investigation that Godfrey would handle.

 5         Q.    But would it then be dependent on the

 6    supervisor to make that referral?

 7         A.    Yeah, generally.  If I got a call in on

 8    one of my patrol deputies, I would look at it.  At

 9    the time we had body camera.  I would look at the

10    body camera footage.  And, if it was something that

11    I could handle that wasn't a policy violation, you

12    know -- I got a lot of calls that I could look at

13    the body camera and whomever called it in, it was

14    false because I could look at it and tell.  You

15    know, I could see the whole interaction.

16         Q.    Nothing like video.

17         A.    Right.  So that's the way a lot of those

18    were handled.  It was real easy for me.  You know, I

19    get a complaint, I could look at the body camera

20    footage and if -- which I can't recollect me looking

21    at footage.  We had one that went to an IA that I

22    can recall that was excessive.

23         Q.    By chance, do you remember that person's

24    name?

25         A.    Cooke.

 1      Q.    By chance, do you remember what year that
 2  occurred?
 3      A.    I don't remember the year.
 4      Q.    And Cooke would have been the deputy or
 5  the suspect?
 6      A.    Deputy Cooke, yes.
 7      Q.    And you looked at the body cam and you
 8  referred it to IA?
 9      A.    Well, yeah.  So, if I saw something that
10  I didn't agree with, you know, we would -- I would
11  get with Godfrey, let the sheriff know.  And then we
12  would determine, depending on the severity of it,
13  where to go.  You know, if that's a training issue
14  that we can fix with training, we would -- in Cook's
15  case, we sent him to training.  And then later we
16  observed some more actions and ended up terminating
17  him due to that.
18      Q.    So that went through you because you were
19  chief deputy or during your time as captain of
20  patrol, correct?
21      A.    Correct.
22      Q.    All right.  So, likewise, if Dedmon
23  served up under McAlpin, then McAlpin would be the
24  first person to have to review any allegation
25  against Dedmon?

 1        A.    Yeah.  If a call come in from

 2    investigations, which that would have been under

 3    narcotics, which fell under Brett under

 4    investigations.  The umbrella of then somebody calls

 5    dispatch complaining on an investigator, it would

 6    have went to Brett at that time.

 7        Q.    But then, according to the body-worn

 8    camera policy, most of those incidents would not

 9    have been recorded because narcotics didn't have the

10    same requirements for body-worn camera; am I

11    correct?

12        A.    I think there's -- you know, under

13    certain situations, they had a little more, I guess

14    leniency than what a patrol deputy would have.

15        Q.    Wouldn't that make an allegation of

16    excessive force that's then reported up the chain

17    more subjective to investigate if you don't have

18    something objective like body-worn cameras that you

19    have as a patrol captain?

20        A.    Yeah.  Obviously, if you have video, it's

21    easier to review and verify whether it's -- whether

22    you can substantiate it or not.

23        Q.    Did you retire as undersheriff?

24        A.    Yes, sir.

25        Q.    When did you become undersheriff?

```
 1        A.    I was there a little over a year.  So I
 2   retired in December of '24, so probably October of
 3   '23, maybe.
 4        Q.    So ten months after the Jenkins and
 5   Parker incident?
 6        A.    Yeah.
 7        Q.    Congratulations.
 8        A.    Thank you.
 9        Q.    And you served as undersheriff for a
10   year, I understood you to say?
11        A.    Correct.
12        Q.    Now, as undersheriff, what were your
13   responsibilities?
14        A.    Just the day-to-day operation of the
15   department.
16        Q.    Okay.  How were those responsibilities
17   different than when you were patrol captain?
18        A.    It was more ordering stuff and
19   secretarial stuff, to be honest.
20        Q.    You don't sound very excited about it.
21        A.    Yeah.  It was -- I mean, it was good.
22   But it was a lot more budget stuff, ordering stuff.
23        Q.    Not a lot of street-level interaction?
24        A.    Not a lot, no.  You know, you -- most of
25   the department heads handled their individual
```

```
 1    department.  Like I said before, if you had a call,

 2    a complaint that come in, it was directed by

 3    dispatch to the department head of that department,

 4    be it court services, investigation and patrol.

 5         Q.    And were you chief deputy at the same

 6    time that you were patrol captain?

 7         A.    It's the same thing.

 8         Q.    It's the same thing?

 9         A.    Yeah.  It was chief deputy.  We didn't

10    really use patrol captain, but it's the same thing,

11    yeah.

12             (Off the record.)

13    BY MR. WALKER:

14         Q.    So, in his deposition, Sheriff Bailey

15    said that there were investigator meetings that were

16    held in the department.  Did you ever attend any

17    investigator meetings?

18         A.    Ever, yes.

19         Q.    But not regularly?

20         A.    No.

21         Q.    Do you know how regularly the

22    investigator meetings would have occurred?

23         A.    At one time they were every morning

24    Monday through Friday in the morning first thing.

25         Q.    And what was the general purpose of those
```

1    investigator meetings?

2        A.    The chief investigator would sign the

3    reports to the investigators.  And they would

4    basically give a quick synopsis of what had come in

5    the night or days or weekend the days before.  And

6    each investigator would be assigned a report, i.e. a

7    case.  And they just went through basically what

8    their reports were.

9        Q.    Okay.  And do you recall if the Jenkins

10   and Parker matter was discussed in any investigator

11   meeting?

12       A.    I do not because I wasn't in there.

13       Q.    Oh.  I may have asked this earlier.  If I

14   did, forgive me.  Did you ever participate in any

15   meeting regarding changes in policy subsequent to

16   the Jenkins and Parker matter?

17       A.    I don't recollect being in one.  We

18   changed some policies after the fact and did some

19   training on the new policies.

20       Q.    Okay.  Did you participate in plotting

21   out those new policies?

22       A.    No.

23       Q.    Okay.  I'm sure at this point everybody

24   has become familiar with the term "Goon Squad,"

25   right?

```
 1          A.     Correct.

 2          Q.     What is your understanding of what was

 3     the Goon Squad?  Because I've heard it described

 4     different ways.

 5          A.     I had never -- I don't recollect hearing

 6     that term until after the incident due to the coin

 7     being found and then them being named the Goon

 8     Squad.  My understanding originally, that was the

 9     shift -- and Jeffrey Middleton had some challenge

10     coins made up.  And I think that's where the term

11     came from.

12          Q.     Were you ever given a challenge coin?

13          A.     I had one.  I don't know who gave it to

14     me.

15          Q.     Okay.  Do you think it was given to you

16     by Middleton?

17          A.     I don't recall.  I had -- my desk, I had

18     several challenge coins on a shelf.  And someone

19     either placed it up there -- and the reason I found

20     it was we were -- I don't even remember the context.

21     I had some people in my office, and it come up about

22     the coins.  And I said, gosh dang, let me look up

23     here.  And I found one.

24                 And honestly, it surprised me.  I didn't

25     know it was up there.  And -- because the front of
```

```
1    it just had the sheriff -- best I recall, had like
2    the sheriff's office emblem logo.  And then the
3    back, I don't remember what it said, but it was
4    obviously the coin.  And I tossed it in the trash
5    because I didn't want anything to do with it or much
6    less it being in my office.
7         Q.    And that term, I guess came into
8    everybody's lexicon after the federal cases came to
9    light.  Is that the best of your recollection?
10        A.    I don't recall when the Goon Squad -- I
11   don't even remember if the coin said Goon Squad on
12   it.
13        Q.    It did.
14        A.    So my understanding was that was -- for
15   whatever reason, I guess Jeffrey had those coins
16   made.  And I got -- I don't know if he disbursed
17   them to whom, to the shift or whatever.  But that
18   was my understanding.  That was -- the coins he made
19   were for the shift or in relation to the shift.
20        Q.    Okay.  Were you ever aware that there
21   existed a Goon Squad or a team of officers who
22   regularly were involved in the use of excessive
23   force?
24        A.    No.
25        Q.    You've never heard that?
```

```
1          A.     No.

2          Q.     And were you ever tasked by Sheriff

3    Bailey with trying to determine whether there was

4    any validity to the allegation that there was a team

5    of officers who regularly used excessive force and

6    did not report it?

7          A.     No.

8          Q.     Are you aware if there was any report

9    prepared within the department regarding whether or

10   not there was a team of people, whether they were

11   referred to as a Goon Squad or otherwise who

12   regularly used and did not report excessive force?

13         A.     No.  We wouldn't have tolerated that.

14               MR. DARE:  I think the question was not

15   were you aware of it, but are you aware of a

16   report --

17               THE WITNESS:  Correct.

18               MR. DARE:  -- concerning that.

19   BY MR. WALKER:

20         Q.     Did anybody ask you the night of -- when

21   did you learn that Hartfield was on the scene on

22   January 24th?  Did you learn that that night or you

23   learned it later on?

24         A.     I don't recall.  I'm sure -- I would feel

25   like he was probably there when I was there.  I feel
```

```
 1   like I probably knew it that night.
 2        Q.    Did you know Hartfield before that night?
 3        A.    I didn't know Hartfield.  Hartfield
 4   had -- I didn't know who he was, I had seen him
 5   before.
 6        Q.    You had seen him?
 7        A.    Yeah, but I didn't know him.  I knew he
 8   worked for Richland.
 9        Q.    You knew he worked for Richland?
10        A.    Uh-huh.
11        Q.    You knew him to look at him, but you
12   didn't have any relationship with him?
13        A.    Yeah.  If he walked into my office, I
14   wouldn't have known who he was.
15        Q.    Would you have found it unusual that he
16   would have been present on the scene when you
17   arrived that night?
18        A.    Sometimes those narcotics guys worked
19   together for whatever reason.  I wouldn't have found
20   it unusual.  I don't think so.
21        Q.    Over the course of yours and Brett
22   McAlpin's mutual employment at the sheriff's
23   department, y'all had, I would imagine hundreds of
24   conversations, right?
25        A.    I mean, we've conversed over the years.
```

Dwayne Thornton   February 21, 2025

50

1      Q.    And did you ever have any conversation

2   with McAlpin, to your recollection, regarding what

3   is commonly now known as the Goon Squad or any group

4   of deputies who regularly used excessive force

5   within the department?

6      A.    No.   I wasn't aware of any use of force.

7   As a matter of fact, out of all of them guys, the

8   only complaint I can ever remember getting on any of

9   those boys was Opdyke.   And a lady called in one

10  early school morning and said a deputy was following

11  too close to her on Williams Road around Florence

12  High School.

13         And I was able to get dispatch to pull up

14  the tracking info, and he was the closest one.   So I

15  called him and asked him about it.   And he didn't --

16  he didn't even remember being on Williams Road.   But

17  that's the only interaction complaint that I can

18  recollect on any of those --

19      Q.    Officers?

20      A.    -- deputies, yes.

21      Q.    And that particular complaint regarding

22  Opdyke was not an excessive force complaint, it had

23  do with his driving?

24      A.    Correct.

25      Q.    Going back to this coin for a second, did

1  you have any discussion with Sheriff Bailey

2  regarding this Goon Squad coin?

3      A.    No.

4      Q.    Do you know whether or not he was

5  provided a coin?

6      A.    I have no idea.

7      Q.    Was any action taken by you or anybody

8  else to disband the Goon Squad?

9      A.    You know, the Goon Squad, in my opinion,

10  was given to that group --

11      Q.    That shift?

12      A.    -- by the media.  No, by the boys that

13  are in jail now.

14      Q.    Okay.

15      A.    You know, that -- if you say Goon Squad,

16  that's who you think of, you know, those boys that

17  went to Conerly Road and are in prison now.

18      Q.    Okay.

19      A.    My honest opinion, the Goon Squad, if it

20  so be -- and why -- I don't even think -- again, I

21  don't know, but that was all Jeffrey's shift, his

22  patrol shift.  And I don't know that they called

23  themselves the Goon Squad.  And, if they did, I

24  don't know why in the world they would have or did.

25  I never heard that.

1          But I think it was just a stupid thing that

2    they come up with a coin.  And I think he put that

3    on there for whatever reason.  I would have to ask

4    him, but yeah, I don't think there was a -- or I

5    know there was no, so to speak, Goon Squad

6    department wide that ran rampant that anybody with

7    any authority would have, one, been aware of, two,

8    would have tolerated.  I worked my entire career and

9    to have that happen wouldn't have been tolerated.

10              MR. WALKER:  Let's go off shortly.

11                  (Off the record.)

12    BY MR. WALKER:

13        Q.    So you spoke earlier with regard to the

14    incident involving Deputy Cooke and Deputy Cooke

15    later being terminated because he was involved in a

16    subsequent incident after receiving training.  Is

17    that right?

18        A.    Correct.

19        Q.    How did y'all document that?

20        A.    Lane Carter did most of that at that

21    time, best I recollect.  He wrote -- I can't

22    remember what it was, but we filed it -- Lane filed

23    it, sent him to training, documented that, when his

24    training was.

25              And then, after his training, I can't

 1    remember which incidents or what it was or even what

 2    triggered it, but we were able to -- we went back

 3    and looked and saw some activity that we didn't

 4    agree with, especially after the training.  And

 5    that's when we terminated him.  And then all of that

 6    would have been in his file, his personnel file.

 7         Q.    And that was how many years ago?

 8         A.    Oh, gosh.  I don't know.  Two, three.

 9         Q.    And, to the best of your recollection,

10    what was the incident that brought Deputy Cooke to

11    your attention?

12         A.    We had one from a pursuit.  I think the

13    original that brought the attention was from a

14    pursuit.  And I think the suspect had, was in a high

15    speed pursuit and ran through a light and killed a

16    motorcyclist.  And I guess Cooke was upset,

17    obviously.

18              And I believe he -- in the back seat of the

19    car, he -- I don't remember if he activated -- I

20    can't remember if he activated the taser or dry

21    stunned him or I can't even remember -- honestly, I

22    can't even remember what it was, but then we

23    self-reported that to the FBI.  I remember that.

24    And that was the original.

25         Q.    So, to go back to our earlier

54

 1   conversation, he tased someone who was in custody

 2   and compliant in the back of a patrol car; would

 3   that be fair?

 4        A.    I think so, but I can't honestly

 5   recollect whether he actually tased or -- I would

 6   assume he did for us to report it and proceed like

 7   we did.  But I can't honestly say that I remember if

 8   he dry stunned him, tased him or -- I can't

 9   remember.  But I know that's the original incident

10   that, I guess started the -- started his issues.

11        Q.    And so he underwent training and then

12   what was the second incident that ended up getting

13   him fired?

14        A.    It wasn't taser I don't think.  It was --

15   I can't remember if he had another deputy trying to

16   affect arrest and the guy was being noncompliant.

17   And the other deputy went to put hands on him.  And

18   the guy was tussling.  And Cooke come up and

19   assisted and then I think struck him a couple times.

20        Q.    Meaning he punched him?

21        A.    Yeah.

22        Q.    And, based on y'all's observation, that

23   punching was outside of departmental policy?

24        A.    I think it was -- and there may have been

25   a couple incidents where we went back after the

Dwayne Thornton - February 21, 2025

55

1   training and realized that, after the training, we

2   felt it was a little excessive.  I think maybe in a

3   one-time instance you may could have articulated him

4   resisting, but I think, once it was obvious that he

5   was no longer a threat, he may have struck him a

6   time or so more, in our opinion, that he shouldn't

7   have.  And, due to the total of circumstances, we

8   felt it best to move on from him.

9        Q.    Is that the only instance of excessive

10  force that you recall?

11       A.    Yeah.  I can't -- I'm sure there's

12  something, but I can't recall during my time as

13  chief deputy with -- dealing with -- dealing with

14  excessive force.  I can't recall another one that

15  jumps to my head.

16       Q.    And you were chief deputy and

17  undersheriff for a combined number of how many

18  years?

19       A.    I don't know, three or four.

20       Q.    Now, I want to go back.  So you have the

21  day shift and a certain number of people

22  particularly in the command level work 8 to 5.  Is

23  that my understanding -- or is my understanding

24  correct?

25       A.    No.  So, if you've got a shift, they work

Dwayne Thornton - February 21, 2025

 1  7A to 7P now, but during that time, you would have

 2  had a shift that come on at 11 a.m. and they work

 3  until 11 p.m., a 12-hour shift a 2/3 split.

 4       Q.    Okay.

 5       A.    So you had -- each day you had a day and

 6  a night shift.  You had four shifts total.  So you

 7  had a day shift, a night shift.  So the night shift

 8  would come on 11P to 11A.

 9       Q.    And so, during the nighttime, who's

10  running the department?

11       A.    The lieutenant is the highest ranking

12  deputy at that time.  Now, in this instance, you had

13  Chief McAlpin, so he would have had been the highest

14  ranking officer at that scene.  But, under a normal

15  circumstance, your admin usually would go home at 5

16  and the shift is ran by the shift lieutenant and, of

17  course, the sergeant and corporal.

18       Q.    So, in that particular instance, wouldn't

19  it be true that McAlpin would have been running the

20  department that night?

21       A.    You know, the sheriff runs the

22  department.

23       Q.    But the sheriff wasn't there?

24       A.    But the sheriff wasn't there.  So

25  effectively McAlpin would have been the highest

Dwayne Thornton - February 21, 2025

57

1    ranking officer, to my knowledge, that was in

2    service at that time.

3        Q.    And he would have been the highest

4    ranking officer in service on a bunch of nights;

5    would that also be true?

6        A.    Quite possibly, yeah.

7        Q.    So, in any number of instances, if the

8    sheriff wasn't present, then McAlpin was there and

9    McAlpin would be giving out orders.  Would that be

10   right?

11       A.    Possible, yes.  So under a normal -- if

12   it's a patrol situation, McAlpin wouldn't have been

13   there giving orders, odds are.  Now, if he happened

14   to be there, he would have been the highest ranking

15   deputy on the scene if he's there.

16       Q.    What should have been the guardrails that

17   would have been in place to manage or supervise

18   McAlpin?

19       A.    I don't know that I can answer that.  I

20   think you've got to trust your guys, especially

21   administration, a chief deputy, a chief

22   investigator.  I think you have to -- you have to be

23   able to trust them to do their job until there's a

24   reason that you're aware of that you can't.

25            Obviously, we've changed that.  That's why

```
 1    the policy is now.  We've changed our entire

 2    complaint system.  If someone calls in, we document

 3    it.  We went -- we've adapted, you know.

 4         Q.    I guess one of the things that comes to

 5    mind, based on what you're saying, because the word

 6    trust has been used several times in terms of the

 7    operation of the department.  Are you aware of

 8    anything that would have been known regarding

 9    McAlpin that should have put the department on

10    notice to put some guardrails in place around him?

11         A.    No.  I'm not aware of any, any situation,

12    much less like the one on Conerly that would have

13    gave us a warning like, hey, this dude is not doing

14    what we expect him to do or should do.

15         Q.    Are you aware of the Gerhart incident?

16         A.    Uh-uh.

17         Q.    What appeared to be a joint raid with the

18    City of Pearl resulted in a federal lawsuit

19    involving Brett McAlpin and raiding the wrong house.

20         A.    I recollect something.  I don't know a

21    lot of the particulars.

22         Q.    So you're not aware of the facts of that

23    situation?

24         A.    No.

25         Q.    Are you aware of -- so you don't know any
```

1     of the facts surrounding the Gerhart incident?

2          A.    No.  I just remember Brett saying years

3     and years ago that a Pearl officer had told him the

4     wrong house that they went to.  That's all I

5     recollect from that.

6          Q.    And you've never heard anything regarding

7     Brett's own behavior while they were in the house?

8          A.    Uh-uh.

9          Q.    Nothing?

10         A.    Uh-uh.

11         Q.    You have to say no.

12         A.    No.  I'm sorry.

13         Q.    Do you think it would have been better to

14    not just have a system in place where you trusted

15    your officers, but also were able to verify their

16    actions before January of '23?

17              MR. DARE:  Object to form.

18              You can answer.

19              THE WITNESS:  I think at the time that

20    that incident happened we were doing what we thought

21    was proper.  I don't think anybody in

22    administration -- I know I'm not aware of it and I'd

23    be floored if the sheriff was -- knew of anything

24    like that that was -- that was occurring.

25              And we've since changed that policy

1  because -- you know, I look at it like in 1908 when

2  Mr. Ford made the Model T, you know, that car in

3  1908 was state of the art, but it didn't have fuel

4  injection, it didn't have power brakes, a lot of

5  things that have since changed.  So you have to be

6  able to change, but at the time of that incident we

7  were doing what we thought was correct.

8  BY MR. WALKER:

9      Q.    Do you think that there's an argument to

10 be made that the department, which I believe Sheriff

11 Bailey said has about 240 employees, was probably

12 too big for the tactics that were being used at the

13 time?

14         MR. DARE:  Object to the form.

15         You can answer.

16         THE WITNESS:  I think hindsight is always

17 20/20, but again, at the time that we were -- at

18 that time, I think we were probably light years

19 ahead of some departments the way we did things.

20 And we have since changed some of those policies.

21 BY MR. WALKER:

22     Q.    You weren't in the meeting that occurred

23 the morning after the Jenkins and Parker incident, I

24 think you testified earlier, the investigative

25 meeting; is that right?

```
 1        A.    No, sir.  I don't recall being in there.
 2        Q.    Is there a reason that you would not have
 3   attended that meeting?
 4        A.    Yeah.  So, as the chief deputy, that's
 5   more of an investigator meeting.  There was some
 6   times I would stop in just to get a grip on what was
 7   going on through the weekend or -- but it was
 8   nothing that I went in every morning and listened to
 9   the reports.
10        Q.    Having been on the scene that night, you
11   don't think that that might have been a meeting you
12   wanted to attend the next day?
13        A.    No, because it was not a meeting about
14   that incident, to my knowledge.  Normally the
15   next -- regardless of what goes on the night before,
16   those meetings are just reports from the night
17   before that are assigned to an investigator.  That
18   one was --
19        Q.    So the investigator meetings would have
20   just been routine?
21        A.    Yes.  Every morning they would have had
22   one.  MBI was investigating that.  That would not
23   have been something that our department was --
24        Q.    And here's somewhere I also am at a bit
25   of a loss.  At what point in time was it obvious
```

```
 1    that what was reported as the initial story, what
 2    was written down in the initial incident reports was
 3    false?  When did you become aware that what the
 4    deputies were saying was false?
 5         A.    I guess when MBI started questioning
 6    them.  I don't remember the exact time, but we had
 7    put, to the best of my knowledge, we had put Elward
 8    on leave immediately.  And then --
 9         Q.    Because he was involved in an
10    officer-involved shooting?
11         A.    Correct.
12         Q.    And that would have been standard
13    department policy?
14         A.    Yes.  Yeah.  We would have put him on
15    leave.  And then, as time went on, Dedmon was on
16    desk duty, nonenforcement desk duty.  And then, as
17    it become -- as it started unraveling on them, we
18    ended up terminating the lot of them.
19         Q.    That was June of '23 when everybody
20    started getting terminated or was terminated?
21         A.    Yeah.  I don't recall the exact date.
22         Q.    Everybody was terminated pretty close to
23    the time when it was announced that, I guess that
24    they were arrested and charged federally?
25         A.    Uh-huh.  I assume.  I don't remember.
```

```
 1         Q.    What was your role in this between
 2  January and June of '23?
 3         A.    Not a whole lot.  Because, again, it was
 4  investigated, the actual scene was investigated by
 5  MBI.  And when -- my dates, I don't have my dates in
 6  front of me, but as you're saying, once it became
 7  obvious that -- because MBI wasn't calling me up and
 8  saying, Hey, chief, here's what we got.  You may
 9  want to let these guys go because we're going to
10  indict them.
11         Q.    And we filed this lawsuit, I believe in
12  March of '23.  Did the allegations that were made in
13  the lawsuit combined with what everybody knew at
14  that time not raise any red flags as early as March
15  of '23?
16              MR. DARE:  Object to form.
17              You can answer if you can.
18              THE WITNESS:  Yeah.  I don't -- say that
19  again.
20  BY MR. WALKER:
21         Q.    We filed the lawsuit in March of '23.
22         A.    Okay.
23         Q.    Did the fact that the lawsuit had been
24  filed -- there was specific allegations that were
25  made in the lawsuit -- combined with what was known
```

64

 1   in the department at that time raise any red flags

 2   regarding the truth or falsity of what it is that

 3   the deputies were reporting?

 4        A.    Yeah.  I don't recollect anything being

 5   known in the department.  And the accusations were,

 6   I thought were outlandish.

 7        Q.    You thought the accusations --

 8        A.    Yeah.

 9        Q.    -- that they had tortured Jenkins and

10   Parker were outlandish?

11        A.    Yeah.  I didn't believe it.

12        Q.    Why?

13        A.    Because I didn't believe it.

14        Q.    I don't have Sheriff Bailey's testimony

15   in front of me, but I recall that he said that he

16   suspected that everything was not aboveboard as

17   early as the next day.  Did he ever share any of

18   that with you?

19        A.    Uh-uh.

20        Q.    No?

21        A.    Uh-uh.

22        Q.    You have to answer out loud.

23        A.    No, no.  I'm sorry.

24        Q.    And I know that MBI was conducting the

25   investigation since it was an officer-involved

1    shooting.  But there was no measure or no protocol

2    within the department to investigate to see if there

3    was any truth or if there were any inconsistencies

4    with regard to what the stories that were being told

5    by the deputies?

6        A.    Yeah.  One, I wasn't questioning -- I

7    wasn't questioning the deputies.  Best I recall, we

8    did -- Godfrey did speak with those involved, but I

9    wasn't a part of that.

10       Q.    And so far as you're aware, nobody else

11   in the sheriff's department was a part of any

12   internal investigation of what when on?  And I

13   apologize.  I think the lawsuit was filed in July,

14   but the arrest were made in June.

15           But so far as you know, in between that

16   time, there was no internal investigation regarding

17   the truth or falsity of what the deputies were

18   reporting occurred --

19       A.    I don't know.

20       Q.    -- and their reasoning for being there

21   that night?

22       A.    No.  I don't know when Godfrey spoke to

23   them, but my understanding, Godfrey did speak to

24   them at some point.

25       Q.    How did you come to that understanding?

Dwayne Thornton - February 21, 2025

```
 1        A.    I can't recollect if -- who told me that.

 2        Q.    Do you know if Godfrey told you that?

 3        A.    Uh-uh.  I don't remember who told me

 4   that.  I assumed that.  And I don't remember who

 5   told me that.

 6        Q.    Did you ever read The New York Times

 7   article, the original one that came out last May, I

 8   think it was?  Mississippi Today.

 9        A.    I'm sure I did.

10        Q.    That particular article identified

11   several people who all alleged that, over a course

12   of years, that they were abused and/or tortured by

13   members of the department.  Were you aware of any of

14   those incidents prior to reading about it in that

15   article?

16        A.    No.

17        Q.    And several people were arrested, and

18   they had probably unusual injuries.  What would be

19   the process for investigating when somebody has

20   injuries that would be unusual?  As a for instance,

21   showing up to jail with two black eyes or face

22   beaten pretty much to a pulp.  What would happen

23   there?

24        A.    If there's a complaint from that?

25        Q.    Shouldn't just the vision of somebody's
```

1    face being beaten, wouldn't that be a red flag in

2    and of itself to somebody?

3            MR. DARE:  Object to argumentative.

4            You can answer it.

5            THE WITNESS:  Yeah.  So, if you come in

6    and you've got black eyes, you would be taken to

7    jail.  There's -- to my knowledge, unless it's cause

8    for transport, there's no notification that, hey,

9    this guy come in with a skinned head or a scraped

10   knee or -- you know, I think medical documents that.

11   But a complaint would need to be made.  And then,

12   you know, then you would look into it if you're

13   aware of it.

14   BY MR. WALKER:

15       Q.   So, unless the person who was beaten

16   black and blue made a complaint, then nothing was

17   done?

18       A.   You would need a complaint to -- I

19   wouldn't have no idea as the chief deputy if

20   somebody come in with a skinned toe or two black

21   eyes.  If there was a use of force, and the deputy

22   did have to punch somebody, then I would know it

23   because I had a use of force.

24            And then I would go back and look at it and

25   look at that video if there was a video.  I would

Dwayne Thornton - February 21, 2025

68

```
 1    always check the use of forces.
 2        Q.    But, if the injured person, for whatever
 3    reason, didn't report the violence, and the deputy
 4    didn't report the violence, y'all had nothing in
 5    place to be able to document that something
 6    occurred, including observations by other members of
 7    the department?
 8        A.    No.  If it's not reported, we wouldn't --
 9    there would be no way to know.  Unless the medical
10    personnel at the jail documented it.
11        Q.    Are those jail employees or are they
12    separately contracted?
13        A.    I can't answer that.  I don't know.
14        Q.    Was there any documentation about the
15    number of recorded incidents or number of injuries
16    that seem to be showing up over time?
17        A.    No, not that I'm aware of.
18        Q.    Was there ever any effort to -- and this
19    would have fell when you were the undersheriff, to
20    determine who all in the department had these Goon
21    Squad challenge coins?
22        A.    No.
23        Q.    Do you believe there should have been an
24    effort to determine who all had the coins?
25        A.    No.  I don't think the Goon Squad coin
```

1  stood for what it turned into.

2       Q.    Based on what you're telling me, would it

3  be fair to say the department was reactive and not

4  proactive in terms of the way it handled excessive

5  force?

6       A.    No.  I think at the time we did what we

7  felt was proper.

8       Q.    Was there any effort to determine if

9  there were more Goon Squad members?  And by Goon

10  Squad the way I'm asking this question, I mean more

11  officers who were using off-the-books excessive

12  force.  Was there any effort made to determine if

13  that existed and who those officers might have been

14  after the Jenkins and Parker incident came to light?

15      A.    Yeah.  That's when we started our -- the

16  way we did our taser downloads.  In lieu of doing a

17  download when there was just a use of force, we

18  would do periodic downloads.  And then we had

19  someone specifically that would review those

20  downloads and look for unreported activations of the

21  taser.

22      Q.    Who would that person have been?

23      A.    Wayne Carter did it.  And now, honestly,

24  I don't know who's doing it now since I retired.

25      Q.    When did you retire?

```
 1        A.    December 31st.

 2        Q.    Two months ago.

 3              MR. WALKER:  Let's go off again.

 4              (Off the record.)

 5   BY MR. WALKER:

 6        Q.    There's a deputy at one point in time by

 7   the name of Roger Thornton.  Are you familiar with

 8   him?

 9        A.    I believe he was a reserve, yes.

10        Q.    Are y'all related?

11        A.    No, sir.

12        Q.    Okay.  It never became clear to you

13   before the deputies were arrested that they were

14   lying?

15        A.    No.

16        Q.    As you sit here today, do you believe

17   that this incident involving Jenkins and Parker was

18   a one-off as the term might be used or was there any

19   sort of determination made that there was a

20   departmental issue that needed to be addressed?

21              MR. DARE:  Object to form.

22              Answer if you can.

23              THE WITNESS:  I was unaware of any use of

24   excessive force by any one deputy, much less a group

25   of deputies.
```

1    BY MR. WALKER:

2        Q.    Were you ever privy to mugshots that came

3    in that would show arrestees or detainees with

4    injuries?

5        A.    I could pull one up if I needed to, but

6    no.  I had -- I wouldn't look at mugshots.

7        Q.    And, other than the medical staff at the

8    jail, the jailers wouldn't make any sort of note

9    that someone was arrested and came in with what

10   appeared to be excessive injuries?

11       A.    Not that I'm aware of.  I don't know of a

12   jailer reporting any injuries or how they would

13   determine excessive or, you know --

14       Q.    And you testified at the beginning, you

15   operated as a jailer for a year?

16       A.    Yeah, thereabout.

17       Q.    And, during your time, did you ever

18   report any excessive injuries that you might have

19   observed?

20       A.    I don't recollect any excessive injuries.

21       Q.    Okay.  Is there anybody in the department

22   who would review mugshots on a regular basis?

23       A.    No, not that I'm aware of.  If you have

24   someone as a jailer, even back in my time in the

25   '90s, if you have someone come in with excessive

1    injuries, you wouldn't admit them anyway because you

2    don't want that liability if something happens to

3    them.

4        Q.    You'd send them straight to the hospital?

5        A.    You'd send them to the hospital or, if

6    it's another agency, you would not let them bring

7    the suspect in and tell them, hey, you've got to get

8    medical treatment to them.

9        Q.    If there were lawsuits against a deputy,

10   do you know how those would have been investigated?

11       A.    No.

12       Q.    No, you don't know?

13       A.    No.  If it's a lawsuit, it wouldn't have

14   went through me.  If it's a complaint or use of

15   force, yeah, I would have looked at it.  But I

16   couldn't sit here and tell you a lawsuit.  You know,

17   I'm not aware of specific lawsuits.

18       Q.    Okay.  Would there be anybody in the

19   department who would have been aware of any specific

20   lawsuit that might have been filed and named a

21   particular deputy or a group of deputies?

22       A.    Yeah.  I can't answer that.  I don't

23   know.

24       Q.    Were you ever made aware that there might

25   have been a situation where evidence was being

73

1    manufactured by deputies?

2         A.    No.

3         Q.    As a for instance, deputies might claim

4    that drugs or contraband was in plain sight when, in

5    point of fact, it wasn't?

6         A.    No, I'm not aware -- would not have --

7    was not aware of any accusations like that.

8         Q.    Or are you aware or were you ever aware

9    of any instances where deputies with the department

10   would falsify information on warrants or fail to get

11   warrants for raids?

12        A.    No.

13        Q.    Was it ever brought to your attention

14   that there were complaints by the district

15   attorney's office that there were an excessive

16   amount of cases for which there was not proper

17   warrant documentation?

18        A.    No.  That wasn't --

19              MR. DARE:  Object to the form.  That

20   didn't happen, but you can answer.

21              THE WITNESS:  Yeah.  That wouldn't have

22   went through patrol anyway.  A warrant would have

23   been procured by investigations.

24   BY MR. WALKER:

25        Q.    A warrant would have been procured by

 1    investigations.  Who would have reviewed the

 2    application for the warrant?

 3         A.    The judge.

 4         Q.    Do you know who was assigned to narcotics

 5    and who was assigned to investigations within the --

 6              MR. DARE:  When?

 7    BY MR. WALKER:

 8         Q.    -- within the investigations department.

 9              MR. DARE:  When?  Like in what time

10    frame?

11              MR. WALKER:  January 2023.

12              THE WITNESS:  Who was assigned?

13    BY MR. WALKER:

14         Q.    Yeah.  Who would have been narcotics?

15         A.    Brett McAlpin was over investigations.

16         Q.    Period or over narcotics investigations?

17         A.    Over investigations.

18         Q.    Okay.

19         A.    The umbrella of narcotics juvenile and

20    CID criminal all fall under investigations, which

21    Brett was over.

22         Q.    And who would have been the lieutenant

23    for CID criminal?

24         A.    I don't think we had a lieutenant.

25         Q.    Was there anybody who would review a

Dwayne Thornton - February 21, 2025

```
 1   warrant application before it went to the judge,

 2   other than the person who was asking for it?

 3        A.    No.  An investigator would do his own

 4   facts and circumstances and then take it to the

 5   judge.  And the judge would decide whether to issue

 6   the warrant.

 7             MR. WALKER:  I think that's all I have.

 8   Appreciate your time.

 9             MR. DARE:  I'm not going to have any

10   questions at this time.  Thank you.

11      (Whereupon, the above-entitled deposition was

12               concluded at 12:35 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              CERTIFICATE OF COURT REPORTER

 2              I, Julie Brown, Court Reporter and Notary

 3   Public, in and for the State of Mississippi, do

 4   hereby certify that the above and foregoing 75 pages

 5   contain a full, true and correct transcript of the

 6   proceedings had in the aforenamed case at the time

 7   and place indicated, which proceedings were recorded

 8   by me to the best of my skill and ability.

 9              I also certify that I placed the witness

10   under oath to tell the truth and that all answers

11   were given under that oath.

12              I certify that the witness has chosen his

13   right to the reading and signing of the deposition.

14              I certify that I have no interest, monetary

15   or otherwise, in the outcome of this case.

16              Witness my signature and seal this day,

17   March 8, 2025.

18

19

20

21                              JULIE BROWN, RPR, CCR 1587

22
     My Commission Expires:
23   April 8, 2028

24

25
```

```
1                 IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
2                       NORTHERN DISTRICT

3    MICHAEL JENKINS, et al.                    PLAINTIFF

4    VS.                      CAUSE NO.  3:23-cv-374-DPJ-ASH

5    RANKIN COUNTY,                             DEFENDANT
     MISSISSIPPI, ET AL.
6

7                  CERTIFICATE OF DEPONENT

8

9         I, DWAYNE THORNTON, do hereby certify that

10   the foregoing testimony is true and accurate to the

11   best of my knowledge and belief, as originally

12   transcribed, or with the changes as noted on the

13   attached Correction Sheet.

14

15                          _____

16                              DWAYNE THORNTON

17

18        Subscribed and sworn to before me, this
     the ___ day of _____, 2025.
19

20                          _____
                                 Notary Public
21   My Commission Expires:

22   _____

23

24

25
```

```
 1                         ERRATA SHEET

 2   PAGE           LINE            CORRECTIONS (IF ANY)

 3   _____          _____           _____

 4   _____          _____           _____

 5   _____          _____           _____

 6   _____          _____           _____

 7   _____          _____           _____

 8   _____          _____           _____

 9   _____          _____           _____

10   _____          _____           _____

11   _____          _____           _____

12   _____          _____           _____

13   _____          _____           _____

14   _____          _____           _____

15   _____          _____           _____

16   _____          _____           _____

17   _____          _____           _____

18   _____          _____           _____

19   _____          _____           _____

20   _____          _____           _____

21   _____          _____           _____

22   _____          _____           _____

23   _____          _____           _____

24   SIGNATURE:_____DATE:_____

25              DWAYNE THORNTON
```