IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

NORTHERN DIVISION


MICHAEL JENKINS, et al.,

     Plaintiffs,

v.          Civil Action No. 3:23-cv-374-DPJ-ASH

RANKIN COUNTY, MISSISSIPPI, et al.,

     Defendants.

_____


REMOTE VIDEOTAPED DEPOSITION OF


JEFFREY MIDDLETON


TAKEN ON

FRIDAY, MARCH 14, 2025

10:07 A.M.


FCI MCKEAN

6975 PA-59

LEWIS RUN, PENNSYLVANIA   16738

JEFFREY MIDDLETON                    March 14, 2025                         2 to 5
83199

Page 2

```
 1              REMOTE APPEARANCES
 2
 3   Appearing on behalf of the Plaintiffs:
 4   TRENT L. WALKER, ESQUIRE
 5   Walker Law Offices
 6   No. 10475 5245 Keele Street, Suite A
 7   Jackson, MS  39206
 8   (601) 321-9540
 9   trent@trentwalkeresq.com
10   --AND--
11   MALIK SHABAZZ, ESQUIRE
12   Shabazz Law Offices
13   700 Pennsylvania Avenue SE
14   Washington, DC  20003
15   (301) 513-5445
16   (301) 513-5447 (Fax)
17   Attorney.shabazz@yahoo.com
18
19
20
21
22
23
24
25
```

Page 3

```
 1         REMOTE APPEARANCES CONTINUED
 2
 3   Appearing on behalf of Defendant Jeffrey Middleton:
 4   CLARENCE M. LELAND, ESQUIRE
 5   CM Leland LTD
 6   P.O. Box 1466
 7   Brandon, MS  39043
 8   (601) 953-4486
 9   mleland@bellsouth.net
10   REMOTE APPEARANCES (CONT'D)
11
12   Appearing on behalf of the Defendant Bryan Bailey:
13   JASON E. DARE, ESQUIRE
14   Biggs Ingram and Solop PLLC
15   578 Highland Colony Parkway, Suite 100
16   Ridgeland, MS  39157
17   (601) 713-1192
18   jdare@bislawyers.com
19
20
21
22
23
24
25
```

Page 4

```
 1              EXAMINATION INDEX
 2                                      PAGE
 3
 4   EXAMINATION BY MR. WALKER            8
 5   EXAMINATION BY MR. DARE            130
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1              EXHIBIT INDEX
 2   EXHIBIT                            PAGE
 3
 4            (NONE MARKED)
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

1           REMOTE VIDEOTAPED DEPOSITION OF
2                   JEFFREY MIDDLETON
3                        TAKEN ON
4               FRIDAY, MARCH 14, 2025
5                      10:07 A.M.
6
7           THE VIDEOGRAPHER:  We are on the record.
8  The time is 10:07 a.m.  The date is March 14, 2025.
9  This is the beginning of the deposition of Jeffrey
10 Middleton.  The case caption is Jenkins vs. Rankin
11 County.
12           Will counsel please introduce yourselves
13 and state whom you represent?
14           MR. WALKER:  Trent Walker.  I represent
15 Michael Jenkins and Eddie Parker, the plaintiffs.
16           MR. DARE:  Jason Dare.  I'm here on behalf
17 of Rankin County and Sheriff Bryan Bailey.
18           MR. LELAND:  And Don Leland on behalf of
19 Jeffrey Middleton.
20           MR. WALKER:  All right.  And also present
21 is my co-counsel Malik Shabazz, also on behalf of
22 the plaintiffs.
23           THE VIDEOGRAPHER:  Our court reporter will
24 swear in the witness.
25           THE REPORTER:  Thank you.

Page 7

1           Mr. Jeffrey Middleton, will you please
2  raise your right hand?
3           Thank you, sir.
4           Do you affirm under the penalty of perjury
5  that the testimony you are about to give will be the
6  truth, the whole truth, and nothing but the truth?
7           THE WITNESS:  I do.
8           THE REPORTER:  Thank you, sir.
9           You may now lower your hand.
10           Counsel, please proceed.  Thank you.
11           MR. WALKER:  Thank you.
12           Let the record reflect we're at the
13 deposition of Jeffrey Middleton.  This is being
14 taken pursuant to notice in accordance with Federal
15 Rules of Civil Procedure for all uses as allowed by
16 such rules, on March 14, 2025 here at FCI McKean in
17 Lewis Run, Pennsylvania.  This deposition is being
18 taken before a court reporter and notary public.
19           All objections except as to form are
20 reserved until such time as the deposition testimony
21 or any part of it is offered into evidence at trial
22 in this matter.
23           Don, we are requesting that Mr. Middleton
24 read and sign.
25           MR. LELAND:  I would, too.

Page 8

1           MR. WALKER:  Okay.
2           And Mr. Middleton, that is so that you
3  will have the opportunity to read what is
4  transcribed here today and attest to the accuracy of
5  what's presented in that transcript.
6           THE WITNESS:  Okay.
7  JEFFREY MIDDLETON, having been first duly affirmed
8  to tell the truth, was examined, and testified as
9  follows:
10 EXAMINATION
11 BY MR. WALKER:
12      Q.   All right.  So Mr. Middleton, we met and
13 briefly conversed.  My name is Trent Walker, and as
14 I just said, I'm the lawyer who represents Michael
15 Jenkins and Eddie Parker in a lawsuit that's been
16 filed against Bryan Bailey and Rankin County and the
17 individual deputies that were involved in the events
18 of January 24, 2023.
19           So we're here today to ask you about
20 topics that are relevant to that matter.  Do you
21 understand that?
22      A.   Yes, sir.
23      Q.   All right.  Are you under the influence of
24 any substance that would impair your ability to
25 understand the questions that I'm asking or to

Page 9

1  answer those questions truthfully?
2       A.   I'm under the influence of nothing.
3       Q.   Okay.  Now, a couple of ground rules, some
4  of which have been explained by Ms. Knight, our
5  court reporter.  Please speak up so she can hear
6  you, particularly since we're doing this by Zoom and
7  remotely.  We want to make sure that we have a clean
8  transcript.
9            Secondly, as she said, I'm going to do my
10 best not to talk over you so I'm going to -- if you
11 will let me ask my entire question then I will try
12 to be quiet and let you give your entire answer.
13 And that will make it that much easier for her to
14 transcribe.
15           If you don't understand something that I'm
16 asking you, please ask me to rephrase the question
17 or otherwise let me know you don't know what I'm
18 talking about and I'm happy to re-ask my question a
19 different way.  But if you do answer the question
20 then I'm going to assume you understood the question
21 before you answered.
22      A.   Okay.
23      Q.   All right.  If you need a bathroom break
24 just let me know.  The only caveat being if you
25 would answer whatever question is pending and then

JEFFREY MIDDLETON                    March 14, 2025                           10 to 13
83199

Page 10

1  ask for a break we will be more than happy to let
2  you do that.
3        I don't intend to be here all day if I can
4  help it, so just, you know, if we can adhere to that
5  then everything should go fairly smoothly.
6        A.   Yes, sir.
7        Q.   All right.  And of course, you've just
8  taken an oath so you're under oath just as if you
9  were in court.
10       A.   Okay.
11       Q.   All right.
12            And would you state your full name for the
13 record?
14       A.   Jeffrey Arwood Middleton.
15       Q.   Okay.  And would you spell that for -- for
16 the court reporter?
17       A.   J-E-F-F-R-E-Y A-R-W-O-O-D M-I-D-D-L-E-T-O-
18 N.
19       Q.   Okay.  And how old are you, Mr. Middleton?
20       A.   Forty-seven.
21       Q.   Where were you born?
22       A.   Jackson, Mississippi.
23       Q.   If this case were to proceed to trial then
24 we would have a jury pool be made up of people who
25 live mostly in Central Mississippi.  I believe that

Page 11

1  is about 13 counties.  Is that right?
2        So for that reason, I'm going to ask you,
3  do you have a lot of relatives in Central
4  Mississippi?
5        A.   Well, most all of -- I would most all of
6  my relatives are in like Rankin County.
7        Q.   Okay.
8        A.   If that consists of Central Mississippi.
9        Q.   It does.
10       A.   Oh.  And I have several in Simpson County.
11       Q.   All right.  And just generally speaking,
12 what are the last names of those relatives that you
13 have in Rankin and Simpson County?
14
15       A.   Middleton and Snell, S-N-E-L-L.
16       Q.   Okay.  Any other last names of first
17 cousins or --
18       A.   That's going to be mostly -- that's going
19 to be mostly it.
20       Q.   Okay.  Did you attend church when you were
21 a resident of Mississippi?
22       A.   Yes
23       Q.   Where did you attend?
24       A.   Clear Branch, C-L-E-A-R, Branch Baptist
25 Church.

Page 12

1        Q.   Where is Clear Branch?
2        A.   Florence, Mississippi.
3        Q.   Okay.  And did you participate in any
4  social organizations while you were living in
5  Mississippi in Rankin County?
6        A.   As an example, like --
7        Q.   Lions Club.  Really anything that you
8  spent a lot of time socially with people that was
9  organized -- I'll give you one.  Are you a member of
10 Masonic order?
11       A.   Yes, sir.  I only went to the second
12 degree.
13       Q.   Okay.
14       A.   And my wife was a -- she didn't -- she was
15 like -- she's like what are you all doing?  And I'm
16 like, nothing.  Just guys doing a bunch of talking.
17 And then she was like, well, why can't you tell me
18 what you do?  And you know, so secrecy or whatever.
19 You know, I don't know if you would call it that but
20 it's -- I didn't do -- I didn't -- I only went those
21 --
22       Q.   Two degrees?
23       A.   -- two degrees.  I've only gone to a lodge
24 thing twice and I --
25       Q.   What lodge was it?

Page 13

1        A.   In Florence.  I don't remember the lodge
2  number or anything.
3        Q.   Okay.  Do you know if it was F and AM or
4  AF and AM?
5        A.   I don't.  No, sir.  I've since been --
6  that's been so many years ago.
7        Q.   So no other fraternal organizations?
8        A.   No, sir.
9        Q.   No car club or motorcycle club of any
10 sort?
11       A.   No, sir.
12       Q.   All right  Where did you attend high
13 school?
14       A.   Florence High School.
15       Q.   What year did you finish?
16       A.   1997.
17       Q.   And after high school did you receive any
18 higher education?
19       A.   No, sir.
20       Q.   After high school what was your first job?
21       A.   As a mechanic.
22       Q.   Okay.  And where was that?
23       A.   Jackson Powertrain.
24       Q.   How long did you work as a mechanic at
25 Jackson Powertrain?

JEFFREY MIDDLETON         March 14, 2025          14 to 17
83199

**Page 14**

1     A.   Well, full time, I'm not sure but off and
2 on up until the time I got -- when to prison. So
3 I've been, you know, working there part time and
4 then full time my entire, you know, since I've been
5 out of high school and while I was in high school
6 but I didn't work there.
7     Q.   Okay. When did you enter law enforcement?
8     A.   2003.
9     Q.   And what agency did you first work for?
10     A.   Jackson Police Department.
11     Q.   How long did you work for the Jackson
12 Police Department?
13     A.   Almost three years.
14     Q.   Until 2006?
15     A.   I think so.
16     Q.   Okay.
17     A.   I might not be exact.
18     Q.   While you were at the Jackson Police
19 Department did you attend or become certified by the
20 Mississippi Law Enforcement Training Academy?
21     A.   Jackson Police Department Training Academy
22 is where I received my certification.
23     Q.   All right. Did you get that in 2003?
24     A.   Yes, sir.
25     Q.   Okay. So you went through the training as

**Page 15**

1 part of becoming a member of JPD?
2     A.   Yes, sir.
3     Q.   Did you go to any other formalized
4 training outside of the training that you received
5 at Jackson Police Academy?
6     A.   Like? While I was with Jackson?
7     Q.   Well, yeah. Let's start there. Did you -
8 - as, for instance, did you ever go to the FBI
9 Training Academy or take courses at some other law
10 enforcement academy in furtherance of your career in
11 law enforcement?
12     A.   No, sir.
13     Q.   Okay. And what position did you hold
14 within Jackson Police Department?
15     A.   Patrol.
16     Q.   All right. You were a patrolman all three
17 years?
18     A.   Yes, sir.
19     Q.   All right. Why did you leave?
20     A.   I was involved in a motor vehicle accident
21 and they terminated my employment.
22     Q.   So with regard to that termination of
23 employment, you were charged with vehicular
24 homicide?
25     A.   Culpable-negligence manslaughter.

**Page 16**

1     Q.   Culpable-negligence manslaughter. And you
2 went to trial or entered a plea in that case.
3     A.   Entered a plea.
4     Q.   And what was that plea?
5     A.   Guilty.
6     Q.   Okay. And what was your sentence? How
7 was that resolved?
8     A.   It was a -- I don't remember what it's
9 called. I can't remember what it was called but
10 they -- they --
11     Q.   Was it PTI or a non-adjudication?
12     A.   Not adjudicated. Yes.
13     Q.   Okay. Now, a non-adjudication is
14 generally reserved for nonviolent crimes. Correct?
15     A.   I'm not sure.
16     Q.   You're not sure.
17     But you pleaded to culpable-negligence
18 manslaughter and you were not adjudicated on?
19     A.   Yes, sir.
20     Q.   Okay. Who was your attorney?
21     A.   Why has that name left me? Mayfield.
22 Tommy Mayfield.
23     Q.   I know Mayfield.
24     Let me ask you, are you -- were you ever
25 filled in on the details of how you were made

**Page 17**

1 eligible for a non-adjudication on a culpable-
2 negligence manslaughter plea?
3     A.   No, sir.
4     Q.   Okay. You were just told that this was
5 how the case was going to be resolved?
6     A.   Yes, sir.
7     Q.   When did you join the Rankin County
8 Sheriff's Department?
9     A.   2010.
10     Q.   And what position were you when you
11 joined?
12     A.   A corrections officer.
13     Q.   How long did you work as a corrections
14 officer?
15     A.   I believe it was eight months.
16     Q.   And what were your duties as a corrections
17 officer?
18     A.   Supervising inmates.
19     Q.   That was it?
20     A.   Yes. No supervisor role if that's what
21 you mean. No, sir. I was just --
22     Q.   And do you know if it was typical for
23 people who joined the Sheriff's Department to start
24 at corrections and move up?
25     A.   At the time that I started there it was

Page 18

1 very typical.
2     Q.  Okay.  Okay.  What other position did you
3 hold?  Or let me rephrase.  After you left
4 corrections what position did you move to?
5     A.  A school resource officer.
6     Q.  How long did you work as a school resource
7 officer?
8     A.  One school year.
9     Q.  And from there did you become a patrolman?
10    A.  Yes, sir.
11    Q.  All right.  And would that have been
12 somewhere around 2011 and 2012?
13    A.  Yes, sir.
14    Q.  And what were your duties as a patrolman?
15    A.  To answer calls for service and to patrol
16 the county, the area that I was -- I was what they
17 would call a South unit.  So, and I did North.  So
18 whenever they split Rankin County into two, a North
19 and a South.
20    Q.  Okay.  And the dividing line was where?
21    A.  It was just always just Highway 80.
22    Q.  Okay.  So North was north of 80 and South
23 was south of 80?
24    A.  Yes, sir.
25    Q.  And from 2012 up until January of '23 were

Page 19

1 you always on the South patrol?
2     A.  January '23?  From '23?  No, sir.
3     Q.  Okay.  So at some point in time you were
4 North patrol?
5     A.  Yes, sir.
6     Q.  Okay.  How long were you on North patrol?
7     A.  I'm not exactly sure.  I'm not sure.
8     Q.  When did you become a lieutenant, a patrol
9 lieutenant?
10    A.  Let's see.
11    Q.  In round numbers.  You don't have to be
12 exact.
13    A.  Nineteen.  2018, 2019 maybe.
14    Q.  Okay.
15    A.  It could have been as late as 2020.
16    Q.  All right.  And what were your duties as
17 the patrol lieutenant?
18    A.  To supervise the deputies that worked on
19 my particular shift.
20    Q.  And how many deputies would you be
21 supervising at any one time?
22    A.  Eight to nine.  They, at one point there
23 were eight and then at one point they added one guy
24 to each shift to bring it to nine.
25    Q.  Okay.  And so including yourself there

Page 20

1 would be nine or 10 people --
2     A.  Yeah.
3     Q.  -- on patrol that were either you or under
4 your supervision?
5     A.  Yes, sir
6     Q.  Did anybody co-supervise those patrolmen
7 with you?
8     A.  Yes, sir.
9     Q.  Who would that have been?
10    A.  Sergeant.
11    Q.  Any particular person or just whoever
12 happened to be a sergeant?
13    A.  Well, it would have changed.  Like they --
14 I had several sergeants that had worked under -- on
15 my shift.
16    Q.  Okay.  But did the sergeant report to you
17 or are you co-equal?
18    A.  The way the shift ran was I allowed the
19 sergeant to run the shift and if he had any trouble
20 he would come to me.  Like, hey, we'd like -- so
21 we'd co-supervise would be the best way to explain
22 that.
23    Q.  Okay.  But even by that explanation the
24 sergeant reported to you?
25    A.  Right.  Yes, sir.

Page 21

1     Q.  You didn't report to the sergeant?
2     A.  Correct.
3     Q.  Okay.  And that eight or nine people,
4 would that be the north and the south or just the
5 south end?
6     A.  North and south.
7     Q.  So at any given time on your shift there
8 would be 10 people out patrolling the county you
9 think?
10    A.  Nine counting me.
11    Q.  Nine including you?
12    A.  Yes, sir.  And then before the man got
13 added it would be eight including me.
14    Q.  Okay.  So did you ever hold any other
15 positions within the department?
16    A.  I don't remember exactly when but I was a
17 sergeant before I was a lieutenant.
18    Q.  Okay.  And who was the lieutenant that you
19 reported to?
20    A.  Three different ones.  Craig Williams,
21 Billy Luke, Tim Glasbar, and Paul Mullins.
22    Q.  That was Paul Mullins, the last person you
23 reported to before you became a lieutenant?
24    A.  Billy Luke.
25    Q.  Billy Luke.  Okay.  And what were the

JEFFREY MIDDLETON                    March 14, 2025                    22 to 25
83199

**Page 22**

1  circumstances of your becoming, moving from sergeant
2  to lieutenant?
3      A.  One of our lieutenants retired.  I'm
4  trying to think of his name.  But a lieutenant
5  retired and it opened up a lieutenant spot and I
6  interviewed for it and got it.
7      Q.  Okay.  And that was when you moved from
8  sergeant to lieutenant?
9      A.  Yes, sir.
10     Q.  All right.  So were you ever on the
11 narcotics unit?
12     A.  No, sir.
13     Q.  All right.  Were you ever on the SRT team?
14     A.  Yes, sir.
15     Q.  All right.  When did you join the SRT
16 team?
17     A.  Around about 2013, 2014.
18     Q.  All right.  And for the purposes of the
19 deposition would you explain what is the SRT team?
20     A.  The SRT is special response team.  And
21 their purpose is to if there's barricaded subjects,
22 high-risk warrants, which I can only recall one or
23 two times doing that, and assist other cities or
24 counties with, you know, whatever we'd get would be
25 abnormal scope of duties for regular patrolmen.

**Page 23**

1      Q.  Okay.  Would it be akin to a SWAT team?
2      A.  Yes, sir.
3      Q.  All right.  And how did you become a
4  member of the SRT team?
5      A.  Just by a memo, you know, giving my desire
6  to become a part of the team and then tryouts.
7      Q.  Okay.  And what did the tryout consist of?
8      A.  Just a lot of physical, running, pushups,
9  you know, the PTIS would be the easiest way to say,
10 shooting skills, and then there would be an
11 interview afterwards for, you know, just questioning
12 why you wanted to be a part of the team and things
13 such as that.
14     Q.  Okay.  So you were a sergeant or you were
15 at least a sergeant in 2017.  Would that be correct?
16     A.  That should be close.  Yes, sir.
17     Q.  Okay.  And you supervised Christian Dedmon
18 for the amount of time that he was a patrolman.
19 Would that also be correct?
20     A.  But not as a sergeant, but yes, sir.
21     Q.  When you supervised him you were a
22 lieutenant?
23     A.  I believe that's correct.  I think when he
24 first came I may have still been a sergeant and
25 then, you know, in that time --

**Page 24**

1      Q.  Right.  And then again, this, it's not a
2  trick question and, you know, I'm not expecting you
3  necessarily to be exact but he did fall under you
4  for some point in time, maybe a couple of years
5  before he moved to investigations.  Is that your
6  understanding?
7      A.  That's correct.  Yes, sir.
8      Q.  Okay.  Did you also supervise Hunter
9  Elward?
10     A.  Yes, sir.
11     Q.  All right.  And he was a patrolman -- was
12 he a patrolman in January of 2023?
13     A.  Yes, sir.
14     Q.  All right.  What about Mr. Opdyke?
15     A.  Yes, sir.  The same would apply to him.
16     Q.  All right.  And so Mr. Elward, Mr. Opdyke,
17 yourself.  And at that particular point in time, Mr.
18 Dedmon had moved to investigations where he worked
19 at that time under Brett McAlpin?
20     A.  In January 2023?  Yes, sir.
21     Q.  All right.  So to the best of your
22 recollection, can you name the eight or nine
23 deputies that you would have been supervising in
24 January of 2023?
25     A.  Daniel Opdyke, Hunter Elward, Jeremiah

**Page 25**

1  Jordan was the sergeant and oh, man, I'm not sure
2  exactly when -- but I mean, let me go and get the
3  others first.  Natsy Molingo (phonetic), Napoleon.
4  We called him Natsy but it's Napolean Molingo.
5      Q.  Okay.
6      A.  Zachary Cotton.  I think Zak was still on.
7  How many is that?
8      Q.  That's five.  Six including you.
9      A.  And I can't remember.  I'm sorry.
10     Q.  That's okay.  But there are two to three
11 other people?
12     A.  Yes, sir.
13     Q.  Okay.
14     A.  And Luke Stickman, I'm not sure when he
15 was in.  I think he was already gone at that time.
16     Q.  But he was a patrolman under you for --
17     A.  I think he had made sergeant and he was
18 not under me at that time.  I'm pretty sure.
19     Q.  He became a sergeant and worked -- was he
20 still working patrol or did he go onto
21 investigations?
22     A.  No.  He was still working patrol but he
23 was on another shift.
24     Q.  Okay.
25     A.  So I don't -- I don't think at this time

JEFFREY MIDDLETON                March 14, 2025                         26 to 29
83199

Page 26

1  he was on my shift.
2      Q.   So there still may have been two or three
3  other people you can't remember.
4           Did you have a relationship with Brett
5  McAlpin?
6  A.       Other than work?
7      Q.   Yes.
8      A.   Early on but it -- after, I'm not sure.
9  It just kind of petered out.  There was nothing --
10 if that makes sense, like early on a little bit,
11 occasionally.
12     Q.   You all socialized.  And when you say a
13 little bit, occasionally, you socialized outside of
14 work?
15     A.   Occasionally.  And -- and then it -- I
16 would say within, well, prior to January of '23, I
17 would back up three years and we didn't even
18 socialize outside of work.
19     Q.   And was there anything in particular that
20 brought that on?
21     A.   No, sir.  Just business of him, you know,
22 moving to his position and just me like, I don't
23 know, just like nothing in particular.  No.  I had
24 kids and was more about my family, I guess, just --
25     Q.   His position was chief investigator?

Page 27

1      A.   Right.
2      Q.   And he was busy, you were busy, so there
3  wasn't a lot of time for outside socializing?
4      A.   Right.  Yes, sir.
5      Q.   And what about Mr. Elward and Mr. Opdyke?
6  Did you socialize with either the two of them
7  outside of work?
8      A.   Opdyke, no.  Elward, occasionally.  And
9  Dedmon, very, very rarely.  Like I could probably
10 say two or three times maybe.
11     Q.   And when we use the term "socialize," what
12 kind of get-togethers would you all have?
13     A.   Just a, like one of the, like a kid's
14 birthday party.  And maybe like a crawfish boil but
15 that would be about it.
16     Q.   Okay.  Do you know what date you were
17 terminated from the Sheriff's Department?
18     A.   I can't remember those.
19     Q.   All right.  How did you learn that you
20 were terminated from the Sheriff's Department?
21     A.   My attorney.
22     Q.   And at that time who was your attorney?
23     A.   He was PBA appointed.  I can't remember
24 his name.
25     Q.   Would that be Mr. Tanner?

Page 28

1      A.   Carlos Tanner was my attorney throughout
2  the criminal case.  It was before Mr. Tanner was
3  retained by me.  The other one was, before Mr.
4  Tanner, he was retained by the PBA.
5      Q.   Okay.  What's the PBA?
6      A.   Police Benevolent Association.
7      Q.   Okay.  Do you remember when it was that
8  you found out?
9      A.   No, sir.
10     Q.   Okay.  After January 24th, did your duties
11 within the department change?
12     A.   After --
13     Q.   Like the --
14     A.   -- January 23, 2023?  January 24, 2023?
15     Q.   No.  The night -- the night of the
16 incident on Conerly Road.
17     A.   Yes, sir.
18     Q.   All right.  Did your -- did your duties
19 change after that night?
20     A.   No, sir.
21     Q.   Okay.  So you continued as a patrolman?
22     A.   Yes, sir.
23     Q.   You continued as a lieutenant?
24     A.   Yes, sir.
25     Q.   And you were working as a patrol

Page 29

1  lieutenant the day you found out that you were
2  terminated?
3      A.   Yes, sir.
4      Q.   So --
5      A.   And --
6      Q.   Go ahead.
7      A.   I'm trying to remember exactly the dates
8  but maybe a few days before that, maybe a week or
9  something before it, I think I did get put on
10 administrative leave with pay and they asked me to
11 turn my truck and equipment in.  So I'm not sure
12 exactly what the gap there was between when they
13 asked me to do that and when my attorney called me
14 and told me that they were terminating me.
15     Q.   It probably wasn't more than a week.
16 Would that be fair?
17     A.   I would just want to put it a little bit
18 bigger and say two weeks.
19     Q.   Okay.  But all the way up until two weeks
20 before you were terminated, you were working in your
21 usual duties and then you were put on administrative
22 leave?
23     A.   Yes, sir.
24     Q.   All right.  Now, before that two weeks did
25 you know that you or anybody else was under

**Page 30**

1 investigation based on this incident at Conerly
2 Road?
3    A.    Yes, sir.
4    Q.    Okay.  When did you find out you were
5 under investigation?
6    A.    I'm not 100 percent but maybe in April.
7    Q.    Okay.  About three months later?
8    A.    Maybe.  Yes, sir.
9    Q.    And up until then you had no idea that
10 anything was out of the ordinary?
11    A.    No, sir.
12    Q.    Had you been asked to give a statement to
13 the Mississippi Bureau of Investigatives about what
14 -- Mississippi Bureau of Investigations about what
15 occurred at Conerly Road?
16    A.    Yes, sir.
17    Q.    Prior to April?
18    A.    Yes, sir.
19    Q.    And what did you tell them?
20    A.    They -- that night just to -- you're
21 talking about just like summarize the --
22    Q.    Yes.
23    A.    Yes.  That I rode over there and just to
24 see what was going on in that area because the house
25 was close to Brett McAlpin's house.

**Page 31**

1    Q.    Okay.
2    A.    And I just found it odd that somebody was
3 supposedly selling drugs, like I would almost say
4 the neighborhood, but it's out in the country so
5 it's really not neighborhoods, but that close to our
6 chief investigator's house.  So I rode over just out
7 of curiosity.  And then myself and Brett McAlpin
8 were in the back of the room and because -- let me
9 back up just a touch.  Whenever I got there, Opdyke,
10 Elward, Dedmon, and Hartfield had already went to
11 the house and went inside the house.
12    Q.    This is what you told MBI or this is what
13 happened?
14    A.    This is what I told MBI.
15    Q.    Okay.
16    A.    And this is what happened.
17    Q.    Continue.
18    A.    And then I went into the house.  And then
19 they were -- one guy was handcuffed in the living
20 room.  I walked past him.  One guy was handcuffed in
21 the hallway.  I walked past him.  And myself and
22 Opdyke continued down the hallway to make sure
23 everybody was in the house.  And I was in the master
24 bedroom, the back bedroom coming out of the master
25 bathroom when McAlpin walked into the bedroom.  So

**Page 32**

1 we -- he walked out of the hall into the bedroom and
2 I walked out of the bathroom into the bedroom.  And
3 then we started discussing the murder that had
4 happened.  And lots, a good bit of time had lapsed
5 between us doing that but that's where myself and
6 McAlpin were at when we heard the gunshot.
7    Q.    Would that be the gunshot that Dedmon
8 fired or the gunshot of Elward shooting Jenkins in
9 the mouth?
10    A.    They were pretty close together I think.
11 I didn't get a distinct -- when I heard that I don't
12 recall getting that distinct two different shots.
13 It wasn't like a boom, boom or anything like that.
14 They were close together.  I would call like say,
15 oh, man, that was two distinct gunshots.  I remember
16 a gunshot and now you had asked me -- so now let me
17 back up.  What I told MBI was that myself and Brett
18 discussed the murder that had happened and that I
19 was leaving.  I was in my truck leaving when I heard
20 them call for medical so therefore, I returned.  I
21 never got out of the driveway I told them.  So I
22 pulled back forward and then to see, you know, why
23 they was calling for medical.  And that's when I was
24 made aware of the shooting.
25    Q.    Okay.

**Page 33**

1    A.    So that's what I told MBI.
2    Q.    All right.  Going back to that in a little
3 bit.
4          So just based on what we've been able to
5 put together, Christian Dedmon sent out a group text
6 and asked are you all available for a mission.  Do
7 you recall that?
8    A.    I was not added to that group until later.
9    Q.    How much later?
10    A.    I was -- had pulled up in my driveway at
11 my home.  I had always -- I had been told, you know,
12 by administration that -- let me back up a little
13 bit so I can explain this how it worked.
14          So I was told by administration to allow
15 my guys if they were not busy to help Dedmon with
16 that because -- with his narcotic duties because it
17 was just him.  And so it was very common knowledge
18 for all four shifts if he was doing some kind of
19 narcotics investigation that he could use deputies
20 off the shift that were working.
21    Q.    Okay.
22    A.    And so that night, Elward takes me and
23 said, hey, we're helping 12, which is Rankin 12,
24 that's Dedmon's number, call sign, with a mission at
25 135 Conerly Road.  And I'm not 100 percent if I did

**Page 34**

1   a thumbs up or okay but that was the gist of that
2   text. My family was not home. I usually had a
3   habit of going home, you know, seeing my kids to bed
4   and things such as that. My family wasn't at home.
5   They were at my in-laws. So I decided at that point
6   that I would leave and drive over there. And I was
7   going to stop by McAlpin's house and ask him, you
8   know, like, hey, what's going on with this house
9   that Dedmon and them are going to? But he was not
10  home. So I moved around and went by the address.
11       Q.   Okay.
12       A.   To see if they were there because at this
13  point the only thing I knew about it was what Elward
14  had sent me.
15       Q.   Okay.
16       A.   And --
17       Q.   Which was one text?
18       A.   Right. And then I went by the house and
19  nobody was there.
20       Q.   At 135 Conerly Road?
21       A.   Yes, sir. And then I got the message from
22  Dedmon saying, hey, LT, why don't you turn your shit
23  off and come over here? And I never questioned what
24  he meant by that and I still to this day don't know
25  what he meant by that. But my response to him was

**Page 35**

1   -- is I'm already in the area. And that's when I
2   was added to the message.
3        Q.   All right. So at the point in time where
4   you were then added to the message, what messages
5   transpired or what did you become privy to?
6        A.   Just the, hey, I'm on the way. Dedmon
7   saying, I'm on the way. And I don't remember
8   who responded. Whoever's waiting at this fire
9   department. And I don't remember who responded to
10  that and said that. And then they sent one that
11  said I'm almost there. And I can honestly say that
12  I was not reading these texts. I just -- now I'm
13  going off of what I've seen in the criminal case.
14  But my phone was in the truck while we was inside
15  the fire department. I went in there to use the
16  bathroom, whatever, and whatever. I come back out.
17  Dedmon had come by. So --
18       Q.   Come by the fire department?
19       A.   Right. So we ended up --
20       Q.   So then what happens?
21       A.   We left the fire department at that time.
22  But I later seen on my phone that he had said
23  something to me about some cameras and to work easy
24  or something.
25       Q.   Do you know what work easy meant?

**Page 36**

1        A.   I have no clue.
2        Q.   Okay. When he said turn your shit off and
3   come with us, what did you understand that to mean?
4        A.   The only thing that I could think of --
5   because when he said that, that's why I went him one
6   that said, well, I'm already I the area. The only
7   thing that I could think of that he would mean by
8   that would be my radio because I couldn't think of
9   anything else that he was saying turn off.
10       Q.   Why would you need to be radio silent for
11  this?
12       A.   I have no clue. I do not know why he
13  would do that. I cannot answer for him.
14       Q.   Okay. But certainly as the shift
15  lieutenant you couldn't think of a reason to be
16  radio silent?
17       A.   Absolutely not.
18       Q.   All right. But then, were you also
19  equipped with bodycam at the time?
20       A.   Yes, sir.
21       Q.   All right. At what point in time did you
22  turn your bodycam off?
23       A.   I never had it on.
24       Q.   You never had it on. Why not?
25       A.   Because at that point in time, anytime you

**Page 37**

1   do narcotics investigations, we did not wear body
2   cameras.
3        Q.   Okay.
4        A.   It was not --
5        Q.   These are for the entire investigation or
6   if you were working with a confidential informant?
7        A.   Both.
8        Q.   Explain.
9        A.   As anytime that we -- they work with
10  Dedmon on a narcotics investigation where there was
11  a -- would be a confidential informant or possibly
12  could be a possible confidential informant, they did
13  not wear body cameras.
14       Q.   So if they were working with Dedmon, and
15  I'm going to presume the same thing with the extent
16  to Mr. McAlpin. Yes?
17       A.   Like McAlpin did this time. But back with
18  McAlpin, we didn't have body cameras. My team
19  wasn't narcotics. But as the chief investigator, he
20  did not -- he just came to see me after the fact if
21  that makes sense, like --
22       Q.   No, no, no, no. So I think what you're
23  getting to is that McAlpin would not have had a
24  bodycam because he would come to the scene after the
25  detention had occurred.

Page 38

1    A.    Yes, sir.
2    Q.    Okay.  But my question is, if your patrol
3  deputies were told not to wear or not to turn their
4  bodycams on with Dedmon because of the potential
5  that they would run across or have contact with a
6  confidential informant that they were not to wear
7  their bodycams.  Is my understanding correct?
8    A.    Yes, sir.
9    Q.    All right.  So anytime Dedmon asked your
10  deputies to participate it was standard operating
11  procedure that they would turn their bodycams off?
12        MR. LELAND:  Object to form.
13  BY MR. WALKER:
14    Q.    Do you understand my question?
15    A.    I believe I do.  So you're asking that
16  anytime that any deputies work with Dedmon that they
17  were to turn their body cameras off or not even have
18  them on, period?
19    Q.    Correct.  That's my question.
20    A.    That was -- I just wanted to make sure I
21  understood it correct.  But that was my
22  understanding up until the day of this happening.
23    Q.    And your understanding is that was because
24  of the potential to interact with confidential
25  informants?

Page 39

1    A.    Yes, sir.
2    Q.    But the -- would you agree with me that
3  all drug interactions did not involve confidential
4  informants?
5    A.    The potential to me --
6    Q.    No.  Just --
7    A.    Okay.  Okay.
8    Q.    All the directions don't, you know --
9    A.    Yes, sir.  I would agree with you.  Not
10  all drug interactions have a confidential informant.
11    Q.    Yeah.  You know, you pull a vehicle over.
12  The vehicle smells like weed.
13    A.    Right.
14    Q.    You search somebody.  You either do or
15  don't find the marijuana.
16    A.    Right.
17    Q.    Or what have you.  That's not a
18  confidential informant situation.
19    A.    And to my knowledge they like -- they
20  would have their cameras on at that time.
21    Q.    Okay.
22    A.    And only after --
23    Q.    Right.  But and -- I'm sorry.  Finish what
24  you were about to say.
25    A.    A deputy stops a car, smells marijuana or

Page 40

1  whatever.
2    Q.    Mm-hmm.
3    A.    But then he's going to either just take
4  that person to jail after, you know, if he finds a
5  reason, or he may call Dedmon.  Like, hey, I've got
6  this person.  They say that they can buy some drugs.
7  Narcotics.  And --
8    Q.    So the patrolmen would --
9        MR. LELAND:  He wasn't done there.
10  BY MR. WALKER:
11    Q.    I'm sorry.  So finish.
12    A.    So then they were -- the deputies would
13  have to have their cameras on at that point.
14    Q.    Yes.
15    A.    Up until the point where they call Dedmon
16  and said, hey, this guy wants to buy some narcotics.
17  He wants to cut himself out.  So once that -- Dedmon
18  got involved so now we've got a CI.  Now they would
19  turn their bodycams off.
20    Q.    All right.  So if you had a situation
21  where you -- you know what a knock and talk is?
22    A.    Yes, sir.
23    Q.    All right.  So if you have a situation
24  where you have a knock and talk then are those body
25  cameras supposed to be on or off?

Page 41

1    A.    I'm not -- I cannot say that specific --
2  that specific situation on a knock and talk.  That
3  was -- I did not do the narcotics so I would -- I'm
4  not sure how to -- I can't give that answer.
5    Q.    Okay.  Do you know if Sheriff Bailey had
6  an expectation that you all would have had your body
7  cameras on?
8        MR. LELAND:  When?
9        THE WITNESS:  When they went to do the
10  knock and talk?
11  BY MR. WALKER:
12    Q.    Yes.
13    A.    I don't know if he would or not but it was
14  my understanding that they have done the same thing
15  before without body cameras.  And --
16    Q.    At what point in time?
17    A.    Just whenever they go help Dedmon with a
18  narcotics deal they had just told me that anytime
19  they would do anything narcotics -- I did not
20  witness this.  This is what I was just told; that
21  anytime they do the narcotics mission or whatever
22  you want to call it, investigation with Dedmon, they
23  were not to wear their body cameras.
24    Q.    So just to return briefly to the group
25  text, did you ever see the baby crying emoji or when

March 14, 2025

Page 42

1  there was talk about working easy?

2      A.   Before I got to the house? No, sir. That

3  was later in the investigation.

4      Q.   But you did see -- you did see that those

5  emojis were present?

6      A.   Before we went to the house --

7      Q.   No.  When you saw your phone.

8      A.   After everything had happened.  And after

9  -- I don't -- when I first recall seeing those baby

10  cries was on the criminal paperwork that they had

11  given me and they were showing me the text messages.

12  Like I said, that -- whenever he was sending all of

13  those messages or they was going back and forth, I

14  never recall reading those.

15      Q.   Okay.

16      A.   And then later on whenever I got to my

17  phone, I still don't recall just going back and

18  reading because now this is everything that has

19  transpired.  I don't recall going back and reading

20  each message.

21      Q.   So when Dedmon sends out a text and says

22  that they're going to "work easy," and Elward sends

23  a baby crying emoji, would that suggest to you that

24  Elward had previously been involved in violent

25  activity with Dedmon?

Page 43

1      A.   I would not know that or read into that.

2  No, sir.

3      Q.   Okay.

4      A.   I just -- the last message I remember

5  reading, and I will get to your question, too, is

6  whenever he said, "Hey, LT, why don't you come over

7  here with us?"  And I said, "I'm already in the

8  area."  And that's the last message that I remember

9  reading through that.  All right.  And then the

10  other stuff later that I seen with the crying emoji

11  and stuff like that, I do not know what he, Hunter

12  Elward or Opdyke meant by the emojis that they sent.

13      Q.   Had you ever heard the use of the term

14  "mission" before within your employment at the

15  Sheriff's Department?

16      A.   Possibly.  I could not recall an exact --

17  I got -- I don't think that I could accurately say

18  that no, I've never heard that because I'm sure it

19  happens but, you know, I couldn't say when or where

20  or anything.

21      Q.   How did you become familiar with that term

22  as it was used by Dedmon that day?

23      A.   How or when?  How, it was just by that

24  text that Hunter had sent me.  Not that -- because I

25  was not part of the text that Dedmon sent to me

Page 44

1  first.  Only that Hunter sent.  And I was only left

2  to assume that he was talking about an investigation

3  with Dedmon.

4      Q.   So you thought that a mission was an

5  investigation?

6      A.   Correct.

7      Q.   All right.  And you didn't think that

8  there was anything illegal about the mission that

9  they were going on?

10      A.   No, sir.

11      Q.   And what you're telling me is that your

12  understanding was that this was going to be a

13  standard drug investigation?

14      A.   Yes, sir.

15      Q.   And what did you understand that your role

16  was supposed to be?

17      A.   Like from Dedmon, Dedmon is the same rank

18  as me.  He's an investigator or a lieutenant.  The

19  Sheriff's Office looks to those as same rank.  So it

20  was not for me to come over and supervise or

21  anything such as that.  I guess he just wanted me to

22  come over.  I don't have a role because he would

23  know that I never, hardly ever went on any

24  investigation or mission with them -- with him.

25      Q.   Was there a reason you didn't?

Page 45

1      A.   I just -- he was -- I don't know, let me

2  see the words to explain it.  Like hyperactive.  I

3  don't know if that would be right.

4      Q.   Well, due to the language you mean by

5  hyperactive?

6      A.   Well, like one time that I did go with him

7  he was talking to this female and he was like

8  jumping up and down, like screaming at her.  And I

9  was just like shaking my head and like that's the

10  kind of thing.  And I could not tell you an exact or

11  what it was but I just heard other people say that

12  he just gets out of hand.  And that's what I mean

13  like -- that's what I assume like out of hand with

14  me because when I'm talking to myself, like hey, and

15  I seen him like, you know, that just didn't seem

16  professional to me.  So I just separated myself from

17  that.

18      Q.   And you assume that his getting out of

19  hand did not extend any further than yelling and

20  screaming at people?

21      A.   Right.  Yes, sir.

22      Q.   Which you found to be unnecessary?

23      A.   Right.  Yes, sir.

24      Q.   Who were the other people you heard that

25  from?

JEFFREY MIDDLETON                    March 14, 2025                    46 to 49
83199

**Page 46**

1    A.   I could not -- I don't know.

2    Q.   Had you ever heard from these other people
3  that Dedmon would be violent with people that he had
4  detained or arrested?

5    A.   I would say yes.

6    Q.   Had you heard from other people that
7  Dedmon would be violent with people he had detained
8  or arrested on multiple occasions?

9    A.   I would say yes.  I mean, I don't know,
10  more than one is multiple.  So yes.

11    Q.   Did you ever hear from anyone that Brett
12  McAlpin was violent with people that were arrested
13  or detained?

14    A.   No, sir.

15    Q.   You never heard that?

16    A.   No.

17    Q.   Did you ever hear of any issues with
18  Opdyke being violent with people that had been
19  arrested or detained?

20    A.   No.

21    Q.   Did you ever hear of any issues with
22  Elward being violent with people that had been
23  arrested or detained?

24    A.   No.

25    Q.   Did you ever hear of any issues with Luke

**Page 47**

1  Stickman being violent with people that had been
2  arrested or detained?

3    A.   No.

4    Q.   Were you familiar or did you at some point
5  become familiar with the publication regarding
6  WhatsApp that involved several deputies within the
7  department?  First of all, do you know what WhatsApp
8  is?

9    A.   Right.

10    Q.   Okay.  The messaging app?

11    A.   Right.

12    Q.   All right.  Had you ever heard of the
13  WhatsApp going on with the deputies between the
14  departments or within the department?

15    A.   There were several groups and like I think
16  that's what my shift was WhatsApp.  There's another
17  platform as well.  I can't remember exactly which
18  one.  But as far as anything other than that the SRT
19  team met up group and but other than that --

20    Q.   Okay.  Well, are you familiar with
21  WhatsApp messages talking about points for killing
22  people?

23    A.   No, sir.

24    Q.   Points awarded for killing people?

25    A.   No, sir.

**Page 48**

1    Q.   You never knew that there was a
2  publication that involved Stickman and some other
3  deputies?

4    A.   Absolutely not.  No, sir.

5    Q.   You never heard of that?

6    A.   No, sir.

7    Q.   This is your first time hearing about it
8  today?

9    A.   That's my first time hearing about this
10  today.  That somebody got points for killing
11  somebody?

12    Q.   Or they were joking about getting points
13  for killing people.

14    A.   Not that I -- no, I don't remember.  If
15  I've read it -- I do not  No, sir.  That's --
16  that's a firm -- I cannot recall that.  I mean,
17  again, if it's -- if it was there I don't remember
18  reading that.  I mean, in some of those group chats,
19  some of those guys, I'm an older guy so I'm a lot
20  slower, they, sometimes when I check my phone there
21  may be 20 or 30 messages from that group chat
22  because they go back and forth.  Like and each, it
23  might say, hey.  You know, it says, yo, what's up?
24  So that's two messages.  Right?  So there may be 20
25  or 30 messages.  So I just skip all of that stuff

**Page 49**

1  and get, you know, start at the bottom.  And I just
2  -- I do not ever recall reading nobody any kind of
3  points.  I do not recall that.

4       MR. WALKER:  Okay.  Let's take a break.
5  Just briefly.

6       We'll go off the record, Madam Court
7  Reporter.

8       THE REPORTER:  Thank you.

9       Okay.  We are off record.  The time is now
10  11:09 a.m.  Thank you.

11       (WHEREUPON, a recess was taken.)

12       THE VIDEOGRAPHER:  We are on the record.
13  The time is 11:19 a.m.

14       You may now proceed.

15  BY MR. WALKER:

16    Q.   Okay.  So Mr. Middleton, I believe that
17  before we got off you said that you knew that -- I
18  believe the words you used were that Mr. Dedmon had
19  a reputation for getting out of hand.  And for that
20  reason you limited your interaction with Mr. Dedmon
21  at least on a working level.

22       Would that be right?

23    A.   Yes, sir.

24    Q.   Yes?

25    A.   Yes.

JEFFREY MIDDLETON                March 14, 2025                          50 to 53
83199

**Page 50**

1    Q.    But that you had no idea that Brett
2  McAlpin had a reputation for any sort of violence.
3    A.    Not -- not that I -- no, sir.  That's been
4  so long ago that he was working narcotics that I
5  don't remember any reputation that he may have had.
6    Q.    And you -- he was a coworker of yours from
7  2010 up until --
8    A.    Until we were terminated.
9    Q.    Until you were terminated.  And all that
10 time you never heard anything about McAlpin being
11 violent?
12   A.    I can't say that I'd say no to that.  I
13 mean, I possibly could have heard that but I do not
14 recall like him having a reputation of being
15 violent.  You know, anywhere in that time from 2010
16 to 2023, I may have heard something, you know, but I
17 cannot give any specifics or who had said it or
18 anything like that.  I guess what I would say is I
19 don't want to say like no that never happened when
20 it possibly could have.  I mean --
21   Q.    So you might have heard of an incident
22 involving Mr. McAlpin?
23   A.    Possibly.
24      MR. LELAND:  Speculation.
25      THE WITNESS:  Yeah, I mean, it's possible.

**Page 51**

1  There's no way that I can say no or yes to that.  I
2  mean, that's --
3  BY MR. WALKER:
4    Q.    When you all were at your sentencing, and
5  this wasn't your attorney but there was an attorney
6  that referred to a culture of violence that existed
7  within the Rankin County Sheriff's Department.  And
8  Mr. Dedmon at his allocution of his sentencing made
9  statements that backed up, as did Mr. Elward.  Do
10 you believe that there's a culture of violence that
11 existed within the Sheriff's Department?
12      MR. LELAND:  Object to form.
13 BY MR. WALKER:
14   Q.    You can answer.
15   A.    Possibly.  I just -- I would say sure.
16 Yes.
17   Q.    Yes.  Okay.  Why do you say yes?
18   A.    Because, like I said, I just -- I don't
19 know if I would -- I would say that it's just a
20 culture of violence other than it's just the -- I
21 don't know why I would say yes.  I mean, I feel like
22 I'm -- I guess I'm just afraid that I would be lying
23 to you if I say no and then there's times from 2010
24 to 2023 that I may have heard some things, rumors,
25 and I can't give you specifics so I feel like I'm

**Page 52**

1  just -- I feel like I would be lying to you if I
2  said yes, I've heard this or no, I have not heard
3  this.  And I only what to go with what I've been
4  involved in and not off of hearsay or rumors.
5    Q.    Well, finish.
6    A.    I'm done.
7    Q.    Well, obviously, have you ever had a
8  deposition taken before today?
9    A.    Whenever I had that motor vehicle
10 accident.
11   Q.    Okay.  Well, obviously, when I ask a
12 question I just want the truth to the question that
13 I'm asking.  Okay?  So if I ask was there a culture
14 of violence and you say yes, I just want to know why
15 you say yes other than I don't want to lie to you.
16   A.    Okay  Well, I would not say there was a
17 culture of violence.  I would say that there has
18 been violence at times within the Rankin County
19 Sheriff's Department during their existence.  I'm
20 sure there has been violence before.
21   Q.    What have you witnessed?
22   A.    I've not witnessed any violence.  I mean,
23 just where somebody was being -- their rights just
24 being totally violated or anything such as that.  I
25 mean, I would say if I'm arresting this guy and he's

**Page 53**

1  fighting with me then that's violence.  That's
2  violence between him and me.
3    Q.    All right.  Well, let me --
4      MR. LELAND:  Hang on.  He's not quite done
5  yet.
6      THE WITNESS:  And, but as far as people
7  being abused, like I said, I could not say that it
8  has never happened.  And could I give you a specific
9  thing that I may or may not have seen.
10 BY MR. WALKER:
11   Q.    Okay.  Let me go back to my original
12 question because I don't want what you cannot attest
13 to but I do want what you can attest to.  And my
14 question as originally posed was that Christian
15 Dedmon affirmed that there was a culture of
16 violence.  I think his exact words were there was a
17 culture of doing things were his exact words.  And
18 that he did things to show off to those who came
19 before him and who would become his boss.  All
20 right?  Those are his exact words.
21   A.    Okay.
22   Q.    Hunter Elward, I don't have his exact
23 words but in order to have done the right thing he
24 would have had to have gone back seven years to when
25 he joined the department in order to do the right

Page 54

1  thing.  So each of them spoke to violation of
2  constitutional rights, abuse, and violence that has
3  been going on during the tenure at the department.
4      So my question to you is not whether you
5  had to become violent within the context of somebody
6  resisting arrest.  My question to you is, is there a
7  culture of violence and abuse within the department
8  of which you are aware?
9      MR. LELAND:  Object to form.
10     THE WITNESS:  No.
11 BY MR. WALKER:
12     Q.   When the call went out about the
13 availability for the mission, everybody knew what
14 that meant.  Right?
15     A.   I wasn't a part of that.
16     Q.   You weren't a part of that call?
17     A.   Not at that time.  No, sir.
18     Q.   Okay.  So were you a part of the group
19 text when the issue of no bad mugshots went out?
20     A.   Yes, sir.
21     Q.   All right.  Did you know what no bad
22 mugshots meant?
23     A.   I would only have left to assume what that
24 would mean.  We never discussed like, hey, this is
25 what bad mug shots means.  Just like anybody in this

Page 55

1  room would come up with the same conclusion that I
2  could.  Which would be that nobody -- no bruising on
3  the face or whatever.
4      Q.   Well, you have to be hit in the face in
5  order to be bruised in the face.  Right?
6      A.   Right.
7      Q.   Okay.  So that would be an instruction,
8  don't hit anybody in the face?
9      A.   I can only assume that just like anybody
10 else.  That's correct.
11     Q.   Would you also assume that it meant it's
12 okay to hit them anywhere just as long as it wasn't
13 the face?
14     A.   I would not assume that it's okay to hit
15 anybody anywhere.  The minimum amount to affect
16 arrest but to just make somebody a punching bag, I
17 would not say that that was allowed or okay.
18     Q.   But it was implied that there was going to
19 be violence when the text was sent, "No bad mug
20 shots."  Isn't that right?
21     A.   Again, I did not read that until after all
22 this.  But afterwards, coming on the backside and
23 seeing it for the first time in the criminal part, I
24 would think that.  By reading that I would think
25 that, too.  Like, hey, no bad mugshots.  That would

Page 56

1  mean do not beat up on these guys.
2      Q.   Or don't beat up in any visible way that
3  would be picked up when they took their mugshots.
4      A.   Or say don't beat up on them in any way
5  because when we carry them to jail they're going to
6  photograph any injuries that they have.
7      Q.   So they make them strip down before they
8  photograph any injuries?
9      A.   I've never worked in bookings so I don't
10 know the process.
11     Q.   Okay.  Well, why are you able to say that
12 they're going to photograph any injuries they have?
13     A.   Because whenever I come to prison they --
14 and you've got any injuries or anything and they
15 would photograph them if I had them.
16     Q.   And you said when you came to prison.  Do
17 you mean after you were arrested?
18     A.   Correct.
19     Q.   Okay.  But that's -- but you started out
20 at the jail.  That was your first job working as a
21 corrections officer at Rankin County Jail.  Right?
22     A.   Yes, sir.
23     Q.   Okay.  What was the process when somebody
24 came in?
25     A.   I did not work in booking.  I was in the

Page 57

1  back.  I was working in a tower and watching a pod
2  of inmates.  I've never worked in booking.
3      Q.   So you don't know if they made them strip
4  down and recorded any injuries to their bodies or
5  not?
6      A.   I do not.  I do know that they performed a
7  strip search which I was never any part of.  But
8  they, when you carry somebody to jail they're going
9  to take them, strip them out of their clothes, and
10 they ask them, do you have any injuries?  Now, and
11 I'm going to go back to Elward for a second.  Elward
12 was the person who invited you to come along and
13 your response was, "I'm already in the
14 neighborhood."
15     A.   No, sir.
16     Q.   Who invited you?
17     A.   Dedmon.
18     Q.   Dedmon said, "LT, why don't you go along?"
19     A.   Yes, sir.
20     Q.   And you're already in the neighborhood?
21     A.   That's correct.
22     Q.   Okay.  And you would agree with me that
23 Dedmon pretty clearly went there for illegal
24 activity.  In other words, to perform illegal
25 activity, not looking for it.

**Page 58**

1  A.  No, sir.  That would have been -- that
2  never crossed my mind that Dedmon was going there to
3  do the illegal activity.
4  Q.  Okay.  I'm not asking about your mind
5  right now.  I think it's been established that -- I
6  picked it up in Faux Christian Desmond to go handle
7  the situation at 135 Conerly Road.
8  Do you agree with me?
9  A.  Yes, sir.
10  Q.  All right.  And Dedmon then asked if
11  people were available for a mission.
12  Do you agree with me on that?
13  A.  That's right.
14  Q.  And then you got looped in.
15  A.  That's correct.
16  Q.  All right.  And then Dedmon was giving
17  instructions about avoiding cameras, no bad mug
18  shots, and working easy, to which your direct
19  report, Mr. Elward, responded with a crying baby.
20  Do you agree to all those things
21  happening?
22  A.  Okay.
23  Q.  So are you now telling me you're the only
24  person who didn't contemplate that there was going
25  to be some abuse and some violation of rights going

**Page 59**

1  on at 135 Conerly Road when you all got there?
2  A.  As I stated before, I did not read any of
3  that that you just said till after the fact, after
4  we had been charged with the criminal thing.  So I
5  cannot say that before we got to that entrance that
6  I thought that there was going to be some criminal
7  activity going on.
8  Q.  Okay.
9  A.  Or that there may be.  I was not aware to
10  say, like, hey, we're fixing to go do something
11  illegal where I could stop that or anything such as
12  that.
13  Q.  All right.  But my question was not
14  necessarily what you were thinking.  My question is
15  --
16  MR. LELAND:  Trent?
17  BY MR. WALKER:
18  Q.  -- if everybody else already knew what was
19  what.
20  A.  I can't say what they thought.
21  Q.  Okay.  So --
22  MR. LELAND:  Trent?  Trent?
23  MR. WALKER:  Yes?
24  MR. LELAND:  Hang on a minute  I've got to
25  get a charger cord.  My phone gave me a low battery

**Page 60**

1  alarm.
2  MR. WALKER:  All right.
3  MR. LELAND:  Give me about two minutes.
4  MR. WALKER:  So let's go off --
5  MR. LELAND:  About 60 seconds.
6  MR. WALKER:  All right.  We're off the
7  record till Don comes back.
8  THE VIDEOGRAPHER:  Please stand by.  The
9  time is 11:33 a.m. and we are off the record.
10  (WHEREUPON, a recess was taken.)
11  THE VIDEOGRAPHER:  We are on the record.
12  The time is 11:40 a.m.  You may now proceed.
13  THE REPORTER:  Let me play back your last
14  question as asked from Mr. Walker.  One moment,
15  please.
16  (WHEREUPON, the record was played back.)
17  THE REPORTER:  That was the recording,
18  sir.
19  THE WITNESS:  That was the recording.
20  THE REPORTER:  Would you like me to play
21  that back one more time?
22  MR. WALKER:  One more time.  Thank you.
23  THE REPORTER:  Yes, sir.  One moment.
24  (WHEREUPON, the record was played back.)
25  BY MR. WALKER:

**Page 61**

1  Q.  All right.  So I guess the train of
2  thought that I was on when we went off the record
3  was it seems apparent, at least to me from looking,
4  that they went there that night for the purpose of
5  violating constitutional rights of whoever was at
6  that house.  Do you agree with me on that?
7  MR. LELAND:  Object to form.
8  THE WITNESS:  That's not a question that I
9  can answer.  That's -- I'm not going to speculate
10  what they were thinking or saying by those messages.
11  Q.  Okay.
12  A.  I'm not -- I cannot answer that.
13  Q.  All right.  Tell me, and I know I asked
14  you earlier, what you told MBI.
15  A.  Okay.
16  Q.  All right.  Tell me from beginning to end
17  what you recall happening when you arrived.  You all
18  left the fire station and what happened?
19  A.  This is the -- what did happen, not what I
20  told MBI.
21  Q.  Okay.  What really happened?
22  A.  When we left the fire department, Dedmon
23  never stopped at the fire department.  He just went
24  by.  And Opdyke and Elward were already in their
25  vehicles and they took off behind me.  They turned

JEFFREY MIDDLETON
83199                              March 14, 2025                              62 to 65

**Page 62**

1  onto Conerly Road and they were moving much faster
2  than I was. So they got ahead of me. And I seen
3  them turning into a driveway. I'm looking up
4  Conerly Road and I seen them turn left into a
5  driveway. And I also seen vehicle headlights coming
6  from the other way.
7      Q.   Okay.
8      A.   And they turned across in front of that
9  vehicle. So I slowed and I was waiting for that
10 vehicle. I even flashed my headlights waiting for
11 that vehicle to come by and -- because I'm thinking
12 that they cut that vehicle off. Like so I'm waiting
13 for that vehicle to go by. But then they flashed
14 their headlights at me so I went ahead and turned
15 in. And when I turned in, I pulled up and parked.
16 And Opdyke, Elward and Dedmon, none of them were in
17 their vehicles. The vehicle that flashed its
18 headlights to me was coming in the driveway. And I
19 turned and seen and recognized that it was Brett
20 McAlpin. So I waited for him to pull up and I spoke
21 to him when he got out of the truck. And then I
22 turned and walked down to the house and entered into
23 the house. And there was nobody in that -- what
24 used to be a garage, it was turned into a bedroom.
25 Nobody in there so I continued into the house. The

**Page 63**

1  door was open. Back up. The door was open and --
2      Q.   The door to the garage/bedroom?
3      A.   Yes, sir.
4      Q.   Okay.
5      A.   And then I went -- you leave that and you
6  go up and you're directly into the kitchen. And
7  there was nobody in the kitchen. So I went to my
8  left and that's the living room. And that is where
9  Elward was with I think it was Mr. Jenkins, I think.
10 And Mr. Jenkins was handcuffed. I walked past them
11 and Dedmon was right there at the end of the hallway
12 or the beginning of the hallway with Mr. Parker. I
13 walked past them, and Opdyke was standing in the
14 hallway. And I asked him has he cleared the rest of
15 the house and he said no. So we went and we cleared
16 the rest of the house. And whenever I was coming
17 out of the master bathroom is when I encountered
18 Brett inside the house.
19     Q.   Okay.
20     A.   And we small talked for a few minutes and
21 then he started telling me about the murder that had
22 happened there. He told me about a shop or a shed
23 or something that had been burned there that they
24 had like an arson case or something. So we -- I
25 don't know how long we talked but we talked and at

**Page 64**

1  some point I had went back to my truck and got a
2  flashlight or my phone or something, I don't
3  remember exactly what I went and got but I went back
4  to my truck for something and come back and at one
5  point I had to pee so I went out the back door and
6  went to the corner of the house and used the
7  restroom and come back through the back door. And
8  when it was -- I don't remember exact but we was in
9  that back bedroom again after that stuff had
10 happened, me going outside to get this, me going
11 outside to pee, and then we was in that back bedroom
12 when we heard the gunshot. And McAlpin looked at me
13 and he said, "What was that?" And I said, "I don't
14 know." And so I turned and went up the hallway and
15 that's when I met Elward.
16     Q.   And what did Elward say?
17     A.   Elward said, "LT, I just fucked up." And
18 I said, "What did you do?" He said -- he said, "I
19 thought my gun wasn't loaded." I said, "What in the
20 hell did you do?" And he said, "I shot him." And I
21 said, "What?" I said, "Did you kill him?" He said,
22 "I don't know." So I said, "Man." And McAlpin was
23 standing there and everybody else was grouped up.
24 All the other ones had come in there, too. Opdyke,
25 Hartfield, Dedmon. And Brett's like, "Man." I just

**Page 65**

1  had already left and I was like I was leaving and I
2  told Dedmon, I was like, "Call for medical. Call
3  for medical." And he's like, "Okay." And I'm
4  walking, going in there to where Mr. Parker was and
5  I looked at Dedmon a third time. I said, "Call for
6  frigging medical." And he called for medical. And
7  Mr. Parker -- I mean, Mr. Jenkins was on his back
8  and making a gurgling noise with blood in his mouth.
9  And I moved him up to his side so he would not
10 aspirate or drown. And then I was trying to find
11 out, because Hunter never said where he had shot
12 him, and I was looking to see where he was. I don't
13 know where Hunter was at this time. I don't know
14 where anybody was at this time. Now I'm looking at
15 Mr. Jenkins to see where he was shot at and I could
16 see he was -- where I pulled him up on his side, his
17 knee was pulled up, his left knee was pulled up and
18 he was not completely face down but I could see
19 whenever I was standing behind him, I was looking
20 and I seen it looked like an exit wound right here.
21     Q.   In his jaw?
22     A.   Right. Correct.
23     Q.   Okay.
24     A.   And I went -- at that point Dedmon called
25 for medical somewhere in there after that third time

Page 66

1  I told him, and I went out to my truck and was
2  trying to find my medical kit that I have, like a
3  trauma kit, just a little basic gauze and scissors
4  and clot stuff or something when the first fireman,
5  volunteer fireman showed up.
6      Q.   Okay.  How long was it from the time you
7  arrived to the time that you heard this gunshot?
8      A.   No idea.  No idea.  It was a -- it was a
9  pretty good timeframe.  I mean --
10     Q.   By pretty good you mean like 10 minutes,
11 an hour, a half hour?
12     A.   I would think maybe anywhere from 30 to 45
13 minutes.  It could have been longer.  I don't -- I
14 don't remember.
15     Q.   So you all had been at the house 30 or 45
16 minutes to your best recollection?
17     A.   Possibly, to my best recollection.
18     Q.   And in that 30 to 45 minutes, did you
19 witness anybody beating Michael Jenkins or Eddie
20 Parker?
21     A.   No, sir.
22     Q.   You never saw anybody lay a hand on them?
23     A.   I see Elward get Jenkins up off the floor
24 and he roughly put him over to the couch.  He didn't
25 throw him.  He didn't -- I never seen him hit, do

Page 67

1  any of whatever but I say -- I'm not trying to
2  downplay it.  I'm trying to tell you exactly.  He
3  grabbed him and roughly put him up on the couch.  It
4  got him stood up and just shoved him back onto the
5  couch.
6      Q.   Okay.
7      A.   And that was just it.  But as far as
8  anybody else, no, sir.
9      Q.   Did you witness anybody use racially
10 charged language that called either Mr. Parker or
11 Mr. Jenkins the "N word"
12     A.   No, sir.
13     Q.   Or they were calling him monkey?
14     A.   No, sir.
15     Q.   Okay.  You're saying that didn't happen or
16 you just wasn't present when it happened?
17     A.   I wasn't present.
18     Q.   Okay.  Because you were in a different
19 room?
20     A.   Correct.
21     Q.   All right.  Did you witness Mr. Jenkins
22 and Mr. Parker being tased at any point?
23     A.   No.
24     Q.   All right.  You didn't because you were in
25 a different room or because it didn't happen?

Page 68

1      A.   Because I -- I cannot say.  I was in a
2  different room so I did not know if it happened or
3  not.
4      Q.   All right.  Well, it seems to me that that
5  would be an awful lot of commotion for you not to
6  notice.
7      A.   There's -- any time you do something like
8  that there's a lot of commotion anyway.  It's not a
9  calm procedure whenever you go into somebody's house
10 and do that.  People are like, I mean, the police
11 are being live.  The victims or suspects or whatever
12 at that time are being loud.  I mean, and --
13     Q.   I mean, but by your estimation they were
14 being loud for 30 or 45 minutes.
15     A.   No, sir.  They was not loud for like from
16 the time I walk in till the time this happened that
17 it was just screaming and chaos for 30-45 minutes.
18 No, sir.
19     Q.   Okay.
20     A.   There was --
21     Q.   You didn't see any tasing.  I'm sorry,
22 again, finish.
23     A.   The tasing -- I want to get to my part of
24 that.
25     Q.   Okay.

Page 69

1      A.   Because I want to say that I never seen
2  any of them tase anybody.
3      Q.   All right.
4      A.   But do you want me to go to that other
5  part now or is it something we'll get to later or --
6      Q.   Well, I want to make sure that you've
7  given a complete answer to your question.
8      A.   Okay.
9      Q.   I don't want to be cutting you off when
10 you have more to say.
11     A.   Okay.  Well, Elward had told me at some
12 point in there, he said, "Hey, LT, my Taser is
13 messed up."  And I said, "What's wrong with it?"
14 And he had no cartridge on it.  The cartridge is
15 what retains the darts.  And, but if you pull the
16 cartridge off, you can fire the Taser without it,
17 you know, obviously shooting in the dark is the hard
18 stuff.  And the arc goes from one little metal probe
19 to the other one, the electric arc.  And you can
20 pull the trigger and you can watch it go across.
21 But what happened to his is that it was running to
22 the side of the Taser or something.  It wasn't going
23 across.
24     Q.   Okay.
25     A.   It was running to the side.  And he showed

Page 70

1 me this. And I said, "Well, we'll just have to get
2 another one or something, get it fixed. I don't
3 know." And he said, "Because whenever I come in, it
4 wouldn't fire. When I first tried to use it, it
5 wouldn't work." And I was like, "Okay." And then
6 he said, "But then it worked." So I was willing
7 enough to assume that he possibly may have tased
8 somebody or either he just shot into another
9 direction. But I never witnessed nobody being
10 tased. I never -- that was the first I heard about
11 anything with a Taser. And later in the whole ideal
12 I was walking out and Dedmon said, "Hey, LT, which
13 one do you think would hurt worse, this Taser" --
14 because I didn't have a Taser -- "this Taser," and
15 he handed me his, "or Hartfield's?" So I pulled the
16 cartridge off of Dedmon's and pulled the trigger.
17 Now, Mr. Parker was sitting down as far as you are
18 from me now. And whenever I did that he was twisted
19 away from, like his feet was, like if I'm facing
20 him, like his feet would be this way but he was
21 sitting out. Do you understand what I mean?
22    Q.   Okay.
23    A.   And whenever Dedmon asked me that, I
24 noticed Parker turned toward me. He's still sitting
25 down and he turned toward me. And whenever I did

Page 71

1 that he was like putting his feet up, which did give
2 me an indication that he was -- something had gotten
3 him to do that. But I never touched him. And then
4 Hartfield in turn did the same thing by dry firing
5 his. And but he never -- I never seen him touch
6 nobody with it, Hartfield. But it was a thing where
7 it was -- what it was was comparing this old style
8 Taser to the new one. And I told Dedmon, handed him
9 his Taser back, I said, "Most definitely I would
10 think Hartfield's would hurt worse."
11    Q.   Well, do you -- when you say that when you
12 dry fired I guess it was Dedmon's Taser --
13    A.   Correct.
14    Q.   -- that then Mr. Parker raised his leg as
15 if to put himself in a defensive position?
16    A.   Correct.
17    Q.   All right. And to your mind that meant he
18 had been tased?
19    A.   At the -- at the moment it didn't maybe
20 register with me but after I thought about it later
21 I was like I bet -- I'm sure that's why he did that
22 was because he was thinking that I was fixing to
23 possibly tase him. But and that possibly that that
24 may have happened to him earlier in the night.
25    Q.   Okay. And, of course, when you first saw

Page 72

1 each of them they were already handcuffed?
2    A.   Correct.
3    Q.   And were you part of any search for drugs
4 in the house?
5    A.   No, sir.
6    Q.   You just cleared the house with Opdyke?
7    A.   Yes, sir.
8    Q.   All right. And then the remainder of your
9 time in the house was spent in the bedroom talking
10 to --
11    A.   McAlpin.
12    Q   -- McAlpin. So when the eggs were being
13 thrown at these two gentlemen where were in?
14    A.   In that back bedroom.
15    Q.   In the back bedroom.
16    A.   Or either maybe -- I don't know where I
17 was when that happened because I didn't even -- I
18 didn't know that happened. I could have been
19 outside using the restroom or into my truck. But I
20 was -- I did not -- I was not in that room.
21    Q.   Okay. So when the chocolate was squeezed
22 all over them, you never saw either of them with
23 chocolate all over them?
24    A.   No, sir.
25    Q.   Or milk?

Page 73

1    A.   No, sir.
2    Q.   Okay. You never saw them waterboarded
3 using liquor and water?
4    A.   No, sir.
5    Q.   You never saw warm grease being poured
6 over either of the two of them?
7    A.   No, sir. Whenever I walked back and
8 encountered all of them again -- when I say all of
9 them I'm referring to those, Opdyke, Hartfield,
10 Dedmon, and Elward. Because I would say 90 percent
11 of the time myself and McAlpin were in that back
12 bedroom or either had stepped outside. Hatfield was
13 standing in the hallway at the bathroom and I said,
14 "What are you all doing?" Because I didn't see any
15 of the victims/suspects. I didn't see any of them.
16 I said, "What are you all doing?" And Hartfield
17 said that they're taking a shower. And I said, "For
18 what?" And he said, "Well, actually, to be cleaned
19 up." And I said, "For what?" He said, "Oh, they
20 had some chocolate on them." I was like -- and that
21 was as far as that went. I just shook my head and
22 walked off. But to have seen them prior with
23 anything on, no, sir, I never seen them with
24 anything on them and that was my first.
25    Q.   Okay. Now, what I'm listening to you

Page 74

1 saying, you're the shift lieutenant. Something
2 clearly is awry here. Would you agree?
3    A.   Something could be awry.
4    Q.   And as the shift lieutenant you didn't see
5 any sort of responsibility to find out whether or
6 not that was true, that something was awry or that
7 your concerns were baseless?
8    A.   I guess, did I see any -- nothing stood
9 out. If they would have had me, oh, we just got
10 through pouring chocolate syrup all over them or we
11 just did this, he just said he had chocolate on him.
12 So I did not know.
13    Q.   At what point in time -- where were you
14 when the dildo was being used on them?
15    A.   I do not know where I was at. I was not
16 in the room.
17    Q.   You were not in the room?
18    A.   I don't know where I was at when they did
19 that because I don't know when they did that.
20    Q.   Mr. Middleton, would it be a fair
21 statement that there was a lot of torture and
22 violation of constitutional rights to put it lightly
23 and you made a conscious effort to be anywhere but
24 where that was happening?
25    A.   That would be a false statement. I did

Page 75

1 not put myself somewhere where I could not be a
2 witness to that. I did not know that was going on.
3 I was back there in the room discussing with McAlpin
4 about a murder that happened at that house. Nothing
5 further than that. I was not staying back there
6 with McAlpin so that they could do illegal things,
7 violating anybody's rights or anything such as that.
8    Q.   So were you present when the home
9 surveillance system was stolen?
10    A.   No, sir.
11    Q.   But that would be in keeping with making
12 sure that there were no cameras that could record
13 what went on that day?
14    A.   The reason that they did that?
15    Q.   Yeah.
16    A.   The reason that they stole that?
17    Q.   Yes.
18    A.   I would only assume that's the reason they
19 stole that.
20    Q.   Now, it was also stated that you and Mr.
21 McAlpin stole bar mats, military uniforms, and some
22 other items from the residence.
23    A.   The only thing, it was a bar mat. As far
24 as my knowledge, the military uniform never moved
25 from the closet. And as far as any other items, I

Page 76

1 wouldn't have a clue, but the only thing was, I
2 don't know who laid it there but it was on the hood
3 of my truck when I walked out to my truck.
4    Q.   What?
5    A.   The bar mat. And I grabbed it and took it
6 back into the house. And I never stole a bar mat.
7 I never took a bar mat out of the house nor any
8 other items. But the bar mat was on my truck
9 whenever I walked outside. I don't know who placed
10 it there but I carried it back in the house.
11    Q.   What did you see your role as being that
12 evening?
13    A.   Just to, like I said earlier, like I
14 wanted to go over there and see, you know, this
15 house where there supposedly selling narcotics
16 almost in the backyard of our chief investigator's
17 house.
18    Q.   Who told you they were selling narcotics
19 out of the house?
20    A.   That's what they said. They said we've
21 got narcotics -- our mission, that's what it was.
22    Q.   So Dedmon said that they were selling
23 narcotics out of the house?
24    A.   He said we've got this -- "Come over here.
25 Why don't you come over here, LT?" I said, "I'm

Page 77

1 already in the area." And whatever I seen, not back
2 at Edwards, at the fire department, that's when they
3 was telling me that they're supposed to be selling
4 dope out of there. And I want to say that I may
5 have text McAlpin in there somewhere. I don't
6 remember that if -- somewhere I had an indication
7 that that's what -- well, honestly, if the narcotics
8 investigator is over there going to a knock and
9 talk, that's what he's going to do because they're
10 selling narcotics.
11    Q.   Did you ask did they have a warrant to
12 search the house?
13    A.   No. No, sir.
14    Q.   Okay. And are warrants common if you're
15 going to do a knock and talk?
16    A.   No, sir.
17    Q.   So if you're doing the knock and talk you
18 wouldn't have a warrant?
19    A.   No, sir.
20    Q.   All right. Now, were they actually going
21 to do a knock and talk or were they going over there
22 for the purpose of doing what they eventually did or
23 what you all eventually did?
24    A.   I do not know because I told you when I
25 became aware of the deal. I did not know what their

Page 78

1  intentions were.
2      Q.  Earlier you said that Dedmon had a
3  reputation for getting out of hand.  And at the
4  point in time you heard that you're shift
5  lieutenant?
6          MR. LELAND:  Object to the form.
7          THE WITNESS:  At that time was I a
8  lieutenant?
9  BY MR. WALKER:
10     Q.  Yeah.
11 A.  I mean, I had heard it before I was, I mean, a
12 lieutenant.
13     Q.  Okay.  Did you hear it when he was working
14 under you?
15 A.  Possibly.  I can't recall the exact date or
16 time.
17     Q.  That he was getting out of hand?
18     A.  Not, I mean, like he was -- he was more --
19 I wouldn't say he was getting out of hand.  He was
20 more animated, just like I told him about standing
21 in front of that lady jumping up and down and
22 yelling.
23     Q.  Did you observe that when he was working
24 under you?
25     A.  No.  He was narcotics then.

Page 79

1      Q.  When you observed him yelling at the lady?
2
3      A.  Right.
4      Q.  All right.  Had you heard when he was
5  working under you that he could get out of hand?
6      A.  No, sir.
7      Q.  Okay.  But when he became narcotics he
8  gained the reputation for getting out of hand?
9      A.  Possibly.  That's when I started hearing
10 things.
11     Q.  That's when you started hearing things.
12 Did you ever discuss those things that you were
13 hearing with Sheriff Bailey?
14     A.  No, sir.
15     Q.  Did you ever discuss it with the
16 undersheriff?
17     A.  I don't think so.  I never really had any
18 discussion with the sheriff or undersheriff other
19 than they may text me and tell me they need me to
20 get some guys to go over here for people running
21 stop signs.  You know, just basically pass
22 information along, but.
23     Q.  Let me ask you, it seems like there's a
24 lot of leeway for this particular activity to take
25 place.  How did you all account for Taser use?

Page 80

1      A.  If you used your Taser, policy was that
2  you would take it to have it downloaded.  That you
3  had to do a use of force report.
4      Q.  Okay.  And you described earlier that you
5  were testing out Elward's Taser because he said it
6  didn't work, right?
7      A.  I never tested his Taser.  He was showing
8  me.
9      Q.  He was just showing you?
10     A.  Correct.
11     Q.  Okay.  So he had triggered off his Taser?
12     A.  Correct.
13     Q.  All right.  So is he supposed to file a
14 use of force report for that?
15     A.  No.
16     Q.  All right.  But if he uses his Taser on a
17 person then he's supposed to file a use of force
18 report and download the Taser?
19     A.  Correct.
20     Q.  But if he triggered his Taser not at a
21 person he didn't have to download that?
22     A.  Correct.
23     Q.  Well, doesn't that leave a lot of room for
24 a person to use their Taser on someone who has been
25 detained or arrested and say, well, I was just

Page 81

1  testing it?
2      A.  In training for the Taser to get a Taser
3  that is one thing at the beginning of your shirt
4  that they say is that you fire your Taser without a
5  cartridge at the beginning of a shirt to make sure
6  it's working properly.  And so that's just things
7  that anybody with a Taser would do is just to make
8  sure it's working properly throughout.  Or not
9  throughout but just periodically.
10     Q.  And your shift is 11 a.m. to 11 p.m.?
11     A.  Correct.
12     Q.  All right.
13     A.  And so as far as, I mean, I answered your
14 question.  I mean, I would guess that somebody could
15 fire their Taser without touching anybody or
16 shooting anybody with it or anything like that and
17 not have to file a report on that.
18     Q.  And conversely, they could actually shoot
19 someone and say I was just checking it to make sure
20 it worked and not file a report on that?
21     A.  We can speculate that kind of stuff all
22 day long.
23     Q.  Well, I'm asking isn't that quite possible
24 to do?
25     A.  As a hypothetical?  It's quite possible

JEFFREY MIDDLETON
83199
March 14, 2025
82 to 85

---

Page 82

1 that they could not have as well.

2 Q. Okay. So by saying it's possible they

3 could not have it's also possible they could?

4 A. I would say sure.

5 Q. Okay.

6 A. I mean, you've got -- yes, sir.

7 Q. And Elward came to you after 9 o'clock at

8 night say8ihng my Taser is not working correctly and

9 he was supposed to know that at 11:00 that morning.

10 A. And he was supposed to have known that?

11 Q. Because he was supposed to test it at the

12 beginning of his shift.

13 A. Correct.

14 Q. So a 11:00 that morning he should have

15 said, "LT, my Taser's not working correctly."

16 A. Unless it was working at 11:00 that

17 morning when he tested it. Because that's a tool

18 that he would need to do his job and would want

19 to come to me and make sure that he had proper

20 equipment.

21 Q. Okay. But then wouldn't it also

22 conversely mean that he had used his Taser that

23 night to be able to tell you that it wasn't working

24 correctly?

25 A. Correct. That's what I said. He said

---

Page 83

1 that he tried to use his Taser and it didn't work.

2 And then that's when he showed me that.

3 Q. Okay. So moving back, and you said you

4 don't remember hearing Dedmon fire his weapon at

5 all?

6 A. I said that I never remember hearing a

7 distinct oh, no, we used it on -- when Parker got

8 shot.

9 Q. Jenkins.

10 A. Jenkins, I'm sorry. Whenever Mr. Jenkins

11 was shot. Prior to that it's -- whenever Dedmon

12 shot that round, he wasn't even standing beside

13 Parker.

14 Q. You saw that?

15 A. I heard that.

16 Q. You heard it?

17 A. Right.

18 Q. Where were you when that occurred?

19 A. I was in the hallway.

20 Q. You were in the hallway?

21 A. And the same hallway that he was in. And

22 I was walking away and I was just about to turn into

23 that same bedroom. And whatever -- I heard it and

24 it scared -- scared me. And I turned around and I

25 was like, what the heck was that? And he was

---

Page 84

1 holstering his pistol.

2 Q. Okay. So you did hear him fire off a

3 round inside the house?

4 A. Right. At that time. Yes, sir.

5 Q. Okay. Because I thought I understood you

6 to say earlier that you did not hear that.

7 A. But the question I understood that you

8 were asking at that point was did I hear him fire a

9 round at the same time Hunter Elward fired a round

10 whenever Mr. Parker was shot.

11 Q. Mr. Jenkins.

12 A. Yeah. Again, Mr. Jenkins. Sorry.

13 Q. Okay. But now to be clear, within a few

14 minutes of you all entering the house you knew

15 Christian Dedmon had fired off a round?

16 A. Correct.

17 Q. Near Mr. Parker?

18 A. Correct.

19 Q. Did you know that was a crime?

20 A. Yes.

21 Q. As the lieutenant on scene, why didn't you

22 call a halt to this?

23 A. That's a very good question. And I don't

24 have a good answer to that at all as to why I did

25 not do that. I did not -- I didn't want to deal

---

Page 85

1 with Dedmon because like what we discussed earlier,

2 he was -- what was the word that I used? Like that

3 he was really animated so I did not hang around with

4 him. Him and Sheriff Bailey were good friends and

5 hung out together outside of work and just -- I knew

6 just to leave him alone.

7 Q. You know to leave Dedmon alone?

8 A. Correct.

9 Q. Because -- no, go on. Tell me why you

10 need to leave him along and what did it have to do

11 with Sheriff Bailey?

12 A. Because that they -- I did not know but I

13 assumed that I -- that I would just let Dedmon do

14 Dedmon, whatever his narcotics stuff. That's

15 another reason that I didn't hang around him. Just

16 let him do whatever he wanted to do, whatever he

17 did. And it seemed to me that with him being good

18 friends with the sheriff that I would not -- I would

19 just be totally like, hey, leave it. I don't know

20 this but I just kind of think like, hey, if these

21 two are good friends I'm not going to go try to get

22 him in trouble or anything. So therefore, that's

23 why I just stayed away.

24 Q. Did you feel like there were sufficient

25 concerns that the sheriff should have been made

---

JEFFREY MIDDLETON
83199

March 14, 2025

86 to 89

Page 86

1  aware with regard to Dedmon's behavior?
2      A.   I felt like -- I felt like the sheriff was
3  aware.
4      Q.   Why did you feel that way?
5      A.   Just because he -- the sheriff was aware
6  of everything that happened.  If somebody had a use
7  of force report or if anybody had a complaint of
8  being abused or anything like that he knew about
9  that.
10     Q.   Okay.  Give me an example of a complaint
11 of abuse that Sheriff Bailey was aware about.
12     A.   I don't know if he was aware but I was
13 only left to assume that he was aware of the other
14 case that Dedmon and Elward and Opdyke, and in fact,
15 there were two other deputies there, Sanford and
16 doggone, one more, on the side of the interstate
17 when Dedmon fired his round and --
18     Q.   Against Alan Schmidt.
19     A.   Okay.  And that whole incident, well,
20 there was a -- I heard that there was a recording
21 where that guy had called his mother or grandmother
22 or something from the jail phone saying what
23 happened.  And that Dedmon had the recording.  And I
24 don't know how that even works.  Like how do you get
25 the recording from the jail or anything like that.

Page 87

1  Maybe he can get it on his own but I was just only
2  left to assume that -- I guess assume.  I want to
3  make sure that that's said that the sheriff knew
4  about that.
5      Q.   Based on what you -- again, you just said
6  the sheriff knew about everything.  Did he have a
7  strong management style?
8           MR. LELAND:  Object to form.  You can
9  answer.
10          THE WITNESS:  Like if a pursuit happened.
11 BY MR WALKER:
12     Q.   Yes.
13     A.   And within just a few minutes the sheriff
14 was going to be on the radio, hey, what's going on?
15 Why are you all pursuing him?  Anything like that.
16 You know, he's going to be wanting to know, like
17 conditions, traffic, things like that.  And if he
18 thinks that we shouldn't be pursuing, he's going to
19 call it off immediately.  So if you say that's a
20 strong management system, that's just an example of
21 it, I would say yes.  Like if I have a juvenile
22 missing I would call the sheriff and let him know.
23 Like hey, we've got a juvenile missing in the woods.
24 I just want to let you know that we're fixing to try
25 to get the drones out and the dogs out.  He's like,

Page 88

1  yes, that's good.  He wants to know about all those
2  such things.
3      Q.   So would it be fair to say he was or is
4  very hands on as a sheriff?
5      A.   Yes.
6      Q.   And that he wanted to have a working
7  knowledge of all aspects of what was going on with
8  your patrol?
9      A.   To a certain -- if it involved, you know,
10 like just day to day things, like us just answering
11 calls and such things like that, no.  But if it
12 involved something more, like he would -- I don't
13 want to say more important things but like, like if
14 we was going to go do a search warrant or something
15 he would want to know about that.
16     Q.   Okay.  So if there was going to be a
17 search at 135 Conerly, he probably would have wanted
18 to know about that?
19     A.   And it was my knowledge that he did.  Like
20 it's because --
21     Q.   Ahead of time?
22     A.   -- because I had been told by Dedmon or
23 Brett or something probably, right, that anytime he
24 was going to do anything that he would send a --
25 Dedmon would send an email out to admin which would

Page 89

1  be the sheriff, the undersheriff, and maybe the
2  legal counsel.  But I don't know who all he sent it
3  to but he -- I had heard him said before or say
4  before that he, yeah, he let him know what he was
5  doing.
6      Q.   That Dedmon would or McAlpin would?
7      A.   Dedmon would.  McAlpin would have been a
8  part of that admin email or text.  Now, whether or
9  not he did that that night I do not know.
10     Q.   But that was your understanding that that
11 was what his modus operandi was?
12     A.   Right.  That anytime he's going to do any
13 kind of narcotics investigation that he let those
14 people know.
15     Q.   Unless, of course, it was going to be an
16 off-the-books event.
17     A.   I cannot answer that.
18     Q.   Part of what you pleaded guilty to was
19 that you had after the shooting offered to plant a
20 drop gun on or near Mr. Jenkins to justify Elward's
21 shooting of Mr. Jenkins.  Correct?
22     A.   The wording is wrong.
23     Q.   Okay.  How am I wrong?
24     A.   Because I didn't offer to plant it on him
25 or anything -- how the wording was exactly, Elward

Page 90

1 told me that he was going to say that this was
2 while, I think, I'm not sure, I'm not sure exactly
3 at what point this was but Hunter Elward had told me
4 that he was going to say that he was unhandcuffed
5 and reached for a gun. And during while he was left
6 in a room by himself or something with him while
7 Dedmon was getting a phone where he'd be able to
8 call to set up a deal. I was leaving and Brett was
9 still there. And so I -- Brett had already left.
10 And so I asked him, I said, "Do you have a gun that
11 you're going to put down there?" I said, "I've got
12 one." And he said, "I've got it taken care of." So
13 that was the wording that was used.
14    Q.    Okay. So you never retrieved your drop
15 gun?
16    A.    No.
17    Q.    All right. Which then brings us to the
18 question, why did you have one?
19    A.    I didn't have it. It was not a drop gun.
20 It was just an old gun that was not registered to
21 me. It was an old .38 revolver that I just had
22 that, I mean, I had -- I don't even remember -- I
23 had several guns in my truck. You know, like the
24 gun that I use when I'm on the SWAT team. And that
25 was just an old gun that was in my truck.

Page 91

1    Q.    So the gun you use when you're on the SWAT
2 team, that's the Sheriff Department's gun. Right?
3    A.    That's my gun.
4    Q.    That's your gun? The gun you use for the
5 SWAT team?
6    A.    Correct.
7    Q.    Okay. Is your personal --
8    A.    Correct.
9    Q.    -- firearm?
10    A.    Correct.
11    Q.    All right.
12    A.    The pistol. The pistol one. The rifle
13 was not.
14    Q.    Okay. So you had a pistol. Your service
15 pistol or an SRT pistol?
16    A.    I had a service pistol that the Rankin
17 County Sheriff's Department supplied me with that I
18 wore daily as a deputy working. Whenever we did
19 anything with SRT I had a pistol that I had
20 purchased that was not personal that I carried in my
21 holster. And then I had a rifle that was purchased
22 by Rankin County that was assigned to me in my
23 possession as well. Actually, I had two. I had a
24 sniper rifle and like an AR-15.
25    Q.    And both rifles belonged to the county?

Page 92

1    A.    Correct.
2    Q.    The pistol that you solely used for SRT
3 operations belonged to you?
4    A.    Correct.
5    Q.    And then additionally there was an old .38
6 that was not registered to you or anybody else you
7 knew.
8    A.    Correct.
9    Q.    And you kept that in your vehicle?
10    A.    Correct.
11    Q.    Okay. Were there any other guns that you
12 kept in your vehicle that were not registered to you
13 or anyone else?
14    A.    No.
15    Q.    Okay. So why did you keep that gun in
16 your vehicle, the .38?
17    A.    Back up. I did have a shotgun that was --
18 that was the Sheriff Department's that had orange
19 stocks that was --
20    Q.    Those were for what now?
21    A.    Less lethal. Like --
22    Q.    A shotgun that was for less lethal use?
23    A.    Right. So it had orange -- orange stocks
24 on it.
25    Q.    Okay. What, you shot like bean bags out

Page 93

1 of that?
2    A.    Correct.
3    Q.    All right. But specifically, the only
4 nonregistered gun that you had was the .38?
5    A.    Correct.
6    Q.    So why did you have that particular gun in
7 your -- your Rankin County Sheriff's Department
8 vehicle?
9    A.    I could not give you a good answer to
10 that. The pistol that I had that I used for SRT
11 that was my personal was actually not registered to
12 me. I bought it from somebody else. So I mean, the
13 way gun registry works in Mississippi is -- and I'm
14 not trying to say that you all know this. I'm just
15 -- but if I go to Bass Pro and buy a gun and bring
16 it to you, then that gun is going to be under my
17 name.
18    Q.    Mm-hmm.
19    A.    But if I go to just an individual that's
20 got a gun for sale and I buy it from him then that
21 gun is not going to be registered to me. It's going
22 to be registered to the original purchaser.
23    Q.    Yes.
24    A.    And so the pistol that I toted with SRT
25 was not registered to me.

JEFFREY MIDDLETON
83199
March 14, 2025
94 to 97

Page 94

1   Q.   Because you got it from this individual?

2   A.   Correct.

3   Q.   And the .38 belonged to some other

4   individual and it was not registered to you.

5   A.   Correct.

6   Q.   Neither was it reported stolen so far as

7   you know?

8   A.   Correct.

9   Q.   Okay.  But it was a gun that you just kept

10  --

11  A.   In my vehicle.

12  Q.   -- in your vehicle.  And it certainly was

13  in position to come in handy that particular night?

14  A.   I had -- at times I've had multiple guns

15  that I brought home from that I would shoot during

16  firearms training and stuff and maybe I just left

17  that gun in the vehicle.  But I can 100 percent tell

18  you that I did not take that gun and put it in my

19  truck and say this is going to be a drop gun.  But I

20  did know that it was in my vehicle that night.

21  Q.   Okay.  And you offered it to Dedmon if he

22  needed it and he said he had it taken care of?

23  A.   I said I have this if you need it.  And I

24  said I have a gun in my truck.  And he said, it's

25  taken care of.  I never said you can have it.  I

Page 95

1   just told him it was in my vehicle.  That was the

2   wording.  I said, I have a gun in my truck and he

3   said it's taken care of.

4   Q.   I want to back up just a second.  You said

5   that you knew that Dedmon and Sheriff Bailey were

6   friends.  And not to put words in your mouth but you

7   thought it might be futile to try to report anything

8   on Dedmon to Bailey because you thought Bailey

9   should already know.

10       Is that a fair statement that I just made?

11  A.   I'd say fair statement and just a small

12  part of fear of backlash to me.

13  Q.   From Sheriff Bailey?

14  A.   Correct.

15  Q.   That if you reported on Dedmon that the

16  backlash would fall on you?

17  A.   Correct.  But that was only my personal

18  thoughts and opinion, not that I have nothing that

19  I'd gotten from anybody else.

20  Q.   Well, you'd been working at the department

21  at that point in time 13 years.  What led you to

22  think that there would be backlash?

23  A.   Because of their relationship.

24  Q.   Had you observed their relationship?

25  A.   Like I'd see them on Facebook or something

Page 96

1   like that, or something like that, yes.  But no, not

2   personally because I was -- I did not hang around

3   the office.  I stayed -- it was not my job to hang

4   around the office so I stayed out in the county

5   riding around.  So I was not up there at the office

6   to see their relationship.

7   Q.   But do you think that it was well known

8   within the department based on your observation that

9   Mr. Dedmon and Sheriff Bailey had a close, personal

10  relationship?

11       MR. DARE:  Object to the form.

12       THE WITNESS:  Sure.  Yes.  I mean, just

13  based off of what I've seen on, like I say, Facebook

14  or hearing other people say it.  I mean, yes.

15  BY MR. WALKER:

16  Q.   What did you see on Facebook?

17  A.   They were out at a restaurant eating.

18  Dedmon was still with his wife at the time and

19  Sheriff Bailey, they took like a group picture or

20  something.  And I can't remember all the things that

21  I've seen but I mean, I just, you, like I said,

22  after all that time you hear people talk.  You see

23  little bits and pieces here so you put a puzzle

24  together.  And I cannot give you specifics.

25  Q.   But you felt enough that there would be

Page 97

1   backlash if you went to Sheriff Bailey and said,

2   hey, Dedmon's behavior is not something that should

3   be accepted in this department?

4   A.   Correct.

5   Q.   And you felt that Sheriff Bailey would get

6   angry and upset at you for telling him that?

7   A.   I think it's possible that -- not that he

8   would like -- this is just my opinion, like not that

9   he would get upset and do anything to me right then

10  but maybe, you know, that might would -- I would

11  have a mark on my back or something.  I don't know.

12  That was just my personal opinion.  Like when you

13  see somebody who's got a -- are here or have put all

14  these pieces together, they've got a close

15  relationship, I'm not going to go try to get that

16  person in trouble.

17  Q.   Had you ever witnessed any backlash by

18  Sheriff Bailey against any other member of the

19  department?

20  A.   No.

21  Q.   Was there any requirement for yearly

22  training for deputies to go through?

23  A.   Firearms.

24  Q.   Okay.  Was there a requirement for anybody

25  to go through any training other than firearms

Page 98

1  training?
2      A.   They -- no.
3      Q.   **Was there ever a requirement that you all**
4  **would undergo any training regarding police**
5  **brutality or avoiding the use of excessive force?**
6      A.   We did at some point during my time at the
7  Sheriff's Department, we did take a class one time a
8  Color of Law class.
9      Q.   **Do you know when that was?**
10     A.   I do not and I don't -- I don't know if
11 Dedmon or any of those were working there at that
12 time or not.
13     Q.   **So it could have been previous to 2017?**
14     A.   Right.  Yes, sir.
15     Q.   **And Hunter Elward became an employee**
16 **around 2017 also?**
17     A.   I cannot remember.
18     Q.   **Do you know when Opdyke became an**
19 **employee?**
20     A.   No, sir.
21     Q.   **Do you know if there was ever any emphasis**
22 **within the Rankin County Sheriff's Department**
23 **regarding the avoidance of police brutality or**
24 **excessive force?**
25     A.   Can you rephrase the question?

Page 99

1      Q.   **Did anybody ever talk to you all about how**
2  **to deescalate a situation so it didn't become a**
3  **situation where the use of force was required?**
4      A.   Training and stuff?  No, sir.
5      Q.   **No training on that.  Do you know if**
6  **anybody ever talked to you all or did you have any**
7  **classes where you talked about what would or would**
8  **not be a violation of civil rights?**
9      A.   Only that Color of Law class.
10     Q.   **The Color of Law class.**
11     A.   That I can recall.  That I can recall.
12     Q.   **And it was probably before 2017 do you**
13 **think?**
14     A.   We had some FBI courses, I forgot about
15 that, that we took online.  And I can't remember
16 what all they were but maybe one of them may have
17 fell into that category.  FBI Online Academy or
18 something like that.  And there were several classes
19 that were required for you to do.  And it was
20 basically watching a video and then answering some
21 questions afterwards.  And, but I cannot remember
22 what all they were.  One of them could have possibly
23 fell into that.
24     Q.   **Okay.  Where did the name Goon Squad come**
25 **from?**

Page 100

1      A.   This -- the only thing on that WhatsApp or
2  whatever the name of the group was on Chat, the
3  heading, you know, like a group, you've got to name
4  a group.  Name the group.  I guess you can just
5  leave it blank.  And I think you've got to put
6  something in there.  And at first I just added
7  Lieutenant Middleton's Shift.  And so I do not
8  remember where I first heard the word "goon" or
9  anything like that but I can honestly tell you,
10 which all of this is honesty anyway but I want to
11 emphasize that I guess from this that until this
12 happened I never knew what a goon was.  I never had
13 heard that.  I mean, the only thing that I related
14 it to was the Goonies, a movie about some kids.  And
15 I kind of interpreted it as a bunch of like goofy
16 people where, I don't know, I don't know how to
17 explain it  But, and I was trying to come up with
18 their name and I had asked in the message, like hey,
19 what's a good name for the shift?  We can call it
20 the shift.  And this, that, and the other.  And I
21 don't know if somebody suggested it to me or I had
22 done it myself.  I couldn't tell you exact.  And so
23 that's the reason I started that name, the shift
24 that worked for me that -- and again, me and two
25 others was only there that night, a part of that

Page 101

1  shift.  But all it was was a text message group or a
2  message group between me and the rest of the guys on
3  my shift to where I would say, hey, go to this.  You
4  know, like we're having trouble with speeders here.
5  Go here.  Things such as that.
6      Q.   **So you said the name was suggested to you**
7  **by somebody else on the shift?**
8      A.   I said I couldn't remember if it was
9  suggested or if I just thought of it or what.  But
10 --
11     Q.   **But you're the person who adopted it?**
12     A.   Right.  Sure.
13     Q.   **Okay.  Whose idea was it to have those**
14 **challenge coins mint?**
15     A.   Matt.
16     Q.   **Okay.  How many did you have made?**
17     A.   I cannot recall.  I don't remember.
18     Q.   **Do you know -- well, we know that**
19 **Christian Dedmon communicated with the other**
20 **deputies by a group chat.  Was it on you all's**
21 **nightshift chat, the Goon Squad chat?**
22     A.   No, sir.  He was not a part of my -- when
23 he worked on my shift he would have been a part of
24 that but when he left my shift he was not a part of
25 that chat anymore.  Anytime somebody new comes on

JEFFREY MIDDLETON
83199                              March 14, 2025                          102 to 105

Page 102

1  the shift, I would add them.  If they left, they
2  were taken off.
3       Q.   So was that name in existence at the time
4  that Christian Dedmon was on your shift?
5       A.   No.
6       Q.   When did that name come into existence?
7       A.   Maybe in '21 or '22.  Maybe.  I mean, I'm
8  not sure exactly when he did but it was -- it was
9  only a short time before this happened.
10      Q.   So when -- let me ask this before I get
11 into that.
12           You said earlier that if members of your
13 shift were available and Dedmon asked, they were
14 free to go help him with an investigation.  How many
15 investigators would have been on any given shift, if
16 you know?
17      A.   How many investigators would be on?
18      Q.   Well, as I understand it, the department
19 is divided into patrol and then investigations.  And
20 investigations is divided specifically into
21 narcotics versus other major investigations.
22      A.   CID and criminals?
23      Q.   Yes.
24      A.   And then there's juvenile investigations.
25      Q.   Okay.  So on any given shift, other than

Page 103

1  Dedmon, how many narcotics investigators would there
2  have been?
3       A.   As a general rule, the investigators
4  worked Monday through Friday, 8:00 to 5:00.
5       Q.   Okay.
6       A.   And so that's where things, you know,
7  obviously, some would be off.  And I don't remember
8  how many investigators we had.  Maybe 10.
9       Q.   Okay.
10      A.   But that would just be in their, you know,
11 unless they were on call.
12      Q.   So -- so would you have a shift of
13 narcotics investigators all on at the same time or
14 would they work 8:00 to 5:00 and go home?
15      A.   Yeah.  Narcotics generally worked just
16 kind of when they wanted to because most of the time
17 it would be late at night, early mornings, things
18 such as that.
19      Q.   So then it would be necessary for Dedmon
20 to utilize patrol people to help him carry out
21 investigations?
22      A.   Yes.
23      Q.   Did anybody tell you that the Goon Squad
24 challenge coin was a problem or that you shouldn't
25 have minted it?

Page 104

1       A.   No.
2       Q.   Did anybody ever tell you they thought
3  Sheriff Bailey would have a problem with it?
4       A.   No.
5       Q.   Did anybody ever tell you they thought
6  that the Goon Squad challenge coin was improper?
7       A.   No.
8       Q.   Did you give Sheriff Bailey a Goon Squad
9  coin?
10      A.   No.
11      Q.   You didn't have to go through him to
12 approve having the challenge coin made though, did
13 you?
14      A.   I did not.  I'm not sure if I had to or
15 not but I didn't.
16      Q.   Do you know if anybody actively tried to
17 keep the existence of the Goon Squad coin away from
18 Sheriff Bailey?
19      A.   No.
20      Q.   No, you don't know, or no, it did not?
21      A.   I do not know if anybody actively tried to
22 keep that away from the sheriff.
23      Q.   Okay.  But that coin was distributed to
24 people who were outside of the nightshift.  Right?
25      A.   It was the dayshift but yes, it was.

Page 105

1       Q.   I'm sorry.  The 11 a.m. to 11 p.m. shift.
2       A.   That's -- they call that our dayshift but
3  I mean, I see what you mean with that, but.
4       Q.   Okay.  But the coin was distributed to
5  people outside of your shift?
6       A.   Yes.
7       Q.   All right.  So you kind of had to assume,
8  especially given what you said earlier, that Sheriff
9  Bailey would find out about it because he knew about
10 everything.
11           MR. DARE:  Object to form.
12           THE WITNESS:  (Inaudible) I gave one to
13 several people like in the office up there so I
14 mean, I don't know.
15 BY MR. WALKER:
16      Q.   I may have asked this question earlier.
17 You said you gave it to several people in the
18 office.
19      A.   Yes.
20      Q.   Do you remember who in the office you gave
21 one to?
22      A.   I do.
23      Q.   Who?
24      A.   I gave one to Michael -- he was there --
25 he was over the court services.  He was a captain.