## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

**MICHAEL COREY JENKINS,**                                          **PLAINTIFFS**
**EDDIE TERRELL PARKER**

**v.**                                          **CAUSE NO. 3:23-cv-374-DPJ-ASH**

**RANKIN COUNTY, MISSISSIPPI, et al.**                          **DEFENDANTS**

---

### REPLY TO PLAINTIFFS' [146] MEMORANDUM RESPONSE TO
### [132] MOTION FOR SUMMARY JUDGMENT PREMISED ON QUALIFIED IMMUNITY

---

**NOW COMES** Defendant, Sheriff Bryan Bailey, in his individual capacity, by and through counsel, and in support of his Rule 56 Motion, states as follows:

I.      **CONCEDED AND/OR ABANDONED CLAIMS**

Following the conclusion of discovery on March 3, 2025 (01/31/2025 TEXT-ONLY ORDER), Sheriff Bailey moved for summary judgment pursuant to Rule 56 on any and all claims against him. [132] Motion / [133] Memo. Sheriff Bailey's [132] Motion was premised on qualified immunity, which "'alters the typical summary judgment burden of proof' because the plaintiff has the burden of rebutting it." *Lavergne v. Lavespere*, No. 24-30317, 2025 U.S. App. LEXIS 8609, at *9 (5th Cir. Apr. 11, 2025) (quoting *Luna v. Davis*, 59 F.4th 713, 715 (5th Cir. 2023) (per curiam)).[1] And it is a plaintiff's burden – not the defendant's – to cite the court to case(s) in support of its position in response to a Rule 56 QI motion.[2]

---

[1] "The defense has two prongs, both of which must be rebutted to overcome qualified immunity: whether an official's conduct violated a constitutional right of the plaintiff; and whether the right was clearly established at the time of the violation." *Id.* (quoting *Luna*, 59 F.4th at 715).

[2] *Fletcher v. Dechow*, Civil Action No. 4:23-cv-00183, 2025 U.S. Dist. LEXIS 61915, at *18-19 (S.D. Tex. Mar. 31, 2025) (citing *Vann v. City of Southaven*, 884 F.3d 307, 310 (5th Cir. 2018); *Cass v. City of Abilene*, 814 F.3d 721, 733 (5th Cir. 2016) (granting qualified immunity even though the defendant

It has long been held in this jurisdiction "that issues not sufficiently briefed are waived." *Nida v. Tactical Force, LLC*, No. 1:23-cv-365-TBM-RPM, 2025 U.S. Dist. LEXIS 60234, at *7 (S.D. Miss. Mar. 31, 2025) (citing *United States v. Martinez*, 263 F.3d 436, 438 (5th Cir. 2001)) ("Generally speaking, a defendant waives an issue if he fails to adequately brief it.").[3] Moreover, "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived and it is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put fresh on its bones." *Id.* at *7 (additional citations omitted). And "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Skinner v. Hinds County*, No. 3:10-cv-358-DPJ-FKB, 2011 U.S. Dist. LEXIS 112724, at *5 (S.D. Miss. Sep. 29, 2011) (quoting *Jackson v. Cal-W. Packaging Corp.*, 602 F.3d 374, 379-80 (5th Cir. 2010)). "To avoid waiver, a party must identify relevant legal standards and any relevant Fifth Circuit cases." *Nida*, 2025 U.S. Dist. LEXIS 60234, at *7 (quoting *JTB Tools & Oilfield Servs., L.L.C. v. United States*, 831 F.3d 597, 601 (5th Cir. 2016)).

In response to Sheriff Bailey's [132] Motion, Plaintiffs do not dispute that the former deputies were properly trained and concede dismissal of their failure to train claim. *See*

---

cited no cases in his favor to the district court because plaintiffs bear the burden of showing specific law on point).

[3] *See also Id.*, n.2 (citing *Nichols v. Enterasys Networks, Inc.*, 495 F.3d 185, 190 (5th Cir. 2007) ("Where analysis is so deficient, this court has considered the issue waived for inadequate briefing."); citing *McKethan v. Texas Farm Bureau*, 996 F.2d 734, 739 n.9 (5th Cir. 1993) (failure to sufficiently brief issue constitutes waiver of issue); citing *Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994) ("A party who inadequately briefs an issue is considered to have abandoned the claim."); citing *United States ex rel. Wuestenhoefer v. Jefferson*, 105 F. Supp. 3d 641, 672 (N.D. Miss. 2015) ("This failure to develop the relevant argument effectively represents a waiver of the point."); *and also Parks v. Yazoo County*, No. 3:19-CV-632-DPJ-FKB, 2020 U.S. Dist. LEXIS 240076, at *6 n.1 (S.D. Miss. Nov. 12, 2020).

[146] Response, pg. 27 n.6 ("Plaintiffs' claim with respect to defendant Bailey is not based upon inadequate or a failure to train the defendant deputies.").

Further, Plaintiffs make no argument and cite to no cases in support of any failure to discipline claim against Sheriff Bailey, other than in support of their ratification claim. They also fail to address any (1) Fourteenth Amendment claim, whether a due process claim or equal protection and/or (2) Fourth Amendment search and seizure claim, with the only argument in the [146] Response relating to Plaintiffs' Fourth Amendment excessive force claim and Sheriff Bailey's failure to supervise the former deputies at issue related to that claim. Plaintiffs have, thus, conceded, waived, and/or abandoned any and all failure to train claim, failure to discipline claim, Fourth Amendment search and seizure claim, and/or Fourteenth Amendment claim against Sheriff Bailey, and all such claims should be dismissed with prejudice. This would leave only a failure to supervise claim premised on alleged excessive force.

Finally, Plaintiffs inadequately brief any pattern or practice of prior unconstitutional activity element in support their failure to supervise claim, and accordingly, waived and abandoned such aspect of their claim. Plaintiffs only argument in support of a pattern of prior unconstitutional force comes on [146] Response, page 26, in which they allege:

> In addition to the Alan Schmidt incident and guilty pleas. Plaintiffs would like the court to acknowledge the affidavits of Jeremy Travis Paige, Mitchell Hobson, Maurice Porter and Frederick Trimble and J. Tyler Mote. Each one of these persons were victimized by Rankin County deputies, specifically Brett McAlpin and Christian Dedmon in the years preceding the fateful night of January 24, 2023.

*Id.* No exhibits were attached to Plaintiffs' [146] Response in compliance with L.U. Civ. R. 7(b)(2). There are 600-plus pages of documents included in docket entries [147] through [151], but none of these documents are labeled and/or identified with exhibit numbers.

3

There are no arguments in the [146] Response about facts in the referenced affidavits and no allegations as to how the facts are similar to those alleged in the instant litigation. More importantly, perhaps, there are no allegations or arguments that the facts contained in the affidavits were made available to Sheriff Bailey prior to the incident on January 24, 2023. Because Plaintiffs fail to make any substantive argument in support of a pattern or practice claim against Sheriff Bailey and fail to cite the Court to any caselaw in support of such claim, they have waived and/or abandoned this claim.

## II.    OBJECTIONABLE ATTACHMENTS AND/OR ALLEGED FACTS

Plaintiffs do not cite the Court to any exhibit supporting their "Statement of Relevant Facts" in their [146] Response, pgs. 4-7, and have not attached any proper summary judgment evidence in support of such facts. They reference responses to requests for admission by Defendant Middleton [148-2], but these do not bind a co-party such as Sheriff Bailey and are properly excluded under Fed. R. Evid. 802. *Becerra v. Asher*, 921 F. Supp. 1538, 1544 (S.D. Tex. 1996) (citing 8A C. Wright, A. Miller & R. Marcus, Federal Practice and Procedure § 2264 at 571-72 (1994) ("It is only when the admission is offered against the party who made it that it comes within the exception to the hearsay rule for admissions of a party opponent."); *Riberglass, Inc. v. Techni-Glass Industries, Inc.*, 811 F.2d 565, 580 (11th Cir. 1987) ("Nor do the admissions of a party bind a coparty."). The Bill of Information and/or General Allegations contained in [148-1] is likewise classic inadmissible hearsay and should not be considered by the Court as summary judgment evidence.

Further, Plaintiffs attach the plea hearing for the former deputies for the position that "Middleton's shift called themselves 'the Goon Squad.' Middleton's shift was willing to use excessive force and not to report it." [148-3], pg. 73. This was a statement made by Assistant

U.S. Attorney Erin Chalk and was not essential to any judgment of conviction entered against the former deputies. Thus, it is hearsay without an exception and should not be considered summary judgment evidence. *See* Fed. R. Evid. 803(22)(C). Plaintiffs likewise rely on statements made by Dedmon and/or Elward, or made on their behalf, during sentencing. *See* [149] and [149-1]. Similarly, these statements were not essential to any judgment of conviction entered against the former deputies and should not be considered summary judgment evidence on the basis of hearsay.

Finally, Plaintiffs argue that the policy changes made following the incident at issue show culpability of this Defendant and/or show that the changes should have been made sooner. Both arguments and any testimony regarding changes to policy are inadmissible as subsequent remedial measures. Fed. R. Evid. 407 provides as follows:

> When measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove:
>
> - negligence;
> - culpable conduct;
> - a defect in a product or its design; or
> - a need for a warning or instruction.
>
> But the court may admit this evidence for another purpose, such as impeachment or — if disputed — proving ownership, control, or the feasibility of precautionary measures.

*Id.*

Based on Rule 407, arguments and/or evidence concerning policy changes should not be considered by the Court in ruling on Defendant's [132] Motion. *See Salcido v. Harris County*, No. H-15-2155, 2018 U.S. Dist. LEXIS 169034, at *59 (S.D. Tex. Sep. 28, 2018) (citing *Mills v. Beech Aircraft Corp., Inc.*, 886 F.2d 758, 764 (5th Cir. 1989)).

III.    **FAILURE TO SUPERVISE CLAIM**

"[T]he mere failure to supervise … a subordinate is insufficient to establish § 1983 supervisory liability." *Cook v. Horsley*, No. 24-10626, 2025 U.S. App. LEXIS 8784, at *3 (5th Cir. Apr. 14, 2025) (citing *Goodman v. Harris County*, 571 F.3d 388, 396 (5th Cir. 2009)). This is because a supervisory official, including the final policy-maker such as Sheriff Bailey, cannot be liable under theories of respondeat superior and/or vicarious liability. Instead, a supervisor "may be held liable only if (1) he affirmatively participates in the acts that cause the constitutional deprivation, or (2) he implements unconstitutional policies that causally result in the constitutional injury." *Ladnier v. Nelson*, No. 1:22-cv-00167-RPM, 2024 U.S. Dist. LEXIS 93209, at *7 (S.D. Miss. May 24, 2024) (citing *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011)). Alternatively, "[a] supervisor may also be liable for failure to supervise … if: '(1) the supervisor … failed to supervise … the subordinate official; (2) a causal link exists between the failure to … supervise and the violation of the plaintiff's rights; **and** (3) the failure to … supervise amounts to deliberate indifference.'" *Ladnier*, 2024 U.S. Dist. LEXIS 93209, at *7-8 (quoting *Porter*, 659 F.3d at 446) (emphasis added).

A.    **No personal participation**

Plaintiffs argue that since Sheriff Bailey "was home in bed when the plaintiffs were tortured, Bailey dep at 114-15; and that the Captain of Patrol [*i.e.*, Chief Deputy Dwayne Thornton], who was the direct supervisor of the leader of the Goon Squad, defendant Middleton, was also home in bed, Thornton dep at 9, a reasonable jury could conclude that the defendant Bailey knew about the planned raid of plaintiffs residence, Middleton dep at 8." [146] Response, pg. pg. 18. This argument is illogical at best.

The incident at issue occurred at or after 11:00 PM on January 24, 2023, and the administration staff – including Sheriff Bailey and Chief Deputy Thorton – worked from around 8:00 AM to 5:00 PM. [132-2], pgs. 16-17. It would be normal for a person that worked an 8:00A to 5:00P shift to be in bed and/or asleep by 11:00P. Plaintiffs here also point to Jeffery Middleton's deposition that Sheriff Bailey was hands-on and, according to hearsay, Middleton heard that Dedmon and/or McAlpin were to email or text Sheriff Bailey about narcotics operations. [151-1], pgs. 88-89. But there are no emails or texts between Sheriff Bailey and either Christian Dedmon or Brett McAlpin sent prior to the incident at issue on January 24, 2023. And it is uncontested that Sheriff Bailey did not learn the truth about what happened during the night at issue until June of 2023. [132-1], pgs. 116-117.

"[T]he nonmoving party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Hathaway v. Bazany*, 507 F.3d 312, 319 (5th Cir. 2007) (internal quotation marks and citation omitted). Nor can the non-movant defeat summary judgment with "speculation, improbable inferences, or unsubstantiated assertions." *Cloud49, L.L.C. v. Rackspace Tech., Inc.*, No. 24-50385, 2025 U.S. App. LEXIS 5636, at *6 (5th Cir. Mar. 11, 2025) (quoting *Lawrence v. Fed. Home Loan Mortg. Corp.*, 808 F.3d 670, 673 (5th Cir. 2015)). There is no summary judgment evidence before the Court that Sheriff Bailey either participated in the events on January 24, 2023, or knew about any plans prior to the incident. Accordingly, he cannot be liable under a theory of personal participation.

B. **No facially unconstitutional policy or procedure**

A policy can be "facially unconstitutional if it 'affirmatively allows or compels unconstitutional conduct." *Verastique v. City of Dallas*, 106 F.4th 427, 435 (5th Cir. 2024)

(quoting *Edwards v. City of Balch Springs*, 70 F.4th 302, 309 (5th Cir. 2023)). The mere fact that a policy "commits some decisions to an individual officer's on-the-scene discretion, or gives some detailed instructions while omitting others," does not mean that it "affirmatively allows or compels" unconstitutional conduct. *Edwards*, 70 F.4th at 309.

Plaintiffs allege that provisions in the following policies are deficient:

i.    Body Worn Camera Policy

**Restrictions on Using the BWC**

BWCs shall be used only in conjunction with official law enforcement duties. The BWC shall not generally be used to record: …

2. Encounters with undercover officers or confidential informants.

[132-7], at 049.

**Supervisory Responsibilities**

2. At least on a monthly basis, supervisors will randomly review BWC recordings to ensure that the equipment is operating properly and that officers are using the devices appropriately and in accordance with policy and to identify any areas in which additional training or guidance is required.

*Id.* at RC 050.

The Rankin County Sheriff's Department ("RCSD") began using BWCs in or around October of 2021. When first put into place, the BWC policy was modeled after the then-existing model policy from the Texas Police Chiefs Association[4] and from the Internation Association of Chief of Police ("IACP"),[5] both of which are all-but identical to the RCSD policy. *See also* Police Executive Research Forum (PERF)[6] (Prohibited recordings should include the

---

[4] https://www.texaspolicechiefs.org/plugins/show_image.php?id=1297.
[5] https://www.theiacp.org/sites/default/files/all/b/BodyWornCamerasPolicy.pdf.
[6]https://www.policeforum.org/assets/docs/Free_Online_Documents/Technology/implementing%20a%20body-worn%20camera%20program.pdf.

following: Conversations with confidential informants and undercover officers (to protect

confidentiality and officer safety).

ii.    Use of Force Policy

**Reporting the Use of Force:** …
The agency's Chief Officer or his/her designee will review any report
generated by this policy in an effort to:
1. Protect the integrity of the facts and the evidence;
2. Ensure that the Officer's use of force complied with all appropriate state
   and federal laws and department policy;
3. Determine if the Officer's use of force indicates a need for special
   counseling, training, or disciplinary action; and
4. Determine whether the situation requires further action.

**Reporting Requirements:**
A *Use of Force Report* shall be completed and submitted, prior to the end of the
shift (except for deadly force situations), by any Officer(s) who:
1. Discharges a firearm or electronic weapon for other than training.
2. Takes an action that results in or is alleged to have resulted in bodily injury
   or death to another person;
3. Applies force through the use of lethal or less-than-lethal weapons; or
4. Applies weaponless physical force at a level as defined by the agency.
5. Charges an arrestee(s) with Resisting Arrest or any crime where physical
   force, beyond simply handcuffing, was required to effect the arrest.

[132-7] at RC 041-042.

iii.    TASER Policy

**Reporting Procedures:**

Deputies utilizing the Taser X26 device will prepare a Use of Force Report
describing the use of the Taser. This report will be completed and submitted
to the supervisor prior to the end of the shift. The Taser X26 discharge history
report, downloaded from the device after deployment, will then be attached to
the Use of Force Report.

*Id.* at 047. Examples of RCSD use of force reports can be found at [132-11] at RC 1826-27,

1831-32, 1834. Examples of TASER downloads associated with use of force reports can be

found at [132-11] at RC 1830, 1833, 1836.

9

iv.    Complaint Policy

**Proactive Prevention Measures:**
Each Department supervisor is responsible for managing corruption responsibilities that include:
1. Reviewing citizen and internal complaints for indicators of misuse of police powers for personal gain. ...
4. Investigating citizen complaints in which corruption is suspected. ...

**Response to Corruption Allegations:**
Whenever there is a suspicion that a complaint or an internal investigation will result in a charge of corruption, the following procedures will be followed:
1. The Sheriff notified immediately and will be responsible for notifying appropriate county officials.
2. Information will be released to the public as determined by the Sheriff. If a Complaint is prosecuted criminally, the Sheriff will authorize release of information appropriate to the public.

[132-7] at RC 023, 025.

Although Plaintiffs allege that these policies were deficient, they make no argument that they are facially unconstitutional. Thus, no liability can exist based on the implementation of these policies.

C.    **No failure to supervise**

"In virtually every instance where a person has had his or her constitutional rights violated by a [county] employee, a § 1983 plaintiff will be able to point to something the [county or sheriff] 'could have done' to prevent the unfortunate incident." *City of Canton v. Harris*, 489 U.S. 378, 392 (1989) (quoting *Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985) (opinion of Rehnquist, J.)). But allowing cases against counties and/or sheriffs to proceed on a failure to supervise claim[7] "under § 1983 on a lesser standard of fault would result in *de*

---

[7] Even though the *Canton* Court analyzed a failure to train claim, the same analysis is applicable here. *See Trammell v. Fruge*, 868 F.3d 332, 344 n.11 (5th Cir. 2017) ("[A] failure-to-supervise claim is evaluated in the same way as a failure-to-train claim.").

*facto respondeat superior* liability on municipalities – a result [ ] rejected in *Monell*....["8]

Federal courts would also be forced to "engage ... in an endless exercise of second-guessing municipal employee-[supervision] programs," which they are "ill suited to undertake, as well as one that would implicate serious questions of federalism." *Canton*, 489 U.S. at 392 (citing *Rizzo* v. *Goode*, 423 U.S. 362, 378-380 (1976)).

The foregoing policies show that deputies at the RCSD were not left wholly unsupervised. Through the use of colorful adjectives and colloquialisms, Plaintiffs and their expert, Thomas Tiderington,[9] argue that the foregoing policies were defective pursuant to national standards. But even if Tiderington's opinions of inadequate supervision are accepted by the Court, they do not create a triable issue of fact as to whether the supervisory policies and procedures at the RCSD fell below constitutional minimums.

Plaintiffs devote much of their [146] Response to Middleton calling his shift the Goon Squad, but Middleton testified that this was purely the name of a WhatsApp group chat and that "the only thing [he] related it to was the Goonies, a movie about some kids. And [he] kind of interpreted it as a bunch of like goofy people." [151-1], pg. 100. Middleton further testified:

> Q. Is it true or false that the members of the Sheriff's Department routinely faced no accountability for the use of excessive force or injuries to detainees or arrestees?
>
> A. I'm not aware of any excessive force other than what we know about here and have been reported. So that answer would be no because I don't of any -- like, hey, this guy had excessive force put on him and nothing was done about it. ...
>
> Q. Is it true that the Rankin County Sheriff's Department had a culture that rewarded aggressiveness and the willingness to do what was needed to be done to achieve whatever goals it perceived?

---

[8] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 693-94 (1978).
[9] Sheriff Bailey has separately moved to strike the Tiderington affidavit on the basis that no expert opinions were timely produced on or before the discovery deadline of March 3, 2025.

A.  No.

Q.  Were you led to believe that would be no adverse consequences regarding the use of excessive force for constitutional violations?

A.  No.

[151-2], pgs. 119, 122. It is uncontested that Sheriff Bailey did not know of the existence of the Good Squad until it was referenced in the aforementioned criminal proceedings, [132-1], pg. 100, which is the same position held by Chief Deputy Thornton ([132-2], pg. 46), Christian Dedmon (**Exhibit 1**, pgs. 36-37), and Terrell Parker ([132-4], pg. 65.). In fact, Steve Godfrey was the only deponent besides Middleton to know the Goon Squad existed prior to January 24, 2023, as he received a challenge coin three to four months prior. [151-3], pg. 74. And he was not aware of any nefarious meaning behind the name or any correlation between the name and the incident at issue. *Id.*, pgs. 74-80.

A.  **No deliberate indifference**

"To show deliberate indifference in [a failure to supervise case], Plaintiff must demonstrate either (1) a 'pattern of violations and that the inadequacy of the supervision is obvious and likely to result in a constitutional violation' or (2) that a 'supervisory official implements a policy so deficient that the policy itself is a repudiation of constitutional rights.'" *Ellis v. M.T.C.*, No. 5:23-cv-64-DCB-BWR, 2025 U.S. Dist. LEXIS 11137, at *7 (S.D. Miss. Jan. 22, 2025) (citations omitted).

i.    No Pattern

In order for an inadequacy of supervision to be obvious to the final policymaker, he / she must have actual or constructive knowledge of prior violations. *See* [133], pgs. 6-8. Plaintiffs allege actual knowledge through Middleton's following testimony:

A.  I don't know if he was aware but I was only left to assume that he was aware of the other case that Dedmon and Elward and Opdyke, and in fact, there were two other deputies there, Sanford and doggone, one more, on the side of the interstate when Dedmon fired his round and –

Q.  Against Alan Schmidt.

[151-1], pg. 86. But this speculation is not proper summary judgment evidence, especially being that Sheriff Bailey did not know about any claims alleged by Schmidt prior to January 24, 2023. [132-1], pgs. 258-59. Sheriff likewise did not have any reason to know of Schmidt's allegations since (1) Dedmon's incident report did not disclose any use of force, [132-15] at RC 1942, (2) Schmidt did not have any injuries, *Id.* at RC 1745, 1932, and (3) Schmidt did not tell anyone with Rankin County about his version of facts until February of 2023. [132-5], pgs. 35-37.

Further, Middleton "heard from other people" that Dedmon was violent with other people. [151-1], pg. 46. But Middleton only saw Dedmon become "animated" with a female on one prior occasion and offered no admissible, non-hearsay testimony about Dedmon being violent. [151-2], pg. 132.

Finally, Middleton testified that Dedmon "seemed" to be "good friends with the sheriff." [151-1], pg. 85. But this was based on one Facebook post showing Sheriff Bailey and Dedmon at a restaurant, *Id.*, pg. 96, and Middleton never spoke with Sheriff Bailey about Dedmon and/or his thoughts on Dedmon. [151-2], pg. 136. Based on the totality of the evidence, including the uncontested testimony of Sheriff Bailey, he had no actual knowledge of prior violations.

Constructive knowledge is also missing. Plaintiffs allege that "although not necessary to overcome [their] burden to deny qualified immunity to Sheriff Bailey," and "[i]n addition to the Alan Schmidt incident and guilty pleas," they "would like the court to acknowledge the

affidavits of Jeremy Travis Paige, Mitchell Hobson, Maurice Porter and Frederick Trimble and J. Tyler Mote."[10] [146], pgs. 24 & 26.

The Paige, Hobson, Porter, Trimble, and Mote incidents all occurred in 2018 and/or 2019, or prior to implementation of the BWC policy. Only Paige submitted a complaint related to his claims when he filed a PLRA suit on March 24, 2020. *See Paige v. Rankin County*, No. 3:20-cv-197-FKB (S.D. Miss.). In that litigation, Paige alleges that he was "punched in the face [and] knocked out" by McAlpin on August 1, 2018. *Id.* [1], pg. 5. After he was taken back to his house, he was then put "in a Pearl police car where I was beat on some more." *Id.* McAlpin admitted that he used force to take Paige to the pavement but swore that he never hit or kicked Paige. *Id.*, [44-2] 08/13/21 Affidavit. This litigation was dismissed without a finding of fault as to McAlpin and it was reasonable for Sheriff Bailey to rely on McAlpin's sworn statement of the events. Moreover, Plaintiffs do not dispute that McAlpin did not use any force – reasonable or otherwise – for at least two years prior to January 24, 2023 (*see* [132-14], at RC 2231) and was not alleged to have used any force during the incident at issue. Accordingly, the Paige incident is insufficient to put Sheriff Bailey and/or the RCSD of any excessive force by McAlpin.

The Hobson, Porter, Trimble, and Mote incidents are detailed in the deputies' reports attached as **Exhibit 2** and reflect either no use of force or reasonable force under Fourth Amendment standards. None of these individuals state in their affidavits that they attempted to contact Sheriff Bailey and/or anyone with the RCSD about their version of events. And all

---

[10] Docket entry [149-2] contains 105 pages of documents but only a handful of affidavits. The only affidavit not specifically mentioned by Plaintiffs was Lenora Yawn (pgs. 498-99), who recounts what she was told by her son, Tatum. Defendant will not address this as Plaintiffs did not do so in their [146] Response. Moreover, Lenora stating what her son told her is inadmissible hearsay.

of their affidavits were signed in February and March of 2025, and not provided to Defendant until March 3, 2025 – *i.e.*, over two years after the incident at issue. Sheriff Bailey could not have constructive knowledge of a pattern of violations based on these four affidavits since none of them were available to Defendant prior to January 24, 2023.

Finally, Plaintiffs do not submit any summary judgment evidence regarding the Schmidt incident that occurred in December of 2022.[11] It is clear that the reports submitted by Dedmon do not show any use of force and Schmidt failed to notify anyone with the RCSD about his allegations until after the incident at issue. [132-5]; [132-15]. For all the foregoing reasons, Plaintiffs fail to create a triable issue of fact on the issue of constructive notice and Sheriff Bailey is entitled to summary judgment.

ii.    No Deficient Policy

Many sheriff's departments and police departments, especially in Mississippi, are not able to afford the newest technology and/or software for BWCs and/or TASERs. This would include redaction software that blurs the face and/or distort the voice of an undercover officer and/or a confidential informant ("CI"). The RCSD BWC policy provision related to these individuals was designed to prevent recording of persons whose identity must remain confidential for their protection, so that such recording is not inadvertently produced to the public. And the policy provision is identical to the IACP model policy. *See* n.5 *supra.* The monthly supervisor review provision is also identical to the IACP model policy. *Id.* There are no Mississippi requirements for a BWC, so Tiderington opines that these policies fall below

---

[11] In [149] and [149-1], the U.S. Attorney's Office reads a victim impact statement from Schmidt into the record. This is hearsay within hearsay and should be excluded under either FRE 802 or 805.

national standards. But since the RCSD BWC policy mirrors the IACP model policy upon which Tiderington relies, Tiderington's reliability pursuant to FRE 702(d) is in question.[12]

The BWC policy was not designed with Dedmon in mind, but the exception did cover many of his actions as he was a narcotics investigator and oftentimes worked undercover and/or with a CI. [132-1], pg. 147. Middleton was clear in his deposition that deputies would turn off BWCs only when they had a suspect willing to become a CI. [151-1], pgs. 39-40. As drafted, this policy provision is not deficient.

It is difficult to check every hour of every BWC video. [132-1], pg. 155. But the random monthly monitoring of BWC recordings was believed proper, especially since this provision is identical to that of the IACP model policy. And the BWC policy, coupled with the use of force policy and TASER policy, were effective in identifying that another deputy's actions violated the policies and resulted in him being suspended for two weeks, removed from patrol shift to court services, and receiving supplemental color of law training. *See* [132-2], pgs. 40-41; [132-12] at RC 2812. Dedmon's TASER download associated with the incident at issue prompted him being placed on restricted desk duty following the incident. [132-1], pgs. 122, 124.

The complaints policy placed substantial responsibility on a supervisor's shoulders, requiring a supervisor to investigate his / her subordinates and notify Sheriff Bailey of their findings. [132-1], pg. 61. This procedure of having department heads or lower-level supervisors investigate their subordinates appeared effective, as issues ranging from failure

---

[12] Defendant did not have the opportunity to depose Tiderington on his opinions since they were not disclosed until April 14, 2025, when filed as [147].

to complete reports ([132-12], at RC 2770, 2807, 2813) to rude behavior (*Id.*, at RC 2772) were timely and appropriately addressed, with disciplinary action taken where needed.

In January of 2023, the State of Mississippi did not require the implementation of any particular policy for a sheriff's department other than initial training to obtain a certificate. A policymaker's decision on whether to use BWCs and/or TASERs and the specific language of policies governing the use of those devices, including review of use, involve substantial discretion. And there will be no § 1983 unless the implementation and/or maintenance of those policies fell below constitutional minima -- even if someone like Tiderington opines the policies fall below national standards. Because Plaintiffs fail to meet their burden of creating a triable issue on whether Sheriff Bailey acted with deliberate indifference, this Defendant is entitled to judgment as a matter of law.

   B. **No causal link**

"[R]igorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Bd. of the County Comm'rs v. Brown*, 520 U.S. 397, 405 (1997). To meet their burden under the causation element, Plaintiffs "must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Valle v. City of Houston*, 613 F.3d 536, 542 (5th Cir. 2010) (quoting *Brown*, 520 U.S. at 404). In other words, "the plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." *Id.* (quoting *Brown*, 520 U.S. at 411).

Plaintiffs' only argument regarding causation is that the issue is "undisputed." [146], pg. 16. Nothing could be further from the truth and Plaintiffs should be deemed to have abandoned this issue.

The policies themselves are innocuous as written and taken as a whole should have been sufficient to catch to catch any excessive force violations by deputies. The BWC policy was not operational in 2018 / 2019 when the Paige, Hobson, Porter, Trimble, and/or Mote incidents allegedly occurred. But Sheriff Bailey, even without knowledge of the allegations by those individuals, had BWCs purchased for the RCSD and implemented the BWC policy to increase transparency and to know what deputies were doing when he was not present. Incidents like those alleged by Schmidt and/or Plaintiffs would have been caught by the prior policies and the monthly audit of BWC videos. Even if a narcotics investigator was misusing the undercover agent / CI exception to the BWC camera policy, this violation would have been caught and rectified under the prior policies.

The mere fact that the existing policies did not uncover the Schmidt allegations prior to the incident with Plaintiffs does not create a causal link between Sheriff's decision to implement the policies and any deprivation of Plaintiffs' federal rights, especially since Schmidt did not disclose his allegations until after the incident with Plaintiffs. And Sheriff Bailey's decision to implement policies that far exceed State minimum standards for supervision does not show deliberate indifference to the risk that the use of excessive force would follow. Plaintiffs have wholly failed to show that the supervisory techniques employed at the RCSD were the moving force behind the excessive force used on January 24, 2023, and Sheriff Bailey is entitled to summary judgment as a result.

IV.    **RATIFICATION**

Elward was "placed on administrative leave due to his involvement in an officer involved shooting at 135 Connerly Road" on January 25, 2023. [132-8] at RC 084. Dedmon "was placed on desk duty," was ordered "not [to] engage in any investigator or law

18

enforcement actions," and was "removed from any investigator on-call duties" on January 27, 2023. *Id.* at RC 068. This status remained until June of 2023, when Sheriff Bailey was finally told the truth about what happened during the incident at issue and terminated all the former deputies. [132-1], pgs. 11-13. Plaintiffs allege that this termination came after their [1] Complaint was filed on June 12, 2023, but summons was not issued until July 18, 2023 (*see* [3], pgs. 2 & 4), and Sheriff did not receive notice of the lawsuit until after terminating the former deputies. At no point between the incident on January 24, 2023, and the terminations in June of 2023, did Sheriff defend the former deputies.

To this end, Sheriff was adamant that had he known the truth on January 24, 2023, he would have arrested the former deputies that night. *See*

> A. So if you're asking me if I knew the truth about what happened now, I would have arrested them myself that night if I would have known the truth. That evening, I would have called the FBI and arrested them myself that night if I had known the truth that night. There wouldn't have been no suspension or anything. They would have been in the jail.

[131-1], pg. 127. But Sheriff Bailey did not know the truth initially because the former deputies lied about their involvement. *Id.*, pg. 131. McAlpin and Middleton stated that they were not present during the incident, *Id.*, and Plaintiff Terrell Parker corroborated the former deputies' stories. [132-4], pg. 59. Because the former deputies and one of the suspects lied about what happened on January 24, 2023, it was impossible for Sheriff Bailey to know that an unconstitutional action occurred. This lack of knowledge would preclude a ratification theory. *Carr v. City of Spring Valley Vill.*, No. 19-20373, 2022 U.S. App. LEXIS 13307, at *18 (5th Cir. May 17, 2022). This lack of knowledge would also negate any argument that stricter discipline should have occurred earlier.

Plaintiffs argue that Dedmon was a member of the Goon Squad – despite him not knowing of its existence (**Exhibit 1**, pgs. 36-37) – and that Sheriff Bailey failed to determine who had Goon Squad coins and/or which deputies were Goon Squad members after the guilty pleas by the former deputies. [146], pg. 23. But who had Goon Squad coins was irrelevant, as the department knew who was on Middleton's shift. Instead, the RCSD investigated whether there was any "off-the-books excessive force," regardless of whether the deputy was on Middleton's shift. [132-2], pg. 69. The department downloaded all TASERs and to determine if there were "unreported activations." *Id.* The Sheriff also created the position of compliance director, who is charged with review of all BWC videos, TASER downloads, and complaints submitted via an online portal. [132-1], pgs. 49, 60-61.

In all, Plaintiffs have not met their burden to defeat Sheriff's [132] Motion on a ratification theory and this Defendant is entitled to judgment in his favor.

V.    **CONCLUSION**

Whether under a failure to supervise or ratification theory of liability, Plaintiffs have failed to meet their burden to overcome summary judgment and Sheriff Bailey is entitled to dismissal with prejudice as to any and all claims against him.

**RESPECTFULLY SUBMITTED,** this 28th day of April, 2025.

                              SHERIFF BRYAN BAILEY, IN HIS INDIVIDUAL
                              CAPACITY - DEFENDANT

                    BY:    _/s/ Jason E. Dare_____
                              JASON E. DARE

**OF COUNSEL:**

Jason E. Dare (MSB No. 100973)
jdare@bislawyers.com
Biggs, Ingram & Solop, PLLC
Post Office Box 14028
Jackson, Mississippi  39236-4028
Telephone:    (601) 987-5307
Facsimile:     (601) 987-5307